03cv17000zac-ord(SanctionsRuling).wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: WELDING FUME PRODUCTS    :
  LIABILITY LITIGATION     :    **Case No. 1:03-CV-17000**
          :    **(MDL Docket No. 1535)**
          :
          :    **JUDGE O'MALLEY**
          :
          :    **ORDER**
          :

Various defendants filed a motion asking the Court to impose upon certain plaintiffs and their counsel sanctions and other remedial relief (docket no. 1517). On February 13-15, 2006, the Court held an extensive hearing on this motion, as well as other, related motions. Toward the end of the hearing, the Court ruled on the sanctions motion from the bench, and promised a written ruling confirming and explaining further its decision.

This is that written ruling, confirming that the motion for sanctions is **DENIED**.

## I. Background.

As discussed in some detail in an Order recently issued by this Court in one of the constituent cases of this Multi-District Litigation, the Court and the parties earlier "agreed that an appropriate mechanism to assess the strengths and weaknesses of the parties' different positions would be for this Court to preside over a number of 'bellwether trials' (sometimes also referred to as 'MDL trials')." *See* Order at 2, *Solis v. Lincoln Elec. Co.*, case no. 04-CV-17363 (Feb. 1, 2006) (docket no. 14). In the last few months, the plaintiffs in both the second and third bellwether cases, Dewey Morgan and Scott Landry, filed motions

to voluntarily dismiss.[1]  It is these dismissals that provoked defendants to move for sanctions.  In particular, defendants assert that "the decisions of plaintiffs' counsel to proceed with the *Morgan* and *Landry* cases despite early and obvious warning signs about the veracity of those plaintiffs' claims forced both the Court and the defendants to waste substantial time and money preparing frivolous or fraudulent cases for trial."  Motion at 1.

The circumstances surrounding the plaintiffs' two dismissals are as follows.  In April of 2005, counsel for plaintiffs chose the *Landry* case for the third MDL trial.  On November 8, 2005, counsel for Landry announced their decision not to pursue his case after all.  This announcement, although it came seven months after *Landry* had been picked for the third bellwether trial, was still well in advance of the June 1, 2006 trial date and before the parties had engaged in extensive discovery.[2]  Nonetheless, defendants did incur some costs defending against Landry's claims and preparing for trial.  The reason that Landry gave for his decision not to proceed to trial was that his employer made clear its displeasure in having to comply with discovery requests and allowing him time off from work.  In their motion for sanctions, however, defendants question this explanation, suggesting it is really an excuse to avoid a sure loss at trial and exposure of Landry's claims as frivolous.  Defendants assert: (1) there is no evidence supporting Landry's stated reason for dismissing his case; (2) Landry had a history of alcohol and drug use, which could have caused his alleged neurological symptoms; and (3) other facts are consistent with Landry not having any neurological injury caused by welding, such as his: (a) having been diagnosed at a medical screening sponsored by plaintiffs' counsel, and not a treating doctor; and (b) not having sought

---

[1] *See Morgan v. Lincoln Elec. Co.*, case no. 04-CV-17251 (docket no. 84); *Landry v. Nichols Wire, Inc.*, case no. 03-CV-17016 (docket no. 15).

[2] The third bellwether trial will still take place beginning on June 1, 2006, but Landry's case has been replaced with *Solis v. Lincoln Elec. Co.*, case no. 04-CV-17363.

medical treatment since this initial diagnosis.  Defendants conclude that Landry's counsel "failed to conduct adequate, independent, pre-filing investigation of [Landry's] claims" before choosing his case as the third bellwether trial, and it is plaintiffs' counsel who should bear the expense of this failure.  Motion at 5.

