03cv17000zaq-ord(MetLifeSJ).wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: WELDING FUME PRODUCTS | : | |
| LIABILITY LITIGATION | : | **Case No. 1:03-CV-17000** |
| | : | **(MDL Docket No. 1535)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **MEMORANDUM AND ORDER** |

Currently pending in this Multi-District Litigation ("MDL") are about 1,900 cases.  In all of these lawsuits, the plaintiffs allege: (1) they inhaled fumes given off by welding rods; (2) these fumes contained manganese; (3) this manganese caused them permanent neurological injury and other harm; and (4) the defendants knew or should have known that the use of welding rods would cause these damages.  Although the complaints in these cases and the theories of liability they recite are not identical, the plaintiffs generally bring claims sounding in strict product liability, negligence, fraud, and conspiracy.  The gravamen of the complaints is that the defendants "failed to warn" the plaintiffs of the health hazards posed by inhaling welding rod fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process.

Virtually all of the defendants named by the plaintiffs are companies that actually "handle" welding rods – that is, they are companies that manufacture, supply, distribute, or consume welding rods.  The exception is that plaintiffs have also sued a company that operates within a completely different economic sector: the Metropolitan Life Insurance Company ("MetLife").  The essence of plaintiffs' claims against MetLife is that MetLife's actions helped the other defendants hide the

dangers of manganese in welding fumes.  The plaintiffs seek to impose liability upon MetLife using theories of conspiracy, aiding and abetting, fraud, negligence, and negligent undertaking.

MetLife now seeks summary judgment in its favor on all claims, in every case pending in this MDL (docket no. 1745).  For the reasons stated below, the motion is **GRANTED**, and MetLife is **DISMISSED** as a party in this litigation.

## I.     Facts.

The following material facts are not in dispute.  MetLife is, and always has been, an insurance company, issuing individual and group life, health, and disability policies.  It has never manufactured, distributed, sold, or directly consumed welding rods.

In the first half of the twentieth century, a division of MetLife known as the "Industrial Health Section" published dozens of different health-related pamphlets intended to educate various types of tradesmen about workplace hazards.  MetLife provided the publications free, to promote public health.  During the 1930s, for example, the Industrial Health Section published safety booklets targeting white collar workers ("Physical Examination of Executives"), women ("Hygiene for Working Women"), miners ("Silicosis"), leather tanners ("Protection of Workers Exposed to Chromium"), adolescents ("The Prevention of Oil Pimples"), and welders ("Health Protection in Welding").  It is the latter publication that plaintiffs use to connect MetLife to the other defendants in this case.

The history of the critical MetLife publication is as follows.  In 1926, MetLife published a 15-page pamphlet titled "Safety in Welding."  Although this pamphlet identified as an important welding hazard "poisonous substances which may be volatilized by heat," the pamphlet stated that

the "principal and typical hazard [of this type] is lead poisoning"; the pamphlet made no mention

of manganese.[1]  As the industrial use of welding expanded over the next decade, however, so did

MetLife's understanding of the hazards surrounding it.  In 1937, MetLife published a new, longer

booklet, under the title "Health Protection of Welders."  This booklet was 27 pages long and

contained substantial discussion under each of three headings: (1) "Hazards from Fire and

Electricity"; (2) "Radiant Energy"; and (3) "Gases and Poisonous Fumes or Dust Arising in Welding

Processes".  In addition to poisoning from exposure to lead, the booklet mentioned the dangers

posed by volatilization of zinc, brass, bronze, manganese, cadmium, phosphorus, arsenic, selenium,

and silicon.  With regard to manganese in particular, the booklet stated:

> *Manganese* is an important poison from the point of view of its effects rather
> than from frequency of exposure to it.  Manganese has a selective action on some of
> the nerve centers of the brain.  It causes a disease similar to paralysis agitans, which
> in chronic cases is seldom fatal, but which, owing to the fact that no satisfactory
> treatment is known, is always disabling.  Prevention, therefore, is the measure to be
> stressed when the possibility of manganese dioxide fumes or dust is present.

1937 Booklet at 23 (hereinafter, "*the Manganese Paragraph*").  The booklet also cited a 1932

German report by Erich Beintker, summarizing it as follows:

> Two cases of poisoning in a mild form, by manganese oxide fumes given off
> from the electrodes in arc welding of tanks and boilers, have been reported from
> Germany.  The electrode used contained 0.2 percent manganese.  It is stated that
> protective filter respirators or air helmets are necessary in tank and boiler work,
> although in open rooms it is improbable that these precautions will be needed.

*Id.* at 24 (hereinafter, "*the Beintker Paragraph*") (footnote omitted).

Like the other publications issued by the Industrial Health Section, MetLife's "Health

Protection of Welders" booklet was part public service, part sales tool, and part claims-reduction

---

[1] 1926 Pamphlet at 8.

3

device.  In all regards, MetLife considered its 1937 welding safety booklet fairly successful.

Immediately after initial distribution of the booklet, an internal MetLife newsletter printed excerpts

from thank-you letters sent by booklet recipients, adding: "Copies of the booklet are available for

Group [Insurance Sales] Supervisors who feel they can use them profitably."[2]  The 1937 annual

report of MetLife's Industrial Health Section recounts that the new booklet "has stimulated

considerable interest in the hazards of welding.  Many requests for this booklet have been received

from Group policyholders, industrial firms, public health and labor departments, universities,

doctors, and welders' unions."[3]  The Industrial Health Section was also proud to report that the

booklet led two of MetLife's own insureds – one of which was Westinghouse Electric &

Manufacturing Company, a predecessor-in-interest to defendant Viacom – to undertake studies of

their welder-employees "for any physical defects or illnesses resulting from exposures [to welding

fumes]."[4]

There is no evidence that, when MetLife was drafting its 1926 and 1937 welding safety

publications, any of MetLife's co-defendants in this case (or their predecessors-in-interest) had any

input into the actual language the booklets contained.  This circumstance changed, however, in 1938.

