03cv17000zav-ord(MedMonCert).wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: WELDING FUME PRODUCTS | : | |
| LIABILITY LITIGATION | : | **Case No. 1:03-CV-17000** |
| | : | **(MDL Docket No. 1535)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | <u>**MEMORANDUM AND ORDER**</u> |
| | : | |

A number of plaintiff welders filed in California federal district court a lawsuit known as *Steele v. A.O. Smith Corp.* The *Steele* action was transferred to this Court as related to *In re: Welding Fume Products Liability Litigation*, MDL No. 1535. The plaintiffs in *Steele* now move for class certification (master docket no. 1837). For the reasons stated below, the Court concludes this motion must be **DENIED**.

As set out in Section IX of this Order, below, the Court **directs** the *Steele* plaintiffs to submit a position statement regarding the Court's continuing jurisdiction over their case.

## I.    Background.

On June 23, 2003, the Judicial Panel on Multi-District Litigation ("MDL Panel") conferred multi-district status on "*Welding Fume*" lawsuits filed in federal court, and transferred three such pending cases to this Court, pursuant to 28 U.S.C. §1407.[1] The MDL Panel concluded that the three *Welding Fume* cases each "present[ed] claims of personal injuries allegedly caused by exposure to welding fumes. The actions thus share factual questions concerning, inter alia, whether exposure to welding fumes causes the

---

[1] *In re Welding Rod Prods. Liab. Litig.*, 269 F.Supp.2d 1365 (J.P.M.L. 2003).

conditions complained of by plaintiffs and whether defendants knew or should have known of any health risks associated with exposure to welding fumes."[2]

Since that time, the MDL Panel has transferred to this Court about 9,750 related cases filed by plaintiffs around the country.[3]  Another 1,760 cases have been removed directly to, or filed directly in, this Court.[4]  By virtue of subsequent remands to state court, voluntary dismissals, and stipulated dismissals pursuant to a Tolling Agreement (and also two trials and a settlement), the number of active cases now pending in this *Welding Fume* MDL is about 1,775.

As a general matter, the plaintiffs in the *Welding Fume* cases all allege that: (1) they inhaled fumes given off by welding rods; (2) these fumes contained manganese; and (3) this manganese caused them permanent neurological injury and other harm.  The *Welding Fume* plaintiffs name as defendants various manufacturers, suppliers, and distributors of welding rod products, and claim the defendants knew or should have known that the use of welding rods would cause these damages.  The plaintiffs generally bring claims sounding in strict product liability, negligence, fraud, and conspiracy.  The gravamen of the complaints is that the defendants "failed to warn" the plaintiffs of the health hazards posed by inhaling welding rod fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process.

Since the inception of the *Welding Fume* MDL, the Court has, among other things: (1) ruled that the plaintiff welders' claims are not pre-empted by the Occupational Safety and Health Act or the Hazard

---

[2]  *Id.* at 1366-67.

[3]  *See* MDL Panel Rules 1.1, 7.4 (discussing "tag-along actions").

[4]  As of September 14, 2007, this Court had obtained jurisdiction, for at least some period of time, over 11,515 separate *Welding Fume* cases.  In addition, another 9,670 potential plaintiffs, who have not yet filed a case, signed the parties' Tolling Agreement (master docket no. 235, exh. 1).

2

Communication Standard;[5] (2) issued rulings addressing the admissibility of expert opinions on a variety of matters, including a determination that "the sum of the epidemiological and other evidence proffered by the parties is sufficiently reliable to support the assertion that exposure to welding fumes can cause, contribute to, or accelerate a parkinsonian syndrome that some doctors will diagnose as [Parkinson's Disease]";[6] (3) concluded that the medical screening programs employed by plaintiffs' counsel did provide them with "a good faith basis to assert a claim that the [plaintiff-]welder[s] suffered neurological injury caused by welding fumes";[7] and (4) ruled that defendant Metropolitan Life Insurance Company was entitled to summary judgment in every *Welding Fume* MDL case.[8] Also, the Court has presided over two *Welding Fume* trials, both of which ended in jury verdicts for defendants on all claims.[9]

When the *Welding Fume* MDL was new, the Court's first case management order set out procedures applicable to any cases filed as putative class actions, and identified nine such cases that had

---

[5]  *In re Welding Fume Prods. Liab. Litig.*, 364 F.Supp.2d 669 (N.D. Ohio 2005).

[6]  *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *36 (N.D. Ohio Aug. 8, 2005) (examining expert opinions for admissibility in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).

[7]  *In re Welding Fume Prods. Liab. Litig.*, 2006 WL 1173960 at *9 (N.D. Ohio Apr. 5, 2006) (distinguishing *In re Silica Prods. Liab. Litig.*, 398 F.Supp.2d 563 (S.D. Tex. 2005)).

[8]  *In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605 (N.D. Ohio Apr. 9, 2007).

[9]  The first trial was in *Solis v. Lincoln Elec. Co.*, case no. 04-CV-17363, which involved claims made under Texas law.  The second trial included two consolidated cases, *Goforth  v. Lincoln Elec. Co.*, case no. 06-CV-17217, and *Quinn  v. Lincoln Elec. Co.*, case no. 06-CV-17218, which involved claims made under South Carolina law.  In addition, the Court has presided over four other cases that were set for trial but ultimately were not tried, during which time the Court issued many evidentiary and other rulings applicable to all *Welding Fume* cases.  These four cases were: *Ruth v. A.O. Smith Corp.*, case no. 04-CV-18912, which settled on the eve of trial; *Landry v. Nichols Wire*, case no. 03-CV-17016, which was voluntarily dismissed early in discovery; and *Morgan v. Lincoln Elec. Co.*, case no. 04-CV-17251, and *Peabody v. Lincoln Elec. Co.*, case no. 05-CV-17678, both of which were voluntarily dismissed shortly before trial.

already been transferred into the MDL.[10]  Shortly thereafter, however, plaintiffs' liaison counsel notified

the Court that "Plaintiffs in those [putative class action] cases do not intend to seek class certification."[11]

Accordingly, until now, this MDL Court has not been asked to certify any classes under Fed. R. Civ. P.

23.

**II.      The *Steele* Class Action Complaint.**

One of the *Welding Fume* cases transferred more recently into this MDL is *Steele v. A.O. Smith

Corp.*[12]  Like the other *Welding Fume* complaints, the *Steele* complaint names a large number of

defendants that manufacture, supply, distribute, or consume welding rods.[13]  And, like the other *Welding

Fume* complaints, the *Steele* complaint states claims for negligence, strict liability, fraud, and aiding and

---

[10]  *See* Case Management Order (master docket no. 63) at §I.A.1, §IX, and Exhibit B.

[11]  *See* Notice of Plaintiffs' Position on Class Matters (master docket no. 120) at 1.

[12]  The *Steele* action was originally filed on October 13, 2005 in the federal district court for the Northern District of California, under the caption *Simonds v. A.O. Smith Corp.*  The MDL Panel transferred *Simonds* to this Court on January 18, 2006, where it was assigned case no. 06-CV-17057.  The plaintiffs then filed on the master docket an amended complaint with a new caption (master docket no. 1746).

[13]  The complaint in *Steele* names 29 defendants.  First Amended Complaint (master docket no. 1746) at ¶¶ 19-47.  The Court has previously dismissed MetLife as a defendant.  *See In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605 at *2 (N.D. Ohio Apr. 9, 2007).  Although virtually all of the other *Welding Fume* complaints name General Electric as a defendant, the *Steele* complaint does not.

4

abetting.[14]  Unlike all of the other *Welding Fume* complaints, however, the 16 *Steele* plaintiffs do not allege they have suffered an *existing* physical injury caused by inhaling the manganese contained in welding fumes.  Rather, the *Steele* plaintiffs allege that, as welders, they "have been exposed to welding fumes containing manganese in excess of the [Threshold Limit Value][15] and will continue to be exposed to manganese in welding fumes, and thereby suffer, and will continue to suffer, a significantly increased risk of serious neurological and neuropsychological injury."[16]

Rather than seeking pure monetary damages, the 16 *Steele* plaintiffs pray for various types of injunctive and declaratory relief – primarily, a medical monitoring program to account for their allegedly increased risk of developing welding-fume-induced brain damage.  Specifically, the *Steele* plaintiffs ask

---

[14]    Specifically, the *Steele* complaint lists claims for: (1) Negligence; (2) Negligent Misrepresentation; (3) Negligence – Sale Of Product (Against Manufacturer Defendants Only); (4) Negligence – Voluntary Undertaking; (5) Strict Liability – Failure To Warn (Against Manufacturer Defendants Only); (6) Strict Liability – Design Defect (Against Manufacturer Defendants Only); (7) Fraud/Deceit By Suppression/Concealment (Conspiracy); and (8) Aiding And Abetting.  Unlike other *Welding Fume* cases, the *Steele* complaint also adds claims for: (9) Medical Monitoring Under Arizona Law; (10) Medical Monitoring Under California Law; (11) Medical Monitoring Under Florida Law; (12) Medical Monitoring Under New Jersey Law; (13) Medical Monitoring Under Ohio Law; (14) Medical Monitoring Under Pennsylvania Law; (15) Medical Monitoring Under Utah Law; and (16) Medical Monitoring Under West Virginia Law.
Notably, however, plaintiffs explain that the first eight of these claims are meant only to provide a basis for recovery of medical monitoring relief, in those states where medical monitoring is a remedy and not a stand-alone cause of action.  *See* Hearing tr. at 156 (Apr. 25, 2007) ("[T]his case was brought as a medical monitoring case.  There aren't any other causes of action in the complaint.")

[15]    Threshold Limit Values ("TLVs") are promulgated by the American Conference of Governmental Industrial Hygienists ("ACGIH").  The ACGIH describes a TLV as follows: "[TLVs] refer to airborne concentrations of chemical substances and represent conditions under which it is believed that nearly all workers may be repeatedly exposed, day after day, over a working lifetime, without adverse health effects. TLVs are developed to protect workers who are normal, healthy adults."  *See* www.acgih.org/Products/tlv_bei_intro.htm.  The current TLV for manganese is an 8-hour time-weighted average of 0.2 mg/mm$^3$.

[16]    First Amended Complaint (master docket no. 1746) at ¶169 (footnote added); *see id.* at ¶166 ("Plaintiffs are not presently asserting claims for manganese-related injury").

5

for:

> creation of a comprehensive medical monitoring program, supervised by the Court, and
> funded by Defendants, that: (a) notifies individuals who have been exposed to manganese
> from welding rod fumes of the potential harm from such exposure and the need for periodic
> testing and examination; (b) provides periodic medical testing and examinations designed
> to facilitate early detection of toxic exposure to manganese from welding fumes; (c)
> provides early detection and treatment of neurological and neuropsychological diseases and
> injuries caused by exposure to welding fumes; (d) provides further observational
> epidemiological studies of steel welders that are sufficiently powered to assess the
> association between such welding and neurological and neuropsychological injury; (e)
> accumulates and analyzes relevant medical and exposure information from Class and
> Subclass members, and publishes findings; and (f) gathers and forwards to treating
> physicians information related to the diagnosis and treatment of neurological injuries and
> diseases which may result from exposure to welding fumes.[17]

The *Steele* plaintiffs also pray that the Court order defendants to: (1) "provide and/or pay for the provision of effective product warnings;" (2) "establish programs to educate welders, and their employers and contractors, on the risks associated with exposure to manganese in welding fumes and on the preventative measures which must be taken to reduce welders' exposure to welding fumes;" (3) "require[] that all steel welders and welder helpers use air supplied respirators during all welding operations;" and (4) pay for a "court[-]supervised observational epidemiological study of steel welders that is sufficiently powered to assess the association between such welding and neurological and neuropsychological injury."[18]

Finally, the *Steele* plaintiffs ask the Court to certify their lawsuit as a class action.  Essentially, plaintiffs propose certification of eight, separate, state-wide classes, with two subclasses each – one sub-

---

[17] *Id.* at ¶171.

[18] *Id.* at Prayer, ¶3.

class of current welders, and one sub-class of former welders.[19]  As discussed below, the eight states listed

each recognize the primary aspect of relief sought by the *Steele* plaintiffs – medical monitoring – as either

---

[19]  Initially, plaintiffs' proposal was as follows:

> Each of the eight proposed statewide Classes (the "Classes") is defined as: All natural persons who work or have worked as steel welders or steel welder helpers who are citizens and residents of one of the following states: Arizona, California, Florida, New Jersey, Ohio, Pennsylvania, Utah, and West Virginia.  Plaintiffs propose the designation of two Subclasses within each Class: 1) all natural persons currently employed as steel welders or steel welder helpers as of the date this Court orders class notice to issue, and 2) all natural persons who are retired or former steel welders or steel welder helpers as of the date of the class notice issue date.

First Amended Complaint (master docket no. 1746)  at ¶2.  During the course of briefing, however, the plaintiffs changed this proposal, stating:

> Plaintiffs no longer seek to include "welder helpers" in the class definition.  Specifically, Plaintiffs will modify the proposed former welder subclass to include: "All natural persons who have worked *for a year or more* as steel welders who are not presently asserting claims for manganese-related injury, and who also are citizens and residents of one of the following states: Arizona, California, Florida, New Jersey, Ohio, Pennsylvania, Utah and West Virginia."

Reply brief (master docket no. 2020) at 12 (emphasis in original).  Thus, plaintiffs' proposal for the eight statewide Classes would now be more precisely defined as:

> All natural persons who currently work as steel welders, or formerly worked as steel welders for a year or more, who are citizens and residents of one of the following states: Arizona, California, Florida, New Jersey, Ohio, Pennsylvania, Utah, and West Virginia, and who are not presently asserting claims for manganese-related injury.  Plaintiffs propose the designation of two Subclasses within each Class: 1) all natural persons currently employed as steel welders as of the date this Court orders class notice to issue, and 2) all natural persons who formerly worked as steel welders for a year or more, as of the date of the class notice issue date.

The plaintiffs also make clear that the class would include only persons whose job duties regularly include(d) welding – that is, occupational welders, as opposed to occasional or casual welders.  *See* Hearing  tr.  at 64-65  (Apr.  24, 2007) (addressing use of employment records to determine class membership).

The plaintiffs' inclusion of the "year or more" qualifier might raise certain class-definition problems, but the Court does not reach this issue in this opinion.  *See Perez v. Metabolife, Int'l, Inc.*, 218 F.R.D. 262, 268 (S.D. Fla. 2003) ("For the Court to determine, [when passing on whether certification is appropriate,] a minimum dosage level for class membership would require making a determination on the ultimate issue as to whether [a given exposure level] can result in increased risk of injury," and a class "should not be defined by criteria that  . . .  require an analysis of the merits of the case") (citation omitted).

a cause of action or an item of damages.  Further, all eight states do *not* require that a plaintiff suffer an existing, physical injury to obtain medical monitoring.

The *Steele* plaintiffs explain that class certification is appropriate because "[c]ommon questions of fact and law exist as to all members of each Class and Subclass."[20]  Plaintiffs assert that, among others, these "common legal and factual questions, which do not vary from member to member, and which may be determined without reference to the individual circumstances of any Subclass member," include: (a) "[w]hether Defendants' conduct has caused, and/or continues to cause members to be exposed to manganese in welding fumes;" (b) "[w]hether Defendants' conduct has caused, and/or continues to cause members to be at an increased risk of developing neurological injury or neuropsychological injury, relative to the non-welder population;" (c) "[w]hether Defendants have intentionally or negligently failed, and/or continue to fail to adequately warn or disclose to members the true risks associated with exposure to manganese in welding fumes;" and (d) "[w]hether Defendants engaged in a course of conduct to suppress, conceal or misrepresent facts relating to the dangers of exposure to manganese in welding fumes."[21]

In support of their assertions that the defendants' conduct has put all class-member welders at increased risk of developing neurological injury, and that medical monitoring is an appropriate mechanism to address this increased risk, the *Steele* plaintiffs offer the following proven facts and allegations, which give context to the Court's class certification decision:

---

[20]  First Amended Complaint (master docket no. 1746) at ¶57.

[21]  *Id.* Plaintiffs also allege another thirteen common questions of law and fact.  *Id.*

8

- manganese is a known neurotoxin.[22]

- most welding rods contain manganese.[23]

- when these welding rods are used, they produce fumes that contain manganese.[24]

- during normal use of welding rods, welders often inhale these welding fumes in amounts exceeding safe levels.[25]

- exposure to the manganese contained in welding fumes can cause brain damage, even after short periods of time.[26]

---

[22] *Id.* at ¶3.  *See In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605 at *2 (N.D. Ohio Apr. 9, 2007) ("*MetLife Opinion*") (quoting "Health Protection of Welders," a safety pamphlet published by Metropolitan Life Insurance Company in 1937, which stated: "Manganese is an important poison from the point of view of its effects rather than from frequency of exposure to it.  Manganese has a selective action on some of the nerve centers of the brain.  It causes a disease similar to paralysis agitans [Parkinson's Disease], which in chronic cases is seldom fatal, but which, owing to the fact that no satisfactory treatment is known, is always disabling.").

[23] *Id.* at ¶125 (quoting a 1966 memorandum authored by defendant Lincoln Electric, which stated: "manganese is common in all electrodes and is by far the major threat to health in mangjet [welding rods]").

