03cv17000zaw-ord(CatSJ).wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: WELDING FUME PRODUCTS      :
  LIABILITY LITIGATION            :     **Case No. 1:03-CV-17000**
                                          :     **(MDL Docket No. 1535)**
                                          :
                                          :     **JUDGE O'MALLEY**
                                          :
                                          :     **<u>MEMORANDUM AND ORDER</u>**
                                          :

Currently pending in this Multi-District Litigation ("MDL") are about 1,775 cases.  In all of these lawsuits, the plaintiffs allege: (1) they inhaled fumes given off by welding rods; (2) these fumes contained manganese; (3) this manganese caused them permanent neurological injury and other harm; and (4) the defendants knew or should have known that the use of welding rods would cause these damages.  Although the complaints in these cases and the theories of liability they recite are not identical, the plaintiffs generally bring claims sounding in strict product liability, negligence, fraud, and conspiracy.  The gravamen of the complaints is that the defendants "failed to warn" the plaintiffs of the health hazards posed by inhaling welding rod fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process.

One of the defendants named in these complaints is Caterpillar, Inc.  The thrust of the plaintiffs' claims against Caterpillar is that: (1) Caterpillar was a huge consumer of welding rods and employed many welders; (2) like the welding rod manufacturer defendants, Caterpillar knew that users of welding rods could suffer neurological injury; and (3) Caterpillar conspired with the manufacturer defendants to conceal the hazards of welding rods, in order to avoid the cost of respirators and other equipment necessary to protect its welder-employees.

Defendant Caterpillar now seeks summary judgment in its favor on all claims, in every case pending in this MDL (master docket no. 1979).  For the reasons stated below, the motion is **GRANTED**, and Caterpillar is **DISMISSED** as a party in this litigation.[1]


I.      **Procedural History.**

Beginning in September of 2003, Caterpillar filed a series of motions, pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c), seeking to dismiss all of the claims brought against it by all of the plaintiffs in this MDL.  The primary arguments asserted in these motions were that: "(1) the claims for conspiracy to commit fraud fail because the complaints do not plead fraud with sufficient particularity; (2) the negligence claims fail because the complaints fail to identify a duty owed by [Caterpillar] to the plaintiffs; and (3) the product liability claims fail because [Caterpillar] did not manufacture or distribute any welding rod products, which is the only basis for strict product liability."[2]  The Court denied these motions "without prejudice to [Caterpillar's] assertion of similar arguments in summary judgment motions" because Caterpillar's "arguments, to varying degrees, rel[ied] on matters outside of the pleadings."[3]

In assessing Caterpillar's arguments, however, the Court noted that the plaintiffs had used generic allegations, which did not fully apprise Caterpillar or the other defendants regarding their alleged role in the claimed conspiracy: "While plaintiffs have alleged the 'what' of certain supposedly conspiratorial acts

---

[1]  There is a minor exception to this ruling in connection with cases where: (1) Caterpillar was the plaintiff's employer, or (2) subsequent discovery provides a plaintiff with a factual basis for product liability claims against Caterpillar.  *See* footnotes 99 and 145, below.

[2]  Order at 2 (April 4, 2005) (master docket no. 992).

[3]  *Id.* at 3.

in great detail, they have alleged the 'who' in virtually no detail."[4] The Court chose, at that juncture, "to assess the sufficiency of the plaintiffs' claims with substantial leniency," and allowed the plaintiffs to pursue discovery against all defendants in an attempt to prove their conspiracy and other claims. The Court warned, however, that it would pay high scrutiny to plaintiffs' proofs if Caterpillar later filed summary judgment motions:

> the Court's leniency[, however,] is temporary: the Court intends to be much more exacting toward plaintiffs when reviewing any defense motions for summary judgment. The defendants are correct in their assertion that many of the allegations, especially those that are generic, paint only a sketchy connection between a given defendant and the plaintiffs' alleged harm. The defendants are right to insist that plaintiffs must define their theories of liability more clearly, and show each of the elements of each of their claims against each defendant. Although the Court concludes the plaintiffs' claims survive (barely, in some cases) the defendants' Rule 12 motions, plaintiffs' oppositions to motions for summary judgment will have to meet fully the higher Rule 56 standard.[5]

Since that time, Caterpillar has produced to plaintiffs in discovery thousands of pages of documents, answered many dozens of interrogatories, and presented several witnesses for deposition. After discovery was completed, Caterpillar filed the instant summary judgment motion, again asserting there is no basis for a judgment against them on any of the claims asserted by any of the plaintiffs in this MDL. With benefit of discovery, plaintiffs have responded with a much more detailed explanation of Caterpillar's actions and precisely how plaintiffs believe Caterpillar took part in the alleged conspiracy. This discovery is summarized below. Ultimately, however, the Court concludes that, although Caterpillar was associating with welding rod manufacturers against which plaintiffs have colorable claims, there is insufficient evidence upon which a reasonable jury could conclude that Caterpillar conspired with those other defendants to harm the plaintiffs.

---

[4] *Id.* at 6-7.

[5] *Id.* at 8.

3

## II.    Facts.

To give context to the Court's factual recitation, the Court first repeats here the plaintiffs' own characterization of the conspiracy claims they assert against Caterpillar and the other defendants. Plaintiffs explain:

> The plan of the welding rods industry was to conceal and misrepresent vital information concerning the health risks of manganese.  This plan was knowing and willful. This plan had several aspects:
> 1.    minimize the warnings on welding consumable labels
> 2.    preclude fundamental neurological epidemiology studies on welders
> 3.    promulgate misleading scientific information in the published literature [and]
> 4.    oppose appropriate exposure limits of manganese emitted in welding fumes.
> * * *
> The motive[s] for the plan [were]:
> 1.    to limit the costs inherent in providing a safe working environment for welders [and]
> 2.    to maximize sales which would have otherwise been reduced because of safety issues.[6]

The evidence mustered by plaintiffs "to demonstrate that Caterpillar participated in a knowing, intentional and willful industry-wide effort to conceal and misrepresent the facts about the adverse health effects of manganese in welding rods" is set out by category, below.[7]  The following material facts are not in dispute, and are examined from the perspective most favorable to plaintiffs.

### A.    Historical Context.

Plaintiffs assert that the conspiracy Caterpillar allegedly joined in 1972 actually began as early as

---

[6]  Response brief at 6 (master docket no. 2006).

[7]  *Id.*  Caterpillar suggests in passing that some of the documents discussed below are inadmissible because they "would be subject to hearsay or other objections," reply brief at 11 n.9 (master docket no. 2022), but Caterpillar does not actually make those objections or argue the Court should not consider any of these documents.  Accordingly, the Court examines all of the evidence proffered by plaintiffs.

the 1930s.  It was in 1932 that Dr. Erich Beintker first published a report titled "The Effect of Manganese During Arc Welding."  Although written in German, the report was translated and came to the attention of the welding rod industry in America.  Dr. Beintker was one of the first persons to suggest that exposure to manganese in welding fumes could be hazardous.  The Metropolitan Life Insurance Company, in a 1937 booklet titled "Health Protection of Welders," summarized Dr. Beintker's report as follows:

> Two cases of poisoning in a mild form, by manganese oxide fumes given off from the electrodes in arc welding of tanks and boilers, have been reported from Germany.  The electrode used contained 0.2 percent manganese.  It is stated that protective filter respirators or air helmets are necessary in tank and boiler work, although in open rooms it is improbable that these precautions will be needed.[8]

The Booklet went on to explain the symptoms of manganese poisoning:

> *Manganese* is an important poison from the point of view of its effects rather than from frequency of exposure to it.  Manganese has a selective action on some of the nerve centers of the brain.  It causes a disease similar to paralysis agitans, which in chronic cases is seldom fatal, but which, owing to the fact that no satisfactory treatment is known, is always disabling.  Prevention, therefore, is the measure to be stressed when the possibility of manganese dioxide fumes or dust is present.[9]

Over the course of the next few decades, other publications reiterated the warning that manganese in welding fumes could be hazardous.  For example, in 1943, an industrial hygiene guide discussing welders' manganese exposure noted that "[d]isability, such as crippling, caused by manganese poisoning, may be permanent if the disease is allowed to become well established.  * * *  Manganese victims usually remain life-long cripples, unfit for gainful employment.  Manganese apparently attacks and progressively destroys a non-vital portion of the neuro-muscular system, leaving the victim well in other respects."[10]

---

[8]  Metropolitan Life Insurance Company, *"Health Protection of Welders" Booklet* at 24 (1937).

[9]  *Id.* at 23.

[10]  "1021 Answers to Industrial Health and Safety Problems," *Occupational Hazards Magazine* at 66 (1943).

In response to the knowledge that welding fumes could be hazardous, members of a trade organization known as the National Electric Manufacturers Association ("NEMA") met to discuss the propriety of supplying warnings to welders.  Specifically, in 1937, the members of NEMA's Electric Welding Section – many of whom were employed by the defendants in this case (but not by Caterpillar) – heard "an argument that it is advisable to avoid all possible hazards by cautioning users of the [welding] process to provide ventilation wherever necessary and that it was further desirable to set up a uniform method of calling attention to this."[11]  Accordingly, the members passed a resolution "to circulate among the members for approval, by letter ballot, a warning notice which should call attention to the hazards involved in breathing smoke and fumes, and suggest that adequate ventilation be provided for all welding operations."[12]

The record submitted by the parties does not make clear whether any such warning notice was drafted or approved by NEMA.  Over the course of the following three decades, however, there are numerous examples of documents showing that certain defendants in this case – other than Caterpillar – decided both individually and jointly *not* to supply warnings with their welding rods, and, in some cases, to discount any threat of welding fume health hazards.  A few examples include:

- In 1943, an article written by two medical-doctor-employees of defendants Union Carbide and General Electric appeared in *The Journal of the American Welding Society*.  The article generally downplayed risks associated with welding, and stated: "As encountered in welding fumes the amounts [of manganese and other possibly injurious substances] are usually definitely less than those known to have toxic effects, and it is doubtful if any reports alleging injury from these metals in welding can be substantiated."[13]

---

[11]  NEMA Electric Welding Section meeting minutes at 116 (March 17, 1937).

[12]  *Id.*

[13]  A. Cranch & B. Vosburgh, *Health Aspects of Welding*, J. of the American Welding Society, 343, 345 (1943).

6

- In 1949, an article researched and written by employees of defendants Lincoln Electric and General Electric, and supported by NEMA, appeared in *Welding Engineer* magazine.  The article stated: "Medical science has thoroughly investigated the effects of fumes by arc and gas welding and has given them an entirely clean bill of health – or one so very close to it as to make no difference if welding is done under proper conditions of ventilation . . . .  Toxic gases are not evolved from electrode coatings; comparatively, welding is safer with coated electrodes than with bare wire."[14] In subsequent years, Lincoln Electric distributed reprints of this article.

- In 1949, members of the NEMA Arc Welding Section discussed action recently taken by another trade organization, the American Welding Society ("AWS").  The AWS had "approved a standard covering the marking of containers for fluxes which are alleged to contaminate the atmosphere when used."[15]  During the ensuing conversation, "[s]everal opinions were expressed that it was inadvisable to place such markings on electrode package labels because of the adverse reflection on the welding process."[16]  One NEMA member "estimated that if such marking was applied, it would result in a loss of business from ten to thirty percent.  Another member . . . commented that, on the advice of his company's legal counsel, all such markings had been removed from package labels because of the implication that such fumes might be harmful."[17]

- In an internal memorandum discussing the meeting described immediately above, the history of the product manufacturers' use of warnings was summarized as follows: "the arc welding industry at one time desired to take every precaution to guard against injury, and the NEMA section decided to incorporate a warning clause on all electrode box labels.  It turned out, however, that some of the manufacturers did not do this and as a result immediately capitalized on the advantage of being able to sell an electrode which did not have to be marked 'poison.'  As a result, one by one all of the various manufacturers took this information off the label and all were very glad to get it off."[18] The memo added that "Mr. Lincoln of the Lincoln Electric Company said that if his company did anything like that [i.e., use a warning] it would put him out of business."[19]

- In 1951, the NEMA Arc Welding Section recognized that "State Health Bureaus have recognized an increasing interest in the analysis of fumes from welding electrodes and cases have been found

---

[14]  C. Clason, *Welding and Cutting Fumes*, Welding Engineer (1943).

[15]  NEMA Arc Welding Section meeting minutes at 538 (Oct. 17, 1949).

