03cv17000zbn-ord(TEMPLATE INSERT Global-In-Limine1).wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

IN RE: WELDING FUME PRODUCTS   **:**
 LIABILITY LITIGATION      **:**  **Case No. 1:03-CV-17000**
               **:**  **(MDL Docket No. 1535)**
               **:**
               **:**  **JUDGE O'MALLEY**
               **:**
               **:**  <u>**EVIDENTIARY ORDER**</u>

This Court has now presided over five MDL bellwether trials.  Before each trial, the parties filed many dozens of motions in limine, seeking to exclude or limit the admission of certain types of evidence.  Many of these motions have become repetitive, meaning the parties file the same motions in limine in each successive case, even though the parties already know how the Court will rule.[1]  While the parties file these motions in each case to protect their ability to appeal the Court's evidentiary rulings, there is a better way to provide the parties with the protection they require, without repetitious filing of formulaic motions.

Accordingly, the Court now memorializes, in summary form, its prior rulings on a number of the parties' prior evidentiary motions, and holds that **these rulings will apply to all future cases**

---

[1]  Except as noted below, the motions to which the Court refers generally are not case-specific – that is, the contours and grounds for the motions do not change from case to case.

**in this MDL** that are tried by this Court.[2]  Thus, any party wishing to appeal one of these evidentiary

---

[2] In a forthcoming Order, the Court will suggest that these evidentiary rulings will also apply to all cases in this MDL that are tried by *other* courts, such as transferor courts on remand.

*See Manual for Complex Litigation, Fourth* §20.133 at 226 ("Although the transferor judge has the power to vacate or modify rulings made by the transferee judge, subject to comity and 'law of the case' considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings."); David F. Herr, *Multidistrict Litigation Manual* §10:5 at 270-71 (2007) ("The transferor court (court to which the actions are remanded) receives the cases in the condition they are in at the time of remand.  Decisions that have been made in the case continue to apply unless circumstances change warranting their modification.  The decisions made by the transferee court are considered 'law of the case.'") (footnotes omitted); *Sentner v. Amtrak*, 540 F.Supp. 557, 558 n.3 (D.N.J. 1982) (quoting *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3rd Cir. 1981) ("Adherence to law of the case principles is even more important in this context where the transferor judge and the transferee judge are not members of the same court.  Here, the principles of comity among courts of the same level of the federal system provide a further reason why the transferee court should not independently re-examine an issue already decided by a court of equal authority.").

2

rulings in the future may – and should – simply point to this Order on appeal.[3]

_____

[3]  Of course, on appeal, the parties *must* also point to the transcripts of the Court's oral rulings entered during prior MDL bellwether trials, when the Court addressed the parties' motions in limine at greater length.  These oral rulings were issued at final pretrial conferences, at sidebar conferences during trial, and from the bench during trial when ruling on objections raised by counsel.  And, the parties *must* also point to the other *written* Orders addressing these evidentiary issues, as well.  To be clear: this Order only *summarizes* some of the Court's repetitive evidentiary rulings, and reiterates that these evidentiary rulings are continuing in nature; but the summaries cannot be fully understood absent review of the full rulings, themselves.

From the beginning of this MDL, the Court made clear and the parties agreed that the evidentiary rulings entered in each bellwether case would apply to all future MDL cases, unless different factual circumstances warrant modification.  Thus, the precise ruling on a given evidentiary issue may have been best explained by the Court during a prior bellwether trial.

*See Jowers* pretrial tr. at 5-6 (Jan. 23, 2008) ("I want to reiterate the fact that we have understood from the very beginning that all of the Court's rulings in earlier cases, except to the extent that the parties argue for and the Court decides to alter them, continue to apply.  And I do not think that, despite the fact that . . . you all can press the restart buttons on your motions and re-file virtually identical briefs with respect to those motions, that means that the Court needs to go through a detailed analysis of every ruling that it has done in the past and to repeat all the rationale for all of the rulings that it has made in the past.  So I want to make it clear that to the extent that any issues go up in this case from either side to the Court of Appeals, that that record won't be complete absent the Court's rulings in its earlier pretrial proceedings.  So the *Ruth* rulings, the *Solis* rulings, the *Tamraz* rulings, all need to be incorporated into the rulings in this case in order for some of the things that I'm going to say to make full sense and in order for the record to be complete with respect to those things.  So I'm incorporating all of those prior rulings, both the written rulings and the on-the-record oral rulings with respect to the motions in limine in those cases to the extent that those motions are repeated in whole or in part in this case."); *id.* at 178-80 (addressing preservation of appellate rights regarding pretrial evidentiary rulings).

*See also Tamraz* pretrial tr. at 6 (Nov. 1, 2007) (ruling as follows on defendants' motion to exclude certain expert witnesses: "I will stand by all of the earlier rulings that I have made with respect to those expert witnesses.  As I said, they are Cunitz, Longo, Parent and Rosen, all the defendants' earlier objections to their testimony are preserved, and all the restrictions that the Court placed on the testimony of those experts will remain intact for purposes of this proceeding, and you can refer to the Court's earlier rulings, some written and some oral, relating to those experts, but I think we all know what the limitations are."); *id.* at 195-97 (Nov. 2, 2007) ("Any ruling as to any document that was made during any of the prior proceedings stands unless there is a good reason to readdress that document because of a change of circumstances, either case-specific or otherwise, and all objections to those rulings stand, so that you don't need to raise them again.  Any objection that any party made to a ruling with regard to document admissibility is preserved for the record in this case, so for example, for purposes of appeal, you don't have to re-lodge those objections.  You already have them.  That's on the record.  It's been stated many times.").

*See also Byers* pretrial tr. at 5 (Oct. 30, 2008) (addressing the same issue); *Solis* pretrial tr.

(continued...)

3

In the future, the parties need not (indeed, generally **should not**) file in an individual case a motion (including a motion for reconsideration) addressing an evidentiary issued discussed below. Going forward, a party may file a motion in limine directed at modifying the contours of the rulings documented in this Order *if* (and *only if*) the party sincerely believes the particular circumstances of an individual case warrant a modification.  For the most part, the Court memorializes in this Order only those rulings it believes are least likely to be affected by the idiosyncracies of a specific case.[4]

---

[3](...continued)
at 60-61 (June 1, 2006); *Goforth* pretrial tr. at 2, 20, 23-24 (Oct. 27, 2006); *Solis* pretrial tr. at 455-58 (June 1, 2006).

To the extent that the Court's rulings, as stated during successive MDL bellwether final pretrial hearings, were revised or refined as the MDL progressed, the Court's most recent rulings prevail.

[4] Some of the evidentiary issues addressed below apply only to certain classes of cases.  For example, the Court's ruling that the defendants may show the jury only actual warning labels used, and not exemplar or "mock-up" labels, applies broadly to all cases; in contrast, the Court' ruling that the defendants may adduce evidence of many (but not all) stressors in a plaintiff's life, which might have caused him depression or emotional distress, carries aspects that are more case-specific.  The Court acknowledges that the parties may still need to file case-specific motions in limine addressing and flagging a few of the evidentiary issues that are discussed in this Order, even though the rulings set out below will have given the parties much direction.

Following the bold headings below, the Court lists (in footnotes) citations to some (but certainly not all) of the pretrial transcripts where the Court issued oral rulings on the issues raised. The Court does not provide many citations showing oral rulings issued *during* bellwether trials, but those mid-trial rulings should continue to educate the parties regarding the contours of admissible evidence.

- **Defendants' Motion to Exclude Evidence of Other Welding Fume Lawsuits – GRANTED IN PART.**
- **Defendants' Motion to Exclude Reference to Settlements of Other Welders' Claims – GRANTED IN PART.**
- **Plaintiff's Motion to Exclude Evidence of Lawyer Advertising – GRANTED IN PART.**
- **Motion to Exclude Evidence of Efficacy of Lawyer Advertising – GRANTED.[5]**

The topics of "other *Welding Fume* claims and lawsuits" and "plaintiffs' lawyers' advertising" are grouped together because they invariably arise together in the parties' pretrial evidentiary motions.

Defendants in each trial seek to exclude evidence of other *Welding Fume* lawsuits filed by other plaintiffs, arguing this evidence has very limited relevance to the merits of the claims of the plaintiff at trial. Defendants assert that, to the limited extent evidence of other *Welding Fume* lawsuits may be relevant to their notice and knowledge of the health hazards of welding, this evidence is excessively prejudicial under Fed. R. Civ. P. 403 – especially because the existence of these lawsuits shows only that the claims were brought, not that they are valid.

---

[5] *See Byers* pretrial tr. at 97-116, 157, 256-57 (Oct. 22, 2008); *Jowers* pretrial tr. at 21-35, 64-65, 88 (Jan. 23, 2008); *Tamraz* pretrial tr. at 24-36, 119-23 (Nov. 1, 2007); *Goforth* pretrial tr. at 26-36, 74, 100-06 (Oct. 25, 2006); *Solis* pretrial tr. at 201-04, 206-07, 223-24 (May 16, 2006); *Solis* pretrial tr. at 408-15, 440-42 (June 1, 2006); *Ruth* pretrial tr. at 163-78 (Aug. 30, 2005); *Ruth* pretrial tr. at 67, 139 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *3-4 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

Defendants also assert that, if evidence of other *Welding Fume* lawsuits is allowed, then defendants should be permitted to introduce: (1) evidence that, beginning in 2002, the plaintiffs' bar engaged in heavy advertising to obtain clients for *Welding Fume* lawsuit; and (2) expert evidence on the efficacy of this type of advertising.  Defendants assert this evidence would tend to show an alternative reason for the many thousands of *Welding Fume* lawsuits filed by other welders. Plaintiffs respond that evidence of lawyer advertising is itself excessively prejudicial compared to its limited relevance under Fed. R. Civ. P. 403.

The Court has ruled as follows on these motions.  Except as noted below, evidence of lawsuits brought by other welders, and also evidence of lawyer advertising, must be excluded pursuant to both Fed. R. Evid. 403 and 611(a)(2).  While plaintiffs are correct that a multiplicity of injury claims by welders is inconsistent with the notion that no harm can flow from exposure to welding fumes, defendants are also correct that the spark leading to the great number of recent *Welding Fume* lawsuits is the combination of the advertising and screening processes used by plaintiffs' counsel to identify potential claimants.  As defendants point out, moreover, the validity of the claims asserted in those cases remains mostly untested.[6]

Given the complicated issues in these cases, a jury's time would not be well-spent sifting through expert opinions regarding the efficacy of lawyer advertising and debating the viability of thousands of lawsuits that are not before it.  The Court, accordingly, finds it is necessary and

---

[6]  Indeed, after their MDL cases were set for trial, three bellwether plaintiffs – Landry, Morgan, and Peabody – dismissed all of their claims, the latter two shortly before trial, and plaintiffs often file their own motion seeking to exclude evidence regarding the circumstances of the dismissal of these and any other *Welding Fume* cases.  The Court has always granted these motions for the same reasons it grants defendants' motions to exclude evidence of other *Welding Fume* lawsuits: except as discussed immediately below, the number and validity of other, similar cases is minimally relevant to the claims of a given *Welding Fume* plaintiff.

appropriate to exclude both types of evidence to the extent possible, because of its limited relevance, possibly prejudicial effect, and also as a matter of prudent trial management.

The Court adds the following caveats, however, so that the scope of this ruling is not misunderstood. First, the Court generally excludes reference to *lawsuits*, and evidence analyzing the arguable driving force behind those lawsuits having been filed. This ruling does not pertain to claims for disability filed by a welder directly with one of the defendants, or filed with any employee benefit plan sponsored by or in any way affiliated with a defendant or a governmental entity (e.g., disability claims, Social Security claims, and so on). Those types of claims, and their allowance *vel non*, are generally not the product of lawyer advertising and may, indeed, be relevant to the credibility of a defendants' current disavowal of having reason to know of any connection between welding and neurological injury.

Second, although Rules 403 and 611 counsel against admission of evidence regarding the *recent* spate of *Welding Fume* lawsuits that led to creation of this MDL, a different balance adheres to certain similar lawsuits filed many years earlier. These lawsuits were definitely not the product of the recent mass advertising to which defendants object; further, the facts and circumstances of these lawsuits clearly go to whether defendants had notice of the hazards of welding fumes – especially cases where defendants settled for relatively large sums. Indeed, in the last three MDL bellwether trials, counsel for the parties reached agreement regarding admission of evidence of the following "historical" lawsuits, which were brought by welders who suffered neurological injuries:

7

*Nobles*, *Cox*, *Treece*, *Kocher*, *Whisenhunt*, and "the Miami case."[7]   Evidence regarding the

---

[7]  For example, in the MDL bellwether trial of *Jowers*, the parties reached the following agreement: "Plaintiffs will agree not to reference or attempt to introduce the mass of claims/lawsuits, and defendants will agree not to call advertising experts, Schimmel and Thomas, or attempt to introduce lawyer advertising.  Defendants also will agree not to suggest plaintiffs' lawsuit is "lawyer-made;" however, [defendants] do reserve the right to simply establish that Racette's subjects were referred to him by lawyers.  Although defendants want their objections preserved, we understand that the Court will allow evidence of the fact that the following other claims were made: AC Nobles, Miami, Cox, Treece, Kocher and Whisenhunt."  Email between counsel (Jan. 15, 2008). *See also Goforth* pretrial tr. at 27-31 (Oct. 25, 2006) (counsel first describing this agreement regarding introduction at trial of historical *Welding Fume* lawsuits); *Tamraz* pretrial tr. at 21-27, 130-31 (Nov. 1, 2007) (reiterating this agreement).

The parties also understand that reference will be made to a welder named Ruth, whose MDL case settled and who has been the subject of published medical studies.  Despite allowing these references to other *Welding Fume* lawsuits, the Court has limited these references to a minimum.

Finally, the Court has excluded evidence of MDL plaintiffs' verdicts in the cases of *Tamraz* and *Jowers*.

circumstances and existence of these lawsuits is admissible.[8]

Third, it has become clear that it is simply not possible to avoid completely any reference

---

[8] In the second MDL bellwether trial of *Solis*, the Court explained from the bench its ruling on admissibility of certain earlier *Welding Fume* lawsuits, as follows:

> In this case, the defendants have argued both that there is no possible injury that could occur from welding fumes, because it can't get into the brain with sufficient quantity to cause injury, and more importantly, the defendants have argued that they were under no duty to conduct any additional investigation or to provide any additional warnings because they had no notice of any reason to do so.  In other words, they were not even alerted to any need to conduct additional investigation.
>
> This is not a classic products case, where the only question is whether or not a particular product is defectively designed or manufactured, and where therefore an injury suffered by someone else is irrelevant to the question of whether the design defect or manufacturing defect exists.
>
> This evidence of pre-1999 claims is relevant to the question of knowledge, the duty to investigate, the duty to make inquiry, and what would be required of one who is expected to be essentially an expert in the field as relates to the potential injury that their particular product could cause.
>
> I note that in the [first MDL bellwether] case [of *Ruth*], the *defendants* sought to introduce evidence regarding the absence of prior claims.  The plaintiffs resisted that, and the defendants won on that motion because the defendants said it went directly to the question of whether they were put on notice of any need to investigate further.
>
> So for the defendants now to say that this evidence is irrelevant is completely inconsistent with the position that they have taken in the past, and, as I said, is inconsistent with the fact that they have continued to argue that they had no duty to conduct additional investigation, and no notice of any need to provide additional warning.
>
> * * *
>
> I emphasize again, however, that I stand by my earlier ruling with respect to post-1999 evidence of claims.  It is arguable, as plaintiffs have pointed out, that the later claims are relevant to . . . the question of whether or not harm could ever flow from welding fumes, but I find that, both given the fact that many of those claims arose out of lawyer advertising or came in the form of lawsuits that post-dated the initiation of this MDL, and because of the undue prejudice and complications that would flow from having to allow the defendants then to reasonably respond to explain where those multitude of claims came from, that for all those reasons, the prejudice and unworkability of that later evidence greatly outweighs its minimal probative value.  So I stand by that earlier ruling that defendants won on the *Ruth* case with respect to post-1999 claims.