Turning to the *Morgan* case, counsel for Morgan announced their decision not to pursue his case in early December of 2005; this was only several weeks before the February 6, 2006 trial date.  By that time, both sides had spent considerable time and money preparing for trial.  Furthermore, counsel's decision not to pursue the Morgan case was precipitated by a bombshell – during his deposition, Morgan was shown a surveillance videotape of himself engaging in various household tasks, such as carrying groceries, raking leaves, and climbing onto and driving a tractor, all of which he had earlier testified under oath he was unable to do because of his neurological injuries.  The videotape provided graphic proof that statements Morgan had made to his attorneys, his doctors, the experts in this case, and the rehabilitation counselor who had developed a life care plan for him, included substantial embellishment of his symptoms and misrepresentations regarding the limitations caused by those symptoms.  Obviously, these misrepresentations had served as the partial basis for – and, thus, tended to undercut – the diagnoses of Morgan's doctors and experts that he suffered from manganese induced parkinsonism ("MIP").  Defendants repeat their theme that plaintiffs' counsel failed to conduct an adequate, independent, pre-filing investigation of Morgan's claims before choosing his case as the second bellwether trial, and plaintiffs should reimburse defendants for the expenses of preparing for Morgan's trial.

## II.     Analysis.

### A.     Rule 11.

Defendants first purport to seek sanctions against certain plaintiffs' counsel pursuant to Rule 11 of the Federal Rules of Civil Procedure.  Rule 11 requires an attorney to investigate the factual basis for any claims asserted in a complaint or other document filed with the Court.  Specifically, Rule 11(b)(3) states:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –
> * * *
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(3).  As suggested by the "later advocating" language quoted above, an attorney's obligation to investigate the factual basis for his client's claims does not end with the filing of a complaint; "litigants may [also] be sanctioned under the amended rule for continuing to insist upon a position that is no longer tenable." *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997), *cert. denied*, 522 U.S. 1046 (1998); *see also Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 336 (6th Cir. 1988) ("an attorney and the litigant have a continuing obligation to review and reevaluate their pleadings, motions and other papers and upon discovery that such papers were without merit, to immediately dismiss the action at the risk of inviting the imposition of Rule 11 sanctions").

Importantly, however, Rule 11 contains a mandatory "safe harbor" provision, requiring a party moving for sanctions to give the opposing party an opportunity to correct any failure to meet the obligations described above.  Specifically, the Rule states that a motion for sanctions "shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service

4

of the motion * * *, the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(1)(A).  If a movant does not give the opposing party this 21-day notice, the Court cannot award sanctions.  *See Ridder*, 109 F.3d at 297 ("we hold that sanctions under Rule 11 are unavailable unless the motion for sanctions is served on the opposing party for the full twenty-one day 'safe harbor' period before it is filed with or presented to the court"); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511(6ᵗʰ Cir. 2002) (same).

In this case, there is no question but that defendants failed to provide the mandatory 21-day safe harbor period.  Defendants filed their motion on December 6, 2005, and they do not assert they served the motion on plaintiffs' counsel at any time before actually filing it.  In fact, according to unrebutted argument presented during the Court's hearings on the sanctions motion, defendants sent copies of the motion to the press at about the same time they filed it, so that reporters received the motion before some of plaintiffs' attorneys had seen it.[3]  Given defendants' clear failure to even attempt to allow plaintiffs the benefit of the safe harbor prerequisite, the Court easily concludes that sanctions are unavailable under Rule 11.

### B. Section 1927.

In addition to Rule 11, defendants also cite 28 U.S.C. §1927 as a basis upon which this Court can impose sanctions upon plaintiffs' counsel.  "Unlike Rule 11 sanctions, a motion for excess costs and attorney fees under §1927 is not predicated upon a 'safe harbor' period."  *Ridder*, 109 F.3d at 297.  This

---

[3]  "[B]efore the motion was served on my office, it was served on the Wall Street Journal." Hearing tr. at 289 (Feb. 14, 2006).  The sanctions motion was filed late Tuesday, December 6, 2005, and an article on the motion appeared in the following Thursday's Wall Street Journal: Nathan Koppel, *Plaintiffs' Lawyers Come Under Fire For Claim Veracity*, Wall St. J. Dec. 8, 2005, at A8.

statute provides that

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. §1927. The Sixth Circuit Court of Appeals has stated that this standard is met "when an attorney knows or reasonably should know that a claim pursued is frivolous." *Tareco Props., Inc. v. Morriss*, 321 F.3d 545, 550 (6th Cir. 2003). "Fees may be assessed without a finding of bad faith, 'at least when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims.'" *Ridder*, 109 F.3d at 297 (quoting *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986)). "[S]imple inadvertence or negligence that frustrates the trial judge will not support a sanction under section 1927. There must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Id.* (quoting *In re: Ruben*, 825 F.2d 977, 984(6th Cir. 1987), *cert. denied sub nom. Swan v. Ruben*, 485 U.S. 934 (1988)).