At that time, many of the nation's welding companies, including Westinghouse, Lincoln, and several

other defendants, belonged to a trade group known as the National Electrical Manufacturers

Association, Welding Section ("NEMA-WS").  On January 3, 1938, the Director of MetLife's

Industrial Health Section (Dr. McConnell) wrote a letter to the Chairman of NEMA-WS (Mr.

---

[2]  Sales Gossip #16, at 12 (April 30, 1937).

[3]  1937 Annual Report, Industrial Health Section, at 1.

[4]  *Id.* at 2.

Reddie), informing him that MetLife intended to reprint its welding safety booklet and "wish[ed] to bring up to date those parts which need revising."[5]  MetLife asked NEMA-WS for help with this revision and requested input specifically regarding the booklet's discussion of electric shock hazard associated with the changing of welding electrodes.  McConnell's request made no mention of the booklet's discussion of hazards associated with welding fumes or manganese.

Reddie wrote back to McConnell, assuring him that NEMA-WS would cooperate.  Reddie also advised that "[t]here are numerous other paragraphs in the booklet, aside from the matter of changing electrodes, which need to be considered."[6]  Reddie then wrote a separate letter to Mr. Cogan, the Director of Engineering at NEMA, informing him of the letter he had received from MetLife's McConnell.  Reddie described to Cogan his critical view of MetLife's booklet and what NEMA should try to do about it:

> The Metropolitan Life Insurance Company, New York, put out a publication under the subject of "Health Protection of Welders."  Some of their recommendations are  very far fetched and would make welding appear to be an unusually hazardous occupation.  This situation should not exist.
> * * *
> What we want is a definite contact with [MetLife], which will insure cooperation between [NEMA-WS] and [MetLife] in regard to their publication.
> In addition to my own [letter to Reddie], it is my opinion that Headquarters of NEMA in New York should contact [MetLife] and get some suggestions on a plan of procedure which I can place before the [upcoming NEMA-WS] meeting [for a vote].

Letter from W. Reddie to C. Cogan at 1-2 (Jan. 11, 1938).  Again, although critical of MetLife's publication, in neither of Reddie's letters did he complain specifically about MetLife's discussions

---

[5]  Letter from W. McConnell to W. Reddie at 1 (Jan. 3, 1938).  In addition to being Chairman of NEMA-WS, Reddie was employed by Westinghouse, which was a MetLife insured.

[6]  Letter from W. Reddie to W. McConnell at 1 (Jan. 11, 1938).

of welding fumes or manganese.

At the next NEMA-WS meeting, held on January 20, 1938, Reddie brought up the subject of the letter he had received from MetLife's McConnell.  The minutes of the meeting reveal that the members "voted, that Chairman Reddie be empowered to act as a committee of one to follow this matter and assist in rewriting the booklet."[7]  Five months later, at another NEMA-WS meeting, Reddie reported back on his efforts.  Under the heading of "UNFINISHED BUSINESS," the June 23, 1938 meeting minutes state:

> Chairman Reddie reported that the desire of [NEMA-WS] to secure changes in the [MetLife] publication "Heath Protection of Welders" had been about 80% successful. The title of the book has been changed to read, "Health Protection in Welding". The section on page 7 entitled "Electric Shock" has been rewritten to conform more to the standard practice of changing electrodes.  The section on page 10 covering the use of ultra-violet and infra-red rays has been rewritten.  Several changes have been made in the latter part of the pamphlet which tends to eliminate some of the scare which this pamphlet caused when first published.  The pamphlet has been printed so it is too late to make any additional changes.

Minutes at 148, Meeting of NEMA-WS (June 23, 1938).

A comparison of the 1937 and 1938 MetLife booklets reveals that, with regard to the discussion of hazards associated with welding fumes and manganese, the changes to the 1938 version "secured" by Reddie were modest.  The title of the booklet was changed from "Health Protection of Welders" to "Health Protection in Welding."  The above-quoted *Manganese Paragraph* was replicated verbatim, except for one minor word-choice edit.  The discussion of the two German welders in the *Beintker Paragraph* was expanded:

> Two cases of poisoning reported to be due to manganese fumes given off from the electrodes during arc welding inside boilers and tanks have been recorded in Germany.  One man who had been exposed for a period of five years complained

---

[7]  Minutes at 135, Meeting of NEMA-WS (Jan. 20, 1938).

of dizziness, loss of appetite, and some vomiting after such work, and another man who had done electric welding for 10 years suffered from headaches with difficulties of speech and mild signs of central nervous system disturbances.  The symptoms in neither case were typical of severe manganese poisoning such as is seen among men who are employed grinding manganese.  The electrodes used by these men had a manganese content of 2.18 percent and 0.2 percent respectively.  Analyses made of electrodes with a manganese content showed a marked diminution in the manganese content after use.  Fume from the electrodes during welding were found to contain manganese, probably a colloidal form of the oxide.

1938 Booklet at 24 (footnote omitted).  Finally, at the very end of the 1938 version of the booklet,

MetLife added a new section entitled "Protective Measures."  This section read as follows:

> Since the evidence tends to show that small amounts of fumes containing harmful gases and materials from welding processes may cause injurious effects, protection for the operator can best be provided by adequate ventilation.  Where this measure is not practicable, as when welding inside of boilers and other confined spaces, the operator always should be supplied with uncontaminated air by means of a hose mask or a positive-pressure respirator.