[24] *Id.* at ¶62; *see MetLife Opinion*, 2007 WL 1087605 at *2 (quoting "Health Protection of Welders," a safety pamphlet published by Metropolitan Life Insurance Company in 1937, which stated: "Analyses made of electrodes with a manganese content showed a marked diminution in the manganese content after use.  Fume from the electrodes during welding were found to contain manganese, probably a colloidal form of the oxide.").

[25] *Id.* at ¶148; *id.* at ¶71 (quoting a 1994 statement made by The Ferroalloys Association that, to ensure a welder's exposure to manganese contained in welding fumes was kept below the then-proposed (and now adopted) TLV, "respirators would become mandatory at most of our operators").

[26] *Id.* at ¶63; *id.* at ¶103 (quoting the American Welding Society's Health and Safety Committee chairman, who stated in 1984 that "manganese fume can cause a disease quite similar to Parkinson's Disease after six months to two years of exposure."); *id.* at ¶164 (discussing a 2004 report issued by the International Institute of Welding, which stated: "a. Exposure to manganese and/or its compounds can cause brain damage resulting in disorder of mood and movement.  b. Compounds containing manganese are present in fume from steel welding and allied processes.  c. It is impossible to dismiss the possibility that occupational exposure to compounds containing manganese in welding fume may cause manganism and/or enhance susceptibility to or cause Parkinson's Disease in welders.").

- manufacturers of welding rods have known all of the above information for decades.[27]

- these manufacturers have insufficiently warned welders and their employers about the dangers of exposure to manganese in welding fumes;[28] and

- these manufacturers have long acknowledged that, in light of the danger of exposure to manganese in welding fumes, regular medical monitoring of welders is necessary and appropriate.[29]

## III.    Jurisdiction.

The parties agree, and the Court concludes, that it has federal subject matter diversity jurisdiction over the *Steele* action, pursuant to 28 U.S .C. §1332, as amended by the Class Action Fairness Act of 2005 ("CAFA").[30]

Under CAFA, federal courts have jurisdiction in diversity, with exceptions not at issue here,[31] over (1) cases filed as class actions[32] (2) with one hundred or more class members,[33] (3) in which any member of the plaintiff class is a citizen of a state different from that of any defendant (known as "minimal

---

[27] *Id.* at ¶7.  *See MetLife Opinion*, 2007 WL 1087605 (discussing the history of industry knowledge regarding the danger of exposure to manganese in welding fumes).

[28] *Id.*

[29] *Id.* at ¶104 (quoting certain defendant's welding rod Material Safety Data Sheets, which stated that manganese in welding fumes could cause neurological damage and "[e]xposed employees should get quarterly medical examinations for manganism").  *See MetLife Opinion*, 2007 WL 1087605 at *6 (quoting "1021 Answers to Industrial Health and Safety Problems at 64-68 (1943)", which stated that one procedure to help prevent welders from suffering from manganese exposure was to "Examine the workmen four times annually in order to detect early signs or symptoms.").

[30] Pub. L. No. 109-2, 119 Stat. 4 (2005) (codified in scattered sections of 28 U.S.C.)

[31] *See* 28 U.S.C. §1332(d)(3, 4, 5, & 9) (listing exceptions to federal jurisdiction).

[32] *See* 28 U.S.C. §1332(d)(8) (jurisdiction attaches to a putative class action case "before or after the entry of a class certification order by the court with respect to that action").

[33] *See* 28 U.S.C. §1332(d)(5) (federal jurisdiction does not attach if "the number of members of all proposed plaintiff classes in the aggregate is less than 100.")

10

diversity),[34] and (4) where the amount in controversy exceeds $5 million.[35] In the instant case, the number of welder plaintiffs in the proposed class numbers in the tens of thousands; most of the defendants have citizenship different from most of the plaintiffs; and the aggregate cost of the medical monitoring program and other relief requested by the plaintiffs could easily exceed $5 million by a factor of 400 or more.[36] Thus, federal jurisdiction attaches to the *Steele* case and its proposed multi-state plaintiff class.[37]

Indeed, for reasons discussed later, it is notable that this Court would likely have jurisdiction over even a single-state class action brought by plaintiff welders. For example, if the same case had been filed only by plaintiffs who were citizens of Utah (instead of all eight states recited), the above-listed jurisdictional requirements would still be met. And federal jurisdiction would obtain even if this hypothetical case were filed in Utah state court, as the case would almost surely be removed successfully

---

[34] *See* 28 U.S.C. §1332(d)(2)(A) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which – (A) any member of a class of plaintiffs is a citizen of a State different from any defendant"); *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 584 (2005) ("minimal diversity" exists "so long as one party on the plaintiffs' side and one party on the defendants' side are of diverse citizenship").

[35] 28 U.S.C. §1332(d)(2); *see id.* §1332(d)(6) ("In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.").

[36] Hearing tr. at 191, 240 (Apr. 25, 2007) ("That means what plaintiffs are proposing is a program that would cost [$200 million] a year, and over a ten-year period that would be, of course, [$2 billion]."). *See Katz v. Warner-Lambert Co.*, 9 F.Supp.2d 363 364-65 (S.D.N.Y. 1998) (when a plaintiff class brings a claim for medical monitoring and creation of research fund, the amount in controversy is measured by the cost to the defendant of creating the monitoring program and/or the research fund); *In re Rezulin Prods. Liab. Litig.*, 168 F.Supp.2d 136, 152-53 (S.D.N.Y. 2001) (same).

[37] Although the defendants do not argue otherwise, it is also worth noting that the *Steele* plaintiffs clearly have standing under Article III to assert their claims for medical monitoring. *See Sutton v. St. Jude Medical S.C., Inc.*, 419 F.3d 568, 570 (6th Cir. 2005) (reversing the district court's conclusion that "as-of-yet uninjured [medical] device implantees" did not have standing to pursue a claim for medical monitoring).

to federal court.[38]  These circumstances differ from the pre-CAFA world, when federal jurisdiction

required *complete* diversity between plaintiffs and defendants, even in class actions.[39]

## IV.    Legal Standards for Class Certification.

### A.    General Standards.

To obtain class certification, the *Steele* plaintiffs "must meet all four requirements of Rule 23(a)

and the requirements of at least one of the subdivisions of Rule 23(b)."[40]  The four requirements set out

in Rule 23(a) are known as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.

---

[38]  It is easier after CAFA for defendants to remove to federal court a putative class action than an ordinary case.  *See Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*, 485 F.3d 804, 810 (5th Cir. 2007) ("CAFA eliminates the standard [removal] requirements of unanimous consent among the defendants and the one-year removal deadline"); 28 U.S.C. §1453(b) ("A class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section 1446(b) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants."); *In re General Motors Corp. Dex-Cool*, 2006 WL 2818773 (S.D. Ill. Sept. 27, 2006) ("Class actions filed in state court that satisfy the jurisdictional prerequisites of CAFA are subject to removal to federal court.").

On the other hand, it is more likely that an "exception" to federal jurisdiction would apply to a single-state plaintiff class.  *See Preston*, 485 F.3d at 810 ("The district court can decline jurisdiction under three provisions: (1) the home state exception, §1332(d)(4)(B); (2) the local controversy exception, §1332(d)(4)(A); and (3) discretionary jurisdiction, §1332(d)(3).").  Thus, for example, even though federal jurisdiction might otherwise exist over an Ohio-only welder plaintiff class action that was filed in Ohio state court and removed, this Court might have to "decline to exercise" that jurisdiction and remand the case.  *See Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1022 (9th Cir. 2007) ("Implicit in both subsections [1332](d)(3) and (d)(4) is that the court has jurisdiction, but the court either may or must decline to exercise such jurisdiction.").

[39]  The law prior to CAFA was that, in a federal class action, "the citizenship of the named class representatives must be [completely] diverse from that of the defendants."  *In re School Asbestos Litigation*, 921 F.2d 1310, 1317 (3rd Cir. 1990) (citing *Snyder v. Harris*, 394 U.S. 332, 340 (1969)).  It was not true, however, that "the citizenship of *each* class plaintiff must be [completely] diverse from the citizenship of each defendant."  *Id.* (emphasis added).

[40]  *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 565 (E.D. Ark. 2005).

12

Specifically, the *Steele* plaintiffs may sue as representative parties "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."[41]

Because the *Steele* plaintiffs pray exclusively for equitable relief, as opposed to legal damages, they seek certification pursuant to Rule 23(b)(2).  This subsection provides that the *Steele* plaintiffs may prosecute their lawsuit as a class action only if they show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

The Sixth Circuit Court of Appeals[42] has warned that a case is "not maintainable as a class action [simply] by virtue of its designation as such in the pleadings."[43]  Rather, "[t]here must be an adequate statement of the basic facts to indicate that each requirement of [Rule 23] is fulfilled."[44]  Ordinarily, the Court's determination of whether to certify a class "should be predicated on more information than the pleadings will provide . . . .  The parties should be afforded an opportunity to present evidence on the

---

[41]  Fed. R. Civ. P. 23(a).

[42]  Another MDL court recently concluded that, "in considering a motion for class certification of state claims under Rule 23, the law of the transferor circuit controls."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435, 441 (S.D.N.Y. 2007).  Having so concluded, however, the *In re MTBE* court went on to cite case law regarding class certification from a variety of circuits, probably because the law on class certification is not appreciably different amongst federal circuits.  Thus, even though the transferor circuit in this case is the Ninth Circuit, this Court cites generally-applicable standards for class certification shared by all federal courts.

[43]  *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

[44]  *Id.*

maintainability of the class action."[45]  In this case, the Court received evidence and argument at a two-day

class certification hearing, as well as through affidavits attached to the parties' extensive briefs.[46]

    As the parties requesting class certification, the *Steele* plaintiffs bear the burden of showing that

their proposed class should be certified and the requirements of Rule 23 are met.[47]  A district court should

not certify a class unless it has found, "through rigorous analysis, that all the prerequisites of Rule 23(a)

have been satisfied."[48]  Generally, however, a district court "has broad discretion in determining whether

to certify a class."[49]

    A court may not deny certification based on a preliminary inquiry into the substantive merits of

the plaintiffs' claims, or a determination that the plaintiffs are unlikely to succeed.[50]  That is, the strength

of a plaintiff's claim should not affect the certification decision.  On the other hand, a district court should

look past the pleadings when determining whether the requirements of Rule 23 have been met.  Going

beyond the pleadings is necessary because a court "must understand the claims, defenses, relevant facts,

---

[45]  *Id.* (quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974) (citation omitted, ellipsis in original).

[46]  In addition, the parties' presentation of evidence at several *Daubert* hearings and the two prior MDL trials has educated the Court fully regarding the factual and legal issues relevant to class certification.

[47]  *See Golden v. City of Columbus*, 404 F.3d 950, 965 (6th Cir. 2005), *cert. denied*, 126 S.Ct. 738 (2005) ("the party seeking class certification . . . bears the burden of proof") (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).

[48]  *Falcon*, 457 U.S. at 161.

[49]  *In re American Medical Sys.*, 75 F.3d at 1079.

[50]  *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

and applicable substantive law in order to make a meaningful determination of the certification issues."[51]

Ultimately, a class action is appropriately certified if it will "conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion."[52]

**B.     Rule 23(b)(2) and Rule 23(b)(3).**

Before turning to an analysis of whether the *Steele* plaintiffs meet the requirements set out above, the Court examines the defendants' argument that,

> as a threshold matter, plaintiffs err in arguing that their class certification bid should be evaluated under Fed. R. Civ. P. 23(b)(2). Because the members of plaintiffs' proposed classes are not bound together by any legal relationship or trait and because the medical monitoring remedy plaintiffs seek is primarily monetary, as opposed to injunctive, in nature, their claims should be subject to the predominance, superiority and manageability requirements of Rule 23(b)(3).[53]

Although the *Steele* plaintiffs assert in passing that class certification "could also be proper under Rule 23(b)(3),"[54] they respond that they have invoked the proper subdivision of Rule 23 and should not have

---

[51]  *Id.* (citing *Manual for Complex Litigation* §30.11 (3rd ed. 1995)).  *See Barnes v. American Tobacco Co., Inc.*, 176 F.R.D. 479, 489 (E.D. Pa. 1997), *affirmed*, 161 F.3d 127 (3rd Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999) (observing that a court "must attempt to strike the fine balance between permissibly identifying the issues that the case will present for purposes of determining whether the requirements of Rule 23 have been met and impermissibly deciding those issues on the merits").

[52]  *In re Baycol Prods. Liab. Litig*, 218 F.R.D. 197 (D. Minn. 2003).

[53]  Response brief (master docket no. 1985) at 28.

[54]  Certification motion (master docket no. 1838) at 3 n.5.  *See In re Telectronics Pacing System, Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997), *mandamus denied*, No. 97-3448 (6th Cir. June 11, 1997) (certifying a medical monitoring class action under both Rules 23(b)(2) and (b)(3)).

to meet "the relatively more stringent requirements of Rule 23(b)(3)."[55]  The Court agrees.

The *Manual for Complex Litigation* observes that "[c]ourts are divided over whether Rule 23(b)(2) or 23(b)(3) is the appropriate vehicle for certifying a mass tort class for medical monitoring," but further notes that "Rule 23(b)(2) generally applies when the relief sought is a court-supervised program for periodic medical examination and research to detect diseases attributable to the product in question."[56] If, instead, "money damages are the relief primarily sought in a medical monitoring class, as in programs that pay class members but leave it to the members to arrange for and obtain tests, certification must generally meet the Rule 23(b)(3) standards."[57]

In this case, the *Steele* plaintiffs ask only for injunctive relief, in the form of a court-supervised medical monitoring program.[58]  The *Steele* plaintiffs do not ask for any money damages; indeed, the proposed class definition includes only welders "who are not presently asserting claims for manganese-related injury."[59]  Nor do the *Steele* plaintiffs ask that defendants simply be ordered to: (1) pay

---

[55] *Plymouth County Nuclear Info. Committee, Inc. v. Boston Edison Co.*, 655 F.2d 15, 18 n.7 (1st Cir. 1981).  *See In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 145 (E.D. La. 2002) ("Unlike Rule 23(b)(3), Rule 23(b)(2) does not expressly require that issues of law or fact common to the members of the class *predominate* over any questions affecting only individual members.  Rather, what is required under (b)(2), in addition to satisfying the prerequisites of Rule 23(a), is a finding [only] that the 'opposing party has acted or refused to act on grounds *generally applicable* to the class'") (citations omitted, emphasis in original); *Parker v. Time Warner Entertainment Co., L.P.*, 239 F.R.D. 318, 332 (E.D.N.Y. 2007) ("In contrast to the more lenient 23(b)(2) requirements, Rule 23(c)(2)(B) provides stringent notice requirements for 23(b)(3) classes").

[56] *Manual for Complex Litigation* §22.74 at 427 (4th ed. 2004) (footnote omitted).

[57] *Id.* (footnote omitted).  Put more simply, "[t]he choice between application of Federal Rules of Procedure 23(b)(2) and (b)(3) revolves around whether the complaint is seeking predominantly money damages or equitable relief."  *Id.* §22.74 at 425.

[58] *See* First Amended Complaint (master docket no. 1746) at ¶171.

[59] *Id.* ¶54.

16

them "a certain sum of money" directly, which they then "may or may not choose to use" to monitor their medical condition; or (2) "pay [their] medical expenses directly so that [they] may be monitored by the physician of [their] choice."[60]

Rather, the *Steele* plaintiffs ask the Court to "establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced is utilized for group studies."[61]  Courts routinely find that, "[u]nder these circumstances, the [requested] relief constitutes injunctive relief as required by Rule 23(b)(2)."[62]  The *Steele* plaintiffs were careful to ask only for medical monitoring relief that is truly equitable in nature.  Accordingly, it is the requirements of Rules 23(a) and 23(b)(2) that they must meet to obtain class certification.

## V.     Choice of Law.

Another MDL court has recently observed that Rule 23 "makes no reference to choice-of-law issues, but, in [multi-state] class actions, choice-of-law constraints are constitutionally mandated because

---

[60] *Barnes v. American Tobacco Co.*, 161 F.3d 127, 132 (3rd Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999) (quoting *Day v. NLO, Inc.*, 144 F.R.D. 330, 335-36 (S.D. Ohio 1992), *reversed on other grounds*, 5 F.3d 154 (6th Cir. 1993)).  The *Barnes* and *Day* courts found that "neither of these forms of relief constitute injunctive relief as required by Rule 23(b)(2)."  *Id.*

[61] *Id.*

[62] *Id.*; *see also Wilson v. Brush Wellman*, 817 N.E.2d 59, 65 (Ohio 2004) ("Court supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive.  It has the added advantage of being a bright-line test, which can be readily and consistently applied."); *cf. Lewallen v. Medtronic USA, Inc.*, 2002 WL 31300899 (N.D. Cal. Aug 28, 2002) (distinguishing between cases where plaintiffs seek "the establishment of a medical monitoring fund, rather than the establishment of a medical monitoring program"); *Mehl v. Canadian Pacific Railway Ltd.*, 227 F.R.D. 505, 519 (D. N.D. 2005) (denying medical monitoring class certification under Rule 23(b)(2) because, *inter alia*, the Plaintiffs requested only simple compensation, not "a court-supervised medical monitoring fund or program").

a party has a right to have her claims governed by the state law applicable to her particular case."[63]  Indeed, the *In re Prempro* court further concluded that when, as in *Steele*, "[multi-state] class certification is sought in a case based on common law claims, the question of which law governs is crucial in making a class certification determination.  Not only must the choice-of-law issue be addressed at the class certification stage – it must be tackled at the front end since it pervades every element of [Rule] 23."[64]

In fact, this approach is necessary only if there is a true conflict between the laws of the different states that might apply to each plaintiff.  In *Phillips Petroleum Co. v. Shutts*, the Supreme Court held that, if there is no meaningful conflict of laws, there is no need to engage in a choice-of-law analysis.[65]  In this case, the *Steele* plaintiffs posit that there is no such conflict, for two reasons.  First, plaintiffs assert that the law of the particular eight states they have chosen to include in their proposed class is not different from one state to the next: all eight states recognize medical monitoring, and do not require the plaintiff to suffer actual physical injury to obtain it.  Second, plaintiffs explain that, because they "seek certification of [separate] classes from [each of the] eight states, rather than the application of one particular state's law to the claims of class members [of] all 8 (or even 50) states, the Court need not engage in a choice-of-law analysis or determine whether the state laws are uniform – often the most challenging predicate to class

---

[63] *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 562 (E.D. Ark. 2005).