[16]  *Id.*

[17]  *Id.*

[18]  Airco memorandum from I. Yates to F. Saacke at 1 (Oct. 25, 1949).

[19]  *Id.*

7

where the concentration of toxic elements is higher than is recognized for safe limits."[20]  The committee members, however, all chose to continue their practice of not providing warnings, after one member stated "that it is a question of recognizing which is the greatest risk, that is, to invite the claims which allegedly may be caused by arc welding because some information appears on the box of welding electrodes to indicate welding fumes might be harmful, or to recognize the preponderance of the evidence that the fumes from arc welding are not harmful."  *Id.* at 582.

- In 1955, defendant Lincoln Electric published a booklet, "Procedure Handbook of Arc Welding," which stated that "[m]uch research has been done which has proven that the fumes and smoke obtained when welding steel and the ferrous alloys are not harmful."[21]

- In 1965, in response to a request for information from a NASA industrial hygienist, Lincoln Electric wrote that it knew "of no difficulties from [use of its JetWeld rods] from a health point of view where adequate ventilation is provided," and enclosed an article titled "Welding 'Hazards': Our Modern Day Mythology," which ridiculed those who associated welding with any health risk, while stating that "toxic gases are not produced by electrode coatings," and that "[l]ead poisoning is the only chronic ailment that can be caused by welding fumes; other illnesses attributable to fumes dissipate quickly and have no cumulative effect."[22]

In the late 1960s, however, practices regarding warnings on welding rod products changed. Specifically, in 1966, prompted by the tobacco industry's use of a warning for cigarettes, the American Welding Society's ("AWS's") Committee on Filler Metal – which had members from a large number of defendants in this case (but not Caterpillar) – addressed the question of whether there should be "mandatory warning labels" for welding rods.[23]  Eventually, in April of 1967, the AWS did adopt a mandatory warning label, which read: "Caution.  Welding may produce fumes and gases hazardous to health.  Avoid breathing these fumes and gases.  Use adequate ventilation.  See USAS Z49.1, 'Safety in Welding & Cutting" published by the American Welding Society."

---

[20]  NEMA Arc Welding Section meeting minutes at 581 (Jan. 17, 1951).

[21]  Lincoln Electric, "*Procedure Handbook of Arc Welding,*" at I-27 (10th ed. 1955).  Lincoln reiterated this statement in subsequent editions of the Handbook for at least the next 15 years.

[22]  Letter to J. Terry from A. Patnik (Nov. 30, 1965).

[23]  AWS Committee on Filler Metal meeting minutes at 2 (June 8, 1966).

8

During the period between the welding industry's adoption of this mandatory warning and the time when Caterpillar allegedly joined the conspiracy to conceal the hazards of welding fumes, certain defendants took actions that plaintiffs claim were designed to mitigate the force of the new warning. For example, shortly after the warning was adopted, Lincoln Electric wrote a letter to the AWS Committee on Filler Metal, stating its policy would be to place this warning "on all its cartons" but not "on the product which is inside the carton."[24]  Lincoln Electric recognized what the effect of this policy would be: "Obviously, many welders using the electrode will never see the container and will therefore never see the warning label."[25] Also, once it became apparent that a majority of the welding rod manufacturers were going to agree to adopt the mandatory warning label, the AWS Committee on Filler Metal appointed a task force "to prepare an article slanted toward reassuring the users that the health hazards are minimal and thus allaying suspicions of some new evidence or change in the extent of hazards, as a result of the appearance of these warning labels."[26] When this "slanted article" was published, it stated, among other things: "Over the years, the number of welders who have shown any effects from these fumes has been extremely small, and their disability temporary, usually less than 24 [hours]."[27]

Thus, based on plaintiffs' own description of it, the alleged conspiracy to conceal the hazards of welding fumes had been in place for several decades when Caterpillar allegedly joined it in 1972.

**B.**     **Caterpillar's Connection with other Alleged Conspirators.**

---

[24]  Letter from R. Shutt to P. Shepard at 1 (June 7, 1967).

[25]  *Id.*

[26]  Internal memo to file from Arcos Corp.'s R.D. Thomas (Jan. 30, 1967).

[27]  J. Caprarola, *et al.*, "Welding Industry to Use Caution Label on Filler Metal Packages," *Welding Journal* (August 1967).

9

Caterpillar is a manufacturer of heavy equipment.  As a part of its manufacturing processes, it purchases (from other defendants) and consumes large quantities of welding rods, and employs a large number of welders.  In light of the importance of its welder-employees and the tasks they perform, Caterpillar has long undertaken two activities.  First, Caterpillar created an internal Department of Industrial Hygiene.  This department is avowedly dedicated to: (a) reduction of workplace injuries to its employees, including welders; and (b) ensuring compliance with health-related governmental and industrial regulations, including rules limiting welding fume exposure.  To help meet these goals, many of Caterpillar's manufacturing plants have medical directors, to whom resident industrial hygienists (and other health and medical personnel) report.

Second, in 1972, Caterpillar became a member of the American Welding Society ("AWS"), a non-profit trade association devoted to the advancement of the science and application of welding.  In particular, over a three-decade period, two Caterpillar employees served as members of the AWS Safety & Health Committee, which was dedicated to developing information about welding safety for use by welders and their employers.  These individuals were: (1) Dr. Neal Ward, Caterpillar's Assistant Medical Director, who was on the AWS Safety & Health Committee from 1972-86; and (2) Dr. Thomas Neu, Caterpillar's Medical Director for the Aurora, Illinois manufacturing plant, who succeeded Dr. Ward on the same Committee from 1986 into the late 1990s.  During this entire period, the AWS Safety & Health Committee was composed of between five and ten active members.  Meetings were often also attended by guest representatives of various businesses that consume and manufacture welding rods, as well as

10

scientific investigators and governmental regulators.[28]

The Safety & Health Committee's self-professed responsibility was "the development and promotion of knowledge concerning the working environment of all persons involved in welding, brazing, thermal cutting, and allied processes."[29]  The Committee's "Membership and Duty Statement" proclaimed that it was the duty of the Committee to:

- promote knowledge concerning occupational and environmental effects on the health and safety of personnel involved in welding and allied processes, including the storage and handling of welding equipment and materials.
  * * *
- develop safe practices and standards for such processes, to ensure a safe working environment for welders and associated personnel.[30]

In addition to Drs. Ward and Neu, various other Caterpillar employees attended Health and Safety Committee meetings occasionally, and also attended meetings of other AWS committees.

It is through AWS membership that plaintiffs assert Caterpillar conspired with the other defendants to hide the hazards of welding fumes.  It was at AWS meetings that Caterpillar allegedly reached a "meeting of the minds" with other defendants regarding their common purpose and design.  Plaintiffs point to the following evidence, which reveals the state of Caterpillar's knowledge regarding the alleged conspiracy, and Caterpillar's actions allegedly in furtherance thereof.

---

[28]  For example, the AWS Safety & Health Committee meeting on June 23, 1999 lists members from the following businesses and organizations, among others: (1) MDL defendants – ESAB, Praxair, Lincoln Electric, Westinghouse Electric, and Caterpillar; and (2) governmental entities – the U.S. Department of Safety, the U.S. Department of Energy, the U.S. Army Center for Health Promotion and Preventative Medicine,  the National Institute for Occupational Safety and Health ("NIOSH"), and the Florida Division of Safety.  Individuals representing entities engaged in welding education and research also frequently attended AWS meetings.

[29]  AWS Rules of Operation for Safety & Health Committees at 1 (1974, rev. 1990).

[30]  *Id.* at 18.

**C.      Caterpillar's Knowledge of Welding Fumes' Neuro-Toxicity**.

In 1970, shortly before Caterpillar joined, the AWS commissioned the Battelle Memorial Institute to produce a report entitled "Survey of Welding Fumes and Gases."  The Survey, which was widely distributed within AWS – and which Caterpillar received even before it became an AWS member – reported that manganese in welding fumes could cause welders to suffer neurological injury.  Specifically, the study stated:

> The fumes from manganese are highly toxic, and they can produce total disablement even after exposures as short as a few months to high-fume concentrations . . . .  Exposure to manganese dioxide may cause a neurological lesion involving the basal ganglia, the frontal cortex, and occasionally the pyramidal system.  Symptoms are similar to Parkinson's syndrome and include 'weakness of the legs,' difficulty in walking downhill, instability, and weakness while doing heavy work.[31]

The Survey also reported on research done in 1966 to "determine the concentration of selected toxic components" in fumes generated from "commercially available" welding rods.[32]  According to the Survey, this research showed that "several" welding rods "produced manganese and vanadium fumes that exceeded recommended [Threshold Limit Values, or 'TLVs']."[33]  As the Survey acknowledged, the then-applicable

---

[31]  Battelle Survey at 27.

[32]  *Id.* at 60.

[33]  *Id.* at 65.  Threshold Limit Values ("TLVs") are promulgated by the American Conference of Governmental Industrial Hygienists ("ACGIH").  The ACGIH describes a TLV as follows: "[TLVs] refer to airborne concentrations of chemical substances and represent conditions under which it is believed that nearly all workers may be repeatedly exposed, day after day, over a working lifetime, without adverse health effects. TLVs are developed to protect workers who are normal, healthy adults."  *See* www.acgih.org/Products/tlv_bei_intro.htm.
    Over time, as knowledge of the toxicity of manganese has increased, the TLV for manganese has dropped.  In 1948, the TLV was an 8-hour time-weighted average of 6.0 mg/mm$^3$; it was dropped to 5.0 mg/mm$^3$ in 1960, and dropped again to 1.0 mg/mm$^3$ in 1979; and the current TLV for manganese, set in 1995, is an 8-hour time-weighted average of 0.2 mg/mm$^3$.  In 2003, the ACGIH issued a "notice of intended change (NIC)" to lower the TLV for manganese to 0.03 mg/mm$^3$, but this change was never ratified.

manganese TLV was 5.0 mg/mm$^3$.[34]  Thus,  as of the time that Caterpillar joined the AWS, it knew the AWS was reporting that over-exposure to manganese in welding fumes could cause permanent neurological damage – even "total disablement" – and that commonly-used welding rods could generate fumes so copious that worker exposure would exceed healthy limits established by industrial hygienists.[35]

In fact, in 1972, Caterpillar employee Bob Ranney attended a meeting of the AWS Task Group on Welding Fumes and discussed his company's existing policies regarding welding fume exposure.  A memorandum that recorded Ranney's statements revealed that Caterpillar believed "fumes must be caught and extracted at the source to do a really effective job," because standard room ventilation did not provide adequate protection for welders.[36]  Thus, Caterpillar had budgeted "about $400 per welder" for "smoke extraction" in 1972.[37]

Other documents, both internal to Caterpillar and also shared by AWS members, show that, from 1970 forwards, the neuro-toxicity of welding fumes was a recurring topic.  For example, in 1979, an AWS literature review noted that "[p]otential exposure to manganese occurs whenever this metal is used in

---

[34]  *Id.* at 27.

[35]  One AWS member characterized the Battelle Study as having "shown us that virtually all welding consumables are capable of producing unacceptable levels of fumes and/or gases in the arc stream." Letter from W.T. Delong (Dir. of Research Welding Prods. Div., Teledyne McKay) to Chairman, AWS Task Group on Welding Fumes at 1 (Nov. 15, 1971).  DeLong continued: "However, [the Study] has not yet gone beyond this to the most basic question of all, which is how to insure that the welder is protected." *Id.* DeLong advocated for focusing further studies on ventilation techniques and requirements.

[36]  Internal Teledyne McKay memo from W.T. Delong to D.F. Helm at 2 (Feb. 17, 1972).