*Solis* pretrial hearing tr. at 202-03 (May 16, 2006).

to the existence of other *Welding Fume* cases during the course of a *Welding Fume* trial.  For example, the parties will often seek to impeach or challenge a witness with testimony elicited in other *Welding Fume* trials, so the jury may come to understand that the trial they are watching is not the only one of its kind.  Indeed, these references to other *Welding Fume* cases are made at least as often by defendants as by plaintiffs.  Thus, while the Court rules that references to other *Welding Fume* cases must be kept to a minimum, the Court also notes that such references cannot be avoided entirely.[9]

Fourth, although the defendants may not, as a general matter, refer to lawyer advertising, and may not show to the jury any *Welding Fume* advertisements, there are three limited exceptions to this rule.  One: if the evidence shows the plaintiff saw an advertisement or letter from a plaintiff's attorney that *lists the symptoms* a welder with neurological injury might have, *and* if the plaintiff saw this communication *before* he ever visited a doctor complaining of his symptoms, then the defendants may ask the plaintiff about having seen the advertisement, and may read aloud the relevant portions to establish that the plaintiff was aware of the symptoms of parkinsonism before he ever went to a doctor; but defendants may not show the advertisement to the jury, and the advertisement is not itself admissible.[10]  Two: when questioning plaintiff's neurology experts Dr. Paul Nausieda or Dr. Juan Sanchez-Ramos, who conducted medical screenings for plaintiffs' counsel, defendants may bring out the fact that the welders whom these doctors screened had viewed advertisements that listed certain neurological symptoms.  Similarly, when discussing medical

---

[9]  The Court has also directed the parties to refer to "a witness's prior testimony" and not to "prior trials."  *Byers* trial tr. at 428 (Nov. 4, 2008).

[10]  As discussed below, however, defendants may not characterize the plaintiff's claim as "lawyer-generated."

articles written by Dr. Brad Racette, who examined welders at screenings for the purpose of studying a possible link between welding and neurological injury, defendants may bring out the fact that the welders whom Dr. Racette studied saw advertisements that listed certain neurological symptoms.  Again, however, the defendants may not show these advertisements to the jury.[11]

And three: defendants will sometimes seek to elicit testimony (from administrators of workers' compensation or disability or health plans) that the employer historically received very few claims from welders for neurological injury.  Plaintiffs may then seek to elicit responsive testimony that welders could not know to make such claims, if they had no idea their neurological injury could be work-related.  If plaintiffs do elicit such responsive testimony, they must ensure their questioning is limited to the period before 2002.  Otherwise, the door may be opened for defendants to bring out the fact that, after 2002, the mass advertising by the plaintiffs' bar would have given welders more knowledge that their neurological injury was, in fact, possibly work-related.[12]

Finally, the Court adds that these caveats are narrow: testimony that is admissible under these exceptions must be kept to the minimum necessary to make the point.  The bottom line is: as much as possible, evidence of other *Welding Fume* lawsuits and of lawyer advertising will be excluded.

---

[11]  *See Goforth* trial tr. at 1882-85 (June 1, 2006).  The Court further held that defense counsel may adduce testimony regarding payments made by plaintiffs to screening doctors (such as Dr. Nausieda), but may not attack the screening process itself.  *Tamraz* trial tr. at 1149-50 (Nov. 8, 2007).

[12]  *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313) (concluding the door had not been opened in deposition); *Jowers* trial tr. at 1673-78 (discussing the allowable scope of Ingalls employee Steve Pierce on this topic).

• **Plaintiff's Motion to Exclude Exemplar Warnings, Warnings for Other Products, Warnings of Other Manufacturers, and Post-Use Warnings – GRANTED IN PART.[13]**

In 1967, the American Welding Society ("AWS") adopted a mandatory warning label to accompany welding rods. With minor variations, all of the manufacturer defendants in the MDL used this mandatory warning. In 1979, the AWS revised the language for this mandatory warning label, and again, with minor variations, all of the manufacturer defendants adopted the mandatory language. Eventually, the manufacturers stopped acting in lockstep and began to use individualized warning label language; further, the manufacturers used different wording to describe health hazards in their MSDSs (which were first required in 1985), and also used different language on certain specialty products, such as high-manganese-content welding rods.

Plaintiffs have moved for an order prohibiting defendants from introducing: (1) any warning labels or MSDSs for welding rod products that the plaintiff did not actually use;[14] (2) any "exemplars" or mock-up labels that were not actual warning labels used by the defendants; and (3) any warning labels on other types of products, such as insecticides or cigarettes.

The Court has granted this motion in large part, but not completely. Addressing these

---

[13] *See Byers* pretrial tr. at 116-124, 248-49 (Oct. 22, 2008); *Jowers* pretrial tr. at 11-21, 65-66, 71-81, 90-91 (Jan. 23, 2008); *Jowers* trial tr. at 1333-34 (Feb. 14, 2008); *Tamraz* pretrial tr. at 131, 142-43 (Nov. 1, 2007); *Goforth* pretrial tr. at 74 (Oct. 25, 2006); *Goforth* pretrial tr. at 31-40, 62-68 (Oct. 27, 2006); *Solis* pretrial tr. at 194-95 (May 16, 2006); *Ruth* pretrial tr. at 69-72 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *4-5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[14] This includes warning labels on: (a) welding rod products manufactured by entities who are not defendants at trial (even if the entity was originally named as a defendant in the complaint); (b) welding rod products manufactured by a defendant but never used by the plaintiff; and (c) warning labels issued by a defendant after the plaintiff stopped welding. *See, e.g., Jowers* trial tr. at 1934-35 (Feb. 21, 2008) (ruling that, although witness Lyttle had shown a Union Carbide label to the AWS as an example of what the entire industry should adopt as a standard in1979, the label could not be shown to the jury because Union Carbide was not a defendant at trial).

categories in reverse order: plaintiffs argue that warning labels on unrelated, non-welding-rod products (like insecticides) are simply not relevant to any issue in a *Welding Fume* lawsuit, because the circumstances of use of those other products are different than the circumstances of use of welding rods.  Defendants respond that warning labels on other products that employ the same language – such as "use adequate ventilation" and "can be hazardous to your health" – are relevant to show the adequacy of this warning language generally, especially in response to a plaintiff's expert's opinion that this language is always insufficient.  The Court concludes that similar warning language on other products has some minor relevance, so defendants may adduce evidence that the warning language defendants use is common and appears on other products.  Defendants may not adduce evidence, however, as to the specific, other products on which the similar warning language appears (such as insecticides or cigarettes), because the circumstances of use of those products and the hazards they may carry are different from welding fumes; rather, defendants may simply solicit testimony that similar warning language is used elsewhere.  Further, given the addictive quality of tobacco and the high stakes and strong emotions surrounding tobacco litigation, the Court concludes that reference to tobacco warnings (by any party) carries the risk of excessive prejudice and must be excluded.[15]

As for exemplar warning labels, defendants have sought to show mock-up labels to the jury that are more readable, or laid out differently, than the labels the defendants actually used.  Given that the placement and size and physical design of a warning label goes to its adequacy, defendants may not use these exemplar labels; defendants may show the jury only those labels they actually

---

[15]  See also the discussion regarding cigarette warnings at page 67, below.

used on the products at issue in a particular case.[16]

As for warning labels that are on products the plaintiff did not actually use, and warning labels issued by a defendant after the plaintiff stopped welding, the plaintiff would not have seen these labels during any relevant period, so the labels are generally not admissible.  There are two exceptions to this rule. The first exception is tied to the learned intermediary defense.  If the applicable State law in the case recognizes the learned intermediary defense, then a product manufacturer can discharge its duty to warn by providing information about the dangers of the product to a third person (such as an employer) upon whom it can reasonably rely to communicate the information to the product's end-users.  Thus, even if the plaintiff did not actually use a given product with a certain warning label, that label may be relevant if there is evidence that the plaintiff's employer saw it.  Accordingly, warning labels on products the plaintiff never used may be admitted, to the extent, and *only* to the extent, that defendants can first establish through testimony of the plaintiff's employers' representatives that: (1) the learned intermediary defense is viable in the particular case; (2) the particular warnings were actually received; and (3) the warnings educated and informed the employer in a particular, meaningful way that was in addition to any education and information provided by the warnings on the defendants' other products.

The second exception involves allowing the limited use of certain labels only on cross-

---

[16] Thus, for example, defendants may not show the jury a warning label used by another manufacturer (e.g., Air Liquide) that is not a defendant at trial.  This ruling includes a prohibition against showing the jury any AWS memorandum that describes the mandatory label language, and suggesting that a defendant used "this label," since the language layout, font size, and so on in the memorandum is not identical to the defendants' actual warning labels.  AWS memoranda discussing mandatory warning language must be used *only* in connection with witnesses describing what AWS did.

Although some of the Court's prior rulings have sometimes suggested otherwise, **defendants may not present their warning label language using a PowerPoint slide or other document created for litigation**; all warning label language must be shown using actual warning labels.

examination.  Defendants' witnesses sometimes will assert at trial that: (1) welding fume exposure cannot cause neurological injury, especially exposure to fumes emitted from mild-steel welding rods; or (2) it was not feasible to include on a warning label the hazard of neurological injury.  If defendants' witnesses do make these assertions, or defendants' counsel does make these arguments, then plaintiffs may introduce *on cross-examination* other manufacturers' labels, and labels issued after the plaintiff stopped welding, for the purpose of showing: (1) that welding rod manufacturers have acknowledged the risk of neurological injury from welding fume exposure; and (2) the feasability of having included on a warning label the hazard of neurological injury.[17]

- **Plaintiff's Motion to Exclude the "Navy Video" – DENIED.[18]**

    In the 1940s, the United States Navy produced a short movie of welders working in smoky conditions, along with a voice-over explaining basic safety precautions.  In the first MDL bellwether trial of *Solis*, plaintiffs played an excerpt of this film with no objection from defendants.  In the second MDL bellwether trial of *Goforth*, defendants played an excerpt with no objection from plaintiffs.  In subsequent bellwether trials, however, defendants have sought to play an excerpt, but plaintiffs have objected.  The Court initially sustained the objection (in the bellwether trial of

---

[17]  One of the labels that plaintiffs often seek to introduce on cross-examination to make these showings is a label that defendant manufacturer ESAB began using in 2006, which states: "Overexposure to manganese and manganese compounds above safe exposure limits can cause irreversible damage to the central nervous system, including the brain."  *See Jowers* trial tr. at 1959-61 (Feb. 21, 2008) (Court ruling that defendants had opened door to use of ESAB label by plaintiffs on cross-examination).  The Court has separately held that, if it allows plaintiffs to show this label to the jury on cross-examination, ESAB may adduce evidence of its contentions that it included this language solely for litigation purposes.  *See Jowers* pretrial tr. at 68 (Jan. 23, 2008); *Tamraz* pretrial tr. at 140 (Nov. 1, 2007).

[18]  *See Byers* pretrial tr. at 127-29 (Oct. 22, 2008); *Jowers* trial tr. at 1344-50, 1456-57 (Feb. 14 & 19, 2008).

*Tamraz*), concluding the defendants had not sufficiently authenticated the video and could not lay an adequate foundation showing the plaintiff or any coworkers had ever seen it.  Subsequently, however, defendants offered alternative arguments for its admissibility: foundational concerns were allayed by the ancient documents rule at Fed. R. Evid. 901(b)(8); and the film was relevant to the same extent and for the same reasons as other, historical documents created by non-defendants, which plaintiffs have consistently used at trial.  The Court has concluded that the defendants' alternative arguments are well-taken.  Accordingly, the Court's position on the admissibility of the Navy video has evolved and the video will be admissible in all future MDL cases.

•      **Plaintiff's Motion to Prohibit Conflating Warning Labels With MSDSs – DENIED.[19]**

Plaintiffs have moved for an order requiring defense counsel and witnesses to refer to Material Safety Data Sheets ("MSDSs") as precisely that, and not as "warnings."  In particular, when plaintiffs ask a defense witness when certain information was first placed "on a *warning label*," plaintiffs do not want the witness to be allowed to answer by stating when the information first appeared on their *MSDSs*.  The Court denied this motion.  If necessary, plaintiffs can ask follow-up questions for clarification.

Plaintiffs have also moved for an order precluding defendants from referring to certain language on the first page of MSDSs as a "warning," rather than as directions for emergency response teams.  The Court denied this motion also, and plaintiffs can again ask follow-up questions or present argument to clarify.

_____

[19] *See Byers* pretrial tr. at 123-24 (Oct. 22, 2008).

- **Plaintiff's Motion to Exclude Evidence of the Disqualification of Experts in Other Cases – GRANTED.[20]**

Plaintiffs often call at trial expert witness Dr. Robert Cunitz to testify about warnings.  In at least four other product liability cases that did not involve welding rods, courts have ruled that Dr. Cunitz was not qualified to offer his proposed expert opinions.  Plaintiffs have asked that evidence of these other disqualifications be excluded as irrelevant.  This motion is well-taken.  The only relevant question is whether Dr. Cunitz is qualified to opine in *Welding Fume* cases.  Following extensive briefing on this issue, the Court concluded that Dr. Cunitz is, in fact, so qualified (though with limitations).[21]

Especially given the particular bases for the disqualification rulings in those four other cases, any attempt by defendants to delve into Dr. Cunitz's disqualifications in other proceedings would confuse the jury, cause the plaintiff undue prejudice, and have the effect of undermining the admissibility rulings of this Court.

---

[20] *See Byers* pretrial tr. at 73-75 (Oct. 22, 2008); *Jowers* pretrial tr. at 68-69 (Jan. 23, 2008); *Tamraz* pretrial tr. at 132 (Nov. 1, 2007); *Goforth* pretrial tr. at 78 (Oct. 25, 2006); *Solis* pretrial tr. at 197 (May 16, 2006); *Ruth* pretrial tr. at 72 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).  *But see Tamraz* tr. at 1588-91 (ruling the door had been opened to limited questioning on Cunitz's disqualifications in other cases).

[21] *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *6-8 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353) (addressing the admissibility of Dr. Cunitz's opinions under the *Daubert* standard and granting in part defendants' motion to exclude his testimony).

•       **Plaintiff's Motion to Bar Evidence of Previously-Named Defendants, Previously-Filed Claims, and Previously-Dismissed Cases – GRANTED.**[22]

Defendants have argued that a plaintiff's originally having named in his complaint welding rod manufacturer-defendants other than the ones appearing at trial, and then dismissing them, is relevant and admissible to show the plaintiff's awareness of warnings issued by these other manufacturers.  Defendants go so far as to state that the plaintiff's allegations, in his original complaint, are tantamount to admissions that he read these other manufacturers' warnings.  The Court disagrees; the fact that the plaintiff merely named certain defendants and then dismissed them is not an admission and is not relevant to any issue in a *Welding Fume* case.  Unless there is evidence that the plaintiff actually used a manufacturer's products, it is irrelevant that the manufacturer was a previously-named, dismissed defendant.[23]

Similarly, the fact that many – or any – other plaintiffs filed other *Welding Fume* cases and then moved for voluntary dismissal is irrelevant to any issue that is pending in a specific *Welding Fume* case.  And the fact that a given plaintiff earlier filed a different lawsuit seeking reimbursement

_____

[22]  *See. e.g., Byers* pretrial tr. at 73-75 (Oct. 22, 2008); *Jowers* pretrial tr. at 69-70 (Jan. 23, 2008); *Goforth* pretrial tr. at 76 (Oct. 25, 2006); *Solis* pretrial tr. at 197 (May 16, 2006); *Ruth* pretrial tr. at 78 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[23]  The same analysis also applies to a defendant who obtains summary judgment on the basis that the plaintiff could not show he ever used that defendant's welding rod products.

Further: (1) while plaintiffs may adduce evidence that a previously-dismissed defendant signed an agreement with remaining defendants to cooperate and testify, (2) plaintiffs may not pursue the point further, to the extent it is revealed that the witness worked for a company that was once a defendant; and (3) defendants may adduce responsive testimony that the agreement was signed because of a business relationship (such as distributor/manufacturer).  *See Jowers* trial tr. at 1592-96 (Feb. 19, 2009) (outlining this process in connection with WESCO, which was a dismissed defendant that had earlier obtained indemnification from defendant ESAB).

for other physical injuries is also generally not relevant.[24]  Such evidence will be excluded.

•    **Plaintiff's Motion to Exclude Evidence of Flying on Private Airplanes – GRANTED.[25]**

Various fact and expert witnesses sometimes use counsel's private airplanes to attend depositions, hearings, medical appointments, and so on.  Plaintiffs have sought to preclude defendants from bringing out this information at trial.  Defendants originally argued this evidence goes to bias, in the same way as does evidence of an expert's hourly rates; later, defendants did not oppose this motion.  The Court has concluded the "private airplane" evidence is too attenuated to show bias.  Counsel may sufficiently undertake impeachment on the basis of bias due to financial interests by adducing evidence of how much a witness was paid, how often they have worked for a particular party (or type of party), and the extent to which their expenses were covered or reimbursed.  Federal Rules of Evidence 403 and 611 counsel against delving into greater detail regarding which hotels experts use,  in what restaurants they ate, whether they fly first class, and so on.  This limitation will be applied equally to all parties.  As the Court explained, moreover, this rule applies to all aspects of the parties' and their witnesses' travel, such as the class of an individual's flight or the hotel room in which they stayed.