Having carefully reviewed the evidence in this case, the Court concludes the circumstances leading up to the dismissal of the *Morgan* and *Landry* cases do not come close to supporting an award of sanctions under §1927. At no time did plaintiffs' counsel pursue claims they should have known were meritless; at no time did plaintiffs' counsel undertake any obstructive tactics; and at no time did plaintiffs' counsel assert a frivolous position.

That these conclusions are true in connection with the *Morgan* case is best revealed by statements made by defendants' own expert who examined Morgan – Dr. Anthony Lang. In his initial expert report, Dr. Lang opined that Morgan did have an organic neurological problem – "long-standing essential tremor"

– and that Morgan also had a "psychogenic movement disorder."  Report at 6.  Dr. Lang explained at the sanctions hearing that "there is quite a spectrum of psychiatric causes of psychogenic movement disorders," ranging from outright conscious malingering to a deep-seated, non-volitional psychosis.  Tr. at 208 (Feb. 13. 2006).  Initially, Dr. Lang opined that Morgan "showed no clear features of purposefully feigning his symptoms and previous evaluations have commented that he provided no indication of deliberately exaggerating or minimizing his symptoms."  Report at 6.  It was only after Dr. Lang viewed defendants' surveillance videotape that he concluded where in the spectrum Morgan's psychiatric impetus could be found: "the surveillance videotape demonstrated the underlying psychogenic or psychological cause here, malingering or faking."  Tr. at 209.[4]

That one of the world's leading experts on psychogenicity of neurological disorders was unable to conclude Morgan was deliberately dissimilating, until after seeing a surreptitious surveillance video, highlights the flaw in defendants' argument that Morgan's counsel should have known Morgan's claims were frivolous.  If defendants' expert could not tell, how could plaintiffs' counsel?  Further, it is important to note that: (1) three of plaintiffs' experts – themselves leaders in their fields – *continue* to opine that, even in light of Morgan's embellishments, Morgan has unexaggerated symptoms consistent with MIP; and (2) Dr. Pullman, who was retained as an expert by *neither* side, recently conducted a computerized electrophysiological tremor analysis and concluded – consistent with plaintiffs' experts – that Morgan has some measure of organic parkinsonism not attributable to essential tremor.  In other words, Morgan's

---

[4] In fact, in his declaration, Dr. Lang's conclusion was not so clear cut: "review of the surveillance videotape of Mr. Morgan makes it clear that *a large part* of the psychogenic features were performed deliberately."  Reply brief, Lang declaration at ¶4 (emphasis added).  *See also* Stanley Fahn & Daniel Williams, *Pscyhogenic Dystonia*, 50 Advances in Neurology: Dystonia 431, 434 (1988) ("[w]hen faced with a patient having a psychogenic dystonia, it is often not possible with certainty to distinguish among somatoform, factitious, and malingering disorders").

claims are not frivolous even now, as there is evidence and expert opinion supporting the conclusion that Morgan suffers from an organic parkinsonism that is neither essential tremor nor psychogenic.  While his case has surely become unwinnable, given his exaggerations and stretching of the truth, Morgan's claims were not (and still are not) so devoid of factual underpinning that his counsel should be sanctioned for having failed to discover the true situation.[5]

This leaves, as a basis for sanctions under §1927, the *Landry* case.  The Court does not set out here much analysis of the circumstances surrounding the dismissal of the *Landry* case, in part because defendants relied most heavily on the *Morgan* case to support their motion for sanctions.  It suffices to say that: (1) defendants have not shown Landry's early dismissal of his case caused them to incur any substantial measure of "excess costs, expenses, and attorneys' fees;" (2) the only medical diagnosis of Landry's condition on the record is Dr. Paul Nausieda's diagnosis of MIP, and there is no medical diagnosis of neurological injury or symptomatology caused by drug use; and (3) defendants' assertion that the real reason for Landry's dismissal was not the one he gave is highly speculative, especially in light of the affidavit later tendered by Landry's employer supporting Landry's explanation.  Plaintiffs' dismissal of the *Landry* case provides even less of a basis for sanctions than does their dismissal of the *Morgan* case.