*Id.* at 28 (hereinafter, "*Protective Measures Paragraph*").[8]  Accompanying this paragraph were two

photographs of a welder, one "with good local exhaust ventilation" and one without.  The "without"

photo showed a working welder, with fumes rising around his mask; the "with" photo showed the

same welder with a flexible exhaust pipe pointed at his work-table, and no welding fumes apparent.

There is no way of knowing exactly what "additional changes" to the MetLife welding

booklet were the "unfinished business" referred to by Reddie and NEMA-WS in 1938.  This is

because the evidentiary record includes no further references by Reddie or NEMA to the MetLife

welding booklet; nor any references by MetLife of having requested or received additional input on

the booklet from NEMA, Reddie, or anybody else.

---

[8]   Essentially, the *Protective Measures Paragraph* was an expansion on the following sentence, originally contained in the shorter, 1937 version of the *Beintker Paragraph*: "It is stated that protective filter respirators or air helmets are necessary in tank and boiler work, although in open rooms it is improbable that these precautions will be needed."

The record does show that MetLife eventually made major changes to the above-quoted language in its welding safety booklet, but these changes did not occur until eight years later. Specifically, the subsequent history of MetLife's "Health Protection in Welding" booklet shows that MetLife revised the booklet six more times. The first revision was published two years later, in 1940. The *Manganese Paragraph*, *Beintker Paragraph*, and *Protective Measures Paragraph* quoted above from the 1938 edition were replicated exactly in the 1940 edition. Then, in 1946, MetLife published another revised edition. This edition involved substantial changes, some curious. For unknown reasons, all references to the dangers of manganese in welding fumes were deleted – both the *Manganese Paragraph* and the *Beintker Paragraph* were simply removed. In fact, the 1946 edition downplayed the danger of manganese. After discussing the danger of poisoning by lead, cadmium, mercury, and other elements contained in welding fumes, the booklet stated:

> Selenium, chromium, manganese, antimony, and other rare metals may also enter into the composition of rod coatings and weld materials. The amount present, however, is negligible, and no cases of poisoning have been definitely ascribed to welding processes.

1946 Booklet at 26. The latter sentence, of course, was contrary to the discussion contained in the *Beintker Paragraph* in earlier versions of the booklet. Ultimately, the 1946 edition was silent regarding the "important poison" – manganese – first discussed by MetLife nine years earlier in its 1937 edition, and about the brain damage that MetLife had earlier acknowledged manganese can

8

cause.[9]

MetLife's new silence about manganese in 1946 was especially odd because, at the same time, industrial hygienists were becoming increasingly aware that manganese in welding fumes was hazardous.  For example, in 1943, three years before MetLife eliminated the *Manganese Paragraph* and the *Beintker Paragraph* from its welding booklet, Occupational Hazards Magazine published a book entitled "1021 Answers to Industrial Health and Safety Problems."  The book, which was produced during discovery by defendant Hobart, included a lengthy discussion of manganese hazards.[10]  In answer to the question, "Manganese Exposure Prevails for What Workers?", the book listed 11 occupations, including "welders."  To the question, "To What Extent is Manganese Exposure an Occupational Hazard?", the book answered (in part): "Absorption of the poison [manganese dioxide or manganese oxide] usually takes place through inhalation of the finely divided powder of the fumes from the fusing of manganese alloys."  And, in answer to the question, "What are the Effects of Manganese Exposure?", the book stated:

> The absorption of manganese as a toxic dust or fume is cumulative, and symptoms or signs of the poisoning usually appear only after several months' exposure.  The deposit of manganese dust stored in the lung tissues or other organs

---

[9]  On the other hand, the 1946 edition expanded substantially the discussion of ventilation contained in the *Protective Measures Paragraph.*  Included in this discussion was the following warning, the wisdom of which surely has not dissipated with time:

> In shops where maintenance welding is done in any tank, boiler, or other inadequately ventilated confined space where local exhaust ventilation is impracticable, the welding operator and other near-by workers should be protected by wearing appropriate respirators.  Although such confined spaces are usually the very places where the wearing of an air mask is most inconvenient to the operator, it is nevertheless essential for self protection to wear either a hose mask or a Bureau of Mines approved supplied-air (air-line) respirator."

1946 Booklet at 29.  Every subsequent version of the booklet also contained this warning.

[10]  1021 Answers to Industrial Health and Safety Problems at 64-68 (1943).

9

is capable of remaining in the body for years without complete elimination, even after the removal of the worker from the exposure.

Disability, such as crippling, caused by manganese poisoning, may be permanent if the disease is allowed to become well established.  However, there is no pronounced life-shortening destruction of vital tissues, as is the case with lead poisoning.  Manganese victims usually remain life-long cripples, unfit for gainful employment.  Manganese apparently attacks and progressively destroys a non-vital portion of the neuro-muscular system, leaving the victim well in other respects.

*Id.* at 66.[11]

Finally, in answer to the question "In Manganese Exposures, What Treatment and Prevention are Effective?", the book warned:

Under the heading of prevention and control, which procedures acquire additional significance in view of the insidious, hopeless, crippling nature of this poison, the following can be a general guide:
1. Provide adequate work room ventilation.  Remove manganese dust and/or fumes at the points of origin by exhaust ventilation.  * * *  Where isolation of process is not possible, provide approved respirators for exposed workers.
* * *
3. Examine the workmen four times annually in order to detect early signs or symptoms.  Instruct both workmen and foremen in the dangers and methods of avoiding the hazard, and in ways to keep clean and fit.  Any affected workmen should be removed immediately to other work.