[64] *Id.* at 561.  In multi-state cases where certification is sought under Rule 23(b)(3), courts usually undertake the choice-of-law analysis "when assessing the predominance requirement." *Id.* at 562 (citing *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 (5th Cir. 2000) and *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)).

[65] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985) (examining choice-of-law issues in a national class action and holding that "there can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit").  The *Shutts* court identified conflicts between Kansas law and the law of other states, and ruled that application of Kansas law to transactions that occurred in these other states was unconstitutional.

certification in other multi-state cases."[66]  Essentially, the plaintiffs maintain that the mechanism of using single-state subclasses, which can be considered and tried separately, avoids the need to engage in a choice-of-law analysis, since the law applicable to each plaintiff will simply be the law of their state of domicile.

The Court examines these two arguments below.


A.  **Medical Monitoring Law**.

The law of medical monitoring varies from state to state.[67]  Some states recognize medical monitoring as an element of damages when liability is otherwise established,[68] while other states recognize medical monitoring as an independent cause of action;[69] some states require proof of a present,

---

[66]  Certification motion (master docket 1838) at 36.

[67]  *See In re Telectronics Pacing Systems, Inc.*, 168 F.R.D. 203, 215-17 (S.D. Ohio 1996) (undertaking a survey of the then-existing law of medical monitoring in 21 different jurisdictions); *Paz v. Brush Engineered Materials, Inc.*, 949 So.2d 1, 6 (Miss. 2007) (surveying the law of medical monitoring in 29 different jurisdictions).  The *Telectronics* court later concluded that "most variations in state law regarding medical monitoring are immaterial," but this statement remains consistent with the conclusion that some of the variations *are* material.  *In re Telectronics Pacing System, Inc.*, 172 F.R.D. 271, 287 (S.D. Ohio 1997), *mandamus denied*, No. 97-3448 (6th Cir. June 11, 1997).

[68]  *See, e.g., Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 823 (Cal. 1993) ("we conclude that a reasonably certain need for medical monitoring is an item of damage for which compensation should be allowed").

[69]  *See, e.g., Redland Soccer Club, Inc. v. Department of the Army and Dept. of Defense of the U.S.*, 696 A.2d 137, 145 (Pa. 1997) ("we hold that a plaintiff must prove the following elements to prevail on a common law claim for medical monitoring . . . .").

19

physical injury to obtain medical monitoring,[70] and some do not;[71] and some states do not provide for medical monitoring at all.[72]

The *Steele* plaintiffs seek certification of their medical monitoring claims in eight different states: Arizona, California, Florida, New Jersey, Ohio, Pennsylvania, Utah, and West Virginia.  The parties agree that medical monitoring is recognized in all of these states, and that a plaintiff need *not* manifest a present, physical injury to obtain it.  For example, in Utah, to obtain medical monitoring, a plaintiff must prove:

(1)     exposure
(2)     to a toxic substance,
(3)     which exposure was caused by the defendant's negligence,
(4)     resulting in an increased risk
(5)     of a serious disease, illness, or injury
(6)     for which a medical test for early detection exists
(7)     and for which early detection is beneficial, meaning that a treatment exists that can alter the course of the illness,
(8)     and which test has been prescribed by a qualified physician according to contemporary scientific principles.[73]

---

[70] *See, e.g., Crooks v. Metropolitan Life Ins. Co.*, 785 So.2d 810, 811 (La. 2001) ("damages do not include costs for medical monitoring or future medical treatment unless such treatment is directly related to a manifest physical or mental injury or disease").

[71] *See, e.g., Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 717 (Mo. 2007) ("[a] physical injury requirement is inconsistent with the reality of latent injury and with the fact that the purpose of medical monitoring is to facilitate the early diagnosis and treatment of latent injuries caused by exposure to toxins"; reversing lower court's denial of certification of a medical monitoring class).

[72] *See, e.g., Johnson v. Abbott Laboratories*, 2004 WL 3245947 at *6 (Ind. Cir. Ct. Dec. 31, 2004) ("Indiana does not recognize medical monitoring as a cause of action . . . , nor have Moving Plaintiffs referred to a single Indiana case in which such relief was granted") (citation omitted).

[73] *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993); *see id.* at 977 (agreeing that Utah "tort law should encompass a cause of action for diagnostic examinations without proof of actual injury").

20

The other seven states list similar requirements, and their cases often cross-reference each other.[74]

There are, however, at least minor differences among these eight states regarding what a plaintiff must show to obtain medical monitoring. For example, in connection with the fourth requirement, "[s]ome courts have adopted a lesser standard for evaluating how much of an increase in risk plaintiffs must show to trigger the medical monitoring remedy."[75] Also, the defenses available vary among the eight states. For example, in both Pennsylvania and Utah, the third element of a claim for medical monitoring is that the plaintiff's exposure to a hazardous or toxic substance was "caused by defendant's negligence,"[76] but the comparative negligence principles of the two states work differently in regard to when a plaintiff would be barred from recovery.[77] Another example: compliance with federal governmental labeling standards

---

[74] *See Burns v. Jaquays Mining Corp.*, 752 P.2d 28, 33 (Ariz. Ct. App. 1987), *review dismissed*, 781 P.2d 1373 (Ariz. 1989); *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 824-25 (Cal. 1993); *Petito v. A.H. Robins Co., Inc.*, 750 So.2d 103, 106-07 (Fla. Ct. App. 1999), *review denied*, 780 So.2d 912 (Fla. 2001); *Ayers v. Jackson Township*, 525 A.2d 287, 313 (N.J. 1987); *Day v. NLO*, 851 F. Supp. 869, 881-83 (S.D. Ohio 1994); *Redland Soccer Club, Inc. v. Department of the Army and Dept. of Defense of the U.S.*, 696 A.2d 137, 145-46 (Pa. 1997); *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 432-33 (W. Va. 1999). *See also Manual for Complex Litigation* §22.74 at 425 (4th ed. 2004) ("The elements of state law claims for medical monitoring typically include exposure to a harmful substance or product that the defendant marketed or wrongfully released into the environment and that has significantly increased the plaintiffs' risk of developing a serious latent disease. Plaintiffs must show that the defendant caused the exposure to the substance and the consequent increase in risk. Courts generally require plaintiffs to show that diagnostic tests exist, that the increased risk has made testing reasonably necessary, and that early detection can significantly improve medical treatment of the disease.").
Of course, that the *Steele* plaintiffs seek to prosecute their claims as a class action does not "alter the required elements which must be found to impose liability." *Cimino v. Raymark Industries, Inc.*, 151 F.3d 297, 312 (5th Cir. 1998).

[75] *Manual for Complex Litigation* §22.74 at 425 (4th ed. 2004).

[76] *Redland Soccer Club*, 696 A.2d at 145-46; *Hansen*, 858 P.2d at 979.

[77] *Cf.* Utah Code Ann. §78-27-38(2) (barring recovery if the plaintiff's negligence exceeds that of all other parties combined, regardless of whether they are before the court); 42 Pa. C. S. A. §7102(a) (barring recovery if the plaintiff's negligence exceeds that of all "defendants against whom recovery is sought").

creates a rebuttable presumption against liability in Florida, but no such presumption attaches in Pennsylvania.[78]

The defendants cite Rule 23(a)(2) and argue that the differences in medical monitoring law between the eight states, *alone*, precludes class certification, because the questions of law common to the class are outweighed by the questions of law that are not shared by all class members, making any class-wide trial unmanageable. The Court disagrees, because the *Steele* plaintiffs have devised a reasonable mechanism to deal with, at trial, the relatively few state-to-state differences.

It is critical to note that the *Steele* plaintiffs do not seek to apply the law of a single state to all of the proposed class members, as was the case in *Shutts*,[79] nor do they seek to "merge" the law of the different states by averaging or melding the legal standards into "a kind of Esperanto [jury] instruction."[80] Rather, the plaintiffs propose single-state subclasses; if necessary, each subclass could try its claims

---

[78] *Cf.* Fla. Stat. Ann. §768.1256(1) ("In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the product is not defective or unreasonably dangerous and the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm: (a) Complied with federal or state codes, statutes, rules, regulations, or standards relevant to the event causing the death or injury; * * * *"); *Sheehan v. Cincinnati Shaper Co.*, 555 A.2d 1352, 1355 (Pa. Super. Ct. 1989) ("the introduction of [federal safety] standards in a strict products liability case was impermissible because such evidence had the effect of introducing the reasonableness of the manufacturer's conduct into an action which focuses, for public policy reasons, upon the existence of a defect").

[79] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985); *see also In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 147 (E.D. La. 2002) (denying class certification because, inter alia, the plaintiffs "have operated under the assumption that the law of only one state – New Jersey – would be applicable" to the entire nationwide class).

[80] *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995), *cert denied*, 516 U.S. 867 (1995).

separately.[81]  This would avoid almost completely the tangled choice-of-law problems presented in other multi-state medical monitoring cases.  For example, in *In re Prempro*, the plaintiffs proposed categorizing 24 states, which "indisputably address[ed] medical monitoring in a number of ways," into several groups of states with similar laws.[82]  But the *In re Prempro* plaintiffs did not submit a workable plan; as noted above, even states that recognize medical monitoring as a cause of action and do not require physical injury still have at least modestly different legal standards.  The *In re Prempro* plaintiffs' grouping proposal created an unworkable set of circumstances for trial.[83]

The smaller breadth of difference between the eight relevant state laws in this case, and the *Steele* plaintiffs' proposal on how to deal with those differences, distinguishes this lawsuit from *In re Prempro* and similar cases.  As noted above, the aspects of the relevant legal standards that the eight particular states chosen by plaintiffs have in common far outweigh those aspects that are different.  The elements of a cause of action for medical monitoring in Florida, Pennsylvania, Utah, and West Virginia, for example, are virtually identical.  In such circumstances, choice-of-law issues can be managed by using carefully-crafted jury instructions.  As *Newberg* observes, "careful trial planning with the use of jury interrogatories and special verdicts will avoid most jury-instruction complexities in multistate class actions, even when varied

---

[81] *See* Fed. R. Civ. P. 23(c)(4)(B) ("When appropriate * * * a class may be divided into subclasses and each subclass treated as a class").

[82] *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 569 (E.D. Ark. 2005).

[83] *Id.* at 569, 568 (noting "the fact that medical monitoring is not treated uniformly throughout the United States creates a myriad of legal issues," and that plaintiffs "fail[ed] to present a manageable plan" for trial"); *see also In re Propulsid*, 208 F.R.D. at 147 (concluding a nationwide class trial would be unmanageable because "[i]t is unclear how many different state laws are applicable or for that matter whether these laws may be grouped in to a smaller number of more manageable categories.").

23

state laws might be applicable under the principles of *Shutts*."[84]

The "broad discretion" that a district court enjoys in determining whether to certify a class goes principally to the question of whether the court reasonably concludes it could manage the complexities that class certification carries.  The undersigned believes a court[85] could manage the differences in medical monitoring law among the eight states chosen by the *Steele* plaintiffs by holding separate trials for each state-wide subclass, or perhaps a combined trial for a few statewide subclasses, where the law in those

---

[84]  Alba Conte and Herbert B. Newberg, 3 *Newberg on Class Actions* §9:68 at 463 (4th ed. 2005); *see also Manual for Complex Litigation* §§11.633, 12.451 (4th ed. 2004) (discussing the use of special verdicts and interrogatories as a mechanism for dealing with complicated choice-of-law issues).

*Newberg* explicates: "The *Shutts* choice of law requirements seemingly place impossible complexities in the litigation path of multistate or national diversity suits with respect to ascertaining applicable laws, applying choice of law standards, attempting to divide the class into subclasses in order to assure that all class members in states with similar laws can be tried together, and trying to sort out the variable state laws in a noncomplex fashion for meaningful jury instructions. The application of the laws of multiple states to a common set of claims certainly has potential complexities, but, on analysis, procedures and litigation devices are available, in common usage, to render these tasks manifestly manageable for the court, the jury, and all the parties."  3 *Newberg on Class Actions* §9:68 at 463.

[85]  Because the *Steele* case was filed in the district court for the Northern District of California and transferred to this Court pursuant to 28 U.S.C. §1407(a), the ultimate trial of the matter must occur in the Northern District of California.  *See* 28 U.S.C. §1407(a) (cases transferred to MDL courts "*shall* be remanded by the [MDL Panel] at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated") (emphasis added); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40-41 (1998) (ruling that a district court conducting pretrial proceedings pursuant to §1407(a) has no authority to invoke §1404(a) to assign a transferred case to itself for trial); *but see Solis v. Lincoln Elec. Co.*, 2006 WL 266530 at *3-4 (N.D. Ohio Feb. 1, 2006) (noting that, because §1407(a) is simply a venue statute and not a jurisdictional limitation, a *Lexecon* issue can be cured by waiver of venue objection or re-filing of the complaint in the transferee Court).

states is similar enough to allow creation of jury instructions and a verdict form that is not too complex.[86]

Essentially, by choosing only the eight states they did, and proposing single-state subclasses, the *Steele*

plaintiffs overcome the choice-of-law concerns raised by other courts in the context of requests for medical

monitoring class certification.[87]

There are other issues related to trial complexity, discussed below, which convince the Court that

class certification is not appropriate in this case.  But the Court is not persuaded by defendants' argument

that, because the eight statewide subclasses chosen by the *Steele* plaintiffs are governed by medical

monitoring laws that are slightly different, class certification would lead to an unmanageable proceeding.

### B.  Single-State Subclasses.

In fact, the defendants ultimately conceded at oral argument that, if the Court were to engage in

separate trials for each statewide subclass, "some of the state law variation problems" would be solved.[88]

But defendants push their choice-of-law argument further, arguing that plaintiffs' effort to use a

---

[86]  In a response to an interrogatory, the *Steele* plaintiffs originally stated they would "likely propose a single trial if class certification is granted;" however, plaintiffs modified their position on brief and at oral argument, stating the trial could "be done [either] one state at a time" or "for all eight states at once" or could even be bifurcated, with truly common issues tried first.  Hearing tr. at 142-44 (Apr. 24, 2007).  *See also id.* at 124-25 ("You could also elect to conduct eight one-state trials, each under its own state law, or select one state as a test case trial first on both the medical monitoring remedy and liability.");  reply brief (master docket no. 2020) at 70 ("This Court need not conduct eight separate trials, although it may request the jury to enter eight sets of special verdict/jury interrogatories.");  hearing tr. at 216-217 (Apr. 25, 2007) ("There were alternative proposals.  One is that you could try it together, and the other is that you can have eight separate trials.").

[87]  *See Lewis v. Bayer AG*, 2004 WL 1146692 (Pa. Ct. Com. Pl. 2004) (denying certification of a nationwide medical monitoring class, but certifying a single-state medical monitoring class of Pennsylvanians who used a certain allegedly defective prescription drug).  *See also* footnotes 154 & 177, below (discussing cases where courts mitigated choice-of-law issues by certifying a class smaller in size than the requested multi-state class).

[88]  Hearing tr. at 217 (Apr. 25, 2007).

"subclassing mechanism" to avoid a choice-of-law problem is too simplistic, because another aspect of the problem remains.  Defendants explain that, *even within a single-state subclass of welders*, the Court would be faced with additional choice-of-law issues of constitutional magnitude.  An example of the problem that defendants envision is as follows:  A welder who is a citizen of Florida, and would thereby be included in the Florida single-state subclass, may have actually spent his entire welding career in Michigan, before retiring to Florida.  While Florida recognizes a claim for medical monitoring, Michigan does not.[89]  Given this clear conflict, the Court would have to determine whether Michigan or Florida law applies.  To make this determination, the Court would have to apply the choice-of-law rules of California, because that is where the *Steele* complaint was originally filed.[90]  California uses a three-step "governmental interest" test to determine which state's laws apply, in the case of conflict.[91]

---

[89]  *See Henry v. Dow Chemical Co.*, 701 N.W.2d 684, 702 (Mich. 2005) ("regardless of whether the relief plaintiffs seek is equitable or legal in nature, defendant was entitled to summary disposition regarding plaintiffs' medical monitoring cause of action because plaintiffs have not stated a valid cause of action"); *id.* at 704 ("The [medical monitoring] cause of action proposed by plaintiffs is not cognizable under Michigan law.").