[37]  *Id.* "Fume extraction" involves a mechanism  to capture fumes at their source, using vacuum suction near the weld itself.  In comparison, general room ventilation exhausts fumes only to the same extent as the air turn-over of the ambient environment.

electrode coatings or in electrode wire," and that manganese is "poisonous to the nervous system."[38]  This literature review went on to state that the "observation that manganism resembles Parkinson's disease deserves emphasis.  Although no data on the prevalence of parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's disease.  Further investigations may be warranted."[39]

Similarly, in 1979, an internal Caterpillar memorandum written by industrial hygienist R.E. Kinser discussed an "industrial hygiene review" that occurred at a Caterpillar manufacturing plant, and addressed particularly an example study of "the potential exposure of one welder to manganese fume."[40]  The memorandum notes that the welder's potential manganese fume exposure reached "almost three times in excess of the [then-current] OSHA standard [of 5.0 mg/mm$^3$]" and, in the next sentence, observed: "Chronic inhalation of manganese fumes may result in manganese poisoning, otherwise known as manganism.  Symptoms include weakness, headaches, instability, slow articulation, difficulty in walking, and spasmodic laughter, among others."[41]  The memorandum further noted:

> In addition it is felt that the current OSHA standard of 5 mg/M$^3$ as a ceiling value is not appropriate in that it contains little or no safety factor to provide protection against any adverse health effects resulting from exposure to manganese fume.  A review of the literature would indicate that manganese fume is more hazardous than previously thought and a more restrictive limit would appear necessary.  The limit of 1.0 mg/M$^3$ as a time-weighted average for manganese fume (proposed by the American Conference of

---

[38]  American Welding Society, *"Effects of Welding on Health,"* at xix (1979). The Franklin Research Center prepared this literature review for the AWS Safety & Health Committee, and the review was overseen by the AWS Research Committee and Research Finance Committee.  At least three Caterpillar employees were members of these committees at the time.  *Id.* at vii.

[39]  *Id.* at 29.

[40]  Memorandum from R. Kinser to N. Ward *et al* at 1 (Mar. 9, 1979).

[41]  *Id.* at 2.

Governmental Industrial Hygienists) is a more appropriate limit.[42]

Kinser concluded that: (a) unless and until "local ventilation" (meaning fume extraction) could mitigate exposure, "mandatory use of a NIOSH certified respirator for protection against metal fumes is necessary;" and (b) "[m]edical surveillance through periodic physical examinations for welders exposed to excessive levels of manganese fume should be considered.  Special emphasis should be given to identifying any symptoms of manganism."[43]  Kinser ended his memo with the suggestion that, "[b]ecause of the potential overexposure to . . . manganese, . . . the recommendations made in this memo should be implemented as soon as possible."[44]

Later, in about 1992, as the welding community began to discuss the issue of whether, and to what extent, lower-dose exposures to welding fumes were also hazardous, Caterpillar acknowledged in an internal memorandum "a number of recent studies which have alleged to show pre-clinical neurological effects due to low level exposure to manganese," including "Central Nervous System (CNS) disorders span[ning] the range from reduction in short term memory and hand tremor to full blown manganism."[45] The memorandum's conclusion, however, remains representative of Caterpillar's stance today: "All of the studies cited above have been criticized for a variety of reasons and can not be considered conclusive."[46]

**D.     Caterpillar's Involvement with Studies of Toxicity of Welding Fumes**.

---

[42] *Id.*

[43] *Id.* at 2, 3.

[44] *Id.* at 3 (some language redacted from document produced by Caterpillar).

[45] *See* depo. of Paul Hodgins (July 7, 2005), exh. 17 at 1 (internal memo dated June 3, 1992).

[46] *Id.* at 3.

In 1973, Caterpillar undertook an internal study on the health effects of ultraviolet radiation from welding on its welder-employees. The study did not, however, examine the health effects of welding fumes on welders.

In 1978, the AWS Safety & Health Committee – including Caterpillar's Dr. Ward – voted to draft a request that "[t]he Franklin Institute Research Laboratories . . . submit a formal proposal on a Mild Steel Arc Welding Prospective Study for a six year period."[47] The AWS envisioned this prospective epidemiological study would examine welders' risks of suffering chronic lung disease, cancer, and eye injuries; there was no mention initially of examining the risk of developing neurological injury. In a follow-up meeting in 1979, however, Kinser from Caterpillar (attending in place of Dr. Ward) commented on the then-existing draft of AWS's request for proposal ("RFP") to the Franklin Institute, as follows:

> Mr. Kinser observed that in mild steel welding a significant amount of manganese appears in the fume. In view of the several court cases alleging manganese poisoning, it would seem appropriate to include some kind of neurological examination to indicate the possible connection with manganese exposure in the epidemiological study.
> It was suggested that this question be brought up at the meeting scheduled for the next day at the Franklin Institute Research Laboratories.
> Except for the above comments on the draft RFP, no action was taken and there was no official approval of an RFP to distribute to potential research organizations.[48]

Three months later, the Safety & Health Committee again examined the draft RFP. At that time, Dr. Ward reiterated Kinser's thoughts: "Dr. Ward indicated the need for a cursory neurological evaluation of the welders."[49] The Committee voted to finalize the RFP and to submit it to four research

---

[47] AWS Safety & Health Committee meeting minutes at 5 (Nov. 30, 1978).

[48] AWS Safety & Health Committee meeting minutes at 4 (March 19, 1979).

[49] AWS Safety & Health Committee meeting minutes at 3 (June 20, 1979).

16

organizations;[50] in addition, it voted to create a "Monitoring SubCommittee - Epidemiology," and appointed Dr. Ward as chairman.  The final version of the RFP for epidemiological study issued by the AWS asked that the medical assessments of welders include a "neurological examination," explaining: "It is believed this should be included due to concern that manganese exposure may be significant."[51]

Although the AWS finalized and approved the RFP seeking an epidemiological study of welders, the evidentiary record is incomplete regarding the responses of the four research organizations to which the RFP was sent.  In October of 1980, however, Dr. Ward wrote to his boss at Caterpillar, Medical Director Dr. Gerald Grawey, that the AWS "is making an effort to begin a prospective epidemiological study of mild steel welders" and that the "University of Michigan is the contractor."[52]

Plaintiffs point out there are no minutes from any AWS Safety & Health Committee meeting reporting on the status of the welders epidemiological study over the course of the next two years.  The Committee did, however, continue to maintain an awareness of anecdotal evidence regarding the effects of manganese in welding fumes.  In 1981, for example, the Committee "discussed the fact that some cases of manganism have been documented at levels below 5 milligrams per cubic meter and that this was the reason that the current [TLV] was lowered to 1 milligram per cubic meter."[53]

The next mention in any AWS document regarding the welders epidemiological study occurred in 1982, when the minutes from the AWS Subcommittee on Fumes and Gases mention that "the proposed

---

[50]   The four research organizations were University of Cincinnati (Kettering Laboratories), University of Pittsburgh, University of Michigan, and Franklin Institute Research Laboratories.

[51]   AWS RFP at 3.

[52]   Letter from Ward to Grawey at 1 (Oct. 28, 1980).

[53]   AWS Safety & Health Committee meeting minutes at 5 (May 20, 1981).

17

epidemiological study has been shelfed [sic] because of lack of funds for this project."[54]  Put simply, the

AWS did not pursue its own proposal for a six-year study, involving nine different, periodic medical

examinations of 2,000 welders, because it was going to be too expensive.  But the Safety & Health

Committee remained interested in funding epidemiological research.  Two years later, in 1984, Dr. Ward

wrote to Dr. Grawey again, noting that the AWS's research fund "is now $181,825.  This amount of money

is making the board of directors rather anxious to fund research.  Two of us, who are also members of the

research committee, share feelings that the funds should be reserved for epidemiological studies.

Specifically, the NIOSH study."[55]  Dr. Ward memorialized the Safety & Health Committee's discussions

on the subject:

> The final topic of discussion was the NIOSH proposal for a prospective epidemiological
> study of mild welders.  NIOSH apparently does not have adequate funds to accomplish this
> study, which is estimated to cost approximately $1.7 million over a period of seven years.
> They were never specific about the amount of financial support they would request from
> the welding society.  It was agreed that NIOSH would send a request for a specific sum of
> money for support of the study.[56]

The proposed NIOSH study was aimed at studying the pulmonary function of welders.  At the same time,

Dr. Ward revealed that, for parochial reasons, the AWS Safety & Health Committee's support for the

proposed NIOSH study protocol was only lukewarm:

> I think all of the members, to some degree, support the study, although there seemed to be
> less than enthusiastic interest in assisting from the financial point of view.  It was also
> obvious that the Committee has different objectives from NIOSH.  The committee
> members would like to see a negative study which we feel would be useful in challenging
> some of the allegations made in the literature about health of welders.  NIOSH would

---

[54]  AWS Subcommittee on Fumes and Gases meeting minutes at 2 (Mar.  2, 1982).  Dr. Ward also
testified that the study did not take place due to lack of available funding.  Ward depo. at 276 (June 15,
2005).

[55]  Memorandum from Ward to Grawey at 1 (June 11, 1984).

[56]  *Id.*

18

prefer a positive study; however they are uncertain that the levels of exposure found in industry such as Caterpillar would provide the intensity of exposure necessary to obtain positive findings.[57]

There is no evidence that the AWS ever contributed funds to support the proposed NIOSH epidemiological study of welders.  Over the next decade, however, the AWS Safety & Health Committee made the following contributions toward research of the neurological effects of welding fumes: (1) $5,000 to "Dr. Hochberg from the University of South Florida" to help pay for his "studies of manganism (MRI studies);"[58] and (2) $30,000 to the Harvard MOVEMAP study, an early effort to see if combining brain imaging and tremor analysis could "detect a difference between the symptoms of manganism and Parkinson's disease."[59]

Beyond Caterpillar's central involvement with AWS's pursuit *vel non* of studies regarding welding fume toxicity, Caterpillar was also aware of a fume-exposure study undertaken at a Belgian Caterpillar manufacturing plant.  Specifically, Caterpillar-Belgium ("Cat-Bel") wrote a memo to Caterpillar's Medical Director, Dr. Grawey, informing him of "a study done in our plant concerning welding fumes."[60]  The memo stated that, in response to welders' complaints, the Ministry of Labor had collected fume samples in April of 1987; the results were "very high [both] for total fumes [and] for Mn and FeO2."[61]  Cat-Bel followed up with its own three-week study, measuring welders' exposures "behind the faceshield;" the measurements occurred at different workstations, at different times, and while the welders used a variety

---

[57] *Id.*  NIOSH was also conducting a cancer epidemiology study at Caterpillar at this time.

[58] AWS Safety & Health Committee meeting minutes at 2 (Dec. 8-9, 1993).

[59] AWS Safety & Health Committee meeting minutes at 4 (Dec. 7-8, 1994).

[60] Memo. to Grawey at 1 (Jan. 4, 1988).

[61] *Id.*

19

of welding rods. The results showed that "measurements of total dust . . . and Manganese exceed in quite all cases the T.L.V. respectively of 5 mg/m3 for total dust . . . and 1 mg/m3 for Manganese."[62] In contrast with these measurements "behind the faceshield," "measurements of the ambient atmosphere of the building were all within the T.L.V. limits."[63]

Finally, a 1992 internal memo sets out Caterpillar's views on the need for further studies of the effects of welding fume exposure:

> There have been a number of recent studies which have alleged to show pre-clinical neurological effects due to low level exposure to manganese.
> * * *
> All of the[se] studies . . . have been criticized for a variety of reasons and can not be considered conclusive. Reasons include lack of historical monitoring, poor control group selection, poor sampling and use of improper testing and questioning. Since these studies are clearly in the range where manganese exposure begins to cause biological effects, there is considerable need for a new study which addresses past deficiencies and leads to a clearly established dose-response relationship between manganese exposure and neurological disfunction [sic].
> * * *
> [These] [r]ecent studies are alleging the development of neurological disfunction [sic] as a result of exposures to very low levels of manganese. These studies are based on highly subjective and generalized data. If left unchallenged by more specific and targeted studies the workplace standards will almost certainly be reduced by an order of magnitude or more.[64]

## E. Caterpillar's Views on Appropriate Manganese Fume Exposure Limits.

As noted above in footnote 33, the TLV for manganese promulgated by the ACGIH has dropped over time. When first published in 1948, the TLV was an 8-hour time-weighted average of 6.0 mg/mm³; it was dropped in 1960 to 5.0 mg/mm³; dropped again in 1979 to 1.0 mg/mm³; and then dropped again in

---

[62] *Id.*

[63] *Id.*

[64] *See* depo. of Paul Hodgins (July 7, 2005), exh. 17 at 1-3 (internal memo dated June 3, 1992).

1995 to 0.2 mg/mm³.  These reductions in the manganese TLV reflect a consensus among industrial

hygienists that the more that is known regarding the toxicity of manganese, the lower the exposure limits

must be set to ensure "no adverse health effects."  Of course, the lower the TLV of a given substance, the

more difficult – and expensive – it becomes to ensure workers' exposures do not exceed it.  As seen below,

these competing concerns are reflected in Caterpillar's documents.