---

[24]  Although the fact that a plaintiff earlier filed a lawsuit seeking compensation for other physical injuries is generally not admissible (nor is the fact of any compensation received), the plaintiff's underlying medical history may well be relevant and admissible.  For example, if a plaintiff earlier asserted he suffered an injury or disability due to an automobile accident, this history is relevant to the extent he now claims similar injuries or disability due to MIP.  While the medical evidence is certainly admissible, *the fact of the prior lawsuit* is not, barring special circumstances (such as a pattern of filing work-related injuries bearing substantial similarity to the claims asserted).

[25]  *See Byers* pretrial tr. at 83 (Oct. 22, 2008); *Jowers* pretrial tr. at 69 (Jan. 23, 2008); *Tamraz* pretrial tr. at 132 (Nov. 1, 2007); *Goforth* pretrial tr. at 75-76, 92-93 (Oct. 25, 2006); *Solis* pretrial tr. at 196-97 (May 16, 2006); *Ruth* pretrial tr. at 78 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *6 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

- **Plaintiff's Motion to Exclude Evidence of Collateral Sources – GRANTED IN PART.[26]**

*Welding Fume* plaintiffs will sometimes have received workers' compensation or other disability plan benefits.  Often, these benefits qualify as "collateral sources" under State law and are inadmissible as evidence.[27]

In these circumstances, defendants generally agree they cannot use collateral source evidence to show damage mitigation.  But defendants argue that, for two other reasons, they should be permitted to make reference to federal or state "health benefit programs" or "collateral sources," so long as those references are not connected with the payment of benefits to the plaintiff.

First, defendants may seek to adduce evidence regarding how infrequently welders as a group have made claims for collateral source benefits due to neurological impairment as a result of welding.  For example, the person in charge of plaintiff's employer's health and disability benefits program may seek to testify that he never received a claim from a welder for benefits due to neurological injury.  Defendants want to adduce this evidence to show that, despite the exposure of many welders to welding fumes, none has suffered an injury similar to the plaintiff's.  The Court agrees this is relevant, and rules as follows.  No witness or document may refer to a plaintiff's application to a workers' compensation or any similar benefits program, nor to the plaintiff's having received these benefits.  However, the defendants may adduce testimony from administrators of

---

[26] *See Byers* pretrial tr. at 76-80, 86-98 (Oct. 22, 2008); *Jowers* pretrial tr. at 64-65, 185-86 (Jan. 23, 2008); *Tamraz* pretrial tr. at 130, 140-42 (Nov. 1, 2007); *Tamraz* trial tr. at 896 (Nov. 7, 2007);*Goforth* pretrial tr. at 73-74 (Oct. 25, 2006); *Solis* pretrial tr. at 194 (May 16, 2006); *Ruth* pretrial tr. at 78-80, 140 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *6 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[27] In Mississippi, for example, "[c]ompensation or indemnity for the loss received by the plaintiff from a collateral source, wholly independent of the wrongdoer, as from insurance, can not be set up by the [defendant] in mitigation or reduction of damages."  *Busick v. St. John*, 856 So.2d 304, 309 (Miss. 2003).

these benefit plans regarding the frequency of claims made by welders generally for neurological impairment.  The parties will usually work out a stipulation that addresses these concerns.[28]

Second, the defendants may seek to show that, in the context of seeking disability benefits, the plaintiff asserted his disability was caused by an injury or disease other than welding fume exposure, or he claimed physical symptoms that are relevant to his *Welding Fume* claims.  Again, the Court agrees that this evidence is relevant and admissible, but it must be introduced in a way that keeps from the jury, as much as possible, the fact of any collateral source benefit compensation, or that the claim of disability was made for the purpose of seeking compensation, or any rulings issued in connection with the claim.

- **Plaintiff's Motion to Bar Certain Testimony Regarding PET Scans and L-dopa Trials – GRANTED IN PART.[29]**

The Court earlier denied a *Daubert* motion filed by plaintiffs seeking to strike or limit testimony relating to PET scans.  The essence of plaintiffs' motion was that PET scans are not sufficiently reliable diagnostic tools for the purpose of differentiating Parkinson's Disease from Manganese-Induced Parkinsonism.  The Court concluded that the alleged weaknesses of PET scans

---

[28]   The admissibility of evidence related to this issue is also discussed in the context of admissibility of evidence of other lawsuits and other claims, see page 11 and footnote 5.  Notably, it is only the person(s) who would normally receive reports of neurological injury to welders – such as the administrator of plaintiff's employer's health and disability benefits – who may testify on this subject.  Neither a co-worker of the plaintiff nor a defendant employee who works with welders may testify regarding whether he has ever seen other welders with neurological injury.  *See, e.g., Goforth* trial tr. at 3083-84 (Nov. 16, 2006) (prohibiting this testimony from defendant representative Ms. Quintana).

[29]   *See Jowers* pretrial tr. at 105-16 (Jan. 23, 2008); *Tamraz* pretrial tr. at 87-92 (Nov. 1, 2007); *Ruth* pretrial tr. at 80-81 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *7 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

for diagnostic purposes were grist for cross-examination, not the basis for wholesale exclusion under *Daubert*.

Plaintiffs' later raised a separate issue of whether defendants would be permitted to ask a plaintiff, himself, about his reasons for choosing not to undergo a PET scan. The Court concluded that this line of questioning, when directed at a person who is not a learned professional or sufficiently educated regarding the science behind (or risks and benefits of) a complicated, invasive, radioactive medical procedure like a PET scan, would be confusing and unfair. Accordingly, the Court ruled this evidence was not admissible, pursuant to Rule 403. While defendants may establish that a plaintiff has not undergone a PET scan, they may not address his own willingness *vel non* to have one. Defendants may ask the plaintiff's doctor, if appropriate, why he did not recommend a PET scan, or whether he did, in fact, make such a recommendation; but defendants may not ask the plaintiff, himself, why he did not undertake one.

These same rulings also apply, for the most part, to a plaintiff's ingestion of the drug levodopa ("L-dopa"), which doctors sometimes prescribe to ameliorate parkinsonian symptoms. That is, defendants: (1) may adduce evidence that some doctors believe it is possible to use L-dopa trials to distinguish between Parkinson's Disease and Manganese-Induced Parkinsonism; and (2) may ask plaintiff's treating doctor, if appropriate, why he did not recommend L-dopa; but (3) may *not* question the plaintiff regarding his own willingness to undergo an L-dopa trial. The only exception is that, if the plaintiff's own treating physician prescribed or recommended L-dopa, and the plaintiff then decided not to follow this recommendation, defendants may ask the plaintiff why.

Finally, the Court also ruled that defendants may not bring out the fact that they offered to pay for cost of the plaintiff's PET scan (which is about $10,000), unless the plaintiff suggests that

22

the reason he did not undergo a PET scan was the cost.[30]

• **Plaintiff's Motion to Bar Evidence of Other Possible Causes of His Neurological Injury – GRANTED IN PART.[31]**

In every *Welding Fume* case, the plaintiff asserts he suffers neurological injury caused by exposure to manganese in welding fumes.  Plaintiffs have sometimes filed motions in limine stating they anticipate defendants might seek to submit evidence of possible *other* causes of the neurological injury, such as ingesting poisoned well water, Gulf War syndrome, head injury, or carbon monoxide exposure.  Plaintiffs have also stated they anticipate defendants might point to other sources of manganese exposure, such as welding on steel painted with primer, ingesting high-manganese drinking water, grinding of steel in the workplace, dietary supplements, and so on. Plaintiffs have argued none of this evidence should be admitted unless there is: (1) a good faith, factual basis for these other causes or toxic exposures; and (2) expert opinion that these other agents can cause the plaintiff's particular set of symptoms or disease.[32]

Generally, the Court has agreed with plaintiffs' position.  Defendants may not suggest at trial, for example, that a plaintiffs' neurological condition might have been caused by some other, *hypothetical* toxic exposure, like carbon monoxide, if there is no evidentiary, factual basis for that suggestion.  Nor may defendants suggest the plaintiff's neurological condition was caused by some

---

[30] *Tamraz* trial tr. at 1129, 1185 (Nov. 8, 2007).

[31] *See Byers* pretrial tr. at 52-53 (Oct. 22, 2008); *Jowers* pretrial tr. at 103-04 (Jan. 23, 2008); *Tamraz* pretrial tr. at 69-79 (Nov. 1, 2007); *Solis* pretrial tr. at 146-51, 196 (May 15 & 16, 2006); *Ruth* pretrial tr. at 38-48 (Aug. 30, 2005); *Ruth* pretrial tr. at 82-86, 140 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *8 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[32] See Solis trial tr. at 2516-17, 2741 (June 15, 2006) (excluding as rank speculation expert testimony regarding possible manganese overexposure due to dietary supplements).

23

other, actual, *known* toxic exposure, unless there exists an admissible expert opinion that this known toxic exposure can cause the plaintiff's condition.[33]

Further, defendants' expert industrial hygienists may testify regarding various common activities that occur in the plaintiff's workplace that yield exposure to manganese, such as metal-grinding, -cutting, and -blasting, but only if defendants first lay a foundation that, in fact, the plaintiff was probably exposed to that particular activity or source of manganese. Defendants' expert industrial hygienists may, if appropriate, also testify that there exist governmental or other regulations regarding manganese exposure limits with respect to these other activities. Unless defendants' expert industrial hygienists are also neurologists, however, they may *not* testify or opine that any of these other activities did or can cause neurological injury, as they are not qualified to do so; their testimony must be limited to the simple possibility of manganese exposure from these other sources.

---

[33] Defendants do not necessarily need expert opinion tying other, possible causes of plaintiff's condition to plaintiff's *symptoms*, if those connections are within common knowledge. For example, if plaintiff's doctors assert the plaintiff's loss of libido is tied to his manganese exposure and manganese-induced parkinsonism ("MIP"), defendants may question the doctors whether the loss of libido might instead be caused by other circumstances, such as natural aging; defendants need not adduce expert testimony regarding this link. On the other hand, if plaintiff's doctors assert the plaintiff's resting tremor is tied to his manganese exposure and MIP, defendants may question the doctors whether the tremor might instead be caused by exposure to (for example) insecticides *only* if defendants: (1) have a good faith, factual basis for suggesting the plaintiff was actually exposed to insecticides; and (2) present expert testimony that insecticide exposure can cause resting tremor.

• **Plaintiff's Motion to Exclude Evidence of Negative Economic Impact – DENIED.[34]**

Although State law on punitive damages varies, the Court has adhered to the following rulings in every MDL bellwether case.  The Court intends to continue to follow these rulings connected to punitive damages in every MDL case where a claim for punitive damages is asserted and is still viable at the time of trial, absent a showing by a party that State law requires otherwise.

Plaintiffs have moved to exclude evidence that a punitive damages award would cause defendants to suffer certain negative economic impacts, such as having to lay off workers.  Beyond the fact that any such effect (or at least the degree) is uncertain and unpredictable, plaintiffs assert such evidence is unduly prejudicial and immaterial to an award of punitive damages.  Defendants respond that a jury is charged with considering the "economic effects" of an award of punitive damages when determining the proper amount, and that the possibility of lay-offs and other reductions is a probative economic effect.

One factor a jury may consider when determining whether and to what extent a punitive damages award is appropriate in a given case is the defendant's ability to fund any such award.  Accordingly, the Court concludes the law allows defendants to present witnesses to provide testimony that, if a particular punitive damages award is given, there would be a negative economic effect on the defendants, including the effects to which plaintiffs object.  The Court adds, however, that such testimony will be limited to ensure there are no unnecessary or unsupported appeals to

---

[34] *See Jowers* pretrial tr. at 70-72 (Jan. 23, 2008); *Tamraz* pretrial tr. at 133 (Nov. 1, 2007); *Goforth* pretrial tr. at 79 (Oct. 25, 2006); *Solis* pretrial tr. at 195 (May 16, 2006); *Ruth* pretrial tr. at 98-99 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *9 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

On a related note, however, the Court has granted as unopposed motions by plaintiffs to exclude evidence that a plaintiff's verdict would lead to an increase in defendants' insurance premiums. *See Jowers* pretrial tr. at 66 (Jan. 23, 2008); *Tamraz* pretrial tr. at 131 (Nov. 1, 2007); *Goforth* pretrial tr. at 74 (Oct. 25, 2006); *Solis* pretrial tr. at 195 (May 16, 2006).

sympathy.

• **Defendants' Motion to Exclude Evidence of Corporate Wealth – GRANTED IN PART.**

In at least one MDL bellwether trial, defendants moved to exclude evidence of their own corporate wealth, arguing this evidence was not relevant to a jury's determination of punitive damages.[35]  In support of this argument, defendants pointed to *Clark v. Chrysler Corp.*, 436 F.3d 594, 604 (6th Cir. 2006), where the appellate court held that "[the defendant's] wealth is an inappropriate basis for the $3 million punitive damage award."   The Court denied defendants' motion, however, noting that the *Clark* opinion: (1) cannot overrule earlier Sixth Circuit opinions holding that the defendant's financial condition *is* relevant;[36] and (2) was itself contrary to several

_____

[35] *See Goforth* pretrial tr. at 79-86 (Oct. 25, 2006) (discussing a motion to exclude testimony of plaintiff's economics expert, originally filed by defendants in *Beheler* at docket no. 21).  The *Goforth* defendants had also moved for judgment as a matter of law on plaintiff's punitive damages claim, arguing the facts did not allow a reasonable jury to conclude, by clear and convincing evidence, that exemplary damages were appropriate.  After the Court denied this motion, the defendants moved to exclude from the jury's consideration any evidence of corporate wealth when assessing punitive damages.

[36] As do most appellate courts, the Sixth Circuit holds that "[a] panel of this Court cannot overrule the decision of another panel."  *United States v. Hardin*, 539 F.3d 404, (6th Cir. 2008).  Cases decided earlier than *Clark* by the Sixth Circuit routinely held that a jury may consider a defendant's financial condition when determining punitive damages.  *See Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 647 (6th Cir. 2005) ("The defendant's financial position is equally relevant to the State's interest in deterrence, which is also a valid purpose of punitive damages."); *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (discussing circumstances where "the defendant's aggregate net worth of $1.6 billion becomes relevant").

26

Supreme Court opinions.[37]

The Court further held, however, that: (1) the financial condition of the defendant companies' parents was not relevant (e.g., the net worth of defendant Lincoln Electric Company is relevant, but the net worth of parent Lincoln Electric Holding Company is not); and (2) while the plaintiff's expert may opine regarding the financial status of a defendant, he may not opine that a defendant could or should pay an amount in punitive damages within a certain range, or within a multiple of shareholder dividends.  The parties will often simply stipulate to the net worth of each defendant, and leave it at that.[38]

•  **Plaintiff's Motion to Exclude Characterizations of an Author as a "Plaintiff's Expert" or "Defense Expert" – GRANTED.[39]**

During trial, both plaintiffs and defendants ask questions of their own and the other side's experts regarding many dozens of learned treatises and medical and scientific articles.  Often, but not always, the authors of these articles and treatises have received payment from, and/or consulted with, the parties regarding issues central to the *Welding Fume* MDL.  The extent to which a party may adduce evidence that an author of one of these articles or treatises has received such payments is discussed at page 63, below.

---

[37]  *See, e.g., BMW of North America, Inc. v. Gore*, 517 U.S. 559, 591 (1996) (Breyer, J., concurring) ("a fixed dollar award will punish a poor person more than a wealthy one, [so] one can understand the relevance of [the defendant's financial position] to the State's interest in retribution"); *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 n.28 (1993) (rejecting defendant's contention that "evidence of its impressive net worth" should not have been admitted, since, "[u]nder well-settled law . . . factors such as these are typically considered in assessing punitive damages").

[38]  *See, e.g., Jowers* trial tr. at 1416-17 (Feb. 15, 2008).

[39]  *See Byers* pretrial tr. at 66-70, 126-27 (Oct. 22, 2008); *Jowers* pretrial tr. at 135-38, 145-46 (Jan. 23, 2008); *Jowers* trial tr. at 2720-22 (Feb. 26, 2008).

Separately, plaintiffs have moved to prohibit certain questioning and testimony involving non-testifying authors who have *not* received payment from, nor consulted with, any party regarding *Welding Fume* issues. As an example, the parties have referred at trial to "The Warnings Handbook," written by Michael Wogalter. Although Mr. Wogalter has apparently testified in other product liability cases on behalf of plaintiffs, he has never testified in a *Welding Fume* trial and has not consulted with any party about the specific issues raised in *Welding Fume* cases. Thus, when defendants' warnings expert Dr. Jane Welch referred to Mr. Wogalter in an MDL bellwether trial as "a prominent plaintiff's expert," the Court sustained an objection. Further, in a subsequent case, the Court granted plaintiff's motion to exclude any questioning or testimony similarly characterizing any non-testifying author or witness as associated with plaintiffs or defendants, unless that author or witness has actually received payments from (or consulted with) *Welding Fume* parties about *Welding Fume* issues. The Court has also ruled inadmissible evidence regarding amounts of payments by the parties or their attorneys to experts appearing in *Welding Fume* trials, if those payments were for unrelated litigation.[40] This ruling applies equally to all other MDL cases and applies equally to both plaintiffs and defendants.