In sum, defendants have not shown that plaintiffs' counsel adopted any obstructive, vexatious, unreasonable, or frivolous positions in pursuing the *Morgan* or *Landry* cases.  Indeed, it is worth noting that plaintiffs' counsel immediately sought to inform the Court after viewing the Morgan surveillance

---

[5] This is not to say, of course, that Morgan would have won his case at trial had he not exaggerated his claims.  A jury may well have concluded that defendants' experts were correct and Morgan's neurological symptoms were caused only by essential tremor or psychogenic factors, and not welding fume exposure.  But this was and remains a question of fact that is debatable; it is not a frivolous question.

video.[6]  Morgan's prevarications are sad and exceedingly unfortunate, as they caused both plaintiffs and

defendants to waste huge amounts of time and money, not to mention judicial resources; but the blame

falls on Morgan, not his attorneys, who were as surprised as anybody at what Morgan had done.

Accordingly, defendants are not entitled to sanctions under §1927.[7]


## III.  Motion for Remedial Relief.

Although the events that provoked defendants to move for sanctions were the dismissals of *Morgan*

and *Landry*, the defendants' motion is directed at much more than just these two cases.  Noting that both

Morgan and Landry were diagnosed by Dr. Paul Nausieda as having MIP, defendants assert that "the

developments in *Morgan* and *Landry* . . . raise serious questions about the claims of those [many other]

plaintiffs who . . . allege a diagnosis of manganism, the vast majority of whom were diagnosed by Dr. Paul

Nausieda at a plaintiff-sponsored screening."  Motion at 2.  Defendants insist that the results in *Morgan*

and *Landry* so undermine Dr. Nausieda's credibility that *all* of his medical diagnoses should be

disregarded entirely: "because the events described herein call into question the diagnoses and claims of

---

[6]  In contrast, defendants obtained the surveillance video beginning on October 20 and continuing through November of 2006, and showed it to Morgan and his counsel on December 1, 2006.  Given that the costs incurred by defendants after at least some of the video was taken may be attributed to defendants' own strategic choices, many of these costs would not be recoverable in any event.

[7]Although the Court concluded that defendants are not entitled to sanctions under Rule 11 because of procedural issues, the §1927 analysis above leads to the conclusion that defendants also would not be entitled to sanctions under Rule 11 on the merits.  For the same reasons, defendants have not given the Court any basis for employing its "inherent powers" to award sanctions.  *See Runfola & Associates, Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir. 1996) ("[i]n addition to Rule 11 and 28 U.S.C. §1927, a district court may award sanctions pursuant to its inherent powers when bad faith occurs").  Finally, defendants cite Fed. R. Civ. P. 37 in their motion, but only to support their request for additional discovery into the plaintiffs' medical screening processes (discussed below); defendants do not cite Rule 37 to support their request for imposition of sanctions.

thousands of other plaintiffs screened by Dr. Nausieda, defendants further request that . . . the claims of all plaintiffs who were diagnosed with manganism or parkinsonism at a Nausieda screening be dismissed unless they present proof that they have obtained confirmation of their diagnosis from a second, independent physician." *Id.* at 4.

The many plaintiffs who have filed cases that are a part of this MDL share a common complaint: they allege they suffer some sort of neurological injury, such as parkinsonism, and further allege that it was exposure to the manganese contained in welding fumes that caused, contributed to, or accelerated this injury. This Court has had at least tangential dealings with about 19,000 such plaintiffs: as of the date of this Order, over 5,500 active cases are a part of this MDL; the Court has remanded to state courts another 4,500 or so cases, based on lack of federal jurisdiction; and another 8,600 putative plaintiffs have not filed formal cases, instead electing to participate in a tolling agreement filed with this Court (*see* docket no. 235). Of course, there are also many other, similar plaintiffs with whom this Court has had no dealings, because these plaintiffs filed complaints in state court, where they remain. In sum, there are tens of thousands of plaintiffs around the country who have asserted they were neurologically injured by welding fumes.