*Id.* at 67.  The book's manganese discussion concluded with a bibliography listing 15 scholarly articles addressing manganese poisoning.

After 1946, MetLife revised its "Health Protection in Welding" booklet four more times, publishing revisions in 1950, 1951, 1952, and 1955.  The discussions (or lack thereof) regarding

---

[11]  The book also said: "In relation to the wide technical and industrial use of manganese, the reported number of cases of poisoning is small, pointing to the belief that only a small number of workers have a predisposition for this poisoning, that not all manganese compounds exert a toxic action, and that a comparatively long or severe exposure time is needed before symptoms appear." *Id.* at 66.

manganese and brain damage in these four editions were the same as in the 1946 edition.[12]  MetLife

then ceased distribution of its welding safety booklet in 1957.


## II.    Legal Standard.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for

summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific

---

[12]  Unlike the 1950-52 editions, the 1955 edition added beryllium and manganese to the list of "important . . . metallic mineral and chemical substances – the fumes of which in confined spaces may produce health hazards."  1955 Booklet at 12.  The 1955 Booklet, however, continued to state that the amount of manganese in welding rods "usually is negligible, and no cases of poisoning from [this] material[] have been definitely ascribed to welding."  *Id.* at 15.  During this time, manufacturers were increasingly becoming aware of the apparent dangers of manganese in welding fume.  *See* docket no. 1785, exh. 4 (internal Airco memorandum from John Crowe to E. Roper regarding Airco nickel-manganese electrodes, stating: "A reading of [your] file appears to indicate that the fumes are far worse than I had any reason to suspect.  I have also observed that there are no caution notices in any of the instruction sheets issued by Airco.  I do not agree . . . that the responsibility of determining the relative safety of welding manganese steels does not lie with Airco.").  Of course, whether (and the extent to which) manganese in welding fumes does cause brain damage was then, and continues to be, in dispute.  In the context of MetLife's summary judgment motion, however, the Court must view the evidence on this question in a light most favorable to plaintiffs.

11

> facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The

non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## III.    Analysis.

In the various cases in this MDL, plaintiffs have asserted claims against MetLife under the following theories: (1) negligence; (2) fraud; (3) civil conspiracy; (4) negligent misrepresentation; (5) negligent undertaking; and (6) concert of action.  The Court examines these claims below.

### A.        Negligence, Negligent Misrepresentation, and Fraud.

The plaintiffs in this MDL are residents of a variety of states, and each state uses its own language to describe the required elements of a claim of negligence.  The differences in language, however, are superficial; it is hornbook law that, in all jurisdictions, "[t]he elements of negligence are [1] a duty the defendant owes to the plaintiff, [2] a breach of that duty by the defendant, [3] a causal connection between the breach and the plaintiff's injury, and [4] actual injury."  57A Am. Jur. 2d *Negligence* §71 (May 2006).[13]  As for "the elements of negligent misrepresentation, a plaintiff must generally show that: [1] the defendant had a duty to exercise reasonable care in the giving of information; [2] the defendant supplied false information; [3] with a reasonable reliance by the plaintiff upon the information given; and [4] the plaintiff suffered damages proximately caused by

---

[13]   *See, e.g., Texler v. D.O. Summers Cleaners & Shirt Laundry Co.,* 693 N.E.2d 271, 274 (Ohio 1998) ("In order to establish actionable negligence, the plaintiff must show the existence of a duty, a breach of the duty, and an injury proximately resulting therefrom.").

the defendant's negligence.  37 Am. Jur. 2d *Fraud and Deceit* §128 (Jan. 2007).[14]

Similarly, there is general agreement in all states that, "[t]o maintain an action for damages for [fraud] by reason of concealment, the following elements must generally be present: [1] an actual concealment [2] of a material fact [3] with knowledge of the fact concealed [4] with intent to mislead another into relying upon such conduct [5] followed by actual reliance thereon by such other person having the right to so rely [6] with injury resulting to such person because of such reliance." 37 Am. Jur. 2d *Fraud and Deceit* §200 (May 2006).[15]

The essential difference between negligence and fraudulent concealment is state of mind: "Fraud is a malfeasance, a positive act resulting ordinarily from a willful intent to deceive; negligence is strictly nonfeasance, a wrongful act resulting from inattention, but not from design." *Id.* at §16.  "Thus, much more is required to prove a cause of action for fraud than is required to prove an action in negligence."  *Id.*

MetLife attacks each one of the elements of plaintiffs' claims for negligence, negligent misrepresentation, and fraudulent concealment, arguing that no plaintiff can prove even one of the

---

[14]  *See Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) ("The elements of negligent misrepresentation are as follows: 'One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'") (quoting 3 *Restatement (Second) of Torts* §552(1) (1965)).

[15]  *See, e.g., Friedland v. Lipman*, 429 N.E.2d 456, 456 (Ohio Ct. App. 1980) ("A claim of common law fraud requires proof of the following factual elements: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.").

14

required elements of these claims against it by a preponderance of the evidence.  Of course, a failure of proof on any single element of a claim requires entry of judgment in MetLife's favor.  In this case, the Court concludes that, based on the evidence of record, no jury could reasonably find in favor of plaintiffs and against MetLife on the claims of negligence, negligent misrepresentation, and fraudulent concealment, because plaintiffs cannot carry their burden of proof on the element of proximate cause.  Because plaintiffs cannot prove proximate cause, the Court does not examine the other elements of these torts in any detail.