[90]  Federal courts sitting in diversity must apply the choice-of-law rules of the forum state.  *In re Vioxx Prods. Liab. Litig.,* 239 F.R.D. 450, 454 (E.D. La. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,*, 313 U.S. 487, 496 (1941)).  "In MDL cases, the forum state is typically the state in which the action was initially filed before being transferred to the MDL court."  *Id.*  In the *Steele* case, the original complaint was filed in the Northern District of California; thus, this Court must apply the choice-of-law rules of California.  It is immaterial that the *Steele* plaintiffs subsequently filed their First Amended Complaint on the MDL master docket, as opposed to the *Steele* docket.  *See In re Propulsid*, 208 F.R.D. at 142 (concluding that the master complaint filed on the master MDL docket was "merely a procedural device," and the choice-of-law analysis was governed by the law of the forum of the transferor court, where the "specific action brought before the Court for class certification" was originally filed).

[91]  *See Clothesrigger, Inc. v. GTE Corp.*, 236 Cal. Rptr. 605, 608-09 (Cal. Ct. App. 1987) ("Analysis of a choice of law question proceeds in three steps: (1) determination of whether the potentially concerned states have different laws, (2) consideration of whether each of the states has an interest in having its law applied to the case, and (3) if the laws are different and each has an interest in having its law applied (a 'true' conflict), selection of which state's law to apply by determining which state's interests would be more impaired if its policy were subordinated to the policy of the other state.").

Defendants assert that, in the hypothetical situation of the Michigan welder who retired to Florida, California choice-of-law rules would likely result in application of Michigan law.  Assuming that defendants are correct, it then follows that, the more "relocated welders" there are, the less integrated would be the legal standards applicable to even the single-state class of Florida plaintiffs.  Further, defendants contend, simply having to undertake this choice-of-law analysis for each plaintiff in a single-state class gives rise to a legal brain-teaser of immense proportions – thus demonstrating that a trial of a class limited in scope to a single state would still be unmanageable.

It is true that other courts have concluded that choice-of-law issues, even in single-state classes, can implicate so many individual issues that a class trial becomes unmanageable.[92]  Of course, California courts applying the governmental interest test have also concluded otherwise, and certified classes with a scope statewide and beyond;[93] the real question is the degree to which the class definition implicates individual issues.  Indeed, to some extent, the choice-of-law issues raised by defendants can be avoided by slightly re-defining the class.[94]  For example, defendants' "moved welder" hypothetical suggests possible choice-of-law problems only with the "former welder" subclasses, not the "current welder" subclasses; thus, even accepting defendants' arguments, partial certification could avoid much of any

_____

[92]  *See Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 394 (D. Kan. 1998) ("To determine if [the alleged 'class injury' of addiction] occurred in Kansas, a conclusion would have to be reached as to each member that they became addicted to cigarettes in Kansas.  Only after such consideration is it possible to determine whether each person can be admitted to the class.  * * *  The task is unimaginably difficult considering the individual inquiry required to determine addiction.  Plaintiffs' attempt to overcome the choice of law concerns recognized by other courts greatly enhances the unmanageability of the class.").

[93]  *See, e.g., Church v. Consolidated Freightways, Inc.*, 1992 WL 370829 (N.D. Cal. Sept. 14, 1992) (certifying a California statewide subclass for claims of fraud and negligent misrepresentation, after finding that conflict of laws issues did not preclude certification, and even though "a large percentage of potential class members do not reside in California").

[94]  *See id.* (granting class certification to a re-defined class, after having earlier denied it).

27

choice-of-law problem.[95]

Ultimately, however, the Court does not analyze fully defendants' argument that choice-of-law issues cloud even single-state welder classes, precluding certification.  For the reasons discussed in Section VI.D of this opinion below, the Court concludes that class certification is inappropriate because of other, more intractable problems.

## VI.    Rule 23(a).

The Court now turns to an examination of the four prerequisites set out in Rule 23(a), although not in the same order as they are set out in the Rule.  While the four prerequisites tend to overlap, the Court examines different aspects of the propriety of class certification under each requirement.[96]

---

[95]  For example, the choice-of-law issues associated with the "retired/moved welder" diminish if the class definition: (1) does not include "former welders;" and/or (2) limits class inclusion to residents who did a substantial amount of their welding in the state.  Unlike *Emig*, in which the court believed a mini-trial would be required to determine where each plaintiff became addicted, in the case at hand simple employment information, such as that contained in the plaintiff fact sheets, could reveal whether substantial exposure to welding fumes occurred in the state of residence.

[96]  Higher courts have observed that analyses of the second, third, and fourth prerequisites can all overlap.  *See Amchem*, 521 US at 626 n.20 ("[t]he adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)"); *In re American Medical Sys., Inc.*, 75 F.3d at 1083 (the adequacy requirement "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members"); *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998) (the "commonality and typicality requirements of Rule 23(a) tend to merge").  To avoid duplicative analyses, this Court examines, under the rubric of "adequacy," only the competency of class counsel and the existence of intra-class conflicts of interest.  Under the rubric of "commonality," the Court examines only whether the plaintiffs meet the minimum requirements for common questions of law and fact.  And under the rubric of "typicality," the Court examines the nature of the plaintiffs' claims and the differences across class members.

A.      **Rule 23(a)(1) – Numerosity.**

Under Rule 23(a)(1), the putative class must be "so numerous that joinder of all members is impracticable."  "No strict numerical test exists to determine when a class is so numerous that joinder is impracticable."[97]  Rather, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.[98]  When class size "reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone."[99]  The Sixth Circuit Court of Appeals has affirmed certification of a class made up of less than 100 individuals.[100]

The numerosity requirement is also satisfied more easily upon a showing that there is wide "geographical diversity of class members," which makes joinder of all the class members more impracticable.[101]  Satisfaction of the numerosity requirement "does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required."[102]

In this case, the *Steele* plaintiffs estimate "there are well over a thousand current and former welders in each of the proposed [sub]Classes," and these plaintiffs are dispersed across the country.[103]  "The numerosity requirement is met when plaintiffs demonstrate that the number of potential class

---

[97]  *In re Telectronics*, 172 F.R.D. at 279 (citing *In re American Medical Systems*, 75 F.3d at 1079).

[98]  *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330 (1980).

[99]  *Id.*

[100]  *See Haytcher v. ABS Industries, Inc.*, 1991 WL 278981 at *1-2 (6th Cir. 1991)  ("approximately 61 individuals").

[101]  *Council of and for the Blind of Delaware County Valley, Inc. v. Regan*, 709 F.2d 1521, 1319 (D.C. Cir. 1983).

[102]  *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 63 (S.D. Ohio 1991) (citations omitted).

[103]  Certification motion (master docket 1838) at 58.

members is large, even if plaintiffs do not know the exact figure."[104]  Defendants do not challenge the plaintiffs' assertion that each of the subclasses meets the numerosity requirement.  Accordingly, the Court finds this requirement is clearly satisfied.

**B.      Rule 23(a)(2) – Commonality.**

Rule 23(a)(2) provides that a prerequisite to class action certification is the presence of "questions of law or fact common to the class."  The Sixth Circuit Court of Appeals has observed that, "[a]lthough Rule 23(a)(2) refers to common questions of law or fact, in the plural, there need only be one question common to the class."[105]  This single question, however, must present a "common issue the resolution of which will advance the litigation."[106]  The Sixth Circuit has further observed that "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is

---

[104]  *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 601 (E.D. Mich. 1985).

[105]  *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *see In re American Medical Systems, Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996) (the commonality test "is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class") (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.10, at 3-50 (3rd ed. 1992)).

[106]  *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc), *cert. denied*, 524 U.S 923 (1998).

30

impermissible."[107]  In fact, "the commonality requirement has been characterized as a 'low hurdle' easily surmounted."[108]

This Court concludes that the *Steele* plaintiffs meet the commonality prerequisite.  The evidence required to prove many of the necessary elements of a medical monitoring claim will be common to every plaintiff in the class, regardless of which state law applies.  For example, one of the elements of the *Steele* plaintiffs' claims for medical monitoring is that their exposure to welding fumes "result[ed] in an increased risk of a serious disease, illness, or injury."[109]  It is certain that the expert testimony from both plaintiffs and defendants going to this issue will be the same for each class member plaintiff.[110]  The same is true regarding the question of whether a medical test exists for early detection of Manganese-Induced

---

[107]  *In re American Medical Systems, Inc.*, 75 F.3d at 1080 (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)).  *See also Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 479 (S.D. Ohio 2004) ("the Sixth Circuit, as well as others, has held that class certification will not be denied simply because the class members' claims have some factual dissimilarities").  Thus, for example, a federal district court found the commonality requirement satisfied in a case where the plaintiff class members sought medical monitoring after being exposed to the chemical TCE in their drinking water, even though a number of factors varied among and between class members, including: "exposure history, amount of water used or consumed, personal medical histories affecting the risk of illness, Tucson's water distribution patterns, TCE concentration levels, sources of TCE, and [the defendant's] course of conduct over the years," as well as "variation in susceptibility to disease."  *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 712-13 (D. Ariz. 1993).

[108]  *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996); *see In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006) ("[t]here is a low threshold for commonality, and the fact that some plaintiffs have different claims or require individualized analysis does not defeat commonality").

[109]  *See, e.g., Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993) (setting out this requirement as elements four and five of a claim for medical monitoring); *Redland Soccer Club, Inc. v. Department of the Army and Dept. of Defense of the U.S.*, 696 A.2d 137, 145 (Pa. 1997) (setting out this requirement as element four of a claim for medical monitoring).

[110]  Indeed, the Court has read and heard the medical and statistical expert testimony addressing this fact question several times already, because it has been a common question in the MDL cases previously set for trial.  *See In re Vioxx*, 239 F.R.D. at 459 ("Having presided over several bellwether trials in this MDL, the Court need not speculate on the issue of commonality, but rather is confident that common questions exist.").

Parkinsonism, and other essential elements of a medical monitoring claim.[111]

Other courts have easily concluded, in the context of class claims for medical monitoring, that the prerequisite of commonality was met – even if the other prerequisites of Rule 23 were not.[112]  This Court does as well.

### C.    Rule 23(a)(4) – Adequacy.

The Court next examines the adequacy prerequisite, skipping the typicality prerequisite for the moment.

Rule 23(a)(4) permits certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class."  The Sixth Circuit Court of Appeals has "articulated two criteria for determining adequacy of representation: '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously

---

[111] Plaintiffs assert that a battery of medical tests "involving several different screening techniques" can differentiate neurological harm caused by welding fume exposure from neurological deficits attributable to other causes.  Certification motion (master docket no. 1838) at 13.  These tests would include: "(1) head MRI; (2) a survey questionnaire for both manganese and Parkinson's Disease; (3) a brief neuropsychological test battery that includes items to assess motor slowness; (4) olfactory testing; and (5) neurological examination that includes the motor portion of the Unified Parkinson's Disease Rating Scale."  *Id.*  Certainly, all plaintiffs would adduce common proofs in support of these assertions.

[112] *See, e.g., Wall v. Sunoco, Inc.,* 211 F.R.D. 272, 278, 276 (M.D. Pa. 2002) (reciting the elements of a medical monitoring claim under Pennsylvania law and concluding: "it appears that the plaintiff is accurate when she argues that many of these questions are common to the whole class"); *Goasdone v. American Cyanamid Corp.*, 808 A.2d 159 (N.J. Super. L. 2002) ("As noted by plaintiff, questions common to claims of all class members in this case include whether defendants placed [a toxic substance] in the stream of commerce; whether defendants knew or had reason to know that the [toxic substance] might present potential health risks to workers exposed to [it]; whether any warnings by defendants were adequate; whether exposure to the [toxic substance] places workers at an increased risk of developing disease, including bladder cancer; and whether defendants controlled industry standards and public knowledge on the health risks of exposure to the [toxic substance]. The existence of these common questions are sufficient to meet the requirement of commonality.").

32

prosecute the interests of the class through qualified counsel.'"[113]  Essentially, the adequacy requirement is meant to test "[1] the experience and ability of counsel for the plaintiffs and [2] whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent."[114]

The defendants do not question that the *Steele* plaintiffs are represented by qualified and competent counsel, and the Court is certain that proposed class counsel, who enjoy excellent national reputations, have the capability and experience to prosecute the case as a class action.[115]  The defendants do, however, insist that the proposed representative plaintiffs suffer two different types of certification-killing conflicts of interest with the proposed class they would represent.  First, defendants argue that, as to at least some of the representative plaintiffs, the defendants will interpose "an arguable defense that is not applicable to many or most [of the other] members of the class."[116]  Defendants note that, "[w]here it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative."[117]  This is because the named plaintiffs' litigation efforts will "necessarily be[] devoted to their own problems posed by the * * * [unique] defense, * * * result[ing] in less attention to the issue[s] which [will] be controlling for the rest

---

[113]  *In re American Medical Sys., Inc.*, 75 F.3d at 1083 (quoting *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976), *cert. denied*, 429 U.S. 870 (1976)).  *See Smith v. Babcock*, 19 F.3d 257, 264 n.13 (6th Cir 1994) ("No class should be certified where the interests of the members are antagonistic . . . .  * * *  Only through diligent application of the class certification requirements in Fed. R. Civ. P. 23 can a district court ensure that the interests of individual class members will not be sacrificed by the named plaintiff.").

[114]  *Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977).

[115]  In particular, the Court has considered all of the factors identified in Fed. R. Civ. P. 23(g)(1)(C), and concludes that proposed class counsel easily meet the adequacy requirement.

[116]  Response brief (master docket no. 1985) at 89.

[117]  *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1165 (7th Cir. 1974).

of the class."[118]

Second, defendants argue that at least some of the representative plaintiffs complain of present physical injuries caused by welding fumes, which creates "an intractable conflict with the *uninjured* class members they seek to represent."[119]  As the Supreme Court has explained, "for the currently injured, the critical goal is generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."[120]  Defendants argue that this "currently injured / presently un-injured" conflict between the *Steele* plaintiffs and the proposed class forecloses certification.

The Court concludes that both of the defendants' arguments fail.

In support of their first argument, defendants list a number of idiosyncratic experiences suffered by one or more of the 16 proposed class representatives, which, defendants assert, provide a basis for interposition of individual defenses that will create a "sideshow" at trial.  Specifically, defendants present a catalog showing that several named plaintiffs have abused drugs or alcohol; several have medical histories of epilepsy, stroke, back injury, or other trauma that has resulted in neurological damage; and several have suffered exposures to industrial toxins other than manganese (or even have been exposed to sources of manganese other than welding fumes).  Defendants assert that these different occurrences all can produce some of the same symptoms allegedly caused by Manganese-Induced Parkinsonism, including tremors, bradykinesia, loss of libido, mental confusion, insomnia, night sweats, incontinence, and other maladies.  Defendants argue that a trial of the named plaintiffs' claims would, therefore, involve lengthy

---

[118]  *Id.*

[119]   Response brief (master docket no. 1985) at 88 (emphasis added).

[120]  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997).

34

detours through their individual medical and employment backgrounds and require examination of how their peculiar life circumstances may have caused or exacerbated their symptoms, or increased their risk for future neurological disorders.  Defendants assert that the *Steele* plaintiffs will be more concerned with parrying these defenses than with prosecuting those elements of their claims that they have in common with the plaintiff class; therefore, the *Steele* plaintiffs are not adequate representatives.

As an initial matter, defendants' argument applies more solidly to cases where plaintiffs have sought damages for *existing* injuries, not for medical monitoring to provide early detection of latent neurological harm.  The principal question at the *Steele* trial would *not* be, "Did welding fumes cause these plaintiffs' their claimed injuries?", because the plaintiff class is not claiming any present physical injury. Thus, evidence of other sources of possible neurological injury to the named plaintiffs is of diminished relevance.  Rather, the principal questions at trial would be, "Did defendants' negligence cause the plaintiffs to be exposed to manganese in welding fumes, does any such welding fume exposure increase the risk of neurological disease, and is there a test to detect this specific neuro-injury?"[121]  The defenses to plaintiffs' proofs and arguments on these questions are not defenses that are peculiar to a specific plaintiff or "[in]applicable to many or most [of the other] members of the class."  The *Steele* plaintiffs request only injunctive relief and do not claim damages for present injuries; these circumstances

---

[121]  At a medical monitoring trial, the defendants would certainly be allowed to submit evidence that: (1) welding fumes do not increase the risk of neurological disease; (2) there is no medical test (or set of tests) that can detect Manganese-Induced Parkinsonism or distinguish it from other neurological syndromes; and (3) any medical test devised by plaintiffs would only be measuring the symptoms caused by conditions other than welding fume exposure (for example, simple Parkinson's Disease or exposure to other neuro-toxins).  But this evidence would go to a defense applicable to all class members.

distinguish this case from all of those that defendants cite.[122]

Further, Rule 23(a)(4) requires the representative plaintiffs need only be "adequate," not perfect. No class can be "perfectly homogenous," and "[d]ifferences between named plaintiffs and class members render the named plaintiffs inadequate representatives *only if those differences create conflicts* between the named plaintiffs' interests and the class members' interests."[123]  This Court's experience with the six MDL cases that have been set for trial so far has shown that a primary defense tactic in each case is to argue that the plaintiff's symptoms are caused by something other than welding fumes – be it other toxins, illegal drug use, past injuries, psychogenic disorder, or family-related Parkinson's Disease.  In this sense, the named plaintiffs in *Steele* are entirely representative of the class; their efforts to show that the medical monitoring program they seek can provide early detection for symptoms deriving from welding fume exposure, as opposed to any of the many idiosyncratic circumstances that virtually every welder has, will

---

[122]  *See Elliott v. Chicago Hous. Auth.*, 2000 WL 263730, at *12 (N.D. Ill. Feb. 28, 2000) ("[I]ndividual variations among [named] Plaintiffs and class members concerning magnitude of exposure and extent of injuries does not defeat typicality, especially here where damages for personal injuries are not sought."); *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3rd Cir. 1994) ("cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of varying factual patterns underlying individual claims.  Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold.'").