In 1971, the Occupational Safety and Health Administration ("OSHA") issued a regulation setting

the Permissible Exposure Limit Ceiling ("PEL-C")[65] to manganese fume at 5.0 mg/mm³.  This OSHA limit

remained in force in 1979, even though the ACGIH had earlier dropped the TLV from 5.0 to 1.0 mg/mm³.

Two of Caterpillar's industrial hygienists, Kinsey and B.C. Manning, agreed that the ACGIH's stance was

well-supported: "It is felt that the current OSHA standard of 5 mg/M³ as a ceiling value is not appropriate

in that it contains little or no safety factor to provide protection against any adverse health effects resulting

from exposure to manganese fume.  * * *  The limit of 1.0 mg/M³ as a time-weighted average for

manganese fume (proposed by the American Conference of Governmental Industrial Hygienists) is a more

appropriate limit."[66]

In the late 1980s, however, when OSHA proposed to reduce the manganese exposure limit from

a PEL-C of 5.0 mg/mm³ to a PEL-TWA of 1.0 mg/mm³ – essentially equivalent to the ACGIH's existing

TLV of 1.0 mg/mm³ – Caterpillar retreated from Kinser's position:

---

[65]  The PEL-C is the maximum amount to which a person may be exposed *at any moment in time*. This compares to the TLV, which is the maximum *average* amount to which a person may be exposed over an 8-hour time period.  Thus, for example, during a work day, a welder may be exposed to manganese fumes for a 5-minute period in excess of the 5.0 mg/mm³ PEL-C, but may not suffer manganese fume exposures in excess of the 8-hour time-weighted average of 0.2 mg/mm³ TLV – and vice versa.

The 8-hour TLV measurement is also essentially the same as the measurement known as PEL-TWA, or "Permissible Exposure Limit - Time Weighted Average," mentioned below.

[66]  Memorandum from Kinser to Ward *et al* at 2 (Mar. 9, 1979).

> We do not support the TWA limit of manganese at 1 mg/M[3]; however we do support a TWA limit of 2 mg/M[3] and feel that the literature stated supports this position.
>
> If the limit is reduced to 1 mg/M[3], we estimate that 5% to 10% of all mild steel welders would be exceeding the limit.  The effort of controlling exposure for these people far exceeds the hazard involved.[67]

At about this time, Caterpillar also filed litigation against OSHA, seeking to prevent the reduction of the manganese fume exposure limit.  This litigation was ultimately successful.[68]

Caterpillar's Thompson also resisted later the ACGIH's 1995 manganese TLV reduction from 1.0 mg/mm[3] to 0.2 mg/mm[3].  When this reduction was proposed, an organization known as The Ferroalloys Association contacted both Caterpillar and the AWS, stating it intended to protest this change and seeking support.[69]  Thompson responded: "I am writing this letter in support of your association's attempt to convince the ACGIH's TLV committee not to reduce the current TLV for manganese from 1 mg/m[3] to 0.2 mg/m[3].  We feel it is unnecessary, unjustified, and extremely expensive."[70]  In explanation, Thompson added:

> In over 2400 personal samples taken in the breathing zone of the welder, we have found that approximately 50% would be over exposed to manganese at 0.2 mg/m[3].  In contrast, only [about 6%] were over exposed to the TLV of l mg/m[3].
> * * *
> We have also estimated the costs for providing local exhaust ventilation [fume extraction] on all our weld stations and that cost is between $8-9 million.  At present, about

---

[67]  Letter from H.K. Thompson, Caterpillar Industrial Hygiene Mgr., to U.S. Dept. of Labor at 2 (July 13, 1988).

[68]  *See  AFL-CIO v. OSHA*, 965 F.2d 962 (11th Cir. 1992) (vacating the new PELs set by OSHA in 1989 for 376 substances, including manganese, thus reinstating the PELs originally established in 1971; Caterpillar was one of the named petitioners).

[69]  Although the ACGIH's manganese TLV does not have the force of law, as does OSHA's manganese PEL-C, OSHA requires manufacturers to list hazardous chemicals on product Material Safety Data Sheets ("MSDSs") if the product can release the chemical in concentrations exceeding the ACGIH's TLV.  *See* 29 C.F.R. §§1910.1200(g)(2)(vi).

[70]  Letter from Thompson to Edward Kinghorn at 1 (Feb. 17, 1995).

> one third of our weld stations are ventilated with weld fume extraction systems.  While we have found that it is effective in reducing fume levels, it does not always control manganese to the level of 0.2 mg/m$^3$.
>
> This leaves us with only one other means of controlling welder exposure, the use of respirators.  This a very expensive, ongoing daily expense.  For instance, supplying one disposable respirator per day, costing $7.60 each, to each of our welders (1400) is $3640, or almost $900,000 per year plus disposal cost.
> * * *
> In summary we feel that the current TLV of 1 mg/m$^3$ provides adequate protection to the welders and that reduction to 0.2 mg/m$^3$ is unnecessary.[71]

On the same day in 1995 that Thompson sent his letter of support to The Ferroalloys Association's Kinghorn, the AWS Safety & Health Committee did the same thing.  The AWS letter went so far as to say that, in its 1979 literature review titled "Effects of Health on Welding," "*no specific concerns* were raised relating the manganese exposure of welders to the development of disease," and therefore "there does not appear to be any justification for lowering the manganese exposure limit at this time."[72]  Of course, this 1979 literature review is the same one that noted welders are often exposed to manganese fumes, observed that manganese is "poisonous to the nervous system," and registered "*a concern* that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's disease."[73]  In any event, the AWS letter to The Ferroalloys Association concluded: "there does not appear to be any justification for lowering the manganese exposure limit at this time. . . .  We feel [a reduction of the TLV] is unjustified based on current information and would not be technically feasible for the entire welding industry."[74]

Despite the fact that the ACGIH did later reduce the manganese TLV to 0.2 mg/m$^3$, neither Caterpillar nor the "entire welding industry" has warned or required welders to wear respirators as a matter

---

[71]  *Id.*

[72]  Letter from Kevin Lyttle to Kinghorn at 1, 2 (Feb. 17, 1995) (emphasis added).

[73]  Effects of Welding on Health at 29 (1979) (emphasis added).

[74]  Letter from Kevin Lyttle to Kinghorn at 2 (Feb. 17, 1995).

of routine.

### F.    Caterpillar's Knowledge Regarding the Adequacy of Warning Labels.

For over 30 years, companies that manufacture welding rods have generally shipped their products together with warning labels and also Material Safety Data Sheets ("MSDSs").  As a large consumer of welding rods, Caterpillar received these warnings and MSDSs.  Further, as a member of AWS, Caterpillar was privy to discussions among the manufacturers regarding the content of these warnings and MSDSs, and whether any language changes were necessary.

Thus, Caterpillar knew that, in 1979, in response to two lawsuits, the AWS was "considering the mandatory industry-wide use of a new 'WARNING' label" and that the "abbreviated 'CAUTION' label currently required is considered to be legally inadequate."[75]  In June of 1979, the AWS did adopt a mandatory warning label, which stated, in pertinent part:

> **FUMES AND GASES** can be dangerous to your health.
> •      Keep your head out of fumes.
> •      Use enough ventilation or exhaust at the arc or both.
> •      Keep fumes and gases from your breathing zone and general area.
> * * *
> See American National Standard Z49.1, "Safety in Welding and Cutting,"
> published by the American Welding Society.

Accordingly, Caterpillar knew that the manufacturers had all decided, in 1979, not to include any warning language specifically addressing: (1) the danger of neurological harm from manganese in welding fumes; and (2) under what circumstances the "ventilation or exhaust at the arc" was "enough."

Further, in 1982, the AWS Safety & Health Committee discussed "a potential lawsuit to be filed

---

[75]  Internal Huntington Alloys memo from J.P. Hunt to J.W. Cundiff (Mar. 16, 1979) (summarizing discussions at a meeting of the AWS Filler Metal Committee).

by a seriously ill welder that will be based on inadequate labeling."[76]  The welder "had been using stick electrode and assumed that there would be no greater fume hazard when he was changed to using flux cored wire, with the same label.  The welder is now a paraplegic and the cause is alleged to be the welding fume containing manganese."[77]  In response to this lawsuit, the AWS considered the suggestion that "a paragraph or two be put into ANSI Z49.1 concerning different fume levels from different processes," but the AWS "rejected this idea and felt that it was the responsibility of the employer to be sure that the work place was free of the hazards."[78]  Again, Caterpillar was aware that the manufacturers did not amend their welding rod warnings to address the hazard of neurological injury from welding fumes, or to quantify ventilation requirements, or to suggest that certain welding products carried a greater risk than other products of manganese fume exposure.

Similarly, in 1984, the AWS Safety & Health Committee "discussed the need for a publication on weld fume ventilation to counter product liability lawsuits.  Most members felt that wording such as ''adequate' on the label was not enough and that some quantification for ventilation would be necessary."[79]  Caterpillar's Dr. Ward was present at this Safety & Health Committee meeting.  Despite acknowledgement of this insufficiency, neither AWS nor the welding rod manufacturers ever adopted warning language further defining the phrase "adequate ventilation."[80]

---

[76]  AWS Safety & Health Committee meeting minutes at 5 (May 11-12, 1982).

[77]  *Id.*

[78]  *Id.*  The suggestion was made by AWS Safety & Health Committee Member David G. Howden, an Ohio State University Professor of Welding Engineering.

[79]  AWS Safety & Health Committee meeting minutes at 2-3 (June 5-6 1984).

[80]  Also present at this meeting were representatives of The Ohio State University's Engineering School and the U.S. Department of Energy's Argonne National Laboratory.

G.       **Caterpillar's Knowledge Regarding the Accuracy of Welding Literature.**

The AWS made a point of publishing articles in welding trade magazines addressing health and safety issues.  As a member of AWS, Caterpillar participated in meetings discussing the content of these articles.

In 1972, for example, at the first AWS meeting that Caterpillar's Dr. Ward attended, the Safety & Health Committee discussed promoting its "Survey of Welding Fumes and Gases," which it had just received from the Battelle Memorial Institute.  Among other things, this Survey stated that "[t]he fumes from manganese are highly toxic, and they can produce total disablement even after exposures as short as a few months to high-fume concentrations."[81]  The Committee "decided to prepare an Introduction and announcement to be published in the *Welding Journal* as soon as possible.  This will . . . [publish] the fact that the Battelle reports represent only a beginning in a limited area of the total problem, and give an interpretive discussion of the Battelle reports and precautions concerning their too literal interpretation."[82]  Seven years later, in 1979, Marvin Kennebeck, a member of the Safety & Health Committee, wrote an article characterizing the Battelle study as having "turned up no major hazards relating to welding."[83]

In 1984, the Safety & Health Committee discussed a suggestion that "more safety material be published that would reach the welder."[84]  The Committee members participating in the discussion included Dr. Ward.  The Committee notes conclude "that much of the safety and health information

---

[81]  Battelle Survey at 27.

[82]  Internal Teledyne McKay memo from W.T. Delong to D.F. Helm at 1 (Feb. 17, 1972).  Also present at this meeting was Bob Monroe from the Battelle Memorial Institute.

[83]  Marvin Kennebeck, *Safety – What We Don't Know Is Hurting Us*, Welding Design Magazine 44 (Nov. 1979).

[84]  AWS Safety & Health Committee meeting minutes at 5 (June 5-6, 1984).

published to date never reaches the welder, the individual that most needs it.  However, some members felt there should be a certain amount of control by management over what welders should see and also that the reading level of the average welder was fairly low."[85]

Also, even though virtually all of AWS's more recent health and safety publications touch upon the harmful effects of manganese fume exposure, many do not mention the degree to which manganism can be debilitating.  For example, a 2002 AWS welding safety publication has a section addressing "Chronic (Long Term) Effects of Overexposure."[86]  This section states that "[p]rolonged exposure to manganese oxides may affect the central nervous system, causing tiredness, fatigue, sleepiness, muscular weakness, emotional disturbances, and uncontrolled movements while walking (muscle spasms)."  The Fact Sheet does not make mention of the information contained in the 1970 Battelle survey, that "fumes from manganese are highly toxic, and they can produce total disablement even after exposures as short as a few months to high-fume concentrations," nor does it state that symptoms of this disablement are "similar to Parkinson's syndrome," can be permanent, and can be mis-diagnosed.