Finally, plaintiffs have also moved for an Order requiring defendants' experts to be fully prepared to answer how much compensation they have received from defendants, asserting that some experts avoid answering fully at trial. The Court has granted this Order, and applied the ruling equally to plaintiffs' experts.

---

[40] Thus, for example, evidence of payments by plaintiffs' counsel to plaintiffs' expert Dr. Burns for his work on *Welding Fume* cases is admissible, but payments by plaintiffs' counsel to Dr. Burns for his work on tobacco cases is not admissible. Similarly, defendants may question plaintiff's expert Dr. Cunitz regarding whether he was hired by plaintiffs or defendants in other product liability cases, but not about the amount of payments he received.

•     **Plaintiff's Motion to Exclude Certain Comments in Opening Statement – DENIED.**[41]

Plaintiffs have moved to prohibit defense counsel from making certain comments during opening statement, including: (1) without welding rod products, the United States would have lost World War II; (2) defendant Lincoln has an annual bonus program that sometimes pays its employees amounts larger than their annual salary; (3) Lincoln has a "no lay-off" policy; and (4) Lincoln and other defendants "take care of their employees" and "really care about welders." Plaintiffs complain these comments are irrelevant, or are not tied to any testimony later offered by a witness.

The Court has denied these motions, observing that, even if the relevance of these comments is low, the risk of unfair prejudice is even lower; further, defendants, like plaintiffs, have a right to "personalize" their clients for the jury.  The Court has cautioned defendants, however, that they: (1) may not engage in hyperbole; and (2) must offer proofs at trial to support any comments in opening statement regarding company policies.

On a related note, plaintiffs have also moved to exclude defense counsel's assertion in opening statement that "Dr. Beintker probably got it wrong" when he reported, in 1932, that he found neurological injury in two welders.  The Court has overruled this motion and allowed defendants to preview their evidence, so long as defendants subsequently adduce testimony to support their assertion.[42]

---

[41]  *See Byers* pretrial tr. at 125-26 (Oct. 22, 2008); *Tamraz* pretrial tr. at 96-98, 131 (Nov. 1, 2007); *Goforth* pretrial tr. at 75-76 (Oct. 25, 2006); *Solis* pretrial tr. at 195 (May 16, 2006).

[42]  *See Byers* pretrial tr. at 164-66 (Oct. 22, 2008) (defendants noting that subsequent articles challenged Dr. Beintker's conclusions).

- **Plaintiff's Motion to Exclude Videotaped Objections Made During Deposition Testimony – GRANTED.[43]**

During the course of the videotaped trial preservation depositions of witnesses who do not testify live at trial, questioning counsel is sometimes interrupted when opposing counsel makes objections.  Plaintiffs have moved the Court to direct defendants to excise counsel's lodging of objections from any videotape shown to the jury, where the objections were either withdrawn (i.e., not presented to the Court for ruling) or denied by the Court.  The Court has granted this motion and ordered that this direction applies equally to both sides.

- **Plaintiff's Motion to Exclude Evidence that Plaintiff's Close Relatives are also Welders – DENIED.[44]**

Some of the *Welding Fume* plaintiffs have close relatives, such as a son or brother, who are also welders.  Plaintiffs have moved to exclude this evidence, arguing it is not relevant, while defendants respond that information the plaintiff told his relative about welding safety, such as whether to wear a respirator and so on, and the fact that these family members continue to weld despite knowledge of the plaintiff's alleged injuries, may have some relevance.  The Court agrees with defendants.

- **Plaintiff's Motion to Exclude Evidence that President Bush Welded at Lincoln Electric. – GRANTED.[45]**

In 2008, President George W. Bush attended a fundraiser at defendant Lincoln Electric.  At

---

[43] *See Byers* pretrial tr. at 128-30 (Oct. 22, 2008).

[44] *See Byers* pretrial tr. at 132 (Oct. 22, 2008).

[45] *See Byers* pretrial tr. at 153-54 (Oct. 22, 2008).

this event, the President was shown how to use a computer to perform about 20 seconds of automated welding.  Plaintiffs ask that this evidence be excluded as irrelevant, and the Court has always granted this motion as unopposed.

- **Defendants' Motion to Modify the Court's Earlier *Daubert* rulings – DENIED.**[46]

Early in the history of this MDL proceeding, the Court held hearings on the admissibility of the opinions of a number of experts, applying the evidentiary standards set out in *Daubert*[47] and Federal Rule of Evidence 702.  The Court then issued a "*Daubert* opinion," which granted in part and denied in part the motions of the parties to exclude the testimony of each other's experts, including plaintiffs' experts Robert Cunitz, William Longo, Richard Parent, David Burns, and others.[48]

In each subsequent, individual *Welding Fume* bellwether trial, defendants have filed a motion asking the Court, essentially, to reconsider its *Daubert* rulings and to exclude entirely the testimony of these plaintiff's experts.  It is apparent that defendants file this motion in each case simply to protect their appellate rights.  This Order makes clear that the Court will adhere to its *Daubert* rulings in every MDL bellwether case, and the defendants should not file a similar motion in each individual case for form's sake.

In addition, defendants have filed motions arguing that some of plaintiff's experts  – especially Dr. Burns and Mr. Cunitz – have testified outside the boundaries allowed in the *Daubert*

---

[46]   *See Jowers* pretrial tr. at 9-10 (Jan. 23, 2008); *Tamraz* pretrial tr. at 6 (Nov. 1, 2007); *Goforth* pretrial tr. at 54-55, 67, 113 (Oct. 25, 2006).

[47]   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[48]   *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *6-8 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

31

opinion, and asking the Court to preclude them from doing so at trial.  As the Court has explained,

the boundaries continue to apply in every MDL case, and defendants have an obligation to object

contemporaneously at trial if they believe the expert is offering disallowed testimony.  Pretrial

motions asking the Court to police live expert testimony beforehand on a question-by-question basis

are not workable and should not be filed.[49]


•    **Plaintiffs' Motion to Exclude Evidence Regarding Employers' "HazCom" Duties –
       DENIED.[50]**

Plaintiffs have sought to prevent defendants from eliciting certain testimony from their

Industrial Hygiene experts regarding the Hazard Communication Standard ("HazCom"), 29 C.F.R.

§1910.1200, which was promulgated by the Occupational Safety and Health Administration

("OSHA").  Plaintiffs assert the defendants' experts first discuss the duties, under HazCom, of

employers to convey warnings to employees, and then "opine or insinuate" that the employers

complied with the provisions of OSHA or HazCom.  Specifically, plaintiffs have argued that

defendants intend to have their experts read portions of OSHA and HazCom to the jury and then

testify to the jury: (1) what *they* think these regulations mean; (2) what *they* think the employers'

obligations under the regulations are; and (3) whether *they* think the employers complied with those

regulations.  Plaintiffs argue this is inappropriate because: (1) testimony explaining how a statute

or regulation works and what it means invades the province of the Court; (2) testimony opining that

---

[49]  *See Jowers* pretrial tr. at 42-47 (Jan. 23, 2008) (explaining this ruling).

[50]  *See Byers* pretrial tr. at 72 (Oct. 22, 2008);  *Byers* pretrial tr. at 278-79 (Oct. 23, 2008);
*Tamraz* pretrial tr. at 64-66 (Nov. 1, 2007); *Goforth* pretrial tr. at 86-91 (Oct. 25, 2006); *Solis*
pretrial tr. at 189-91, 193, (May 16, 2006); *Solis* pretrial tr. at 418-19 (June 4, 2006);  *Ruth* pretrial
tr. at 49-60 (Aug. 30, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *10 (N.D. Ohio Feb. 27,
2006) (*Ruth* docket no. 183).

an employer complied with its legal duties under HazCom invades the province of the jury; and (3) such testimony is wholly irrelevant anyway, because the manufacturer's duties to the plaintiff are separate from the employers' duties to its welder-employees.

In response, defendants argue that what the employers' duties are under HazCom, and whether the plaintiffs' employers met those duties, is highly relevant. Defendants assert that the question of what warnings were required depends on all the circumstances of the product-user and his environment, and those circumstances necessarily include what the manufacturer could reasonably expect an employer to tell its employees, as required under HazCom. For example, defendants note their warnings instruct employers of welders, as well as welding rod users, to refer to OSHA regulations and the MSDSs required under HazCom, "incorporating them by reference." Defendants also note that the "adequate ventilation" referred to in their warnings is necessarily provided by the employer, not the manufacturer, and the OSHA regulations make this clear.

The Court has concluded that the plaintiffs' motions to exclude evidence of employers' duties under HazCom must be denied, but the Court has added certain caveats. Testimony regarding HazCom requirements, and plaintiffs' employers' efforts to comply therewith, is relevant to many issues in a *Welding Fume* case, including: (1) the learned intermediary doctrine; (2) comparative fault (at least in some States); and (3) most important, what "all the circumstances" were surrounding the welding rod products' purchase and use. A central question in a *Welding Fume* case is whether defendants acted reasonably, under all the circumstances, in determining what warnings they needed to supply to the ultimate users of their welding rod products. These circumstances include the defendants' knowledge that the HazCom regulation existed, that employers had certain HazCom-related duties, and that some employers created "HazCom programs" to warn and educate their employees. Accordingly, the Court has ruled that defendants' witnesses may testify about *the*

33

*defendants' understanding* of what HazCom required and how the defendants endeavored to meet those requirements. The court will be careful, however, to exclude any "ultimate conclusion testimony" opining whether a defendant did actually meet any given legal requirement. Further, the court will strictly limit any expert's attempt to explain the *meaning* of any terms or provisions in any statute or regulation, as opposed to simply what the statute or regulation says.

These limitations apply to both plaintiffs' and defendants' experts: an expert may not opine, for example, that a given warning or MSDS *did* meet regulatory or other legal standards, nor may he opine that it did *not*. In sum, evidence regarding the existence of HazCom and an employer's efforts to comply with it are admissible, but a legal conclusion about what HazCom requires and whether an employer met those requirements is not.[51] As with all the Court's *Daubert* and related evidentiary rulings limiting the areas about which experts may opine, it is the responsibility of counsel to timely object at trial if counsel believes a witness is not maintaining compliance.

• **Plaintiff's Motion to Prohibit In-Court Requests for: Stipulations, Documents from Plaintiff's Files, and Demonstrations to the Jury – GRANTED.[52]**

Plaintiffs have sought an Order directing that defendants be precluded from asking the plaintiffs for certain things in open court, including: (1) stipulations or agreements; (2) documents in plaintiffs' trial files; and (3) physical demonstrations before the jury. Plaintiffs' concern is that a refusal of defendants' request in front of the jury might "look bad," even spiteful, especially if the

---

[51] The Court has also ruled that OSHA regulations, ANSI standards, and similar codes may be referred to at trial and shown to the jury; whether they are admissible as evidence and viewed by the jury during deliberations will depend on the particularized circumstances of the trial. *See Goforth* pretrial tr. at 20-22 (Oct. 27, 2006); *Solis* pretrial tr. at 417-18 (June 4, 2006).

[52] *See Byers* pretrial tr. at 81, 247 (Oct. 22, 2008); *Jowers* pretrial tr. at 66, 85-89 (Jan. 23, 2008); *Tamraz* pretrial tr. at 130-31 (Nov. 1, 2007); *Goforth* pretrial tr. at 74-76 (Oct. 25, 2006); *Solis* pretrial tr. at 194-95 (May 16, 2006).

refusal has a legitimate reason that plaintiffs are prohibited from revealing to the jury.  Defendants have not opposed this request, so long as it is made mutual, including plaintiff not engaging in physical demonstrations at his own counsel's request.  The Court has ruled accordingly.  This ruling does not preclude an attorney from asking counsel opposite for a copy of demonstrative evidence or an exhibit.[53]

- **Motions to Exclude Evidence of the Parties' Litigation Documents – GRANTED.[54]**

    Both plaintiffs and defendants have filed motions to exclude from evidence documents they or the Court filed in this or related *Welding Fume* litigation, including: (1) motions and responsive briefing related to several matters (such as for sanctions, or for a court-ordered epidemiological study); (2) Court Orders resolving these motions or other matters; (3) a party's objections to discovery requests, or denials of requests for admission; and (4) orders issued by State courts in *Welding Fume* cases.

    The Court has granted all of these motions, concluding this evidence does not help to establish any issue at trial.[55]  This ruling does not, however, apply to the following evidence

---

[53]  *See Goforth* trial tr. at 1751-52 (Nov. 8, 2006) (clarifying this point).

[54]  *See Byers* pretrial tr. at 144-45 (Oct. 22, 2008); *Jowers* pretrial tr. at 11, 14, 36, 56-65 (Jan. 23, 2008)*; Tamraz* pretrial tr. at 23-25, 130-32 (Nov. 1, 2007); *Goforth* pretrial tr. at 74, 107-08 (Oct. 25, 2006); *Solis* pretrial tr. at 198, 201, 205 (May 16, 2006).

[55]  "[T]he jury should not be informed about the judge's preliminary decisions concerning the admissibility of evidence."  1 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* ‘104.60[1] (2nd ed. 2005).  A Judge "should refrain from advising the jury of [her] findings" because it "is likely to influence strongly the opinion of individual jurors when they come to consider their verdict and judge the credibility of witnesses."  *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979).  "A party cannot read into evidence a party's denial of or refusal to admit a fact.  A denial or refusal to answer is no evidence of any fact."  Michael C. Smith, *O'Connor's Federal Rules: Civil Trials* 405 (2006).

contained in litigation documents, which is relevant and admissible: (1) positive discovery assertions, such as admissions and responses to interrogatories; (2) Fact Sheets; (3) Notices of Diagnosis; and (4) any amendments or supplements to these documents (e.g., an amended Fact Sheet with changed answers).[56]

- **Plaintiff's Motion to Exclude References that Impugn Motives of Counsel, Denigrate the Basis for Fees, and to Richard Scruggs – GRANTED.[57]**

Plaintiffs have asked the Court to prohibit defendants from seeking to elicit information that impugns the motives of plaintiffs' counsel.  Specifically, plaintiffs seek to exclude from trial the following matters: (1) any reference to the criminal guilty pleas or criminal actions of Richard Scruggs, who was formerly Plaintiffs' co-lead counsel, or his associates; (2) any suggestion that the *Welding Fume* MDL is a "lawyer-made epidemic," or that the plaintiff's claim was "lawyer-generated" or came through "marketing" by attorneys; (3) any observation that plaintiffs' counsel get paid on a contingent basis; (4) any suggestion that plaintiffs sued defendants only because they have "deep pockets;" and (5) any suggestion that plaintiffs are pursuing *Welding Fume* litigation because asbestos or silica litigation has "dried up."  The Court has granted this motion, most aspects of which defendants have not opposed, concluding that none of these matters are relevant to any issue at trial.

---

[56] Fact Sheets may need to be redacted before publication to the jury or submission during deliberations.  *See Byers* trial tr. at 3404-05 (Nov. 21, 2008).

[57] *See Byers* pretrial tr. at 80-83 (Oct. 22, 2008); *Jowers* pretrial tr. at 65, 67-68, 133-41 (Jan. 23, 2008); *Tamraz* pretrial tr. at 69, 130-32 (Nov. 1, 2007);*Goforth* pretrial tr. at 76-7 (Oct. 25, 2006); *Goforth* trial tr. at 2162-66 (Nov. 13, 2006); *Solis* pretrial tr. at 144, 194-95 (May 15 & 16, 2006).

•       **Plaintiff's Motion to Exclude References that the Plaintiff Violated Workplace Safety Rules – DENIED.[58]**

If there exists evidence that a *Welding Fume* plaintiff violated any of his employers' workplace safety rules, defendants generally want to introduce it at trial, while plaintiffs seek to exclude it as irrelevant.  Unless the evidence is excessively prejudicial, the Court has ruled that this evidence is admissible as relevant to the question of proximate cause.  That is, evidence of whether the plaintiff ignored *other* safety warnings given him by his employer is relevant to show whether he would have paid attention to and heeded a better welding fume warning – which, in turn, is relevant to the question of causation.

•       **Plaintiff's Motion to Exclude Evidence of Stressors – DENIED IN PART.[59]**

In every *Welding Fume* trial, the plaintiff has sought to exclude evidence of various private aspects of his personal and family life.   This evidence includes, for example, allegations of plaintiff's violent behavior (both domestic and otherwise), suicidal thoughts and depression suffered by himself or other family members, illegal drug use by himself or other family members, criminal history, alcoholism, and so on.