As defendants are quick to note, in many of these cases, the plaintiffs did not contact an attorney after *first* having been diagnosed by a doctor as suffering from a neurological injury. Rather, most of the plaintiffs with cases pending in this MDL came to know of the possibility that they had a legal claim through their contact with lawyers, who then directed plaintiffs to attend a "medical screening" coordinated and paid for by the attorneys. At the screening, various legal and medical personnel: (1) interviewed the plaintiffs to obtain their welding work history and medical history; and (2) gave them a

physical examination for neurological disorders.[8]

A great majority of the MDL plaintiffs who went to one of these medical screenings was examined by Dr. Nausieda.  For example, plaintiffs present statistics showing that various neurologists have so far examined a total of 3,649 welders at medical screenings, and Dr. Nausieda was the examining neurologist for 3,093 of them, or about 85% of the total.  Opposition brief at 7.  Dr. Nausieda is the diagnosing doctor in almost 400 of the 1,650 cases in this MDL;[9] and of the roughly 300 cases where the diagnosis is MIP, Dr. Nausieda is the diagnosing neurologist in about 90% of them.

Defendants point to these figures and imply – if not argue explicitly – that this entire mass tort is made of whole cloth:

> This is not a case in which physicians around the country recognized certain symptoms in their patients, agreed that those symptoms should result in a particular diagnosis, and then diagnosed patients who came to their offices seeking medical advice.  To the contrary, this is a case in which one physician – Dr. Nausieda – defined the symptomology (while on the payroll of a group of plaintiffs' counsel) and then organized and oversaw a series of screenings (advertised and paid for by plaintiffs' counsel) that have yielded virtually all of the manganism diagnoses in the country.

Motion at 23; *see id.* at 28 ("the record in this proceeding now strongly suggests that a group of attorneys has essentially created a mass tort out of thin air").[10]  In addition to asking the Court to impose a

---

[8] The plaintiffs' initial lawyer contacts arose from a number of sources, including, among others, lawyers' pre-existing client databases, lawyer-sponsored advertising, and direct communications by lawyers to members of relevant trade unions.

[9] There are actually now approximately 5,500 cases in this MDL; of those, there are motions to remand to state court pending in about 3,850, leaving about 1,650 cases where there is no jurisdictional issue.  Plaintiffs were required to submit "fact sheets" in these 1,650 cases indicating what their diagnosis is and who gave it to them.  Of these 1,650 cases, it appears that Dr. Nausieda provided a diagnosis in about 400 of them.  For many of the other cases, the Court is not able to determine who the diagnosing doctor was, if any; indeed, about 700 fact sheets show no diagnosis at all.

[10] To be fair, Morgan was diagnosed with a movement disorder by his regular treating physician, long before he ever saw Dr. Nausieda; however, it was Dr. Nausieda who diagnosed Morgan with MIP, as opposed to essential tremor or another variety of parkinsonism.

11

requirement that all plaintiffs diagnosed by Dr. Nausieda either obtain a second diagnosis or face dismissal, defendants also ask for extensive discovery into the medical screening processes where Dr. Nausieda participated.

It is important to note that defendants' indictment of Dr. Nausieda and the medical screenings in which he participated is painted against the backdrop of an infamous, recent case known as *In re: Silica Prods. Liab. Litig.*, 398 F. Supp.2d 563 (S.D. Tex. 2005) (hereinafter, "*Silica MDL Opinion*").  Judge Janis Jacks, in the *Silica MDL Opinion*, excoriated both plaintiffs' counsel and the diagnosing doctors for engaging in a medical screening process that she found was tantamount to committing a fraud on the court. Among other things, the *Silica MDL Opinion* documented the following: (1) certain doctors who had signed forms diagnosing patients with silicosis later testified they: (a) did not actually see the patients they diagnosed, (b) did not know the criteria for a silicosis diagnosis, or rejected generally-accepted criteria, and (c) did not believe they were diagnosing patients, even though they signed written forms saying they were; (2) certain doctors diagnosed over 99% of the patients they examined as having silicosis, after having earlier diagnosed 99% of the same patients with asbestosis – results that are medically irreconcilable; (3) plaintiffs' counsel payed a "bounty" to screening companies for referring patients with positive silicosis diagnoses, leading to multiple efforts by screeners to obtain a positive diagnosis; (4) the number of plaintiffs with positive silicosis diagnoses was over 1,000 times the rate expected, based on existing medical literature; and (5) at least some counsel for plaintiffs facilitated this state of affairs and knew that the doctors' written diagnoses were false.