As with all torts, an essential element of the claims of negligence, negligent misrepresentation, and fraudulent concealment is that the defendant's actions must have "proximately caused" damage to the plaintiff.  Proximate cause "is not necessarily dependent upon nearness in time or distance, with which proximity is most readily associated, but is ordinarily used to describe or characterize a cause without which the accident could not have happened." 57A Am. Jur. 2d *Negligence* §410 (May 2006).  One "encompassing definition" of the term is as follows: a "proximate cause" of an injury is a "cause which: (1) in a natural and continuous sequence, unbroken by any new and independent cause, produces an injury; (2) without which the injury would not have occurred; and (3) from which a person of ordinary prudence could have reasonably foreseen that such a result, or some similar injurious result, was probable under the facts as they existed." *Id.* §413.  Of course, "an injury may result from two or more concurrent and directly cooperative and efficient proximate causes." *Id.* §514.  "If the defendant's action contributed to cause a plaintiff's injury, the defendant is liable even though his or her act of negligence alone might not have been a sufficient cause." *Id.* §516.

To carry their burden of proof on the element of proximate cause, then, the plaintiffs must

show, by a preponderance of the evidence, that: (1) MetLife's actions or omissions produced their injuries "in a natural and continuous sequence;" (2) they would not have suffered their injuries but for MetLife's behavior (or, at the very least, MetLife's behavior substantially contributed to their having suffered injuries); and (3) an ordinarily prudent person could have reasonably foreseen that MetLife's conduct would likely lead to their suffering some injury.

The evidence mustered by the plaintiffs in this MDL does not rise to the level of a prima facie showing of proximate cause. The most recent edition of MetLife's welding safety booklet was published over 50 years ago, in 1955, and distribution of this booklet ceased in 1957. No plaintiff has asserted he was misled by the MetLife booklet's silence regarding the hazards of manganese in welding fumes, or by the omission of the *Manganese Paragraph* and the *Beintker Paragraph*. There is no evidence that any plaintiff actually relied on anything MetLife said or did, or failed to say or do. Nor has any plaintiff asserted that any such reliance substantially contributed to his injuries. For example, there is no evidence that any plaintiff failed to use a respirator because MetLife's welding safety booklet lulled him into thinking that the dangers from inhaling manganese in welding fumes were not serious. The evidence simply does not permit the conclusion that MetLife's actions and/or omissions sparked a "natural and continuous sequence" that produced injury to any plaintiff.

Further, no rational jury could conclude that an ordinarily prudent person would have reasonably foreseen that MetLife's actions, when taken, would probably lead to the plaintiffs' presently-alleged injuries. MetLife's welding booklet publication was a voluntary act, driven partly by self-interest and partly by a desire to promote public health. MetLife had no duty to the public, or to welders, to provide any information or warning at all, and its decision – for whatever reason – to excise the *Manganese Paragraph* and the *Beintker Paragraph* from its welding safety booklet

16

in 1946 was not an evasion of any legal requirement.  MetLife had no direct or special relationship with any plaintiff in this case, and it did not make any known, false statement (e.g., "manganese in welding fumes may be inhaled with impunity").[16]  Thus, it could not be reasonably foreseen that MetLife's half-century-old publication decisions would lead today to plaintiffs' claimed damages, "unbroken by any new and independent cause."

In sum, plaintiffs have not put forth evidence upon which a jury could reasonably conclude that MetLife proximately caused them any injuries through negligence or fraudulent concealment. "Where it appears from the undisputed facts that the act of negligence complained of is not the efficient or proximate cause of the injury, then the question is for the court."  57A Am. Jur. 2d *Negligence* §428 (May 2006); *see also* 37 Am. Jur. 2d *Fraud and Deceit* §247 (May 2006) (if "no reasonable jury could find that the plaintiff's reliance was reasonable, the defendants are entitled to judgment as a matter of law").  Based on the undisputed facts in this case, MetLife is entitled to summary judgment on plaintiffs' claims of negligence, negligent misrepresentation, and fraud.

---

[16] Arguably, MetLife made a known, false statement in the 1946 Booklet when it wrote that the amount of manganese present in welding rods "is negligible, and no cases of poisoning have been definitely ascribed to welding processes."  1946 Booklet at 26.  But it was not reasonably foreseeable that this statement by an insurance company could lead to any injury to plaintiffs 50 years later.  Further, as this Court stated in the first MDL case that was set for trial, when addressing decades-old statements by other defendants that welding was safe: "[plaintiff] argues that the effect of these historical statements was to create a lasting false impression, causing industry participants, including his employer, to be less careful than necessary to assure his safety, [but] this effect is too attenuated to suggest any direct reliance on an affirmative misrepresentation made by a defendant." *Ruth v. A.O. Smith Corp.*, 2005 WL 2978694 at *2 (N.D. Ohio Oct. 11, 2005).  Thus, while the "MetLife evidence" may be relevant and admissible against other defendants for other purposes, it is too slender a reed, standing alone, upon which to impose liability – particularly against MetLife.

**B.      Conspiracy.**

All states generally agree that a "civil conspiracy requires [1] an object to be accomplished, [2] a meeting of minds on the object or course of action, [3] one or more overt acts, and [4] damages as the proximate result thereof.  16 Am. Jur. 2d *Conspiracy* §51 (Jan. 2007).[17]  MetLife argues that plaintiffs cannot carry their burden of proving any of these four elements.  Because MetLife's argument regarding the second element is sufficient grounds for entry of judgment as a matter of law, the Court does not reach the other arguments.