*Cf. Wall v. Sunoco, Inc.*, 211 F.R.D. 272, 278, 279 (M.D. Pa. 2002) (finding that "the defendants have defenses that they will be able to use against the plaintiff that they would not be able to use against the other potential plaintiffs," because the named plaintiff "claims to have present injuries while she is attempting to represent a class of presently asymptomatic persons," and those injuries might have been caused by other events).

[123]  *UAW v. General Motors Corp.*, 2006 WL 891151 at *11 (E.D. Mich. Mar. 31, 2006) (emphasis added) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999), *cert. denied*, 528 U.S. 1159 (2000)).

be completely in line with the interests of the entire class.[124]  "[I]t is well settled that only a conflict that

goes to the very subject matter of the litigation will defeat a party's claim of representative status."[125]  The

Court can see no antagonism between the representative plaintiffs and the class members stemming from

their different medical, family, and social histories, when examined in light of the relief the plaintiffs seek.

Turning to their second argument, the defendants note correctly that the case law is replete with

examples of denials of class certification where the class included both "presently[-]injured and futures

plaintiffs."[126]  This is because the "presently-injured" plaintiffs usually seek immediate "monetary damages

for past and future injuries," but the "not-yet-injured members" of the class reasonably seek only medical

---

[124]  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435, 445-46 (S.D.N.Y. 2007) (defendants argued that the named plaintiff did not have common interests with the class – his "claims are not typical because he must address this [statute of limitations] defense" – but the court concluded otherwise, finding that "the fact that [the named plaintiff] must address the statute of limitations question makes it more likely, not less, that the interests of the class members will be fairly and adequately protected because many absent members are likely to be subject to the very same defense").

[125]  *UAW v. General Motors Corp.*, 2006 WL 891151 at *11 (E.D. Mich. March 31, 2006) (quoting *Georgia State Conference of Branches of NAACP v. Georgia*, 99 F.R.D. 16, 34-35 (S.D. Ga.1983)).  Mere "differences in the interests of the class representatives and the other class members are not dispositive under Rule 23(a)(4). The key question is whether the interests are antagonistic." *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 610 (W.D. Pa.1983) (emphasis in original). *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999), *cert. denied*, 528 U.S. 1159 (2000) ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."); *Shutts v. Phillips Petroleum Co.*, 679 P.2d 1159, 1172 (Kan. 1984), *aff'd in part and rev'd in part on other grounds*, 472 U.S. 797 (1985) ("The fact that a defense may be asserted against the named representatives, as well as some other class members, but not the class as a whole, does not destroy the representatives' status.").

[126]  *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 630 (3rd Cir. 1996), *affirmed*, 521 U.S. 591 (1997).

monitoring and perhaps a fund for future payments; these interests are often at odds.[127] Defendants suggest there is a similar problem with the named plaintiffs in *Steele*, many of whom state "that they currently suffer from the same symptoms that plaintiffs in individual personal injury cases claim are caused by exposure to the manganese in welding fumes."[128]

The critical question when searching for a potential conflict between the named representative plaintiffs and the proposed medical monitoring class, however, is not whether the named plaintiffs are, in fact, completely uninjured, or instead already "share symptoms" with presently-injured welders.  Rather, the critical question is whether the named plaintiffs *seek damages* for present injuries.  If the named plaintiffs seek only medical monitoring relief on behalf of themselves and the class, and do not advance claims for present injuries, there is no conflict of interest – the named plaintiffs hold no hope of "generous immediate payments" antagonistic to the establishment of a "fund for the future."[129]  In every case cited by defendants, the named plaintiffs who were seeking certification of a medical monitoring class

---

[127]  *See Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 663-64 (M.D. Fla. 2001) ("the court cannot ignore that the named Plaintiffs complain of extremely varied types and degrees of illness or injury as a result of exposure, and that they seek immediate compensation for past and future damages including medical expenses by way of this separate subclass.  As such, their interests and motivations in the personal injury subclass are not necessarily aligned with the interests of the not-yet-injured members of the medical monitoring subclass who, at present, seek only a fund to cover costs related to their monitoring.  It is not unreasonable to anticipate that because of the differences, named Plaintiffs may not seek to adequately protect the not-yet-injured members of the monitoring subclass should it develop that it is not in their interest to do so.  Because of the potential for such conflict, I conclude that the requirement of adequacy of representation is not met by these named Plaintiffs.").

[128]  Response brief (master docket no. 1985) at 87.

[129]  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997).

simultaneously brought claims for personal injuries, creating an irreconcilable conflict.[130]  If, as in this case, "the parties to an action do not assert their individual rights in a context in which they are in conflict but instead simply assert a common, collective right against an interloper who threatens to interfere with their rights or they seek to preserve a fund, even though it might not be sufficient to satisfy their individual claims, the class interests are not antagonistic for purposes of representing the class."[131]

It is true, as defendants note, that 7 of the 16 named plaintiffs in *Steele* have entered into the "Tolling Agreement" in this litigation, preserving their right to file personal injury claims in the future.[132] But the Court does not view these plaintiffs' entry into the Tolling Agreement as having created a conflict "that goes to the very subject matter of the litigation."[133]  After all, the *Steele* plaintiffs allege that their exposure to manganese in welding fumes puts them at risk for developing "manganism, a *progressive*,

---

[130]  *See Amchem*, 521 U.S. at 626 (describing a "single giant class" composed of both "currently[-]injured and expossure-only [sic] categories of plaintiffs"); *Wall*, 211 F.R.D. at 277 (the named plaintiff "also asserts an individual personal injury claim"); *Rink*, 203 F.R.D. at 664 ("the named Plaintiffs . . . seek immediate compensation for past and future damages"); *Bostick v. St. Jude Med., Inc.*, 2004 WL 3313614 at *4 (W.D. Tenn. Aug. 17, 2004) (the named plaintiff seeking to represent the medical monitoring subclass "seeks compensatory and other damages for medical expenses and pain and suffering").

[131]  7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc. 3rd* §1768 at 390 (2005) ("Wright & Miller"); *see id.* ("Thus, a potential conflict between the representatives and some class members should not preclude the use of the class-action device if the parties appear united in interest against an outsider at the beginning of the case.").

[132]  *See* Tolling Agreement (master docket no. 235, exh. 1) at 1 (tolling various deadlines associated with "claims in any matters against defendants involving claims of personal injury, loss of consortium, or any other damages allegedly caused by exposure to manganese in welding fumes").

[133]  Wright & Miller, *Fed. Prac. & Proc. 3rd* §1768 at 390.

39

physically and mentally disabling illness."[134]  And the fundamental basis of their claim for medical

monitoring is "that the defendant marketed or wrongfully released [a harmful substance] into the

environment . . . that has significantly increased the plaintiffs' risk of *developing* a serious latent

disease."[135]  That some of the *Steele* plaintiffs have acted to protect their right to later seek damages for

actual physical injuries caused by exposure to defendants' products, should any such injuries develop

through progression of symptoms, is not inconsistent with any relevant legal interests or factual

circumstances shared by the entire class.[136]  If one of the named *Steele* plaintiffs actually files a claim for

damages, alleging his manganism has progressed to the point that he has developed compensable physical

injuries, then the Court might have to reassess that plaintiff's adequacy as a class representative.  But just

because a named plaintiff has simply entered into a Tolling Agreement does not make that plaintiff's

---

[134] First Amended Complaint (master docket no. 1746) at ¶63 (emphasis added).  *See also* Hearing
tr. at 57 (Apr. 24, 2007). ("[M]anganism is progressive.  It is a progressive syndrome that's universal from
the beginning, [in] that it typically begins with very mild, very nonspecific, subtle changes.  * * * [I]t can,
although does not necessarily, progress to a severely debilitating disease * * *  It doesn't always progress
. . . .").

[135] *Manual for Complex Litigation* §22.74 at 425 (4th ed. 2004) (emphasis added).

[136]  Nor does the existence of the Tolling Agreement suggest that the plaintiffs are engaged in
impermissible claim-splitting.  *Arch v. American Tobacco Co., Inc.*, 175 F.R.D. 469, 479-80 (E.D. Pa.
1997) ("the 'monitoring' for diseases cannot logically be deemed to preclude class members from bringing
future actions for diseases which class members may subsequently suffer"); *Scott v. American Tobacco
Co.*, 725 So.2d 10, 19-20 (La. Ct. App. 1998) ("The trial court properly reserved the right of plaintiffs and
members of this defined class to assert any claims for damages they may have sustained as a result of
smoking cigarettes.  The class action is limited only to a claim for a medical monitoring program."); *Day
v. NLO, Inc.*, 851 F.Supp. 869, 877 (S.D. Ohio 1994) (certifying for class treatment "property damage,
emotional distress and medical monitoring" claims, while "reserv[ing] for future litigation" claims for
physical injuries).  *But see Perez v. Metabolife, Int'l, Inc.*, 218 F.R.D. 262, 272 n.10 (S.D. Fla. 2003)
("Although there is some suggestion in *Petito* [*v. A.H. Robins Co.*, 750 So.2d 103, 105 (Fla. Dist. Ct. App.
2000), *review denied*, 780 So.2d 912 (Fla. 2001)] that plaintiffs who prevail under a medical monitoring
cause of action would not be foreclosed from claim splitting, thus allowing them to bring a suit if they later
suffer an actual injury due to the exposure, this is certainly not a well-settled or well-tested legal
principle.").

interests antagonistic to those of the rest of the class.

In sum, the Court finds that the named plaintiffs in *Steele* will fairly and adequately represent the interests of the proposed class.

**D.      Rule 23(a)(3) – Typicality.**

The Court now returns to the typicality requirement.  Rule 23(a)(3) mandates that, to obtain class certification, "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."[137]  Testing for typicality ensures that "a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."[138]

Although the two prerequisites of commonality and typicality are sometimes examined together,

---

[137] *In re American Medical Systems*, 75 F.3d at 1082.

[138] *Id.*

41

their foci are distinct: "commonality focuses on similarities, while typicality focuses on differences."[139]

More specifically, "[u]nder the commonality prong, a court must ask whether there are sufficient factual or legal questions *in common* among the class members' claims to make class certification economical and otherwise appropriate. In contrast, under the typicality prong, a court must ask whether, despite the presence of common questions, each class member's claim involves so many *distinct* factual or legal questions as to make class certification inappropriate."[140] Although the "test for typicality, like commonality, is not demanding and does not require identicality," too many meaningful differences across the plaintiff class can preclude certification.[141]

After having undertaken an exhaustive review of state and federal case law addressing class certification of medical monitoring claims, the Court concludes that, in fact, typicality is wanting in the

---

[139] *Brashear v. Perry County, Ky.*, 2007 WL 1434876 at *6 (E.D. Ky. May 14, 2007) (citing *Marquis v. Tecumseh Products Co.*, 206 F.R.D. 132, 159-60 (E.D. Mich. 2002)). *See also Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1232 n.10 (9th Cir. 2007) ("Commonality examines the relationship of facts and legal issues common to class members, while typicality focuses on the relationship of facts and issues between the class and its representatives.").

In this respect, the typicality prerequisite raises concerns similar to – but not entirely the same as – the predominance requirement of Rule 23(b)(3). *See Amchem*, 521 U.S. at 623 n.18 ("the predominance requirement of Rule 23(b)(3) is similar to the requirement of Rule 23(a)(3) that 'claims or defenses' of the named representatives must be 'typical of the claims or defenses of the class.'"); *Ball v. Union Carbide Corp.*, 385 F.3d 713, 728 (6th Cir. 2004) ("As any claim the class may have had in common threatened to splinter into individualized claims, it was not error for the district court to refer [during its discussion of typicality] to the fact that Plaintiffs' individualized claims *predominated* over their claims in common.") (emphasis added).

[140] *Marquis*, 206 F.R.D. at 159-60 (emphasis in original). As Judge Joseph Kinneary put it: "Clearly, people and parcels of real property, like snowflakes, necessarily have different and unique characteristics. The important question is to what extent those differences, when compared to the nature and extent of the shared characteristics of the named plaintiffs' and the class members' claims, will defeat the Court's ability to achieve a considerable efficiency through collective adjudication of those claims." *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 65 (S.D. Ohio 1991).

[141] *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 884 (6th Cir. 1997) (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)).

*Steele* case.  Given the large size of the class, the differences in defendants' conduct, and the variable working environments in which all of the welder plaintiffs performed, each class member's claims involve so many distinct factual questions that class certification becomes inappropriate.

### 1.      A Matter of Perspective.

As noted earlier, federal courts have "broad discretion in determining whether to certify a class."[142] The same is invariably true for state courts.[143]  Thus, it is not surprising that there is no common set of factual circumstances predictive of whether a court will certify a medical monitoring class.  It is easy to find cases, for example, where a court *granted* class certification to plaintiffs in a limited geographic region who sought medical monitoring after suffering single-source exposure to a toxin in their drinking water, and just as easy to find cases where a court *denied* certification under similar conditions – and there is no obvious or simple way to reconcile the two different results.[144]  Similarly, courts have ruled oppositely in different cases involving plaintiff classes seeking medical monitoring for illnesses allegedly

---

[142]  *Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1029 (6th Cir. 1977) ("A district court has broad discretion in determining whether a particular case may proceed as a class action so long as it applies the criteria of Rule 23 correctly.")

[143]  *See, e.g., In re Consol. Mtge. Satisfaction Cases*, 780 N.E.2d 556, 558 5 (Ohio 2002) ("a trial judge is given broad discretion when deciding whether to certify a class action"); *Linder v. Thrifty Oil Co.*, 2 P.3d 27, 31 (Cal. 2000) ("Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification."); *Stone v. CompuServe Interactive Services, Inc.*, 804 So.2d 383 (Fla. Ct. App. 2001) ("The question of whether to grant or deny certification is committed to the broad discretion of the circuit court.").

[144]  Compare: *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) (certifying a medical monitoring class, consisting of persons living and working near a specific manufacturing facility, where defendant's practices at the facility allegedly led to plaintiffs' exposure to TCE in their drinking water); *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003) (same); *Thomas v. FAG Bearings Corp. Inc.*, 846 F. Supp. 1400 (W.D. Mo. 1994) (denying class certification in virtually identical circumstances).

caused by: (1) addiction to nicotine in the same brands of cigarette;[145] and (2) adverse side effects of the same prescription drug.[146]

Having pored over these cases seeking a unifying theme, the Court has noticed two factors worthy of mention.  The first is that, when examining typicality, Courts tend to have one of two perspectives. Courts focus either on: (a) *the defendant's conduct*, and the degree to which it affected each plaintiff equally, or (b) *the effects on the plaintiff class* of the defendants' conduct, and the degree to which those effects are similar from plaintiff to plaintiff.  Put more simply, the first focus is on what the defendants did; the second focus is on how the plaintiffs were affected by what defendants did.  And because the latter is naturally more variable, this focus more often leads to denial of certification.

An example illustrates the point.  In both *Scott v. American Tobacco Co.* and *Barnes v. American Tobacco Co.*, the plaintiffs sought to certify a statewide class of cigarette smokers, in order to obtain

---

[145] Compare: *Scott v. American Tobacco Co.*, 725 So.2d 10 (La. Ct. App. 1998), *writ denied*, 731 So.2d 189 (La. 1999) (certifying a medical monitoring class of Louisiana smokers); *Barnes v. American Tobacco Co.*, 161 F.3d 127 (3rd Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999) (reversing certification of a medical monitoring class of Pennsylvania smokers).  *See also Engle v. Liggett Group, Inc.*, 945 So.2d 1246, 1267 (Fla. 2006) (affirming certification of a medical monitoring class of Florida smokers).

[146] Compare: *In re West Virginia Rezulin Litig.*, 585 S.E.2d 52 (W. Va. 2003) (reversing a lower court and certifying a class of West Virginia plaintiffs seeking, *inter alia*, medical monitoring in connection with an allegedly defective diabetes prescription drug); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) (denying certification of a national plaintiff class seeking medical monitoring in connection with the same diabetes drug).  Also, compare: *In re Baycol Prods. Liab. Litig.*, 218 F.R.D. 197 (D. Minn. 2003) (denying certification of a national medical monitoring class of plaintiffs who used a prescription drug to lower cholesterol); *Lewis v. Bayer AG*, 2004 WL 1146692 (Pa. Ct. Com. Pl. 2004) (certifying a medical monitoring class of Pennsylvanians who used the same drug).