**H.      Caterpillar's Role as a Manufacturer**.

As noted above, Caterpillar is a large consumer of welding rods, and never manufactured welding rods itself.  Between 1991 and 2003, however, Caterpillar entered into an agreement with MG Industries ("MGI"), whereby MGI manufactured small amounts of welding rods for resale by Caterpillar.  Specifically, MGI manufactured certain welding rods, packaged these welding rods with Caterpillar's

---

[85] *Id.*  The minutes do not reflect which members did and which did not feel that "there should be a certain amount of control by management over what welders should see."

[86] AWS Safety & Health Fact Sheet No. 24 (2002), entitled "Fluxes for Arc Welding and Brazing: Safe Handling and Use."

name and logo, and sold them to Caterpillar; Caterpillar then resold these welding rods to its independent

dealers; and the dealers were free to retain the welding rods for their own use, or resell them again to

consumers.  As for warning labels and MSDSs, Caterpillar simply passed on those that MGI included with

the welding rods when they were originally shipped.

Although this activity does not make Caterpillar a "manufacturer" of welding rods, the Court takes

judicial notice of the fact that, under the product liability law of some states, a supplier of a defective

product may be held liable "as if it were the product manufacturer," if that supplier marketed the product

using its own name.[87]  Because Caterpillar used its own name to sell the MGI welding rods to its dealers,

and the dealers were free to sell those "Caterpillar" welding rods to consumers, it is possible in some cases

that Caterpillar may be held liable as if it were the manufacturer of those welding rods.  The Court

incorporates this observation in its analysis of plaintiffs' strict product liability claims, below.


III.    **Legal Standard.**

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the moving party is entitled to a
judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary

judgment:

---

[87]  *See, e.g.*, Ohio Rev. Code §2307.78(B)(7) ("A supplier of a product is subject to liability for
compensatory damages based on a product liability claim under sections 2307.71 to 2307.77 of the
Revised Code, as if it were the manufacturer of that product, if the manufacturer of that product is or
would be subject to liability for compensatory damages based on a product liability claim under sections
2307.71 to 2307.77 of the Revised Code and any of the following applies: * * * (7) The supplier in
question marketed that product under its own label or trade name.")

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the  matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.[88]

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.[89]  A fact is "material" only if its resolution will affect the outcome of the lawsuit.[90]  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."[91]

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will

---

[88] *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[89] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).

[90] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[91] *Id*. at 252.

29

bear the burden of proof at trial.[92]  Moreover, "the trial court no longer has a duty to search the entire

record to establish that it is bereft of a genuine issue of material fact."[93]  The non-moving party is under

an affirmative duty to point out specific facts in the record as it has been established which create a

genuine issue of material fact.[94]  The non-movant must show more than a scintilla of evidence to overcome

summary judgment; it is not enough for the non-moving party to show that there is some metaphysical

doubt as to material facts.[95]


**IV.**     **Analysis.**[96]

    **A.**     **Product Liability Claims**.

As a general matter, the plaintiffs in this MDL name in their complaints dozens of defendants, and

then assert "generic" product liability claims against all of the named defendants, or against a roughly-

defined subset thereof, such as the "manufacturer defendants."  As a rule, the plaintiffs do not recite in

their complaint exactly which defendants' welding products they used, and do not identify precisely those

---

[92] *Celotex*, 477 U.S. at 322.

[93] *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

[94] *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).

[95] *Id*.

[96] As Caterpillar points out, while its motion asked for summary judgment on *all* claims asserted by all plaintiffs, the plaintiffs' response brief was captioned "Plaintiffs' Response to Caterpillar's Motion for Summary Judgment *on the Aiding and Abetting and Conspiracy Claims*" (emphasis added).  Plaintiffs did not respond to Caterpillar's arguments regarding negligence and product liability claims.

    In light of the burdens imposed by Rule 56, this failure is reason enough to grant summary judgment to Caterpillar on the negligence and product liability claims; however, the Court addresses here more fully all of Caterpillar's claims and grants summary judgment on substantive, not procedural, grounds.

defendants against which they bring their product liability claims.

To allow the parties and the Court to better understand the scope of the claims asserted, the Court earlier ordered each plaintiff to submit a "fact sheet" listing, among other things, the welding products he used and where he worked.[97]  Critically, there is no plaintiff with an active case pending in this MDL who has indicated on his fact sheet that he used a welding product manufactured or distributed by Caterpillar. Nor has any plaintiff indicated he worked for Caterpillar or at a Caterpillar facility.

While it is undisputed that it is *possible* that Caterpillar's independent dealers *may have* used, or even resold to consumers, welding rods originally manufactured by MGI and then branded with the Caterpillar name, it is also undisputed that no plaintiff in this MDL *actually claims* to have used or been injured by such a welding rod.

"It is elementary that in any action claiming injury from a product, the plaintiff must show causal connection between the defendant manufacturer and that product."[98]  Here, no plaintiff even alleges this causal connection, much less makes a showing of disputed or undisputed fact that he used a Caterpillar-branded welding rod.  There can be no product liability claim against a defendant where there was no use of the defendant's product.  Accordingly, Caterpillar is entitled to summary judgment on the generic

---

[97]  *See* master docket no. 405 at 4 (Second Amended Case Management Order).

[98]  *Baughman v. General Motors Corp.*, 627 F.Supp. 871, 874 (D. S.C. 1985).  *See* Annotation, *Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged to Have Caused Injury*, 51 A.L.R.3d 1344, 1349 (1973) ("Regardless of the theory which liability is predicated upon, whether negligence, breach of warranty, strict liability in tort, or other grounds, it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold, or was in some way responsible for the product, and this rule is supported in all of the cases examined in this annotation.") (footnotes omitted).  Plaintiffs in this MDL have not invoked any modern theories of liability, such as market share liability, that dispense with the traditional requirement of product identification.

product liability claims asserted by every plaintiff in this MDL and those claims are hereby dismissed.[99]

### B.  Negligence-Based Claims.

The plaintiffs' complaints in this case assert three different varieties of claims under the larger rubric of "negligence."  They include: (1) undifferentiated "Negligence;" (2) "Negligence – Sale of Product;" and (3) "Negligent Performance of Undertaking."  As with their other claims, the plaintiffs generally assert these negligence-based claims against all "defendants," including Caterpillar, as opposed to, for example, only the manufacturer defendants.[100]

As discussed below, because the plaintiffs do not identify any relevant duty owed to them by Caterpillar, much less a duty that Caterpillar breached, all of these claims against Caterpillar fail as a matter of law and undisputed fact.

### 1.  Negligence – Sale of Product.

Typical of the allegations that plaintiffs use to support their claim of negligent sale of a product

---

[99]  The Court understands that, in this MDL, the parties' practice has been to undertake final discovery regarding the specific welding products used by a particular plaintiff only when a given case is set for trial, and further that this additional discovery may uncover evidence that a particular plaintiff did, in fact, use or suffer injury attributable to a Caterpillar-branded welding rod.  If this situation occurs, that individual plaintiff may then move to amend his complaint to more specifically name Caterpillar as a defendant to a product liability claim.  *Cf.* Peripheral Defendant Order (master docket no. 1824), exh. A at 6 (discussing "re-institution of claims against previously dismissed peripheral defendants").  The same is true with respect to other product-based claims (e.g., a negligence claim based on the sale of a product, discussed below, or a claim for breach of product warranty).  To this limited extent, and only because of the discovery practices peculiar to this MDL, the Court's dismissal of the product liability claims against Caterpillar is without prejudice to the possible, albeit unlikely, request for reinstatement of those claims.

[100]  *See, e.g, Graham v. Lincoln Elec. Co.*, Case no. 05-CV-19263, docket no. 8 ("First Amended Complaint").  The First Amended Complaint in *Graham* asserts all three of these negligence-based claims against "defendants."

are the following, taken from the first amended complaint in *Graham*:

101.  Certain Defendants, during some or all relevant times, manufactured sold, and/or distributed welding products that were supplied to the Plaintiff for use.

102.  The Plaintiff was exposed to welding fumes containing manganese from products sold by these Defendants, while using the products or working in the proximity of others using the products.

103.  These Defendants **had the duty, as product sellers**, to exercise reasonable care for the safety of the Plaintiff.

104.  These duties included the responsibility for the following safety and health matters relating to welding fumes:
    a.  the investigation of the health hazards;
    b.  writing and publishing adequate and timely precautionary product labels and other health and safety information; and
    c.  writing and publishing adequate and timely specifications and standards about ventilation, safety equipment, and other precautionary measures.
    d.  informing Plaintiff of any changes about safety issues.

105.  The Defendants knew, or in the exercise of reasonable care should have known, that welding fumes would cause neurological damage to welders like the Plaintiff.

106.  The Defendants breached their duty of reasonable care to the Plaintiff and were negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.[101]

As noted in the discussion of plaintiffs' product liability claims, there are no plaintiffs in this MDL who claim they were injured by a welding rod sold by Caterpillar.  Accordingly, there is no plaintiff who has identified any facts supporting the allegation that Caterpillar had any duty running to them, as a "product seller."   Because Caterpillar had no such duty to any plaintiff, Caterpillar is entitled to summary judgment on all claims made by all plaintiffs in this MDL for negligent sale of a product.[102]

---

[101]  *Graham*, First Amended Complaint at 21 (emphasis added).

[102]  This ruling is, again, subject to the absence of contrary evidence obtained during case-specific discovery into the identification of the specific welding products used by a particular plaintiff.  *See* footnote 99, above.

## 2. Negligent Performance of an Undertaking.

The plaintiffs in this MDL point to the AWS Safety & Health Committee's "Duty Statement," which declared that the Committee's duties included "promot[ing] knowledge concerning occupational and environmental effects on the health and safety of personnel involved in welding and allied processes," as well as "ensur[ing] a safe working environment for welders and associated personnel."  Quoting from the *Graham* complaint again, plaintiffs then typically follow with the allegations set out below to support their claim of negligent performance of an undertaking:

176. Defendants, individually, collectively, and as members and participants in AWS . . . , voluntarily undertook the duty to inform and apprise Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community of all issues relating to the health and safety of welders and welding fumes, including the risk of neurological injury from manganese in welding fumes and how to avoid such injury.  This was done through their role in developing the warnings and MSDS on the welding consumables used by the Plaintiff as well as their role in the publication of welder health and safety publications and medical/scientific articles, including . . . AWS's "Battelle Report," "Franklin Research Report," and "Effects of Welding on Health" publications.

177. Defendants negligently performed the duties they undertook to provide to Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community under Restatement (Second) of Torts §324A . . . .[103]

The Restatement provision to which plaintiffs refer states that:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform][104] his undertaking, if . . .  the harm is suffered because

---

[103] *Id.* at 38.

[104] The Restatement uses "protect" instead of "perform," but this is "a typographical error."  *Hill v. United States Fidelity and Guaranty Co.*, 428 F.2d 112, 115 n.5 (5th Cir. 1970).

34

of reliance of the other or the third person upon the undertaking.[105]

Notably, the plaintiffs identify no statement made by Caterpillar directly to any plaintiff suggesting that Caterpillar explicitly undertook a duty to that plaintiff.  Nor does any plaintiff suggest he and Caterpillar had a fiduciary or other special relationship – or even an employment relationship – that might impose a duty.  Rather, the only basis any plaintiff has for visiting a duty on Caterpillar is its membership in AWS.[106]

The question posed by Caterpillar's motion for summary judgment, then, is whether Caterpillar undertook a duty to any welder plaintiff through its membership and participation in the AWS.  Based on the law and undisputed facts in this case, the answer is "no."

First, the AWS Safety & Health Committee's mission statements do not represent a legally binding voluntary undertaking by AWS or by the Committee, much less by each organization belonging to the Committee's changing membership, to issue public reports on research concerning the hazards of manganese in welding fumes.  For the Committee to state that it has a duty to "ensure a safe working environment for welders and associated personnel" is aspirational in nature; without more, it is not tantamount to shouldering a duty to an individual plaintiff.  "[F]ailing, in general, to comply with the

---

[105]  *Restatement (Second) Torts* §324A(c).  Subsections (a) and (b) of §324A are not applicable to the facts of this case.  There is no basis for a claim that Caterpillar "increased the risk [to welders] of harm" from inhaling manganese in welding fumes.  *See Good v. Ohio Edison Co.*, 149 F.3d 413, 421 (6th Cir. 1998) (discussing §324A and noting that, while the defendant "did nothing to diminish the risk posed by this hazard, it likewise did nothing to increase the risk that this hazard posed").  Nor do plaintiffs claim that Caterpillar undertook to perform a duty owed by others (e.g., welding rod manufacturers) to the plaintiffs.