As a general matter, much of this evidence is admissible.  Plaintiffs normally seek damages for emotional distress; accordingly, defendants are entitled to show that the plaintiff's emotional distress was caused by stressors in his life other than the symptoms of his parkinsonism.  Similarly,

---

[58]   *See Byers* pretrial tr. at 124-25, 134-44, 233-43 (Oct. 22, 2008); *Jowers* pretrial tr. at 89 (Jan. 23, 2008); *Tamraz* pretrial tr. at 143-44 (Nov. 1, 2007);

[59]   *See Byers* pretrial tr. at 132-33 (Oct. 22, 2008); *Byers v. Lincoln Elec. Co*., 2008 WL 4849339at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313); *Jowers* pretrial tr. at 104 (Jan. 23, 2008); *Solis* pretrial tr. at 201 (May 16, 2006); *Ruth* pretrial tr. at 72-78, 140 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

the plaintiff usually asserts that depression is one of the symptoms of his manganese-induced parkinsonism ("MIP"); accordingly, defendants are entitled to adduce evidence of alternative causation of depression by other stressors, and that the plaintiff's depression predated his neurological diagnosis.  Defendants are also entitled to adduce limited evidence of: (1) depression or suicide in plaintiff's immediate family, because depression can be familial; and (2) a plaintiff's own alcoholism, which can be tied to depression and also to relevant physical symptoms, such as tremor.

On the other hand, the Court will ensure that any such references to stressors in plaintiff's life, or other aspects of plaintiff's personal history, are strictly limited, to ensure the plaintiff is not subjected to unnecessary embarrassment or prejudice or invasion of privacy.  Further, the Court will normally exclude evidence related to the behavior of the plaintiff's *friends and family* (such as the drug use or criminal history of plaintiff's adult child) as too tenuously linked to plaintiff's *own* behavior and mental state, unless defendants can establish a strong, direct, relevant, and non-prejudicial evidentiary link.  Also, while the Court may allow evidence of financial difficulties as contributing to the plaintiff's depression, it will not allow any suggestion that financial difficulties motivated the plaintiff to file his lawsuit.

• **Plaintiff's Motion to Exclude Duplicative or Cumulative Expert Testimony – DENIED.[60]**

Plaintiffs sometimes file a motion asserting that defendants have named a surfeit of expert witnesses, who will give overlapping testimony.  Plaintiffs ask the Court to order that defendants present only one expert on any given subject, and suggest defendants have actually designated too

---

[60] *See Byers* pretrial tr. at 75-76 (Oct. 22, 2008); *Tamraz* pretrial tr. at 93-94 (Nov. 1, 2007); *Solis* pretrial tr. at 187-88 (May 16, 2006).

many experts as a ploy, to exhaust plaintiffs' counsel and funds.

The Court has denied these motions.  Generally, there is nothing wrong with adducing testimony from multiple experts on related (or even the same) topics, especially in an MDL, where there are core-experts and also case-specific experts.  Thus, rather than enter a pretrial Order limiting defendants' use of expert witnesses, the Court has dealt with this issue by citing to Fed. R. Evid. 611(a) as authority for limiting at trial any duplicative expert testimony via sustaining objections, giving *sua sponte* cautions to counsel, or even terminating counsel's questioning.  Further, because the Court has imposed limits on each side's total trial time, counsel already has an incentive (beyond keeping the jury's attention) to curtail duplicative testimony.


• **Plaintiff's Motion to Exclude Evidence Regarding Expert David Kahane's Wife – GRANTED.[61]**

*Welding Fume* plaintiffs frequently call David Kahane as an expert witness on industrial hygiene.  Mr. Kahane founded a company called Forensic Analytical, and Mr. Kahane's wife, Michelle, was an employee.  Several years ago, Mrs. Kahane was slated to offer forensic testimony in connection with a California state court criminal case, known as *Singh*, but she removed herself as a witness after questions arose regarding her qualifications.  Plaintiffs have sought to exclude as irrelevant any evidence regarding Mrs. Kahane's removal from *Singh* or the reasons therefor.  The Court has granted this motion, which defendants normally have not opposed.

---

[61] *See Byers* pretrial tr. at 154-56 (Oct. 22, 2008).

•    **Plaintiff's Motion to Bar Testimony that Manganese in Welding Fume Cannot Reach the Brain, and Testimony that Manganese in Welding Fume Cannot Cause Injury to the Brain – GRANTED IN PART.**

The defendants' position regarding general causation has evolved during the course of this MDL.  Initially, defendants took the position that exposure to welding fumes simply could not cause neurological injury.  In particular, in their initial "Scientific & Technical Presentation" to the Court, defendants asserted that: (1) manganese particles in welding fumes have extremely low solubility and so are not bio-available to cells in the human body; (2) the body's normal defense mechanisms quickly isolate and excrete virtually all of the manganese particles in welding fumes that a welder might ingest; and (3) any manganese particles in welding fumes that do enter the blood stream never cross the "blood-brain barrier," and so cannot cause neurological injury.[62]

Later, in response to plaintiffs' request for admission that "overexposure to manganese in welding fumes can affect the central nervous system and can cause symptoms similar to Parkinson's Disease," defendants stated:

> It is possible that sustained exposure to manganese in welding fume in quantities far in excess of OSHA's PEL and the ACGIH's TLV could affect the central nervous system and thereby could cause a movement disorder known as manganism, a form of parkinsonism that can be distinguished clinically, radiologically, pharmacologically and pathologically from Parkinson's disease and other movement disorders.  * * *  Whether this occurs, and at what exposure level, has not been established by reliable scientific evidence.[63]

While admitting that neurological injury from welding fume exposure was "possible," defendants

---

[62]    These assertions were made by defense expert toxicologist Dr. Ken Reuhl in a video "science tutorial" presentation created by defendants for the Court submitted on December 22, 2003.

[63]    *See Solis* pretrial tr. at 134-44, 192 (May 15 & 16, 2006) (discussing this admission).

still disagreed with plaintiffs whether, and the extent to which, it ever actually did so.[64]

During the course of subsequent litigation, moreover, defendants' own expert neurologists explicitly conceded that manganese particles in welding fumes *are* bio-available, *do* enter the blood stream, and *can* cross the blood-brain barrier.  Further, these experts conceded that welders *can* get Manganese-Induced Parkinsonism from welding fume exposure.[65]

Defendants currently take the position that, although welding fume exposure can cause a welder to suffer neurological injury in the most egregious of circumstances (e.g., if a welder suffers extremely high exposure to high-manganese fumes in enclosed areas for a prolonged period of time), those circumstances are so rare that it virtually never happens.  This position is not strictly at odds

---

[64] *Id.*; *see also Goforth* pretrial tr. at 24 (Oct. 25, 2006):

| The Court: | But we all agree [that manganese in welding fumes] gets in the blood, it can cross the blood-brain barrier, and your primary debate from the defendants' side is – |
| [Plaintiff's Counsel]: | How much. |
| The Court: | – under what circumstances that can happen, and to what extent that can happen? |
| [Defense Counsel]: | Yeah. |

[65] These concessions were made by defense expert neurologists Dr. Warren Olanow and Dr. Anthony Lang during *Daubert* hearings and bellwether trials.  *See, e.g., Tamraz* trial tr. at 498 (Nov. 5, 2007) (video clip of testimony by Dr. Lang):

| "Question: | You believe that welders can get Manganese Induced Parkinsonism from welding fumes? |
| "Answer: | Yes. |
| "Question: | That has been proven to your satisfaction in the literature? |
| "Answer: | Yes.  I think there are enough patients with features that are sufficiently convincing that I believe that, yes." |

*See also Solis* trial tr. at 3021-22 (same); core expert decl. of Karl Kieburtz at 6 ("it is biologically plausible that exposure to certain welding fumes, and hence manganese could possibly lead to [a parkinsonian neurological] syndrome") (master docket no. 1601, exh. A); Gordon Sze depo. at 283 (agreeing that "it is reasonable to conclude that manganese accumulates in the brain from exposure to welding fume") (Mar. 4, 2005); *Jowers* trial tr. at 619-20 (Feb. 11, 2008) (defense expert neurologist Dr. Howard Hurtig agreeing that "manganese from welding fume accumulates, can accumulate in the part of the brain that controls movement" and "can cause Manganese-Induced Parkinsonism").

with defendants' experts' concessions that manganese in welding fume can reach the brain and can cause brain injury.

In any event, given the admissions quoted above and the concessions that defendants' experts have made at trial, this motion in limine must be granted in large part.  While defendants may continue to argue that welding fume exposure can cause a welder to suffer neurological injury only in rare and severe circumstances, they may not argue that welding fume exposure cannot cause neurological injury under any circumstances.  This ruling does not, however, preclude a defense expert from opining he still believes it has not been proved to his own satisfaction that welding fumes can cause neurological injury – that is, he may disagree with multiple other defense experts on this point.[66]

• **Plaintiff's Motion to Exclude Certain Testimony Regarding the "Taiwanese Cohort" – GRANTED IN PART.[67]**

A number of the many medical articles relied upon by the parties' experts at trial address what is known as the "Taiwanese Cohort," a group of Taiwanese workers who were exposed to high levels of manganese in a smelting plant.  Several of these workers suffered severe cases of manganism, and several articles have been published that follow the progression of their disease.

---

[66] In other words, despite the admissions of defendants' experts that manganese in welding fume can cause neurological injury, a particular expert may maintain an opinion otherwise.  As the Court explained regarding defense toxicology expert Dr. Furbee: "regarding Dr. Furbee's opinion that it has not been proved that welding fumes can cause neurological injury: Dr. Furbee may testify he does not believe this is proved based on his review of the literature; however, he may not testify that he has personally concluded there is no connection between welding fume exposure and neurological injury, as he has not done any independent toxico-neurological studies."  *Byers v. Lincoln Elec. Co*., 2008 WL 4849339 at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

[67] *See Byers v. Lincoln Elec. Co*., 2008 WL 4849339 at *4 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

42

Some of defendants' witnesses have sought to express opinions that: (a) there have been no additional manganism cases arising from the Taiwan smelting plant since the time the original "Taiwanese Cohort" was discovered in 1980; and (b) the asymptomatic workers discussed in Dr. Kim's 1999 article about the Taiwanese smelting plant remain asymptomatic today.  The Court has ruled, however, that a defense expert is permitted to opine only that: (1) no additional cases of manganism arising from the Taiwan smelting plant were ever *reported*, and (2) if additional cases had occurred, he believes they probably would have been reported.

- **Plaintiff's Motion to Prohibit Use of His Video Deposition to Show His Movement Disorder – GRANTED IN PART.[68]**

In every *Welding Fume* bellwether case so far, the plaintiff has agreed to undergo a physical examination by a medical expert hired by defendants – defendants have never had reason to file a motion for Order permitting a physical examination pursuant to Fed. R. Civ. P. 35.  The Court has not seen the agreements between the parties regarding these medical examinations, but the parties have explained that one of the provisions in their recent agreements is that the medical examination will not be videotaped.[69]  In contrast, the plaintiff's discovery deposition often is videotaped.

Each plaintiff has moved to preclude the defendants from using his deposition videotape during trial as demonstrative evidence to show the jury details of his movement disorder, such as presence or absence or type of hand tremor.  Plaintiffs assert that such use of the deposition videotape would be antithetical to the parties' Rule 35 agreement.  Defendants respond that, when

---

[68] *See Byers* pretrial tr. at 49-51 (Oct. 22, 2008); *Jowers* pretrial tr. at 91-103 (Jan. 23, 2008); *Tamraz* pretrial tr. at 133-35 (Nov. 1, 2007).

[69] This agreement is based in part on the Court's informal statement to the parties that, if asked, the Court was not inclined to allow videotaping of an independent medical examination unless it was normal procedure for the examining doctor to do so.

relevant, video depositions are normally allowed to show explanatory gestures, body language, and so on, and they should be allowed to use the videotape in this way; however, defendants do not answer directly the contention that this use of the deposition videotape is contrary to the parties' agreement.

The Court has ruled that defendants may show the jury excerpts of the plaintiff's videotaped deposition only under limited circumstances.  For example, defendants may show video-clips on cross-examination to rebut or impeach the plaintiff and his medical witnesses regarding descriptions of the plaintiff's symptoms.  Defendants may also use such video-clips on direct examination of their own expert medical witnesses, but must: (1) designate those portions before trial, so that the Court and plaintiffs' experts can be aware of the intended scope of such use (which defendants have stated would be limited); and (2) request permission at side-bar to use a video-clip before actually doing so.  The Court reserves the right to rule on defendants' use of these video-clips on an instance-by-instance basis.

Separately, plaintiffs have moved to preclude defendants' witnesses from testifying that refusing to be videotaped can be a clue that the patient is feigning his illness, or suggesting that the plaintiff "refused" to allow videotaping of his examination.  Given that the parties have *agreed* that the plaintiff's medical examinations will not be videotaped, this motion is granted.

- **Plaintiff's Motion to Exclude any Reference to the Danish and Swedish Studies – DENIED.**
- **Plaintiff's Motion to Exclude Hearsay Connected to the Danish and Swedish Studies – GRANTED.**[70]

Since the beginning of this MDL, the Court has repeatedly addressed a number of issues related to two epidemiological studies known as the Danish and Swedish Studies.[71]  Defendants provided funding for both studies, and both studies concluded there was no link between welding and parkinsonism.  Recitation of the full and complicated background of the issues related to the Danish and Swedish Studies is beyond the scope of this Order; it suffices to say there were discovery issues related to the two Studies serious enough to give the Court reason to exclude any reference to them at any MDL trial.  Rather than exclude them (as it could have), however, the Court concluded the Studies would be admissible and reference to them by defendants allowed, but that plaintiffs would have "free rein on cross examination," including leeway to ask about a long series of issues that went to the credibility of those studies.[72]  Since the time the Court issued this

---

[70]  *See Byers* pretrial tr. at 198-208 (Oct. 22, 2008); *Byers v. Lincoln Elec. Co*., 2008 WL 4849339 at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313); *Jowers* pretrial tr. at 105 (Jan. 23, 2008); *Tamraz* pretrial tr. at 147-60 (Nov. 1, 2007); *Goforth* pretrial tr. at 158-60 (Oct. 25, 2006); *Goforth* pretrial tr. at 182-218 (Oct. 30, 2006); *Goforth* trial tr. at 222-230 (Oct. 31, 2006).

[71]  The Court and the parties have referred to these studies by various names, including the "Fryzek Studies," the "Scandinavian Studies," the "Swedish Study," and the "Danish Study."  The two studies are: (1) Jon Fryzek, *et al., A Cohort Study of Parkinson's Disease and other Neurodegenerative Disorders*, 47(5) J. of Occupational & Environmental Medicine 466 (2005) (the "Danish Study"); and (2) C. Fored, *et al., Parkinson's Disease and Other Basal Ganglia or Movement Disorders in a Large Nationwide Cohort of Swedish Welders*, 63 J. of Occupational & Environmental Medicine (2006) (the "Swedish Study").

Evidentiary and discovery issues related to the Scandinavian studies have received extensive attention from the Court, during multiple proceedings over the course of several years.  Perhaps more than with any other issue addressed in this Order, the summary here regarding admissibility of evidence related to the Scandinavian studies cannot be fully understood absent review of the many actual, full rulings, themselves.

[72]  *See Goforth* trial tr. at 223-25 (Oct. 31, 2006).

45

admissibility ruling, the ruling has applied (and will continue to apply) to every MDL case.

Later, defendants supplied some of their experts with various materials that, essentially, were meant to rehabilitate the studies.  For example, one of the issues about which plaintiffs were allowed to inquire on cross-examination was possible incomplete data and coding errors.  After the Court's ruling allowing this cross-examination, counsel for defendants obtained declarations and emails from the studies' authors attesting that any coding errors had been corrected; counsel then supplied this information to their experts in preparation for a subsequent trial.  Plaintiffs moved to exclude any reference to these "rehabilitation materials" (which filled three binders), arguing all of it was hearsay and was not the sort of information upon which an expert would normally rely.  The Court ultimately agreed with plaintiffs – an expert neurologist relying upon a published epidemiological study would not normally also rely upon, for example, an email from the study's author to an attorney, sent well after the publication date, explaining that coding errors in the study had been corrected.  The Court noted, moreover, that plaintiffs had sought this information repeatedly, but defendants never produced it until their belated effort at rehabilitation.  Accordingly, the Court excluded all of this evidence.

- **Defendants' Motion to Exclude Evidence Related to Dr. Bowler's Studies or Opinions – GRANTED IN PART.**

During the early discovery phase of the MDL, the Court ruled that any expert called to testify by a party was required to produce data that the expert had obtained in connection with any welding-fume-related medical or scientific study the expert was conducting.  Plaintiffs had retained Dr. Rosemary Bowler as an expert in neuropsychology, and Dr. Bowler was in the process of conducting a study of welders.  Dr. Bowler refused to produce the study data in discovery, however, so plaintiffs

46

agreed not to use her as an expert or refer to the studies she performed during her retention.[73]  The Court has enforced this agreement.