With their motion, defendants suggest that the medical screenings described in the *Silica MDL Opinion* are similar to the medical screenings involving Dr. Nausieda in this case.  Defendants ask this Court to treat plaintiffs' counsel and the cases in this MDL as Judge Jacks treated those before her –

sanctioning some of plaintiffs' counsel and dismissing or remanding the majority of the pending cases. Having reviewed all of the evidence, however, the Court finds that the medical screenings used by plaintiffs in this case are dramatically different than the ones examined by Judge Jacks, and that this MDL does not resemble the *Silica* case in any meaningful respect.  It is true that, in both this case and the *Silica* case, the great majority of prospective plaintiffs were solicited by lawyers.  But, unlike in the *Silica* case, the screening process used by plaintiffs' counsel in this case to "weed out" persons who do not have a valid basis for claiming an injury caused by the toxin in question was robust.

In this case, welders were invited to engage in a two-tiered medical screening process.  The protocol for this screening process was designed by Dr. William Koller, well before any screenings actually occurred.[11]  In the first tier of the screening, welders were examined by medical doctors who, although they were not neurologists, had been trained to examine patients for symptoms of neurological disorder.  Unlike the *Silica* case, the first tier screeners were not employed by screening companies and were not simply medical technicians.  In addition to obtaining from each welder their medical and work histories, these doctors examined the welder for 20 different possible physical signs.  These signs had been pre-selected by neurologists, and the protocol the doctors followed was pre-designed by experts in conducting medical screenings in non-litigation contexts.  The screening doctors filled in standardized forms to document their findings.  No attorney had any input into or right of approval over the design of the screening or the screeners' determinations.  The first tier examiners tapped for a second tier examination welders who tested positive, on average, for about 9 of the 20 physical signs identified as suggesting a neurological disorder – a relatively high number.  Unlike the *Silica* litigation, the first tier

_____

[11]  After he designed this screening process, Dr. Koller was hired by defense expert Dr. Warren Olanow, at which time Dr. Koller discontinued his work for plaintiffs' counsel.

13

examiners were paid the same hourly rate regardless of whether they concluded a welder had any symptoms of a neurological disorder.  In fact, over 85% of the welders examined by the first tier examiners were *not* referred to a neurologist for a second tier examination – they were sent home.

The second tier examination was conducted by a neurologist – most often, by far, Dr. Nausieda. Unlike the doctors in the *Silica* case, there is no question but that Dr. Nausieda is highly qualified to perform a neurological assessment.  Further, unlike in the *Silica* case, Dr. Nausieda saw and touched and spoke with each welder himself.  Dr. Nausieda's examination involved an assessment of the welder's symptoms using the Unified Parkinson's Disease Rating Scale ("UPDRS"), a commonly used, objective set of criteria to evaluate the presence of a movement disorder.  Again, Dr. Nausieda was paid a flat rate, regardless of whether he concluded a welder suffered from a neurological injury; and again, Dr. Nausieda sent home about 40% of the welders he evaluated, concluding they did not have a movement disorder caused by welding fumes.  Other neurologists who acted as second tier screening examiners had similar evaluative rates.[12]  Many of the welders who were sent home did have a neurological disorder, but Dr. Nausieda concluded the disorder was not linked to welding fume exposure.  On average, the welders whom Dr. Nausieda concluded did have a welding-related neurological injury tested positive on about 7 of the UPDRS factors, which is a substantial number.  This two-step weeding out process eliminated as prospective plaintiffs the vast majority of welders screened: ultimately, less than 5% of the welders

---

[12]  Dr. Nausieda's statistics are consistent with those of other second-tier screening neurologists. For example, neurologist Dr. Juan Sanchez-Ramos has examined 598 welders at screenings and diagnosed 58% as having welding-related neurological injury.  Also notable is that at least 10 other neurologists – both in connection with plaintiffs' screenings and also outside of the litigation context – have concluded that welding fumes caused or contributed to an individual's neurological disorder.  *See* hearing tr. at 419-21 (Feb. 14, 2006) (listing these doctors).  Despite defendants' characterization of Dr. Nausieda as a "one-man epidemic," Mary Egan, *Twitch and Shout*, Forbes 46 (Jan. 9, 2006), it is simply not true that Dr. Nausieda is alone among distinguished neurologists in his belief, or in his diagnostic results, that welding fumes can cause MIP.

screened by plaintiffs' counsel received a positive diagnosis by Dr. Nausieda of welding-fume-induced neurological injury.[13]  Unlike the *Silica* case, this percentage is within the range reported in pre-existing studies in the medical literature.