The Supreme Court has highlighted the importance of the second element of a conspiracy claim, describing a conspiracy as "predominantly mental in composition because it consists primarily of a meeting of minds and an intent."  *Krulewitch v. United States*, 336 U.S. 440, 447-48 (1949).  A "meeting of the minds" occurs "when the parties reach a unity of purpose or common design and understanding . . . .  There must be a preconceived plan."  15A C.J.S. *Conspiracy* §12 (Feb. 2007) (footnotes omitted).  This meeting of the minds does not require a formal or an express agreement: "It is sufficient that the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and to commit the offense charged, although such agreement is not manifested by any formal words, or by a written instrument."  *Id.* §13.  "A civil conspiracy can plausibly be inferred from words, actions, and interdependence of the activities and persons involved."  *Id.*  A conspiracy "is rarely susceptible of direct proof."  *Id.* §31.

---

[17]  *See, e.g., Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996) ("Civil conspiracy in Ohio is a malicious combination of two of more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages. * * * The element of 'malicious combination to injure' does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act").  Some states also require "[p]roof of malice, or an intent to injure," as an element of the tort of civil conspiracy.  16 Am. Jur. 2d *Conspiracy* §51 (Jan. 2007).

18

A Court must be careful when examining, in the context of a summary judgment motion, whether the plaintiffs have met their burden of proof on the second element of a civil conspiracy claim.  Generally, questions of "state of mind are proper questions for the jury and should not be decided on summary judgment." *Trucks, Inc. v. United States*, 234 F.3d 1340, 1343 (11th Cir. 2000). "But the presence of issues involving state of mind, intent, or motivation does not automatically preclude summary judgment.  A party against whom summary judgment is sought is [not] entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element.  There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983) (internal quotation marks and citations omitted; brackets in original).

Put differently, "[w]hile it is not necessary to provide direct evidence of a formal agreement in order to demonstrate a meeting of the minds, 'there must be substantial proof of circumstances from which it reasonably follows, or at least may be reasonably inferred, that the conspiracy existed. Conjecture and speculation alone are not sufficient to establish that the conspiracy existed." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1141 (10th Cir. 2006) (citations and internal quotation marks omitted).  Thus, courts do not shy away from granting summary judgment on claims of civil conspiracy if the evidence supporting the second element is simply lacking.  *See id.* ("[Plaintiff] fails to point to any evidence in the record that provides substantial proof of circumstances that support a reasonable inference that [the two defendants] had reached an agreement as to a common objective."); *In re: Temporomandibular Joint (TMJ) Implants Products Liab. Litig.*, 113 F.3d 1484, 1498 (8th Cir. 1997) ("Plaintiffs have not presented evidence sufficient

19

to create a genuine issue of material fact on their civil conspiracy claim."); *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 782 (9th Cir. 2001) ("This evidence is wholly insufficient to present a jury question on the existence of a conspiracy to violate the plaintiff's constitutional rights.").

MetLife argues that the evidence presented by plaintiffs in this case does not show – or even allow a reasonable jury to infer – that MetLife conspired with any other defendant to: (a) engage in the fraudulent concealment of the hazards of manganese in welding fumes, or (b) harm the MDL plaintiffs (or anyone else).  Even viewing the evidence in a light most favorable to plaintiffs, the Court agrees.

As noted above, MetLife distributed nine different editions of its welding safety booklet between 1926 and 1957.  Despite years of discovery in this case, and a clear focus by plaintiffs on the MetLife booklets, the only evidence that MetLife interacted with any defendant regarding the contents of the booklets during the entire 1926-57 period are the communications that occurred just before publication of the 1938 edition.  This interaction was initiated by MetLife, when it asked NEMA-WS for input specifically regarding the hazards surrounding "the changing of electrodes." MetLife explained that it "suspect[ed] that welding engineers are perhaps not always sufficiently convinced of the danger of low amperage alternating currents used in welding," and MetLife hoped to "indicate in our [1938] booklet" what NEMA-WS's "consensus opinion" was on the subject.

Notably, MetLife made *no mention whatsoever* to NEMA-WS of the hazards surrounding welding fumes or manganese.  And NEMA-WS's communications responsive to MetLife's inquiry – including both its letter answering MetLife, and also its internal communications about the MetLife letter – also did not touch upon welding fumes or manganese.  NEMA-WS did make the vague statement to MetLife that "[t]here are numerous other paragraphs in the [1937] booklet, aside

20

from the matter of changing electrodes, which need to be considered," and did also state, in an internal memorandum, that "[s]ome of [the 1937 booklet's] recommendations are very far fetched and would make welding appear to be an unusually hazardous occupation. This situation should not exist." But there is no rational basis to infer that these ambiguous criticisms referred to the booklet's discussion of welding fumes or manganese.

In fact, the evidence suggests otherwise. When NEMA-WS subsequently detailed its "80% successful" effort to get MetLife to rewrite parts of the booklet, it listed these areas of accomplishment: (1) a change in the title; (2) a rewriting of the section on electric shock hazard attendant to changing electrodes; (3) a rewriting of the section on radiant energy addressing ultraviolet and infrared rays; and (4) changes to unidentified "[parts] in the latter part of the pamphlet." These modifications secured by NEMA-WS certainly did not effect a concealment or misrepresentation of information relevant to welding fumes or manganese. Indeed, one thing that MetLife did *not* change in the 1938 booklet was the discussion of manganese toxicity in the *Manganese Paragraph*; one discussion that MetLife *expanded* in the 1938 booklet was the discussion in the *Beintker Paragraph* of the two welders who reportedly suffered manganese poisoning; and one thing that MetLife *added* to the 1938 Booklet was the warning in the *Protective Measures Paragraph* that welders should obtain adequate ventilation or use respirators, to mitigate the hazards of welding fumes. From this undisputed evidence, no reasonable jury could infer that NEMA-WS and MetLife combined to conceal the hazards of manganese in welding fumes by altering MetLife's 1938 booklet.