Also, although the drug at issue was not a prescription medication, compare: *Perez v. Metabolife, Int'l, Inc.*, 218 F.R.D. 262, 271 (S.D. Fla. 2003) (denying certification of both a Florida-only and a national medical monitoring class of plaintiffs who ingested an over-the-counter diet drug); *Gasperoni v. Metabolife, Int'l , Inc.*, 2000 WL 33365948 (E.D. Mich. 2000) (certifying a class of Michigan plaintiffs seeking, *inter alia*, medical monitoring in connection with the same diet drug).

medical monitoring.[147]  In *Scott*, the court granted certification to a class of Louisiana smokers, and later denied a motion to decertify; in *Barnes*, the court initially granted certification to a class of Pennsylvania smokers, but later decertified the class.  Most revealing are the views of the two courts regarding the "collective nature" of the plaintiffs' claims.[148]  In *Scott*, the court concluded that "[c]ertification of the class in this case is proper because it essentially boils down to one fundamental question: Is a cigarette that contains nicotine a defective product?"[149]  The answer to this "fundamental question," however, could focus on either the nature of *cigarettes* – that is the *defendants' product* – or the nature of *addiction* – that is, the *plaintiffs' responses* to cigarettes.  That the *Scott* court was focused more on the defendants' product, rather than on the varying effects of that product on each plaintiff, is illustrated by the following quote:

> Proof of the addictive quality of nicotine is essential in the claims of all the plaintiffs so that there is a common character among the rights of the representatives and the absent members of the class for a proper class action.
> * * *
> Plaintiffs assert that the defendants' liability is caused by the singular act of the tobacco industry in selling a defective product after concealing the addictive nature of nicotine.  A class action is the most effective way to efficiently and economically handle this claim.  Although there obviously are individual questions of quantum, this does not preclude a

---

[147]  *Scott*, 725 So.2d at 11 (affirming certification of a class of "all Louisiana residents who are or who were smokers on or before May 24, 1996, of cigarettes manufactured by the defendants, who desire to participate in a program designed to assist them in the cessation of smoking and/or to monitor the medical conditions of class members to ascertain whether they may be suffering from diseases caused by, contributed to, or exacerbated by the habit of cigarette smoking"); *Barnes*, 161 F.3d 127 (affirming the decertification of a medical monitoring class composed of "[a]ll current residents of Pennsylvania who are cigarette smokers as of December 1, 1996, and who began smoking before age 19, while they were residents of Pennsylvania") (originally certified at *Barnes v. American Tobacco Co., Inc.*, 176 F.R.D. 479, 493 (E.D. Pa. 1997)).

[148]  *In re American Medical Systems*, 75 F.3d at 1082.

[149]  *Scott*, 725 So.2d at 12.

class action where, as here, predominant liability issues are common to the class.[150]

In contrast, the *Barnes* court focused more on the nature of the individual responses that the members of the proposed plaintiff class had to nicotine:

> Plaintiffs suggest that causation can be proved on a class-wide basis, contending they need to show only that smoking cigarettes was a "substantial factor" in "causing" the three diseases to be monitored in the program.
> * * *
> But plaintiffs cannot prove causation by merely showing that smoking cigarettes causes cancer and other diseases. They must demonstrate that defendants' intentional or negligent nicotine manipulation caused each individual plaintiff to have a significantly increased risk of contracting serious latent diseases, thereby demonstrating the need for medical monitoring.  * * *  According to plaintiffs, the alleged defect is that defendants intentionally designed these cigarettes to be addictive.  But whether defendants caused the injury depends on whether each individual actually is addicted.  These are all issues that must be determined on an individual basis.[151]

The *Barnes* court concluded: "[b]ecause nicotine addiction must be determined on an individual basis and remains an essential part of plaintiffs' medical monitoring claim, we agree with the District Court that class treatment is inappropriate."[152]  Thus, while *Scott* focused on the universality of defendants' conduct toward the class, the *Barnes* court focused on the variety of plaintiffs' reactions to that same conduct.  The

---

[150] *Id.* at 14, 15.  After issuing its certification opinion, the *Scott* court conducted a two-phase trial. A jury found that defendants' product was not defective and medical monitoring was not reasonably necessary, but that defendants were liable for fraud and plaintiffs were entitled to establishment of a smoking cessation program.  On appeal, the defendants argued "that the trial and other post-certification developments demonstrated that the class must be decertified," but the appellate court rejected the motion for decertification.  *Scott v. American Tobacco Co.*, Inc., 949 So.2d 1266, 1284 (La. Ct. App. 2007).

[151] *Barnes*, 161 F.3d at 145.

[152] *Id.* at 146.

46

rulings in other medical monitoring class certification cases also reflect this dichotomy.[153]

The second factor worthy of mention is that state courts more often certify medical monitoring classes than do federal courts – as reflected in *Scott* (a state court case) and *Barnes* (a federal court case). To some extent, this is because the classes that state courts are asked to certify are more often single-state in scope, while federal court class certification requests are more often multi-state in scope; as a result, choice-of-law issues are more likely to derail a certification bid in federal court.[154]

But it is not only the usually-smaller scope of the proposed class, and the concomitant smaller

---

[153] Returning to the examples listed in footnote 144, above, of class certification motions in cases where plaintiffs were exposed to toxins in drinking water, compare: *Yslava*, 845 F. Supp. at 713 (granting certification after focusing primarily on the universality of the defendant's conduct: "contrary to [defendant's] claims, the amount of water used, the variation in TCE concentration, water distribution patterns, or [defendant's] changing conduct over the years does not defeat the common nucleus of facts indicating [defendant] as the source of the contamination.  Further, any variation in susceptibility to disease also does not defeat commonality.  Participation in the proposed medical monitoring program would only require that a plaintiff show he was exposed to at least 5ppb of TCE – a level the EPA has determined unsafe.") with *Thomas*, 846 F. Supp. at 1404 (denying class certification after focusing on the variety of plaintiffs' circumstances: "In the present case, while there are undoubtedly common issues of law and fact, such as whether [defendant] released TCE into the groundwater, the individual issues of causation and damage so overshadow those in numerosity and complexity to render a class action unhelpful. * * * The Court anticipates that plaintiffs' proof of causation  . . . will require individualized proof for each plaintiff.").

[154] Indeed, the *Scott* court observed that, in *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), a federal court had earlier "denied class certification to the *same two named plaintiffs*" who sought certification in *Scott*.  *Scott*, 725 So.2d at 11 (emphasis added).  The *Scott* court explained these different rulings, in part, as follows: "*Castano* rejected the certification of a class for nicotine addiction. However, that refusal to certify was based primarily on what the *Castano* court viewed as the virtually insurmountable problems that would be posed by trying to conduct such litigation on a national basis. That problem is minimized in the instant case by limiting the class to Louisiana residents only."  *Id.* at 13. *See also Lewis*, 2004 WL 1146692 at *11 (granting certification to a state-wide medical monitoring class of Baycol users, but refusing to certify a nationwide medical monitoring class because, *inter alia*, "The elements of a Medical Monitoring claim are not uniform among the states.  * * *  Since the elements of medical monitoring are not uniform, a conflict of law exists.").
It is also true that the various state-law rules of civil procedure applicable to class certification do not track perfectly the analogous federal rules.  But the higher likelihood of certification of medical monitoring classes in state courts appears tied more to differences in application of the class certification rules than to differences in their content.

problem posed by choice-of-law issues, that make state courts more likely to certify medical monitoring classes. State courts generally have also been more willing than federal courts to look past individualized issues of proof in medical monitoring class actions.[155] Again, an example proves the point. As noted above, most states that recognize a cause of action for medical monitoring include, as one of the essential elements of the claim, proof that exposure to the toxic substance "was caused by the defendant's negligence."[156] Invariably, federal courts focus on this element and find it problematic. For example, in *In re Baycol Products Liability Litigation*, the court denied certification of a multi-state medical monitoring class because, among other things, the plaintiffs' entitlement to medical monitoring included the element of "negligence":

> Although the states have not addressed medical monitoring in a uniform way, it appears that * * * the state laws generally require a finding that a plaintiff's exposure to a toxic substance was due to defendant's negligence. As discussed previously, however, *a finding of negligence is inextricably intertwined with individual issues.* As a result, individual issues will undermine the cohesion of the medical monitoring class.[157]

---

[155] *See* 5 *Newberg on Class Actions* §1:1 at 13 (4ᵗʰ ed. 2005) ("at the state court level, varying degrees of success have been achieved in obtaining certification of cases involving claims similar to those denied in federal court").

[156] *See, e.g., Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993); *Redland Soccer Club, Inc. v. Department of the Army and Dept. of Defense of the U.S.*, 696 A.2d 137, 145-46 (Pa. 1997). Plaintiffs' counsel in this case acknowledged that "[w]hat we intend to do is to focus in the medical monitoring trial on negligence, and we will explain the particular type of negligence that most fits the facts here that we are talking about." Hearing tr. at 74 (Apr. 24, 2007).

[157] *In re Baycol Prods. Liab. Litig.*, 218 F.R.D. at 212 (citations omitted, emphasis added); *see also In re Prempro Prods. Liab. Litig.*, 230 F.R.D. at 569-70 ("Additionally, regardless of whether a medical monitoring claim is recognized as a separate cause of action, or as an element of damages, 'state laws generally require a finding that a plaintiff's exposure to a toxic substance was due to defendant's negligence.' '[A] finding of negligence is inextricably intertwined with individual issues,' which would undermine the cohesion of the medical monitoring subclasses. While this is not always the case, it is the case here.") (footnotes omitted); *Perez v. Metabolife, Int'l, Inc.*, 218 F.R.D. 262, 271 (S.D. Fla. 2003) (denying certification of medical monitoring class because, among other things, "The third element, proof of negligence by the Defendant, may depend largely on individualized issues").

In other words, the syllogism goes: (1) a plaintiff's entitlement to medical monitoring requires proof of the defendant's negligence; (2) negligence proofs are highly individual as to each plaintiff; (3) therefore, medical monitoring claims are not suitable for class treatment.  Carried to its logical extreme – which, in their arguments on brief and at oral argument, defendants push for, while plaintiffs ask the Court to guard against – medical monitoring classes should never be certified.

Of course, the individual issues that are "inextricably intertwined" with proof of negligence are present regardless of whether the medical monitoring class action is brought in a state or federal court. But state courts are more willing to discount these individual issues in the context of medical monitoring classes.  For example, in *Lewis v. Bayer AG*, the Pennsylvania state court refused to certify a class composed of all Pennsylvanians who ingested the drug Baycol and wanted to pursue claims of *negligence*. The court reasoned that "[t]he facts surrounding [the class] negligence claims demonstrates [sic] that proof as to one claimant would not be proof as to all.  A myriad of individual causation inquiries exist."[158]  Yet the same court went on to certify a class composed of all Pennsylvanians who ingested the drug Baycol and wanted to pursue claims for *medical monitoring* – claims that incorporate, as an essential element, proof of the defendant's negligence.[159]  The *Lewis* court concluded that the common issues connected to

---

[158]  *Lewis v. Bayer AG*, 2004 WL 1146692 at *9 (Pa. Ct. Com. Pl. 2004).  The court went on to identify these individual issues, many of which defendants in this case also recite.  *See id.* ("These inquiries must necessarily include but are not limited to family history, preexisting medical history, age, gender, lifestyle, quantity of Baycol ingested, date of prescription, duration of the course of treatment, whether Baycol was used alone or in conjunction with another drug, what if any warning was given to the individual consumer by the physician, whether warnings regarding Baycol were received by the individual claimant's physician, which of different Baycol labels is applicable and most importantly whether any injury is causally related to Baycol use.  Analysis of these issues may further reveal individualized intervening or superceding causes of injury.").

[159]  *Id.* at *15 (finding that "Plaintiffs have sustained their burden of demonstrating that common issues of fact and law exist to satisfy the requirement of commonality as it pertains to the claims for medical monitoring," even though the third element of the claim was exposure to a hazardous substance "caused by defendants' negligence").

all of the other elements of a medical monitoring claim – including the fact that "plaintiffs' claims arise out of similar conduct by the defendants" – outweighed the individual issues.[160]  Thus, even though the federal court refused to certify a medical monitoring class of Baycol users in *In re Baycol*, the state court granted certification to a medical monitoring class of Baycol users in *Lewis*.  Generally, in state courts, the syllogistic inference is not as strong.

As plaintiffs pointed out in oral argument, this dichotomy between state and federal case law regarding medical monitoring class certification highlights a tension addressed by the *Erie* doctrine. "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."[161]  Thus, this Court must apply Federal Rule of Civil Procedure 23 (as construed by federal courts) to determine whether certification of a class of plaintiffs bringing state-law medical monitoring claims (as construed by state courts) is appropriate.  At the same time, a "federal court sitting in diversity should 'reach the same result as the state court would reach in deciding the identical issue.'"[162]  Apparently, however, it is not easy to do both.  As discussed above, when faced with almost identical medical monitoring class certification motions, state courts are generally more amenable to granting

---

[160]  *Id.* (quoting *In re Pennsylvania Diet Drugs Litig.*, 1999 WL 962583 at *12, 41 Pa. D. & C.4th 78, 100  (Pa. Ct. Com. Pl. Mar. 12, 1999).

[161]  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *see Hydrite Chemical Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 890 (7th Cir. 1995) ("the procedure in cases brought in federal court, including diversity cases, is governed by federal rather than state law").  *Gasperini* goes on to note, however, that "[c]lassification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor." *Gasperini*, 518 U.S. at 427.

[162]  *Rhone v. State Auto. Mut. Ins. Co.*, 858 F.2d 1507, 1509 (11th Cir. 1988) (quoting *Goodwin v. George Fischer Foundry Systems, Inc.*, 769 F.2d 708 (11th 1985)); *see Markham v. City of Newport News*, 292 F.2d 711, 718 (4th Cir. 1961) (the *Erie* doctrine's "basic philosophy is that a federal court exercising its diversity jurisdiction to adjudicate rights created by the state sits as another court of that state sits [and so] should reach the same result as the state courts would reach in deciding the identical issue").

certification than are federal courts.[163]

Further, this dichotomy carries serious implications in light of CAFA.  As noted above in section III of this opinion, the likelihood that federal jurisdiction will attach to even a single-state class action is much higher after passage of CAFA.  To the extent that "some areas of state substantive law are only adjudicated in the form of class actions," CAFA will thus work to preclude state courts from any opportunity to address certain areas of law.[164]  More to the point at issue here, CAFA will also remove from state courts the chance even to apply their own civil *procedural* rules to determine the threshold question of whether certification of a medical monitoring class is appropriate.  The upshot of CAFA, then, is to move questions of medical monitoring class certification out of state courts and into federal courts – a move, which, based on existing precedent, favors defendants.[165]

The point of this discussion, of course, is not to engage in an academic critique of CAFA or Rule

---

[163]  One commentator suggests the *Erie* doctrine is best followed, and the above-described dichotomy best resolved, by federal courts fully "adher[ing] to state-court, class certification jurisprudence."  *See* Daniel R. Karon, *"How Do You Take Your Multi-State, Class-Action Litigation?  One Lump or Two?" Infusing State Class-Action Jurisprudence into Federal, Multi-State, Class-Certification Analyses in a "CAFA-nated" World,* 47 Santa Clara L. Rev. 567, 595 (2006).

[164]  Justin D. Forlenza, Note, *CAFA and Erie: Unconstitutional Consequences?*, 75 Fordham L. Rev. 1065, 1067 (Nov. 2006).  *See id.* at 1092 (arguing that, "[b]ecause state courts will be restricted from hearing most or all interstate class actions, they will never have a chance to create law in those areas," and "As a result of CAFA, the federal courts 'will inappropriately usurp the primary role of state courts in developing their own state tort and contract laws, and will impair their ability to establish consistent interpretations of those laws.'") (quoting S. Rep. No. 109-14, at 92 (2005), reprinted in 2005 U.S.C.C.A.N. 3, 84 (minority views of Senators Leahy, Kennedy, Biden, Feingold, and Durbin)).

[165]  In Pennsylvania, for example, case law states that "decisions applying the rules for class certification should be made liberally and in favor of maintaining a class action."  *Lewis*, 2004 WL 1146692 at *8; *see Foust v. Southeastern Pennsylvania Transp. Authority*, 756 A.2d 112, 118 (Pa. Commw. 2000), *appeal denied*, 771 A.2d 1289 (Pa. 2001) ("in doubtful cases any error should be committed in favor of allowing class certification").  Thus, it is more likely, after CAFA, that a Pennsylvania medical monitoring class will not be certified, because it is probably a federal court that will decide the issue using more stringent federal standards.

51

23, but to understand as fully as possible the contours of the relevant legal landscape, and why courts examining similar certification questions have ruled differently.  Having thoroughly canvassed both state and federal case law on the subject of medical monitoring class actions, the Court now returns to the question of typicality in this case.