[106]  Plaintiffs summarized their position regarding Caterpillar's duties as follows: "Caterpillar, through its association with AWS . . . , undertook a duty to provide a safe environment for both its own employees and all welders," and "In short, the actions taken by AWS became the actions of Caterpillar, and the duties to act imposed on AWS became the duties of Caterpillar."  Supplemental Answer to [Interrogatory 38] Regarding Caterpillar's Role in the Welding Fume Industry's Tortious Conduct in Manufacturing and Marketing Welding Consumable Products at 7, 8.

promises made in [public statements] and the industry's voluntary code" does not translate to negligent performance of a voluntary undertaking.[107]

Second, courts have repeatedly held that *trade associations, themselves*, have no duty to users of products in that trade.  One example is seen in *Sizemore v. Georgia-Pacific Corp.*[108]  The *Sizemore* plaintiffs, after their home burned down, sued not only the manufacturer of the plywood used to build the home, but also the Hardwood Plywood & Veneer Association ("HPVA").   Reminiscent of the claims made by plaintiffs in this MDL, the *Sizemore* plaintiffs asserted that the plywood was defective because it was "highly flammable and susceptible to rapid flame spread," and also that, for "thirty years, HPVA misrepresented and concealed information regarding the flammability properties of hardwood plywood paneling from various professional organizations that write and amend model building codes."[109]   In particular,

> Plaintiffs contend that HPVA acted negligently and recklessly by manipulating [plywood flammability] test protocol[s] and concealing results of [those] tests that supposedly demonstrated the [high] flammability of hardwood plywood paneling and the increased safety of alternatives, and by failing to warn local, state and federal regulatory bodies and the general public about the alleged flammability of hardwood plywood paneling. Plaintiffs further contend that HPVA conspired with [the plywood manufacturers who were HPVA members] and others to commit these torts.[110]

The *Sizemore* court, however, rejected these claims, concluding that the HPVA neither "owed a duty of care [n]or assumed a duty not otherwise owed to end users of a product allegedly manufactured by one

---

[107] *Texas v. American Tobacco Co.*, 14 F. Supp.2d 956, 973 (E.D. Tex. 1997).

[108] *Sizemore v. Georgia-Pacific Corp.*, 1996 WL 498410 (D. S.C. Mar. 8, 1996).

[109] *Id.* at *1.

[110] *Id.* at *3.

of HPVA's members."[111]  Regarding liability under §324(A), the court stated:

> [T]here is nothing in the record to suggest that HPVA undertook to assume any duty to warn or any other duty owed by Georgia-Pacific or any other manufacturer of hardwood plywood paneling to the plaintiffs or the public at large.  The unspecified HPVA charter and bylaw provisions invoked by plaintiffs are for the benefit of HPVA's members, not the general public.[112]

Of course, if a *trade association* owes no duty to the end users of products in that trade, then the various members of that trade association who are not themselves product manufacturers are even further removed from owing a duty to end users.  Just as the relationship between the trade association and the product user is "far too attenuated to rise to the level of a duty flowing between them," the relationship between the association's many non-manufacturer members and the product user is too weak to support negligence liability.[113]  Certainly, trade association membership, alone, cannot be the foundation for

---

[111]  *Id.* at *4.

[112]  *Id.* at *7.

[113]  *Sizemore*, 1996 WL 498410 at *8 (quoting *South Carolina State Ports Authority v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324, 325-26 (S.C. 1986)).  While membership in a trade association certainly does not *insulate* a manufacturer from negligence liability, membership alone certainly does not impute negligence upon, or otherwise taint, a non-manufacturer.

liability.  Many other courts have reached similar conclusions.[114]

_____

   [114] *See Beasock v. Dioguardi Enterprises, Inc.*, 494 N.Y.S.2d 974 (N.Y. Sup. Ct. 1985), *reversed on other grounds*, 499 N.Y.S.2d 558 (granting summary judgment to tire and rim trade association on negligence claims predicated on promulgation of faulty product standards, because association neither owed nor voluntarily undertook a duty to plaintiff); *Howard v. Poseidon Pools, Inc.*, 506 N.Y.S.2d 523 (N.Y. Sup. Ct. 1986), *affirmed in relevant part*, 134 A.D.2d 926 (N.Y. Ct. App. 1987) (granting summary judgment to swimming pool trade association on negligence claims, even though association had published minimum safety standards, because it owed no duty to plaintiff or to control the manufacturer); *Meyers v. Donnatacci*, 531 A2d 398 (N.J. Super. Ct. 1987) (holding that, by promulgating safety standards for residential in-ground swimming pools, a trade association did not assume a duty to warn consumers of the danger of shallow diving); *Friedman v. F.E. Myers Co.,* 706 F. Supp. 376 (E.D. Pa. 1989) (granting summary judgment to trade association of water pump manufacturers on claims of negligence and concert of action, because association owed no duty to plaintiff; applying Pennsylvania law); *Bailey v. Edward Hines Lumber Co.*, 719 N.E.2d 178 (Ill. Ct. App. 1999) (granting summary judgment to truss-plate trade association on third-party indemnification claim brought by truss manufacturer that had relied on association's recommendations, because association owed no duty to carpenters who relied on recommendations); *Commerce and Industry Ins. Co. v. Grinnell Corp.*, 1999 WL 508357 (E.D. La. July 15, 1999) (granting summary judgment on subrogation claim by insurance company against trade association that published fire safety codes, because association owed no duty to owner or occupant of warehouse that burned down). *See also Klein v. Council of Chemical Ass'ns*, 587 F. Supp. 213 (E.D. Pa. 1984) (granting motion to dismiss negligence claims against chemical trade associations, which had promulgated safe exposure levels of certain substances, because the plaintiff had not identified the particular substance at issue; applying Pennsylvania law; distinguishing *Arnstein, infra*)

   The Court has identified several cases where claims against trade associations based on an assumed duty were allowed, but those cases are easily distinguishable and/or have been heavily criticized.  *See Arnstein v Manufacturing Chemists Ass'n*, 414 F Supp 12 (E.D. Pa. 1976) (denying motion to dismiss a claim that a chemical industry trade association undertook a duty to promulgate accurate product exposure information; later distinguished in *Klein*, 587 F. Supp. 213); *Rogers v. R.J. Reynolds Tobacco Co.*, 761 S.W.2d 788 (Tex. Ct. App. 1988) (denying motion for summary judgment on civil conspiracy claim filed against tobacco trade association; *Rogers* was later criticized twice by the Texas Supreme Court, *see Triplex Communications v Riley*, 900 S.W.2d 716, 720 n. 2 (Tex. 1995) and *Firestone Steel Prods. Co. v Barajas*, 927 SW2d 608, 617 (Tex. 1996)); *King v. National Spa & Pool Inst., Inc.* 570 So.2d 612 (Ala. 1990) ("The trade association's voluntary undertaking to promulgate minimum safety design standards for safe diving from diving boards installed in residential swimming pools . . . and to disseminate those standards to its members for the purpose of influencing their design and construction practices, made it foreseeable that harm might result to the consumer if [the trade association] did not exercise due care."; *King* was later called the "minority view, even in the specific swimming pool trade association setting," by the *Sizemore* court, citing cases); *Meneely v. S.R. Smith, Inc.*, 5 P.3d 49 (Wash. Ct. App. 2000), *review denied*, 21 P.3d 290 (Wash. 2001) (affirming jury verdict against swimming pool trade association, premised on its having "promulgat[ed] industry wide safety standards" upon which all pool manufacturers relied); *Snyder v American Ass'n of Blood Banks*, 676 A.2d 1036 (N.J. 1996) (affirming summary

(continued...)

38

Indeed, plaintiffs' argument also fails because it proves too much.  Plaintiffs claim that Caterpillar,
solely through participation in AWS, undertook a duty to them (and to their employers, OSHA, the public
health community, and others) to warn them accurately about the risk of neurological injury from
manganese in welding fumes.  But this argument would apply equally to other members of the AWS
Safety & Health Committee (such as NIOSH, and Professor Howden from The Ohio State University
School of Welding Engineering) and even to certain AWS Safety & Health Committee meeting guests
(such as the U.S. Department of Safety, the U.S. Army Center for Health Promotion and Preventative
Medicine, and the Florida Division of Safety).  Following plaintiffs' argument, every member of a trade
organization either has or assumes a duty to warn product users of dangers posed by the product, if those
dangers are discussed at the organization's meetings.  This argument stretches the concept of duty too far.

The law simply does not recognize the existence of a duty between trade association members and
trade product users, in the circumstances of this case.  Caterpillar did not breach a duty to plaintiffs that
was imposed by law, nor did it breach a duty it took upon itself voluntarily.  Accordingly, Caterpillar is
entitled to summary judgment on all claims made by all plaintiffs in this MDL for negligent performance
of an undertaking.

### 3.      General Negligence.

In their complaints, the plaintiffs also assert claims for undifferentiated "negligence."  These
claims, however, do not identify any duty allegedly flowing from Caterpillar to the plaintiffs other than

---

[114](...continued)
judgment against blood bank trade association ("AABB") for negligently enhancing a blood recipient's
risk of contracting AIDS; unlike the AWS, the AABB "accredits member institutions" only if they comply
with the association's standards; also, compare *N.N.V. v. American Ass'n of Blood Banks*, 75 Cal. App.
4th 1358 (Cal. Ct. App. 1999) (rejecting *Snyder* and similar cases)).

the same alleged duties asserted in the other negligence-based claims addressed above.[115]

The Court has already concluded that, based on the undisputed facts and as a matter of law, Caterpillar did not owe these duties to any plaintiff.  Accordingly, Caterpillar is also entitled to summary judgment on all other negligence claims made by all plaintiffs in this MDL.

### C.    Conspiracy Claims.[116]

As this Court noted recently in a related opinion, "civil conspiracy requires [1] an object to be accomplished, [2] a meeting of minds on the object or course of action, [3] one or more overt acts, and [4] damages as the proximate result thereof."[117]  The plaintiffs in this case argue they meet these requirements, because they have evidence tending to show that: (1) beginning in the 1930s, various defendants (mostly, welding rod manufacturers) decided to accomplish the objective of concealing known hazards of welding

---

[115]  For example, in the first amended complaint in *Graham*, the duties alleged in support of the negligence claim are as follows:

91.    The Defendants have the duty imposed by law, or have assumed the duty, to exercise reasonable care for the safety of the Plaintiff and similarly[-]situated persons.

92.    Because exposure to welding fumes presents a risk of physical harm, all Defendants had a legal duty to exercise reasonable care for the safety of the Plaintiff when making representations about welding safety and health in warning labels, publications, and instructions for ventilation and other precautionary measures.

First Amended Complaint at 20-21.

[116]  Caterpillar offers two reasons why plaintiffs' conspiracy claims fail as a matter of law and undisputed fact: (1) there is no evidentiary basis upon which a reasonable jury could base a finding of liability for conspiracy; and (2) a conspiracy claim cannot succeed when it is premised on a claim for failure to warn.  The Court examines only the first argument here.  The Court found well-taken the latter argument in *Ruth v. A.O. Smith Corp.*, 2005 WL 2978694 (N.D. Ohio Oct. 11, 2005), applying Mississippi law.  Currently pending is a motion by various defendants asserting that the same argument also succeeds under the law of 12 other states.  *See* master docket no. 1795 ("Multi-State Conspiracy Motion").  Although the Court will have to assess this latter argument when it rules on the Multi-State Conspiracy Motion, it does not do so in this Order, which applies to all MDL cases regardless of the applicable law.

[117]  *In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605 at *9 (N.D. Ohio Apr. 9, 2007) (quoting 16 Am. Jur. 2d *Conspiracy* §51 (Jan. 2007)).

fumes, for fear that public knowledge of these hazards would imperil welding rod sales; (2) these defendants reached a meeting of the minds to work together to achieve this objective, as reflected in trade association and other documents; (3) these defendants undertook various overt acts to accomplish their objective, including intentionally failing to provide accurate warnings about their products, promulgating false information to the welding industry that welding fume was not hazardous, and precluding research into the true nature of the hazard; and (4) as a result of defendants' actions in furtherance of this conspiracy, the plaintiffs have suffered physical injury.

For the purpose of ruling on Caterpillar's pending motion, the Court *assumes* the plaintiffs can prove that certain *other*, manufacturer defendants, did, in fact, engage in the above-described conspiracy for some period of time.  The critical question, however, is whether plaintiffs carry their burden of showing a reasonable jury could find that *Caterpillar joined* this existing conspiracy in 1972, as plaintiffs claim.  For the reasons stated below, the Court concludes no reasonable jury could so find.