Notably, however, this agreement pertained only to studies Dr. Bowler pursued during her retention by plaintiffs.  Nothing precludes reference by the parties to any studies Dr. Bowler conducted after her association with the plaintiffs ended.  Thus, despite their own motion seeking to exclude reference to Dr. Bowler's earlier studies, defendants have referred at trial to subsequent studies published by Dr. Bowler.  Of course, this opens the door to plaintiffs' reference to those same studies, and defendants are also allowed to note that Dr. Bowler had earlier been retained as an expert by plaintiffs.[74]

- **Plaintiff's Motion to Exclude Evidence of "Incorrect" Diagnoses of MIP by Dr. Nausieda – GRANTED IN PART.[75]**

Dr. Paul Nausieda is one of plaintiffs' expert neurologists, who is also a treating physician.  Plaintiffs hired Dr. Nausieda early during the course of this MDL to screen welders for manganese-induced parkinsonism ("MIP"), so he has examined thousands of welders, and he has formally diagnosed a large number of them with MIP.  One way that defendants have sought to attack Dr. Nausieda's credibility is to identify instances where he diagnosed a welder with MIP but was subsequently proved wrong.  Specifically, defendants have proffered testimony from Dr. Daniel Perl, who is a neuropathologist, regarding the autopsy results of four patients whom Dr. Nausieda

---

[73]  *See Ruth* pretrial tr. at 10, 95 (Aug. 30, 2005); *Goforth* trial tr. at 817, 832-35, 934-40 (Nov. 2, 2006).

[74]  *See Jowers* trial tr. at 1724-26, 1740, 1748 (Feb. 20, 2008); *Byers* trial tr. at 918-19, 928-30, 944, 1052 (Nov. 6, 2008).

[75]  *See Byers* pretrial tr. at 290-312 (Oct. 23, 2008); *Tamraz* pretrial tr. at 145-46 (Nov. 1, 2007).

diagnosed with MIP; Dr. Perl asserts the pathological examination of the brain tissue from these patients confirm they suffered from other forms of parkinsonism and *not* MIP.  As have many of the neurologists who have testified before the Court, Dr. Nausieda agrees that pathological examination is generally the "gold standard" for diagnosing which form of parkinsonism a patient suffered; clinical examination is normally considered less accurate.[76]

The four Nausieda patients at issue are known as Bollato, Edwin, Patricia, and Bassham (a/k/a the "Prion Case").  Plaintiffs have argued Dr. Perl's testimony regarding these patients should not be admitted because it is based on inadmissible hearsay, is not accurate, and is not relevant.  For example, plaintiffs note that Dr. Perl did not, himself, perform a neuropathological examination of Edwin, Bassham, or Patricia, nor did he, himself, view their brain tissue slides.  Rather, Dr. Perl: (1) merely read the report of another neuropathologist regarding Edwin, which concluded the patient suffered a neurogenic disease known as MSA; (2) read a worker's compensation order connected to Bassham, which supposedly suggested Dr. Nausieda admitted his patient suffered from Prion's Disease and not MIP; and (3) read the report of another neuropathologist regarding Patricia, which *agreed* with Dr. Nausieda's diagnosis of MIP, but Dr. Perl believes the other doctor's examination was incomplete and incorrect.  Even as to Bollato, upon whom Dr. Perl did perform a neuropathological exam, plaintiffs have argued Dr. Perl's opinion is ultimately not relevant to whether the *Welding Fume* plaintiff at issue has MIP.

The Court ultimately found that neuropathological evidence regarding the type of disease

---

[76] *See Daubert* hearing tr. at 43, 50 (Apr. 19, 2005); *Byers* pretrial tr. at 296 (Oct. 23, 2008). While it is generally true that pathological examination at autopsy of a patient's brain tissue is considered the "gold standard" for diagnosing the form of parkinsonism from which the patient suffered, this assertion is not unassailable.  *See* Ryan Uitti, *et al., Is the Neuropathological 'Gold Standard' Diagnosis Dead?  Implications of Clinicopathological Findings in an Autosomal Dominant Neurodegenerative Disorder*, in 10 PARKINSONISM & RELATED DISORDERS 461, 462 (2004).

suffered by patients diagnosed by Dr. Nausieda as having MIP is relevant and admissible, but that Dr. Perl could not offer pure litigation-related opinions based on hearsay pathology reports. Specifically, the Court concluded that: (1) Dr. Perl could testify regarding his own neuropathology findings on Bollato; (2) defendants could question Dr. Nausieda about whether he believed he had mis-diagnosed the Prion case, and could introduce documents connected with the worker's compensation case through Dr. Perl to support a mis-diagnosis argument, if Dr. Nausieda denied it; and (3) Dr. Perl could not testify about the hearsay neuropathology reports of Edwin or Patricia. The Court also concluded that defendants could ask Dr. Nausieda about a supposed admission that he had mis-diagnosed Edwin.[77]

As the parties obtain new evidence of additional autopsies performed upon Dr. Nausieda's patients, the Court will apply the same general rules regarding admissibility.

•    **Defendants' Motion to Exclude Reference to Dr. Lang's Diagnoses of Other MDL Plaintiffs – GRANTED.[78]**

Defendants have employed Dr. Anthony Lang as an expert neurologist in four *Welding Fume* bellwether cases so far: *Morgan*, *Solis*, *Tamraz*, and *Byers*.  In all but *Tamraz*, Dr. Lang diagnosed the plaintiff with psychogenic tremor, which Dr. Lang, himself, describes as a rare condition.[79]

_____

[77]  *See also Byers* trial tr. at 2969-72 (Nov. 19, 2008) (the Court suggesting stipulations regarding Dr. Perl's testimony on this issue).

[78]  *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

[79]  *See Solis* trial tr. at 3007, 3070 (June 19, 2006); *Byers* trial tr. at 2601 (Nov. 8, 2008). Other experts also characterize psychogenic tremor as rare.  *See Goforth* trial tr. at 2058 (Nov. 9, 2006) (Dr. Swash testifying that psychogenic parkinsonism is "a very rare condition"; *Solis* trial tr. at 1320 (June 8, 2006) (Dr. Louis testifying that one in a thousand patients might have psychogenic parkinsonism).

49

Defendants have moved to exclude the fact that Dr. Lang has diagnosed other *Welding Fume* plaintiffs with psychogenic tremor for the purpose of suggesting that he "over-diagnoses" this condition. Defendants assert that, if this evidence is allowed, it would make for several trials-within-a-trial, as defendants would be entitled to introduce rebuttal evidence showing the bases for all of Dr. Lang's diagnoses of psychogenicity.

The Court has granted this motion. This ruling, of course, is in contrast to the ruling described immediately above, which allows defendants to attack plaintiff's expert Dr. Nausieda's diagnoses of MIP. The critical difference is that the information used by defendants to attack Dr. Nausieda's diagnoses include his own admissions and also the relatively objective information obtained through neuropathological examination; in contrast, plaintiffs' attacks on Dr. Lang's diagnoses rely solely on the rarity of psychogenicity and his apparent post-retention penchant for diagnosing it. The Court has noted, however, that its ruling regarding the admissibility of Dr. Lang's other diagnoses was made "at this precise juncture" – the Court explained that, while "the number of [Dr. Lang's] other diagnoses of psychogenic parkinsonism does not provide a sufficient basis to show bias" at this time, this factor "may change in the future."[80]

- **Plaintiffs' Motion to Exclude Evidence Tendered by Defense Expert Mr. Chute – GRANTED IN PART.**
- **Plaintiffs' Motion to Exclude Testimony from Plaintiffs' Expert Mr. Ewing –**

---

[80]  *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313). In other words, the fact that Dr. Lang diagnosed three out of four welders with psychogenic parkinsonism is not sufficiently probative; if he later reaches the same diagnosis for, say, 9 out of 10 welders, the probative value may change.

Separately, the Court ruled that plaintiffs may not cross-examine Dr. Lang with a statement he made to plaintiff Tamraz suggesting Tamraz should consult with a movement disorder specialist unaffiliated with the *Welding Fume* litigation. *Byers* trial tr. at 2698-700 (Nov. 18, 2008).

**DENIED.**[81]

The first MDL bellwether case involved plaintiff Charles Ruth. Defendants and plaintiffs each retained an expert industrial hygienist in *Ruth*, and each expert issued a report offering an opinion regarding whether Ruth had ever suffered welding fume exposures above the ACGIH's TLV of 0.2 mg/m$^3$. Defendants' expert, Daniel Chute, opined that Ruth's exposures, on average, did not exceed the TLV.[82] In contrast, plaintiffs' core expert, Charles Ewing, wrote that a welding fume survey performed at Ruth's place of employment revealed that Ruth likely suffered exposures in excess of both the TLV and OSHA's PEL.[83]

Ruth's case was settled before trial, but evidence regarding his diagnosis and exposures often continues to come up in other *Welding Fume* trials. Even before his case settled, Ruth was made the subject of a medical article: Ahmed Sadek, *et al., "Parkinsonism Due to Manganism in a Welder,"* 22 Int. J. Toxicol., 393, 393 (2003). During the subsequent MDL welding fume trial of *Tamraz*, defendants' expert neurologist, Dr. Anthony Lang, was asked in deposition by plaintiff's counsel: "Do you believe the Sadek report to be a credible and reliable case report of a welder who developed Manganese-Induced Parkinsonism?" Dr. Lang responded: "Yes. I believe that this is a credible example of the case of Manganese-Induced Parkinsonism."[84] Because this statement is an admission of one of defendants' experts that a welder can contract MIP, even after suffering

---

[81] *See Byers v. Lincoln Elec. Co*., 2008 WL 4849339 at *4 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).; *Tamraz* trial tr. at 1344-49 (Nov. 9, 2007).

[82] *See Jowers* trial tr. at 1783-84 (Feb. 20, 2008) (Chute wrote that Ruth's "maximum average exposure would not have exceeded 0.1 mg/m$^3$").

[83] *See Byers* trial tr. at 1322-29 (Nov. 10, 2008) (Ewing wrote that "the range of exposures to manganese in these welders was from 0.22 - 5.3 mg/m$^3$, calculated as an eight hour time-weighted average").

[84] *See Jowers* trial tr. at 625-26 (Feb. 11, 2008).

relatively low manganese fume exposures, plaintiffs use Dr. Lang's statement to cross-examine other defense witnesses who assert this circumstance cannot happen.

Defendants have sought to counter plaintiffs' use of Dr. Lang's statement by introducing: (1) statements from plaintiff-expert Ewing's report that Ruth's exposures were high; (2) statements from defense-expert Chute's report explaining the assumptions underlying the conclusion that Ruth's exposures did not exceed the TLV; (3) statements from defense-expert Chute's deposition explaining these same assumptions; and (4) statements made by Ruth in deposition regarding his exposures.  Plaintiffs have objected to the use of this evidence to explain and allegedly weaken the conclusion that defendants' own expert, Chute, reached in *Ruth*.

The Court ruled that those portions of Chute's expert report that outline the assumptions he made in reaching his conclusions about Ruth's exposures are admissible under the rule of completeness. The proposed portions of Chute's deposition transcript are not admissible, however, as the rule of completeness does not apply to statements offered to contradict or expand upon those appearing in the report, and the deposition statements are otherwise hearsay.  The same is even more true regarding statements contained in Ruth's own deposition transcript, as they cannot possibly "complete" Chute's opinions.  Finally, the statements contained in Ewing's report on Ruth is admissible against plaintiffs as an admission, as he is one of plaintiffs' core experts.

- **Plaintiff's Motion to Exclude Irrelevant Evidence Related to the Government Contractor Defense – GRANTED.**

In cases where none of the plaintiff's employers were government contractors, the plaintiff always moves for exclusion of any evidence related solely to the government contractor defense. These motions are always granted as unopposed.

• **Motions to Exclude Case-Specific Testimony from Core Experts – GRANTED.**

Both plaintiffs and defendants designated a number of "core experts" whom they might call as witnesses in any MDL trial "to offer testimony that is generally applicable in support of [the party's] position in more than one of the [MDL cases]."[85]  The Court has ruled that, unless a core expert timely provides a supplemental, *case-specific* expert report, his admissible opinions are limited to those stated in his *core* expert report – he may not offer plaintiff-specific opinions.  This rule extends to preclude a core expert from offering an opinion about a "hypothetical patient" who has the same symptoms or test results as the plaintiff.[86]  This rule does not, however, foreclose defendants from cross-examining a plaintiff's core expert with case-specific questions (that is, challenging whether the plaintiff's core expert's general opinion applies to the particular circumstances of plaintiff's case).

• **Motions to Exclude Cross-Examination of Experts with Statements Made by Other Experts – DENIED in part.**
• **Motions to Exclude Hearsay Statements of Experts – GRANTED.**

Plaintiffs and defendants have both moved to exclude the other side's use of statements made by an expert to cross-examine another expert.  For example, plaintiffs have moved for an order prohibiting defendants from cross-examining a plaintiff's expert witness with contradictory statements made by other plaintiff's expert witnesses.  The Court's rulings on these motions are informed by whether the statements at issue qualify as an admission by a party or his agent.  Thus, the Court has ruled that, as a general matter, a defendant may cross-examine a plaintiff's expert

---

[85]  Case Management Order at 29, 30 (Dec. 9, 2003) (master docket no. 63).

[86]  *See Jowers* trial tr. at 469-72 (Feb. 8, 2008); *id.* at 2155-58 (Feb. 22, 2008); *id.* at 2380-82 (Feb. 25, 2008).

53

witness with contradictory statements made by: (1) that plaintiff's own, *case-specific* experts; and (2) any of the plaintiffs' *core* experts, even if the core expert is not a trial witness.  A defendant may *not*, however, cross-examine a particular plaintiff's expert witness with statements made by some *other Welding Fume* plaintiff's *case-specific* witness.[87]

Similarly, the Court has ruled that, as a general matter, a plaintiff may cross-examine a defense expert witness with contradictory statements made by: (1) the defendants' own, *case-specific* experts; (2) any of the defendants' *core* experts, even if the core expert is not a trial witness; and (3) defendants' *case-specific* experts from any other *Welding Fume* case.[88]

A related issue is that plaintiffs have moved to preclude defendants from introducing statements made by the defendants' own experts in other trials, if the expert is not being called in the plaintiff's specific case – arguing such statements are hearsay.  For example, defendants did not call their expert neurologist Dr. Lang to testify in the bellwether trial of *Jowers*, but sought to introduce videotaped testimony he had given earlier in another *Welding Fume* trial.  Defendants

---

[87] Stated differently: defendants may cross-examine plaintiff A's experts with contradictory statements made by plaintiff A's other case-specific experts and also any of plaintiffs core experts, but not with statements made by plaintiff B's case-specific experts.  The latter statements do not qualify as admissions by plaintiff A or his agents, while the other statements do.

[88] Stated differently: a plaintiff may cross-examine any defense expert with contradictory statements made by any other defense expert in any *Welding Fume* case, as all such statements qualify as admissions by defendants or their agents.

Defendants are treated differently from plaintiffs with respect to use of contradictory statements from case-specific experts for two related reasons.  First, while the plaintiff is always different from one case to the next, at least some of the defendants remain the same.  For example, Lincoln has been a defendant in all five MDL bellwether trials, and ESAB and Hobart have been defendants in four of the five.  Second, the defendants have entered into a Joint Defense Agreement which contains judgment sharing provisions.  *See Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 at *24-25 (N.D. Ohio July 18, 2008) (appeal pending) (discussing these provisions).  Thus, a case-specific expert of defendants, acting as defendants' collectively-retained agent in one trial, remains the defendants' agent in subsequent trials.  In contrast, the fact that a plaintiff in one case retains a case-specific expert provides no basis, without more, for deeming that expert as an agent for any other plaintiff.

54

sought to introduce this statement to explain an admission Dr. Lang made, which plaintiff Jowers had introduced pursuant to the rules set out in the paragraph above.  The Court sustained plaintiff's objection, as Dr. Lang's statement from the earlier trial was hearsay.[89]  The only exception to this rule is when the defense expert's statement must be admitted under the doctrine of completeness.[90]

•       **Defendants' Motion to Exclude Evidence Regarding Preparation of Expert Reports – GRANTED.**

Early in the history of this MDL, the parties agreed that "neither side will be obligated to produce communications between attorneys and any expert with regard to the drafting of the expert['s] reports including but not limited to any drafts of the report."  In practice, both sides have avoided seeking discovery of draft reports, or asking experts during deposition about how they prepared their reports.  Plaintiffs strayed from the parties' agreement during the *Jowers* trial, but agree the motion is well-taken.

---

[89]   *See Jowers* trial tr. at 1818-20 (Feb. 20, 2008).  The general contours of this ruling excluding hearsay statements of experts applies equally, of course, to both plaintiffs and defendants.