Defendants identify a number of perceived shortcomings in the plaintiffs' screening process, such as that the advertisements by certain lawyers identified the symptoms a neurologically injured welder might have, allowing welders to more easily feign those symptoms; and that MIP has no diagnostic "signature" that can be revealed by an objective medical test, such as an x-ray or blood test, so there is no way of definitively testing the neurologists' conclusions.  There is no question but that a medical screening is not fully diagnostic, or that a plaintiff will need more than the opinion professed by a screening neurologist to prevail at trial.  It is important to note, however, that the burden on plaintiffs' counsel *before filing a case* is only to ensure there is a good faith basis to assert a claim that the welder suffered neurological injury caused by welding fumes.  The screening process designed by the plaintiffs in this case achieved that goal.  Indeed, the "weeding-out" rates described above, together with the testimony of the screeners at the Court's sanctions hearing, leaves the Court with the impression that there are likely few welders who were so successful as malingerers that they survived the screening process despite the absence of any neurological disorder.  Even Morgan, who exaggerated his symptoms, did suffer undisputedly from parkinsonism.

The medical community has long used screening processes to detect in large populations medical conditions that do not have an objective diagnostic signature, and which rely largely on self-reporting

---

[13]  Some of the welders who were referred to a second-tier screening by a first-tier screener have not yet had their second-tier neurological examination; thus, the ultimate percentage of Dr. Nausieda's second-tier positives may change by a percentage point or two.

(such as depression or alcoholism).[14] The screening process used by plaintiffs in this case appears no more likely to produce false positives than any other.[15] This is not to say, at all, that a welder who survives the plaintiffs' two-tiered screening process has a valid claim. But it is to say that the circumstances in this case are wholly unlike those in the *Silica* case, and that the two-tiered screening process used by plaintiffs, culminating in a medical opinion by Dr. Nausieda, provides a sufficient and adequate basis upon which a plaintiff may file a claim for neurological injury caused by welding fumes.

In sum, the defendants' indictment of the plaintiffs' screening processes generally, and Dr. Nausieda's conclusions at the end of those screenings in particular, is unbefitting and inappropriate. This Court has repeatedly noted that it has been a privilege to receive edification, in the form of testimony and reports, from the world-class experts hired by both sides in this matter. The Court includes Dr. Nausieda in that assessment, and strongly discourages counsel in this matter from attacking the character of any

---

[14] As plaintiffs note, the United States Senate has recognized that the use of medical screenings by plaintiffs' counsel has helped many asbestos victims learn they have a disease, when otherwise they might not have known their own condition. On the other hand, the Senate also noted there can be "problems associated with mass screenings." While the legislation was defeated, the Senate proposed the establishment of a federal asbestosis medical screening program. *See* S. 852, 109th Cong. §225 (2005); S. Rep. No. 109-097, at 83 (2005).

[15] It is notable, for example, that Dr. Nausieda consistently concludes that many welders who *do* have a neurological order do *not* have MIP. That is, it is not true that Dr. Nausieda always concludes a welder's neurological disorder must have been caused by welding. Dr. Nausieda explained several signs, atypical in patients with simple Parkinson's Disease, that lead him to conclude it is more likely that a welder's neurological disorder was MIP caused by welding: (1) onset of the disorder at an early age; (2) the presence of an action tremor or a significant postural ("anti-gravity") tremor; (3) a bilateral symmetry of symptoms; (4) onset of neuropsychiatric complaints after welding exposure; and (5) a sleep/wake cycle disorder with night sweats. *See* hearing tr. at 434-38 (Feb. 14, 2006) (noting also that severity of welding fume exposure is a diagnostic factor). Dr. Nausieda will usually screen out a welder – that is, prevent one sort of false positive – who does not have any atypicality.

counsel or witness on the opposing side, especially in the press.[16]  The Court does agree with defendants that certain administrative mechanisms are appropriate to move this litigation forward, and the Court has set out those mechanisms in a separate order.  *See* docket no. 1724.  But the Court finds untenable and unjustified defendants' request that "the claims of all plaintiffs who were diagnosed with manganism or parkinsonism at a Nausieda screening be dismissed unless they present proof that they have obtained confirmation of their diagnosis from a second, independent physician."  Motion at 4.