To support their conspiracy claim, plaintiffs point especially to two salient facts. First, after MetLife published its 1938 booklet, NEMA-WS characterized its effort to secure language changes

21

as "unfinished business" – suggesting that NEMA-WS intended to continue a campaign toward securing the remaining 20% of the revisions it desired.  Second, in 1946, the *Manganese Paragraph* and the *Beintker Paragraph* disappeared from MetLife's booklet, as did any suggestion that manganese in welding fumes was a poison that could cause brain damage.  Plaintiffs argue that the silence in MetLife's 1946 booklet is traceable directly to NEMA-WS's scheme to conceal from welders the dangers of manganese in welding fumes – a scheme which MetLife ultimately joined.

As the Court noted above, MetLife's choice in 1946 to excise all warnings related to manganese from its welding safety booklet does beg the question: why?  Perhaps, as plaintiffs believe, NEMA-WS continued for eight years to urge MetLife to conceal the hazards of manganese, and – although MetLife resisted this effort when it published the 1940 booklet – MetLife finally acceded in 1946.  But the only way a jury could reach this conclusion would be to engage in pure speculation.  There is simply no evidence in the record that NEMA-WS communicated *anything* to MetLife after 1938, much less pressured MetLife to delete or change the booklet's manganese-related warnings specifically; indeed, there is not even any evidence that NEMA-WS pressured MetLife to modify manganese-related warnings *before* 1938, either.  In the end, it is equally tenable that MetLife deleted the *Manganese Paragraph* and the *Beintker Paragraph* from the 1946 booklet because MetLife had never received a manganese-related insurance claim, and so decided the language was unnecessary, especially in light of its expansion of the *Protective Measures Paragraph*.

Or not.  The point is, both of these conclusions are based equally, and entirely, upon conjecture and surmise, even when viewing the evidence in a light most favorable to plaintiffs.

When "there is no evidence beyond mere conjecture and speculation that an agreement

22

existed," then "no jury [can] properly find that a conspiracy existed" and "[judgment] for the defendant" must be entered as a matter of law.  *Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989).  This principle aptly describes the circumstances surrounding MetLife's nexus to the other defendants in this MDL.  Accordingly, MetLife's motion for summary judgment on plaintiffs' conspiracy claims must be granted.

### C.      Acting in Concert; Aiding and Abetting.

In addition to the claim of conspiracy, some MDL plaintiffs also state the closely-related claims of: (1) acting in concert; and (2) aiding and abetting.  These two claims both derive from §876 in the Restatement (Second) of Torts.  Specifically, §876**(a)** is the source of plaintiffs' claims for acting in concert, while §876**(b)** is the source of plaintiffs' claims for aiding and abetting:

> *§876.  Persons Acting In Concert.*
> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a)      does a tortious act in concert with the other or pursuant to a common design with him, or
> (b)      knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself,
> * * *

4 *Restatement (Second) of Torts* §876 (1977).

Like the tort of conspiracy, the torts of acting in concert and aiding and abetting both include an element of scienter.  Regarding a claim for acting in concert, the Restatement explains: "Parties are acting in concert when they act in accordance with *an agreement to cooperate* in a particular line

of conduct or to accomplish a particular result." *Id.* §876 comment a (emphasis added).[18]  Similarly, one is an aider and abettor only if he "*knows* that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."  *Id.* §876 (emphasis added); *see In re: Temporomandibular Joint (TMJ) Implants Products Liab. Litig.*, 113 F.3d 1484, 1495, 1496 (8th Cir. 1997) ("the aider and abettor must knowingly and substantially assist the wrongful act"; "plaintiff must establish that [an] alleged aider and abettor acted with [the] intention of advancing the tortious activity") (citation omitted).

As set out above in the discussion of plaintiffs' conspiracy claims, the evidence in this case does not allow a reasonable jury to conclude that MetLife acted with the requisite state of mind for liability to attach under the theories of acting in concert or aiding and abetting.  The only alleged assistance, encouragement, or concerted actions identified by plaintiffs are the editing changes MetLife made to the 1946 welding safety booklet.  There is no evidence suggesting Metlife made these changes pursuant to a cooperative understanding that, by doing so, it would help NEMA-WS or the other defendants to suppress information.  Any such inference by a jury would be unsupported speculation.[19]

Accordingly, based on the undisputed facts in this case, MetLife is entitled to summary judgment as a matter of law on plaintiffs' claims of acting in concert and aiding and abetting.

---

[18]  The theory of liability set out under §876(a) is closely related to the theory of conspiracy. The Restatement explains that "it is in connection with" actions "done pursuant to a common design or plan for cooperation" that "the word 'conspiracy' is often used."  *Id.* §876 comment b.

[19]  *See also Sindell v. Abbot Labs.*, 607 P.2d 924, 933 (Cal. 1980) (affirming dismissal of mass tort claims of concerted action, stating: "it seems dubious whether liability on the concert of action theory can be predicated upon substantial assistance and encouragement given by one alleged tortfeasor to another pursuant to a tacit understanding to fail to perform an act").