**2. Typicality Problems Exist from Any Perspective.**

To repeat, "under the typicality prong, a court must ask whether, despite the presence of common questions, each class member's claim involves so many *distinct* factual or legal questions as to make class certification inappropriate."[166]  To explain why the Court believes each class member's claim involves too many individualized questions of fact and law to allow for certification in *Steele*, the Court also repeats here the essential elements of a claim for medical monitoring, and focuses on the third and fourth elements:

(1)   exposure
(2)   to a toxic substance,
**(3)   which exposure was caused by the defendant's negligence,**
**(4)   resulting in an increased risk**
(5)   of a serious disease, illness, or injury
(6)   for which a medical test for early detection exists
(7)   and for which early detection is beneficial, meaning that a treatment exists that can alter the course of the illness,
(8)   and which test has been prescribed by a qualified physician according to contemporary scientific principles.[167]

For the sake of argument, the Court assumes that all except the third and fourth elements of this claim present questions common to all class members.  That is, the Court assumes that whether manganese

---

[166] *Marquis v. Tecumseh Products Co.*, 206 F.R.D. 132, 159-60 (E.D. Mich. 2002) (emphasis in original).

[167] *Hansen*, 858 P.2d at 979 (emphasis added).

in welding fumes is a toxic substance (element two) is a fact question that all class members would attempt to prove with common evidence.  Similarly, whether there exist medical tests capable of detecting Manganese-Induced Parkinsonism, as opposed to parkinsonian symptoms induced by other causes for which defendants would not be liable (element six), is a fact question susceptible to proof through expert opinion that all class members will share.

The essential questions raised by the third and fourth elements of plaintiffs' medical monitoring claims, however, are problematic – even when viewed from the perspective of "what the defendants did," as opposed to "how the plaintiffs were affected by what defendants did."  That is, even ignoring issues such as an individual plaintiff's age, medical history, lifestyle, susceptibility to Manganese-Induced Parkinsonism, and so on, the defendants' conduct in this case cannot be examined consistently across the class.

In medical monitoring cases stemming from toxic spills or radioactive releases, the question of negligence (element three) is virtually the same as the question of exposure – if the plaintiffs were exposed to a toxic material released by the defendant, then the defendant was negligent.  In other words, if "what the defendants did" was to release a hazardous substance to which no person should normally ever be exposed, then the evidence going to the question of whether the defendant was negligent is common to all plaintiffs.  This same reasoning may even be present in medical monitoring cases involving prescription drugs.  As a state court explained when it certified a medical monitoring class in *In re Pennsylvania Diet Drugs Litigation*:

> In this case, plaintiffs' core theory of defendants' negligence is that the FDA would not have approved dexfenfluramine and fenfluramine had defendants disclosed what they knew about the diet drugs' dangerous side effects.  No one would have consumed the drugs because the drugs would have never been on the market.  Therefore, anyone who has consumed dexfenfluramine or fenfluramine is injured as a result of defendants'

53

negligence.[168]

Similarly, in medical monitoring cases stemming from toxic spills or radioactive releases, the question of increased risk of injury (element four) is virtually the same as the question of exposure – if the plaintiffs were exposed to a toxic material released by the defendant, then their risk of illness is higher. Thus, for example, if a plaintiff would never normally use or consume the toxin TCE, the very fact of ingestion of TCE-laced drinking water virtually establishes an increase to his risk of illness caused by that toxin.

In this case, however, the allegedly hazardous substance to which the plaintiffs were exposed (manganese fumes) is released by a commonly-used and extremely useful product (welding rods), the sale and use of which requires no governmental dispensation.  The parties experts agree, moreover, that not every exposure to manganese fumes is toxic; the level of exposure is critical to the question of whether an increased risk of illness occurs.[169]  And, the product came with warnings.  Thus, whether the defendants were negligent (element three) depends not simply on whether any given plaintiff suffered exposure, but

---

[168] *In re Pennsylvania Diet Drugs Litig.*, 1999 WL 962583 at *10, 41 Pa. D. & C. 4th 78, 95 (1999) (Pa. Ct. Com. Pl. 1999).

[169] Plaintiffs' experts concede that low levels of exposure to manganese in welding fumes carry virtually no risk.  *See, e.g.*, depo. of Elan Louis (Jan. 17, 2007) at 100 (agreeing that "there is a safe dose of manganese that you could have, you could be exposed to").  By limiting the proposed class to full-time occupational welders (see footnote 19), plaintiffs try to ensure that all class members suffer enough exposure to make the question of additional risk a common one – similar to inclusion in toxic spill cases of geographic limits in the class definition, to ensure that only plaintiffs who suffered meaningful exposure are class members.  *See Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 61 (S.D. Ohio 1991) (defining the class "as all persons living within a six mile radius of the boundaries of the Portsmouth Plant whose persons or property have been exposed to radioactive or hazardous wastes released from the plant," and noting that this definition reasonably included only persons who suffered meaningful exposure).  The analogy is imperfect, however, because: (1) even some full-time welders will not necessarily experience enough exposure to suffer an increased risk of illness (e.g., aluminum welders who always work outdoors); and, more importantly, (2) it is only the increased risk of illness caused by exposure due to the failure of the warning that is relevant.

on whether the warning supplied by the defendant sufficiently apprised the plaintiff of the risk of exposure. Similarly, whether a given plaintiff suffers an increased risk of illness (element four) depends not simply on the fact of welding fume exposure, but on the *degree* of exposure, and whether there was more exposure than might have otherwise occurred *due to the failure of the warning*. These circumstances change dramatically the degree of typicality of evidence and issues among plaintiffs in this case, because of the great variety of products, manufacturers, warnings, employers, and workplaces involved.

The *Steele* plaintiffs have named as defendants about two dozen welding rod manufacturing companies. Each company produces a variety of welding rods and other welding consumables. Some of these welding rods have no manganese content, and some have high manganese content; some are consumed slowly during welding and produce little fume, and some are consumed quickly and produce copious fumes. These different products are sold with different warnings, and also with different cautionary statements contained in different Material Safety Data Sheets ("MSDSs"). Further, the warnings and MSDSs accompanying these products have changed over time, and the risks about which the defendants had to warn depended upon, among other things, the changing, then-current state of knowledge regarding the dangers posed by use of the product. Also, the workplace conditions where the plaintiffs use these welding rods are highly variable – some workplaces have state-of-the-art ventilation systems, while others are confined spaces with no source of fresh air. Finally, some plaintiffs work for sophisticated employers that have regular welding safety training programs and provide welders with filters, respirators, or other safety equipment; other plaintiffs work for employers who are far more laissez-faire.

Indeed, the parties introduced evidence regarding all of these contextual matters in both of the MDL *Welding Fume* cases that have gone to trial. For this reason, in *Solis v. Lincoln Elec. Co.*, the Court

55

explicitly instructed the jury (under Texas law) that "'Adequate' warnings and instructions mean warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person *in the circumstances of the product's use*."[170]  Similarly, in *Goforth and Quinn v. Lincoln Elec. Co.*, the Court instructed the jury (under South Carolina law) that,

> [w]hen considering whether the warnings and instructions supplied by the defendants were adequate and, thus, whether the product was defective with only such warnings, you are to consider *all facts and circumstances surrounding the foreseeable uses of the defendants' products*.  This includes the facts that: (1) the defendants sold their welding products to employers, like Duke Power Company, who, in turn, provided them to their employees at work sites; and (2) employers generally are required to provide safe and healthful working conditions for their employees.[171]

And, the Court explained that the risks that a warning must disclose depend on what the manufacturer knew or should have known, "based on the latest knowledge and available information."[172]  The adequacy of the warnings in the context of the medical monitoring claims asserted in the *Steele* case must be measured with reference to all of these same facts and circumstances.

Given all of these differences, no finder of fact can determine, on a class-wide basis, whether the defendants' conduct was "unreasonable" toward every plaintiff.  For example, a jury could conclude a certain defendant was reasonable – not negligent – because it supplied a certain MSDS containing a certain warning to a certain sophisticated employer for whom a certain plaintiff worked, so that the plaintiff cannot prove the third element of his medical monitoring claim.  And yet, the same jury could conclude it was not reasonable – it was negligent – for the same defendant to supply only certain other warnings to the employer of another plaintiff, whose training and working conditions were poor.  Similarly, a jury

---

[170]  *See Solis*, case no. 04-CV-17363, Jury Instructions (docket no. 195) at 20 (emphasis added).

[171]  *See Goforth*, case no. 06-CV-17217, Jury Instructions (docket no. 130) at 28 (emphasis added).

[172]  *Solis* Jury Instructions at 21; *Goforth* Jury Instructions at 26.

could conclude that one plaintiff did not suffer any increased risk of illness resulting from a defendant's failure to warn, while another plaintiff did. Even if the Court ignores the individual, personal histories of the plaintiffs, the variety of contexts within which the defendants acted may yield different conclusions regarding liability. In light of the different welding products, warnings, employers, work environments, and so on, *there is ultimately no single course of conduct* by all of the defendants.[173] In sum: there is insufficient typicality.

As a general matter, the undersigned finds that focusing on the universality of the defendant's conduct toward the class, rather than the variety of the plaintiffs' reactions to that conduct, tends to be more in keeping with the entire concept of whether certification of a medical monitoring class is appropriate. But no court – state or federal – has certified a medical monitoring class action as sprawling in scope as the one the *Steele* plaintiffs seek.[174] In the case at hand, because the defendants' conduct (and,

---

[173] *See Ball v. Union Carbide Corp.,* 385 F.3d 713, 728 (6th Cir. 2004) (when one defendant's liability "can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy. Here, however, there are multiple Defendants with presumably differing liability levels, if any. Accordingly, there is no 'single course of conduct.'") (some internal quotation marks and citation omitted).

[174] Some courts have allowed a large number of plaintiffs to pursue medical monitoring claims where the toxic exposure was caused by several manufacturing defendants. *See, e.g., Miranda v. Shell Oil Co.,* 17 Cal. App. 4th 1651, 26 Cal. Rptr. 2d 655 (Cal. Ct. App. 1993) (allowing "well in excess of 100" plaintiffs to pursue medical monitoring claims against at least four different pesticide manufacturers; no mention of class certification). Other courts have certified a medical monitoring class when the defendant's conduct included provision of different warnings about the product at issue over time. *See, e.g., Lewis,* 2004 WL 1146692 at *10 (noting there were several "warning label changes" for the drug Baycol during the period of exposure). And some courts have allowed medical monitoring claims to proceed when the defendants' conduct at issue occurred over a long period of time. *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 835 (3rd Cir. 1990), *cert. denied,* 499 U.S. 961 (1991) (allowing 38 plaintiffs to pursue medical monitoring claims against six defendants related to toxic exposure "as the result of decades of PCB use" at a railyard; no mention of class certification). But this Court can find no case where a court certified a medical monitoring class with *all* of these complicating circumstances present to the degree they exist in this case (that is, many manufacturing defendants, many years of conduct at issue, *and* many changes to the warnings over time).

more particularly, the context in which the defendants acted)  is not universal across the class, the Court cannot grant plaintiffs' motion for certification.

## VII.    Rule 23(c)(4).

The plaintiffs have suggested that, even if their motion for class certification is not well-taken regarding *all* of the issues raised and the *entirety* of the class they have proposed, certification may still be appropriate with regard to more discrete issues or a class smaller in scope.[175] This suggestion implicates Federal Rule of Civil Procedure 23(c)(4), which states: "[w]hen appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

It is "well-established" that, pursuant to Rule 23(c), "a court has the inherent power and discretion 'to redefine and modify a class in a way which allows maintenance of an action as a class action.'"[176] This

---

[175] *See* Hearing tr. at 296 (Apr. 25, 2007) ("[E]ven a single issue or a single claim or a single question, not even a whole cause of action, not even a whole claim may be certified for class treatment under Rule 23(c)(4)(A).  It needs to be doable and fair, and to make it fair, you can select one state, you can select one warnings period, you can select welders that have worked full-time for a certain number of years.").
The defendants are willing to concede that sufficient narrowing of the issues and the class definition to allow certification might be possible in theory, but argue that the resulting class in this case would have to be so narrowly defined that the Rule 23(a)(1) numerosity requirement would fail, and there would be no judicial benefit to trying the matter as a class action.  *See* Hearing tr. at 272 (Apr. 25, 2007) ("Your Honor, depending upon the period of time, the products that those people used, the variations in the processes of the welders at that facility, you might be able to craft a narrow enough class in a narrow enough circumstance that you might be able to do it as to that particular situation.").

[176] *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435, 438 (S.D.N.Y. 2007) (quoting *Doulin v. City of Chicago*, 662 F.Supp. 318, 336 (N.D. Ill. 1986)).

discretion allows the Court to change the composition of the class itself,[177] or to confine the issues that will be included in the class trial.[178]  Conceivably, then, this Court could address the typicality problems discussed above by trying only certain common issues (e.g., whether there exist medical tests for early detection of Manganese-Induced Parkinsonism) and/or the claims of only certain, more-similarly-situated plaintiffs (e.g., welders who worked at a certain plant and used certain products during a certain time).

The Court declines, however, to use Rule 23(c)(4) to cure the *Steele* plaintiffs' motion.  In analogous circumstances, other courts have warned that a court must not "manufacture" adherence to the

---

[177]  *See id.* ("Because the only way to maintain the action as a class action is to modify the proposed class, the Court will redefine the classes so that the Companies and the Parson Defendants are considered separately."); *Shvartsman v. Apfel*, 138 F.3d 1196, 1201 (7th Cir. 1998) (affirming the trial court's decision "den[ying] the[] request for certification of a nationwide class, [and] deciding instead to certify a class limited to plaintiffs in the Seventh Circuit").

[178]  *See Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468 (5th Cir. 1986) (affirming adoption of a trial process involving: (1) certification of a class of asbestos claimants solely to determine the viability of the defendants' "state of the art" defense, followed by (2) "mini-trials" involving small groups of plaintiffs to determine individualized issues, if necessary).  As the trial court explained: "Resolution of the state of the art issues by way of class action consideration would be the most efficient use of public and private resources as state of the art is the most significant contested issue in each case. The threshold questions upon which liability may attach are bound up in the resolution of the state of the art issues.  The individual case concerns of exposure and damages can be protected through adoption of a procedure of mini-trials to be held after the class-wide determinations on state of the art." *Jenkins v. Raymark Industries, Inc.*, 109 F.R.D. 269, 279 (E.D. Tex. 1985).

requirements of Rule 23 "through the nimble use of subdivision (c)(4)."[179]  Indeed, in *Matter of Rhone-Poulenc Rorer Inc.*, after the district court certified an MDL lawsuit "as a class action with respect to particular issues only," the Seventh Circuit Court of Appeals issued a writ of mandamus, ordering decertification.[180]  Despite having "respect for the district judge's commendable desire to experiment with an innovative procedure for streamlining the adjudication of th[e] mass tort" at issue, the appellate court concluded that the trial court's use of Rule 23(c)(4) created a number of "serious problems."[181]  Two of them were: (1) the district court's bifurcation of issues did not "carve at the joint," creating a likelihood that the topics addressed at the first trial would necessarily be reexamined by a different jury at the second trial;[182] and (2) "the undue and unnecessary risk of a monumental industry-busting error in entrusting the

---

[179]  *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996).  The *Castano* court, in discussing the predominance requirement of Rule 23(b)(3), explained: "The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.  Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended."  *Id.* (citations omitted).  *See also Perez v. Metabolife, Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003) (the "predominance requirement cannot be satisfied by seeking to repeatedly split the claims pursuant to Rule 23(c)(4)") (quoting *Kemp v. Metabolife International Inc.*, 2002 WL 113894 at *4 (E.D. La. Jan. 25, 2002)).  As noted above in footnote 139, the predominance requirement of Rule 23(b)(3) addresses similar concerns as the typicality requirement of Rule 23(a)(3).

[180]  *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1297 (7th Cir. 1995), *cert. denied*, 516 U.S. 867 (1995) (discussing a nationwide class action brought on behalf of hemophiliacs infected by the AIDS virus as a consequence of using the defendant drug companies' blood-solid products).

[181]  *Id.* at 1297 (internal quotation marks omitted), 1304.

[182]  *Id.* at 1302 (explaining that bifurcation-of-jury issues pursuant to Rule 23(c)(4) raises Seventh Amendment concerns).  Given that the remedies sought by the *Steele* plaintiffs are entirely injunctive in nature, it is not clear to what extent their claims should be tried to a jury.  *See* First Amended Complaint (master docket no. 1746) at 75 ("Plaintiffs, on behalf of themselves and all others similarly situated, demand a trial by jury on all issues so triable.").

60

determination of potential multi-billion dollar liabilities to a single jury when the results of the previous cases indicate that the defendants' liability is doubtful at best."[183]  The undersigned is not entirely confident that, were it to certify *sua sponte* a smaller class or more limited issues, it would avoid similar problems.

Moreover, it appears likely that a sufficient narrowing of subject matter to allow for a class action trial would be so severe as to destroy the very utility of certification.  To reach the necessary level of typicality, the Court would have to try the claims only of plaintiffs who all: (a) used certain welding products, (b) welded in specific work environments, (c) worked at specific plants for specific employers, and/or (d) were provided certain warnings.  Obviously, the class size and the class issues diminish with each restriction, to the point that trial of a class that meets the typicality requirement would not advance the overall litigation.  In sum, the Court concludes that partial certification pursuant to Rule 23(c)(4) is not appropriate in this case.[184]

## VIII.   Rule 23(b)(2).

The Court sets out only a few additional comments regarding Rule 23(b)(2).  In light of the Court's conclusion that the *Steele* plaintiffs do not satisfy all of the prerequisites of Rule 23(a), a more thorough examination of Rule 23(b)(2) would be superfluous.