The second element of a conspiracy claim – a "meeting of the minds" – occurs "when the parties reach a unity of purpose or common design and understanding . . . .  There must be a preconceived plan."[118]  This meeting of the minds does not require a formal or an express agreement: "It is sufficient that the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and to commit the offense charged, although such agreement is not manifested by any formal words, or by a written instrument."[119]  But "[b]efore a person who joins an existing conspiracy will be held liable for what was previously done pursuant to the conspiracy, . . . it must be shown that he or she joined

_____

[118]  15A C.J.S. *Conspiracy* §12 (Feb. 2007) (footnotes omitted).

[119]  *Id.* §13.

41

the conspiracy with knowledge of the unlawfulness of its object or of the means contemplated."[120] Further, "mere knowledge, acquiescence, or approval of a plan, without cooperation or agreement to cooperate, is not enough to make out a conspiracy; there must be intentional participation [and] transaction with a view to the furtherance of a common design."[121]  "A party who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives, is liable as a civil conspirator.[122]

Because a conspiracy "is rarely susceptible of direct proof,"[123] the required intentional participation of a co-conspirator "can plausibly be inferred from words, actions, and interdependence of the activities and persons involved."[124]  But, "[i]n the absence of proof of an express or implied agreement between the parties, mere presence at the commission of a wrong, or failure to object to it, is not enough to charge one with responsibility for conspiring to commit the tortious act."[125]  As one court explained: "[K]nowledge alone of tortious conduct is insufficient to prove a conspiracy agreement.  * * *  Knowledge of the planned tort must be combined with intent to aid in its commission.  * * *  An entity that engages in legitimate business with a party that is acting tortiously cannot be deemed a co[-]conspirator, absent clear evidence

---

[120] 16 Am. Jur. 2d *Conspiracy* §57 (July 2007).

[121]  15A C.J.S. *Conspiracy* §17 (Feb. 2007).

[122]  *Id.* §18.

[123]  *Id.* §31.

[124]  *Id.* §13.

[125]  16 Am. Jur. 2d *Conspiracy* §55 (July 2007).

42

of an agreement to join in the tortious conduct.[126]

This Court's careful examination of all of the evidence in this case, even when viewed in a light most favorable to plaintiffs, leaves it convinced that the *most* that can be said about Caterpillar is that it was present when other defendants decided to engage in tortious acts, and Caterpillar failed to object. There is no evidence that would allow a jury to conclude that Caterpillar actually joined any conspiracy by agreeing to cooperate with other defendants, intending to help them achieve the objective of hiding the hazards of manganese in welding fume.

This is so because, from the beginning, Caterpillar's actions and statements reveal that, in most regards, it was actually working at cross-purposes from the supposed objectives of the conspiracy.  For example, although plaintiffs assert that one aspect of the defendants' plan was to "preclude fundamental neurological epidemiology studies on welders,"[127] it was Caterpillar that first suggested, at a 1978 AWS meeting where one topic was welding research, that "it would seem appropriate to include some kind of neurological examination to indicate the possible connection with manganese exposure in the epidemiological study."[128]  Only because Caterpillar made the suggestion did the AWS's request for proposal for an epi-study later include a neurological component.  And when it became clear that this planned epi-study was too expensive for AWS to pursue, it was Caterpillar that urged AWS to spend the money it did have (in 1984) on the proposed NIOSH epidemiological study, rather than some other research.  Further, because Caterpillar believed in 1992 that most existing welding fume studies were flawed, it advocated for "a new study which addresses past deficiencies and leads to a clearly established

---

[126]  *Sebastian Int'l, Inc. v. Russolillo*, 162 F.Supp.2d 1198, 1207 (C.D. Cal. 2001) (internal quotation marks and citations omitted) (discussing California law).

[127]  Response brief at 6.

[128]  AWS Safety & Health Committee meeting minutes at 4 (March 19, 1979).

dose-response relationship between manganese exposure and neurological disfunction [sic]."  These simply are not the actions of an organization seeking to help others suppress neurological epidemiological research on welders.

Another example is that plaintiffs assert one objective of the defendants' conspiracy was to "oppose appropriate exposure limits of manganese emitted in welding fumes."[129]  It is notable, however, that two of Caterpillar's industrial hygienists wrote to Dr. Ward in 1979, opining that the existing OSHA manganese fume limit was too *high*, and the lower limit proposed by the ACGIH was more appropriate.  And, about 10 years later, Caterpillar wrote to the U.S. Department of Labor, again agreeing that existing exposure limits were too *high*, although disagreeing that the limits should be lowered as far as was being proposed.  Written expressions of agreement that official exposure limits are too high is plainly irreconcilable with a conclusion that Caterpillar joined a conspiracy to oppose any lowering of those same limits.  It is true that Caterpillar wrote to The Ferroalloys Association in support of its efforts to prevent the ACGIH from *further* lowering existing manganese exposure limits, and that Caterpillar later successfully sued OSHA for the same reason.  But this legal and political activity shows only that Caterpillar had its own view of what were "appropriate" exposure limits, and of the "appropriate" way to protect workers from the threat of harm posed by welding fumes; this evidence does not support a conclusion that Caterpillar was conspiring with other defendants to conceal information in order to avoid any reduction of the amount of allowable welding fume exposure, or to hide the fact that welding fumes could harm workers absent some precautions.

Indeed, not only is the conspiratorial motive ascribed to Caterpillar different from that of all of the other alleged co-conspirators – Caterpillar wanted to avoid safety equipment expenditures, while the

---

[129]  Response brief at 6.

welding rod manufacturers wanted to maintain sales – but Caterpillar was not even acting in accord with its own supposed motive.  Even before the time it allegedly joined the conspiracy, Caterpillar provided its welders with equipment that supplemented their general ventilation.  Thus, in 1972, Caterpillar reported it had budgeted $400 per welder for fume extraction equipment.  During the 1970s, Caterpillar "got[] together with Hobart and created a special world class ventilation system that nobody else had."[130]  In 1995, Caterpillar had outfitted one third of its welding stations with fume extraction equipment.  If a jury must "infer[] [a conspiracy] from words, actions, and interdependence of the activities and persons involved," the actions listed above leave little from which to draw the necessary inference.[131]

Furthermore, all of the other evidence marshaled by the plaintiffs proves, at most, that Caterpillar attended trade association meetings where many, many topics were discussed, and that, at some of these meetings, some of these topics included the content of the manufacturers' warning labels, and the prospect of writing welding journal articles to put a "spin" on the Battelle Survey.  When viewed in a light most favorable to plaintiffs, a jury could reasonably conclude that Caterpillar's attendance at these meetings shows that Caterpillar came to share, with other defendants, knowledge that the warnings were incomplete, and that defendants were avoiding public disclosure of *all* of the dangers reported in the Battelle Survey.  But, as noted above, "mere knowledge, acquiescence, or approval of a plan, without cooperation or agreement to cooperate, is not enough to make out a conspiracy."[132]  The mere fact of Caterpillar's attendance at these meetings, without additional evidence (even circumstantial) that Caterpillar intended

---

[130] *Goforth* trial tr. at at 4446-47 (characterization by plaintiffs' counsel).  *See also id.* at 694 (plaintiffs' expert Dr. Richard Lemen testifies that "Caterpillar has a pretty good [welding fume mitigation] program, and this has been very effective in their program for reducing exposures")

[131] 15A C.J.S. *Conspiracy* §13 (Feb. 2007).

[132] *Id.* §17.

to advance the alleged conspiratorial goals, is not enough.  "Attendance at a meeting of an organization does not necessarily signify approval of *any* of that organization's activities."[133]  Put more broadly, "[c]ircumstances that are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy," and it is certainly lawful to associate with other industry participants in trade organizations.[134]

Indeed, also present at the 1972 AWS meeting where the defendants discussed writing an article to "spin" the Battelle Survey was a representative from the Battelle Memorial Institute, itself; and also present at the 1984 meeting where the defendants agreed that the wording "adequate ventilation" on the label was insufficient were representatives of the Ohio State University's Engineering School and the U.S. Department of Energy's Argonne National Laboratory.  Without more, these representatives' simple presence at meetings and presumed knowledge of the defendants' actions does not make them co-conspirators, jointly and severally liable for any tortious behavior.[135]  The same must be true for Caterpillar.

This is not to say that joint activity undertaken through a trade association can never be evidence of a conspiracy.  In somewhat similar circumstances, another court concluded that plaintiffs could pursue

---

[133] *In re Asbestos School Litigation*, 46 F.3d 1284, 1290 (3rd Cir. 1994) (emphasis in original).  The minutes of the AWS meetings do not reflect any votes.

[134] 15A C.J.S. *Conspiracy* §37 (Feb. 2007).  *See McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 265 (Ill. 1999) (reversing jury verdict in favor of plaintiffs on conspiracy claim, because facts adduced by plaintiffs to support conspiracy between manufacturers were "as consistent with innocent as with guilty conduct"); *In re Asbestos School Litigation*, 46 F.3d at 1290 (examining the normal activities of a "trade organization called the Safe Buildings Alliance ('SBA')," which included submitting position papers to rule-making bodies, and concluding "[t]here can be no doubt that at least some of the SBA's activities were constitutionally protected").

[135] "A civil conspiracy is only a means for establishing vicarious liability for an underlying tort, or a means of establishing join liability for tortious conduct.  It is used to broaden the number of parties liable for tortious conduct."  15A C.J.S. *Conspiracy* §8 (Feb. 2007) (footnotes omitted).

a conspiracy claim against asbestos manufacturers based on the allegation that "[m]embers of the referenced trade associations suppressed publication as well as general dissemination of medical and scientific data concerning the health hazards associated with inhalation of asbestos fibers."[136]  In that case, however, the defendant: (1) "[did] not dispute the fact that the members of [the Quebec Asbestos Mining Association] and the members of the Asbestos Textile Institute intentionally suppressed information on the dangers of working with asbestos from the 1930s up to and including the 1970s"; and (2) had itself written a letter to the U.S. Navy misrepresenting the state of medical knowledge regarding asbestos, an act which a jury could reasonably have concluded was in furtherance of the conspiracy.[137]  In this case, even assuming that some manufacturer defendants engaged in a conspiracy to conceal the dangers of manganese in welding fumes, and even assuming those manufacturer defendants took actions during certain trade association meetings after 1972 to advance their conspiracy, no reasonable jury could conclude that Caterpillar's attendance at those meetings proves it joined that conspiracy.  Caterpillar's

---

[136] *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 148 (Del. 1987).  *See also Cipollone v. Liggett Group, Inc.*, 683 F. Supp. 1487 (N.J. 1988) (denying a motion for directed verdict on a claim that tobacco manufacturers conspired to misrepresent the safety of cigarettes, noting that manufacturers had gone so far as to create a purportedly independent research organization to promulgate false information); *City of New York v. Lead Industries Ass'n, Inc.*, 597 N.Y.S.2d 698 (N.Y. Sup. Ct. 1993) (denying a motion to dismiss a claim that five manufacturers of lead-based paint conspired, through their co-defendant trade organization, to misrepresent the safety of their product and conceal their knowledge of its hazards); *Sackman v. Liggett Group, Inc.*, 965 F. Supp. 391 (E.D.N.Y. 1997) (denying summary judgment on a claim that tobacco companies engaged in a conspiracy through their co-defendant trade association); *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1985 (2007) (Stevens, J., dissenting) ("Many years ago a truly great economist perceptively observed that '[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices.'" (quoting Adam Smith, *An Inquiry Into the Nature and Causes of the Wealth of Nations*, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds. 1952)).

[137] *In re Asbestos Litigation*, 509 A.2d 1116, 1120-21 (Del. Super. Ct. 1986), *affirmed sub nom. Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987).  The trial court acknowledged that "mere membership in a trade association, including attendance at meetings, is not sufficient to give rise to an inference of conspiracy, absent proof of 'knowing participation' in the wrongful conduct," but found that the evidence presented by plaintiffs went well beyond mere trade association membership.  *Id.* at 1120.

attendance at all of those AWS meetings is just as consistent with perfectly lawful conduct.[138]

Accordingly, Caterpillar is entitled to summary judgment on all conspiracy claims made by all plaintiffs

in this MDL.