[90]  Federal Rule of Evidence 106 states that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  The Court construes this rule narrowly, however: statements made by Dr. Lang *immediately surrounding his admission* may be admissible to give it context; but statements made by Dr. Lang at entirely other times are not admissible under the rule of completeness.  *See Byers* pretrial tr. at 59-65 (Oct. 22, 2008).

•　　　**Defendants' Motion to Exclude Documents Relating to Welding Rod Companies Who are Not Named Defendants, and to "Historical Documents" – DENIED.**[91]

In the MDL bellwether trial of *Ruth*, the Court issued a written opinion ("*Ruth Document Order*") addressing the admissibility of a number of documents authored or produced in discovery by entities that were associated with the welding rod industry but were not defendants at trial.[92] These entities included, for example: (1) trade organizations, such as the American Welding Society ("AWS") and the National Electrical Manufacturers Association "(NEMA"); and (2) manufacturers of welding rods whose products the plaintiff had never used.

In its *Ruth Document Order*, the Court outlined its reasoning for different categories of documents, listing the various factors it considered when determining relevance and admissibility. The Court also included a chart listing about 50 specific documents and an admissibility ruling for each.  Subsequently, the Court and the Special Master applied the reasoning in the *Ruth Document Order* to rule on the admissibility of dozens, if not hundreds, of additional, individual documents that fell into the same categories.

One category addressed in the *Ruth Document Order* was documents authored by non-party manufacturers, including certain documents that were purely internal materials (such as an intra-company memorandum).  The Court concluded that some of these documents were admissible, stating as follows:

> [W]hen reviewing the documents [at issue] for relevance and admissibility – especially documents authored by industry participants who are not now (or never were) defendants in this case – the Court was guided by several other cases,

---

[91] *See Byers* pretrial tr. at 246-47 (Oct. 22, 2008); *Jowers* pretrial tr. at 35-36 (Jan. 23, 2008); *Tamraz* pretrial tr. at 22-23 (Nov. 1, 2007); *Goforth* pretrial tr. at 106 (Oct. 25, 2006).

[92] *Ruth v. A.O. Smith Corp.*, 2005 WL 6293396 (N.D. Ohio Aug. 13, 2005) (*Ruth* docket no. 172).

56

including: *Gonzalez v. Digital Equipment Corp.*, 8 F.Supp.2d 194 (E.D.N.Y. 1998); *Dartez v. Fibreboard Corp*, 765 F.2d 456 (5th Cir. 1985); and *Borel v. Fiberboard Paper Prods. Corp.*, 493 F.2d 1076 (6th Cir. 1973).  Generally, these cases explain that documents produced by non-party manufacturers may be relevant in a case against a defendant manufacturer in the same industry, even if the documents are purely internal materials.  The reason is that these documents may support an inference that, given the state of the art, defendant-members of the industry had, or should have had (given their duty to have the knowledge and skill of an expert), the same "state of mind" with respect to possible damage to users of their product, and/or the adequacy of warnings in connection with such dangers.[93]

In other words, evidence regarding a *non-party* manufacturer's knowledge of: (a) risks posed by its product, (b) the efficacy of its warnings, and (c) the level of knowledge of learned intermediaries, may be relevant to the *defendant* manufacturer's knowledge on those issues, as well. On the other hand, an internal document of a non-party that does not add anything of evidentiary value regarding the state of industry knowledge, and is relevant only to internal thought processes or individual "bad intentions," generally will not be admissible.[94]

In every subsequent MDL bellwether trial, the defendants have filed at least one motion in limine asking the Court to reassess this particular aspect of the rulings memorialized in the *Ruth Document Order*.  The Court has overruled each such motion, and has only become more certain with each trial that the documents at issue are, in fact, highly relevant and admissible.  This Order makes clear that the reasoning and result of the entire *Ruth Document Order* are hereby incorporated

---

[93]  *Ruth v. A.O. Smith Corp.*, 2005 WL 6293396 at *2 (N.D. Ohio Aug. 13, 2005) (*Ruth* docket no. 172).

[94]  The Court added that, even though the *Ruth* plaintiffs had brought a claim of conspiracy against some of the entities that had authored the documents at issue, the Court was *not* basing its admissibility rulings in any way on Fed. R. Evid. 801(d)(2)(E).  *Id.* at *2 n.3; *see also Jowers* pretrial tr. at 35-36 (Jan. 23, 2008) (same); *Tamraz* pretrial tr. at 22-23 (Nov. 1, 2007) (same); *Ruth* pretrial tr. at 56-61 (Aug. 8, 2005) (granting summary judgment to defendants on plaintiff's conspiracy claim and then addressing admissibility of documents).

into this Order by reference, and apply to all MDL cases.[95]


• **Defendants' Motion to Exclude Documents Pre-Dating Plaintiff's First Use of Welding Rods – DENIED.[96]**

Defendants have moved for exclusion of all documents created before the plaintiff's first use of welding rods, arguing that, since the manufacturers were all providing warnings and/or MSDSs by the time the plaintiff started welding, any evidence going to circumstances before that has no bearing on the plaintiff's claims.[97]  Defendants have also argued that, even if this "old document" evidence is somehow relevant, it should be excluded under Rule 403.  The Court has denied this motion, concluding these documents are relevant and admissible because they tend to show one of the following facts at issue: (1) whether one of the defendants believed that manganese in welding fumes can cause neurological injury; (2) the extent of involvement by industry participants in setting or creating the fume standards adopted by OSHA and ANSI, upon which defendants rely heavily; (3) whether employers may have received less information than was available to the manufacturing defendants, or received misleading information, which goes to the learned intermediary defense; (4) whether one of the defendants acted with the requisite *mens rea* to support punitive damages; (5) the state of industry knowledge regarding the risks of manganese in welding fume; and (6) the state

---

[95] Thus, the defendants should not file motions in limine, for the purpose of protecting their appellate rights, directed either at *categories* of documents (e.g., documents authored by manufacturers who are not defendants at trial) or *specific* documents (e.g., the "Richard LaFave email," see *Jowers* pretrial tr. at 38-39 (Jan. 23, 2008)), upon which the Court already ruled in the *Ruth Document Order* or during subsequent hearings and trials.

[96] *See Byers* pretrial tr. at 250 (Oct. 22, 2008); *Jowers* pretrial tr. at 47-53 (Jan. 23, 2008); *Tamraz* pretrial tr. at 16-18 (Nov. 1, 2007).

[97] Defendants provided their first warning in 1967 and their first MSDS in 1985. Defendants filed their first such motion in a case where the plaintiff began welding in 1978.

of industry knowledge regarding the efficacy of existing warnings and historical warnings.[98]

• **Plaintiff's Motion to Exclude Testimony Related to the Origin of Document MDL-LI-00345576-608, and Defendants' Cross-Motion to Exclude the Document – BOTH DENIED.[99]**

The document in question is a PowerPoint presentation titled "Welding Fume Extraction – July 2004," and is also referred to by the alternative title, "What is Welding Fume?"  The document contains language that is clearly relevant to the issues in a *Welding Fume* case.  The logo of defendant Lincoln appears on every page, and two Lincoln employees are listed on the last page as references for more information.  Lincoln produced the document during discovery.

Defendant Lincoln has asserted this document was actually created by an employee of a different company – Brad Pritzl of Euromate, which supplies fume removal equipment – without Lincoln's knowledge or permission.  Defendants argue, accordingly, that the document is irrelevant and should be excluded.  Plaintiffs argue it is clearly relevant and further move to preclude Lincoln from disclaiming authorship, asserting any such contention would be hearsay.  Neither of these positions is well-taken.  Whether Lincoln authored or ratified the document is an issue of disputed fact; a jury could certainly conclude it is a Lincoln document and contains Lincoln admissions.  Further, Lincoln witnesses may present an explanation or disavowal without referring to hearsay statements by others.  Accordingly, both parties' motions are denied.

---

[98] On a related note, after defense counsel stated, in a *Welding Fume* trial, that defendants have "warned for over 40 years, before the law required it," plaintiffs filed a motion asking the Court to disallow this statement, because defendants have always had a duty to warn under common law.  The Court directed defendants to modify their statement to "before OSHA required it," as opposed to "before the law required it."  *Byers* pretrial tr. at 72-73, 158 (Oct. 22, 2008).

[99] *See Byers* pretrial tr. at 65-71 (Oct. 30, 2008); *Tamraz* pretrial tr. at 92-93 (Nov. 1, 2007).

- **Defendants' Motion to Exclude References to "Hardface Welding" in Cases Where Plaintiff Did not Engage in It – DENIED.[100]**

In the MDL bellwether trial of *Tamraz*, the plaintiff stated he had never engaged in "hardface welding," also known as "hardfacing" or "hardsurfacing."  Hardfacing involves addition of wear-resistant welding metal to the surface of a part that has worn down, such as the steel teeth on a steam shovel's bucket, to build the worn surface back up.  Often, hardfacing involves the use of high-manganese welding rods.  Defendants have argued that, since the plaintiff did not engage in hardfacing, documents referring to it should be excluded from trial.

The Court has denied this motion, stating that a pretrial, blanket ruling excluding such documents was not appropriate.  Some of the documents that discuss hardfacing address the hazards of manganese and welding fume generally, and thus remain relevant regarding defendants' knowledge.  For example, these documents may contain admissions that manganese in welding fumes can cause neurological injury; the fact that this admission is made in the context of hardfacing goes to weight, not admissibility.  Where appropriate, however, the Court will give (and, in fact, has given) a limiting instruction to the jury, if requested by the defendants.

- **Defendants' Motion to Exclude Evidence of Company Knowledge and Warnings Issued After Plaintiff's Last Exposure to Welding Fumes – DENIED.[101]**

Virtually every *Welding Fume* plaintiff will have stopped working as a welder by the time of trial.  Defendants have moved to exclude evidence that shows their own knowledge of the health effects of welding fumes after the time the welder-plaintiff stopped welding, including any warnings

---

[100]  *See Byers* pretrial tr. at 249 (Oct. 22, 2008); *Jowers* pretrial tr. at 37 (Jan. 23, 2008); *Tamraz* pretrial tr. at 18-20 (Nov. 1, 2007); *Solis* pretrial tr. at 61-73 (June 1, 2006).

[101]  *See Jowers* pretrial tr. at 11-14, 68-69 (Jan. 23, 2008); *Tamraz* pretrial tr. at 134-140 (Nov. 1, 2007).

60

defendants issued after that time.  Defendants argue that any information they obtained regarding the health effects of welding fumes after the plaintiff stopped welding is irrelevant, as it can have no bearing on what the defendants could have known to warn plaintiff about when he was welding.  Defendants also argue that later-issued warning labels must be excluded as subsequent remedial measures, pursuant to Fed. R. Evid. 407.

The Court denied this motion, stating again that a pretrial, blanket ruling excluding such documents was not appropriate.  Although many such documents may, in fact, not be admissible, some may be admissible for various reasons.  For example, in some MDL bellwether trials, certain defense witnesses have "opened the door" to admission of later-issued warning labels by suggesting it was not feasible to include a manganese-specific warning on a welding rod label; this made admissible in rebuttal the fact of a later-issued label that did include a manganese-specific warning.[102]  Similarly, assertions by defendants that exposure to welding fumes simply cannot cause a welder to suffer MIP may open the door to admission in rebuttal of statements in later-issued documents acknowledging that there is such a risk.  Thus, as with "hardfacing" documents, the admissibility of evidence showing defendants' knowledge of welding fume hazards after the time the plaintiff stopped welding will have to be on a document-by-document basis, depending on all of the evidence at trial.  Again, where appropriate, the Court will give a limiting instruction to the jury, if requested by the defendants.

---

[102] *See also Jowers* pretrial tr. at 11-14, 68-69 (Jan. 23, 2008) (noting that, if the Court did later admit certain warnings used by defendants after the plaintiff last welded, defendants were then allowed to assert that some of the language was included in the warnings only for litigation purposes); *Tamraz* pretrial tr. at 134-140 (Nov. 1, 2007) (same).

• **Defendants' Motion to Exclude Evidence of Lobbying Activities – DENIED.[103]**

At various times, defendants have urged the ACGIH, OSHA, and other entities not to lower the TLV exposure limit for manganese. Defendants have moved to exclude documents reflecting such lobbying activities, arguing it is constitutionally-protected speech and cannot be considered by a jury, even in part, as a basis for liability. Plaintiffs responded with case law standing for the proposition that, although "the *Noerr-Pennington* doctrine [holds] that lobbying alone cannot form the basis for liability, . . . such activity may [still] have some evidentiary value."[104]

The Court agreed with defendants' general contention that documents are not admissible only to show their lobbying efforts, which are constitutionally-protected activities. But the Court denied defendants' motion, ruling again that a pretrial, blanket ruling was not appropriate. To the contrary, the Court has since admitted several such documents over defendants' objection because, even though the document was arguably created for lobbying purposes, it also contains statements directly relevant to issues central to every *Welding Fume* case. For example, a document which unsuccessfully urged the ACGIH not to lower its manganese TLVs, and also asserted that many welders would be "overexposed" if the TLV was lowered, contains an admission; the fact that the document involved First Amendment lobbying activity does not immunize the communication from coming into evidence, and defendants cannot use the First Amendment as a shield to keep relevant evidence from a jury. Other, similar documents may be relevant to show defendants' knowledge

---

[103] *See Byers* pretrial tr. at 249-50 (Oct. 22, 2008); *Jowers* pretrial tr. at 37-38 (Jan. 23, 2008); *Tamraz* pretrial tr. at 20-22 (Nov. 1, 2007); *Solis* pretrial tr. at 33-60 (June 1, 2006); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *13 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[104] *Hamilton v. Accu-Tek*, 935 F. Supp 1307, 1327 (E.D.N.Y. 1996). *See also MCI v. AT&T*, 708 F.2d 1081, 1160 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983) ("[e]vidence of an activity that is protected by the *Noerr* doctrine may be admitted to show the purpose and character of other activities if doing so if not overtly prejudicial").

that manganese exposure has neurological health effects, or that defendants considered funding various studies to examine neurotoxicity of welding fumes.[105]  The Court has cautioned the plaintiffs, however, that they may not suggest to the jury that defendants were engaged in any improper activity by lobbying.

- **Defendants' Motion to Limit Evidence of Payments to Authors – GRANTED IN PART.[106]**
- **Plaintiffs' Motion to Require Preparedness in Answering Payment Questions – GRANTED.**

Both the plaintiffs and the defendants have given sizable amounts of money to various persons and organizations as reimbursement for scientific research addressing the question of whether, and the extent to which, manganese in welding fumes causes parkinsonism.  Many of the funding recipients have published medico-scientific studies, articles, and treatises setting out their conclusions.  The Court has issued a detailed Order addressing the discovery obligations of the parties concerning their payments to the authors of these studies, articles, and treatises, upon which expert witnesses often rely during trial; the Order explains that the fundamental basis for discovery of this information is that the payments are relevant to show the possible bias of the authors.[107]

As an example, one of defendants' experts, Dr. Warren Olanow – who is a highly respected neurologist and researcher – received from defendants over $1.6 million between October of 1999

---

[105]  *See Solis* pretrial hearing tr. at 33-60 (June 1, 2006).

[106]  *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *5-6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313); *Byers* pretrial tr. at 209-220 (Oct. 22, 2008); *Jowers* trial tr. at 1155-61 (Feb. 14, 2008); *id.* at 1813-14 (Feb. 20, 2008);

[107]  *In re Welding Fume Prods. Liab. Litig.*, 534 F.Supp.2d 761 (N.D. Ohio 2008) (master docket no. 2114).

and March of 2006.  During this same time period, Dr. Olanow published at least a dozen articles upon which various experts testifying in MDL bellwether trials have relied to form their opinions. Thus, when plaintiffs cross-examine such an expert, plaintiffs often point out that the author of the articles upon which the expert relies to form his opinion received substantial compensation from the defendants.

Defendants have come generally to accept the proposition that evidence of funding received by an author of a medical article goes to show the author's possible bias, so that it is fair to ask an expert who relies upon the article about his knowledge of the author's compensation; however, defendants have moved to restrict the plaintiff's depth of inquiry on this subject.  Specifically, defendants point out that the amount of compensation they have paid to a given author or expert is directly tied to the existence of the entire *Welding Fume* MDL – they likely would have paid most of these authors and experts only a fraction of the compensation if there were only a handful of *Welding Fume* cases, as opposed to the many thousands of cases filed by plaintiffs in the last several years.  Thus, the only reason that plaintiffs can assert the authors of the medical articles appearing on a given expert's reliance list – that is, the list of all of the medical articles upon which the expert relied to form his opinion – received a total of $7 million from defendants, is that the authors have served as testifying and consulting experts for *Welding Fume* defendants for many years. Defendants note they are stuck in a bind – they cannot explain to the jury that one reason they have paid large aggregate amounts to their experts and to authors is because there are so many *Welding Fume* cases, because the fact of many cases is prejudicial, but so is the fact of the large aggregate payments.