Finally, the Court addresses defendants' request for additional discovery into plaintiffs' counsel's screening processes.  So far, defendants have obtained discovery of the following aspects of plaintiffs' screening processes: (1) the lawyers' advertisements and invitations publicizing the screenings; (2) several depositions of Dr. Nausieda, during which he described the screenings generally and his role specifically; (2) redacted copies of all of the second-tier screening forms filled in by Dr. Nausieda, regardless of whether the welder filed a lawsuit; (3) unredacted copies of all of the second-tier screening forms filled in by Dr. Nausieda for those welders who have a lawsuit in this MDL; and (4) redacted first-tier screening

---

[16]  Of course, character evidence may be admissible when relevant.  *See* Fed. R. Evid. 404, 608, & 803(21).  But opinion statements *by counsel* regarding the veracity and professionalism of witnesses and opposing counsel simply degrade the litigation generally and reflect poorly on the speaker.  That this is true is highlighted by the fact that character attacks were made against the first doctors who urged that asbestos causes cancer.  The Court urges counsel for all parties, in the strongest possible terms, to direct their persuasive skills at the merits of this litigation, not the character of the players, and to listeners in the courtroom, not the press room.  *See ABA Model Rules of Professional Conduct*, Rule 3.6 ("A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."); *id.* at cmt. 3 ("certain subjects that are more likely than not to have a material prejudicial effect on a proceeding, particularly when they refer to a civil matter triable to a jury * * * [include] the character, credibility, reputation or criminal record of a party * * * or witness").

17

forms filled out by doctors for those welders who have a lawsuit in this MDL.[17]  In addition, during the sanctions hearing, defendants heard screenings-related testimony from (and, in all but the third example, cross-examined): (1) Dr. Nausieda; (2) Dr. Plauche, who was one of the first-tier screening doctors; (3) Dr. Cunningham, who designed many of the screening protocols; and (4) Dr. Burns, who reviewed the screening protocols.  Defendants are unsatisfied, however, and seek further discovery, including: (1) all of the first-tier screening forms; (2) depositions of some or all of the first-tier screening doctors; and (3) depositions of some or all of the individuals who worked with Dr. Nausieda at the screenings or at his professional clinic (including: (a) Dr. Widnell, who also acted as a second-tier screener with Dr. Nausieda; and (b) Dacy Reimer, a nurse who assisted Dr. Nausieda when he performed his second-tier examinations and who also manages the patient database at Dr. Nausieda's clinic).

The Court concludes that the defendants' request for further discovery into the plaintiffs' screening processes is unwarranted.  Fed. R. Civ. P. 26(b)(2) directs this Court to limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  The Court concludes that the burden and expense on the plaintiffs and witnesses of the proposed discovery far outweighs the likely benefit, especially in light of the limited relevance of the proposed discovery and the extent of the discovery already obtained.  *See* hearing tr. at 496-99 and 547-48 (discussing relevance of proposed discovery into first-tier screening processes).  Accordingly, defendants' request to undertake additional discovery of the plaintiffs' screening processes is denied.

---

[17]  Although the Court had concluded that the first-round screening forms were not discoverable, plaintiffs' counsel voluntarily produced them to defendants anyway.

**IV.     Conclusion.**

The Court concludes there is no basis upon which to impose sanctions against plaintiffs' counsel in this proceeding.  Defendants' request that the Court do so was unsupported and, indeed, is unsupportable on the record in this case.  Try as defendants might to characterize it as such, this MDL is not similar to the *Silica* MDL; and this Court will not treat it as if it were.  It is time for all parties to focus on the merits of these cases.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY
UNITED STATES DISTRICT JUDGE**

**DATED**: April 5, 2006