D.       **Negligent Undertaking.**

Finally, in addition to the claims of negligence and negligent misrepresentation, some MDL

plaintiffs also state the related claim of negligent undertaking. This claim derives from §324A of

the Restatement (Second) of Torts:

> *§324A. Liability To Third Person For Negligent Performance Of Undertaking.*
> One who undertakes, gratuitously or for consideration, to render services to
> another which he should recognize as necessary for the protection of a third
> person or his things, is subject to liability to the third person for physical
> harm resulting from his failure to exercise reasonable care to [perform][20] his
> undertaking, if
> (a)      his failure to exercise reasonable care increases the risk of such harm,
>          or
> (b)      he has undertaken to perform a duty owed by the other to the third
>          person, or
> (c)      the harm is suffered because of reliance of the other or the third
>          person upon the undertaking.

*Restatement (Second) of Torts* §324A (1965). Plaintiffs invoke only subsection (c).[21] Essentially,

plaintiffs claim that: (1) MetLife undertook to supply to welding rod manufacturers, and to

employers of welders (if not also welders, themselves), with safety information regarding the

hazards of welding fumes; (2) MetLife failed to perform this undertaking with reasonable care when

it deleted the manganese-specific warnings from the 1946-55 Booklets; (3) the welding rod

manufacturers, employers of welders, and welders, themselves, relied on the MetLife Booklets to

---

[20]  The Restatement uses "protect" instead of "perform," but this is "a typographical error."
*Hill v. United States Fidelity and Guaranty Co.*, 428 F.2d 112, 115 n.5 (5th Cir. 1970).

[21]  Subsections (a) and (b) are not applicable to the facts of this case. There is no basis for
a claim that MetLife "increased the risk [to welders] of harm" from inhaling manganese in welding
fumes. *See Good v. Ohio Edison Co.*, 149 F.3d 413, 421 (6th Cir. 1998) (discussing §324A and
noting that, while the defendant "did nothing to diminish the risk posed by this hazard, it likewise
did nothing to increase the risk that this hazard posed"). Nor do plaintiffs claim that MetLife
undertook to perform a duty owed by others (e.g., welding rod manufacturers) to the plaintiffs.

25

understand the hazards of welding; and (4) MetLife's failure to perform its "undertaking" properly ultimately caused damages to the plaintiffs.

The "reliance" language of subsection (c), of course, refers to the requirement of proximate cause; if a plaintiff cannot show any reliance (by himself or a relevant intermediary) upon the defendant's undertaking, then he cannot show his injuries were proximately caused by that defendant. In other words, if a welder cannot show that either he, or a welding rod manufacturer, or his employer, relied upon the MetLife welding safety booklet to the welder's detriment, then the welder cannot prevail on a claim of negligent undertaking.

As noted during the Court's discussion of proximate cause in the context of plaintiffs' negligence and fraud claims, there is no evidence that any plaintiff actually relied to his detriment upon anything MetLife said or did, or failed to say or do. Plaintiffs offer no evidence that, "but for" MetLife's statements and/or silence, the plaintiffs would have avoided their allegedly damaging exposures to manganese in welding fumes.

Further, there is also no evidence that the reason a plaintiff suffered harm was because a welding rod manufacturer or the plaintiff's employer relied on MetLife's statements or omissions. In fact, there is very little evidence linking MetLife's booklets to any other defendant. It is true, as plaintiffs point out, that a 1938 Airco memorandum quotes verbatim both the *Manganese Paragraph* and *Beintker Paragraph* from the 1937 MetLife Booklet. But the gravamen of plaintiffs' claim is that it was MetLife's *subsequent omission* of these paragraphs that was negligent, and which ultimately caused the plaintiffs harm. Plaintiffs must show not only that Airco relied on MetLife's welding booklets, but also that plaintiffs suffered harm *because of* Airco's reliance. There is no evidence at all to support this link. Plaintiffs do not suggest, for example, that Airco later saw

26

MetLife's excision of the *Manganese Paragraph* and *Beintker Paragraph* from the 1946 Booklet, and so decided not to warn sufficiently.  To the contrary, the only evidence is that Airco relied on MetLife's "undertaking" at a time when plaintiffs believe MetLife was *not* negligent.[22]

In sum, plaintiffs' claim for negligent undertaking fails as a matter of law, based on the undisputed facts, because plaintiffs cannot show that any allegedly negligent undertaking by MetLife proximately caused them damage.  Accordingly, MetLife is entitled to summary judgment on this claim, as well.


**IV.     Conclusion.**

Having carefully reviewed all of the evidence of record, the Court concludes that in no case in this Multi-District Litigation could a reasonable jury find in favor of plaintiffs on any of their claims against MetLife.  Accordingly, MetLife is entitled to summary judgment on all of plaintiffs' claims in every such case, and to dismissal as a party in this Multi-District Litigation.

**IT IS SO ORDERED.**


/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: April 9, 2007

---

[22]  Similarly, the only other evidence linking any edition of the MetLife Booklet to a defendant is MetLife's report that the 1937 Booklet prodded Westinghouse to study the health of its welder-employees.  This cannot be an example of negligent performance of an undertaking.  And it is certainly too speculative for any reasonable jury to conclude, for example, that: (1) Westinghouse's reliance on the 1937 MetLife Booklet shows that Westinghouse later also relied on the 1946 MetLife Booklet; (2) the omission of any manganese warnings from the 1946 Booklet led Westinghouse to provide deficient warnings to plaintiffs; and (3) because of these deficient warnings, plaintiffs suffered harm.

27