Rule 23(b)(2) states that a class action may be maintained if "the party opposing the class has acted

---

[183]  *Id.* at 1303.  It is true that this "economic analysis" aspect of *Rhone-Poulenc* has been heavily criticized, and that Judge Ilana Rovner issued a cogent dissenting opinion.  Indeed, Chief Judge Posner's "economic analysis" took no account of the countervailing financial pressures that defendants can place on plaintiffs.  But the *Rhone-Poulenc* case as a whole still stands for the proposition that a district court should be cautious about using Rule 23(c)(4).

[184]  This conclusion says nothing, however, about the propriety of holding a common issues trial, pursuant to Fed. R. Civ. P. 42(a), which is a very different question.

or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Certification under this Rule is appropriate "where a court, through a single injunction or declaration, can redress 'group, as opposed to individual, injuries . . . .' A Rule 23(b)(2) action cannot resolve individualized issues of fact, nor provide different types of relief required to redress individual injuries."[185]

In the 1990s, federal courts were more willing to certify medical monitoring cases under Rule

---

[185] *In re Managed Care Litigation,* 209 F.R.D. 678, 686 (S.D. Fla. 2002) (citations omitted, ellipsis in original), *affirmed in part and reversed in part on other grounds*, 382 F.3d 1241 (11th Cir. 2004), *cert. denied*, 43 U.S. 1081 (2005).

23(b)(2) than they are today.[186]  Generally, those courts that did so focused, again, on the defendant's conduct, as opposed to the varying effects this conduct had on the plaintiff class.  Because the defendant's conduct was often an action or inaction "generally applicable to the [entire] class" and without regard to individual plaintiffs – conduct such as releasing toxins into the environment or marketing medical devices – courts were willing to find that Rule 23(b)(2) was satisfied.  For example, in *Day v. NLO,* where the plaintiff class sought medical monitoring after exposure to radioactive materials, the court's entire analysis of whether Rule 23(b)(2) was satisfied was as follows:

---

[186]  The following non-exhaustive chronological list identifies federal courts that have certified medical monitoring classes in a non-settlement context: (1) *In Re Three Mile Island Litig.*, 87 F.R.D. 433 (M.D. Pa. 1980) (toxic spill; class certified under the more demanding Rule 23(b)(3)); (2) *Barth v. Firestone Tire and Rubber Co.*, 661 F.Supp. 193 (N.D. Cal. 1987) (toxic exposures at a manufacturing plant); (3) *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D. Ohio 1991) (toxic spill); (4) *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) (toxic spill); (5) *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) (toxic spill); (6) *Abuan v. General Elec. Co.*, 3 F.3d 329 (9th Cir. 1993), *cert. denied*, 510 U.S. 1116  (1994) (toxic spill; summary judgment later granted to defendants); (7) *Day v. NLO, Inc.*, 851 F. Supp. 869, 879-82 (N.D. Ohio 1994) (toxic exposures at a manufacturing plant); (8) *In re Copley Pharmaceutical, Inc.*, 158 F.R.D. 485, 492 (D. Wyo. 1994) (pharmaceutical (Albuterol); class certified under the more demanding Rule 23(b)(3)); (9) *Gibbs v. E.I. DuPont de Nemours & Co., Inc.*, 876 F. Supp. 475 (W.D.N.Y. 1995) (toxic exposures at a manufacturing plant); (10) *German v. Federal Home Loan Mortg. Corp.*, 885 F.Supp. 537 (S.D.N.Y. 1995) (lead paint); (11) *In re Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997) (medical device); (12) *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998) (toxic spill; class later decertified after summary judgment rulings, *see* 197 F.R.D. 404 (C.D. Cal. 2000)); (13) *In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 673066 (E.D. Pa. Aug. 26, 1999) (pharmaceutical); (14) *Gasperoni v. Metabolife, Int'l , Inc.*, 2000 WL 33365948 (E.D. Mich. Sept. 27, 2000) (over-the-counter drug); (15) *Josephat v. St. Croix Alumina, LLC*, 2000 WL 1679502 (D. V.I. Aug. 7, 2000) (hazardous material spill); (16) *Elliott v. Chicago Housing Authority*, 2000 WL 263730 (N.D. Ill. Feb. 28, 2000) (lead paint); (17) *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003) (toxic spill).

This Court has certified a medical monitoring class that was agreed to by all parties in the context of settlement.  *In re Inter-Op Hip Prosthesis Liability Litig.*, 204 F.R.D. 330 (N.D. Ohio 2001) (medical device).  Class certification questions in a settlement context, while entailing consideration of many of the same concepts, remain fundamentally different from those presented in a liability context.  Thus, while class certification may be inappropriate at the liability phase of a lawsuit for a given group of plaintiffs in connection with a given set of claims, that fact would not *necessarily* bar certification for settlement purposes.

In the case at bar, the defendants allegedly caused all of the potential class members to be overexposed to radioactive materials through negligent or intentional misconduct. If the plaintiffs in this case ultimately prove their allegations, the class members will be entitled to injunctive relief in the form of an extensive court-supervised medical monitoring program.   Therefore, we conclude that the party opposing class certification (the defendants) allegedly acted or refused to act on grounds generally applicable to the class for which final injunctive relief with respect to the class as a whole may be appropriate. Accordingly, the requirements of rule 23(b)(2) are satisfied in this case.[187]

Using this same logic, the *Steele* plaintiffs argue that Rule 23(b)(2) is satisfied in this case because the manufacturing defendants marketed their products, accompanied by allegedly insufficient warnings, to the entire class generally, without regard to any plaintiff's individual circumstances.

In 1998, however, the Third Circuit Court of Appeals affirmed denial of certification for a medical monitoring class in *Barnes v. American Tobacco Co.*, and used language that has since become widely adopted.  In discussing Rule 23(b)(2), the *Barnes* court declared that "the cohesiveness requirement enunciated by both this court and the Supreme Court [in *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3rd Cir. 1996), *affirmed sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)] extends beyond Rule 23(b)(3) class actions.  Indeed, a (b)(2) class may require more cohesiveness than a (b)(3)

---

[187] *Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D. Ohio 1992), *mandamus denied in relevant part sub nom. In re NLO, Inc.*, 5 F.3d 154, 159 (6th Cir. 1993).  The *Day* court engaged in a similarly abbreviated analysis in discussing typicality: "In the case at bar, the similarity of the plaintiffs' claims, when compared to the differences in the individual plaintiffs' lifestyles and exposure histories, support the Court's ability to achieve efficient and just adjudication of the plaintiffs' claims.  Further, the individual issues to which the defendants refer (most significantly the statute of limitations, medical histories and psychological compositions) can be effectively addressed through some sort of claims procedure should the plaintiffs ultimately prevail in this action.  Accordingly, the Court concludes that the claims of the representative parties in this action are typical of the claims of the class." *Id.* at 334-35.

An even more brief discussion of Rule 23(b)(2) in a medical monitoring context is found in *Cook v. Rockwell Intern. Corp.*, 151 F.R.D. 378, 388 (D. Colo. 1993): "common evidence would be required to establish the level and nature of injury or disease by substances released from Rocky Flats and the causal connection, if any, between the release of the substances and any injuries or disease allegedly sustained.  Therefore, despite the fact that there would be some issues of individual proof, injunctive relief in the form of medical monitoring would seem appropriate to the class as a whole."

class. * * * While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive."[188] This implicit "cohesiveness" requirement has since been cited by many other courts as one of their bases for denying medical monitoring class certification.[189] Defendants argue in this case that the class proposed by the *Steele* plaintiffs is not cohesive, so certification under Rule 23(b)(2) is not appropriate.

This Court notes only that whether there is an implicit cohesiveness requirement within Rule 23(b)(2) is not settled within this Circuit. The Sixth Circuit Court of Appeals has never cited *Barnes*, nor used the term "cohesive" in any discussion of Rule 23(b)(2). And the Ninth Circuit Court of Appeals has

---

[188]  *Barnes*, 161 F.3d at 142-43.

[189]  *See, e.g., In re Baycol*, 218 F.R.D. at 212 (citing *Barnes* and concluding: "As discussed previously, however, a finding of negligence is inextricably intertwined with individual issues. As a result, individual issues will undermine the cohesion of the medical monitoring class."); *In re Prempro*, 230 F.R.D. at 569 (stating that cohesiveness does not exist if there are substantial "factual differences between the proposed class members"); *In re MTBE*, 209 F.R.D. at 343 (concluding the class was not cohesive because of, among other things, "differences in the level of contamination that the named plaintiffs allege, the source of the contamination, how the contamination affects each plaintiff, and the nature of relief that each will require"); *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005) (decertifying a medical monitoring class both because of differences in the applicable laws of the 17 states involved and also because "[p]roposed medical monitoring classes suffer from cohesion difficulties"). *But see In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 673066 at *9-10 (E.D. Pa. Aug. 26, 1999) (finding the medical monitoring class met the cohesion requirement addressed in *Barnes*).

pointedly "refused to read a 'cohesiveness' requirement into Rule 23(b)(2)."[190]

To a large degree, the cohesiveness requirement imposed by *Barnes* appears to duplicate aspects of the commonality and typicality requirements of Rule 23(a).[191]  Thus, this Court is not persuaded by the defendants' argument that certification under Rule 23(b)(2) must be denied for the *additional* reason of lack of class cohesiveness.

In any event, because the Court has already concluded that class certification is inappropriate for lack of typicality, the Court need not answer the question whether the plaintiff class in this case meets the requirements of Rule 23(b)(2).

## IX.    Conclusion.

As plaintiffs point out, many entities affiliated with the welding industry have publicly acknowledged, *outside of litigation*, that there is merit to plaintiffs' primary concern regarding possible

---

[190] *O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404, 411-12 (C.D. Cal. 2000) (rejecting the assertion that "Rule 23(b)(2) has an implicit 'cohesiveness' requirement that is similar, if not more stringent, than the predominance requirement of Rule 23(b)(3)"); *see Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998), *cert. denied*, 526 U.S. 1003 (1999) (stating, in a civil rights case: "We note that with respect to 23(b)(2) in particular, the government's dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding of the rule.  Although common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2). It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole.  Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.").
It is impossible to know whether the apparent drop-off in certification of medical monitoring classes by federal courts in more recent years is due to adoption of the cohesiveness analysis set out in *Barnes*, or to the 1999 promulgation of Fed. R. Civ. P. 23(f) (which first permitted interlocutory appellate review of class certification orders), or to some other factor.

[191] *See* Note, Pankaj Venugopal, *The Class Certification of Medical Monitoring Claims,* 102 Colum. L. Rev. 1659, 1679 (Oct. 2002) (suggesting that there are both "weak and strong versions" of the cohesiveness requirement reflected in the case law, and that the weak version "is nothing more than the commonality feature required of all class actions by Rule 23(a)").

dangerous health effects from exposure to welding fumes.  Indeed, at least some defendants have

recognized that some welder-plaintiffs: (1) are routinely exposed to manganese in welding fumes above

safe threshold limits;[192] (2) thereby suffer an increased risk of developing neurological illness due to

exposure to welding fumes; and (3) should obtain medical monitoring to address this increased risk.  As

stated in the 1985 MSDS that accompanied several of defendant Hobart's welding rods:

> **MANGANESE - MANGANESE DIOXIDE (MnO2)**   Long term overexposure to
> manganese compounds may affect the central nervous system.  Symptoms include
> muscular weakness, tremors similar to Parkinson's disease.  Behavioral changes and
> changes in handwriting may appear.  Employees exposed to manganese compounds should
> get quarterly medical examinations for early detection of manganese poisoning.[193]

Further, members of the welding industry have recognized publicly that "[l]ong term overexposure to

manganese compounds" can occur in as little as six months.[194]

      That the industry has acknowledged, at least in part, the legitimacy of plaintiffs' prayer, however,

is not tantamount to the existence of a basis upon which this Court can conclude that the plaintiffs are

---

[192]  *See* master docket no. 2006, Exh. LLL (Jan. 4, 1988 memorandum from Caterpillar-Belgium ("Cat-Bel") to Caterpillar's Medical Director, Dr. Gerald Grawey) at 1 (discussing a study of fume exposure in a manufacturing plant and summarizing that welders' "behind the faceshield" exposures "exceed in quite all cases the T.L.V. respectively of 5 mg/m3 for total dust . . . and 1 mg/m3 for Manganese"); master docket no. 2020, Exh. 2 (Oct. 18 1995 Minutes of AWS Project Committee on Fumes and Gases) at 2 (noting that the newly-lowered manganese TLV of 0.2 mg/mm$^3$ "would be exceeded in most workplace atmospheres"; committee members included representatives from defendants Lincoln, Hobart, ESAB, Caterpillar, and others); First Amended Complaint (master docket no. 1746) at ¶71 (quoting a 1994 statement made by The Ferroalloys Association that, to ensure a welder's exposure to manganese contained in welding fumes was kept below the then-proposed TLV of 0.2 mg/mm$^3$, "respirators would become mandatory at most of our operators").

[193]  *See* master docket no. 1838, Exh. H (Aug. 1985 Hobart MSDS for Shielded Metal Arc Welding (SMAW) Hardsurfacing) at 2.  Identical statements are found on MSDSs distributed by other defendants for other welding consumable products.

[194]  *See* O.J. Fisher, *Welding Health Standards and Regulations*, Welding Journal 24 (Sept. 1984) ("Manganese fume can cause a disease quite similar to Parkinson's disease after six months to two years of exposure.").  Mr. Fisher was the chairman of the American Welding Society's ("AWS") Safety and Health Committee when he wrote this article.  *See also* footnotes 22 - 29 and accompanying text, above.

entitled to pursue their medical monitoring claims as a class.  For the reasons stated above, the Court concludes that the *Steele* plaintiffs' motion for class certification does not meet all of the requirements of Federal Rule of Civil Procedure 23.  This conclusion says nothing about the merits of the plaintiffs' claims, nor whether they can pursue medical monitoring on an individual basis, nor even whether a state court might allow a similar class action lawsuit to proceed.  Nor does it say anything about the propriety of a common issues trial, pursuant to Fed. R. Civ. P. 42(a).  But it does mean that the *Steele* plaintiffs' motion to prosecute their case as a class action must be denied.

Having concluded that the *Steele* plaintiffs may not pursue their lawsuit as a class action, the question becomes: what may they do next?  Even though the Court has denied the motion for class certification, it appears possible the plaintiffs may still be allowed to pursue their individual claims in this MDL court, because their jurisdictional basis for doing so (CAFA) remains valid.[195]  It also appears possible they may wish simply to dismiss their claims, as one of the bases for their motion for class certification was that the value of prosecuting "a medical monitoring claim is likely too small to merit an

---

[195]  The language of CAFA, itself, is not entirely clear, although one provision suggests federal jurisdiction may continue.  *See* 28 U.S.C. §1332(d)(8) ("This subsection shall apply to any class action before *or after* the entry of a class certification order by the court with respect to that action.") (emphasis added).  Recent opinions examining CAFA jurisdiction (all of which are unreported) generally conclude that federal removal jurisdiction continues after class certification is denied, but this conclusion is not unanimous.  *See, e.g., Colomar v. Mercy Hosp., Inc.*, 2007 WL 2083562 at *2 (S.D. Fla. July 20, 2007) (holding that removal jurisdiction continued even after class certification was denied and after the only diverse defendant was dismissed); *Garcia v. Boyar & Miller, P.C.*, 2007 WL 1556961 at *5 (N.D. Tex. May 30, 2007) (holding that federal jurisdiction remains, even if the plaintiffs withdraw their motion for class certification); *Genenbacher v. CenturyTel Fiber Co. II, LLC*, 2007 WL 1452031 at *2 (C.D. Ill. May 15, 2007) (in the context of removal, "the Court's denial of class certification did not affect the Court's continued diversity jurisdiction over this matter"); *but cf. McGaughey v. Treistman*, 2007 WL 24935 at *3 (S.D.N.Y. Jan. 4, 2007) ("[b]ecause Plaintiff's motion for class certification must be denied, Plaintiff's action is no longer a class action, and this Court cannot retain subject matter jurisdiction in diversity over Plaintiff's action pursuant to [CAFA]," because there remains no individual action "that meets the $75,000 amount-in-controversy requirement of 28 U.S.C. §1332(a)").

68

individual action."[196]

To answer this question, the Court directs the *Steele* plaintiffs to submit a position statement, within the next 30 days, declaring what they wish to do and what they believe CAFA and the Federal Rules allow them to do next.  The defendants may submit a response 14 days thereafter.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: September 14, 2007

---

[196] Certification motion (master docket no. 1838) at 83.  Earlier, counsel for plaintiffs suggested a common issues trial only in connection with "individuals who have exhibited symptoms of welding fume-related neurological disease and who have also filed suit or are in the tolling agreement in this MDL litigation;" counsel have not suggested a common issues trial in connection with "those individuals [like the *Steele* plaintiffs] who have not yet exhibited symptoms of welding fume-related neurological disease." Motion for common issues trial (master docket no. 1852) at 1.

69