**D.      Claims for Acting in Concert, and Aiding and Abetting.**

In addition to the claim of conspiracy, the MDL plaintiffs also state the closely-related claims of:

(1) acting in concert; and (2) aiding and abetting.  These two claims both derive from §876 in the

Restatement (Second) of Torts.  Specifically, §876**(a)** is the source of plaintiffs' claims for acting in

concert, while §876**(b)** is the source of plaintiffs' claims for aiding and abetting:

> *§876.  Persons Acting In Concert.*
> For harm resulting to a third person from the tortious conduct of another, one is
> subject to liability if he
> (a)      does a tortious act in concert with the other or pursuant to a common design
> with him, or
> (b)      knows that the other's conduct constitutes a breach of duty and gives
> substantial assistance or encouragement to the other so to conduct himself,
> * * *

4 *Restatement (Second) of Torts* §876 (1977).

Like conspiracy, the tort of acting in concert includes an element of scienter.  Regarding a claim

for acting in concert, the Restatement explains: "Parties are acting in concert when they act in accordance

---

[138] *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982) ("Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed [wrongful] acts . . . .  For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.").

with *an agreement to cooperate* in a particular line of conduct or to accomplish a particular result."[139]

For the reasons discussed above, the Court has concluded that no reasonable jury could find that Caterpillar acted "in accordance with an agreement to cooperate" with any other defendant in this case – neither an agreement to engage in a particular course of conduct, nor an agreement to accomplish any of the objectives alleged by plaintiffs.  Accordingly, Caterpillar is entitled to summary judgment on all claims of acting in concert made by all plaintiffs in this MDL.

With regard to the claim of aiding and abetting, "[t]he prime distinction between civil conspiracy and aiding and abetting is that a conspiracy involves an agreement to participate in a wrongful activity or to commit a tortious act, while aiding and abetting focuses on whether a defendant knowingly gives 'substantial assistance' to someone who performs wrongful conduct, not on whether the defendant agrees to join the wrongful conduct."[140]  To be liable as an aider and abettor, one must "act[] with [the] intention of advancing the tortious activity."[141]  Further, in order for the assistance to be "substantial," the assistance "must be the proximate cause of plaintiffs' harm."[142]  For liability to attach, the defendant must provide affirmative assistance or encouragement, and not merely fail to prevent the tortious act.  "Mere knowledge

---

[139] 4 *Restatement (Second) of Torts* §876, comment a (1977) (emphasis added).  The theory of liability set out under §876(a) is closely related to the theory of conspiracy.  The Restatement explains that "it is in connection with" actions "done pursuant to a common design or plan for cooperation" that "the word 'conspiracy' is often used."  *Id.* §876 comment b.

[140] 15A C.J.S. *Conspiracy* §3 (Feb. 2007) (footnotes omitted); *see Halberstam v. Welch*, 705 F.2d 472, 476-79 (D.C. Cir. 1983) (comparing and contrasting claims of conspiracy and aiding-and-abetting).

[141] *In re: Temporomandibular Joint (TMJ) Implants Products Liab. Litig.*, 113 F.3d 1484, 1496 (8th Cir. 1997).

[142] *Id.* at 1495.  *See also Chavers v. Gatke Corp.*, 132 Cal. Rptr. 2d 198, 205-06 (Cal. Ct. App. 2003) (Section 876(b) requires that "the encouragement or assistance [be] a substantial factor in causing the resulting tort.") (quoting Restatement (Second) of Torts, §876, cmt. d).

that a tort is being committed and the failure to prevent it does not constitute aiding and abetting."[143]

In this case, plaintiffs do not point to any acts of affirmative assistance or encouragement that Caterpillar gave to any other defendant, to help achieve the alleged goals of concealing information about the hazards of welding fumes, publishing misleading literature, minimizing warnings, or precluding neuro-epidemiological research.  Certainly, simple attendance at AWS meetings does not qualify as assistance or encouragement.  And even Caterpillar's votes on the AWS Safety & Health Committee cannot be considered "substantial assistance," as there is not even a suggestion that Caterpillar's votes were the proximate cause of any harm to any plaintiff.  There is no document or other piece of evidence tending to show that Caterpillar urged another defendant to act in accordance with the alleged tortious objectives, nor that Caterpillar took any action to make it easier for another defendant to achieve these objectives.  Simply, just as Caterpillar's connection with the other defendants in this case is too attenuated for a reasonable jury to find that Caterpillar conspired with them, it is equally clear no reasonable jury could find that Caterpillar aided and abetted another defendant to breach its own duty to any plaintiff.[144]

Accordingly, Caterpillar is entitled to summary judgment on all claims of aiding and abetting made

---

[143] *Fiol v. Doellstedt*, 58 Cal. Rptr. 2d 308, 313 (Cal. Ct. App. 1996).  *See also Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997) ("civil liability for aiding and abetting requires affirmative conduct"); *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1114 (C.D. Cal. 2002) (under California and New York law, "'substantial assistance or encouragement' requires actual participation in the [wrongful] conduct"); *Sindell v. Abbot Labs.*, 607 P.2d 924, 933 (Cal. 1980) (affirming dismissal of mass tort claims of concerted action, stating: "it seems dubious whether liability on the concert of action theory can be predicated upon substantial assistance and encouragement given by one alleged tortfeasor to another pursuant to a tacit understanding to fail to perform an act"); *Parker v. Eli Lilly & Co.*, 1996 WL 1586780 at *2 (Ohio Ct. Com. Pl. June 21, 1996) ("concert of action claims require evidence that the tortfeasor was substantially assisted by the other parties[-]defendant, a requirement that cannot be satisfied . . . by a failure to act in contravention of the tortfeasor or his/its misconduct").

[144] *See generally In re TMJ Implants Prods. Liab. Litig.*, 880 F.Supp. 1311, 1318-20 (D. Minn. 1995) (granting summary judgment on claims of aiding and-abetting), *affirmed*, 113 F.3d 1484 (8th Cir. 1997).

by all plaintiffs in this MDL.

**V.     Conclusion.**

The evidence in this case shows that, perhaps more than any other employer of welders, Caterpillar had reason to know, early on, the true extent of the danger posed by the manganese that is contained in welding fumes.  By virtue of its 1972 membership in AWS, Caterpillar received an early copy of the Battelle Survey, which reported that welding fumes containing manganese "can produce total disablement even after exposures as short as a few months to high-fume concentrations," causing symptoms similar to Parkinson's Disease.  Caterpillar was also privy to the 1984 assessments of the welding rod manufacturers themselves, that the wording of the admonition on the warning label to "use adequate ventilation" was "not enough and that some quantification for ventilation [was] necessary."  Further, Caterpillar knew in 1995 that "approximately 50%" of its own welder-employees "would be over exposed to manganese" if the TLV was lowered to 0.2 mg/m$^3$ – which it was, later that year.  And a Caterpillar industrial hygienist recommended in 1979 that Caterpillar welders who were suffering over-exposure to welding fumes should be supplied with respirators and given periodic physical examinations.

If the plaintiffs in this MDL were bringing suit against Caterpillar in its role as their employer, and

Caterpillar were seeking judgment on a claim for intentional tort, the Court might well deny the motion.[145] But no plaintiff-welder in this MDL is suing Caterpillar on the basis that Caterpillar was his employer, "required [him] to continue working in an unusually dangerous situation," and "possessed actual or constructive knowledge of the situation."[146]  Rather, the primary aim of plaintiffs has been to hold Caterpillar liable for having conspired with welding rod manufacturers to conceal the dangers of welding fumes.  To prevail on this claim, plaintiffs must produce enough evidence from which a reasonable jury could conclude that Caterpillar intentionally joined and participated in this conspiracy, with knowledge of its unlawful objectives and with a view to furthering them through a common plan.

The court concludes that plaintiffs do not carry their burden of production.  Plaintiffs have proved only that Caterpillar attended 30 years' worth of trade association meetings, and there was discussion at some meetings regarding: the harmfulness of welding fumes; whether to undertake medical research to

---

[145]  Generally, a plaintiff may pursue a work-related injury against his employer only if "the employer's actions were so egregious that they must be treated as being outside of the employment context altogether, and thus, not completely compensable under the worker's compensation system." *Moore v. Ohio Valley Coal Co.*, 2007 WL 755386 at *4 (Ohio Ct. App. March 7, 2007).  For example, "[i]n Ohio, an employee generally must rely on the worker's compensation system to be compensated for job-related injuries, and does not need to sue the employer in tort in order to be compensated.  However, an employee may also enforce his common-law rights against his employer if the injury stems from an intentional tort.  An intentional tort in this context means that the employer committed some act by which the employer intentionally and deliberately injures the employee. *Id.* (citations omitted).

This Order does not address – and, therefore, does not preclude a plaintiff in this MDL from pursuing – an intentional tort claim against Caterpillar in its role as the plaintiffs' employer.

[146]  *Id.*  The fact that no plaintiff in this MDL is an employee of Caterpillar may suggest that Caterpillar responded to the knowledge it gained through AWS membership by providing sufficient protective measures for its welder-employees.  *See* internal Caterpillar memo from G. Williams to K. Brewer (Sept. 28, 2000) (responding to a suggestion that welding fume extraction equipment be removed: "I absolutely would **not** remove any fume extraction equipment.  This company has gone through at least two cycles of this story in my 24 years at CAT.  We have spent money before on fume extractors, and either did not properly maintain the units, or removed the units.  Then along comes a regulation like OSHA had proposed and this company has to invest more capital expenditures.  * * *  Since we have invested in the 'best available technology' to control weld fume, we need to continue to use that technology.") (emphasis in original).

learn more about the issue; the adequacy *vel non* of manufacturers' warnings; and the state of public knowledge.  There is no evidence showing that Caterpillar, itself, undertook efforts to conceal the hazards of welding fumes, or to publish misleading information, or to suppress neuro-epidemiological research into the true extent of the hazard, or to encourage the manufacturers to supply inadequate warnings.

If a plaintiff in this MDL asserts a claim against Caterpillar in its role as employer, then the Court will assess that claim in due course.  But Caterpillar is entitled to summary judgment on all of the presently-pending claims against it in this MDL for strict product liability, negligence, acting in concert,

aiding and abetting, and conspiracy.  Accordingly, Caterpillar's motion for summary judgment is

**GRANTED** and those claims are **DISMISSED**.[147]

        **IT IS SO ORDERED.**

                                /s/ Kathleen M. O'Malley
                                **KATHLEEN McDONALD O'MALLEY**
                                **UNITED STATES DISTRICT JUDGE**

**DATED**: October 30, 2007

---

[147]  One final footnote: The Court is aware that, in three related cases that this Court earlier remanded to Mississippi state court (collectively, *White v. Lincoln Elec. Co.*), the state court: (1) converted a motion to dismiss filed by Caterpillar into a motion for summary judgment; (2) granted summary judgment on "plaintiffs' joint-and-concurrent-tortfeasors and concert-of-action claims;" and (3) denied summary judgment on "plaintiffs claims of aiding and abetting and negligence." *White v. Lincoln Elec. Co.*, case no. 251-01-960-CIV, slip op. at 12 (Miss. Circ. Ct. Sept. 14, 2006).  The latter denial, of course, is at odds with this Court's instant ruling.

    Although the *White* trial court observed that the Mississippi Supreme Court has declared that denial of a summary judgment motion "will almost *never* be a proper subject of appeal," *id.* at 4 (emphasis in original, footnote and citation omitted), the Mississippi Supreme Court has, in fact, granted Caterpillar's motion for emergency interlocutory appeal to challenge the *White* trial court's partial denial of summary judgment.

    The Mississippi Supreme Court has not yet heard argument, so it is not yet known whether the *White* trial court's opinion will survive.  Regardless, it is clear that, as compared with the evidentiary record reviewed and summarized above by this Court, the *White* trial court had received a much more limited record when it ruled.  Indeed, the record upon which the *White* court acted was akin to the one before this Court on Caterpillar's motion to dismiss – a record this Court found was an inadequate basis upon which to summarily resolve the conspiracy claims asserted in this MDL.  In light of all the evidence produced by the parties in this MDL, the undersigned cannot agree with the *White* court's conclusion that, at this stage of the proceedings, various fact issues surrounding the claims for negligence and aiding and abetting remain "for jury resolution." *Id.* at 6, 10-11. *See also Hunt v. Air Prods. & Chems., Inc.*, slip op., no. 052-9419 (Mo. Cir. Ct. April 29, 2006) (in a welding fume case, granting defendants' motion to dismiss claims for conspiracy and negligent performance of an undertaking).