The Court has concluded that the information related to payments by defendants to experts who wrote articles and conducted studies is highly probative, but that safeguards need to be put into

64

place to ensure the introduction of this evidence is not repetitive or overstated, to the unfair prejudice of defendants.[108]  Accordingly, in light of Fed. Rules of Evid. 403 & 611, the Court has ruled as follows: (1) if a defense expert specifically relies upon an article/study in his deposition or trial testimony, or in the body (not merely reliance list) of his report, or if defense counsel refers specifically to an article/study with any witness, then plaintiffs may adduce evidence of all payments made by defendants to the author(s) of that particular article/study; (2) if the basis of a defense expert's opinions is largely a literature review (such as with toxicologist Dr. Furbee), plaintiffs may adduce evidence of all payments made by defendants to the author(s) of any *individual* article/study on that witness's reliance list; (3) in no case may plaintiffs refer to any exact total of payments made by defendants to groups of authors (e.g., the entire total of payments made by defendants to all authors, or the total for a given reliance list), except a generic reference such as "tens of thousands" or "millions."

Finally, plaintiffs have asserted that defense experts sometimes arrive at trial unprepared to answer accurately how much compensation they have received.  Accordingly, the Court has ordered experts from both sides to be prepared to testify regarding their hourly rate, the amounts they have received, and the amounts they expect to be paid by the time their testimony is completed.

---

[108]  The Court has also concluded that defendants' suggestion – which is that evidence of lawyer advertising should be admitted to explain why there are so many *Welding Fume* lawsuits, which explains in turn why defendants spent the amounts they have on experts and articles – is not a good one, because evidence of lawyer advertising has a much lower probative value and carries a much higher risk of prejudice.  *Byers* pretrial tr. at 217-18 (Oct. 22, 2008).

• **Motions to Exclude Evidence Regarding Business Ethics – GRANTED.[109]**

Before the first MDL bellwether trial, the Court held a *Daubert* hearing to determine the admissibility of various experts' proposed testimony.  One of those experts was "Dr. W. Michael Hoffman, who is a Professor of Philosophy and Ethics, [whom plaintiffs listed] to offer testimony about business ethics generally and also whether the defendants acted ethically in this case."[110]  The Court ultimately concluded that testimony from *any* expert on the subject of business ethics was generally not admissible, because ethical standards are different from the legal standards that a jury must apply.[111]

In subsequent cases, both plaintiffs and defendants have filed motions in limine asking the Court to preclude the other side's experts from offering testimony going to business or corporate

---

[109]  *See Byers* pretrial tr. at 126 (Oct. 22, 2008);  *Byers* pretrial tr. at 278 (Oct. 23, 2008); *Tamraz* pretrial tr. at 94-98 (Nov. 1, 2007); *Goforth* pretrial tr. at 42-59, 73-74 (Oct. 25, 2006).

[110]  *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *18 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

[111]  The Court explained its rulings as follows, and also added the caveat that there was a small possibility that ethics testimony by plaintiff's experts would be allowed on rebuttal:

> It is th[e legal] standard, and not what an ethical corporation 'should have done,' that matters.  Dr. Hoffman's opinions on a corporation's purported ethical requirements, and whether a particular defendant met those requirements, will not help a juror navigate this [legal] instruction; indeed, because his opinions are all premised on a moral compass, not a legal one, confusion is almost assured.
>
> In sum, the Court concludes that Dr. Hoffman may not testify in plaintiff's case in chief.  The Court holds open the remote possibility, however, that it may allow Dr. Hoffman to testify in rebuttal.  Specifically, plaintiffs have suggested that certain defendants may testify that their actions always comported with the highest ethical standards.  It is conceivable that the Court might then allow plaintiffs to call Dr. Hoffman on rebuttal to explain: (1) the ethical principles that apply to a business; and (2) whether certain conduct meets these universal ethical standards.

*Id.* at *21.  The Court also ruled that the same exclusion applied to defendants' expert witness on ethics, as well.  *Id.*

*See also* Goforth trial tr. at 1518-20 (Nov. 7, 2006) (allowing very limited ethics testimony from Dr. Burns on rebuttal, because defendants had opened the door on cross).

ethics, even if some of the expert's testimony on other topics was admissible.  The Court has granted

all such motions, and makes clear here (again) that testimony from any expert witness on this subject

matter will not be admitted.  A plaintiffs' expert witness may review defendants' documents and

discuss what defendants *actually* said about their own knowledge of welding fume hazards, and what

defendants *actually* did; but that witness may not opine regarding what defendants *should* have

known or *should* have done.[112]

• **Defendants' Motion to Exclude References to Tobacco and Asbestos – GRANTED.[113]**

Defendants ask the Court to preclude plaintiffs' witnesses from comparing the *Welding Fume*

---

[112]  There is, of course, a gray area regarding this type of expert testimony.  As the Court explained in a similar context:

> It is difficult for the Court to provide in advance complete guidance to the parties as to "where the lines will be drawn" at trial.  This is especially true because some of counsel's questions to [plaintiff's expert] may be phrased in hypothetical form, some may refer to other testimony and evidence, and the Court will have to examine the overall methodological foundation for many of [the expert's] answers on a question-by-question basis.  The parties will have to use the familiar trial technique of raising objections to particular questions.

*In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *8 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353) (*Daubert* Order discussing the admissibility of opinions of plaintiff's expert on warning and human factors psychology, Dr. Cunitz); *see id.* at 22 ("The Court has tried to explain, for each expert, where it will set limits and why, but the precise extent that a party will have to rely on cross-examination instead of a sustained objection must be left for trial.").

Essentially, a qualified plaintiff's witness may: (1) review and read aloud from historical documents, such as internal company documents and medical publications; (2) recite his conclusions regarding: (a) the consequences of Mn exposure; (b) what *the documents* show that defendants knew, and when they knew it; and (c) what defendants actually did and when they did it, as compared with what they knew; BUT, the witness may *not*: (a) offer legal conclusions or ethics testimony; (b) characterize defendants' state of mind; or (c) speculate about what might have occurred if defendants had warned earlier or "better."

[113]  *See Byers* pretrial tr. at 247-48 (Oct. 22, 2008); *Jowers* pretrial tr. at 14-21 (Jan. 23, 2008) (also discussing another caveat, connected with admissibility of evidence of the plaintiff's alleged failure to heed tobacco warnings); *Tamraz* pretrial tr. at 42 (Nov. 1, 2007); *Goforth* pretrial tr. at 48-54, 94-98, 114 (Oct. 25, 2006); *Solis* pretrial tr. at 433-34 (June 1, 2006).

industry, warnings, and lawsuits to those of tobacco or asbestos. This motion is granted, with some small caveats. References to tobacco and asbestos may be necessary but will be kept to a minimum. For example, a plaintiff's actual exposure to asbestos may be admissible to the extent he earlier claimed this exposure caused him to suffer disability or physical symptoms that overlap with his *Welding Fume* claims. Also, the parties may elicit simple background information, such as an expert witness's involvement with public health efforts and smoking (e.g., Dr. Burns). Beyond these references, however, all parties will not introduce evidence related to asbestos or tobacco.

- **Defendants' Motion to Exclude Plaintiff's Animation – GRANTED IN PART.**[114]

In every *Welding Fume* bellwether trial, the plaintiff has sought to play a video animation showing welding fumes entering a welder's lungs, and the manganese in the fume eventually entering the welder's brain. Defendants have consistently asked the Court to exclude the animation, and the Court has consistently granted this motion in part.

In particular, the Court has ordered that the plaintiff may present this animation to the jury, but must excise that portion of it that shows manganese entering the welder's brain through the "olfactory pathway." This portion shows the welder breathing fumes in through his nose, and then shows the manganese in those fumes entering the brain directly, through the olfactory epithelium – as opposed to showing the fumes passing into the welder's lungs, and the manganese then carried to the brain by blood in the circulatory system, in the same way that oxygen moves from lungs to brain. The Court excluded the "olfactory pathway" portion of the animation after concluding the

---

[114] *See Byers* pretrial tr. at 248 (Oct. 22, 2008); *Jowers* pretrial tr. at 36-37 (Jan. 23, 2008); *Tamraz* pretrial tr. at 8-10 (Nov. 1, 2007); *Goforth* pretrial tr. at 117-18 (Oct. 25, 2006); *Goforth* pretrial tr. at 4-5 (Oct. 27, 2006); *Solis* pretrial tr. at 452-55 (June 4, 2006); *Ruth* pretrial tr. at 46 (Aug. 8, 2005).

science supporting this theory of manganese exposure to the brain was insufficiently reliable at that time.  The Court concluded that the rest of the animation, however, was a fair depiction and admissible.  Absent a change in scientific knowledge, this ruling will apply to all MDL cases.[115]

- **Defendants' Motion to Exclude other *Welding Fume* Plaintiffs from Testifying at Trial – GRANTED IN PART.[116]**

Some *Welding Fume* plaintiffs list as potential trial witnesses three welders who were, themselves, also *Welding Fume* plaintiffs, and who suffer obvious signs of neurological disease: Charles Ruth, Lonnie Whisenhunt, and Kenneth Riley.  Plaintiffs list these witnesses for the following possible purposes, among others: (1) to the extent that Ruth and Whisenhunt worked for the same employer or at the same work sites as did the plaintiff, to offer testimony regarding working conditions and the employer's welding safety practices; and (2) Riley worked at defendant ESAB as a test welder, and would offer testimony regarding the welding safety information that this welding rod manufacturer gave to is own employees.

---

[115] While the Court concluded that experts could, under *Daubert*, opine that manganese from welding fume enters the brain through the olfactory pathway, the Court concluded the question was a close one and that defendants' videotape animation was not a reliable depiction of the scientific conclusions.  *Cf. Daubert* hearing tr. at 46 (Aug 8. 2005) (the Court: "On the first issue, the olfactory pathway, I have gone back and forth on this question.  I think it is a very close question as to whether there is a sufficient scientifically reliable basis to allow this testimony, because it is based on rat studies, and there are lots of criticisms as to extrapolating from animal studies and particularly rat studies and particularly rat studies as it relates to the olfactory pathway.  But after analyzing the question and examining the extent to which defendants' own experts, including Dr. Fechter and Dr. Olanow and others, do rely on animal studies, I have concluded that I am going to allow the testimony and simply give the defendants wide latitude on cross-examination with respect to the – whether or not the testimony is sufficient to establish the things that plaintiffs purport that it establishes.").

[116] *See Tamraz* pretrial tr. at 38-39 (Nov. 1, 2007); *Jowers* pretrial tr. at 6-9 (Jan. 23, 2008); *Solis* pretrial tr. at 215-17 (May 16, 2006).

Defendants object that the testimony these witnesses would offer is at best minimally relevant, and that a plaintiff's real purpose for calling them would be to suggest impermissibly that neurological injury from welding fume exposure is common among welders.  Defendants cite the Advisory Committee Notes to Federal Rule of Evidence 403, which defines "unfair prejudice" as evidence having "an undue tendency to suggest decision on an improper basis, commonly an . . . emotional one," and argue that the risk of unfair prejudice clearly outweighs the probative value of any testimony from these three witnesses.

For the most part, the Court agrees with defendants.  Given the serious risk of sympathy and unfair prejudice, the Court has ruled that these witnesses may not testify in a plaintiff's case in chief.  The Court held open the possibility, however, that these witnesses might be allowed to offer rebuttal evidence, depending on the evidence adduced by defendants in their case in chief.[117]

• **Motions to Preclude Witnesses from Testifying About Their Belief that Other Welders Suffer (or Don't) From Welding-Related Illnesses – GRANTED.[118]**

In some *Welding Fume* cases, the welder-plaintiff or his co-workers have stated at deposition they believe they know of other welders who also suffer from movement disorders caused by exposure to welding fumes.  Defendants seek to exclude this testimony, arguing that the plaintiff and his co-workers are lay witnesses not qualified to opine regarding whether another welder has a

---

[117]  *See Solis* pretrial tr. at 165-71 (May 15, 2006) and 215-17 (May 16, 2006).  To date, while welders Ruth and Whisenhunt may have worked at the same worksites as other welder-plaintiffs, they have not worked *with* those plaintiffs.  The Court's analysis may be different if the *Welding Fume* plaintiff at trial actually worked alongside Ruth or Whisenhunt.  The same rules will apply if a plaintiff lists as a witness any other welder who has suffered neurological injury (e.g., MDL plaintiffs Jeff Tamraz and Robert Jowers).

[118]  *See Byers* pretrial tr. at 133-34, 253 (Oct. 22, 2008); *Byers* pretrial tr. at 274 (Oct. 23, 2008); *Jowers* pretrial tr. at 185-92 (Jan. 23, 2008); *Tamraz* pretrial tr. at 39-43 (Nov. 1, 2007).

disease, or what may have caused that disease.  The Court has agreed with defendants and ruled accordingly.  Thus, for example, while a co-worker witness may testify regarding his observation of the *plaintiff's* symptoms (e.g., tremor), he may not testify regarding the symptoms of *other* welders, nor offer his opinion on why the plaintiff or other welders suffer these symptoms.

Further, the Court also prohibited any lay witnesses called by defendants from offering similar symptom-related testimony.  Lay employees of defendants may not testify, for example, that they have worked with many welders during many years and have never seen any of them exhibit tremor or suffer from neurological injury.  The only caveat is that a defense witness whose job duties included receipt of health claims or complaints from welders may testify he did not receive any claims or complaints of neurological injury.

- **Defendants' Motion to Exclude Reference to Individual Susceptibility – DENIED.[119]**

Defendants have moved to exclude any reference during trial to the concept of individual susceptibility, arguing there is no evidence: (1) regarding individual susceptibility to manganese *generally*, or (2) that a given plaintiff is himself "more" susceptible to manganese exposure than the average person.  Defendants assert that plaintiffs are using false logic – that is, "welders who are susceptible to manganese will develop tremors, and the plaintiff has tremors, so he must be susceptible to manganese" – in order to convince a jury that the bare fact of a plaintiff's injury shows he has manganism.  Ultimately, defendants insist, allowing the plaintiff to make the

---

[119] *See Byers* pretrial tr. at 220-26 (Oct. 22, 2008); *Byers v. Lincoln Elec. Co*., 2008 WL 4849339at *6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313) ("Defendants' Motion in Limine to Exclude Reference to Individual Susceptibility is denied.  Plaintiffs are not arguing (and may not) that Byers, himself, is individually susceptible; and the concept generally is relevant and admissible, as discussed by defendants' own documents and experts.  To the extent the defendants are concerned the jury will infer Byers is individually susceptible, defendants can clarify this on cross.").

suggestion that some individuals may be more susceptible to manganese than others, without actual evidence that this is true, eliminates the plaintiff's burden of proof on causation.

The Court has denied this motion because at least three of defendants' own experts – movement disorder specialist Dr. Howard Hurtig, toxicologist Dr. Brent Furbee, and neuro-pharmacologist Dr. James Bennett – have each testified that the concept of individual susceptibility exists generally as to *all* known drugs and toxins *and specifically as to manganese*.  Further, there are similar statements in various medico-scientific articles, including a Canadian consensus document co-authored by defense expert Dr. Warren Olanow ("There is a concern that these workers are at increased risk of developing manganism where progression depends on the exposure level, the exposure duration, *and individual susceptibility*") and a 1955 article produced by defendants from their industrial hygiene files ("In no other occupational disease is individual sensitivity more important than manganism").

Further, it is beyond question that the concept of individual susceptibility is relevant.  First, defendants' knowledge thereof goes to whether their warning is sufficient.  Second, the concept rebuts defendants' argument that, if manganese in welding fumes is toxic, there should be an epidemic of welders with Manganese-induced Parkinsonism – individual susceptibility may explain why there is no epidemic.

Accordingly, defendants' motion to exclude any reference to the concept of individual susceptibility must be denied.  The Court will sustain an objection, however, to any suggestion that the plaintiff is, himself, individually susceptible, unless the plaintiff adduces a personalized, medico-scientific foundation for such evidence.

## CONCLUSION

The evidentiary rulings documented in this Order are summaries of rulings the Court has entered in the MDL bellwether cases over which it has so far presided.  These rulings will apply to all future MDL cases tried by this Court.  The parties' objections to those rulings are preserved for all future trials and any appeals thereof.  Accordingly, a party should file a pretrial motion addressing these same evidentiary issues in future trials only if the party sincerely believes the particular circumstances of an individual case warrant a modification.  Further, although this Order documents the Court's rulings, the parties still have an obligation to object at trial if they believe the opposing party is not complying with the Court's conclusions regarding admissibility.

As the Court presides over future bellwether trials, it may enter rulings on other evidentiary issues that are applicable to all MDL cases.  If so, the Court will enter an additional Evidentiary Order memorializing these rulings, so that the parties will not need to file repetitious motions in limine.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: August 31, 2009

73