**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| **IN RE: WELDING FUME PRODUCTS** | : | **Case No. 1:03-CV-17000** |
| **LIABILITY LITIGATION** | : | **(MDL Docket No. 1535)** |
| | : | |
| | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| | : | |
| | : | **SPECIAL MASTER DAVID R. COHEN** |
| | : | |

# TRIAL  TEMPLATE

# FOR

# *WELDING  FUME*  MDL  CASES

## THE PURPOSE OF THIS DOCUMENT

This Court is the Transferee Court presiding over the Multi-District Litigation known as *In re: Welding Fumes Products Liability Litigation*, MDL no. 1535.

This document outlines the proceedings that have occurred in this MDL since its 2003 inception, and summarizes the Court's pretrial rulings applicable to every MDL case.

The purpose of this document is to assist trial judges in transferor courts who may preside over the trial of an individual *Welding Fume* case, after the Judicial Panel on Multi-District Litigation remands the case from this Court back to the transferor court.

In addition, this document may be a useful reference tool for state court judges presiding over similar *Welding Fume* cases.

All of this Court's written Orders cited in this document are available on the MDL Court's public website: www.ohnd.uscourts.gov.  Click on "MultiDistrict Litigation Cases" in the left column, and then "MDL 1535 Welding Fumes Products Liability Litigation."

Beyond this document, the single written Order that is most likely to educate the reader about the evidence and the issues that a transferor court may expect to see at a *Welding Fume* trial is *Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724 (S.D. Miss. 2009).  In this opinion, the undersigned reviewed all of the parties' evidence in the context of resolving defendants' post-judgment motions, filed after the jury reached a plaintiff's verdict in the fourth MDL bellwether trial.

On the next few pages is presented both a compact and a detailed table of contents.  The detailed table of contents includes brief summaries of each Section of this document, so the reader may quickly obtain the gist of the discussion.

ii

## CONTACTS  FOR  ADDITIONAL  INFORMATION

The reader may also obtain additional information from the following persons:

**_Welding Fume_ MDL Judge**
Honorable Kathleen M. O'Malley
United States Courthouse
801 W. Superior Ave. #16A
Cleveland, OH  44113-1840
216-357-7240

**_Welding Fume_ Special Master**
David R. Cohen
23220 Chagrin Blvd.
Two Commerce Park #360
Cleveland, OH 44122
216-831-0001
david@specialmaster.biz

**_Welding Fume_ Plaintiffs' Liaison Counsel**
John R. Climaco
Lisa A. Gorshe
Climaco Lefkowitz Peca Wilcox & Garofoli
55 Public Square, #1950
Cleveland, OH 44113
216-621-8484
Lagors@climacolaw.com

**_Welding Fume_ Defendants' Liaison Counsel**
John H. Beisner
Stephen J. Harburg
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
202-371-7470
sharburg@omm.com

**_Welding Fume_ Plaintiffs' Lead Counsel**
John W. (Don) Barrett
Barrett Law Office, P.A.
404 Court Square North
P.O. Box 987
Lexington, MS 39095
800-889-9622
dbarrett@barrettlawoffice.com

iii

## COMPACT  TABLE  OF  CONTENTS

I.  Prologue  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.  Law of the Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

III.  Appointment of a Special Master and a Settlement Mediator  . . . . . . . . . . . . . . . . . . . . .  8

IV.  Jurisdictional Rulings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

V.  The Parties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

VI.  The Parties' Claims and Defenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

VII.  Choice of Law Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

VIII.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

IX.  Pretrial Evidentiary Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53
　　　A.  Documents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53
　　　B.  Admissibility of Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57
　　　C.  Motions in Limine  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  147

X.  Motions for Judgment as a Matter of Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  224

XI.  Trial Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  273

XII.  Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  284

XIII.  Appendices

# DETAILED  TABLE  OF  CONTENTS

I.    **Prologue** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

Beginning in 2003, about 12,600 *Welding Fume* cases were transferred to or filed in the MDL Court, and about 3,900 federal cases currently remain pending.  The gravamen of the complaint in each of these cases is that manganese contained in the fumes given off by welding rods has caused the plaintiff to suffer neurological injury, and the defendant manufacturers of these welding rods failed to warn of this hazard.  The undersigned has presided over six bellwether trials and will now begin the process of suggesting remand to transferor courts of cases that have become close to trial-ready.

II.   **Law of the Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

As a general matter, the "transferor court is bound, upon remand, by the orders entered by [this MDL] transferee court during the coordinated or consolidated pretrial proceedings.  Those decisions are considered law of the case." This applies to evidentiary, procedural, and substantive rulings.  The purpose of this trial template is to document the MDL Court's pretrial rulings, so that the transferor court may more easily understand and enforce those rulings at trial.

III.  **Appointment of a Special Master and a Settlement Mediator** . . . . . . . . . . . . . . . . . . . . . . **8**

Early in the MDL proceedings, the Court appointed David R. Cohen, Esq. as Special Master.  Mr. Cohen is available to help transferor judges upon remand.  The Court also appointed James J. McMonagle, Esq. as a Settlement Mediator.

IV.   **Jurisdictional Rulings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

The MDL Court will have ruled on all jurisdictional motions prior to remanding a case back to a transferor court.  Thus, there should remain for the transferor court no issues regarding federal jurisdiction.

V.    **The Parties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
      A.    **The Defendants** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

Plaintiffs named as defendants dozens of welding rod manufacturers and suppliers, as well as alleged co-conspirators.  The Court has granted summary judgment to certain defendants (MetLife & Caterpillar) in all *Welding Fume* cases.  Further, the Court entered a "Peripheral Defendant Dismissal Order," dismissing without prejudice all defendants in every case except those against whom a given plaintiff is most likely to proceed at trial.  Still remaining as defendants in virtually every case are the five biggest welding rod manufacturers: (1) Lincoln Electric Company, (2) BOC Group (formerly known as Airco) (3) ESAB Group, (4) TDY Industries, Inc., formerly known as Teledyne Industries, Inc. (as successor-in-interest to Teledyne McKay), and (5) Hobart Brothers Company.  Defendant-specific discovery in each case may lead to dismissal of some of these five defendants, and possibly to renaming of some previously-dismissed defendants.

**B.     The Plaintiffs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        In 2000, the national plaintiffs' bar engaged in a concerted effort to notify welders that, if they suffered from a movement disorder, their neurological injury might be caused by exposure to welding fumes.  The Court has imposed several obligations on plaintiffs' counsel to ensure they intend to actually try the cases they filed.   These additional obligations include the filing of: (1) a "Notice of Diagnosis" of neurological injury, signed by a medical doctor; and (2) a "Certification of Intent to Try the Case," to be submitted by plaintiff's counsel following initial medical records discovery.  These obligations have winnowed the plaintiffs' cases substantially, so there is a high likelihood that a case remanded to a transferor court will go to trial.

**VI.   The Parties' Claims and Defenses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
**A.      Plaintiffs' Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

        The plaintiffs generally bring claims sounding in strict product liability, negligence, fraud, and conspiracy; and plaintiffs seek both compensatory and punitive damages.  The gravamen of the complaints is that the defendants "failed to warn" the plaintiffs of the health hazards posed by inhaling welding rod fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process.

**B.     Defendants' Defenses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

        At trial, a transferor court can expect the defendants to interpose some or all of the following fact-based defenses: (1) the warning language defendants used was adequate; (2) the plaintiff did not prove he used a particular defendant's welding rods; (3) the plaintiff did not prove he saw a particular defendant's warnings; (4) the plaintiff did not prove his neurological condition was caused by exposure to welding fumes; (5) the plaintiff's neurological condition is not manganese-induced parkinsonism, it is something else (e.g., psychogenic movement disorder); (6) the defendants are immune pursuant to their role as government contractors; (7) the defendants are not liable because the plaintiff's employer was a learned intermediary; (8) the defendants are not liable because the plaintiff was a sophisticated user; (9) the plaintiff did not prove that a better warning would have made any difference; (10) the plaintiff is, to some degree, responsible for his own injuries under the theories of contributory negligence, comparative negligence, or assumption of the risk; and (11) punitive damages are not available because the plaintiff did not present clear and convincing evidence of gross negligence.  These and other defenses are discussed below.

**1.     Federal Preemption** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**2.     Statutes of Limitations or Rules of Repose** . . . . . . . . . . . . . . . . . . . . . . **25**

**3.     Adequacy of Warnings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**4.     Product Identification** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

|   | 5. | General and Specific Medical Causation | 28 |
|---|---|---|---|
|   | 6. | Type of Neurological Injury | 30 |
|   | 7. | The Government Contractor Defense | 32 |
|   | 8. | Sophisticated User and Learned Intermediary Defenses | 33 |
|   | 9. | Warning Language Causation | 34 |
|   | 10. | Contributory Negligence, Comparative Negligence, and Assumption of the Risk | 36 |
|   | 11. | Punitive Damages and Lack of Gross Negligence. | 36 |
| VII. | | Choice of Law Issues | 38 |

This Court has so far applied the laws of five States in MDL bellwether trials: Mississippi, Texas, South Carolina, California, and Iowa.  The parties sometimes, but not always, agree on which State's law applies.  In cases of disagreement, the choice-of-law analysis a transferor court will have to apply is highly fact-specific.  As a general matter, however, choice-of-law principles will suggest use of the law of the State where the plaintiff did the most substantial amount of his welding.  Complications may arise if the plaintiff used different manufacturers' products only in certain States.

| VIII. | | Discovery | 43 |
|---|---|---|---|
|   | A. | General Discovery – Already Accomplished | 43 |

The parties have engaged in huge amounts of "general discovery" directed at information relevant to every *Welding Fume* case.  This includes, for example, the defendants' historical knowledge of the hazards posed by welding fumes, the warnings defendants provided to welders over time, and the state of medical and scientific knowledge regarding neurotoxicity of manganese in welding fumes.  For the most part, the parties have completed all general discovery.

| B. | Case-Specific Discovery – Some Still Necessary | 48 |
|---|---|---|

To prepare for trial in a specific *Welding Fume* case, the parties must engage in substantial "case-specific discovery" directed at information relevant to the individual plaintiff's particular claims and circumstances.  This discovery will address the plaintiff's employment history, medical history, and welding experiences.  At least some of this case specific discovery may not occur until after this Court has remanded the case to the transferor court.  Accordingly, a transferor court may have to oversee some aspects of case-specific discovery.  The Special Master is available to assist transferor courts with resolution of discovery disputes, provide background and research regarding pretrial motions, and even serve at the elbow of the transferor judge during trial, at the pleasure of the transferor court.

**IX.    Pretrial Evidentiary Rulings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **53**

**A.    Documents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **53**

This Court has ruled on the admissibility of many hundreds of documents, and has made clear from the beginning of this MDL that an admissibility ruling in any *Welding Fume* trial would carry over and apply in all future *Welding Fume* cases, absent unusual circumstances.  Questions of admissibility of case-specific documents (such as plaintiff's medical records) will, of course, remain for the transferor court; but the admissibility of many "general" *Welding Fume* documents has already been decided.

**B.    Admissibility of Expert Testimony** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **57**

The parties in this litigation have sought to introduce at trial complicated testimony from a plethora of experts in a number of fields, including neurology, neuro-pathology, neuro-psychology, neuro-radiology, epidemiology, bio-statistics, industrial hygiene, industrial engineering, chemistry, materials science, toxicology, warnings, corporate ethics, military specification and procurement, economics, government lobbying, and ancient corporate documents.  Early in this MDL, the Court held a multi-day *Daubert* hearing to determine the admissibility of opinions offered by these experts.  Further, the Court has engaged in additional analyses of the admissibility of expert testimony prior to each MDL bellwether trial.  These analyses are summarized below.

**1.    General Observations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

**2.    Dr. Olanow, Dr. Louis, Dr. Nausieda, Dr. Lang, Dr. Hurtig, & All Other Neurologists** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **60**
Opinions Regarding General Causation, Welding Fume, and Parkinson's Disease

**3.    Dr. Olanow, Dr. Eidelberg, Dr. Sze, Dr. Atlas, & All Other Neurologists and Neuro-Radiologists** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **62**
Opinions Regarding Brain Scans and Differential Diagnosis of Parkinsonisms

**4.    Dr. Olanow, Dr. Perl, Dr. Calne, & All Other Neurologists and Neuro-Pathologists** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **63**
Opinions Regarding Brain Tissue Damage Caused by Manganese Exposure

**5.    Dr. Hoffman, Dr. Levy, Dr. Zimmerman, Dr. Burns, Dr. Messick and others** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **64**
Opinions Regarding Business Ethics and Occupational Health Practices

**6.    Dr. Cunitz, Dr. Krenek, Dr. Purswell, Dr. Welch, Dr. Wood, and Others** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **67**
Opinions Regarding the Adequacy of Warnings

7.      **Dr. Zimmerman and Mr. Ewing**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **74**
          Opinions Regarding Industrial Hygiene and Welding Fume Exposure

8.      **Dr. Roth and Dr. Parent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **81**
          Opinions Regarding the Toxicology and Biochemistry of Manganese

9.      **Mr. Fechter, Mr. Buckley, & Mr. Longo** . . . . . . . . . . . . . . . . . . . . . . . . . . **91**
          Opinions Regarding Bioavailability of Manganese

10.     **Dr. Wells** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **94**
          Opinions Regarding Statistics and Epidemiological Studies

11.     **Dr. Levy, Dr. Baker, Dr. Burns, Dr. Lemen, and Others** . . . . . . . . . . . . . **97**
          Opinions Regarding the State of the Art of Medical Knowledge Concerning
          Manganese, and Defendants' Knowledge Concerning Manganese

12.     **Dr. Harrison** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **101**
          Opinions Regarding Lobbying

13.     **Mr. Null & Ms. Booth** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **103**
          Opinions Regarding the Welding Practices and Industrial Hygiene of the
          U.S. Navy

14.     **Mr. Paskal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **106**
          Opinions Regarding Industrial Hygiene and Welding Fume Simulations

15.     **Dr. Baker** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **107**
          Opinions Regarding Occupational Medicine and Health

16.     **Dr. Gartrell** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **108**
          Opinions Regarding Punitive Damages

17.     **Mr. Manz, Mr. Stropki, Mr. Kotecki, Mr. Nagarajan, Mr. Ferree, Mr.
          Plotica, Mr. Lyttle, Ms. Quintana, and other Corporate
          Representatives** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **109**
          Expert Opinions Regarding any Specialized Subject Matter

18.     **Mr. Thomas, Mr. Schimmel, and Others** . . . . . . . . . . . . . . . . . . . . . . . . **112**
          Opinions Regarding the Efficacy of Legal Advertising

19.     **Dr. Rosen and Others** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **114**
          Opinions Regarding Punitive Damages

**20.**    **Dr. Schapira** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **115**
           Opinions Regarding General Causation

**21.**    **Dr. Furbee and Dr. Blum** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **116**
           Opinions Regarding Toxicology, Blood Serum Manganese Levels, Welding
           Fume Exposure, and Manganism

**22.**    **Mr. Kahane** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **121**
           Opinions Regarding Industrial Hygiene

**23.**    **Dr. Welch** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **122**
           Opinions Regarding Warning Adequacy

**24.**    **Dr. Sze** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **123**
           Opinions Regarding Neuro-Radiology

**25.**    **Dr. Atlas** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **125**
           Opinions Regarding Neuro-Radiology

**26.**    **Dr. Tintner** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **127**
           Opinions Regarding Electrophysiology

**27.**    **Dr. Stebbins** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **129**
           Opinions Regarding Neuropsychology.

**28.**    **Dr. Brent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **133**
           Opinions Regarding Epidemiology

**29.**    **Dr. Watts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **136**
           Opinions Regarding Charles Ruth

**30.**    **Certain Treating Doctors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **139**
           Diagnoses of Manganese Neurotoxicity

**C.**     **Motions in Limine** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **147**

Before each MDL bellwether trial, the parties have filed numerous motions in limine addressing the admissibility of various pieces of evidence, ranging from critical documents to relatively trivial comments made by witnesses.  The Court's rulings on these pretrial evidentiary motions are discussed below.

1.     ‣ Defendants' Motion to Exclude Evidence of Other Welding Fume Lawsuits – GRANTED IN PART.
       ‣ Defendants' Motion to Exclude Reference to Settlements of Other Welders' Claims – GRANTED IN PART.
       ‣ Plaintiff's Motion to Exclude Evidence of Lawyer Advertising – GRANTED IN PART.
       ‣ Motion to Exclude Evidence of Efficacy of Lawyer Advertising – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **150**

2.     Plaintiff's Motion to Exclude Exemplar Warnings, Warnings for Other Products, Warnings of Other Manufacturers, and Post-Use Warnings – GRANTED IN PART . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **157**

3.     Plaintiff's Motion to Exclude the "Navy Video" – DENIED . . . . . . . . . . . **160**

4.     Plaintiff's Motion to Prohibit Conflating Warning Labels With MSDSs – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **161**

5.     Plaintiff's Motion to Exclude Evidence of the Disqualification of Experts in Other Cases – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **162**

6.     Plaintiff's Motion to Bar Evidence of Previously-Named Defendants, Previously-Filed Claims, and Previously-Dismissed Cases – GRANTED . . **163**

7.     Plaintiff's Motion to Exclude Evidence of Flying on Private Airplanes – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **164**

8.     Plaintiff's Motion to Exclude Evidence of Collateral Sources – GRANTED IN PART . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **165**

9.     Plaintiff's Motion to Bar Certain Testimony Regarding PET Scans and L-dopa Trials – GRANTED IN PART . . . . . . . . . . . . . . . . . . . . . . . . . . . **166**

10.    Plaintiff's Motion to Bar Evidence of Other Possible Causes of His Neurological Injury – GRANTED IN PART . . . . . . . . . . . . . . . . . . . . . . . **168**

11.    Plaintiff's Motion to Exclude Evidence of Negative Economic Impact – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **170**

12.    Defendants' Motion to Exclude Evidence of Corporate Wealth – GRANTED IN PART . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **171**

13.    Plaintiff's Motion to Exclude Characterizations of an Author as a "Plaintiff's Expert" or "Defense Expert" – GRANTED . . . . . . . . . . . . . . . . **172**

14.    Plaintiff's Motion to Exclude Certain Comments in Opening Statement – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **172**

15.    Plaintiff's Motion to Exclude Videotaped Objections Made During Deposition Testimony – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **175**

16.    Plaintiff's Motion to Exclude Evidence that Plaintiff's Close Relatives are also Welders – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **175**

17.    Plaintiff's Motion to Exclude Evidence that President Bush Welded at Lincoln Electric – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **175**

18.    Defendants' Motion to Modify the Court's Earlier Daubert rulings – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **176**

19.    Plaintiffs' Motion to Exclude Evidence Regarding Employers' "HazCom" Duties – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **177**

20.    Plaintiff's Motion to Prohibit In-Court Requests for: Stipulations, Documents from Plaintiff's Files, and Demonstrations to the Jury – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **179**

21.    Motions to Exclude Evidence of the Parties' Litigation Documents – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **180**

22.    Plaintiff's Motion to Exclude References that Impugn Motives of Counsel, Denigrate the Basis for Fees, and to Richard Scruggs – GRANTED . . . . . . **181**

23.    Plaintiff's Motion to Exclude References that the Plaintiff Violated Workplace Safety Rules – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **182**

24.    Plaintiff's Motion to Exclude Evidence of Stressors – DENIED IN PART . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **182**

25.    Plaintiff's Motion to Exclude Duplicative or Cumulative Expert Testimony – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **183**

26.  Plaintiff's Motion to Exclude Evidence Regarding Expert David Kahane's Wife – GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **184**

27.  Plaintiff's Motion to Bar Testimony that Manganese in Welding Fume Cannot Reach the Brain, and Testimony that Manganese in Welding Fume Cannot Cause Injury to the Brain – GRANTED IN PART  . . . . . . . . . . . . . . **185**

28.  Plaintiff's Motion to Exclude Certain Testimony Regarding the "Taiwanese Cohort" – GRANTED IN PART  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **187**

29.  Plaintiff's Motion to Prohibit Use of His Video Deposition to Show His Movement Disorder – GRANTED IN PART  . . . . . . . . . . . . . . . . . . . . . . . **188**

30.  ‣ Plaintiff's Motion to Exclude any Reference to the Danish and Swedish Studies – DENIED.
     ‣ Plaintiff's Motion to Exclude Hearsay Connected to the Danish and Swedish Studies – GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **190**

31.  Defendants' Motion to Exclude Evidence Related to Dr. Bowler's Studies or Opinions – GRANTED IN PART  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **191**

32.  Plaintiff's Motion to Exclude Evidence of "Incorrect" Diagnoses of MIP by Dr. Nausieda – GRANTED IN PART  . . . . . . . . . . . . . . . . . . . . . . . . . . . . **192**

33.  Defendants' Motion to Exclude Reference to Dr. Lang's Diagnoses of Other MDL Plaintiffs – GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **195**

34.  ‣ Plaintiffs' Motion to Exclude Evidence Tendered by Defense Expert Mr. Chute – GRANTED IN PART.
     ‣ Plaintiffs' Motion to Exclude Testimony from Plaintiffs' Expert Mr. Ewing – DENIED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **196**

35.  Plaintiff's Motion to Exclude Irrelevant Evidence Related to the Government Contractor Defense – GRANTED  . . . . . . . . . . . . . . . . . . . . . . **198**

36.  Motions to Exclude Case-Specific Testimony from Core Experts – GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **198**

37.  Motions to Exclude Cross-Examination of Experts with Statements Made by Other Experts – DENIED IN PART.
     Motions to Exclude Hearsay Statements of Experts – GRANTED  . . . . . . . **199**

38.  Defendants' Motion to Exclude Evidence Regarding Preparation of Expert Reports – GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **202**

39.     Defendants' Motion to Exclude Documents Relating to Welding Rod
        Companies Who are Not Named Defendants, and to "Historical
        Documents" – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **202**

40.     Defendants' Motion to Exclude Documents Pre-Dating Plaintiff's First Use
        of Welding Rods – DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **205**

41.     Plaintiff's Motion to Exclude Testimony Related to the Origin of Document
        MDL-LI-00345576-608, and Defendants' Cross-Motion to Exclude the
        Document – BOTH DENIED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **210**

42.     Defendants' Motion to Exclude References to "Hardface Welding" in Cases
        Where Plaintiff Did not Engage in It – DENIED  . . . . . . . . . . . . . . . . . . . . .   **211**

43.     Defendants' Motion to Exclude Evidence of Company Knowledge and
        Warnings Issued After Plaintiff's Last Exposure to Welding Fumes –
        DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **212**

44.     Defendants' Motion to Exclude Evidence of Lobbying Activities –
        DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **213**

45.     ‣ Defendants' Motion to Limit Evidence of Payments to Authors –
        GRANTED IN PART.
        ‣ Plaintiffs' Motion to Require Preparedness in Answering Payment
        Questions – GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **214**

46.     Motions to Exclude Evidence Regarding Business Ethics
        – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **217**

47.     Defendants' Motion to Exclude References to Tobacco and Asbestos –
        GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **218**

48.     Defendants' Motion to Exclude Plaintiff's Animation – GRANTED IN
        PART . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **219**

49.     Defendants' Motion to Exclude other Welding Fume Plaintiffs from
        Testifying at Trial – GRANTED IN PART . . . . . . . . . . . . . . . . . . . . . . . . . .   **220**

50.     Motions to Preclude Witnesses from Testifying About Their Belief that
        Other Welders Suffer (or Don't) From Welding-Related Illnesses –
        GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **221**

51.     Defendants' Motion to Exclude Reference to Individual Susceptibility –
        DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **222**

**X.**     **Motions for Judgment as a Matter of Law** ...................................... **224**

In the *Welding Fume* cases over which this Court has presided so far, the Court has ruled on a number of motions for judgment as a matter of State and federal law.  These motions are described below.

**A.**     **Defendants' Motion to Dismiss All Post-1985 Claims, Based on Federal Preemption – DENIED** ............................................... **224**

Early in the litigation, certain defendants argued that the Hazard Communication Standard, promulgated in 1985 by the Occupational Safety and Health Administration ("OSHA"), preempted the plaintiffs' failure-to-warn claims.  This Court found the argument was not well-taken.  Accordingly, none of the claims asserted by a plaintiff in a *Welding Fume* case will fail based on federal preemption grounds.

**B.**     **Defendants' Motion for Summary Judgment on All Claims, Based on the Government Contractor Defense – DENIED** ......................................... **225**

In any *Welding Fume* case where the plaintiff used welding rods while working on a project for the federal government, the manufacturing defendants will interpose the government contractor defense.  That is, defendants will assert that, because the government knowingly specified the chemical formulation of and warnings accompanying the welding rods used by the plaintiff, the defendants are clothed with governmental immunity.  This Court has ruled that whether the defendants prevail on this defense in a given case is a matter for the jury.

**C.**     **Defendants' Motion for Summary Judgment on Plaintiff's Claim for Failure to Warn Based on Adequacy of Warning Language – DENIED** .................... **228**

Every *Welding Fume* plaintiff's failure-to-warn claim presents a central issue of fact: was the warning language used by the defendants sufficient to apprise the plaintiff of the neurological hazards of using welding rods? This Court has ruled that a failure-to warn claim will *not* founder based on the argument that the defendants' warning language was "adequate as a matter of law;" rather, the adequacy of the defendants' warnings is always a question for the jury.

**D.**     **Defendants' Motion for Judgment as a Matter of Law on Plaintiff's Claim for Failure to Warn Based on Lack of Showing that a "Better" Warning Would Have Made a Difference – DEPENDS** ................................... **232**

To prevail on a claim for failure to warn, a plaintiff must prove not only that the warning language provided by defendants was inadequate, but also that a better warning would have made a difference by motivating the plaintiff to change his behavior.  State law may assist the plaintiff in shouldering this burden by recognizing the rebuttable "heeding presumption" – an evidentiary premise that the plaintiff would have read and followed a better warning.  A defense motion for judgment as a matter of law on the question of whether a plaintiff would have heeded a better warning will be highly fact-specific and depend on the applicable State law, but may be amenable to judgment as a matter of law in certain circumstances.

**E.**    **Defendants' and Plaintiffs' Motions for Summary Judgment on the Sophisticated User and Learned Intermediary Defenses – DENIED** . . . . . . . . . **234**

The Sophisticated User Defense holds that a product manufacturer need not warn members of a trade (such as welders) about dangers generally known to that trade.  The Learned Intermediary Defense holds that a product manufacturer can discharge its duty to warn by providing information about the dangers of the product to a third person (such as an employer) upon whom it can reasonably rely to communicate the information to the product's end-users.  The strength and viability of these defenses turns on both the extent to which governing State law recognizes them, as well as the facts of each case.  Defendants in *Welding Fume* cases will assert they are entitled to summary judgment under both defenses, while plaintiffs will object and even assert the undisputed facts show the defenses both fail as a matter of law.  To date, this Court has denied all summary judgment motions directed at these two defenses, whether filed by plaintiffs or defendants, but has instructed the jury regarding the availability of these defenses where appropriate.

**F.**    **Plaintiffs' Motion for Summary Judgment on the Joint Tortfeasor Defense under Mississippi Law – GRANTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **239**

Defendants have asked the Court to allow a jury to apportion fault to Mississippi *Welding Fume* plaintiffs' employers.  This Court has held, however, that there can be no such apportionment under Mississippi law if the plaintiff was covered by the federal workers' compensation statute known as the Longshore and Harbor Workers' Compensation Act ("LHWCA").

**G.**    **Plaintiffs' Motion for Summary Judgment on the Defense of Contributory Negligence under Mississippi Law – DENIED** . . . . . . . . . . . . . . . . . . . . . . . . . . **241**

Plaintiffs may move for summary judgment on the defense of contributory negligence, arguing the undisputed facts do not allow a jury to reasonably conclude the plaintiff was, himself, in any way negligent.  Because this question is very fact-specific, it is most likely a question that must be resolved by a jury.

**H.**    **Defendants' Motion for Summary Judgment on Plaintiff's Claim for Conspiracy and Fraud under Mississippi Law – GRANTED** . . . . . . . . . . . . . . . **242**

*Welding Fume* plaintiffs commonly state claims for conspiracy and fraud, asserting the defendants conspired to conceal and misrepresent information regarding the toxic effects of manganese in welding fumes.  Applying Mississippi law, the Court granted summary judgment to defendants on these claims, because the plaintiff identified no *affirmative* misrepresentations (as opposed to omissions) made by any alleged conspirator upon which he relied.  Notably, however, the same result does not necessarily adhere when other States' laws are applied, as revealed immediately below.

**I.**    **Defendants' Motion for Summary Judgment on Plaintiff's Claim for Fraud under California Law – DENIED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **244**

California has a state-court analog to this federal MDL, known as California Judicial Council Coordinated Proceeding ("C.J.C.C.P.") No. 4368, in which are aggregated

all of the California state court *Welding Fume* cases. The Judge presiding over this C.J.C.C.P. has denied a motion for summary judgment on a claim for fraudulent concealment. Because the operative facts will be virtually the same in all *Welding Fume* cases, a federal court applying California law will normally be compelled to also deny a motion for summary judgment on a claim for fraudulent concealment.

**J.** **Defendants' Motion for Summary Judgment on Plaintiff's Claims for Negligent & Conscious Misrepresentation under Mississippi Law – GRANTED in part and DENIED in part** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

As noted earlier, this Court ruled that a *Welding Fume* plaintiff's claim for fraud under Mississippi law will fail if the plaintiff identifies no *affirmative* misrepresentations (as opposed to omissions) made by defendants. A plaintiff may, however, premise a fraud claim upon affirmative statements made by defendants in their marketing and scientific publications sent to plaintiff's employer, with the expectation that the employer would repeat the misrepresentations to plaintiff. The Court allowed one Mississippi plaintiff to pursue this theory at trial under exacting evidentiary standards, denying a motion for summary judgment; however, the Court subsequently granted a trial motion for directed verdict on this same claim.

**K.** **Defendants' Motion for Summary Judgment on Plaintiff's Claims for Fraud under Iowa Law – GRANTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

Iowa law is essentially the same as Mississippi law – a *Welding Fume* plaintiff's claim for fraud under Iowa law will fail if the plaintiff identifies no *affirmative* misrepresentations (as opposed to omissions) made by defendants. Accordingly, the Court granted summary judgment to defendants on an Iowa plaintiff's fraud claim, because the plaintiff identified no affirmative misrepresentation made by any defendant upon which he relied.

**L.** **Defendants' Motion for Summary Judgment on Plaintiff's Claims for Negligence under Mississippi Law – GRANTED** . . . . . . . . . . . . . . . . . . . . . . . . . 249

Mississippi courts have held that negligence-based claims of product defect under common law are redundant of strict liability claims of product defect under the Mississippi Products Liability Act ("MPLA"). Accordingly, it is appropriate to grant summary judgment on a *Welding Fume* plaintiff's negligence claim under Mississippi law if the plaintiff also states a strict liability claim under the MPLA.

**M.** **Defendants' Motion for Summary Judgment on Plaintiff's Claims for "Aiding & Abetting" and "Acting in Concert" under California Law – GRANTED** . . . 250

Two related theories of liability outlined in *Restatement (Second) of Torts* §876 are "acting in concert," and "aiding and abetting." Some *Welding Fume* plaintiffs rely on these theories to claim that each defendant assisted and encouraged every other defendant to fail to undertake scientific investigations into whether welding fumes can cause neurological injury. This Court ruled that defendants were entitled to summary judgment on a plaintiff's §876 claims under California law because "it seems dubious whether liability on the

concert of action theory can be predicated upon substantial assistance and encouragement given by one alleged tortfeasor to another pursuant to a tacit understanding *to fail to perform an act*." Similar results will probably adhere when other States' laws are applied.

**N.    Defendants' Motion for Summary Judgment on Plaintiff's Claim for "Negligent Performance of a Voluntary Undertaking" under Texas & California Law – GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252**

Many *Welding Fume* plaintiffs rely on *Restatement (Second) of Torts* §323 to assert a State law claim for "negligent performance of a voluntary undertaking." Specifically, plaintiffs claim the defendants voluntarily assumed a duty to fully research and report the hazards of welding rods, but then breached that duty. This Court noted that, under Texas law, a plaintiff cannot prevail on such a claim if the only evidence of the alleged voluntary undertaking is a defendant's marketing messages promising to be a leader in the field of welding safety. The same result occurs under California law and probably the law of other States, as well.

**O.    Defendant's Motion for Summary Judgment on all of Plaintiff's Claims Based on Lack of Product Identification – DEPENDS . . . . . . . . . . . . . . . . . . . . . . . . . . 254**

To prevail on his product liability claims against a particular manufacturing defendant, a *Welding Fume* plaintiff must show he actually used that manufacturer's products. Because many plaintiffs worked as welders for a variety of employers in different locations over many years, and because welding rods are somewhat fungible, the discovery of product identification evidence can be toilsome, and the results less than clear. Whether a given defendant is entitled to judgment as a matter of law based on lack of product identification is a highly fact-specific question, and the answer as to certain defendants in certain cases may not become clear even until after trial.

**P.    Defendants' Motion for Summary Judgment on Plaintiff's Claim for Breach of Warranty under California Law – GRANTED . . . . . . . . . . . . . . . . . . . . . . . 258**

Some *Welding Fume* plaintiffs assert claims for breach of warranty. Often, the applicable State law will parallel Uniform Commercial Code §2-313, which requires a plaintiff to show: (1) the defendant made affirmative statements to the plaintiff about the welding rods; and (2) those statements became "part of the basis of the bargain." While some of the defendants' publications and marketing materials may qualify as the necessary affirmative statement, this Court has not seen a welder testify that these representations induced him to begin his career in welding, or to continue working as a welder, or to use or not use any specific welding product, or to take any particular level of care when welding.

**Q.    Defendants' Motions for Summary Judgment on Plaintiffs' Claims for Design Defect under South Carolina and California Law – GRANTED . . . . . . . . . . . . 259**

In addition to stating claims for defective *warnings*, some *Welding Fume* plaintiffs state claims for defective *design*, asserting that: (a) defendants should have formulated their welding rods to emit less manganese in the fume; and/or (b) defendants should have

incorporated a device on their welding wire machines to suck fumes away during welding. State case law usually requires the plaintiff to offer expert testimony addressing the existence of an alternative, feasible design. To date, no plaintiff has offered such expert testimony, so the Court has granted defendants' motions for summary judgment on design defect claims.

**R.     Defendants' Motions for Judgment as a Matter of Law on all of Plaintiff's Claims Based on Lack of Evidence of Overexposure – DENIED** . . . . . . . . . . . . **262**

Defendants may assert at trial that the plaintiff did not sufficiently quantify: (a) how much welding fume exposure a person must suffer before he has an increased risk of contracting Manganese-Induced Parkinsonism; and/or (b) how much total welding fume exposure the plaintiff actually suffered, himself, during his career; and/or (c) how much of plaintiff's welding fume exposure is attributable to each specific defendant. To date, the Court has denied defendants' motions for summary judgment and for directed verdict on these grounds and allowed the jury to assess the evidence. Further, in cases where the jury found for the plaintiff, the Court has denied post-judgment motions for judgment notwithstanding the verdict, concluding the plaintiff adduced sufficient evidence of specific causation. Because this evidentiary burden on the plaintiffs is an important and somewhat difficult one, however, it is possible that a transferor court might find the plaintiff's trial record in a given case inadequate.

**S.     Defendants' Motions for Judgment on Plaintiff's Claim for Punitive Damages as a Matter of Various States' Laws – DENIED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **265**

In every *Welding Fume* case, defendants have moved for judgment as a matter of law on plaintiffs' claim for punitive damages. The Court has denied every such motion, regardless of the applicable State law. In the MDL bellwether trial of *Jowers*, the jury found in favor of plaintiff on his punitive damages claim. Applying Mississippi law, the Court denied defendants' post-judgment motion for judgment notwithstanding the verdict, concluding a jury could reasonably find, by clear and convincing evidence, that the defendants' actions manifested a willful, wanton or reckless disregard for the safety of others. The standards for imposition of punitive damages under the laws of other States may be more strict, but a transferor court should normally rule on a motion for judgment as a matter of law on punitive damages only after all of the evidence has been presented at trial.

**T.     Plaintiffs' Motion for Attorney's Fees Following a Verdict of Punitive Damages under Mississippi Law – GRANTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . **269**

After a jury awarded punitive damages to a Welding Fume plaintiff under Mississippi law, the plaintiff filed a post-judgment motion for an award of attorney's fees. The Court granted this motion, concluding that the "almost universal rule" is: if punitive damages are awarded by the jury, then an award of attorney's fees is justified under Mississippi law.

**U.**     **Plaintiffs' Motion for Judgment as a Matter of Law on Plaintiff's Claim for Loss of Consortium under Mississippi Law – DENIED** . . . . . . . . . . . . . . . . . . . . **271**

A jury awarded damages to a Welding Fume plaintiff under Mississippi law, but found against the plaintiff's wife on her claim for loss of consortium. The wife argued she was entitled to judgment notwithstanding the verdict, because her testimony was uncontroverted. Although the question was close, the Court denied the motion because it was loathe to set aside a jury's decision absent the most egregious circumstances.

**XI.**     **Trial Matters** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **273**

So that transferor courts might obtain some benefit from this Court's MDL bellwether trial experiences, the Court sets out certain trial procedures it has used to good effect, and to illustrate the routine with which the parties have become familiar.

**A.**     **The Jury Venire; Jury Questionnaires; Voir Dire** . . . . . . . . . . . . . . . . . . . . . . . . **273**

This Court normally calls a venire of about 55 potential jurors, and ultimately seats a jury of nine. Plaintiffs and defendants are each given a total of five peremptory strikes. About 10 days before trial, members of the venire fill out a jury questionnaire. The Court and the parties use voir dire to follow up on information obtained in the questionnaire; argument during voir dire is not permitted. Sample questionnaires may be obtained from the Special Master or Liaison Counsel.

**B.**     **Time Limits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **275**

From the very first MDL bellwether trial, the Court has imposed time limits upon the parties. The Court is now allowing each side a total of 30 trial hours, not including voir dire, opening statement, or closing argument. The Special Master tracks the running totals of time used and reports to the parties at the end of each trial day. A *Welding Fume* trial will normally last about three weeks, depending on holidays, how long the jury deliberates, length of trial days, and so on.

**C.**     **Introduction of Witnesses; Note-Taking by Jurors; Witness Order Disclosure; Exchange of Demonstrative Exhibits** . . . . . . . . . . . . . . . . . . . . . . . . **276**

The Court permits counsel to give a short introduction of each witness and their role in the litigation, to provide context to the jurors. The Court also allows jurors to take notes during trial. Each day, counsel must disclose to the other side the witnesses they intend to call and the demonstrative exhibits they intend to use the next trial day.

**D.**     **Bifurcation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **278**

No party has moved for bifurcation in a *Welding Fume* case, and the Court has never found any reason for bifurcation.

**E.**     **Videotaped Trial Deposition Transcripts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **278**

The Court has followed a specific protocol regarding the parties' use of videotaped trial transcripts of fact witnesses. Before a videotaped deposition is played in Court, both parties: (1) designate those portions of the transcript they want presented to the jury; and

(2) assert objections to the other side's designations.  After the Court rules on these objections, a party wishing to present a videotaped deposition of a fact witness in its case-in-chief must show to the jury, all at once, *all* of the designated portions of the videotaped deposition, including those designated by the opposing party.  The only two exceptions to this rule are: (1) if one party's designations are very short and the other party's designations are much longer, the Court may allow the first party to present only the short designation, by itself; and (2) when the plaintiff wants to play in its case-in-chief portions of a videotaped deposition of *a party opponent on cross-examination,* the defendant may not force the plaintiff to present concurrently defendant's own designations.

**F.**     **Admission of Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **280**
This Court follows the practice of addressing final admissibility of exhibits only after all of the evidence has been tendered – that is, after the defendants have rested.  Appendix Five lists all of the non-case-specific documents and exhibits this Court has admitted into evidence in all of the MDL bellwether trials.

**G.**     **Jury Instructions and Verdict Forms**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **282**
The MDL Court has drafted Jury Instructions and Verdict Forms in bellwether trials involving application of the law of five different states, so far: Mississippi, Texas, South Carolina, California, and Iowa.  Copies of these Instructions and Verdict Forms may be obtained from the Special Master or Liaison Counsel.

**XII.**   **Conclusion**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **284**

**Appendices.**

**1.**     **Appendix One – MDL Bellwether Trial Result Summary**
This Chart summarizes the defendants, applicable law, and final result of all of the MDL bellwether trials.

**2.**     **Appendix Two – MDL Bellwether Trial Witness Chart**
This Chart lists all of the witnesses who have appeared in the first six MDL bellwether trials, and their roles.

**3.**     **Appendix Three – MDL Opinion Chart**
This Chart lists all of the opinions issued by this Court that are cited in this Trial Template.  These opinions are all available on the MDL Court's public website: www.ohnd.uscourts.gov.  Click on "MultiDistrict Litigation Cases" in the left column, and then "MDL 1535 Welding Fumes Products Liability Litigation."

**4.**     **Appendix Four – MDL Bellwether Trial Exhibit Number Ranges**
This Chart lists the number ranges reserved by the parties for various types of exhibits, such as plaintiff's case-specific exhibits and defendants' general exhibits.

**5.      Appendix Five – MDL Bellwether Trial Document Chart**

This Chart lists all of the documents that have been admitted in MDL bellwether trials that are *not* case-specific.  As a general matter, the admissibility of most of these documents will not change from trial to trial.

**6.      Appendix Six – Word Index**

## I.    Prologue.

On June 23, 2003, the Judicial Panel on Multi-District Litigation ("MDL Panel") conferred multi-district status on "*Welding Fume*" lawsuits filed in federal court, and transferred three such pending cases to this Court, pursuant to 28 U.S.C. §1407.[1]  The MDL Panel concluded that the three *Welding Fume* cases each "present[ed] claims of personal injuries allegedly caused by exposure to welding fumes.  The actions thus share factual questions concerning, inter alia, whether exposure to welding fumes causes the conditions complained of by plaintiffs and whether defendants knew or should have known of any health risks associated with exposure to welding fumes."[2]

Since that time, the MDL Panel has transferred to this Court about 9,860 related cases filed by plaintiffs around the country.[3]  Another 2,720 cases have been removed directly to, or filed directly in, this Court.[4]  By virtue of subsequent remands to state court, voluntary dismissals, and so on, the number of active cases now pending in this *Welding Fume* MDL is about 3,900.  In light of the size and complexity of the MDL, the Court early on granted the parties' joint motion for appointment of a Special Master and appointed David R. Cohen, Esq. to help oversee all aspects of the litigation.[5]

---

[1]  *In re Welding Rod Prods. Liab. Litig.*, 269 F.Supp.2d 1365 (J.P.M.L. 2003) (master docket no. 1).

[2]  *Id.* at 1366-67.

[3]  *See* MDL Panel Rules 1.1, 7.4 (discussing "tag-along actions").  As of February 17, 2010, the MDL Panel had transferred 456 cases to this Court.  Several of these, however, were multi-plaintiff cases; after each plaintiff was severed and assigned his own case, there were over 9,860 separate lawsuits attributable as tag-along actions.

[4]  As of May 10, 2010, this Court had obtained jurisdiction, for at least some period of time, over 12,600 separate *Welding Fume* cases.

[5]  *In re Welding Rod Prods. Liab. Litig.*, 2004 WL 3711622 (N.D. Ohio Nov. 10, 2004) (master docket no. 612).

As a general matter, the plaintiffs in the *Welding Fume* cases all allege that: (1) they inhaled fumes given off by welding rods;[6] (2) these fumes contained manganese; and (3) this manganese caused them to suffer permanent neurological injury and other harm.  The *Welding Fume* plaintiffs name as defendants various manufacturers, suppliers, and distributors of welding rod products, and claim the defendants knew or should have known that the use of welding rods would cause these damages.  The plaintiffs generally bring claims sounding in strict product liability, negligence, fraud, and conspiracy.  The gravamen of the complaints is that the defendants "failed to warn" the plaintiffs of the health hazards posed by inhaling welding rod fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process.

Since the inception of the *Welding Fume* MDL, the Court has, among other things: (1) addressed the admissibility at trial of many hundreds of documents, and reviewed tens of thousands of documents for privilege; (2) ruled that the plaintiff-welders' claims are not pre-empted by the Occupational Safety and Health Act or the Hazard Communication Standard;[7] (3) issued rulings addressing the admissibility of expert opinions on a variety of matters, including a determination that "the sum of the epidemiological and other evidence proffered by the parties is sufficiently reliable to support the assertion that exposure to welding fumes can cause, contribute to, or accelerate a parkinsonian syndrome that some doctors will

---

[6]  Defendants' products at issue in this litigation include welding rods, welding sticks, welding wire, and other meltable products used to weld pieces of metal together, all of which are referred to collectively as "welding consumables."  For the sake of simplicity, the Court refers to all of these products in this document as "welding rods," except where context calls for more specific identification.

[7]  *In re Welding Fume Prods. Liab. Litig.*, 364 F.Supp.2d 669 (N.D. Ohio 2005) (master docket no. 1002).

2

diagnose as [Parkinson's Disease]";[8] (4) concluded that the medical screening programs employed by plaintiffs' counsel did provide them with "a good faith basis to assert a claim that the welder[-plaintiffs] suffered neurological injury caused by welding fumes";[9] (5) ruled that defendants Metropolitan Life Insurance Company and Caterpillar, Inc. were entitled to summary judgment in every *Welding Fume* MDL case;[10] and (6) denied class action status for plaintiffs asserting claims for medical monitoring.[11]

Also, as of the date of this writing, the undersigned has presided over six *Welding Fume* MDL bellwether trials: three ended in jury verdicts for defendants on all claims, and three ended in jury verdicts

---

[8] *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *36 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353) (examining expert opinions for admissibility in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).

[9] *In re Welding Fume Prods. Liab. Litig.*, 2006 WL 1173960 at *9 (N.D. Ohio Apr. 5, 2006) (master docket no. 1725) (distinguishing *In re Silica Prods. Liab. Litig.*, 398 F.Supp.2d 563 (S.D. Tex. 2005)).

[10] *In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605 (N.D. Ohio Apr. 9, 2007) (master docket no. 2016) (granting summary judgment to MetLife); *In re Welding Fume Prods. Liab. Litig.*, 526 F.Supp.2d 775 (N.D. Ohio 2007) (master docket no. 2091) (granting summary judgment to Caterpillar).

[11] *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279 (N.D. Ohio 2007) (master docket no. 2077).

3

for the plaintiffs, with two juries awarding punitive damages.[12]  The Court purposefully chose bellwether cases from different States, so that other courts applying the laws of those States would have the benefit of this Court's rulings on issues particular to the law of those jurisdictions (such as jury instructions).

Importantly, the MDL Panel has transferred to this Court the various *Welding Fume* cases that were filed in federal courts around the country "for coordinated or consolidated *pretrial* proceedings," pursuant to 28 U.S.C. §1407.[13]  This statute makes clear that "[e]ach action so transferred shall be remanded by the [MDL Panel] at or before the conclusion of such pretrial proceedings to the district from which it was

---

[12]  The first trial was in *Solis v. Lincoln Elec. Co.*, case no. 04-CV-17363 (N.D. Ohio), which involved claims made under Texas law and ended in a defense verdict.  The second trial included two consolidated cases, *Goforth  v. Lincoln Elec. Co.*, case no. 06-CV-17217 (N.D. Ohio), and *Quinn  v. Lincoln Elec. Co.*, case no. 06-CV-17218 (N.D. Ohio), which involved claims made under South Carolina law and ended in a defense verdict.  The third trial was in *Tamraz v. Lincoln Elec. Co.*, case no. 04-CV-18948 (N.D. Ohio), which involved claims made under California law and ended in a \$20.5 million plaintiffs' verdict.  The fourth trial was in *Jowers v. Airgas-Gulf States, Inc.*, case no. 08-CV-36 (S.D. Miss.), which involved claims made under Mississippi law and ended in a \$2.9 million plaintiffs' verdict (including an award for \$1.7 million in punitive damages).  The fifth trial was in *Byers v. Lincoln Elec. Co.*, case no. 04-CV-17033 (N.D. Ohio), which involved claims made under Texas law and ended in a defense verdict.  And the sixth trial was in *Cooley v. Lincoln Elec. Co.*, case no. 04-CV-17734 (N.D. Ohio), which involved claims made under Iowa law and ended in a \$6.25 million plaintiff's verdict (including an award for \$5 million in punitive damages).  See also chart at Appendix One.

In addition, the Court has presided over four other cases that were set for trial but ultimately were not tried, during which time the Court issued many evidentiary and other rulings applicable to all *Welding Fume* cases.  These four cases were: *Ruth v. A.O. Smith Corp.*, case no. 04-CV-18912 (N.D. Ohio), which settled on the eve of trial; *Landry v. Nichols Wire*, case no. 03-CV-17016 (N.D. Ohio), which was voluntarily dismissed early in discovery; and *Morgan v. Lincoln Elec. Co.*, case no. 04-CV-17251 (N.D. Ohio), and *Peabody v. Lincoln Elec. Co.*, case no. 05-CV-17678 (N.D. Ohio), both of which were dismissed shortly before trial.

Finally, two other judges of this Court graciously agreed to preside over recent *Welding Fume* trials, both of which ended in defense verdicts: (1) *Arroyo v. Lincoln Elec. Co.*, case no. 08-CV-17980 (N.D. Ohio) (Honorable Jack Zouhary); and (2) *Mann v. Lincoln Elec. Co.*, case no. 06-CV-17288 (Honorable David Dowd).  With a few exceptions, this Trial Template Order discusses only those cases over which the Court presided through trial or dismissal – this Order does not discuss *Arroyo* or *Mann*.

[13]  *In re Welding Rod Prods. Liab. Litig.*, 269 F.Supp.2d 1365, 1367 (J.P.M.L. 2003) (master docket no. 1) (emphasis added).

4

transferred unless it shall have been previously terminated."[14]  The Supreme Court explains that this language normally "obligates the [MDL Panel] to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course."[15]  Thus, it is the transferor court, where the federal case originated, that must normally conduct the actual trial.

In addition to pursuing pretrial proceedings applicable generally to every case in this MDL, this Court also put into place a phased process where groups of cases were identified for case-specific discovery.  The purpose of this rolling process was to make certain cases ready for remand to and trial in the transferor courts, and the process has now reached the point where remand of some of these cases is appropriate.

The Manual for Complex Litigation states that "[o]ne of the final actions of the transferee court should be a pretrial order that fully chronicles the proceedings, summarizes the rulings that will affect further proceedings, outlines the issues remaining for discovery and trial, and indicates the nature and expected duration of further pretrial proceedings."[16]  The instant document is this MDL Court's attempt to fulfill this mandate and provide a "trial template" for transferor courts.[17]

---

[14]  28 U.S.C. §1407(a).  As noted, the statute makes clear that it is the MDL Panel, and not this MDL transferee court, that remands a transferred case to the originating transferor court.  Because the MDL Panel normally awaits a suggestion of remand from the transferee court, however, this Order sometimes uses shorthand terminology and refers to "a remand by this Court," rather than "a suggestion of remand by this Court made to the MDL Panel"  *See Manual for Complex Litig. Fourth* §20.132 at 225 ("The Panel looks to the transferee court to suggest when it should order remand, but that court has no independent authority to order section 1407 remand.").

[15]  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998).  *But see Manual for Complex Litigation, Fourth* §20.132 at 224-25 (2004) (noting several procedural mechanisms parties may use to avoid remand of cases back to transferor courts).

[16]  *Manual for Complex Litigation, Fourth* §20.132 at 224-25 (2004).

[17]  The Court may amend this "Trial Template" from time to time to reflect additional rulings or circumstances of which transferor courts should be made aware.

5

## II.     Law of the Case.

As a general matter, the "transferor court is bound, upon remand, by the orders entered by the transferee court during the coordinated or consolidated pretrial proceedings.  Those decisions are considered law of the case."[18]  This is true even with regard to matters affecting the conduct of the trial itself, such as the number of expert witnesses allowed.[19]  Thus, the evidentiary, procedural, and substantive decisions made by this MDL Court follow a *Welding Fume* case back to the transferor court, where they continue to adhere.

---

[18]  David F. Herr, *Multidistrict Litigation Manual* §9:3 at 242 (2007) (footnote omitted); *see also id.* §10:5 at 270-71 ("The transferor court (court to which the actions are remanded) receives the cases in the condition they are in at the time of remand.  Decisions that have been made in the case continue to apply unless circumstances change warranting their modification.  The decisions made by the transferee court are considered 'law of the case.'") (footnotes omitted); *id.* §10:17 at 280-81 ("The assigned judge in [the transferor court] becomes a 'successor' judge to the transferee judge.  The rulings made in the case to that date remain in effect and binding upon the parties.").

*See also Manual for Complex Litigation, Fourth* §20.133 at 226 ("Although the transferor judge has the power to vacate or modify rulings made by the transferee judge, subject to comity and 'law of the case' considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings.").

*See also Sentner v. Amtrak*, 540 F.Supp. 557, 558 n.3 (D.N.J. 1982) (quoting *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3rd Cir. 1981) ("Adherence to law of the case principles is even more important in this context where the transferor judge and the transferee judge are not members of the same court.  Here, the principles of comity among courts of the same level of the federal system provide a further reason why the transferee court should not independently re-examine an issue already decided by a court of equal authority."); *Allegheny Airlines, Inc. v. LeMay*, 448 F.2d 1341, 1345 (7th Cir. 1971) ("The transferor court when the case is returned to it is, in our opinion, in the position of a third court on a second change of venue and takes the case with all of its errors, if any, that may have fastened on the carcase theretofore.").

For an excellent discussion of "how MDL transfer courts review the pretrial determinations of transferee MDL courts," see  *In re: Ford Motor Co.*, 580 F.3d 308 (5th Cir. 2009) (listing three slightly different views, and noting the "authorities are unanimous that [at least] some deference must be given to the transferee court's decisions").

[19]  *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 169 F.R.D. 632, 633 & 637 n.3 (N.D. Ill. 1996) (MDL Judge who also sat on MDL Panel confirming that the MDL transferee court has "the authority to limit the number of common-issue expert witnesses at trials which will take place after remand to the transferor districts").

The point, of course, "is not a matter of trying to tie the hands of the trial judge."[20]  Rather, the law of the case doctrine, in this context, ensures that the transferor judge is not asked to re-plow ground already prepared by the MDL court for the efficient harvest of a verdict at trial.[21]

This Court has worked assiduously to conserve judicial resources by placing transferor judges in the position of having to rule on as few remaining issues as possible before trial.  With that goal in mind, the Court presents below an overview of the *Welding Fume* MDL history, parties, claims, and defenses, and also a catalog of the principal rulings the Court has already entered that apply in remanded cases.  The MDL Court also adds some last rulings that will govern the remanded cases as they leave for their original jurisdictions.

---

[20]  *Id.* at 637.

[21]  *See id.* ("This is not to suggest that in the absence of unforeseen developments the transferor judges in this litigation are bound by what this court does.  The extent to which any transferor judge might see fit to vary what we do here is a matter of his or her own good judgment.  We would expect any error on our part to be corrected before the case went to trial.  This is not a matter of trying to tie the hands of the trial judge.  It is a matter of defining what this court's authority is to enter orders that will bind the parties at trial to the extent the trial judge sees fit to enforce them.  (It is also a matter of determining whether the transferor court can, as a matter of law, safely adhere to the orders of the transferee judge should he or she find it otherwise appropriate to do so.)  But it is obvious that the objectives of §1407 can best be achieved when a departure from the transferee judge's pretrial orders is the exception rather than the rule, and it is this court's impression that such departures are in fact exceptional.").

**III.     Appointment of a Special Master and a Settlement Mediator.**

**A.     Special Master.**

As measured by the total number of actions that have been made a part of the various federal multidistrict litigation dockets, the *Welding Fume* MDL is the third largest of the roughly 350 MDLs currently pending.[22]  The parties, recognizing the scope and complexity of the *Welding Fume* litigation early on, jointly moved the Court for appointment of a Special Master to help oversee all proceedings. As noted above, the Court granted this motion and appointed David R. Cohen, Esq.[23] as Special Master to perform the following duties, among others:

- establish discovery and other schedules, review and attempt to resolve informally any discovery conflicts (including issues such as privilege, confidentiality, and access to medical and other records), and supervise discovery;

- oversee management of docketing, including the identification and processing of matters requiring court rulings;

- compile data and assist with, or make informal recommendations with regard to, interpretation of scientific and technical evidence;

- assist with legal analysis of the parties' motions or other submissions, whether made before, during, or after trials;

- help to coordinate federal, state and international litigation;

- direct, supervise, monitor, and report upon implementation and compliance with the Court's Orders, and make findings and recommendations on remedial action if required;

- make formal or informal recommendations and reports to the parties, and make informal recommendations and reports to the Court, regarding any matter pertinent

---

[22]  *See* www.jpml.uscourts.gov (listing pending MDL dockets by district as of January 11, 2009). The only pending MDLs that have more total actions than the *Welding Fumes* MDL are *In re: Asbestos Products Liab. Litig. (No. VI)*, MDL No. 875, and *In re: Diet Drugs Prods. Liab. Litig.*, MDL No. 1203.

[23]  David R. Cohen Co. LPA, 23220 Chagrin Blvd., Two Commerce Park, Suite 360, Cleveland, OH 44122; 216-831-0001 (tel); 866-357-3535 (fax); david@specialmaster.biz.

8

to these proceedings; and

- communicate with parties and attorneys as needs may arise in order to permit the full and efficient performance of these duties.[24]

The Court and also counsel for all parties have become familiar with and dependent upon the efforts of the Special Master, who has helped ensure the effective and expeditious resolution of disputes in this litigation.

As explained further below, although the Court is now remanding cases to transferor courts for trial pursuant to 28 U.S.C. §1407(a), these remanded cases will still require substantial discovery and motion practice before becoming fully trial-ready.  In connection with MDL bellwether trials, the Special Master has been involved in negotiating and resolving discovery disputes, recommending rulings on dispositive and evidentiary motions, and assisting the Court during trial.  There is no question but that the Special Master's "institutional knowledge," such as his familiarity with the parties and with the complicated issues that arise recurrently in *Welding Fume* trials, will be invaluable to transferor courts.

Accordingly, the Court directs that the Special Master shall serve and assist all transferor courts with any remanded case, to the same extent and in the same capacity as he has served this MDL Court in connection with MDL bellwether trials, to the fullest extent the transferor court desires.

---

[24] *See In re Welding Rod Prods. Liab. Litig.*, 2004 WL 3711622 at *3 (N.D. Ohio Nov. 10, 2004) (master docket no. 612) (Order of Appointment); *In re Welding Rod Prods. Liab. Litig.*, 2005 WL 5417813 (N.D. Ohio Sept. 8, 2005) (master docket no. 1408) (amending Order of Appointment); Order at 1 (Nov. 1, 2005) (master docket no. 1468) (amending Order of Appointment).

9

### B.    Settlement Mediator.

From the beginning of the MDL, the Court and the Special Master have engaged in extensive settlement discussions with the parties.  To obtain additional, focused assistance with settlement efforts, the Court appointed James J. McMonagle as an independent Settlement Mediator.[25]  The Mediator has met with the parties many times during the lengthy course of this MDL to discuss not only settlement of individual cases, but also the possibility of a global resolution of the entire litigation.

To date, these efforts have not been successful on either a case-specific or global basis. Nonetheless, this MDL court remains hopeful that additional settlement efforts will eventually bear fruit. Transferor courts should be aware that their own case-specific settlement efforts necessarily fall within the greater context of the MDL, and that this Court, the Special Master, and the Settlement Mediator continue to pursue settlement efforts as well.

---

[25]  James J. McMonagle, Vorys Sater Seymour & Pease, LLP, 2100 One Cleveland Center, 1375 East Ninth St., Cleveland, OH 44114; 216-479-6158 (tel); 216-937-3734 (fax); JJMcMonagle@vssp.com.

10

## IV.    Jurisdictional Rulings.

There should remain for the transferor court no issues regarding federal jurisdiction.  Early in the history of this litigation, the MDL Court issued a number of Orders addressing the following jurisdictional questions: (1) whether defendants had timely removed plaintiffs' cases from state court to federal court under 28 U.S.C. §1446(b&c); (2) whether plaintiffs had timely filed motions for remand from federal court to state court under 28 U.S.C. §1447(c); (3) whether diversity of citizenship was complete under 28 U.S.C. §1332(a)(1), in light of defendants' arguments regarding fraudulent joinder under various States' laws; (4) whether federal officer jurisdiction exists pursuant to 28 U.S.C. §1442(a)(1); and (5) whether "federal enclave jurisdiction" or "Outer Continental Shelf jurisdiction" attached to plaintiffs' cases pursuant to, respectively, Article I, Section 8, Clause 17 of the United States Constitution, or 43 U.S.C. §1349(b)(1).[26]

Although these various jurisdictional Orders resolved directly only a hundred or so cases, the parties agreed to apply the Court's reasoning to other cases in the MDL and, where possible, stipulate to removal or remand.[27]  This process worked successfully to resolve the question of federal jurisdiction in the vast majority of cases, and this MDL Court continues to assess federal subject matter jurisdiction in those few cases where the parties cannot agree.  In sum, any transferor court to which this Court remands a case pursuant to 28 U.S.C. §1407 may rest assured that, if there was ever any dispute in that case over federal jurisdiction, the dispute has been resolved and federal jurisdiction is proper.

---

[26]  The MDL Court's jurisdictional Orders were filed as master docket entries 101, 148, 224 (*In re Welding Rod Prods. Liab. Litig.*, 2004 WL 1179454 (N.D. Ohio May 21, 2004)), 404, 807, 810 (*In re Welding Rod Prods. Liab. Litig.*, 2005 WL 147081 (N.D. Ohio Jan. 13, 2005)), 811, 1001, and 2184 (*In re Welding Fume Prods. Liab. Litig.*, 606 F.Supp.2d 716 (N.D. Ohio, 2009)); *see also Solis* docket no. 3 (Jan. 13, 2005).

[27]  *See, e.g.*, master docket no. 1954 (Jan. 4, 2007) (parties stipulating to federal enclave jurisdiction in five MDL cases); master docket no. 2001 (Mar. 19, 2007) (parties stipulating to remand of 186 MDL cases to West Virginia state court for lack of federal jurisdiction).

11

## V. The Parties.

### A. The Defendants.

As a rule, all of the plaintiffs in the many cases that are a part of this MDL originally used a generic complaint naming a great many defendants, who allegedly either: (1) manufactured or supplied welding rods; or (2) conspired with those manufacturers and suppliers. Some of these original complaints listed as many as 70 defendants. By listing so many defendants, a given plaintiff's generic complaint was likely to name those particular defendants who manufactured and supplied that plaintiff with the welding products he had actually used; however, this generic complaint also named many defendants who did *not* manufacture or supply the particular welding products that a specific plaintiff used, but who were allegedly co-conspirators.

During the course of presiding over MDL bellwether trials, the Court saw a pattern emerge: as discovery proceeded and trial neared, the plaintiff usually dismissed a large number of the named defendants, because: (1) the evidence showed those defendants did not manufacture or supply a substantial portion of the specific welding rods that the plaintiff actually used; and /or (2) pressing claims against those defendants was simply not worthwhile for financial or strategic reasons. Many of these dismissals were voluntary, although some came only after dispositive motion by the defendant.

As an example, the complaint filed in the first bellwether case to go to trial, *Solis v. Lincoln Elec. Co.*, named 29 defendants – 22 welding rod manufacturers, 5 suppliers, and 2 trade organizations that allegedly conspired with the other defendants. During the course of discovery, plaintiff Solis proceeded to voluntarily dismiss all 5 suppliers, both trade organizations, and 17 of the 22 manufacturers. The Court also granted summary judgment to another manufacturer for lack of sufficient evidence that Solis had ever used any of its welding rod products. Thus, only four manufacturing defendants remained at trial, which

12

defendants won.

Although there was nothing inherently unworkable with this procedure, the Court became concerned that many of the smaller manufacturers and suppliers were simply "peripheral defendants" who would rarely find themselves on a verdict form but, in the meantime, had real lawsuits pending against them, with all of the public reporting and attorney fee requirements that those lawsuits carried.  Moreover, with its Second Amended Case Management Order, the Court had earlier directed each plaintiff to submit to defendants a "Fact Sheet" listing, among other things, the plaintiff's medical history and the welding products he used.[28]  The purpose of the Fact Sheet was "to provide basic factual information about each plaintiff's claims, so as to streamline the case-specific discovery process."  Having engaged in the primary discovery required to submit a Fact Sheet, however, few plaintiffs voluntarily amended their complaints to dismiss those defendants against whom it had become clear there was no basis to bring a claim.  Thus, the plaintiffs' continued use of a generic complaint was neither necessary nor appropriate.

Accordingly, the Court directed the parties to negotiate a 'Dismissal Agreement,' with the following aims: (1) to provide the parties with a vehicle to identify the 'peripheral defendants' in each case; (2) to allow plaintiffs to dismiss those peripheral defendants without prejudice, while (a) tolling any statutes of limitation, and (b) preserving all existing rights to consecutive dismissals under Fed. R. Civ. P. 41(a)(1) or similar state rule; (3) to allow plaintiffs to re-institute their claims against a previously-dismissed peripheral defendant, if discovery later provided a factual basis therefor; and (4) to allow a peripheral defendant against whom a claim was re-instituted to re-open discovery only upon good cause shown and with the approval of the Court.[29]

---

[28]  *See* master docket no. 287, attachment 2 (blank Fact Sheet).

[29]  Order at 3-4 (Mar. 31, 2006) (master docket no. 1724).

13

The ultimate point of this Dismissal Agreement was to force each plaintiff to identify those defendants against whom he had a good faith basis to believe he would ultimately press his claims at trial, and dismiss the rest, while still allowing the plaintiff to reinstitute his claims against a dismissed defendant (e.g., a small manufacturer) if discovery later provided a factual basis for such a claim (e.g., later-found evidence that the plaintiff's employer bought welding rods from that small manufacturer).

The parties did negotiate a "Peripheral Defendant Dismissal Agreement," which identified the following seven defendants as ***not*** peripheral in any case – meaning the plaintiffs were unwilling to dismiss these defendants in any case where they were originally named:

- The Lincoln Electric Company.

- The BOC Group, Inc., formerly known as Airco, Inc., (as itself and as successor-in-interest to: (a) Air Reduction Company, Inc. and (b) Wilson Welder and Metals Company, Inc.).

- The ESAB Group, Inc. (as itself and as successor-in-interest to Alloy Rods Corporation).

- TDY Industries, Inc., formerly known as Teledyne Industries, Inc. (as successor-in-interest to Teledyne McKay).

- Hobart Brothers Company.

- Caterpillar, Inc.

- Metropolitan Life Insurance Company.

The first five of these defendants are the largest welding rod manufacturers in the United States, and some or all of them have remained as defendants in every MDL bellwether trial.  The last two defendants are discussed further below.

Virtually every MDL plaintiff has, in fact, used the Dismissal Agreement to dismiss many of the originally-named defendants.  As provided in the Dismissal Agreement, plaintiffs did so by filing either stipulated motions to dismiss or amended complaints listing fewer defendants.  This process has increased

14

the likelihood that a case remanded by this Court to a transferor court now names only, and all, those manufacturer-defendants and supplier/distributor-defendants against whom the plaintiff actually intends to proceed at trial. The extent to which any remaining case-specific discovery may alter this circumstance, by giving a plaintiff a reason to "add back in" a dismissed defendant, or revealing reasons to dismiss a still-named defendant, is discussed in Section VIII.B of this document.

As noted, two of the defendants that plaintiffs were unwilling to dismiss from any MDL case as "peripheral" were Caterpillar and MetLife. Neither of these defendants manufactured or supplied welding rods to any plaintiff, so plaintiffs obviously could not press product liability claims against them. Rather, the plaintiffs alleged these two defendants conspired with the manufacturer-defendants to conceal the hazards of manganese in welding fumes. Plaintiffs alleged all of the defendants pursued this conspiracy over a period of many years, and the evidence of this alleged conspiracy came, in large part, from trade organizations of which the defendants were all members.

After allowing plaintiffs to pursue discovery against Caterpillar and MetLife, each of these two defendants filed a motion for summary judgment, seeking dismissal of all claims made against it in every MDL case. In two separate Orders, the Court reviewed this evidence in detail and granted both motions.[30] Thus, neither MetLife nor Caterpillar remain as a party-defendant in any remanded case. Certain evidence obtained from these companies (and the trade organizations to which they belonged) is generally admissible, however, and will likely be introduced at trial.

Finally, the Court notes it has issued Orders addressing arguments by some supplier/distributor-defendants that they are entitled to dismissal. For example, the Court denied a motion filed by supplier

---

[30] *In re Welding Fume Prods. Liab. Litig.,* 2007 WL 1087605 (N.D. Ohio Apr. 9, 2007) (master docket no. 2016) (granting summary judgment to MetLife); *In re Welding Fume Prods. Liab. Litig.,* 526 F.Supp.2d 775 (N.D. Ohio 2007) (master docket no. 2091) (granting summary judgment to Caterpillar).

Nordan Smith arguing it is entitled to dismissal of all claims governed by Mississippi law.[31] While claims against many supplier/distributor-defendants remain pending in various MDL cases, no plaintiff has yet chosen to pursue a claim against such a defendant at trial.

### B.      The Plaintiffs.

The reported case law shows that, before the year 2000, there were only a handful of federal cases where welder-plaintiffs alleged they suffered neurological injury caused by inhaling welding fumes and asserted product liability claims against welding rod manufacturers.[32]  By 2003, however, the number of such cases had exploded.  This explosion occurred because, beginning in 2000, the national plaintiffs' bar engaged in a concerted effort to: (1) notify welders that, if they suffered from movement disorders, their neurological injury might have been caused by exposure to welding fumes; and (2) advertise for welder-clients who wanted to sue welding rod manufacturers for product liability.

---

[31]  *See* master docket no. 1514 (Dec. 5, 2005).  The Court denied a series of motions to dismiss, filed by defendant Industrial Welding Supplies of Hattiesburg, Inc. d/b/a Nordan Smith, based on an analysis of Mississippi law, because the "plaintiffs have set forth a colorable claim that Nordan Smith was more than a mere conduit of welding products."  *Id.* at 7.  In the same Order, the Court also granted as unopposed other motions to dismiss filed by other supplier/distributor defendants under Mississippi law.  Of course, the Court's rulings on these motions to dismiss carry no import on any motion for summary judgment that Nordan Smith might later file.

[32]  *See, e.g., Unicore, Inc. v. Tennessee Valley Authority*, 768 F.2d 109 (6th Cir. 1985) (in the context of an indemnity action, referring to a $1.25 million out-of-court-settlement paid to a welder named Whisenhunt for neurological injuries caused by welding fume exposure); *Venham v. Astrolite Alloys*, 596 N.E.2d 585 (Ohio Ct. App. 1991) (reversing summary judgment in favor of defendants in a case brought by a weld-grinder for manganese poisoning); *National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.*, 162 F.3d 821 (4th Cir. 1998) (in the context of settling an insurance coverage dispute, referring to a class action lawsuit brought by welders claiming they suffered neurological injuries caused by welding fume exposure); *Hose v. Chicago Northwestern Transportation Co.*, 70 F.3d 968 (8th Cir. 1995) (affirming a $1.3 million 1994 jury verdict in favor of a plaintiff who claimed his manganese encephalopathy was caused by welding fume exposure); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709 (7th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000) (affirming a 1995 jury verdict in favor of defendants in a similar case).

These efforts were successful.  Statistics maintained by the MDL Panel reveal that, as of May 10, 2010: (1) there have been over 12,600 federal *Welding Fume* cases since the MDL inception in 2003; (2) about 8,700 of these cases have been remanded to state court or dismissed, leaving about 3,900 cases pending in the MDL; and (3) this MDL Court has received cases from 50 different transferor courts around the country.[33]  In addition to federal cases, there are a great number of similar cases pending in State courts around the country.[34]

Suspicious of this onslaught of cases, the MDL defendants sought to ensure there was a valid medical diagnostic basis for each welder-plaintiff's claim that he suffered a neurological injury.  In particular, defendants challenged the medical screenings sponsored by plaintiffs' counsel, which were designed to reveal whether a welder suffered from a neurological injury and whether there was a basis to argue the injury was caused by welding fume exposure.  Insisting these screenings were a sham, the defendants sought an Order from this Court dismissing the claim of any MDL plaintiff who had obtained a diagnosis at a medical screening, unless the plaintiff supplied a second diagnosis from a different, independent physician.

After an evidentiary hearing, this Court denied defendants' request, concluding that the medical screenings used by plaintiffs' counsel in this case were "robust" and not comparable to the screenings used

---

[33]  Defendant Lincoln Electric Company is headquartered in the Northern District of Ohio; as a result, a large proportion of the complaints filed in this MDL were filed directly in this Court.

[34]  As an example, the California state court analog to the *Welding Fume* MDL is known as Judicial Council Coordinated Proceeding No. 4368, *"Welding Product Cases*," where there are at least 50 cases pending (some of them multi-plaintiff).  There are about 75 welding fume cases pending in Ohio state courts.

17

by counsel in the infamous "*In re Silica*" case.[35]  Nonetheless, as the Court noted, the medical screening process satisfied only "the burden on plaintiffs' counsel *before filing a case* . . . to ensure there is a good-faith basis to assert a claim that the welder suffered neurological injury caused by welding fumes."[36] These medical screenings were certainly "not fully diagnostic, [and] a plaintiff will need more than the opinion professed by a screening neurologist to prevail at trial."[37]

Although the Court denied defendants' motion to require each plaintiff to submit a second diagnosis or face dismissal, other circumstances highlighted the legitimacy of defendants' concern that counsel for plaintiffs had filed many *Welding Fume* cases without first engaging in sufficient due diligence to ensure the case was worth pursuing.  In particular, three separate MDL bellwether plaintiffs moved to dismiss their cases before trial, after the parties had spent substantial time and money in discovery.  One of these dismissals occurred after the plaintiff "was shown a surveillance videotape of himself engaging in various household tasks, such as carrying groceries, raking leaves, and climbing onto and driving a tractor, all of which he had earlier testified under oath he was unable to do because of his neurological injuries."[38]  Another dismissal occurred after it was discovered the plaintiff had been less than truthful about his symptoms, medical history, and drug use.[39]  Further, in examining the fact sheets submitted by

---

[35]  *See In re Welding Fume Prods. Liab. Litig.,* 2006 WL 1173960 at *7 (N.D. Ohio Apr. 5, 2006) (master docket no. 1725) (denying defendants' request and discussing *In re Silica Prods. Liab. Litig.*, 398 F.Supp.2d 563 (S.D. Tex. 2005), where the court excoriated both plaintiffs' counsel and the diagnosing doctors for engaging in a medical screening process to identify individuals with silicosis that was tantamount to committing a fraud on the court).

[36]  *Id.* at *9 (emphasis in original).

[37]  *Id.*

[38]  *Id.* at *2 (referring to *Morgan v. Lincoln Elec. Co.*, case no. 04-CV-17251).

[39]  *See Peabody v. Lincoln Elec. Co.*, case no. 05-CV-17678, docket no. 25 (defendants' motion to reopen discovery, describing plaintiff's misrepresentations).

many other MDL plaintiffs not chosen for bellwether trials, it appeared the plaintiff had not described sufficiently the medical condition that he was claiming was caused by welding fume exposure.

Accordingly, the Court concluded it was appropriate to impose upon all MDL plaintiffs two requirements. First, the Court ordered every plaintiff to file a "Notice of Diagnosis," aimed at ensuring that "each plaintiff has a ripe medical diagnosis upon which to base his claims."[40]  This Notice required the plaintiff to name both the exact medical condition from which he asserts he suffers, and also the medical doctor who reached this diagnosis – thus giving defendants a more clear statement of the medical basis for plaintiff's claims.[41]

Second, the Court began making rolling designations of batches of cases for initial medical records discovery.  In these designated cases, the Court ordered each plaintiff's counsel to:

> scan carefully his client's medical records to determine whether those records reveal any issues suggesting that pursuit of the case to trial might be unwarranted.  Counsel's medical records review will include a comparison of those records to his client's sworn fact sheet.  Examples of issues that plaintiff's counsel should examine carefully include: (1) possible drug or alcohol abuse; (2) any other medical conditions, or exposures to toxins, that could cause symptoms similar to those allegedly caused by the welding fume exposure; (3) known genetic or familial susceptibility to movement disorders; (4) serious discrepancies between the medical records and the fact sheet; and/or (5) suggestions of excessive exaggeration or dishonesty.
>
> Following this medical records review, counsel for the plaintiff will (again) interview his client carefully to obtain information bearing on whether pursuit of the case to trial might be unwarranted; this interview must include an explanation to the client that making false statements under oath can carry substantial personal penalties, both monetary

---

[40]  Case Administration Order at 2 (master docket no. 1724).

[41]  *See* master docket no. 1731 at 2 (blank Notice of Diagnosis).

19

and immuring.[42]

After plaintiff's counsel had completed this review of medical records and client interview, counsel had to "either: (1) submit a letter to defense counsel certifying he has completed this process and believes in good faith that he and his client will pursue the matter to trial; or (2) move to dismiss his case or to withdraw his representation."[43]

Of the first 179 cases designated for medical records discovery, plaintiffs ultimately certified 11 of them.  This reflects a winnowing of the MDL cases to include only those that plaintiffs' counsel believe are among their strongest and least susceptible to pretrial dismissal (voluntary or otherwise).  It is only these certified cases that this Court will remand to a transferor court for trial.

Finally, it is notable that any case remanded to a transferor court will have only one welder-plaintiff.  Many multi-plaintiff cases were filed in state courts, removed to federal court, and then transferred to this MDL Court; for example, one case filed in West Virginia and eventually transferred to this Court (known as *Adames*) listed 3,762 individual plaintiffs.  Early on, however, this Court put on a standing Order directing that the multiple plaintiffs in any such case be severed from each other, "thereby creating an individual case on behalf of each such plaintiff."[44]  This severance procedure did not preclude

---

[42] *In re Welding Fume Prods. Liab. Litig.*, 2006 WL 2505891 at *1 (N.D. Ohio Aug. 28, 2006) (master docket no. 1888) (footnote omitted).  In a footnote, the Court observed: "That a given plaintiff may have any of these issues, of course, does not mean he may not proceed to trial.  The point is that plaintiffs' counsel's decision to pursue the matter to trial should be fully informed as early as possible, and the disclosure of all relevant information to defendants should occur, to the extent possible, before depositions begin.  Further, the Court is not requiring plaintiffs' counsel to *guarantee* there will be no late surprises or client revelations during the discovery process, but the Court is requiring plaintiffs' counsel to make a substantial effort early on to achieve this goal."  *Id.* n.3 (emphasis in original).

[43] *Id.*

[44] Order at 2 (master docket no. 59) ("Each of the multi-plaintiff cases shall be severed such that each plaintiff (together with their associated derivative claimants) becomes a plaintiff in a new lawsuit, to which a new case number will be assigned.").

multiple plaintiffs from later seeking a consolidated trial. In fact, the Court later conducted a single MDL bellwether trial involving two separate plaintiffs who had worked for the same employer.[45] But this severance procedure has ensured that any *Welding Fume* case remanded to a transferor court will have only one welder-plaintiff.

---

[45] *See* master docket no. 1921 (five plaintiffs requested consolidation of their cases for trial; the Court granted consolidation as to two).

21

VI.     **The Parties' Claims and Defenses.**

A.      **Plaintiffs' Claims.**

As a general matter, the plaintiffs in *Welding Fume* MDL cases all allege that: (1) they inhaled fumes given off by welding rods; (2) those fumes contained manganese; and (3) this manganese caused them permanent neurological injury and other harm.  The *Welding Fume* plaintiffs name as defendants various manufacturers, suppliers, and distributors of welding rod products, and claim the defendants knew or should have known that the use of welding rods would cause these damages.  The plaintiffs generally bring claims sounding in strict product liability, negligence, fraud, and conspiracy, and seek both compensatory and punitive damages.  The gravamen of the complaints is that the defendants "failed to warn" the plaintiffs of the health hazards posed by inhaling welding rod fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process.

Although the principle claims in any *Welding Fume* case are based on a theory of failure to warn, the Court has seen claims stated in plaintiffs' complaints premised upon all of the legal theories listed below.  As is discussed below in Section X of this document, defendants in various cases have moved for judgment as a matter of law on a number of these claims.

•       strict product liability for failure to warn about the hazards of welding rods ("marketing defect");

•       strict product liability for defective design of welding rods ("design defect");

•       strict product liability for defective design of welding machines;

•       negligent failure to warn about the hazards of welding rods, including the failure to investigate or test whether welding rods were hazardous;[46]

---

[46]   A single plaintiff sometimes asserts in his complaint separate claims for "negligence," "negligent sale of product," "negligent failure to warn," negligent failure to test," and "negligent failure to investigate."  In such cases, the Court has instructed the jury on only a single claim of negligence, and explained that the duty to warn *includes* the duty to test and investigate.

The Court is unaware of any plaintiff having asserted a claim for negligence *per se*.

22

- negligent misrepresentation involving risk of physical harm;

- negligent performance of a voluntary undertaking (relying on *Restatement (Second) of Torts* §324A);

- gross negligence and wanton and wilful conduct for failure to warn about the hazards of welding rods, including the failure to investigate or test whether welding rods were hazardous;

- fraudulent failure to disclose the known hazards of welding rods;

- conscious misrepresentation involving risk of physical harm;

- engaging in a conspiracy to fail to warn about the hazards of welding rods, including the failure to investigate or test whether welding rods were hazardous;

- aiding and abetting the tortious failure to warn about the hazards of welding rods, including the failure to investigate or test whether welding rods were hazardous (relying on *Restatement (Second) of Torts* §876(b));

- acting in concert, and as joint and concurrent tortfeasors, in the tortious failure to warn, including the failure to investigate or test whether welding rods were hazardous (relying on *Restatement (Second) of Torts* §876(a));

- breach of the warranty that welding rods are not hazardous;

- unjust enrichment;

- medical monitoring;

- loss of consortium; and

- punitive damages.


**B.      Defendants' Defenses.**

Although, as noted above, a plaintiff in a *Welding Fume* case may assert claims under a variety of legal theories, the principal claim in every *Welding Fume* case is for failure to warn.  To prevail on this claim against a given defendant, a plaintiff must generally prove at least three things: (1) he is suffering

23

from an illness that was caused by exposure to welding fumes; (2) the welding fumes to which he was exposed were produced, in substantial part, by that particular defendant's products; and (3) the warnings provided by the defendant about the hazards of welding fumes were insufficient.  Before and during trial, defendants will interpose various defenses aimed at each of these three essential aspects of a plaintiff's case.

In the MDL bellwether cases, the defendants have raised many of these defenses in the context of motions for summary judgment and motions for judgment as a matter of law.  This MDL Court has already ruled on some of these defenses, such as federal preemption, on an MDL-wide basis, so the parties should not raise these issues again in a dispositive motion before the transferor court.  Also, the Court has already ruled on other of these defenses, such as contributory negligence, in cases governed by a specific State's law, so the parties should not raise these issues again in a dispositive motion before the transferor court where the same State law applies.  The Court's rulings on these dispositive motions are discussed below in Section X of this document.

On the other hand, the defendants *may* appropriately raise other case-specific dispositive issues, such as product identification or a statute of limitation, in a summary judgment motion before the transferor court.  Still other defenses are clearly matters that must be adjudicated at trial and are not generally amenable to resolution by pretrial motion.

The main defenses asserted by defendants are as follows (listed in no particular order).  Each defense is described here only briefly.

**1.      Federal Preemption.**

Early in this MDL, the defendants asserted the plaintiffs' claims for failure to warn were all pre-

24

empted by a federal regulation known as the Hazard Communication Standard (commonly referred to as the "HazCom Standard"), promulgated by the Occupational Safety and Health Administration ("OSHA"). In a ruling that applies to every *Welding Fume* case, this Court denied defendants' motion for summary judgment on this defense. Accordingly, transferor courts will not have to rule on, or instruct a jury regarding, the defense of federal preemption.

This defense is discussed in greater detail below in Section X.A of this document.

### 2.    Statutes of Limitations or Rules of Repose.

Many *Welding Fume* plaintiffs will avoid a statute of limitations that might otherwise be applicable in their case by pointing to a "discovery rule" that tolls the limitations period.[47] In some circumstances, however, there will be no discovery rule available under State law, or the facts of the case will suggest the discovery rule does not help the plaintiff.[48] In such cases, a defendant may appropriately file before the transferor court a motion for summary judgment on limitations grounds. Similarly, in cases where the plaintiff only used a particular defendant's welding rods many years ago, the claims against that defendant

---

[47] *See, e.g., Venham v. Astrolite Alloys*, 596 N.E.2d 585 (Ohio Ct. App. 1991) (in an early *Welding Fume* case, holding that the statute of limitations did not begin to run until the plaintiff's doctor made a firm diagnosis that the plaintiff suffered from manganese poisoning, explaining: "When an injury does not manifest itself immediately, the cause of action does not arise until the plaintiff knows or, by the exercise of reasonable diligence should have known, that he had been injured by the conduct of defendant, for purposes of the statute of limitations").

[48] In Alabama, for example, the State Supreme Court did not adopt the discovery rule until 2008, and it does not apply retroactively. *See Griffin v. Unocal Corp.*, 990 So.2d 291 (Ala. 2008). Thus, the statute of limitations may be dispositive of certain claims brought by *Welding Fume* plaintiffs where Alabama law applies.

may be barred by a rule of repose.[49]  Again, a defendant may appropriately file before the transferor court a motion for summary judgment on grounds of repose.

Motions for summary judgment, or for judgment as a matter of law, premised upon a statute of limitations or a rule of repose will be highly fact-specific.  To date, no defendant has filed such a motion before this Court in an MDL bellwether case.[50]

### 3.    Adequacy of Warnings.

As noted earlier, to prevail on a failure-to-warn claim against a given defendant, a *Welding Fume* plaintiff must prove, by a preponderance of the evidence, that any warnings provided by that defendant were insufficient.  Beginning in 1967, the defendants did provide some standard warning about the hazards of welding fumes.  In the first MDL bellwether trial of *Ruth*, defendants moved for summary judgment on the failure-to-warn claims, arguing the warnings they provided were adequate as a matter of law.  The Court denied this motion in *Ruth* and has since denied judgment as a matter of law on the same question twice more, following jury verdicts in favor of plaintiffs in the MDL bellwether trials of *Tamraz* and *Jowers*.

Essentially, then, this Court has ruled that whether defendants' warnings were adequate is a question of disputed fact that must be determined in every case by a jury – it is not a question amenable

---

[49]  *See, e.g., Ex parte Liberty Nat'l Life Ins. Co.*, 825 So. 2d 758, 763-64 (Ala. 2002) (explaining that the Alabama rule of repose, which generally prohibits claims that are more than 20 years old, "is based solely upon the passage of time . . . and is not based upon concepts of accrual, notice, or discovery – concepts applicable to statute of limitations").

[50]  Defendants did invoke both the Alabama statute of limitations and also the Alabama rule of repose in the MDL bellwether case of *Byers*, arguing defendants were entitled to summary judgment if Alabama law applied.  Because the Court ultimately concluded that Texas law applied, the Court did not assess these arguments.

to resolution by dispositive motion before the transferor court.

This defense is discussed in greater detail below in Section X.C of this document.

### 4.      Product Identification.

As noted earlier, to prevail on a product liability claim against a given defendant, a *Welding Fume* plaintiff must prove, by a preponderance of the evidence, that he was actually exposed to welding fumes emitted *from that particular defendant's products*.  This raises the issue of product identification – what evidence can the plaintiff adduce that the welding rods he and his coworkers used were manufactured by a particular defendant?  A related question is, even if a plaintiff can show he used a specific defendant's welding rods, was his use of that defendant's rods so *de minimis* or "insubstantial," in the context of his entire welding career, that causation as to that defendant would be speculative?

In some cases, the evidence upon which a plaintiff relies to bring claims against a particular defendant may be so weak that summary judgment as to that defendant is appropriate (or, plaintiff may simply dismiss his claims against that defendant).  For example, in the MDL bellwether trial of *Byers*, the parties stipulated to the dismissal of one manufacturing defendant after discovery revealed no evidence that the plaintiff had used that defendant's welding rods.  Later, the Court granted a motion for summary judgment in favor of six of the nine remaining defendant welding rod manufacturers, concluding the undisputed evidence proved, at most, only infrequent, irregular, and insubstantial use by the plaintiff of those defendants' products.[51]

In other cases, the evidence may be sufficient to warrant allowing the plaintiff to pursue his claims against a particular defendant at trial, but ultimately insufficient to fend off a subsequent motion for

---

[51] *Byers v. Lincoln Elec. Co.*, 607 F.Supp.2d 840, 859-66 (N.D. Ohio 2009) (*Byers* docket no. 379).

27

directed verdict.   For example, in the MDL bellwether trial of *Tamraz*, the defendants did not move for summary judgment based on lack of product identification before trial, but did move for judgment as a matter of law on that basis at trial.  The Court granted the motion as to one of the four defendants.[52]

In sum, frequently – but not always – a few of the defendants will assert the product identification defense before or at trial, and a transferor court may appropriately address the issue via summary judgment.

This defense is discussed in greater detail below in Section X.O of this document.


### 5.      General and Specific Medical Causation.

"General causation" refers to the overarching question of whether exposure to welding fumes *can* cause *a* plaintiff's claimed neurological injury.   "Specific causation" refers to the more particularized question of whether exposure to welding fumes *did* cause *the* plaintiff's claimed neurological injury in a given case.

In every *Welding Fume* case, defendants will assert the defense that the plaintiff has not proved specific causation.  For example, the defendants may assert the plaintiff did not sufficiently quantify: (a) how much welding fume exposure a person must suffer before he has an increased risk of contracting Manganese-Induced Parkinsonism; or (b) how much total welding fume exposure the plaintiff actually suffered, himself, during his career; or (c) how much of the plaintiff's welding fume exposure is attributable to each specific defendant.  This Court has repeatedly denied motions for summary judgment and motions for directed verdict challenging the plaintiff's evidence of specific causation, concluding the

---

[52] *Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending).

plaintiff had adduced sufficient proofs to create a jury question.[53]  A transferor court, however, may conclude otherwise, depending on the evidence actually presented in that case.

As to general causation, the defendants' position, not surprisingly, has evolved during the course of this lengthy and complex MDL.  Initially, defendants took the position that exposure to welding fumes simply could not cause neurological injury.  In particular, in their initial "Scientific & Technical Presentation" to the Court, defendants asserted that: (1) manganese particles in welding fumes have extremely low solubility and so are not bio-available to cells in the human body; (2) the body's normal defense mechanisms quickly isolate and excrete virtually all of the manganese particles in welding fumes that a welder might ingest; and (3) any manganese particles in welding fumes that do enter the blood stream never cross the "blood-brain barrier," and so cannot cause neurological injury.[54]  During the course of the litigation, however, defendants' expert neurologists conceded that manganese particles in welding fumes *are* bio-available, *do* enter the blood stream and *can* cross the blood-brain barrier, and welders *can* get Manganese-Induced Parkinsonism from welding fume exposure.[55]  Further, following a multi-week

_____

[53]  *See, e.g., Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724, 731-43 (S.D. Miss. 2009) (*Jowers* docket no. 459) (appeal pending) (denying a motion for judgment notwithstanding the verdict where defendants argued plaintiff had adduced insufficient evidence of causation); *Byers v. Lincoln Elec. Co.*, 607 F.Supp.2d 840, 853 (N.D. Ohio 2009) (*Byers* docket no. 379) (denying a motion for summary judgment where defendants argued plaintiff "has insufficient evidence regarding: '(1) what level of exposure to welding fumes – if any – causes neurological injury; and (2) whether [he] was exposed to fumes from each individual defendant's products at that level.'").
Notably, despite having denied summary judgment on causation grounds in *Byers* (applying Texas law), the Court expressed its belief that a Rule 50 motion on the same grounds might be well-taken at trial. The *Byers* jury found for defendants.

[54]  These assertions were made by defense expert toxicologist Dr. Ken Reuhl in a "science tutorial" video presentation created by defendants for the Court and submitted on December 22, 2003.

[55]  These concessions were made by, among others, defense expert neurologists Dr. Warren Olanow and Dr. Anthony Lang during *Daubert* hearings and MDL bellwether trials.  *See also Solis* trial tr. at 2708 (June 15, 2006) (parties stipulating that manganese from welding fumes is bioavailable).

29

*Daubert* hearing, this Court ruled there exists sufficiently reliable evidence "to support the assertion that exposure to low-manganese welding fumes can cause, contribute to, or accelerate a movement disorder, including a parkinsonian syndrome that some doctors will diagnose as [Parkinson's Disease]."[56]

In several MDL bellwether cases following these events, defendants did not address general causation at trial – that is, they did not argue in defense that welding fume exposure simply cannot cause a welder to suffer neurological injury. Instead, defendants focused on other defenses, including specific causation.

More recently, however, defendants in the MDL bellwether trials of *Byers* and *Cooley* argued that, although welding fume exposure can *theoretically* cause a welder to suffer neurological injury in the most egregious of circumstances, those circumstances are so rare that it virtually never happens. This argument circles back toward defendants' initial position regarding general causation, although not completely.

In sum, a transferor court will certainly see defendants assert, as a defense, lack of evidence of specific causation; a transferor court will possibly also see defendants assert, as a defense, how limited is the evidence of general causation. In prior MDL bellwether cases, this Court has concluded that the questions of specific causation and the rarity *vel non* of Manganese-Induced Parkinsonism will normally be issues for determination by a jury at trial.


### 6.    Type of Neurological Injury.

Every *Welding Fume* plaintiff claims he suffered neurological injury caused by exposure to manganese contained in fumes emitted by the defendants' welding rods. The name that the plaintiff and

---

[56] *See Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724, 753 (S.D. Miss. 2009) (*Jowers* docket no. 459) (appeal pending) (quoting *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *17 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183), and *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at 36 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353)).

his doctors give to the neurological injury may be: (1) Parkinson's Disease ("PD"), (2) Parkinsonism, (3) Manganese-Induced Parkinsonism ("MIP"), (4) Manganese-Induced Neurotoxicity, (5) Manganism, (6) Manganese Encephalopathy, (7) Manganese Toxicity Syndrome, (8) Manganese Poisoning, (9) Manganese Intoxication, or (10) some other term.  Regardless of the diagnosis, the claimed physical symptoms of the neurological injury generally include some or all of the following: gait impairment, tremors, rigidity, muscle spasms and cramps, postural instability, clumsiness, slowness, loss of bladder and bowel control, speech disturbances, changes in handwriting, and mask-like facial expression.  These physical symptoms are often joined by claimed psychological and behavioral disturbances, such as crying for no reason, inability to sleep, loss of libido, clouded thinking, social withdrawal, depression, and so on.

From the inception of this MDL, defendants have argued emphatically that, while a *Welding Fume* plaintiff may be suffering from some form of neurological injury known as "parkinsonism,"[57] it is not an injury caused by exposure to welding fumes – that is, the plaintiff's disease is not *Manganese-Induced* Parkinsonism or any other syndrome caused by exposure to manganese in welding fumes.  Thus, in specific MDL bellwether trials, defendants have offered the defense that the plaintiff's neurological injury is some *other* type of parkinsonism, such as "Idiopathic Parkinson's Disease" or "Psychogenic Movement

---

[57]  As this Court explained in its *Daubert* Order:
All parkinsonisms involve disorders in the area of the brain known as the basal ganglia, which controls voluntary movement and helps establish posture.  The classic symptoms common to all parkinsonisms are: (1) "rest tremor," meaning an involuntary quiver of a body part while it is at rest (as opposed to "kinetic tremor," meaning an involuntary quiver of a body part while it is being moved); (2) "bradykinesia," meaning general slowness of movement, including paralysis; (3) "rigidity," meaning stiffness or inflexibility; and (4) "postural instability," meaning loss of normal postural reflexes, and/or a hunched, flexed posture.

*In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *23 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

31

Disorder ("PMD.")[58]  Defendants also assert it is possible to distinguish all of these different parkinsonisms (that is, PD, MIP, and PMD) from each other by examining the patient's precise constellation of symptoms, his drug-responsiveness, his medical test results, and so on.[59]

A transferor court will certainly see defendants assert the defense that plaintiff's neurological injury is a form of parkinsonism that is not caused by welding fumes, and the expert evidence going to this defense will be sophisticated and recondite.  Transferor courts may find it helpful to read the relevant portion of this Court's *Daubert* opinion to obtain a foundation for understanding the medicine and science surrounding the parties' neurological diagnoses.[60]

### 7.    The Government Contractor Defense.

In any *Welding Fume* case where the plaintiff welded on a federal government project, such as the construction of U.S. Navy ships, the defendants will assert the government contractor defense (also known as the military contractor defense).  The essence of this defense is that the defendants were acting in their role as federal military contractors when they provided welding rods to the plaintiff, and acting under federal direction during welding rod manufacture; accordingly, they are clothed with the same immunity to suit that the government enjoys.

---

[58]  "Idiopathic Parkinson's Disease" is a diagnosis given to patients with certain clinical features where the cause of the disease is unknown.  *See id.* at *24 (discussing different forms and categories of parkinsonism).  A "Psychogenic Movement Disorder" is "non-organic," meaning it is not caused by any actual, physical degeneration in the brain; rather, it is psychological in origin.

[59]  For a full discussion of the parties' positions regarding whether and how a neurologist specializing in movement disorders can distinguish MIP from other types of parkinsonism, see *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *22-31 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

[60]  *Id.*

Whether the government contractor defense prevails depends on a question of fact – specifically, whether the government: (1) "participated in discretionary design decisions" when it issued welding rod design specifications to the manufacturers, or, instead, (2) "exercise[d] no discretion [and] simply approve[d] a design with a rubber stamp, that is, approve[d] a design without scrutiny."[61]  As discussed in greater detail below in Section X.B of this document, this Court has concluded that reasonable jurors could find in favor of either the plaintiffs or the defendants on this issue.  Accordingly, whether the defendants prevail on the government contractor defense is a matter for the jury, and should not be raised in a motion for judgment as a matter of law.  To date, the defendants have interposed the government contractor defense in one MDL bellwether case that went to trial (*Jowers*); the jury rejected the defense and found for the plaintiff.

8.    **Sophisticated User and Learned Intermediary Defenses.**

The Sophisticated User Defense is premised upon the rule that a manufacturer need not warn members of a trade or profession (sophisticated users) about dangers generally known to that trade or profession.  Defendants assert each welder-plaintiff in this litigation is a sophisticated user of welding rods who received training from his employers, union, and/or welding school, and thus knew (or at least should have known) that welding fume exposure could cause neurological injury.

The Learned Intermediary Defense is similar to, but different from, the Sophisticated User Defense. The Learned Intermediary Defense provides that a manufacturer may discharge its duty to warn by providing information about the product's hazards to a third person, upon whom the manufacturer can

---

[61]  *Ruth v. A.O. Smith Corp.*, 2005 WL 2978694 at *6 (N.D. Ohio Oct. 11, 2005) (*Ruth* docket no. 180) (quoting *Landgraf v. McDonnell Douglas Helicopter Co.*, 993 F.2d 558, 560 (6th Cir. 1993); *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989), *cert. denied*, 494 U.S. 1030 (1990); and *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1153 (6th Cir. 1995)).

reasonably rely to communicate the information to the ultimate users of the product.  (The Learned Intermediary Defense is most often interposed by drug companies, which may discharge their duty to warn the patient by giving notice of a prescription drug's hazards to the prescribing physician.)  The *Welding Fume* defendants assert they discharged their duty to warn when they told the plaintiff's employers and welding instructors about the hazards of welding fumes, because those employers and instructors had their own duties to provide safety instruction to welders and, thus, should have passed on the relevant warning information to the plaintiff.

While the Sophisticated User Defense focuses upon the knowledge of the end-user (here, the welder-plaintiff, himself), the Learned Intermediary Defense focuses upon the knowledge of the entity that provides the product to the end-user (here, the welder-plaintiff's employer).  The contours of these two defenses (and whether they are recognized at all) will depend on the applicable State law.

Both plaintiffs and defendants have filed motions seeking judgment as a matter of law on the validity of these two defenses.  The Court has denied all of these motions, concluding there remain material issues of fact in dispute, so that the question of whether either of these defenses prevail is for the jury.  In the *Jowers* bellwether trial, the jury specifically rejected the defendants' sophisticated user defense; in the *Goforth* bellwether trial, the jury specifically accepted the defendants' sophisticated user defense.[62]

This defense is discussed in greater detail below in Section X.E of this document.

### 9.    Warning Language Causation.

A *Welding Fume* plaintiff must normally show not only that the defendants' warnings were

---

[62]  The jury also accepted the sophisticated user defense in the *Mann* case.

34

inadequate, but also that an *adequate* warning would have made a difference – for example, if he had been given a better warning, he would have worn a respirator and thereby avoided his injury.  Defendants may assert two related defenses addressing the evidence on warning adequacy.  First, if the evidence suggests the plaintiff did not read the warnings he was given, the defendants may assert he cannot prevail because it did not matter *what* their warnings said – a plaintiff's failure to read supplied warnings suggests better warnings would have made no difference.[63]  Second, even if the plaintiff read the supplied warnings, the defendants may assert the plaintiff did not show he would have, in fact, altered his behavior if the defendants had given a better warning.

When assessing either of these "warning language causation" defenses, a transferor court must determine whether the applicable State law adopts the "heeding presumption."  The heeding presumption is "a rebuttable presumption . . . that the [welder] would have read any warning provided by the manufacturer, and acted so as to minimize the risks;" it "is a burden-shifting device assisting a plaintiff in establishing causation."[64]  Even if the presumption does not apply, however, the transferor court and the jury may still conclude, based on the evidence presented, that the defendants' warning language causation defenses fail.  In the MDL bellwether trial of *Tamraz*, the Court did not apply the heeding presumption, but it still denied defendants' motion for judgment premised on the argument that the

---

[63]  It may still be possible for a plaintiff to pursue a failure-to-warn claim, however, even if he concedes he never read any warning.  For example, he may claim he never read a warning because of the warning's size and placement.  *See Boyd v. Lincoln Elec. Co.*, 902 N.E.2d 1023, 1032 (Ohio Ct. App. 2008) (reversing summary judgment for defendant, who had relied in the trial court "on cases that hold that when a plaintiff admits he or she did not read a warning label, proximate cause cannot be established, and the claim fails;" citing this Court's opinion in *Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending)).

[64]  *Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 at *3 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending) (quoting *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1281 (5th Cir. 1974), *cert. denied*, 419 U.S. 1096 (1974)).

35

plaintiff did not show he would have changed his behavior if given a different warning.

This defense is discussed in greater detail below in Section X.D of this document.

### 10. Contributory Negligence, Comparative Negligence, and Assumption of the Risk.

Depending on the applicable State law, defendants will assert the defenses of contributory negligence, comparative negligence, and assumption of the risk. These defenses are usually questions for the jury. In the MDL bellwether trial of *Jowers*, the jury concluded that defendants were liable to the plaintiff and further found that the plaintiff's own negligence was 40% of the cause of his injuries. In the MDL bellwether trial of *Cooley*, the jury similarly concluded that the plaintiff's own negligence was 37% of the cause of his injuries.

As discussed further below in Section X.F of this document, an odd wrinkle in the applicable State law of contributory negligence may arise when the plaintiff was covered by the federal workers' compensation statute known as the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§901 *et seq.* – it may occur that a jury cannot allocate any negligence to the employer. This is the case when Mississippi law applies.

This defense is also discussed in greater detail below in Section X.G of this document.

### 11. Punitive Damages and Lack of Gross Negligence.

Virtually every *Welding Fume* plaintiff asserts a claim for punitive damages. While State law varies somewhat regarding the type and standard of proof a plaintiff must adduce to show entitlement to exemplary damages, most States employ the "clear and convincing" standard and call for something like

36

"gross negligence which evidences a willful, wanton or reckless disregard for the safety of others."[65] Defendants will always interpose the defense that there is no such evidence upon which a reasonable jury can base a punitive damages award.

In every ruling issued to date, this Court has denied defendants' motions for judgment as a matter of law on punitive damages.  In two MDL bellwether cases (*Jowers* and *Cooley*), the juries found defendants liable for punitive damages.

This defense is discussed in greater detail below in Section X.S of this document.

---

[65] *See e.g.,* Miss. Code 11-1-65(1)(a) ("Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.").

37

**VII.    Choice of Law Issues.**

In many cases, the parties will agree regarding which State's laws apply to the plaintiff's claims: it will be the State where the welder-plaintiff spent his working career.  In some cases, however, the welder will have spent his career in several States, and the parties will not agree on the applicable State law.  To complicate a choice-of-law analysis further, it may even occur that the welder used one of the manufacturer-defendant's products in only one State, and another manufacturer-defendant's products in only another State, thus suggesting application of different State's laws to the same claims against different defendants.[66]

This Court has undertaken only one choice-of-law analysis, in the MDL bellwether trial of *Byers.* A choice-of-law analysis is heavily fact-dependent, so this Court can offer only these general observations to a transferor court.  First, the choice-of-law principles that the transferor court will apply are those of the State where the transferor court sits, and not, for example, the choice-of-law principles of Ohio, where the MDL court sits.  This is because: (1) "[i]n diversity cases we apply the choice-of-law rules . . . of the forum state;"[67] and (2)  "[i]n MDL cases, the forum state is typically the state in which the action was initially filed before being transferred to the MDL court."[68]  Given that a case remanded by this MDL

---

[66]  As an example, in the MDL bellwether trial of *Byers,* the plaintiff moved from Texas to Alabama in 1997.  Defendant BOC stopped manufacturing welding rods in 1986, so the plaintiff could not have used BOC's products in Alabama.  Thus, BOC argued that, even if Alabama law "might apply to *some* of Byers' claims, 'Texas law unquestionably applies to plaintiffs' claims against BOC . . . because Mr. Byers used [BOC] products (if at all) only while he was living and working primarily in Texas.'" *Byers v. Lincoln Elec. Co.*, 607 F.Supp.2d 840, 844-45 (N.D. Ohio 2009) (*Byers* docket no. 379) (some emphasis removed).

[67]  *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[68]  *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 295 n.90 (N.D. Ohio 2007) (master docket no. 2077) (citing *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 454 (E.D. La. 2006) and *Klaxon*, 313 U.S. at 496).

38

Court to a transferor court was originally filed in either that transferor court, or in a State court within that federal district before removal, it is the choice-of-law principles of the State where the transferor court sits that will apply.

Second, it is likely that the forum State's choice-of-law principles will follow one of two approaches: (1) the older rule of *lex loci delict* – meaning, apply the law of the place where the injury occurred; or (2) the newer approach set out in the *Restatement (Second) of Conflict of Laws*, where there is a rebuttable presumption that the law of the State where the injury occurred will apply.

If the forum State follows the first approach, the analysis boils down to the question of: In which State did the welder-plaintiff perform the most substantial amount of his welding and, thus, suffer the most substantial amount of welding fume exposure?  For example, if the plaintiff spent 20 years welding in Illinois, 10 years welding in Ohio, and retired to Florida, then Illinois law will probably apply, because that is where the bulk of the alleged injury to the plaintiff occurred.  As noted above, however, this analysis may be complicated by the question of which defendants' products the plaintiff used in each State.

If, on the other hand, the forum State follows the *Restatement* approach – as does Ohio, the forum in the MDL bellwether trial of *Byers* – then "the State where the injury occurred" is the most important factor, but not the only factor, in a choice-of-law analysis.  Specifically, section 146 of the *Restatement* states: "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to a particular issue, some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied."[69]  In determining which State has the most "significant relationship" to a plaintiff's tort claim, the *Restatement* examines the following factors: "(a) the place where the injury occurred, (b) the

---

[69] *Restatement (Second) of Conflict of Laws* §146 (1971).

place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[70]

Notably, in *Welding Fume* failure-to-warn cases, the second factor may be entirely equivalent to the first: under Ohio law, for example, "a failure to warn occurs at the place where the plaintiffs could reasonably have been warned regardless of where the decision not to warn took place."[71]  In other words, a defendant's alleged conduct of failure to warn occurred where the plaintiff used the product with the allegedly defective warning.  Furthermore, in *Welding Fume* failure-to-warn cases, the fourth factor may be irrelevant: courts in products liability cases often conclude that, "there being no 'relationship' between the parties in the ordinary sense of the word, this factor is unhelpful in making a choice-of-law determination."[72]  And given the variety of States in which the different defendants are headquartered and incorporated, the third factor may prove unhelpful.  The *Restatement* observes: "The fact that the domicil and place of business of all parties are grouped *in a single state* is an important factor to be considered in determining the state of the applicable law."[73]  Because there will probably not be anything near such a grouping in a remanded case, the third factor may be meaningless.  Thus, under the *Restatement* approach, the analysis is likely to boil down to the same question as under the approach of *lex loci delict*: In which

---

[70]  *Id.* §145 (1971).

[71]  *Jones v. Brush Wellman, Inc.*, 2000 WL 33727733 at *4 (N.D. Ohio Sept. 13, 2000).

[72]  *LaPlante v. American Honda Motor Co., Inc.*, 27 F.3d 731, 741-42 (1st Cir. 1994); *see also Allison v. ITE Imperial Corp.*, 928 F.2d 137, 142 n.5 (5th Cir. 1991) (affirming the district court's analysis, but noting that, "[u]nless the product the defendant comes in contact with is mobile in its use, or the plaintiff has a history of contacts with the defendant's products before the injury, the center of the relationship under the district court's analysis will always be identical to the place of injury").

[73]  *Restatement of the Law (Second) Conflict of Laws* §145(2), comment e (1971) (emphasis added).

State did the welder-plaintiff perform the most substantial amount of his welding and, thus, suffer the most substantial amount of welding fume exposure?  Generally, it is the law of that State that will apply to the plaintiff's substantive claims.

In sum, as the Court stated in *Byers*: "there will be some cases where there is no clear answer to the question of where did the plaintiff suffer the most substantial amount of welding fume exposure; [and] there will be some cases where, given the idiosyncracies of the timing and location of the plaintiff's welding jobs, the law of a single state cannot apply to all of the plaintiff's claims."[74]  In these cases, the court's choice-of-law analysis will become more complicated.  But usually, "the law applicable to [the] welder's case will be relatively easily determined – it will be the law of the state where he performed most of his work and was thus most exposed to welding fumes."[75]

This MDL Court purposefully chose bellwether cases from different States, so that other courts applying the laws of those States might have the benefit of this Court's rulings on issues particular to the law of those jurisdictions (such as jury instructions).  Pointing up the difficulty of choice-of-law analysis, however, the Court chose the *Byers* case believing that Alabama law would apply, but subsequent analysis proved this to be incorrect.  The law applicable in the Court's MDL bellwether cases so far has been as follows:

---

[74] *Byers v. Lincoln Elec. Co.*, 607 F.Supp.2d 840, 853 (N.D. Ohio 2009) (*Byers* docket no. 379).

[75] *Id.*

41

| Bellwether Case | Applicable State Law |
|---|---|
| *Solis v. Lincoln Elec. Co.*, case no. 04-CV-17363 (N.D. Ohio) | Texas |
| *Goforth v. Lincoln Elec. Co.*, case no. 06-CV-17217 (N.D. Ohio) and *Quinn v. Lincoln Elec. Co.*, case no. 06-CV-17218 (N.D. Ohio) (consolidated for trial) | South Carolina |
| *Tamraz v. Lincoln Elec. Co.*, case no. 04-CV-18948 (N.D. Ohio) | California |
| *Jowers v. Airgas-Gulf States, Inc.*, case no. 08-CV-36 (S.D. Miss) | Mississippi |
| *Byers v. Lincoln Elec. Co.*, case no. 04-CV-17033 (N.D. Ohio) | Texas |
| *Cooley v. Lincoln Elec. Co.*, case no. 04-CV-17734 (N.D. Ohio) | Iowa |

In addition to these six cases tried by the undersigned, two other judges of this Court graciously agreed to preside over these more-recent *Welding Fume* trials:

| Case | Applicable State Law |
|---|---|
| *Arroyo v. Lincoln Elec. Co.*, case no. 08-WF-17980 (N.D. Ohio) (Zouhary, J.) | Texas |
| *Mann v. Lincoln Elec. Co.*, case no. 06-CV-17288 (N.D. Ohio) (Dowd, J.) | South Dakota |

(See also chart at Appendix One for other details.)

42

## VIII.  DISCOVERY.

As described below, the parties have engaged in huge amounts of "general discovery" directed at information relevant to every *Welding Fume* MDL case.  This includes, for example, the defendants' historical knowledge of the hazards posed by welding fumes, the different warnings defendants provided to welders over time, the training and education commonly provided to welders by employers and unions, the state of medical and scientific knowledge regarding neurotoxicity of manganese in welding fumes, and other topics.

To prepare for trial, the parties must also engage in substantial "case-specific discovery" directed at information relevant to the individual plaintiff's particular claims and circumstances.  This discovery will address the plaintiff's employment history, medical history, and welding experiences, and other topics discussed below.  At least some of this case-specific discovery may not occur until after this Court has remanded the case to the transferor court.  Accordingly, a transferor court may have to oversee some aspects of case-specific discovery.

### A.  General Discovery – Already Accomplished.

There are dozens of different defendants named by the thousands of *Welding Fume* MDL plaintiffs, including: (1) manufacturers of welding rods; (2) suppliers and distributors of welding rods; and (3) alleged co-conspirators, such as welding trade associations.  In addition, there are many organizations and individuals which, although they are not necessarily named defendants, have information relevant to all *Welding Fume* claims, including: (1) large employers of welders, such as naval shipyards and industrial equipment manufacturers; (2) welding trade unions; and (3) associations and individuals who have engaged in medical and scientific research examining possible links between welding and parkinsonism.

43

Further, the MDL Court's initial Case Management Order directed the parties to identify their "Core Expert[s] – that is, each expert who is expected to offer testimony that is generally applicable in support of [the party's] position in more than one of the [MDL cases]."[76]  The parties identified a total of 47 core experts seeking to offer general opinions regarding a variety of topics, including neurology, neuro-pathology, neuro-psychology, neuro-radiology, epidemiology, bio-statistics, industrial hygiene, industrial engineering, chemistry, materials science, toxicology, warnings, corporate ethics, military specification and procurement, economics, government lobbying, and ancient corporate documents.[77]  These core experts each filed an expert report, which was often accompanied by a "reliance list" – that is, a bibliography of all the literature upon which the expert relied to form his opinions.

During the course of this MDL, the parties have produced in discovery millions of documents from all of these entities and have undertaken hundreds of related depositions.  Pursuant to the Court's Case Management Order, the plaintiffs established a "document and electronic depository" for the purpose of storing all of these discovery materials.[78]  The Court and the Special Master oversaw this general discovery and were called upon to resolve a number of discovery disputes.

It is unlikely that transferor courts will need to know all the details of the disputes that arose during general discovery, nor even the details of how most of those disputes were resolved.  The critical fact is

---

[76]  Case Management Order at 29, 30 (Dec. 9, 2003) (master docket no. 63).

[77]  The parties filed documents designating their core experts at the following master docket numbers: plaintiffs – 419, 741, 742, 863, 1177, & 1229; defendants – 622, 623, 628, 633, 800, 843, 1230, & 1236.  The Court created a chart listing these core experts as exhibit A to *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

[78]  Motion at 1 (Mar. 7, 2007) (master docket no. 1997); *see* Case Management Order at 16-17 (Dec. 9, 2003) (master docket no. 63) (setting out depository protocol).  The document depository is currently located in Houston, Texas and is administered by plaintiffs' counsel The Kaiser Firm LLP.  The depository is "for the use of parties in federal or state court cases that allege injuries or damages resulting from exposure to manganese in welding fumes."  Motion at 1 (Mar. 7, 2007) (master docket no. 1997).

that, with few exceptions, there now remains to be performed only case-specific discovery to make a given *Welding Fume* case ready for trial.

Nonetheless, in order to educate transferor courts on the history and landscape of the parties' general discovery, the Court provides below the following summary points.

- Early on, the parties negotiated a stipulated Confidentiality and Protective Order.[79]  There have been virtually no disputes regarding the operation of this Order.

- Early on, the Court entered a Standing Order addressing the enforcement of subpoenae issued by other United States District Courts in connection with a *Welding Fume* MDL case.  The Court explained that it was "not only willing but prefer[red] to hear and resolve all discovery disputes that arise in any other United States District in connection with the Welding Rod Litigation."[80]  In all cases where such disputes arose, the other district court did, in fact, refer the matter to this Court.[81]

- Defendants have created over 100 privilege logs and submitted over 60,000 pages of documents to the Special Master for privilege review.  The Special Master has ruled upon the propriety of withholding or redacting all of these documents.  On a semi-annual basis, the defendants continue to submit to the Special Master newly-created documents for privilege review.[82]

- Shortly before the first scheduled MDL bellwether trial of *Ruth*, the Court entered sanctions against certain defendants because they had been dilatory in searching for and producing relevant

---

[79]  Protective Order (Feb. 9, 2004) (master docket no. 131).

[80]  Order at 2 (March 1, 2004) (master docket no. 146).

[81]  *See In re Welding Rod Prods. Liab. Litig.*, 406 F.Supp.2d 1064 (N.D. Cal. 2005) (analyzing Fed. R. Civ. P. 45 and 28 U.S.C. §1407 and concluding that the motion to quash a subpoena issued by a California district court upon a California entity seeking documents relevant to the *Welding Fume* MDL should be transferred to the undersigned).  *See also Pogue v. Diabetes Treatment Ctrs. of America., Inc.*, 444 F.3d 462, 468-69 (6th Cir. 2006) ("A judge presiding over an MDL case therefore can compel production by an extra-district nonparty; enforce, modify, or quash a subpoena directed to an extra-district nonparty; and hold an extra-district nonparty deponent in contempt, notwithstanding the nonparty's physical situs in a foreign district where discovery is being conducted.").

[82]  Defendants objected to only one general discovery ruling issued by the Special Master, involving discovery of a Joint Defense Agreement ("JDA") signed by several defendants.  The Court overruled the objection, but directed the defendants to supply to plaintiffs a summary of certain terms of the JDA rather than the document itself.  Order at 2 (Mar. 9, 2006) (master docket no. 1697); motion hearing tr. at 218-219 (May 16, 2006).

45

documents.  The sanctions included production to plaintiffs of a number of documents that defendants had designated as privileged.  That these documents were ordered produced, however, did not mean they were automatically admissible at trial.[83]  Later, the Court ordered each defendant to certify the sufficiency and completeness of its general discovery efforts.[84]

- The Court addressed two disputed areas of discovery connected to defendants' historical knowledge of the harmfulness of welding fumes: "other claims" and "related foreign entities."  Specifically, the Court issued discovery Orders: (a) clarifying defendants' "obligations regarding production of discovery related to their knowledge of any claims made by any persons [at any time], which are related to alleged neurological effects caused by welding fumes;"[85] and (b) ruling that plaintiffs were entitled to "discovery of documents [from foreign affiliates of American-based manufacturing defendants] regarding: (1) the human health effects of manganese in welding fumes; and (2) governmental regulation of manganese levels."[86]  Discovery in these two areas is now essentially complete.

- The Court also addressed repeatedly another hotly-disputed discovery topic: the extent to which the parties could discover data and other background materials underlying medical studies and articles that were produced or relied upon by the opposing parties' experts.  Discovery in this area is also essentially complete.[87]

- Another important general discovery topic is "the parties' obligations regarding discovery and disclosure of their payments to authors of authoritative articles and studies used during trial."[88]  The Court had to address this topic several times, culminating in a written Order directing that "[a]ll parties to this litigation – both plaintiffs and defendants – must disclose the fact of, and the amounts of, payments they made, either directly or indirectly, to any entity (whether an individual or organization) that has authored or published any study, article, treatise, or other text upon which

---

[83] *See Solis* trial tr. at 1222-39 (June 7, 2006) (imposing sanction of production of all documents listed on certain privilege logs); *Byers* pretrial tr. at 86-87 (Oct. 30, 2008) (ruling that documents produced as a sanction were not necessarily admissible at trial).

[84] Order (Apr. 3, 2007) (master docket no. 2013); Order (June 1, 2007) (master docket no. 2040).

[85] Order at 2 (Apr. 10, 2006) (master docket no. 1729) (defining "other claims" broadly, to include historical lawsuits both actual and threatened, claims made to health and disability benefit plans, informal health complaints to supervisors, and so on); *see also* Order (Aug. 16, 2006) (master docket no. 1876) (protective order directed at shielding private information of persons who made these "other claims").

[86] Order at 3 (Nov. 4, 2005) (master docket no. 1475).

[87] See Section IX.C.30 of this document, which addresses the use at trial of discovery related to the "Scandinavian Studies," which were funded by defendants.

[88] Order at 1 (Feb. 20, 2008) (master docket no. 2114).

any expert in this MDL litigation relies, or has relied."[89]  The parties now provide each other with updated lists and totals before each individual trial.[90]

• On a final note, during the third MDL bellwether trial of *Tamraz*, the Court had to resolve a question of document admissibility that turned on whether the defendants had timely produced the document during pretrial discovery.  To avoid similar issues in the future, the Court entered an Order "remind[ing] all parties of their continuing obligation of disclosure in discovery."[91]  The Court also defined broadly the scope of this obligation.  The following language continues to bind all parties in every *Welding Fume* case, whether pending before this MDL Court or a transferor court:

> **All parties in this litigation have a continuing obligation to disclose non-privileged, relevant information, *regardless of how obtained*, if:**
> **(1)** **it would tend to undermine the disclosing parties' contentions, or it would support the non-disclosing parties' contentions;**
> **(2)** **it identifies any person whom, if their potential testimony were known, a party might reasonably want to depose or call as a witness;**
> **(3)** **it identifies any document or thing which, if its identity or content were known, a party might reasonably have an interest in viewing;**
> **(4)** **it is likely to have an influence upon or affect the outcome of a claim or defense;**
> **(5)** **a party might reasonably want to consider it in the preparation, evaluation, or trial of a claim or defense; or**
> **(6)** **reasonable and competent counsel would consider knowledge of it reasonably necessary to prepare, evaluate, or try a claim or defense.**
> **The parties should construe liberally all of these descriptions.[92]**

---

[89] Order at 3 (Dec. 13, 2007) (master docket no. 2104).

[90] See Section IX.C.45 of this document, which addresses the use at trial of discovery related to the parties' funding of these articles and studies.

[91] Order at 2 (Dec. 13, 2007) (master docket no. 2104).

[92] *Id.* (emphasis in original).

47

**B.      Case-Specific Discovery – Some Still Necessary.**

The parties aimed their *general* discovery efforts at learning information relevant to every *Welding Fume* case.  In addition, the parties must engage in *case-specific* discovery to learn information relevant to the particular claims and defenses made by an individual plaintiff.

During the course of the MDL, the Court has entered several Orders for the purpose of facilitating discovery of some of the simplest case-specific information.  For example, the Court has ordered each MDL plaintiff to: (1) produce to defendants a lengthy "Fact Sheet" listing, among other things, his symptoms, his medical history, his employment history, the welding products he used, and the warnings he received;[93] (2) submit a "Notice of Diagnosis" of neurological injury, signed by a medical doctor, naming the medical condition the plaintiff asserts he suffers;[94] and (3) obtain medical authorizations and produce to defendants all medical records discovery, which includes identification of all treating doctors.[95] Each plaintiff's production of this information gives the parties an initial overview of the contours of the specific MDL case.

Once the Court sets a *Welding Fume* case for trial, the parties engage in additional case-specific discovery in earnest.  The primary areas of case-specific inquiry are:

•      the plaintiff's medical and psychological history, including deposition of the plaintiff's treating neurologists and other doctors, and also possibly medical laboratory test personnel;

•      the plaintiff's employment, including deposition of: (a) the plaintiff's co-workers and supervisors and Union brothers; (b) representatives of plaintiff's employers who are knowledgeable about the

---

[93]  *See* master docket no. 287, attachment 2 (blank Fact Sheet).

[94]  *See* master docket no. 1731 at 2 (blank notice of diagnosis).

[95]  *See, e.g., In re Welding Fume Prods. Liab. Litig.*, 2006 WL 2505891 (N.D. Ohio Aug. 28, 2006) (master docket no. 1888) (designating a batch of 100 MDL cases for medical records discovery); Order at 1-2 (May 4, 2009) (master docket no. 2194) (designating all remaining MDL cases for medical records discovery).

warnings they received from manufacturers, the warnings they gave to their employees, and the employers' safety programs and work conditions; and (c) representatives of the manufacturer-defendants who are knowledgeable about their communications with welding rod suppliers and the plaintiffs' employers and Unions.

- the specific welding rods the plaintiff used, including deposition of: (a) representatives of the plaintiff's employers who bought welding rods for their employees' use; and (b) the distributors from whom those welding rods were purchased;[96]

- the plaintiff's quality of life, including depositions of his family and friends; and

- experts' opinions, including: (1) deposition of the parties' case-specific experts; (2) deposition of the parties' core experts, to the extent the core expert relies on new information to support his opinions; and (3) possibly also other persons who supplied information to an expert, upon which the expert relied to form his opinions.

Except for the Fact Sheet, Notice of Diagnosis, and medical records discovery referred to above, the parties do not normally engage in case-specific discovery until a case is set for trial. Given that this Court's remand of a *Welding Fume* case to a transferor court is for the purpose of trial, however, the order of remand probably will be entered only after this Court gives the parties deadlines for conducting at least some of their case-specific discovery.[97] Of course, once the order of remand is entered, this MDL Court loses jurisdiction over the remanded case; thus, oversight of pretrial discovery and rulings on pretrial

---

[96]  The parties refer to this aspect of discovery as "product ID."  Because a plaintiff will not necessarily remember correctly which welding rod products he used during his career, the parties ask the plaintiff's employers which welding rods they bought for their welder-employees to use.  Because the employers may also not necessarily remember correctly, the parties also ask welding rod distributors to identify which welding rods they supplied to the employers, and when.

[97]  Given that the transferor court will not have set a trial date when the order of remand is entered, this Court will not set deadlines for filing pretrial motions, and may enter deadlines for only certain types of case-specific discovery (e.g., deadlines for fact discovery but not expert discovery, or deadlines for written discovery but not deposition discovery).  That is, this Court may enter different case-specific discovery orders in different remanded *Welding Fume* cases, depending on the circumstances of the case and the MDL.  The transferor court will then follow with any necessary pretrial orders to make the case fully trial-ready.

motions will become the responsibility of the transferor court.[98]

One aspect of case-specific discovery worth highlighting is the deposition of the plaintiff's treating physicians. Because of the importance of these depositions, and given that these witnesses normally appear via video, the Court has ruled that defendants may normally take a short discovery deposition, followed by a trial preservation deposition. With an especially important treater, such as a neurologist, the Court also often allows a period of time to pass (albeit a limited one) between the discovery and preservation depositions, to allow defense counsel to prepare adequately.[99] The parties often agree that plaintiff's counsel may follow similar procedures when deposing a few especially important fact witnesses.

Another notable aspect of case-specific discovery involves the defendants' independent medical examination ("IME") of the plaintiff. Typically, the defendants employ an expert neurologist to perform an IME of the plaintiff, and this "IME expert" submits his report about 30 days later; among other things, this report sets out the IME expert's conclusions regarding from which disease(s) the plaintiff suffers. To date, the defendants' IME expert has never agreed with the plaintiff's experts on this issue. Plaintiffs'

---

[98] *See* David F. Herr, *Multidistrict Litigation Manual* §10:5 at 270 (2007) ("The effect of an order remanding a case to the transferor court for trial is to divest the transferee court of jurisdiction in the case and to vest the transferor court with jurisdiction.").

[99] For example, in one bellwether trial, the Court ruled as follows: (1) as to four of plaintiff's treating physicians, defendants could take a discovery deposition of two hours or less, followed by a break of at least two hours, followed by the parties' taking a trial deposition totaling two hours or less; (2) as to two other treating physicians, defendants could take a discovery deposition of 3.5 hours or less, followed by at least a 24 hour period from the start of the discovery deposition to the start of the trial deposition, followed by the parties taking a trial deposition totaling 3.5 hours or less; (3) the parties would do their utmost to disrupt the doctors' schedules as little as possible (for example, if a doctor listed under category one requests a break of more than two hours, the parties will try to accommodate him despite the provision otherwise; and similarly, if the defendants need less than the allowed duration as a break between discovery and trial depositions, and it is convenient to the doctor for the break to be shorter, the parties will try to accommodate); and (4) the discovery depositions may be used to support pretrial motions (e.g. in limine or *Daubert*), and also may be used to cross-examine the treaters during their trial deposition testimony, but are not otherwise admissible at trial.

50

experts invariably conclude the plaintiff suffers from an organic disease caused, at least in part, by exposure to manganese in welding fumes. Defendants' IME expert invariably concludes the plaintiff suffers from either: (1) an organic disease caused by something *other than* exposure to manganese in welding fumes; or (2) a non-organic, psychogenic disorder; or (3) a combination of both.

The parties have learned that the course of expert discovery in *Welding Fume* trials will take a different track, depending upon whether the defendants' IME expert opines the plaintiff suffers from an organic disorder, or a psychogenic disorder. Accordingly, the Court has ordered that the IME expert must, shortly after the IME, submit to plaintiff's counsel an "initial summary diagnosis," which discloses in simplified but particularized fashion all of those movement disorder(s) from which the IME expert believes the plaintiff suffers – whether organic or psychogenic.[100] As an example, the IME expert in one case offered this initial summary diagnosis of the plaintiff: "tremor consistent with essential tremor; symptoms of depression; no clinical evidence of parkinsonism or dystonia; no clinical evidence of manganism." This initial summary diagnosis made clear that the IME expert concluded the plaintiff suffered from organic disease not caused by manganese exposure, and not any psychogenic disorder. The IME expert's subsequent Rule 26 report, of course, set forth the expert's full diagnosis, reasoning, and conclusions in much greater detail. Because the initial summary diagnosis is provided solely for the convenience of plaintiff's counsel and is not the entirety of the IME expert's opinions, the Court has

---

[100] *See Jerkins* case management order at 3 (*Jerkins* docket no. 30) ("Defendants' neurologist who performs the independent medical examination of Plaintiff is required to disclose to Plaintiff's counsel an Informal Summary Diagnosis ("ISD") no later than 6:00 p.m. Eastern Standard Time on Monday, December 7, 2009. The ISD will simply identify all movement disorders and neurological conditions from which the expert believes the Plaintiff suffers. Absent good cause shown, Plaintiff's counsel may not at any time question the expert about his ISD; the sole function of the ISD is to facilitate Plaintiff's counsel's timely preparation for trial. Plaintiff's counsel is not precluded from questioning the expert regarding how he reached his full diagnosis and the information he needed and when he obtained that information to reach his full diagnosis.").

ordered that, absent good cause shown, plaintiff's counsel may not at any time question the expert about his initial summary diagnosis.[101]  Further, absent agreement by the parties, the Court will not allow the IME to be video- or audio-taped.[102]

It is not uncommon for the parties to require assistance and intervention from the Court during the discovery process, whether resolving disputes that arise during expert depositions or smoothing over scheduling disputes with third parties.  As noted above, this Court has directed the Special Master to serve and assist all transferor courts with any remanded case, to the same extent and in the same capacity as he has served this MDL Court in connection with MDL bellwether trials, to the fullest extent the transferor court desires.  Accordingly, the Special Master is available to assist the transferor court with resolution of discovery disputes and pretrial motions, and to serve at the elbow of the transferor judge during trial, if the transferor court so desires.

---

[101]  *Id.*

[102]  *See* footnote 309.

52

## IX.    PRETRIAL EVIDENTIARY RULINGS.

### A.    Documents.

Shortly before the first anticipated MDL bellwether trial of *Ruth* (which settled), the Court issued a written opinion ("*Ruth Document Order*") addressing the admissibility of a number of documents.[103] In the *Ruth Document Order*, the Court ruled on the admissibility of several dozen individual documents, and also outlined its reasoning regarding the relevance and admissibility *vel non* for different categories of documents generally.[104]  Using the guidelines set out in these rulings, the Special Master thereafter met with the parties in *Ruth* and ruled on the admissibility of hundreds of other documents.[105]  Many of these documents, such as memoranda authored by a defendant or trade association, were relevant to every case

---

[103] *Ruth v. A.O. Smith Corp*., 2005 WL 6293396 (N.D. Ohio Aug. 13, 2005) (*Ruth* docket no. 172). *See also Ruth* pretrial hearing tr. at 193-310 (Aug. 10, 2005) (the parties' first detailed document admissibility hearing with the Court, discussing many non-case-specific documents); *Ruth Daubert* hearing tr. at 56-61 (Aug 8, 2005) (discussing grounds for admissibility of historical documents even though they were not admissible pursuant to conspiracy theory).

[104]  With regard to certain historical documents discovered from defendants, trade organizations, and other entities dating back several decades, for example, the Court concluded some of them were relevant and admissible to show one or all of the following matters, among others: (1) the extent of defendants' changing knowledge over time that exposure to manganese in welding fumes (regardless of which welding product emitted them) could lead to neurological injury; (2) defendants' knowledge over time regarding the effect that giving or failing to give warnings (both specifically connected to manganese and otherwise) would have on their own business, their competition, their product-users, and other industry participants, and how this knowledge tied with the first matter listed above; (3) defendants' involvement with setting or manipulating industry standards relating to manganese in welding fumes (which relates to the government contractor defense); (4) the extent to which, over time, defendants supplied all of their knowledge regarding product hazards to welders and their employers (which relates to the sophisticated user and learned intermediary defenses); (5) whether defendants' decisions to warn *vel non* were made with the requisite mens rea to justify an award of punitive damages; and (6) the historical context within which the defendants made their decisions to warn or not (that is, whether the industry had historically under-warned, and whether this changed the extent of their duty to warn).  See citations listed in the previous footnote and also *Jowers* pretrial tr. at 47-53 (Jan. 23, 2008).  This subject is addressed in greater detail in Sections IX.C.39&40 of this document.

[105]  *See Ruth* pretrial tr. at 11 *et seq.* (Sept. 2, 2005).

53

in the MDL, and the parties understood that the Court's rulings would apply in every subsequent *Welding Fume* case.[106]  Other documents, such as the plaintiff's medical records, were case-specific and not likely to be relevant in other *Welding Fume* cases.

Since that time, the undersigned has presided over six additional MDL bellwether trials, and in every case has ruled on the admissibility of both sorts of documents – that is, documents that are relevant in every *Welding Fume* trial, and also documents that are case-specific.  As with the *Ruth* case, the Special Master met with the parties before each bellwether trial and applied the Court's guidelines to rule on the admissibility of specific documents.[107]  Again, the parties and the Court have always understood that new

---

[106] *See Tamraz* pretrial tr. at 195-97 (Nov. 2, 2007) ("Any ruling as to any document that was made during any of the prior proceedings stands unless there is a good reason to readdress that document because of a change of circumstances, either case-specific or otherwise, and all objections to those rulings stand, so that you don't need to raise them again.").

[107] The Special Master also performed a document admissibility hearing in the two *Welding Fume* MDL cases tried by other judges of this Court – *Arroyo* and *Mann*.

54

document admissibility rulings would continue going forward.[108]

Beginning with the 2006 MDL bellwether trial of *Solis*, the parties endeavored to use the same document numbering system in every subsequent MDL bellwether trial.  There were some hiccups along the way, however, and it was only after the 2008 bellwether trial of *Byers* that exhibit numbering agreements were set in stone.  In particular, the parties have agreed to use the exhibit numbering system shown in the chart attached as Appendix Four in all future *Welding Fume* trials.[109]  For those exhibits that are not case-specific, the chart also indicates whether this MDL Court ever admitted the exhibit during a

---

[108] *See Solis* pretrial tr. at 27 *et seq.* (June 1, 2006); *Goforth* pretrial tr. at 2 (Oct. 27, 2006) ("We are here this morning to do as we have in *Ruth*, as in *Solis*, go through some documents to determine admissibility.  Some of the rulings that I'm going to make today occurred in *Ruth* and *Solis*. * * * To the extent we can, we are going to try and incorporate the rulings from *Ruth* and *Solis* so that the same rulings will adhere in this trial . . . and also the objections that were overruled are incorporated so that you don't need to object again about the admissibility of a document.  Your objection is preserved in this case for purposes of appeal and everything else.  So we don't have to go through the same documents you've gone through before unless there's a reason that in this case you think that a document needs to be reexamined because of a change in who are the defendants or something Like that."); *Tamraz* pretrial tr. at 196 (Nov. 2, 2007) ("Any ruling as to any document that was made during any of the prior proceedings stands unless there is a good reason to readdress that document because of a change of circumstances, either case-specific or otherwise, and all objections to those rulings stand, so that you don't need to raise them again."); *Jowers* pretrial tr. at 244 *et seq.* (Jan. 24, 2008); *Byers* pretrial tr. at 4-5 seq. (Oct. 30, 2008) ("I think this is either the fourth or the fifth time we've done this, we've gone through a document admissibility hearing, the parties and I, before trial.  We've done it in the *Solis*, the *Goforth*, the *Tamraz*, and the *Jowers* bellwether trials.  I think we also did it in *Ruth* before that case settled.  And we also have tried as hard as we can to make sure that the document numbering from bellwether trial to bellwether trial has remained consistent so that a ruling on a given document in *Goforth*, for example, can be tracked, and the parties know that that Court ruling continues from trial to trial.  So now that we are doing this for the fifth or sixth time in the *Byers* trial, all of those rulings, everybody knows what they were, everybody knows that those rulings stand.  Everybody knows that objections that they have made to those rulings continue to have validity for purposes of appeal in this trial, and we are not going to go over those documents except to the extent that there is some circumstance in this trial that makes the ruling appropriate to readdress.  So most of what we're going to do today is talk about case-specific circumstances with regard to any given documents or new documents that we haven't discussed before.").

[109] This numbering system represents a series of agreements reached by the parties during successive MDL bellwether trials, which is why it is not as "neat" as might be expected if it had been agreed to all at once before the first trial.

bellwether trial.  If a certain general exhibit listed in the chart was admitted in an MDL bellwether trial, the same exhibit will normally be admissible in every other MDL trial, including a trial before the transferor court, because it is the same document.[110]

There is one important caveat to this discussion about general document admissibility.  At the time the Court entered the *Ruth Document Order*, which was the Court's first assessment of document admissibility (and when the Special Master subsequently entered his *Ruth* document admissibility rulings), certain defendants in *Ruth* had already been dismissed – including Lincoln Electric Company, BOC Group, and TDY Industries, which are three of the five primary MDL defendants.[111]  The Court's *Ruth Document Order* specifically stated that the extent to which a given document was admissible or required redaction sometimes depended on whether the document was authored by a party or a non-party.[112]  Thus, the premise for some of the document-related rulings in *Ruth* was susceptible to change.  Nonetheless, the parties in subsequent MDL bellwether trials have not asked this Court to reexamine any document admissibility rulings that might have been dependent on the author's status as a party.  Conceivably, this

---

[110] An example: the Court ruled exhibit 260 was admissible in the *Solis* trial.  Thus, the parties in the subsequent *Byers* trial knew their exhibit 260 was admissible (because it is the same document), and the parties know that exhibit 260 will be admissible in every future *Welding Fume* trial as well, absent unusual circumstances.  Not that it matters, but the example of exhibit 260 is a Feb. 24, 1992 memo from George Barnes of defendant ESAB to William Esch of L-Tec addressing the hazard of manganese in welding fumes.  Plaintiffs have introduced this exhibit in every *Welding Fume* bellwether trial.

[111] *See Ruth* docket no. 90 (defendants' motion for voluntary dismissal), docket no 112 (plaintiff's non-opposition to motion); *see* marginal order granting motion for dismissal (July 29, 2005).

[112] *See, e.g., Ruth v. A.O. Smith Corp.*, 2005 WL 6293396 at *2 (N.D. Ohio Aug. 13, 2005) (*Ruth* docket no. 172) ("In other words, evidence regarding a *non-party* manufacturer's knowledge of: (a) risks posed by its product, (b) the efficacy of its warnings, and (c) the level of knowledge of learned intermediaries, may be relevant to the *defendant* manufacturer's knowledge on those issues, as well.  On the other hand, an internal document of a *non-party* that does not add anything of evidentiary value regarding the state of industry knowledge, and is relevant only to internal thought processes or individual 'bad intentions,' generally will not be admissible.") (some emphasis added).

status could change the admissibility of certain documents.

## B.      Admissibility of Expert Testimony.

There are three principal questions a jury in a *Welding Fume* trial must answer: (1) can exposure to manganese in welding fumes cause brain damage?; (2) if yes, did exposure to manganese in welding fumes cause the plaintiff to suffer brain damage?; and (3) if yes, did the defendant welding rod manufacturers give the plaintiff sufficient warning that exposure to manganese in welding fumes could cause brain damage?[113]

Each of these questions depends on disputed facts about which experts will opine.  For example, regarding the first question, the parties may offer expert testimony from epidemiologists comparing rates of parkinsonism in welders to rates for non-welders; and may offer testimony from toxicologists and neurologists addressing the extent to which manganese in welding fumes can penetrate into and damage the brain.  Regarding the second question, the parties may present expert testimony from neuro-radiologists explaining the results of PET scans of the plaintiff's brain, and testimony from industrial hygienists assessing the plaintiff's career-long welding fume exposures.  And regarding the third question, the parties may adduce testimony from experts in the fields of warnings and human factors psychology

---

[113]  The first question goes to "general causation," which "is concerned with whether [a toxin] increases the incidence of disease in a group and not whether the [toxin] caused any given individual's disease."  Federal Judicial Center, *Reference Manual on Scientific Evidence* at 392 (2nd ed. 2000).  The second question goes to "specific causation," which addresses "[w]hether exposure to [a toxin] was responsible for a given individual's disease."  *Id.* at 396.  In other words, general causation asks if a toxin *can* cause *a* plaintiff's harm; specific causation asks if the toxin *did* cause *the* plaintiff's harm.  If the jury concludes that manganese in welding fumes can, and did, cause harm to the plaintiff, the jury must still answer the third question: is the harm the plaintiff suffered proximately caused by defendant's failure to provide sufficient warnings?

The jury may be faced with many other important questions, of course, such as whether the plaintiff's employer was a learned intermediary, and whether the plaintiff proved damages.  But the three questions listed above are at the heart of every plaintiff's claims, and call for the most expert testimony.

on the power and meaning of warning symbols and language.

The parties have filed numerous pretrial motions seeking to limit the admissibility of testimony from the other side's experts.  Some of these motions invoke Fed. R. Evid. 702[114] and *Daubert*[115] and argue the expert is not qualified, or uses unreliable methodology.  Others are motions in limine arguing, for example, that an opinion offered by the expert in his deposition was not contained in his expert report, and so should be excluded at trial for non-compliance with Fed. R. Civ. P. 26(A)(2)(b)(i).[116]

Early in this MDL, the Court issued two written Orders addressing some of these motions and

---

[114] This rule states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

[115] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The *Daubert* court held that federal trial judges must serve a "gatekeeping role" – "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589. The Supreme Court also suggested a non-exclusive list of factors for trial courts to consider when deciding whether proposed scientific expert testimony is sufficiently "reliable," as required by the second and third conditions in Rule 702.  The specific factors listed by the *Daubert* Court are: "(1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community."  Fed. R. Evid. 702 (advisory committee notes, 2000 amendments) ("*Advisory Committee Notes*"); *Daubert*, 509 U.S. at 593-594.

[116] This rule states that an expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(A)(2)(b)(i).  The parties also make similar motions at trial.  *See, e.g., Byers* trial tr. at 2731-32, 2745 (Court ruling that defense expert Dr. Kieburtz could not offer certain opinions regarding his patients, because his expert report addressed only epidemiology).

establishing the confines it would impose upon admission of testimony from a number of experts.[117]  The Court later issued similar written and oral rulings during subsequent MDL bellwether trials.  Many of the experts at issue have appeared repeatedly at *Welding Fume* trials, and the Court's admissibility rulings continue in force from one trial to the next.  Further, even if a given expert does not reappear, the Court's admissibility rulings as to that expert will often carry implications for a different expert who testifies about the same subject matter at a subsequent trial.

Below, the Court summarizes the admissibility rulings it has entered regarding the opinions of the expert witnesses whom the parties have called at *Welding Fume* trials so far.  In some cases, the summaries below are excerpted verbatim from the Court's earlier-written Orders.  In footnotes, the Court also cites to oral rulings.

### 1.      General Observations.

Before addressing individual experts and subject matter areas, the Court makes these general observations.  Both the plaintiffs and the defendants in this case have been, to varying degrees, guilty of the same fault: they have asked their experts to reach outside their areas of expertise to opine, for example, about the ultimate issue of whether exposure to manganese in welding fumes can cause neurological injury.  As discussed in detail below, such an opinion is certainly within the area of expertise of some of the parties' experts (e.g., neurologists), but clearly not within the area of expertise of other experts (e.g., chemists and warnings experts).  Merely because a person is an expert and can assist the jury to understand discrete issues raised by the parties does not mean he must opine about *every* important issue in the case.

---

[117]  *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

On the other side of the coin, despite the parties' arguments, simply because a witness is not an expert about *everything* does not mean he is unqualified to offer expert opinion about *anything*.

Nearly every expert's report in every *Welding Fume* trial reveals that the expert read many medical and scientific articles which studied and discussed the neurological effect of manganese. While this review may have been vital to the expert's understanding generally of the issues and background of this litigation, it does not make him an expert on that particular subject. Still, a given expert's tendency to opine about areas outside of his particular expertise does not, by itself, disqualify him from testifying about his true, core area of expert knowledge. As this Court has repeatedly reminded the parties, a *Welding Fume* case will be shorter and smoother if the parties tailor their presentations by ensuring each expert's opinion is so confined.

### 2. Dr. Olanow, Dr. Louis, Dr. Nausieda, Dr. Lang, Dr. Hurtig, & All Other Neurologists – Opinions Regarding General Causation, Welding Fume, and Parkinson's Disease.

The very first evidentiary motion filed in this case sought a ruling excluding all testimony, from any witness, that exposure to manganese in welding fumes can cause Parkinson's Disease ("PD"). This defense motion had two distinct elements to it: (1) a fairly typical *Daubert* challenge where defendants argued there exists insufficient scientific evidence of "general causation" – that is, evidence of a link between manganese exposure and PD – to allow expert testimony opining that such a general causal link exists; and (2) a request that the Court rule that, given the lack of reliable evidence of a causal link between manganese exposure and PD, any plaintiff who has PD cannot prevail at trial, as a matter of law, on his claims that his disease was caused by defendants' products.[118] The principal basis for defendants'

---

[118] *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *22-36 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353) (analyzing this motion in detail).

motion was that, using four primary tools, neurologists can distinguish reliably between PD and Manganese-Induced Parkinsonism ("MIP"), and the former cannot be caused by exposure to welding fumes.[119]

Following an exhaustive review of voluminous evidence submitted by the parties, the Court denied defendants' motion.  Specifically, the Court concluded: "the sum of the epidemiological and other evidence proffered by the parties [is] sufficiently reliable to support the assertion that exposure to welding fumes can cause, contribute to, or accelerate a parkinsonian syndrome that some doctors will diagnose as PD."[120]  The Court reasoned that,

> because clinical symptoms of PD and MIP overlap, doctors using *valid clinical definitions of PD* will sometimes diagnose MIP as PD; a person suffering from MIP will sometimes fit within the clinical definition of PD.  Thus, it would not be entirely correct to put a plaintiff, who was diagnosed as having PD but who actually suffers MIP, in the position of having to argue he was "mis-diagnosed;" rather, his doctor may have simply and validly chosen one of two overlapping diagnoses.  The parties are equally able to argue whether

---

[119]  The four tools are: (1) clinical symptoms; (2) levodopa response; (3) neuroimaging; and (4) neuropathology.  For example, defendants argued that: (1) PD patients experience tremor when their limb is at rest, while MIP patients experience tremor when they initiate limb movement; (2) PD patients respond well to the drug levodopa, while levodopa does not help mitigate symptoms in MIP patients; (3) brain scans of patients with PD and MIP yield different radiological pictures; and (4) the brain tissues of patients with PD and MIP degenerate in different ways.  *Id.* at *24-31.

[120]  *Id.* at 36.  In a subsequent opinion, the Court added that "[t]he evidence so far presented is sufficiently reliable to support the assertion that exposure to *low-manganese* welding fumes can cause, contribute to, or accelerate a movement disorder, including a parkinsonian syndrome that some doctors will diagnose as PD."  *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *17 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183) (emphasis added).

the one chosen was correct.[121]

As a practical matter, this ruling means the parties will present conflicting expert opinions regarding the proper diagnosis of plaintiff's brain injury. As discussed in Section VI.B.6 of this document, plaintiffs' experts will usually assert the plaintiff suffers MIP, and defendants' experts will usually assert the plaintiff suffers some other form of parkinsonism that is not caused by welding fume exposure.

### 3. Dr. Olanow, Dr. Eidelberg, Dr. Sze, Dr. Atlas, & All Other Neurologists and Neuro-Radiologists – Opinions Regarding Brain Scans and Differential Diagnosis of Parkinsonisms.

As noted above, to support their argument that there is insufficient evidence of a general causal link between manganese exposure and PD, defendants assert there exist significant radiological differences between brain scans of patients with PD and patients with MIP. Defendants argue these differences show that manganese exposure does not cause PD. In response, plaintiffs moved for a ruling excluding any testimony that PET and MRI Scans may be used as a diagnostic tool to differentiate between PD and MIP,

---

[121] *Id.* at 31 (emphasis in original). The Court further explained:

Defendants [assert] that the differences between PD and MIP revealed by these four tools are all related: manganese overexposure damages a different part of the brain than does PD, and these different patterns of damage: (1) appear different radiologically, (2) respond differently to levodopa therapy, and (3) cause different constellations of clinical symptoms. Given all of these differences, defendants conclude, the Court should not allow any expert to opine that exposure to manganese can cause PD, and should not allow any plaintiff who has been diagnosed as having PD, as opposed to MIP, to prevail at trial. At best, defendants assert, plaintiffs can validly claim, and their experts can legitimately opine, only that exposure to manganese can cause MIP, which is a distinct and different disease.

The Court concludes, however, that it cannot issue the rulings defendants request. The Court concludes both that: (1) there is sufficient scientific data to support the contrary opinions plaintiffs' experts espouse regarding the interplay between manganese exposure, PD and MIP; and (2) judgments regarding a particular plaintiff's condition, and the strength of the parties' scientific evidence of the cause of that condition, must be left for the trier of fact.

*Id.* at 29.

62

arguing the methodology underlying this use of PET and MRI Scans as a mechanism for differential diagnosis is not reliable.

The Court denied this motion, concluding as a *general* matter that the reasoning and methodology of the defendants' brain scan experts were scientifically valid; the Court held that the  limitations of these brain scans is a matter for cross-examination, and not a basis for wholesale exclusion.[122]  Discussed below in Section IX.B.3 of this document, however, are limitations the Court placed on the admissibility of specific opinions of specific experts regarding brain scans.

### 4.    Dr. Olanow, Dr. Perl, Dr. Calne, & All Other Neurologists and Neuro-Pathologists – Opinions Regarding Brain Tissue Damage Caused by Manganese Exposure.

As noted above, to support their argument that there is insufficient evidence of a general causal link between manganese exposure and PD, defendants assert that patients with PD suffer tissue degeneration in an area of the brain known as the substantia nigra pars compacta ("SNPC"), while patients

---

[122]  Since the admissibility of expert testimony is an issue to be resolved by the trial judge under Fed. R. Evid. 104(a), the Court "need only find by a preponderance of the evidence that the expert's reasoning and methodology is scientifically valid."  29 Wright & Gold §6266 at 276 (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).  Rule 104(a) serves to underscore that *"Daubert* does *not* require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct."  *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (emphasis added); *see Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ("it is the expert witnesses' methodology, rather than their conclusions, that is the primary concern of Rule 702").  Thus, under *Daubert*, "the rejection of expert testimony is the exception rather than the rule."  *Advisory Committee Notes*.  This is, in part, because the Supreme Court prefers that litigants rely upon "the capabilities of the jury and of the adversary system generally," rather than "wholesale exclusion" by the Court of fairly supported, relevant testimony.  *Daubert*, 509 U.S. at 596.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.*  This principle remains true even in the most complicated cases: "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  *Ruiz*, 161 F.3d at 85 (quoting *Daubert*, 509 U.S. at 590).  The Court's role is "that of gatekeeper[, not] that of armed guard."  *Id.* at 86.

with MIP suffer neurodegeneration in different brain structures known as the globus pallidus and the striatum. Again, defendants argue these differences in brain tissue injury show that manganese exposure does not cause PD. In response, plaintiffs moved for a ruling excluding any testimony that manganese exposure does *not* cause damage to the SNPC; plaintiffs argued there was no reliable scientific evidence supporting the assertion that manganese exposure damages only the globus pallidus and the striatum, and not the SNPC.

The Court denied this motion, concluding as a *general* matter that the reasoning and methodology used by the defendants' neuropathology experts to conclude that manganese exposure causes preferential damage in the globus pallidus were scientifically valid. The Court concluded the jury can and should weigh the parties' competing expert testimony regarding typical brain damage patterns caused by manganese exposure. Discussed below in Section IX.C.32, however, are limitations the Court placed on the admissibility of *specific* opinions of specific experts regarding neuropathology.

### 5. Dr. Hoffman, Dr. Levy, Dr. Zimmerman, Dr. Burns, Dr. Messick and others – Opinions Regarding Business Ethics and Occupational Health Practices.

At the first *Welding Fume* trial, plaintiffs designated Dr. W. Michael Hoffman, who is a Professor of Philosophy and Ethics, to offer testimony about business ethics generally and also whether the defendants acted ethically in this case. Specifically, in his expert report, Dr. Hoffman set out seven ethical principles, to which, he asserted, all modern businesses should adhere. These principles include, for example, the proclamations that "a corporation should act with honesty and integrity at all times" and "should do more than comply with applicable laws and regulations, particularly if circumstances dictate

64

that possible harm could result from a failure to do more."[123]

Dr. Hoffman then examined whether the defendants met each of these ethical standards, and opined they did not. Among other things, Dr. Hoffman concluded there was "little or no evidence that the Defendants adopted ethically justifiable values which they integrated into their business process." *Id.* at 21. Dr. Hoffman's final conclusion was that "the Defendants have taken a thoroughly reactive approach to safety issues, failing to clear the ethical bar by some margin. There were many missed opportunities to assume voluntary responsibility for promoting the safe use of their products, yet the welding industry as a whole was content to respond only when legislation left no alternative." *Id.* at 29.

The Court concluded this testimony was not admissible because the *ethical* standards Dr. Hoffman listed are different from the *legal* standards that apply in a *Welding Fume* case.[124] Every one of Dr. Hoffman's seven ethical standards is precatory – each sets out what a corporation *should* do. No right-minded person would disagree with the aspirational character of Dr. Hoffman's ethical principles. But the critical question for a *Welding Fume* jury is whether the defendant corporations did what the law *required*

---

[123]  Hoffman declaration at 11-14 (master docket no. 1041, exh. 4). Other principles include: "(1) A corporation should do no unjustifiable harm to its customers, employees, and others affected by its operations. In particular, it should not expose the users of its products to such harm when it knows, or reasonably out to know, that some degree of harm is a likely consequence of ordinary use; * * * (3) A corporation should ensure that its management practices, business decision-making and actions are in accord with ethically justifiable values; * * * and (5) A corporation should act with honesty and integrity at all times, telling the truth even when it may not be in its self-interest to do so – this includes the duty to make timely, truthful and complete public communications pertaining to its business and products." *Id.*

[124]  Defendants do *not* argue that Dr. Hoffman is unqualified to offer expert testimony in the field of business ethics. In fact, Dr. Hoffman is highly qualified as an expert in his field, having: (1) founded the Ethics Officer Association and the Society for Business Ethics; (2) written 16 books on the subject of business ethics, including some of the earliest, seminal works; and (3) served on the advisory board to the United States Sentencing Commission regarding the role a business ethics program should have in the sentencing process for corporations. Although the Court concludes Dr. Hoffman's opinions are not admissible in this case, the Court can certainly imagine cases where his expertise would be admissible and relevant to the issues raised.

them to do, not whether, from a societal perspective, they did what an "ethical corporation" *should have* done.  Dr. Hoffman's opinions regarding the latter, accordingly, would tend to misdirect the finder of fact.[125]

Accordingly, the Court concluded that Dr. Hoffman may not testify *in plaintiff's case in chief*.  The Court held open the remote possibility, however, that it would allow Dr. Hoffman to testify in rebuttal.  Specifically, plaintiffs suggested that certain defendants might testify at trial (as they had in deposition) that their actions always comported with the highest ethical standards.  The Court ruled it might then allow plaintiffs to call Dr. Hoffman on rebuttal to explain: (1) the ethical principles that apply to a business; and (2) whether certain conduct meets these universal ethical standards.[126]  Despite this ruling, the Court has (to date) not allowed rebuttal expert testimony on ethics in any *Welding Fume* trial (although, in response to plaintiff's request for such rebuttal in specific cases, the Court has warned defendants that certain evidence they presented was beginning to open the door to such rebuttal testimony).

For the same reasons, the Court also granted defendants' motions to exclude the "ethics testimony" offered by industrial hygienists Dr. Zimmerman and Dr. Levy, and public health expert Dr. Burns.  For example, in deposition, Dr. Zimmerman opined that: (1) a manufacturer's duty to warn goes "beyond a legal duty; [it is also] a moral obligation;" and (2) a manufacturer has a duty of "product stewardship," which is "more along the lines of a moral obligation."  Only slightly less objectionable were Dr. Levy's opinions regarding "how industry and defendants' actions (or inactions) measured up to prudent practices

---

[125]  That Dr. Hoffman's opinions are likely to confuse the jury is highlighted by his seventh ethical principle: "A corporation *should do more than comply with applicable laws and regulations*, particularly if circumstances dictate that possible harm could result from a failure to do more."  (Emphasis added.)  Simply, Dr. Hoffman sets out a standard in excess of what the law requires; this is unlikely to "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Civ. P. 702.

[126]  Even within this possibility, the Court stated it was less likely to allow testimony on the second type of explanation, and even then, only in the form of answers to hypothetical questions.

of occupational health."  Dr. Levy explained that, in his opinion, whether a defendant's actions measure up to "prudent practices of occupational health" is measured by whether the defendant complied with the "Precautionary Principle."  This principle "call[s] for policies to protect health from potential hazards even when definitive proof and measurement of those hazards is not yet available."[127]  In other words, the duties demanded by this principle are not coterminous with the legal obligations that are relevant in a *Welding Fume* case, especially because "[r]eversal of the burden of proof is often cited as a corollary to the precautionary principle."[128]  Similarly, Dr. Burns' expert reports have contained inadmissible personal value judgments regarding the defendants' corporate conduct, such as that defendants allegedly "failed to meet their social responsibilities" and "chose to misrepresent" the dangers of welding.  It is only the defendants' conduct itself that is relevant and admissible, not whether that conduct measures up to any moral or social standard held by an expert.  Thus, these ethics opinions are also inadmissible.[129]

### 6.    Dr. Cunitz, Dr. Krenek, Dr. Purswell, Dr. Welch, Dr. Wood, and others – Opinions Regarding Warning Adequacy.

In several *Welding Fume* cases, plaintiffs designated Dr. Robert Cunitz to opine about the adequacy *vel non* of the manufacturers' warnings about the dangers of using welding rods.  Dr. Cunitz received his

---

[127] Frank Ackerman & Lisa Heinzerling, *Priceless: on Knowing the Price of Everything and the Value of Nothing*, SK058 ALI-ABA 571, 574 (ALI-ABA Course of Study, February 16-18, 2005); *see also New Mexico v. General Elec. Co.*, 335 F.Supp.2d 1185, 1221 (D. N.M. 2004) (the Precautionary Principle "requires that in the light of scientific uncertainty, when credible evidence is put forth that a risk exists, action should be taken to minimize that risk or eliminate it even though absolute proof has not been obtained which quantifies the risk").

[128] Sonia Boutillon, *Book Review*, 16 Eur. J. Int'l L. 164, 164 (Feb. 2005).

[129] *See also Goforth* pretrial at 42-73 (Oct. 25, 2006) (also excluding defendants' ethics expert, Dr. Messick, whom defendants intended to call in response to Dr. Hoffman's and Dr. Burn's ethics testimony); *Tamraz* pretrial at 93-94 (Nov. 1, 2007) (same).

doctorate degree in "Experimental and Human Factors Psychology." Dr. Cunitz explains that his training and background have given him expertise in "how human beings perceive and react to environmental stimuli. This specialized knowledge concerns human visual and auditory perception, comprehension of language and symbols, . . . human learning, attention and motivation, the elements necessary for visibility, and visual contrast and acuity." Among other positions, Dr. Cunitz served as head of the Human Factors Section in the Center for Consumer Product Technology of the National Bureau of Standards, and is a member of the American National Standards Institute ("ANSI"), Z535 Committee on Warning Signs and Colors.

Dr. Cunitz has submitted both a core expert report, which asserts opinions applicable to every *Welding Fume* case, and also case-specific reports, where he asserts additional opinions. The defendants have challenged the admissibility of virtually all of Dr. Cunitz's opinions, and the Court has issued several rulings delineating the scope of allowable testimony.

### a.       Core Expert Opinions.

In his core expert report, Dr. Cunitz asserted his specialized background and knowledge allows him to "assess [1] the risks inherent in a product, [2] the need to warn against such risks and instruct in the use of the product, and [3] how to make warnings and instructions most effective to the intended users of such products." As a general matter, however, the Court has concluded that Dr. Cunitz is qualified to opine about only the last of these three matters.

Dr. Cunitz has stated he reviewed documents and opinions of *other* experts which reveal: (1) the causal connection between welding and neurological injury; (2) manufacturers' knowledge of the hazards of welding fumes; and (3) public perception of these hazards. This review supposedly allowed him to

68

"determin[e] (a) if warnings were necessary; (b) if warnings would be effective; (c) if there are risks of serious injury associated with a hazard; (d) the nature of the warnings necessary; (e) the appropriate manner in which to communicate the warnings and the conspicuity necessary so the warnings would be read; and (f) whether it is necessary to put permanent warnings on the product itself rather than only in material which accompanies the product."  But in the context of a *Welding Fume* case, determinations (a)-(d) above are not within Dr. Cunitz's own area of expertise.  For example, the questions of whether certain "warnings were necessary," and how much "risk[] of serious injury [is] associated with a hazard," depend primarily on whether, or the degree to which, welding fumes cause neurological injury; at best, Dr. Cunitz can only rely on the opinions of other experts to answer this question.  Dr. Cunitz is not, himself, qualified to opine on whether welding fumes cause neurological injury.[130]  The parties have many other experts who can and will opine on this issue.  Similarly, Dr. Cunitz is not qualified, in a *Welding Fume* case, to opine about the degree of the manufacturers' knowledge of hazards associated with welding fumes, or about what plaintiffs would have done had they been given different warnings.[131]

Moreover, several (but not all) aspects of Dr. Cunitz's opinions either mis-state the applicable legal standards or invade the province of the jury.  For example, Dr. Cunitz explains that "warnings are necessary" if, among other things, the manufacturer has a "reasonable suspicion of harm," meaning that "prudent inquiry" by the manufacturer would reveal "*a possibility* that danger may be present during the

---

[130]  While it us true that Federal Rule of Evidence 703 allows an expert to rely on hearsay, including the opinions of other experts, any such reliance does not enlarge the witness's fundamental area of expertise.  Dr. Cunitz is not a neurotoxicologist, and he does not become qualified to offer neurotoxicological causation opinions merely because he read the declarations of other experts.  *See Larson v. Kempker*, 405 F.3d 645 (8th Cir. 2005) ("an expert may extrapolate from data supplied by other experts . . . , but a person does not become an expert simply by reviewing any expert's reports or research")

[131]  Defendants correctly point out that Dr. Cunitz is not qualified to opine about these particular issues because he supplies no methodology addressing the foundation for these opinions.

foreseeable use or misuse of [the] product." This is simply not the correct legal standard – knowledge of a mere "possibility of danger" does not necessarily translate to a legal warning requirement, nor does it necessarily imply liability.[132]

Dr. Cunitz also proposed to offer "ultimate question" testimony that various warnings were ineffective and inadequate. It is true that, under Federal Rule of Evidence 704(a), an expert opinion is not objectionable merely because it "embraces an ultimate issue to be decided by the trier of fact." But Rule 704(a) "does not lower the bar so as to admit all opinions" – an evidentiary problem remains if "testimony containing a legal conclusion is allowed, as it may convey a witness's unexpressed, and perhaps erroneous, legal standards to the jury."[133] "Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury."[134] Because many aspects of Dr. Cunitz's opinions of warning adequacy are improperly premised upon, among other things: (1) an erroneous "possibility of danger" standard, and (2) his conclusion on the weight of the evidence regarding the

---

[132] *See, e.g.*, Ohio Rev. Code §2307.76(A)(1)(a) ("a product is defective due to inadequate warning or instruction if * * * the manufacturer *knew or, in the exercise of reasonable care, should have known* about a risk that is associated with the product," and failed to warn of that risk) (emphasis added); Miss. Code. §11-1-63(c)(i) ("In any action alleging that a product is defective because it failed to contain adequate warnings or instructions * * * , the manufacturer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that * * * *the manufacturer or seller knew or in light of reasonably available knowledge should have known* about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition") (emphasis added); *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2nd Cir. 2000) ("Under New York law, a manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it *knew or should have known*") (emphasis added, internal quotation marks omitted). These "knew or should have known" standards are quite different from Dr. Cunitz's standard of "prudent inquiry would reveal a possibility of danger."

[133] *United States v. Smith*, 2003 WL 21675340 at *5 (6th Cir. July 15, 2003), *cert. denied*, 540 U.S. 976 (2003) (citing *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)).

[134] *Indiana Ins. Co. v. General Elec. Co.*, 326 F.Supp.2d 844, 847 (N.D. Ohio 2004) (citing *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir.1987)).

neurological risks of inhaling welding fumes, they are inadmissible.[135]

This is not to say, however, that all aspects of Dr. Cunitz's opinions fail to satisfy the dictates of Rule 704 and *Daubert*.  For example, Dr. Cunitz opines that: (1) "many users did not see the packaging warnings because of their location on the package and because of the nature of * * * many workplace environments (tool or supply rooms where the rods were separated from the packaging before being handed out to welders);" and (2) an effective warning should have included certain words, symbols, and colors.  These particular opinions are squarely within Dr. Cunitz's area of expertise (human factors psychology), and the Court's review of all the legal standards recited above mandated the conclusion that they are admissible under *Daubert*.

Ultimately, then the Court denied defendants' motion to exclude *all* of Dr. Cunitz's core expert opinions.  On the other hand, as discussed above, certain of Dr. Cunitz's opinions are inadmissible, so the Court also granted the motion in part.  As a general matter, the Court circumscribed Dr. Cunitz's testimony to matters directly linked to human factors psychology.  While Dr. Cunitz may rely on opinions of other experts regarding other issues in dispute (e.g., whether manganese in welding fumes causes neurological damage), or hypothetically assume certain facts, he may not opine about any issue not within his area of personal expertise.[136]

---

[135]  *See Tyler By and Through Tyler v. Sterling Drug, Inc.*, 19 F.Supp.2d 1239, 1245 (N.D. Okla. 1998) (granting a motion to exclude Dr. Cunitz from offering similar opinions).
    Similarly, the Court ruled that defense warnings expert Dr. Wood could not testify that a warning was "adequate," "reasonable," "appropriate," or "sufficient," as these are ultimate legal opinions.  *Cooley* trial tr. at 2263-70 (Sept. 25, 2009).

[136]  The Court examined all of the sub-parts of ¶30 of Dr. Cunitz's original declaration (master docket no. 1032, exh. 1), where he set out his opinions, and attempted to identify which opinions would be admitted, and which would not.  For the reasons stated above, the Court found it could not rule categorically.  As a general matter, however, and solely for the purpose of providing the parties with some soft guidelines, the Court stated it was more likely to sustain an objection to the opinions expressed at ¶30(a, f, g, h, & i) than at ¶30(b, c, d & e).

71

Finally, the Court noted that the same general limitations will apply to all other warnings experts, such as defendants' experts Dr. Richard Krenek, Dr. Jerry Purswell, Dr. Jane Welch, and Dr. Christine Wood.

### b.      Case-Specific Opinions.

In the MDL bellwether trial of *Solis*, defendants challenged the admissibility of a number of additional, case-specific opinions offered by Dr. Cunitz in his expert report.[137]  After carefully parsing Dr. Cunitz's report, the Court reached the conclusions listed below.  Those opinions that are listed as inadmissible are speculative, outside of Dr. Cunitz's area of expertise, and/or embody ultimate legal conclusions.  Opinions of Dr. Cunitz contained in his report but not listed below were not challenged by the defendants, and so are admissible.

**Admissible Opinions**

> Opinion A – "Some welding consumables were packaged and distributed in such a way that the labeling was never seen by the welders using the products."

> Opinion C – "Welding consumables and welding equipment required warnings instructing product users, employers and supervisors of the appropriate and safe procedures necessary to avoid or eliminate exposure to manganese and other hazardous materials released during the welding process into the breathing stream and immediate environment of the welder and other workers. The warnings should have specified that positive pressure, supplied air respirators were required and, particularly with respect to flux core wire welding, that point source fume extraction was mandatory."

> Opinion E – "In addition, the warnings on the defendant's welding consumables and equipment were defective and unreasonably dangerous to the extent that they were not delivered to the end user.  For example, many users did not see the packaging warnings because of their location on the package and because of the nature of the distribution of consumables such as welding rods in many workplace environments (tool or supply rooms where the rods were separated from the packaging before being handed out to the welders)."

---

[137]  Cunitz's report is at *Solis* docket no. no. 40, exh. 2.

Opinion H – "Proper warnings would have described the hazard of exposure to manganese and other components in the welding fumes, would have effectively conveyed the serious consequences such as those suffered by Mr. Solis, and would have prohibited welding without effective point source fume extraction and/or positive pressure, supplied air respirators."

**Inadmissible Opinions**

Opinion L – "The manufacturers of welding consumables and equipment knew, should have known, or, at the very least, should have long ago developed a reasonable suspicion that fumes generated by many welding consumables were causally connected to a serious disease – nevertheless the Defendants took no effective action to adequately warn of the danger."[138]

Opinion M – "It was unreasonable for manufacturers and sellers of welding consumables and equipment to sell such products without adequate and effective warnings appropriate to and commensurate with the danger presented by such products to the users once they knew, should have known, or at the very least should have reasonably suspected that there was harm from exposure to the fumes."

Opinion N – "Had Mr. Solis been properly warned about the hidden danger of being seriously and permanently injured by his ordinary use of welding consumables and welding equipment and if he was instructed in the proper and practical procedures for avoiding exposure, he would not have used the subject welding consumables and welding equipment without appropriate and safe precautionary measures."

Opinion O – "If his employers and supervisors had been adequately warned they would have taken steps to protect him."

Opinion Q – "It is not reasonable to believe that the US military should have more knowledge about manganese hazards that [sic] any other employer.  It is reasonable to assume that the military's knowledge would be entirely dependent on information, including content and tenor, supplied by the manufacturers of the welding consumables."

Opinion S – "Had effective product stewardship policies and programs been provided by the defendants, Mr. Solis's workplaces would have been evaluated, the hazards of manganese in the welding fumes been identified, and he and his employers and supervisors would have been warned with respect to the danger and the necessary safety precautions."

---

[138] *Compare Goforth* pretrial tr. at 66-72 (Oct. 25, 2006), *id.* at 154-55 (Oct. 30, 2006) (ruling that Dr. Cunitz could refer to documents showing what defendants stated they knew to be the hazards of welding fume exposure, because the adequacy of a warning must be measured in comparison to, among other things, known hazards); *cf. Byers* trial tr. at 1999 (Nov. 14, 2008) (ruling that Dr. Cunitz could acknowledge the existence of historical documents and their contents when relevant to warnings, but could not testify regarding what defendants knew).

Opinion T – "The failures of the defendants to adequately and effectively warn Ernesto Solis as described above were direct and proximate causes of his exposure to the manganese in the welding fumes generated during his employment."

In later trials, the Court also addressed the admissibility of other portions of Dr. Cunitz's opinions, ruling that Dr. Cunitz is permitted to discuss the concept of "anti-warnings" and to opine that certain conduct by defendants acted as an anti-warning.[139]  Finally, the Court noted it was up to defendants to object at trial if they believed Dr. Cunitz's testimony was falling outside of these strictures.[140]

### 7.    Dr. Zimmerman and Mr. Ewing – Opinions Regarding Industrial Hygiene and Welding Fume Exposure.

Plaintiffs designated as experts Dr. Neil Zimmerman and Mr. William Ewing, both of whom specialize in the field of Industrial Hygiene – that is, the identification, evaluation, and control of health risks in the workplace.  Defendants filed two separate motions arguing that Dr. Zimmerman and Mr.

---

[139]  An anti-warning involves "produc[tion of] media that deliberately misrepresent dangerous products as safe in order to contradict or eviscerate true warnings.  These [media] can include, for example, training materials, advertisements, or promotional materials that project an image of safety for what is in actuality a dangerous product or material." Michael S. Wogalter, *Handbook of Warnings* 635 (2006) (emphasis in original) (trial exh. 5433-C).  Thus, an "anti-warning" is not itself a warning at all, but a communication that has the effect of mitigating the force and effect of a separate, already-existing warning.  The Court ruled that Dr. Cunitz may discuss this concept while referring to defendant's actions so long as his testimony refers to the putative anti-warning's *effect*, and not the defendant's *intent* when it produced and distributed the media at issue.  *See Jowers* pretrial tr. at 44-46 (Jan. 23, 2008); *Tamraz* trial tr. at 1614-16 (Nov. 12. 2007).

[140]  *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *8 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353) ("It is difficult for the Court to provide in advance complete guidance to the parties as to 'where the lines will be drawn' at trial.  This is especially true because some of counsel's questions to Dr. Cunitz may be phrased in hypothetical form, some may refer to other testimony and evidence, and the Court will have to examine the overall methodological foundation for many of Dr. Cunitz's answers on a question-by-question basis.  The parties will have to use the familiar trial technique of raising objections to particular questions.").
Of course, the same rule applies with all of the parties' experts; having disallowed testimony from certain experts about certain subject matters, it becomes the parties' obligation to object, if they believe the expert is not adhering to these rulings.

Ewing must be precluded from testifying about certain matters: one motion directed at excluding opinions related to their "Welding Fume Study," and one motion seeking "an Order from the Court precluding Mr. Ewing and Dr. Zimmerman from testifying about medical causation and toxicology, which are beyond these witnesses' claimed area of expertise."

As to the latter motion, defendants noted that neither Mr. Ewing nor Dr. Zimmerman are epidemiologists, toxicologists, or medical doctors. Defendants argued, accordingly, that the two experts should not be permitted to offer the following opinions, because they were unqualified to do so:

- "most welders, and safety and health professionals, do not recognize or appreciate the disabling and permanent injuries that can occur from inhaling welding fume and manganese," Ewing report at 7; *see also* Ewing depo. at 66 ("most welders do not know what manganese is or its health effects");

- "the Occupational Safety and Health Administration's (OSHA's) [permissible exposure limit ("PEL")] for occupational exposure to manganese is not sufficiently protective of welder's health," Ewing depo. at 150; and

- "based on the toxicology literature, the scientific literature, the case reports, * * * I believe firmly that manganese is a neurotoxin," Zimmerman depo. at 59, 66.

The Court found this motion not well-taken. Neither Mr. Ewing nor Dr. Zimmerman came anywhere near offering medical or diagnostic opinions that a particular welder suffered a particular injury from welding fume exposure. Nor did their opinions rely on toxicological or epidemiological expertise. Rather, the opinions listed above are entirely within their field of expertise – Industrial Hygiene – and the Court is satisfied that both men are qualified as experts in that particular field.[141]

---

[141] Although the Court denied the motion to exclude Dr. Zimmerman's testimony, it explained that it retains some concern regarding the third opinion set out above. It appears more appropriate for Dr. Zimmerman to opine that *the literature supports* the conclusion that manganese is a known neurotoxin; it does not appear that Dr. Zimmerman has sufficient medical or toxicological expertise to offer his personal belief that manganese is a neurotoxin. Similarly, the Court precluded defense expert industrial hygienist Dr. Chute from offering toxicological or medical opinions regarding the exposure levels necessary before a welder can develop MIP. *See Jowers* trial tr. at 2674-76, 2679-80 (Feb. 26, 2008).

75

As an example, Mr. Ewing explains that his research into airborne hazards in the workplace, including welding fumes, began over 25 years ago, and he is a Fellow in the American Industrial Hygiene Association.  Through his work, he gained a high degree of familiarity with how and why existing historical manganese exposure standards were determined, such as: (1) permissible exposure limits ("PELs") for manganese established by OSHA; (2) threshold limit values ("TLVs") for manganese established by the American Conference of Governmental Industrial Hygienists ("ACGIH"); and (3) recommended exposure limits ("RELs") established by the National Institute for Occupational Safety and Health ("NIOSH").  Mr. Ewing's work also required him to know that these governmental entities have identified manganese as a neurotoxin.[142]  An expert industrial hygienist with Mr. Ewing's background is qualified to render the expert opinions identified above as objectionable by the defendants.

It certainly remains true that the defendants may challenge Mr. Ewing's and Dr. Zimmerman's opinions through "[v]igorous cross-examination [and] presentation of contrary evidence," *Daubert*, 509 U.S. at 596, and may object to specific questions posed by plaintiffs' counsel, if appropriate.  It is also true that Mr. Ewing and Dr. Zimmerman are not qualified to opine that manganese in welding fume causes Parkinson's Disease, and the Court would sustain an objection to a question asking them to so opine (as opposed to so assume).  But Mr. Ewing and Dr. Zimmerman are qualified to give certain of the opinions expressed in their reports, so the second motion to exclude was denied.

As to the former motion, defendants also moved to exclude testimony from these two Industrial

---

[142] For example, the NIOSH Pocket Guide to Chemical Hazards specifically notes that symptoms of exposure to manganese include "Parkinson's; asthenia, insomnia, mental confusion; metal fume fever." One would expect an expert in Dr. Ewing's field to be familiar with this evidence.  And, of course, defendants' own experts have also stated or written that manganese is a known neurotoxin.

76

Hygienists regarding an experiment they helped to conduct known as the "Welding Fume Study."[143]  The Welding Fume Study was designed to, among other things, "quantify personal breathing zone welding fume and manganese exposures for welders and their potential helpers when performing Shielded Metal Arc Welding (SMAW) in confined spaces, with varying amounts of general dilution ventilation."  In particular, a room-sized test chamber of known dimensions was created, inside of which a welder was engaged to practice his trade using different types of welding rods.  The ventilation rate to the chamber was manipulated and measured, and air samples were collected from under the welder's mask, near his shoulder outside of his mask, and in various spots throughout the chamber (both upstream and downstream from the ventilation flow around the welder).  The samples were then evaluated for welding fume and manganese particle levels.  Ultimately, manganese levels in all of these locations were assessed for five different ventilation rates, for each of three different welding rods.

Defendants objected to the admissibility of any testimony regarding the Welding Fume Study, arguing that the Study is not scientifically reliable.  Defendants pointed out, for example, that: (1) the Study has not been replicated by Ewing or Dr. Zimmerman or anybody else; (2) the measurements taken in the Study did not involve repeat sampling; (3) the room-size and ventilation conditions chosen in the Study did not duplicate any actual conditions for any known welder; and (4) the Study did not examine or attempt to replicate other known variables that affect airborne manganese levels, such as the voltage of the welding machine, the welder's work position, and so on.  Defendants also asserted that the Welding Fume Study was funded by plaintiffs' counsel and conducted solely for purposes of this litigation.  Defendants argued that all of these criticisms illustrate that the Study is not admissible under *Daubert*.

While defendants certainly exposed weaknesses and limitations inherent in the Welding Fume

---

[143] *See* Michael Harris, *et al., Manganese Exposures During Shielded Metal Arc Welding (SMAW) in and Enclosed Space,* J. of Occupational and Environmental Hygiene 375 (Aug. 2005).

Study, the Court concluded these circumstances did not require the Study to be completely excluded from evidence.  Plaintiffs explained they do not intend to suggest the Welding Fume Study actually mimics the conditions a particular welder experienced, or accurately quantifies the historical exposure to welding fumes or manganese particles that a particular welder sustained.  Rather, the Welding Fume Study merely provides a reference point against which a particular welder's circumstances may be compared.  Thus, if a welder testifies he welded mostly outside, using low-fume welding rods, there is a reasonable basis for an expert to opine that the manganese levels measured in the air samples in the Welding Fume Study were probably higher than those the welder experienced; conversely, if the welder worked inside of very small, enclosed spaces with little airflow, using a high-fume product, an expert has a basis to opine that the manganese levels measured in the air samples in the Welding Fume Study were probably lower than those the welder experienced.

The Welding Fume Study is simply one data point, or reference point, that plaintiffs' experts might use to establish historical exposure.  Other relevant information to establish historical exposure will include the welder's explanation of his own working conditions, any air sampling done in the welder's workplace, the OSHA welding sample database, other data available from the welder's employer and Workers' Compensation insurance carrier, measurements from other fume studies by NIOSH, and AWS standardized procedures for estimating welding fume exposure levels.  Even if all of these data and protocols can serve as a basis only to show that the welder was likely exposed to "more than" a certain level of manganese particles – as opposed to definitely exposed to an exact, known level of manganese particles – this information is normally relevant and admissible.[144]

---

[144]    *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999) (reversing exclusion of expert opinion where the expert witness was able to conclude only that the plaintiffs were "exposed to benzene at levels several hundred times the permissible exposure level," because "the law does not require Plaintiffs to show the precise level of benzene to which they were exposed").

In sum, the methodology of the Welding Fume Study is sufficiently empirical, reliable, and scientific to survive the *Daubert* standard, given the limited, comparative purpose for which plaintiffs seek to offer it.  Further, defendants are fully capable of revealing to a jury the limitations which they believe make any referential comparisons to the Welding Fume Study nugatory.  The Court also noted that its decision on this issue was informed by having reviewed other motions and documents in this case which make clear that defendants' own experts (e.g., Drs. Fechter and Olanow) use mechanisms and data to calculate historical estimates of welding fume exposure that are no more precise than the Welding Fume Study.  Accordingly, the Court denied the motion to exclude testimony relating to the Welding Fume Study.

Finally, although *plaintiffs* designated Dr. Zimmerman as an "MDL core expert" on industrial hygiene – not on warnings – plaintiffs moved to exclude parts of his testimony.  Specifically, when defendants asked Dr. Zimmerman at deposition whether "warnings on welding consumables were adequate in the 1990s," Dr. Zimmerman opined "they were adequate." Dr. Zimmerman also wrote in his declaration that welders were not adequately warned "until the 1990s."  Defendants argued this testimony is admissible because it is relevant, qualifies as an admission against interest, and also may come in for "any purpose" under Rule 32(a)(3)(B).

The Court generally agreed with defendants that an opponent's expert's testimony may be

admissible as an admission, even if the opponent does not actually call the expert.[145]  But the Court further concluded that Dr. Zimmerman simply did not make a clear, admissible admission.  For example, Dr. Zimmerman was not shown any Hobart documents, only ESAB documents, and his "admission" went only to an ESAB MSDS, not to a warning label.  Further, as to this document, he stated that it is generally "adequate," but only after giving lengthy and somewhat complicated testimony defining what this term means to him.  Critically, his definition of 'adequate" is different than the legal terminology and standard that would be included in a jury instruction on when and whether a warning is legally sufficient.

---

[145]  This Court's views on this issue have evolved.  The Court now finds fully persuasive the following analysis from another district court on this subject:

> Courts are divided with respect to whether it is appropriate to treat expert deposition testimony – and specifically deposition testimony of a withdrawn expert – as an "admission of a party-opponent" under Rule 801(d)(2)(C) of the Federal Rules of Evidence and therefore as an exception to the hearsay rules.  The Court finds persuasive the analysis of Chief Judge Smith in *Glendale Federal Bank, FSB v. United States*, who took a compromise position and held that whether the deposition testimony of a withdrawn expert is hearsay depends on the timing of the withdrawal.  *Glendale Federal Bank, FSB v. United States*, 39 Fed. Cl. 422, 425 (Ct. Cl. 1997).

>> The beginning of trial is a critical juncture.  By the beginning of trial it is fair to tie the party to the statements of its experts.  When admitting expert deposition testimony under FRE 801(d)(2)(C) we need not find that these experts are obligated to do the sponsoring party's bidding.  We merely note that they were selected as witnesses and retained through the start of the trial because the opinions they held all along, and still hold as the trial begins, are consistent with those of the sponsoring party.  We are not retroactively finding agency or control at the time of a prior deposition.  Rather, an expert witness who is listed as such when the trial begins has been authorized and his or her prior statements are fair game.

> *Id.*  Chief Judge Smith thus concluded:

>> When an expert is put forward as a testifying expert at the beginning of trial, the prior deposition testimony of that expert in the same case is an admission against the party that retained him.  Where an expert witness is withdrawn prior to trial, however, the prior deposition testimony of that witness may not be used.  That deposition testimony is hearsay.

> *Glendale Federal Bank, FSB v. United States*, 39 Fed. Cl. 422, 425 (Ct. Cl. 1997).  The Court is persuaded by and adopts the analysis suggested by Chief Judge Smith.

*Minebea Co., Ltd. v. Papst*, 2005 WL 6271045 at *1 (D. D.C. Aug. 2, 2005).  *See also Mann v. Lincoln Elec. Co.*, case no. 06-CV17288 (N.D. Ohio 2010), dkt. no. 142 (quoting *Minebea*).

Ultimately, for Dr. Zimmerman's "admission" to be allowed into evidence, it would have to be accompanied by Dr. Zimmerman's explanation, as well.  The sum of Dr. Zimmerman's testimony, then, would be unduly confusing to a jury, carry very little probative value to the defendants' case, and, in the end, carry no clear "admission."  Further, admitting this testimony and any rebuttal would take a fair amount of time.  Given that each party has other witnesses to testify about the particular warnings at issue, and pursuant to Fed. R. Civ. P. Rules 611 and 403, the Court concluded the motion to exclude this testimony must be granted.[146]

### 8.  Dr. Roth and Dr. Parent – Opinions Regarding the Toxicology and Biochemistry of Manganese.

Plaintiffs designated as experts Dr. Jerome Roth, who is a toxicologist and biochemist, and Dr. Richard Parent, who is a toxicologist and chemist.  Defendants challenged the qualifications of both doctors to render their opinions regarding how manganese moves through and affects the human body. For the most part, the Court denied these motions.

### a.  Dr. Roth.

Dr. Roth's declaration focuses on: (1) the mechanisms of human absorption of manganese particles found in welding fume, and (2) the subsequent distribution and effects of those particles in the human

---

[146] The Court added, however, that this ruling applied only to *Ruth* defendants Hobart and ESAB. Dr. Zimmerman's discussion of warnings issued by other defendants (e.g., Lincoln) went beyond his discussion of the ESAB MSDS – that is, as to other warnings, he went beyond merely stating they were "adequate," as he defined that term – so other statements he made may be admissible in a different case.

While the Court certainly understands why defendants would want to introduce the statement of an expert hired by *plaintiffs* that a defendant's warning sufficiently apprised a welder of the dangers from welding and welding fumes, the value to defendants of such evidence is only as good as the clarity of the admission.  The clarity of Dr. Zimmerman's statements regarding various warnings varied substantially.

body.  For example, Dr. Roth discussed in his report welding fume particle size, the solubility of these particles in the lung, the physiological mechanisms the human body uses to eliminate or absorb these particles, the amounts absorbed and eliminated, and the effect of these particles on the body and brain. Dr. Roth opined in particular detail regarding the physiological mechanisms that transport manganese particles from the lungs to the brain.[147]  Dr. Roth ended his declaration with the following ultimate opinion:

> [T]he net effect from chronic exposure to welding fumes is the increased deposition of manganese in the brain potentially causing a diffuse injury to the central nervous system, including the globus pallidus, substantia nigra, mid-brain, putamen, caudate, frontal cortex, pons and cerebellum.
> While some of the transport mechanisms discussed above are still being studied, there is no debate that manganese in welding fumes is bioavailable, does cross the blood-brain barrier and does cause neurologic injury.[148]

Defendants asserted Dr. Roth is not qualified to so opine, basing their argument on a litany of supposed deficiencies: (1) "he is not an expert in epidemiology, pulmonology, metallurgy, industrial hygiene, neurology, pathology, neuropsychiatry, movement disorders, or neuroimaging;" (2) he has "never conducted research involving living humans;" (3) he is "not a physician and does not see patients" and is "not qualified to diagnose" Parkinson's Disease; and so on.  Defendants also noted particular weaknesses in his analysis, such as he: (1) "is not an expert on macrophages," (2) does not know the exact pH level inside the lysosome (where he asserts manganese particles are solubilized due to acidity), (3) is unaware

---

[147]  Dr. Roth describes two such lung-brain avenues.  They are: *Avenue One* – (a) fume particles are moved from the lung, in mucus, to the digestive tract (through a process called the mucociliary escalator), then (b) absorbed through the intestine into the blood stream (by binding to a transport protein known as "divalent metal transporter 1," or "DMT1"), and (c) if not cleared from the body by the liver, move through an unknown mechanism to the endothelial cells lining the brain capillaries; and *Avenue Two* – (a) fume particles are surrounded in the lung by scavenger cells (pulmonary macrophages), then (b) dissolved inside lysosomes in those scavenger cells, (c) released into the lung fluid upon self-destruction of those cells, (d) transferred from the lung fluid to the blood stream by DMT1, and finally (e) transported across the blood-brain barrier where deposition occurs.  In other testimony, Dr. Roth has also described a third route: direct entry to the brain through the nasal cavity and olfactory system.

[148]  Declaration at 7-8 (master docket no. 1035, exh. 1).

of the exact physical structure or chemical makeup of manganese fume particles, and (4) does not know the proportion of manganese contained in the welding fume that finally enters the blood stream.

It is true that the gaps in an expert's base of knowledge, or in his analysis, can render his opinion inadmissible.  But the Court easily concluded that any lacunas identified by defendants in Dr. Roth's expert report were grist for cross-examination, not the basis for wholesale exclusion.  Dr. Roth's background in toxicology and biochemistry are impressive, including 30 years of laboratory research on neurotoxicity and neurochemistry, grants from the National Institutes of Health to study manganese biochemistry, and publication of nine articles in peer-reviewed scientific literature on manganese toxicity and transport.  Using a grant from the Environmental Protection Agency ("EPA"), Dr. Roth spent four years studying specific mechanisms of manganese-induced neurotoxicity.  That Dr. Roth is not *every* kind of expert and cannot opine about *every* aspect of the chemistry of manganese inside and outside the human body is probably not possible, and certainly not disqualifying.  Further, the Court does not believe Dr. Roth has offered opinions outside his area of expertise.  Importantly, for example, Dr. Roth stops short of opining that exposure from manganese in welding fumes causes Parkinson's Disease – he concludes only that exposure to welding fumes can lead to "increased deposition of manganese in the brain potentially causing a diffuse injury to the central nervous system."  This opinion does not require expertise in epidemiology or neuropathology that Dr. Roth does not have.

With regard to Dr. Roth's concession that "some of the [manganese] transport mechanisms" he discusses are not fully understood, "[t]he fact that the mechanism remains unclear does not call the reliability of the opinion into question: 'Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim.  Causation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have

83

caused the damage somehow.'"[149]  The *Reference Manual on Scientific Evidence* explains that toxicological evidence, among other things, "explains how a chemical causes a disease by describing metabolic, cellular, and other physiological effects of exposure."[150]  Dr. Roth's expert opinions are focused fairly narrowly on providing precisely that explanation.  Further, he is qualified to provide those types of opinions, and his testimony is likely to aid the trier of fact.  Thus, the Court denied defendants' motion to disallow Dr. Roth as unqualified.

In addition, the defendants moved to exclude certain of Dr. Roth's opinions because they are not scientifically reliable.  In particular, defendants asserted there is no reliable scientific evidence to support Dr. Roth's (or any other expert's) opinions "(1) that manganese contained in welding fume can enter the brain through the olfactory system, (2) that manganese from welding fume is solubilized and made bioavailable by macrophage, (3) that manganese from welding fume is transported across cells that line the lung, and (4) that the Divalent Metal Transporter ("DMT") plays any role in the transport of manganese across the blood-blain barrier."

The Court concluded this motion must also be denied.  With regard to Dr. Roth's opinion that manganese particles contained in welding fumes are solubilized in the lung by macrophage lysosomes, thus becoming bio-available, defendants' own experts conceded that macrophages can solubilize manganese; the true debate is the *extent* to which solubilization occurs, and whether and how any solubilized manganese particles reach the brain.  As to this latter question, at least some of defendants' own experts, again, conceded that manganese does pass from the lung to the blood stream somehow, that

---

[149] *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F.Supp.2d 1230, 1247 (W.D. Wash. 2003) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995) ("*Daubert II*")). *See also Daubert*, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.").

[150]  Federal Judicial Center, *Reference Manual on Scientific Evidence* at 403 (2nd ed. 2000).

manganese does cross the blood/brain barrier somehow, and that manganese does deposit in certain areas of the brain somehow – even though defendants insist the *precise* mechanisms proposed by Dr. Roth are not scientifically reliable explanations of how all of these things occur.  While defendants' challenges to Dr. Roth's explanations certainly highlight gaps in current medical understanding, the Court concluded that Dr. Roth's opinions are not so untethered from the scientific method and from reliably collected data that his opinions are inadmissible under *Daubert*.[151]

The Court added that the question of admissibility is closer with respect to certain parts of Dr. Roth's opinions than others.  For example, the Court is confident that the dictates of *Daubert* do not call for exclusion of Dr. Roth's opinions and explanations regarding macrophages, DMT, and the mucociliary escalator.  As noted above, while defendants can debate the niceties regarding how manganese from welding fumes enters the brain once it is in the lungs, that debate is at the margins – there is substantial scientific support for the proposition that it does so.  A closer question is presented regarding Dr. Roth's opinions and explanations related to the "olfactory pathway," where he contends that manganese particles in welding fumes also obtain relatively direct entry to the brain through the nasal cavity and olfactory system.  Virtually all of his opinion testimony on this issue is based on rat and other animal studies, and defendants correctly criticize extrapolation to humans from these animal studies, because the olfactory pathways of rats and humans have dissimilar physiological structures.  The Court ultimately concluded, however, that admission of this testimony was appropriate.  Defendants' own experts, including Drs.

---

[151]  *See Daubert*, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."); *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F.Supp.2d 1230, 1247 (W.D. Wash. 2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question: 'Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim.  Causation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow.'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995) ("*Daubert II*")).

Fechter and Olanow and others, themselves rely on animal studies to test or prove certain theses regarding human physiology. Accordingly, the Court permitted Dr. Roth to testify about the olfactory pathway, and then allowed defendants wide latitude on cross-examination to challenge whether the animal studies and other facts upon which Dr. Roth relied are sufficient to support his opinions.[152]

### b. Dr. Parent.

Dr. Parent's expert report was much more wide-ranging than Dr. Roth's; while Dr. Roth focused on physiological mechanisms involving the human body's uptake, processing, and transport of manganese in welding fumes, Dr. Parent's report presented a broad overview of various types of research in manganese toxicity – mostly epidemiological research. Indeed, about half of Dr. Parent's 28-page report was devoted to an examination of the "Bradford Hill" criteria, which are "factors that guide epidemiologists" in making judgments about whether causation may be inferred from an association.[153]

In addition to epidemiology, Dr. Parent also provided an overview of research on, among other things: (1) government regulation of manganese exposure; (2) the content of welding fume generally, and manganese content in particular; (3) the levels of exposure to manganese experienced by welders; (4) the neurotoxicity of manganese found in welding fume; (5) symptoms of and differences between various neurological injuries (parkinsonisms); (6) the association between manganese exposure and these parkinsonisms, as revealed by epidemiology, neuropathology, and neuroimaging; and (7) the interplay of environment and genetics in causing parkinsonism. Dr. Parent's ultimate conclusion was that "inhalation

---

[152] Separately, the Court has ordered that plaintiffs may not present to the jury in opening statement an animation that shows manganese entering the welder's brain through the "olfactory pathway." *See* Section IX.C.48 of this document.

[153] *Reference Manual on Scientific Evidence* at 375 (citing A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965)).

exposure to manganese from welding fumes is causally related to the development of a continuum of neurological diseases referred to as parkinsonism or Parkinson's Disease."[154]

The defendants complained that Dr. Parent "lacks the requisite knowledge, skill, experience, training, or education required under Rule 702" to render all of these opinions.  Defendants noted that, like Dr. Roth, Dr. Parent is not (and does not claim to be) "a medical doctor and is not an expert in epidemiology, pulmonology, metallurgy, industrial hygiene, neurology, neuropathology, neuropsychiatry, movement disorders, neuroimaging, or air modeling."  Ultimately, defendants asserted that Dr. Parent was able to reach any conclusion at all only because he read hundreds of articles, and then adopted "bits and pieces" of them – "Dr. Parent's report essentially is a compilation of selected quotes from scientific

---

[154]    Report at 25 (master docket no. 1035, exh. 5). As explained below, the Court found Dr. Parent tended to opine outside of his area of expertise when he offered opinions numbered 5, 6, and 7, above; the Court stated it was more likely to sustain an objection at trial to questions seeking solicitation of such opinions.

Dr. Parent also offered the following 13 opinions (numbered by the Court) that lead up to his ultimate conclusion:

> [1] [E]xcessive inhalation exposure to manganese from inhalation of welding fumes can cause a parkinsonism that is similar, if not identical to, Parkinson's Disease (PD), but [2] presents at an early age as a result of environmental influence on a genetic template of mutations.  It also should be clear from the citations presented above that [3] mild steel welding produces a working environment rich in manganese and [4] without protection a career welder would be exposed to high concentrations of manganese dust and fumes [5] in a particle size range that would result in particulate deposition in the deep lung.  In addition, [6] other components of welding fumes would remain in the deep lung and [7] eventually dissolve and enter into general circulation in the blood stream either directly or via the lymphatic system and [8] eventually find their way to the brain via an active transport mechanism. [9] Once reaching the brain, manganese accumulates during continuing exposure and [10] causes injury to specific tissue in the basal ganglia region of the brain, the area known to be associated with regulation of movement and organization and expression of behavior sequences. [11] A sequella of symptoms closely resembling those of idiopathic PD follows.  [12] Manganese compounds then clear the brain after exposure cases, but [13] the injury is progressive and irreversible even in the absence of manganese.

Report at 25.  For the same reasons, the Court stated it is more likely to sustain an objection to opinions numbered 1, 2, 11, 12, and 13 in this list.

literature."  Defendants further asserted that Dr. Parent often paraphrased inaccurately the "bits" that he

adopted, and he simply and automatically rejected *other* "bits and pieces" from the same articles, if they

did not support his predestined opinion.

The Court rejected defendants' position.  It is true that a person does not become an expert in an

area outside of his regular field merely by "reading up" for the specific purpose of testifying.[155]  Indeed,

Dr. Parent was disqualified for precisely this reason in another case.[156]  But it is also true that a literature

review is appropriate and helpful to a toxicologist.  As the Federal Judicial Center explains:

> The basis of the toxicologist's expert opinion in a specific case is a thorough review of the
> research literature and treatises concerning effects of exposure to the chemical at issue. To
> arrive at an opinion, the expert assesses the strengths and weaknesses of the research
> studies.  The expert also bases an opinion on fundamental concepts of toxicology relevant
> to understanding the actions of chemicals in biological systems.

*Reference Manual on Scientific Evidence* at 415.  In other words, a literature review is fundamental to

expression of expert toxicological opinion.  Indeed, the foundation for an expert witness's opinion can be

eroded by pointing out scientific literature with which he is *not* familiar.  The question, then, is whether

the expert's literature review is the *sole* basis for his opinion, or, instead, helps inform an opinion he

reaches through his own experience, research, or tests in related arenas.

---

[155]    *See Wade-Greaux v. Whitehall Laboratories, Inc.*, 874 F.Supp. 1441, 1465, 1476 (D. V.I.
1994) (in assessing whether an expert witness who was a "pediatrician, pharmacologist and toxicologist"
could testify, the Court stated: "Dr. Done's only knowledge or experience regarding the teratogenicity of
sympathomimetics comes from his review, for purposes of testifying in litigation, of selected literature
appearing in various publications and elsewhere.  Accordingly, Dr. Done is not qualified to offer ultimate
opinions as to the teratogenicity of sympathomimetics in humans.").

[156] *See Poole v. Alfred J. Miller, General & Masonry Contracting Co.*, case no. 95-1260, slip op.
at 2 (14th Jud. Dist. Ct. La. June 4, 1997) ("Dr. Parent admits his opinion regarding the toxicity of cement
and cement dust is derived solely from the literature he researched for purposes of litigation.  The propriety
of allowing Dr. Parent to qualify as an expert simply to regurgitate the work of others is in itself
questionable. * * * [Further, this] Court finds that the literature provided by Dr. Parent not only does not
support his opinion, it refutes his opinion.  Therefore, Dr. Parent is not even properly regurgitating the
findings of others and stands alone in his opinion.").

88

As defendants acknowledged, Dr. Parent is a Diplomate of the American Board of Toxicology,[157] a Fellow of the Academy of Toxicological Sciences, and a member of two European toxicology societies. He has made many dozens of presentations at national Toxicology meetings, including on the subject of "epidemiology for toxicologists;" has published extensively in peer-reviewed toxicology journals and treatises; and acts as both editor and reviewer for several respected toxicology journals. There is little question that Dr. Parent is generally well-qualified as a toxicologist. As plaintiffs further noted, from 1982-1986, Dr. Parent worked as a consultant for the American Welding Society (a now-dismissed defendant in this MDL), designing protocols for experiments examining the physiological effects of welding fumes. These experiments were primarily in the area of examining the toxicity of ozone gas given off during the welding process, but Dr. Parent explained that he "designed some studies that looked at not only the pulmonary toxicity of the fumes, but also, the mutagenicity and cytogenetics of welding fumes."[158] In 1985, Dr. Parent presented two papers at the Annual Meeting of the Society of Toxicology: "*In-vitro* Toxicity of Welding Fumes to Rat Alveolar Macrophages" and "Inhalation Toxicology of Welding Fumes." This history shows that, unlike in the *Poole* case mentioned above at footnote 156, Dr. Parent has pursued his own research about the toxicity of the product in question, and did so outside of the context of his retention as an expert in the current litigation. Thus, there is a basis for plaintiffs' argument that Dr. Parent is qualified to speak specifically to the toxicology of welding fumes and to the

---

[157] *See Reference Manual on Scientific Evidence* at 417 ("As of January 1999, 1,631 individuals from twenty-one countries had received board certification from the American Board of Toxicology, Inc. To sit for the examination, which has a pass rate of less than 75%, the candidate must be involved full-time in the practice of toxicology, including designing and managing toxicological experiments or interpreting results and translating them to identify and solve human and animal health problems. To become certified, the candidate must pass all three parts of the examination within two years.").

[158] "Mutagenicity" refers to the degree to which an agent increases the frequency of cellular mutation; "cytogenetics" is the study of diseases caused by chromosomal abnormalities.

89

strengths and weaknesses of studies done on that subject by others.

The ultimate touchstone governing this Court's analysis is whether Dr. Parent's testimony will assist the trier of fact to understand: (1) abstruse scientific matters; and (2) the strength of the logic and inferences that support medical causation. Dr. Parent's report cited almost 800 journal articles, synthesizing the observations and conclusions they contain into an organized overview of many different aspects of manganese toxicity. The Court stated it was convinced that Dr. Parent may, in fact, assist a jury to understand difficult scientific matters. The Court also concluded that nearly all of the opinions expressed in his report were "based upon sufficient facts or data," and were "the product of reliable principles and methods." Fed. R. Civ. P. 702.

The Court's overall conclusion was not unqualified, however, because certain of Dr. Parent's opinions stray into areas outside of his expertise. For example, Dr. Parent's explanation that inhalation of manganese in welding fumes is causally related to the development of Parkinson's Disease, in particular, depends to too great an extent on expert opinions of other neurologists and neurotoxicologists; his toxicology and chemistry background does not qualify him to render this opinion himself, and plaintiffs have other expert witnesses who are qualified to so opine.

In its discretion, the Court concluded it is appropriate to allow Dr. Parent to testify.[159] This conclusion rested, in part, on the Court's confidence – based on its experiences at the *Daubert* hearing and

---

[159] The Court struggled somewhat with Dr. Parent's very-wide-ranging declaration. As to certain portions of Dr. Parent's opinions, the question of admissibility is close enough that the Court believes the opposite ruling could also be correct. *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (Benavides, J., concurring) ("While I believe this case to be a close one, I must agree that the magistrate judge acted within her discretion in excluding Dr. Jenkins's proffered testimony. It does not follow from this, however, that she would have abused her discretion by admitting the proffered testimony. On the contrary, had she admitted the testimony, I would likewise be of the opinion that she acted within her discretion.").

its review of Dr. Parent's deposition – that opposing counsel is highly capable of using cross-examination to reveal any weaknesses in the general causation chain about which Dr. Parent opines.  Further, the Court stated its intention to sustain, on *Daubert* grounds, any objections to questions seeking to elicit from Dr. Parent an opinion that welding fume exposure can cause Parkinson's Disease specifically, as opposed to neurological injury generally.  While toxicological expertise may require facility with epidemiological research, Dr. Parent tended to opine outside of his area of expertise when he offered overview and discussion of neurological and neuropathological research.  *See* footnote 154, above.

With that caveat, the Court denied the motion to exclude Dr. Parent's opinions based on lack of qualifications.

### 9.   Mr. Fechter, Mr. Buckley, & Mr. Longo – Opinions Regarding Bioavailability of Manganese.

Several experts for both plaintiffs and defendants have addressed the question of whether manganese in welding fumes is "bio-available," meaning whether (and the degree to which) various physiological mechanisms and processes enable the human body to absorb the particular manganese compounds and particle structures contained in welding fumes.  As noted in Section VI.B.5 of this document, the extent to which defendants challenge the assertion that manganese can cross the blood-brain barrier has varied in different *Welding Fume* trials.  Thus, in some trials, the question of bioavailability of manganese has been more central than in others; indeed, in some it has been unchallenged.

Early in the MDL, plaintiffs moved to exclude the testimony of two of defendants' core experts, Brian Buckley and Laurence Fechter.  To oversimplify somewhat, Buckley's principal opinion is that manganese in welding fumes is not "bio-soluble" in lung fluid; Fechter's principal opinion is that manganese in welding fumes poses no neurotoxicological hazard, because: (1) the various physiological

pathways that could allow manganese to reach the brain (including pathways involving lung fluid) do not combine to carry sufficient amounts of manganese to the brain to cause any harm, and (2) the precise form and structure of the manganese compounds that are contained in welding fumes have low bio-availability.

Plaintiffs argued that these opinions did not survive the *Daubert* standard, because the principles and methods the two experts use are not scientifically reliable. Having read the experts' declarations and the lengthy briefs submitted by both sides, and having heard argument and testimony at the *Daubert* hearing, the Court disagreed with this particular argument. As to both Buckley and Fechter, their opinions are sufficiently grounded in the scientific method to pass the *Daubert* standard. Certainly, there are substantial weaknesses in their methodologies that cross-examination can and did expose, and there is much about the conclusions they reach which is questionable in light of the compelling scientific testimony proffered at the hearings; but the Court concluded that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

For a different reason, however, the Court concluded it was appropriate to exclude the testimony of Buckley. Buckley testified at length during the Court's *Daubert* hearing and explained the scientific basis for his opinion that manganese contained in welding fume is not soluble in lung fluid, which has a pH of about 7.5. Buckley further explained that he did not investigate, and/or had no opinion regarding, other physiological mechanisms that might allow manganese in welding fume to move from the lung to the blood stream (such as the role of macrophages in the lungs, or the role of the mucociliary escalator in moving matter from the lungs to the digestive tract). Buckley also professed no opinion regarding the ultimate bio-availability of manganese contained in welding fumes. The sum and substance of Buckley's opinion, then, was simply and only that manganese contained in welding fumes is not soluble in lung fluid

92

alone.

This contention, however, is not at issue – there is no plaintiffs' expert who has opined that absorption of manganese by lung fluid, alone, is a significant pathway leading to manganese in the brain. Indeed, there appears to be no debate, either in this case or in the relevant scientific field, regarding the correctness of Buckley's ultimate and only conclusion.  Given the length of *Welding Fume* trials and the multitude of other scientifically complicated issues, the Court concluded Buckley's testimony would take too much valuable trial time without any beneficial purpose.  The ultimate touchstone governing admissibility of expert testimony is whether it will assist the trier of fact, and the Court concluded Buckley's testimony would not provide substantial assistance.  Buckley's experiments and opinions, though interesting to listen to, are too much ado about nothing that is material, so exclusion is appropriate under Fed. R. Civ. P. 611(a).[160]

The Court further found, moreover, that Buckley's testimony must also be excluded under Fed. R. Evid. 403.  Spending substantial time analyzing and appearing to debate a non-debatable proposition could mislead the jury into believing that plaintiffs proffer a scientific case which they do not, and which is easily rebutted.  In other words, Buckley's testimony would have the effect of putting up what is no more than a straw man which, because of the scientific complexity of the testimony, the jury could be confused into believing is important.

For the same reasons, the Court concluded that those portions of the opinions of defendants' expert Fechter and plaintiffs' expert William Longo that rely upon or refer to Buckley's experiments and opinions must also be excluded.  Thus, for example, Longo's testimony about modifying Buckley's experiments

---

[160] Rule 611(a) states that " [t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

by lowering the pH of the synthetic lung fluid is excluded, as it would not be helpful to a jury and does not meaningfully help to resolve any issue in dispute.  Similarly, Fechter need not refer to Buckley's studies to show that only about 1-2% of manganese contained in welding fume is soluble in lung fluid alone; Fechter can merely state the fact, which is undisputed.  These rulings will greatly streamline the presentation of proofs in this case and yet have no material effect on their substance.[161]

###        10.        Dr. Wells – Opinions Regarding Statistics and Epidemiological Studies.

Plaintiffs designated statistician Dr. Martin Wells to opine about the strengths and weaknesses of the analyses contained in various epidemiology studies.  These studies are all directed at whether there is an association between welding fume exposure and development of neurological damage.  In his reports, much of Dr. Wells's attention was directed at the supposed weaknesses of studies cited by the defendants, although he also opined about the supposed strengths of studies cited by the plaintiffs.  Dr. Wells also undertook his own statistical analysis of mortality data collected by the National Center for Health Statistics ("NCHS").  Dr. Wells ultimately concluded that all of these materials "do not establish the absence of an association between welding fumes and neurological damage.  * * *  If anything, the materials may suggest the existence of such an association . . . ."  Declaration at 2.  During the Court's *Daubert* hearing, the parties examined Dr. Wells extensively about the bases for his opinions.

---

[161]   In the MDL bellwether trial of *Solis*, defendants also filed a motion to exclude evidence of certain tests performed by Longo designed to determine the extent to which macrophages solubilize manganese.  After plaintiffs agreed not to present this testimony at trial, however, the motion became moot; accordingly, the Court never ruled upon it.  *See Solis* pretrial tr. at 182 (May, 16, 2006).  The parties reiterated this agreement in the subsequent bellwether trial of *Goforth*.  *See Goforth* pretrial tr. at 20-26, 114, 168-69 (Oct. 25, 2006) (agreeing that Longo could show photographs of macrophages engulfing manganese particles, but he would not testify regarding his solubility test results).  Finally, plaintiffs did not oppose defendants' motion in *Goforth* seeking to preclude Longo from testifying that welding rods could be designed to contain lower levels of manganese.  Plaintiffs did not call Longo in any subsequent MDL bellwether trials.

In their motion, the defendants noted that Dr. Wells is "simply a statistician," and not a medical doctor or epidemiologist; that Dr. Wells has no previous experience or training in matters involving welding rods or neurology; and that Dr. Wells has never been published as even a co-author of any epidemiological study. Defendants argued that Dr. Wells's "opinions are nothing more than armchair statistics," and asserted that his "lack of understanding and appreciation of medicine leads him to make erroneous statements," such as confusing parkinsonism with Parkinson's Disease. Defendants concluded that, "[n]ot only does Dr. Wells lack that requisite knowledge, skill, experience, training, or education to opine on the issues of epidemiology, welding fumes, and movement disorders, it is clear that he is willing to offer sheer conjecture to bolster plaintiffs' position." Defendants asked the Court to preclude Dr. Wells from testifying about any studies in the epidemiological and scientific literature discussing the existence *vel non* of an association between exposure to welding fumes and neurological damage.

The Court easily concluded defendants' *Daubert* challenge to Dr. Wells was not well-taken. As to qualifications, Dr. Wells's credentials as a statistician are well-established and beyond reasonable challenge. For example, he serves as Professor of Clinical Epidemiology and Health Services at Cornell Medical School, and is the chairperson of Cornell's Department of Biological Statistics and Computational Biology. Dr. Wells is a Fellow of the Royal Statistical Society and the American Statistical Association,[162] and was Editor of the latter organization's Journal. He has also published many articles in peer-reviewed journals, including analyses of biological and genetic data. That Dr. Wells is not an epidemiologist is not at all decisive, as his understanding of statistical principles and methodology relevant to the design and interpretation of epidemiological studies is thorough and clear. Calling Dr. Wells "simply a statistician" is both unfair and uninformed.

---

[162] Only about ⅓ of one percent of the members of the American Statistical Association are recognized as Fellows.

95

Further, Dr. Wells did not attempt to deliver opinions outside the bounds of his expertise, and defendants do not really argue that he did.  Most of Dr. Wells's opinions are grounded in observations about various epidemiological studies' confidence intervals, their post-study power, whether they conclusively support the null hypothesis, the propriety of using stepwise regression and one-sided p-values, and so on.  All of these opinions are squarely within Dr. Wells's area of expertise.  Defendants also mounted attacks on several aspects of the methodologies Dr. Wells used to support certain opinions.  The defendants' most colorable arguments regarding Dr. Wells's methodologies were: (1) his use of post-hoc and retrospective power calculations did not accurately reflect the validity of certain epidemiological studies; and (2) his analysis of mortality data from the NCHS was fatally flawed.  The Court concluded, however, that allowing cross-examination to expose any weaknesses in these methodologies is both sufficient and preferable, rather than wholesale exclusion of Dr. Wells's opinions.[163]

Ultimately the opinions offered by Dr. Wells are relevant to the central epidemiology issues in *Welding Fume* cases, and Dr. Wells is qualified to offer them.  Further, the Court concluded his opinions could be helpful to the jury in understanding the import of the epidemiology studies offered by both plaintiffs and defendants, and in assessing the testimony of other witnesses.  Accordingly, the Court denied

---

[163] Regarding Dr. Wells's analysis of NCHS data, for example, Dr. Wells did not determine what data would be collected, or how, and he did not collect the data himself; rather, he simply applied statistical analysis to the data after it was gathered.  This statistical analysis was within his area of expertise, and did not require additional expertise as an epidemiologist.  While defendants labored capably to expose flaws and limitations in Dr. Wells's NCHS data methodology, any such shortcomings were not so grave as to require complete exclusion of Dr. Wells's opinions.  Moreover, that Dr. Wells's analysis is not published  is not dispositive: "In the absence of independent research or peer review, experts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to the scientific method."  *In re: PPA Prods. Liab. Litig.*, 289 F.Supp.2d at 1238.  This Dr. Wells did.  Accordingly, the Court ruled admissible Dr. Wells' unpublished NCHS analysis and also his unpublished re-analysis of other epidemiological studies.  *See Solis* pretrial tr. at 204-06 (May 16, 2006) (requiring, however, that Dr. Wells be presented on direct during plaintiff's case in chief, and not merely in rebuttal).

the motion to exclude Dr. Wells's opinions based on lack of qualifications.

**11.    Dr. Levy, Dr. Baker, Dr. Burns, Dr. Lemen, and others – Opinions Regarding the State of the Art of Medical Knowledge Concerning Manganese, and Defendants' Knowledge Concerning Manganese.**

In the MDL bellwether trial of *Ruth*, Plaintiffs designated Dr. Barry Levy to explain what the defendants knew about manganese and when they knew it, what they did with this knowledge, and how this knowledge compared to what medical science knew about the same subject.  In subsequent trials, plaintiffs designated other experts, such as Dr. Burns, to address some or all of the same subject matter. The Court placed limitations on the opinions Dr. Levy was allowed to offer in *Ruth*, and then subsequently ruled that the same limitations applied to Dr. Baker, Dr. Burns, Dr. Lemen, and others.  Accordingly, the Court begins by setting out its analysis of the admissibility of Dr. Levy's opinions.

Dr. Levy is a medical doctor, epidemiologist, and specialist in Occupational Medicine.  He sought to offer testimony about the following subject matters:

a.    General descriptions of occupational medicine and epidemiology.

b.    The State of the Art over time with respect to what was known or knowable in the scientific and medical literature about manganese toxicity, in general, and, in particular, what was known or knowable about welding fume toxicity.

c.    What the welding industry and defendants knew or should have known about welding fume toxicity, as evidenced by industry documents, and how industry and defendants' actions (or inactions) measured up to prudent practices of occupational health.

d.    General causation, including epidemiology.[164]

Dr. Levy's analysis involved an historical review and comparison of, on the one hand, the publicly-available medical and scientific literature regarding manganese and welding fumes; and, on the other hand,

---

[164]    Declaration at 4 (master docket no. 1033, exh. 1).

97

the defendants' internal documents regarding the same subject.  His ultimate conclusions were that: "(1) manganese toxicity has been well established in the scientific and medical literature for many decades; (2) manganese in welding fumes causes brain damage in welders; [and] (3) the welding industry and defendants have been aware of this information for many years and have acted to restrict this information from being disseminated to end-users and others."[165]

Defendants asserted that Dr. Levy is "not qualified to present the medical historical testimony he proffers," and also assert that his methodology is not reasonably reliable.  Defendants argued that Dr. Levy has no training as an historian, and no special expertise in the area of neuro-degenerative disorders, so that opinions deriving from his historical review of the public scientific literature and the welding industry's internal documents fall outside of his area of expertise.  According to defendants, Dr. Levy merely offers "a narrative of the case which a juror is equally capable of constructing;" defendants go so far as to say that a lay jury "is equally able to read and understand the documents on which Dr. Levy relies."

The Court easily dismissed the assertion that Dr. Levy is not qualified to testify.  Dr. Levy is board-certified in both internal medicine and also occupational medicine; in addition to being a medical doctor, he also has a Masters Degree in Public Health from Harvard; he served as a medical epidemiologist with the Centers for Disease Control; and he has authored numerous books and articles within the disciplines of epidemiology and occupational medicine, including a 2003 article reviewing the then-current field of knowledge on occupational exposure to and neurological effects of manganese.  He has testified as an expert in other toxic tort cases involving asbestos, silica, benzene, lead, arsenic, hormone therapy, and welding fume exposure.  That he is not an expert in neurology or in the field of historical medical documents is not disqualifying in this case, as his combined background in epidemiology and occupational

---

[165] *Id.* at 13.

medicine (which is fairly rare) provide sufficient expertise upon which the opinions he offers in his declaration, as a general matter,[166] are properly based.

The Court also disagreed that Dr. Levy's methodology is unreliable.  First, it is worth noting that "an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."[167]  Thus, a "narrative" by an expert is not automatically inadmissible; it is only when the narrative is purely "a repetition of the factual allegations in plaintiffs' complaint," involving "nothing technical or scientific," that a court might find the expert testimony unhelpful, because the expert is providing only "simple inferences drawn from uncomplicated facts."[168]  In this case, the great majority of the documents and articles that Dr. Levy reviewed and compared are complicated, and the inferences those documents may or may not support are not at all simple.  It is through the application of his expertise that Dr. Levy may allow the trier of fact to better understand what the documents do (and don't) mean, and, thus, what the defendants did (or didn't) know.  It is *not* the case that "the untrained layman [is] qualified to determine intelligently and to the best possible

---

[166]  As discussed in the final paragraph of this subsection, however, the Court concludes there are certain, specific matters to which an objection at trial would be sustained.

[167]  Fed. R. Evid. 702 (Advisory Committee Notes to 1972 Proposed Rule).

[168]  *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 551 and n.67 (S.D.N.Y. 2004).  The *Rezulin* court also noted that any "historical commentary of what happened" is "properly presented through percipient witnesses and documentary evidence," not expert narrative.  *Id.* at 551.  In this case, there are no percipient witnesses to explain much of the relevant history or to provide historical context to documents.  *See Goforth* pretrial tr. at 51-52 (Oct. 25, 2006) ("I also disagree with the defendants, as I did the last time when they discussed this issue with Dr. Levy, that this is not merely testimony that could be developed from prescient fact witnesses and therefore easily explained to the jury, because unlike in the *Rezulin* case, it's not one defendant with one corporate history.  It is a complex series of events involving not just defendants but trade organizations and really a complex series of medical history.  And, again, the *Rezulin* case was very different.  So just as I did with Dr. Levy, I differentiate between the circumstances in *Rezulin* and those here in terms of deciding that there's no other logical way to present this testimony to the jury other than through state of the art witnesses.") (discussing the admissibility of similar testimony by Dr. Burns); *id.* at 57 (same).

99

degree the[se] particular issue[s] without enlightenment" from experts.[169]

It is true that defendants identified possible weaknesses in Dr. Levy's analysis.  For example, defendants identified several of what they believe were "remarkable omissions" – relevant historical documents pertaining to manganese exposure that Dr. Levy had not seen.  Dr. Levy also freely admitted that his understanding of the differences between various types of related neurological disorders, and his knowledge of the history of certain developments in the field of neurology, was limited.  The Court concluded, however, that these matters are fodder for cross-examination; they do not so undermine the reliability of Dr. Levy's opinions that a jury should not hear his testimony.  Accordingly, the Court denied the motion to exclude Dr. Levy's opinions.

Nonetheless, the Court added the following caveats.  The Court retained some concern that, like Dr. Cunitz, Dr. Levy would be asked to offer testimony that is based largely on personal belief or on his own assessment of the weight of the evidence, and not on a reasoned, independent analysis of the facts. The Court was also concerned that, like Dr. Parent, Dr. Levy might be asked to offer testimony about links in the causation chain that he is not qualified to forge.  Particularly, while Dr. Levy's medical expertise is not debatable generally, Dr. Levy has not performed the necessary studies or been involved in development of the medical literature to such a degree that he is qualified to opine that there is a causal neurological link between welding fumes and brain damage in welders.  Thus, while Dr. Levy may testify that certain opinions are reflected in the historical medical literature on this issue, he may not pass judgment on the validity of those opinions or adopt them as his own.

In the subsequent MDL bellwether trial of *Goforth*, the Court made clear that its admissibility

---

[169]  Fed. R. Evid. 702 (Advisory Committee Notes to 1972 Proposed Rule).

analysis of Dr. Levy's opinions applied equally to Dr. Burns.[170]  The Court further ruled, however, that Dr. Burns' expert report contained additional opinions that were not admissible.  For example, Dr. Burns opined that defendants showed a "negligent and reckless disregard" for welders' health, failed to meet their "social responsibilities," chose to "misrepresent" the dangers of welding, could have taken actions 60 years ago that would have spared many welders from getting manganese poisoning, and acted like "Tobacco defendants," who similarly under-warned on purpose, to the great detriment of public health.  The Court ruled that Dr. Burns could not offer legal conclusions or ethics testimony, characterize defendants' state of mind, speculate about what might have occurred if defendants had warned earlier and better, or refer in any way to the tobacco industry (except to note briefly as background his involvement with public health efforts and smoking).  The Court also ruled that Dr. Burns could not offer his own opinion regarding whether there is a causal connection between welding fume exposure and MIP (because, as a pulmonologist, he was not qualified to so opine), but he could testify regarding whether there appeared to be a consensus in the medical and occupational health literature on that topic (because, as an occupational health specialist who had engaged in a literature review, he was qualified to so opine).[171]

### 12.    Dr. Harrison – Opinions Regarding Lobbying.

Dr. Glenn Harrison is plaintiffs' MDL core expert on lobbying; he is an Economics Professor who specializes in how government regulation and marketplace economics intertwine.  Dr. Harrison's

---

[170] *See Goforth* pretrial tr. at 51-52 (Oct. 25, 2006) ("If all you're doing is replacing one for the other with the same restrictions and limitations that I've previously placed on Dr. Levy, then I will allow Dr. Burns.").

[171] *See generally id.* at 43-63; *see also Byers* trial tr. at 364-66 (ruling that defense counsel could not question Dr. Burns about warning labels, as he is not a warnings expert and had not offered opinions on warning efficacy).

declaration explains that one way economists analyze government regulation is by using supply and demand concepts: politicians supply workplace regulations, workers demand them, and monopolies can arise where the regulated industry "captures" the regulators, so that regulation is somewhat illusory.  This economic theory is decades old and has been applied to many industries, including regulation of the legal bar.[172]  Dr. Harrison ultimately opined that the welding industry engaged in "unacceptable lobbying activities" by withholding information from regulators and putting industry cost ahead of worker safety.  In his declaration, Dr. Harrison explicitly referred to and relied upon the opinions of another plaintiffs' expert, Dr. Hoffman, whom this Court ruled could not testify about business ethics.

Defendants argued that Dr. Harrison's testimony must be excluded for two overriding reasons.  First, defendants insisted that Dr. Harrison's conclusion that the industry engaged in "unacceptable practices" is reminiscent of Dr. Hoffman's inadmissible, subjective conclusion that the industry engaged in "unethical practices."  Second, defendants asserted that, like Dr. Hoffman's testimony, Dr. Harrison's conclusion is not based on the correct legal standard, ignores their First Amendment rights, usurps the jury's role, and is irrelevant to any issue in the case.

The Court agreed that Dr. Harrison cannot opine that the industry did anything "unacceptable," but the Court disagreed that *all* of Dr. Harrison's testimony must be excluded.  In particular, the Court found that the following opinions, contained in Dr. Harrison's declaration, are generally admissible under *Daubert* and the Federal Rules of Evidence: (1) the welding industry had an economic interest in affecting workplace regulation related to manganese exposure, and also in affecting regulations related to defendants' government contractor defense; (2) different health standards for manganese exposure reflect

---

[172]  The Court, accordingly, concluded that Dr. Harrison's testimony passed the *Daubert* standard. Both the principles and methods used by Dr. Harrison, as well as his application of those principles and methods to the facts of the case, are sufficiently reliable; and Dr. Harrison is sufficiently qualified to offer the opinions he sets out in his declaration.

different trade-offs between worker safety and economic feasibility; (3) the welding industry had an economic incentive to discourage decreases in allowed or recommended manganese exposure levels set by regulators; and (4) the information that the industry chose to give to regulators was affected by economic interests.  Further, the Court allowed Dr. Harrison to testify generally on how the marketplace and government regulation interact.

In sum, the Court denied the motion to exclude Dr. Harrison's testimony, but held that Dr. Harrison may not rely on the opinions of Dr. Hoffman, and may not opine that, in his view, the welding rod industry engaged in "unacceptable" activity.

### 13.    Mr. Null & Ms. Booth – Opinions Regarding the Welding Practices and Industrial Hygiene of the U.S. Navy.

Many of the *Welding Fume* plaintiffs worked on ship-construction projects for the United States Navy.  In the MDL bellwether trial of *Solis*, defendants designated Charles Null and Celia Booth to testify about the Navy's knowledge of welding fume hazards generally, and Navy safety practices generally.  The plaintiffs moved to exclude these opinions, arguing both that: (1) neither Null nor Booth were qualified to offer expert opinions; and (2) their opinions were irrelevant because they went only to the Navy's general knowledge and practices, and not the Navy's knowledge and practices at the specific work sites where plaintiff Solis had welded.  In connection with the latter argument, plaintiffs asserted:

> The Navy is a large organization with hundreds of thousands of employees and many work sites.  The Navy could be, on average, the safest welding employer in history with detailed and sophisticated knowledge about welding.  That would tell the jury nothing about the only conditions relevant to this case – the actual conditions relating to Mr. Solis's welding experiences.  Sophistication only matters if it is communicated at the local, operational level.

The Court ruled that Null was qualified to offer his expert opinions.  Null was Chairman of the

Navy/Industry Task Group that investigated the proposed change to the manganese TLV in the mid-1990s, and he specified warnings for the military (known as "MilSpecs"); he was also Director of the Metallic Materials Division for the Naval Sea Systems Command ("NAVSEA") for 24 years. The Court concluded that the opinions Null offered on this subject matter were admissible.

The Court was less sure, however, regarding the qualifications of Booth. Booth is an Industrial Hygienist who worked for an insurance company reviewing the occupational safety of, among other things, welding companies; her duties included overseeing air sampling. Booth also served as a Navy Reservist and worked with the Naval Safety Center on industrial hygiene. Booth stated she intended to opine about "the Navy's occupational safety and industrial hygiene systems and how they compare to commercial industry; the Navy's historic testing for and knowledge about exposure to manganese by welders; and the Navy's knowledge, guidelines and systems for protecting workers from welding fumes." The Court ruled that: (1) to ensure she was qualified, the Court would have to engage in voir dire of Booth outside the presence of the jury before allowing her to offer expert testimony; and (2) at least some of her opinions regarding the extent to which the Navy's general practices were followed at particular work sites

104

were not admissible.[173]

Defendants ultimately called neither Null nor Booth to testify at *Solis*, and have not listed them as

potential witnesses in any subsequent *Welding Fume* case.  Accordingly, the Court has never issued a final

ruling on the admissibility of Booth's testimony.

---

[173]  Specifically, the Court ruled:

Miss Booth is a much more difficult call, and I am disappointed that she is not here for me to hear from her so I can assess this question.  I have some real concerns about her qualification, and I do have concerns about the breadth of some of the opinions that she purports to proffer.  For instance, I doubt that I would allow her to testify that she can compare the Navy's occupational and industrial hygiene practices to those in commercial industries.  I simply don't think that her role as an insurance – or working with insurance companies gives her the ability to express such a general statement, and I'm not sure that it's necessary to compare Navy practices to general commercial practices.

I also believe that it is completely inappropriate for Miss Booth to extrapolate from general Navy practices to specific practices at any specific Naval air base.  For instance, while I think that defendants can ask a jury to infer that if the Navy has general practices that they would be carried out at particular Navy stations, but to ask a witness who has never been in any of these places, never studied any of these places, to somehow turn around and say that because there is a general rule in place, that therefore we know it has always been practiced, and that she can therefore say with some level of expertise that it is practiced at a particular site, is completely inappropriate.

* * *

So . . . I'm going to require a voir dire of Miss Booth outside the presence of the jury, if the defendants choose to bring her.  And at that point, I will decide the scope of any testimony that will be permitted from her.

I don't think I have enough on paper to conclude that she should be completely excluded, and I'm not saying that is likely what I would do, but I do believe that it is likely I would greatly limit her testimony, and I am not ruling out the possibility that I would exclude it altogether once I hear a fuller explication from her or explanation from her as to what her background really is, and why she thinks she is qualified to render these opinions.

*Solis* pretrial tr. at 187-88 (May 16, 2006); *see also id.* at 207 ("As to Booth, I have indicated some concerns, but that relates to more the scope of her qualifications than it does to the mere fact that their testimony addresses Naval practices generally.").

105

14.      Mr. Paskal – Opinions Regarding Industrial Hygiene and Welding Fume Simulations.

In the MDL bellwether trial of *Solis*, plaintiffs designated Steven Paskal, who is both an Industrial Hygienist and also an attorney, to offer expert testimony regarding the historical knowledge of defendants, the safety practices of Solis's employers, and so on.  Defendants filed a motion to exclude at least some of Paskal's opinions, arguing he was not qualified to offer them.  In addition, Paskal undertook several simulations of Solis's welding environments and measured the fume concentrations to which Solis might have been exposed.  Defendants argued these exposure range studies should be excluded because they were not realistic and did not reproduce Solis's actual work conditions.

The Court concluded that defendants' motion was well-taken to the extent that some of the opinions Paskal included in his expert report were outside his area of expertise.  Specifically, the Court stated that Paskal could not: (1) provide medical causation testimony (although he could be asked to assume medical causation facts, and could opine regarding TLVs and levels of manganese known to cause harm); (2) testify about the state of mind of Solis's employers; or (3) express legal conclusions, such as whether a defendant met the legal requirements of the HazCom Standard.  The Court also warned that, regarding what Paskal believed a particular defendant "should or should not have done," Paskal had to limit his testimony to opinions on what industrial hygiene practices are appropriate, and not whether a defendant met its legal duties or any ethical obligations.[174]

In addition, the Court engaged in voir dire of Paskal outside the presence of the jury to determine the admissibility of his exposure range studies.  Ultimately, the Court concluded that testimony regarding these studies was admissible for essentially the same reasons that Zimmerman's and Ewing's Welding

---

[174]  *See Solis* pretrial tr. at 189-90 (May 16, 2006).

106

Fume Study was admissible.[175]

### 15.    Dr. Baker – Opinions Regarding Occupational Medicine and Health.

In the MDL bellwether trial of *Solis*, plaintiffs designated Dr. Edward Baker to offer the following opinions: (1) welding causes Manganese-induced Parkinsonism, which has specific clinical manifestations; (2) the actions of those in the welding industry "did not represent prudent practice with respect to occupational health;" (3) internal company documents show that defendants intended "to create the impression that welding was not hazardous" and to "portray[] welding as being less hazardous than it was;" and (4) defendants "contributed to a false sense of security regarding welding fume hazards and a reduced use of control measures in the workplace," which in turn subjected workers to "increased risk" and "increased the occurrence of disease due to overexposure to welding fume."

Defendants challenged Dr. Baker's qualifications to offer these opinions, and the Court granted this motion in part.[176]  As a general matter, the Court found that Dr. Baker's qualifications to offer many of his opinions were beyond reproach.   Dr. Baker is certified in Internal Medicine and Preventive/Occupational Medicine.  He completed a fellowship in Occupational Neurology, has a Masters Degree from the Harvard School of Public Health, headed the CDC group that studied "the impact of toxic environmental chemicals on the health of children and adults," helped create OSHA toxicology standards,

---

[175]  *See* Section IX.B.7 of this document (discussing admissibility of the Welding Fume Study). *See generally Solis* trial tr. at 1387-1421 (June 8, 2006); *see id.* at 1419-20 ("I'm going to allow the testimony regarding the simulations, and I think simulations is probably not an exact word, but I'm going to allow testimony regarding the studies.  I think there is fair room and game for cross-examination, but obviously defendants are equipped to do that, and especially because no opinion is being expressed that exact air ranges or exact air numbers are meant to replicate any particular day during Mr. Solis's welding experience, I think that for purposes of supplying ranges or data points, the studies are permissible.").

[176]  *See Solis* pretrial tr. at 174-77 (May 16, 2006).

was a professor at the Harvard School of Public Health where he studied "the toxic effects of workplace chemicals on the nervous system," led a research effort at Harvard on occupational neuro-epidemiology, and served as Deputy Director of NIOSH.  Dr. Baker has published over 100 articles in peer-reviewed journals on the effect of workplace exposure to toxic chemicals on the nervous system, such as lead and organic solvents.  In 1987, Dr. Baker was copied on a letter from the National Electrical Manufacturers Association ("NEMA") to NIOSH regarding prospective epidemiological studies on mild steel welding.

The Court held that these qualifications made clear that testimony from Dr. Baker was generally admissible, including his opinions that welding causes Manganese-Induced Parkinsonism, and that MIP has characteristic symptoms.  The Court further held, however, that certain other opinions and characterizations contained in Dr. Baker's report were either speculative, unreliable, or inappropriate. Thus, the Court excluded Dr. Baker's fourth-numbered opinion, listed above.  The Court also stated it would exclude any opinion that: (1) a defendant intended to engage in misrepresentation, or had some other state of mind; and (2) a defendant's industrial hygiene practices were illegal or unethical.

### 16.    Dr. Gartrell – Opinions Regarding Punitive Damages.

Plaintiffs designated economist Dr. Kenneth Gartrell as their core expert on punitive damages.  His core expert report set forth opinions regarding company valuation, defendants' ability to pay punitive and economic damage awards, and calculation of an individual plaintiff's economic losses.  While Dr. Gartrell set forth his general methodology in his core report, he provided no final opinion or calculation regarding regular or punitive damages because it was "inappropriate for [him] to estimate the value of defendants or plaintiffs' damages . . . until an individual's trial has been identified."

In the MDL bellwether trial of *Solis*, defendants noted that Dr. Gartrell had not provided a case-

108

specific expert report offering additional opinions, analysis, or calculations; accordingly, defendants moved to exclude all of Dr. Gartrell's testimony. Plaintiffs responded that Dr. Gartrell had provided a case-specific report in the preceding MDL bellwether trial of *Ruth*, so the defendants knew his opinions and were not prejudiced.

The Court granted defendants' motion in part, allowing Dr. Gartrell to offer limited testimony regarding his general methodology and the defendant-specific conclusions he had disclosed in *Ruth*, but further requiring plaintiffs to make Dr. Gartrell available for deposition.[177] Thereafter, plaintiffs did not call Dr. Gartrell at the *Solis* trial, and have not called Dr. Gartrell to testify in any subsequent *Welding Fume* case.

### 17. Mr. Manz, Mr. Stropki, Mr. Kotecki, Mr. Nagarajan, Mr. Ferree, Mr. Plotica, Mr. Lyttle, Ms. Quintana, and other Corporate Representatives – Expert Opinions Regarding any Specialized Subject Matter.

The individuals listed in the title of this subsection are all employees or representatives of the defendants. For example, Mr. John Stropki is defendant Lincoln Electric's Chairman, President, and Chief Executive Officer; Mr. Sundaram Nagarajan is Group Vice President of defendant Hobart; Mr. Kevin Lyttle is a metallurgical researcher employed by defendant Praxair; and Ms. Marie Quintana is employed as a metallurgical researcher by Lincoln Electric. None of these individuals has filed an expert report in any *Welding Fume* trial pursuant to Fed. R. Civ. P. 26(a)(2)(B).

In various trials, plaintiffs have moved to exclude certain testimony from these corporate representatives, arguing it is not admissible lay testimony but rather expert testimony that was never disclosed in an expert report. In the MDL bellwether trial of *Solis*, for example, plaintiffs wrote:

---

[177] *Solis* pretrial tr. at 152-60 (May 15, 2006); *Solis* pretrial tr. at 179-181 (May 16, 2006).

The lay witness testimony these corporate witnesses are permitted to give 'results from process of reasoning familiar in <u>everyday life</u>,' while the expert testimony they are precluded from giving 'results from a process of reasoning which can be mastered <u>only by specialists in the field</u>.'  FRE 701 (advisory notes) (emphasis added).  The corporate representatives made the subject of this motion do not and do not purport to have expertise on matters such as product defect, epidemiology, toxicology, psychology, industrial hygiene, safety, warnings, military specifications, business ethics, medical causation and general causation.[178]

Accordingly, plaintiffs moved to exclude any testimony from any corporate representative having to do with medical causation, the effectiveness of warnings, bioavailability of manganese in welding fume, and so on.

In response, defendants noted that Fed. R. Evid. 701 still allows testimony by corporate representatives on matters that relate to their business affairs: "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."[179]  While a lay witness's testimony "is limited to those opinions or inferences which are . . . not based on scientific, technical, or other specialized knowledge," Fed. R. Evid. 701, this limitation does not prevent the lay witness from testifying regarding complicated matters within his personal knowledge.  Put differently, that a lay witness "has specialized knowledge, or that he carried out [an] investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701, so long as the testimony was

---

[178]  *See also* Fed. R. Civ. P. 701 (2000 advisory comm. notes) ("Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.  Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. * * * By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 . . . by simply calling an expert witness in the guise of a layperson.").

[179]  *Id.*

110

based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise."[180]

Over the course of the various bellwether trials, the Court concluded that plaintiffs' motions on this issue were well-taken in part; thus, the Court did exclude certain testimony from certain of these corporate representatives.  Two representative exclusions are summarized below.

Damian Kotecki – Mr. Kotecki has a doctorate degree in metallurgy and has worked for over 30 years for defendants Lincoln Electric and TDY.  However, he does not have any specialized expertise in neurology, toxicology, or human factors psychology.  Thus, he may not opine regarding the symptoms of MIP, the likelihood that a welder suffered MIP, the likelihood that a welder's fume exposures exceeded certain levels (or what it means if they did), how welding fume disperses in the air, or the effectiveness of different warning language.[181]

Kevin Lyttle – Mr. Lyttle is a metallurgist; however, he has no expertise in medicine or toxicology.  While his background qualifies him to testify regarding the chemistry and physics of the manganese compounds contained in welding fumes, he is not qualified to testify how those physical aspects affect the *bioavailability* of manganese in welding fumes.  Thus, Mr. Lyttle may testify that the AWS study he helped oversee examined the particulars of the manganese compounds in welding fumes, and he may recite the study's conclusions (if any)[182] regarding how these particulars affected bioavailability.  Mr. Lyttle may also explain the extent, if any, to which he shared the results of the AWS study with his employer or any defendant.  But Mr. Lyttle may

---

[180] *Bank of China v. NBM, LLC*, 359 F.3d 171, 181 (2nd Cir. 2004).

[181] *Solis* pretrial tr. at 183-85 (May 16, 2006); motion at 7-10 (*Solis* docket no. 41).

[182] It appears the AWS study reached very few such conclusions; one of the few the Court could find was in the AWS article at 8: "The welding fumes were composed of very fine particles with a log normal size distribution and average diameters in the *easily respirable* range of 0.1 to 1.0 uM" (emphasis added).

not testify otherwise regarding bioavailability.[183] Finally, plaintiffs may make clear that Mr. Lyttle and his employer have a financial stake in the individual case in which he is testifying, and an interest in the trial's outcome.

The Court held that similar restrictions applied to Ms. Quintana, Mr. Ferree, and other corporate representatives.[184]

The Court hastens to add, however, that there is a host of subjects about which these corporate representatives *are* qualified to testify, including not only their general knowledge of relevant facts but their also areas of particularized and specialized knowledge, gained through experience in their work.

### 18.    Mr. Thomas, Mr. Schimmel, and others – Opinions Regarding the Efficacy of Legal Advertising.

As also discussed below in Section IX.C.1 of this document, defendants have sought repeatedly during bellwether trials to introduce evidence of advertising by plaintiffs' lawyers.  Despite this Court's

---

[183]  *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *7 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313) ("while it may be true that Mr. Lyttle is qualified to testify about the constituents in welding fumes, nothing in his background renders him qualified to opine regarding the impact on bioavailability flowing from the chemical and physical properties of the manganese compounds, which (as defendants recognize) is the reason the constituents are relevant"); *see also Byers* trial tr. at 3021-22 (Nov. 20, 2008) (ruling that Lyttle stayed within these bounds when testifying about the AWS study); *id.* at 3059-60 (ruling that Lyttle could only discuss warnings that he was personally involved with creating); *id.* at 3120-39 (ruling that plaintiffs may ask Lyttle whether a document refreshes his recollection that defendants modified their warnings in 1979 in response to the early "Acie Nobles" *Welding Fume* case, but plaintiffs must avoid the reference in the document to a "judicial determination" that the warnings were not sufficient); *Jowers* trial tr. at 1665-72 (Feb. 19, 2008); *id.* at 1856-73 & 1883-85, 1908-11 (Feb. 20, 2008) (discussing the allowed scope of Lyttle's testimony in detail and the contours of allowable questions addressing his bias); *Cooley* pretrial tr. at 359 (Sept. 4, 2009).

[184]  *Id.  See also Byers* trial tr. at 466, 2343-46 (Nov. 5 & 17, 2008) (ruling Quintana had opened the door to inquiry about her knowledge of welders who were diagnosed with MIP); *id.* at 2379-81 (Nov. 17, 2008) (ruling that defense counsel cannot question Quintana about her knowledge of medical literature unless she read the article as a part of her normal work function); *Cooley* trial tr. at 1987-93 (Sept. 25, 2009) (noting that Quintana is not qualified to testify what level of manganese exposure is safe, whether below the TLV or not)

early ruling that virtually all evidence related to lawyer advertising must be excluded pursuant to both Fed. R. Evid. 403 and 611(a)(2), the defendants frequently assert that plaintiffs have opened the door to allow this evidence and the Court should reconsider its ruling.[185] The Court has always declined to do so. While, despite this consistency, certain of the defendants' counsel and witnesses have ignored the Court's ruling and referred to advertising by plaintiffs' lawyers, there can be no question that this ruling is now firmly established in this MDL.[186]

Defendants sometimes designate as experts two witnesses – psychologist Randall Thomas and business professor and "advertising expert" Kurt Schimmel – both of whom opine that the dramatic increase in *Welding Fume* lawsuits immediately preceding this MDL is attributable mostly to advertising by plaintiffs' counsel, and not, for example, because welders generally got poor diagnostic health care before 2000. Given the Court's rulings regarding the admissibility of advertising generally, the Court has also excluded any opinion testimony from these witnesses.

_____

[185] During the bellwether trial of *Byers* alone, for example, defendants argued three different times that the Court should annul its prior ruling and allow evidence of lawyer advertising. Defendants offered this argument in response to plaintiffs' adducement of the following evidence: (1) payments made by defendants to authors of medical and scientific studies examining welding fumes, *see Byers* pretrial tr. at 210 (Oct. 22, 2008); (2) testimony from Hobart corporate representative Dr. Nagarajan that "manganese in welding fumes cannot cause neurological injury," *Byers* trial tr. at 330-31 (Nov. 4, 2008); and (3) testimony regarding historical complaints filed by other welders, *id.* at 2343-45 (Nov. 17, 2008). None of this evidence was new to defendants, having also been presented in earlier MDL bellwether trials. The Court denied all three requests.

[186] *See, e.g., Jowers* trial tr. at 440, 447-51 (Feb. 8, 2008) (after defendants' first witness stated that "this litigation started with your mass media advertising," the Court characterized his testimony as "an aggressive violation of the Court's order. This witness went out of his way to violate the Court's order."); *id.* at 449-50 (the Court entering a sanction against defendants and observing that "this is how we started the last trial, was blatant violations of motions in limine. Motions in limine are meaningful, and these orders have been in place every single trial, and we emphasized them again for this trial."); *id.* at 1459-60 (Feb. 19, 2008) (entering additional sanctions); *id.* at 1764-65 (Feb. 20, 2008) (rejecting out of hand defendants' suggestion that plaintiff's counsel's questioning had opened the door to evidence of advertising).

113

**19.      Dr. Rosen and others – Opinions Regarding Punitive Damages.**

In the MDL bellwether trial of *Goforth*, plaintiffs identified expert economist Dr. Harvey Rosen to offer opinions regarding defendants' financial conditions, as well as their abilities to pay punitive damages.  Dr. Rosen's expert report purported to address each defendant's net worth, sales, profits, shareholder-dividends-paid, and so on.  Dr. Rosen further opined that each defendant could afford to pay "some multiple" of shareholder-dividends-paid, without any material risk of bankruptcy.  For example, Dr. Rosen concluded: "Given the financial strength of [Lincoln Electric Holdings, Inc.] it would not be unreasonable for them to pay some multiple of its' dividends (approximately $28 million per year) as damages without materially increasing their bankruptcy risks."

Defendants argued that Dr. Rosen's testimony was inadmissible for two primary reasons.  First, Dr. Rosen analyzed the financial condition of the defendant companies' *parents*, not the defendant companies, themselves (e.g., Lincoln Electric Holding Co., not Lincoln Electric Co.), making his methodology fundamentally flawed and the analysis ultimately irrelevant. Second, defendants asserted that Dr. Rosen's conclusion that a defendant could or should pay "an amount that is a multiple of shareholder dividends" is tantamount to a suggestion of a proper range of punitive damages, which is not allowed.

The Court found both of these arguments persuasive.[187]  Regarding the first point, the relevant financial data must be specific to the defendant, not its parent: "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."[188]  Regarding the second point, the Court concluded that an expert may testify regarding a defendant's

---

[187]  *See generally Goforth* pretrial tr. at 79-86 (Oct. 25, 2006).

[188]   *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).

114

financial condition, such as its sales, profits, and net worth;[189] however, an expert may not suggest the amount of an appropriate punitive damages award.[190]

Ultimately, the parties in *Goforth* stipulated to the net worth of the individual defendants at trial, and Dr. Rosen was not called to testify.  The parties reached similar stipulations in subsequent MDL bellwether trials, as well.[191]

### 20.    Dr. Schapira – Opinions Regarding General Causation.

In the MDL bellwether trial of *Jowers*, plaintiffs identified expert neurologist Dr. Anthony Schapira to discuss the topic of general causation – that is, whether exposure to welding fumes can cause Manganese-Induced Parkinsonism.  Dr. Schapira included on his reliance list plaintiff Jowers' medical records, although he did not offer any opinion regarding Jowers' diagnosis.  Concerned that Dr. Schapira had included Jowers' medical records on his reliance list, plaintiffs moved to exclude any opinions from Dr. Schapira other than those related to general causation.  The Court granted this motion, finding that the

---

[189]  *See Clark v. Chrysler Corp.*, 436 F.3d 594, 617-618 (6th Cir. 2006) (Moore, J., dissenting) (citing Sixth Circuit and Supreme Court case law for the proposition that "consideration of the defendant's financial resources is consistent with the purposes underlying punitive damages").

[190]  *See, e.g., Hayes v. Wal-Mart Stores*, 294 F.Supp.2d 1249 (E.D. Okla. 2003) (excluding an expert who wanted to opine that "a punitive damage award equal to or less than dividends paid would financially punish, but not irreparably harm [Wal-Mart]"); *Voilas v. General Motors Corp.*, 73 F.Supp.2d 452, 464 (D. N.J. 1999) ("the assessment of possible ranges of punitive damages is not a proper subject for an expert's report or testimony").  *See also State Farm v. Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (in this seminal punitive damages case, where the Supreme Court set out the only factors a Court and jury may and must consider when assessing punitive damages, financial ability to pay is a tertiary factor, and even then is truly relevant only in economic damages cases; rather, the most relevant financial evidence is data reflecting the defendants' conduct within the State where the injurious conduct occurred, such as product sales in that State).

[191]  *See Tamraz* trial tr. at 2702-03 (Nov. 20, 2007) (parties' stipulations regarding net worth of defendants); *Jowers* trial tr. at 3246 (Mar. 3, 2008) (same).

115

inclusion of plaintiff's medical records on a reliance list did not serve to expand in any way the opinions stated in Dr. Schapira's expert report or the opinions he could express at trial.  Thus, Dr. Schapira could not offer an opinion on Jowers' diagnosis, nor an opinion regarding the likelihood that another doctor's diagnosis was correct.  The Court allowed Dr. Schapira to opine regarding clinical manifestations of various neurological disorders, and the use of differential diagnostic technique to determine whether the presence or absence of particular symptoms in a hypothetical patient suggested the patient suffered from PD, MIP, or some other movement disorder, and also regarding epidemiological studies examining the connection between welding fumes and PD; but he could not opine regarding Jowers' medical records or diagnosis, nor could he opine about a "hypothetical patient" who had the same symptoms and test results as Jowers.[192]

### 21.    Dr. Furbee and Dr. Blum – Opinions Regarding Toxicology.

### a.    Opinions Regarding Blood Serum Manganese Levels.

In the MDL bellwether trial of *Jowers*, plaintiffs identified expert toxicologist Dr. Brent Furbee to testify about the effects and bio-availability of manganese, the history of research into manganism, tests used to measure manganese exposure, and epidemiology studies on manganism in welders.  As a general matter, plaintiffs did not object to these areas of inquiry.  In addition, Dr. Furbee opined that plaintiff Jowers' high blood-serum manganese levels were "highly suspect," and offered a variety of reasons why he believed the laboratory measurements of Jowers' blood-serum manganese were incorrect and falsely inflated.  Dr. Furbee opined, for example, that the phlebotomist might have drawn and tested whole blood instead of blood serum, might not have discarded the first 10cc of blood drawn, might not have cleaned

---

[192] *See Jowers* trial tr. at 469-72 (Feb. 8, 2008); *id.* at 2155-58 (Feb. 22, 2008); *id.* at 2380-82 (Feb. 25, 2008).

the skin thoroughly before the needle stick, might have used the wrong sort of steel needle, and so on. Plaintiffs objected to admission of these latter opinions, arguing they were speculative and also that Dr. Furbee was not qualified to offer them.

The Court granted the plaintiffs' motion, but only in part.  First, the Court ruled that Dr. Furbee was qualified to opine that he believed Jowers' laboratory blood-serum manganese level was suspect because it was inconsistent with Jowers' MRI results, and inconsistent with what would be expected given the air-monitoring data from Jowers' employer.  Further, Dr. Furbee was permitted to explain that, absent repetition of the results, he believed the laboratory measurements were not reliable.  But the Court further held that Dr. Furbee was not qualified to opine about the proper protocols for conducting a blood-serum manganese test, despite having read two articles on the topic supplied to him by counsel.  Accordingly, his opinions regarding why the levels measured by the laboratory might have been inflated were purely speculative and had to be excluded.[193]

The issue of blood serum manganese levels arose again in the following MDL bellwether trial of *Byers*, and plaintiffs again moved to exclude certain opinions expressed by Dr. Furbee, and also defense toxicology expert Dr. Lee Blum.  Specifically, the Mayo Laboratories ("Mayo") tested Byers' blood serum for manganese and reported it to be 1.2 ug/L.  The "reference range" used by Mayo for manganese serum – meaning the range that includes 95% of the population, measured by taking endpoints two standard deviations from the mean – was 0.4 to 0.85 ug/L.  Thus, Mayo's results suggested that Byers' blood measured very high for manganese.  Dr. Furbee and Dr. Blum both sought to opine that Mayo's reference range was wrong, and the high end of the normal range was actually 3.0 ug/L, so that Byers' results were normal.  In support of this opinion, the two doctors asserted that different medical labs use different

---

[193] *See Jowers* pretrial tr. at 117-21 (Jan. 23, 2008); *id.* at 297-301 (Jan. 24, 2008); *id.* at 1719-21 & 1736-41 (Feb. 20, 2008).

117

reference ranges, and a review of all of these ranges, along with a review of various medical articles on the topic, shows the top end is closer to 2.9 or 3.0.

Plaintiffs sought to exclude this opinion, arguing it was speculative.  The Court agreed, to the following extent: the Court ruled that Drs. Furbee and Blum could testify that other laboratories and medical articles use different reference ranges than does Mayo, and could discuss the upper limits of those ranges.  But the doctors were not allowed to reach the final conclusion that the *correct* upper limit that all of these labs and articles *should* be using is a specific number, such as 2.9 or 3.0, because (as they conceded) there was no scientific basis upon which to specify a precise limit.  Similarly, Dr. Furbee and Dr. Blum were allowed to opine that these other laboratories' upper ranges suggested that Byers' serum manganese level was within the normal range and not high, but they could not opine that Mayo was using a "too low" or "wrong" upper limit.[194]

### b.    Opinions Regarding Welding Fume Exposure and Manganism.

The plaintiffs in *Byers* challenged the admissibility of several other opinions issued by Dr. Furbee,

---

[194] *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *3 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

    In the MDL bellwether trial of *Tamraz*, plaintiff's neurology expert Dr. Nausieda sought to offer three bases for his opinion that welding fume exposure can lead to persistent heightened manganese levels in a patient's blood: (1) his own clinical experience; (2) a medical article known as "Ellingson 2006"; and (3) statements made by Dr. Keith Josephs at a neurology conference that he had seen the phenomenon in his own clinical practice.  Defendants moved to exclude the latter basis, arguing that Fed. R. Evid. 703 (which allows experts to rely upon hearsay) does not go so far as to allow an expert to testify that other, non-present experts corroborate his views.  The Court ruled Dr. Nausieda could testify that Dr. Josephs had stated at the conference that he had a certain clinical experience, but could not testify that Dr. Josephs endorsed or agreed with Nausieda's own views.  *See Tamraz* pretrial tr. at 58-64 (Nov. 1, 2007).

and the Court ruled on these opinions as follows.[195]

First, regarding Dr. Furbee's opinion that Byers did not have manganism, and that his symptoms were inconsistent with manganism, plaintiffs argued that Dr. Furbee was not a neurologist and could not offer this opinion.  The Court ruled that Dr. Furbee could testify he believed Byers did not have manganism *because* Byers' exposure levels could not have reached the very high levels (e.g. 30.0 mg/m³) that Dr. Furbee believed are necessary to cause MIP.  Dr. Furbee was not allowed to testify, however, he believed Byers did not have manganism *based on* Byers' actual exposures, because Dr. Furbee did not know this information.  And Dr. Furbee could not testify he believed Byers did not have manganism *based on* Byers' symptoms, because Dr. Furbee is not qualified to so opine, as he is not a neurologist and had not examined Byers.  In other words, Dr. Furbee's opinion was limited to his toxicological expertise (e.g., when exposures to a toxin will cause a disease), and could not be neurological (e.g., which disease is suggested by the patient's symptoms).

The Court further ruled that, on cross-examination, plaintiffs could confirm that: (1) Dr. Furbee was not purporting to express opinions regarding Byers' symptomatology; and (2) in the normal course of his practice, Dr. Furbee would refer patients to neurologists for purposes of diagnosis.  In fairness to Dr. Furbee, however, plaintiffs were not permitted to imply a lack of qualifications to assess symptoms, or to make an initial determination in a patient before him as to whether those symptoms might be indicative of a particular disease, condition or syndrome (and thus might justify a referral to a neurologist, for instance, which Dr. Furbee was qualified to do and apparently regularly does in other cases).

---

[195] *See id.* at *3-4; *see Byers* trial tr. at 3270-72 (limiting Dr. Furbee's opinions to his literature review, and disallowing testimony regarding his personal experience in occupational disease because it was not earlier disclosed); *id.* 3277-81 (excluding opinions based on Byers' actual exposure levels); *id.* at 3285-86 (excluding testimony regarding autopsy); *id.* at 3359-66 (excluding testimony opining on the merits of conclusions contained in ACGIH documents which were not included on Dr. Furbee's reliance list).

119

Second, regarding Dr. Furbee's opinion that it has not been proved that welding fumes can cause neurological injury: plaintiffs again argued that Dr. Furbee could not offer this opinion because he was not a neurologist.  The Court ruled Dr. Furbee could testify he does not believe this causal link is proved based on his review of the literature; however, he could not testify he has personally concluded there is no connection between welding fume exposure and neurological injury, as he did not do any independent toxico-neurological studies.[196]

Third, the Court addressed Dr. Furbee's opinions with respect to two medical articles.  In 1980, Dr. Huang wrote an article reporting on the "Taiwanese Cohort" of six workers in a smelting plant who got manganese poisoning.  Dr. Furbee sought to testify there have been no additional manganism cases arising from this Taiwan smelting plant since 1980, asserting that, if other cases had arisen, it would have been reported in the medical literature.  Similarly, in 1999, Dr. Kim wrote an article discussing the MRI results of several workers from the smelting plant who were asymptomatic.  Dr. Furbee sought to opine that, if any of those workers had become symptomatic, there would probably have been a subsequent medical article published discussing that fact.  Plaintiffs sought to exclude these opinions as speculative. The Court ruled that Dr. Furbee was permitted to opine that: (1) no additional cases of manganism in the workers that were studied in these articles were ever *reported*, and (2) if additional cases had occurred, he believed they probably would have been reported.

Fourth, regarding Dr. Furbee's opinion that a person must suffer exposures of 30.0 mg/m$^3$ before he can get manganism: plaintiffs argued this opinion was not admissible because it was not supported by the literature.  The Court disagreed and held that Dr. Furbee was permitted to give this opinion, as it was

---

[196]  *See also Jowers* trial tr. at 1717-19 (Feb. 20, 2008) (ruling that Dr. Furbee could opine regarding what the literature showed regarding general causation, but could not offer a personal opinion on the matter because he was not a neurologist).

based on his review of the literature and upon a fairly debatable implication from the "Taiwanese Cohort articles."

Finally, the Court held that Dr. Furbee had not actually offered any opinions in his expert report or deposition regarding welding fume constituents and their bio-availability, nor regarding his personal experience with occupational disease patients.  Accordingly, Dr. Furbee was not allowed to opine regarding the bio-chemistry and bio-physics of manganese in welding fume – that is, what the composition of welding fumes is, and why that precise composition is meaningful from a medical (bio-availability) standpoint – beyond the limited statements contained in his report.  In particular, Dr. Furbee could not opine that the manganese found in welding fumes is "bound up" with other elements, and is therefore less bio-available than other forms of manganese, and is therefore less capable of causing neurological injury than other forms of manganese.  Given this ruling, the Court did not reach the issue of whether Dr. Furbee was qualified to offer such opinions in the first place.  Finally, the Court concluded that Dr. Furbee could not testify regarding his own experience, because he was offered as an expert to discuss his review of toxicological literature, not his experience in his occupational disease practice.[197]

### 22.    Mr. Kahane – Opinions Regarding Industrial Hygiene.

Plaintiff's expert industrial hygienist Mr. David Kahane has appeared in the MDL bellwether trials of *Tamraz*, *Jowers*, and *Byers.*  Defendants did not challenge the admissibility of any of Kahane's opinions in the first two of these trials, but did in *Byers*, arguing that certain aspects of his testimony were speculative or otherwise inadmissible.  For example, defendants argued that Kahane should be precluded from offering opinions suggesting that defendants' action were in any way immoral or unethical, and

---

[197] *See Byers v. Lincoln Elec. Co*., 2008 WL 4849339 at *6-7 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

should also be precluded from offering legal opinions, such as that defendants' MSDSs did not comply with the HazCom Standard.  Having already excluded this type of testimony generally from any witness, the Court granted this aspect of defendants' motion.[198]

Defendants also moved to exclude two other of Mr. Kahane's opinions.  First, defendants sought to preclude Mr. Kahane from opining that OSHA's PEL for manganese fume (which is a maximum ceiling amount of 5.0 mg/m$^3$, promulgated in 1971) is outdated and less protective than the ACGIH's TLV (which is an 8-hour time-weighted average of 0.2 mg/m$^3$, promulgated in 1995).  The Court denied this aspect of defendants' motion.  Second, defendants sought to prevent Mr. Kahane from testifying that plaintiff Byers had been routinely exposed to manganese fume at levels above the TLV, or that his exposures were at the "high end" of the exposures seen in the OSHA database.  The Court concluded that Mr. Kahane's methodology was sufficiently reliable, however, and denied this aspect of defendants' motion as well.[199]

### 23.    Dr. Welch – Opinions Regarding Warning Adequacy.

Defendants have designated Dr. Jane Welch as a warnings expert.  In the MDL bellwether trial of *Byers*, plaintiffs asserted that Dr. Welch tended to offer opinions outside of her expertise, touching on

---

[198]  *See Byers* pretrial tr. at 277-79 (Oct. 23, 2008) (explaining that Mr. Kahane could "discuss what he understands HazCom requires or doesn't require," but could not "draw the legal conclusion with respect to compliance or noncompliance with HazCom").

[199]  *See id.* at 279-90; *Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).  *See also Cooley* trial tr. at 1478-83 (Sept. 22, 2009) (addressing Kahane's proposed testimony, and ruling that he: (1) could not speculate on direct about whether the ACGIH would adopt a Notice of Intended Change ("NIC") of the manganese TLV; (2) could not opine about defendants' ethical obligations; (3) could not opine whether a defendant has complied with OSHA regulations; (4) could opine about whether Cooley's exposure levels exceeded the TLV; (5) could not offer general or specific causation opinions; and (6) could not offer opinions on the adequacy of defendants' warnings, although he could discuss the defendants' MSDSs and their purpose.  *See also Cooley* pretrial tr. at 361-70 (Sept. 4, 2009) (addressing the admissibility of evidence related to the ACGIH's NIC).

122

areas of medicine, toxicology, and industrial hygiene.  The Court agreed with plaintiffs that some of Dr. Welch's statements in deposition, such as the opinion that only very high welding fume exposure levels could lead to MIP, were clearly matters outside of her expertise.  Accordingly, the Court affirmed it would limit Dr. Welch's testimony to the subject matter of warnings, and also stated (again) the general rule that it was up to counsel to object at trial if they believed Dr. Welch's testimony was inadmissible.  The *Byers* defendants chose not to call Dr. Welch at trial.[200]

Further, in the earlier MDL bellwether trial of *Jowers*, Dr. Welch had opined at deposition that individuals tend to be consistent in their behavior regarding the heeding of warnings, and the fact that Jowers smoked cigarettes showed he tended to disregard warnings.  Plaintiffs argued that – despite the Court's other rulings restricting the introduction of tobacco warnings and tobacco litigation – if this testimony was adduced at trial, it would open the door to cross-examination and rebuttal evidence going to the effectiveness of cigarette warnings and the interplay between cigarette warnings and addiction.  The Court agreed that Dr. Welch's opinion on this matter could serve to open the door.[201]

**24.     Dr. Sze – Opinions Regarding Neuro-Radiology**.

Defendants designated Dr. Gordon Sze as an MDL core expert in neuroradiology; defendants also designated Dr. Sze as a case-specific expert in both the *Jowers* and *Byers* MDL bellwether trials, to discuss MRI tests generally and the MRI results of the plaintiffs in particular.  In *Byers*, plaintiffs moved to

---

[200] *See also Jowers* trial tr. at 2700-03 (Feb. 26, 2008) (Court accepting Dr. Welch as an expert in the area of warnings design, but expressing reservations about her broader expertise and noting no *Daubert* motion had been filed).

[201] *See Jowers* pretrial tr. at 15-21 (Jan. 23, 2008) (Court ruling that, "to the extent that we have an expert who's going to say that the cigarette [warning] context is telling for this [welding fume warning] context, I think that the plaintiffs have to have some leeway to define the [cigarette warning] context").

exclude certain of his opinions.  The Court granted this motion in part.[202]

Specifically, regarding Dr. Sze's opinion that "it takes less manganese deposition in the brain to be seen on an MRI than it does to cause symptoms of manganism" – or, in other words, a welder can have a "lit-up MRI" but no symptoms: the Court ruled that Dr. Sze could opine he is aware, both from his review of the literature and from his own experience, that patients have had MRIs which light up for the presence of manganese even though they are asymptomatic for manganism or MIP.  Dr. Sze could also opine that he personally inferred from these facts that something more by way of exposure is needed to cause symptoms than is needed to light up an MRI.  The Court further held, however, that any opinions as to *how much* more exposure is necessary to cause symptoms were purely speculative and would not be allowed.  The Court also held that plaintiffs could then cross-examine Dr. Sze regarding whether his inference that "'something more' is necessary to cause symptoms" is a fair inference, or even a logical one.

Regarding Dr. Sze's opinion that "Byers' 2002 MRI test results rule out manganism": the Court granted plaintiffs' motion, ruling that Dr. Sze could not offer this opinion as phrased.  The Court so ruled because: (a) Dr. Sze had never expressed this specific opinion before trial (and he would not be permitted to express any opinion for the first time at trial); and (b) defendants represented that Dr. Sze would not express that opinion at trial (and Dr. Sze was bound by that representation).

Finally, regarding Dr. Sze's opinion that, "while theoretically possible, it is 'highly unlikely' that a welder who was once exposed to sufficient levels of manganese to cause MIP would ever have a normal MRI thereafter, if his exposures have not ceased": the Court ruled that Dr. Sze could opine he believes it is fair to infer from the absence of any examples of this happening in the literature or in his personal experience, that it is unlikely to happen, or even 'highly unlikely' to happen.  The Court further ruled Dr.

---

[202] *Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *2-3 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313); *Byers* trial tr. at 2192-98, 2248-51 (Nov 17, 2008).

Sze could not, however, express any opinions regarding: (1) Byers' own exposure levels, or (2) how likely or unlikely it was that Byers' scenario was the "theoretically possible" circumstance or the "unlikely" circumstance. The Court so ruled because Dr. Sze stated he had no knowledge of Byers' exposure levels, and Dr. Sze had never expressed an opinion on the impact of any particular exposure levels on Byers' MRI results. Again, the question of whether Dr. Sze's inferences, drawn from the absence of examples in the literature or his experience, were fair inferences, was for cross-examination.

### 25.    Dr. Atlas – Opinions Regarding Neuro-Radiology.[203]

Just as defendants designated Dr. Sze as a case-specific expert in neuroradiology in *Jowers* and *Byers*, defendants designated Dr. Scott Atlas for the same purpose in the subsequent MDL bellwether trial of *Cooley*. And, because Dr. Atlas sought to offer similar opinions as had Dr. Sze, the plaintiffs in *Cooley* also sought to exclude them. While the Court concluded that Dr. Atlas, like Dr. Sze, is a highly qualified expert neuro-radiologist, the Court imposed many of the same restrictions on Dr. Atlas.

Specifically, among other opinions, Dr. Atlas sought to assert at trial that: (1) a "normal brain MRI excludes the diagnosis of manganism in patients who are still exposed to their source of excess manganese or who have been withdrawn from the source of manganese exposure within months and possibly years prior to the normal brain MRI;" and (2) "Mr. Cooley's brain MRI dated 1/23/03 excludes the diagnosis of manganism, given the facts that [a] the brain MRI shows no evidence of manganese accumulation and that [b] this MRI was performed within only two weeks following his cessation of exposure to manganese

---

[203] *See Cooley* pretrial tr. at 154-225 (Sept. 2, 2009) (*Daubert* hearing testimony of Dr. Atlas); *Cooley* trial tr. at 403-05 (Sept. 15, 2009) (oral ruling on admissibility of Dr. Atlas's opinions); *Cooley* dkt. no. 219 (documenting the Court's rulings).

in welding fumes."[204]  At a pretrial *Daubert* hearing, Dr. Atlas explained these opinions as follows: "in a patient who has . . . clinical symptoms that suggest or may suggest manganism, and who has had exposure [to manganese] . . . within the several months [prior to] . . . [his] MRI, you can say if the MRI is normal, [then the diagnosis of manganism] is excluded."[205]  As a codicil, Dr. Atlas also opined that "less manganese is needed to be in the brain to cause the MRI abnormality than [to] cause[] the amount of [brain] damage needed to have symptoms" – or, put differently, "MRI is more sensitive to the presence of excess manganese in the brain than the sensitivity of the clinical exam to detect manganese-related damage in the brain."[206]

The Court concluded that these particular opinions met none of the *Daubert* criteria.  Essentially, Dr. Atlas's opinions amounted to a conclusion that an MRI will *always* show manganese accumulation in a patient's brain before that patient shows any clinical symptoms of brain damage caused by manganese. Conversely, Dr. Atlas also concluded that a patient with clinical symptoms caused by manganese exposure will *always* have an abnormal MRI, so long as the patient's manganese exposure did not cease more than three months before the MRI.  Dr. Atlas stated he did not know – and did not need to know, before reaching his opinions – the following information: (1) when the patient's clinical symptoms began to manifest; (2) the span of time during which the patient suffered manganese exposures; (3) the details or extent of the patient's daily and weekly manganese exposures, such as whether his exposures ever exceeded the TLV (which, as defendants admit, does carry risk of neuro-injury); (4) how the patient's exposures during the six-month period before his MRI compared with his exposures during the rest of his

---

[204]  *Cooley* docket no. 219 at 1-2 (Sept. 15, 2009) (quoting Atlas's report at 3).

[205]  *Cooley* pretrial tr. at 164 (Sept. 2, 2009).

[206]  *Id.* at 212, 176; declaration at ¶13.

126

career; (5) the amount of manganese exposure necessary to result in an abnormal MRI; (6) the amount of manganese exposure necessary to cause clinical symptoms; (7) the rate at which manganese clears from the brain; and (8) whether manganese clears from the brain even if exposure to manganese continues.

The Court concluded there were simply too many analytical gaps between the opinions Dr. Atlas sought to offer and the data upon which he relied (or did not rely) to derive them.  The Court ruled that Dr. Atlas could testify: (1) about his own experience and literature review, which showed that some patients with enough manganese accumulation to yield an abnormal MRI have no clinical symptoms; (2) about his literature review, which indicated that patients who have abnormal MRIs due to manganese accumulation seem to maintain these abnormal MRIs for at least three months; (3) that, because he has never seen a report in the literature of a faster clearance rate than three months, he infers that faster clearance rates are unlikely; and (4) he infers from these facts that it takes less manganese accumulation in the brain to cause an abnormal MRI than to cause sufficient brain damage to result in clinical symptoms.  But Dr. Atlas could not opine that a patient with a normal MRI has *never* had enough manganese exposure over his working career to suffer brain damage yielding clinical manifestations, regardless of when the patient's manganese exposure ceased.

### 26.    Dr. Tintner – Opinions Regarding Electrophysiology.

In the MDL bellwether trial of *Byers*, defendants designated Dr. Robert Chen as an expert in neurophysiology, which is the study of the nervous system and the interaction of the brain, nerves, and muscles.  Dr. Chen also specializes in the use of electrophysiology, or measurement of the electrical signals in the brain and muscles, to diagnose movement disorders.   Dr. Chen undertook an

127

electrophysiological examination of Byers and concluded that his movement disorder was psychogenic and not organic – that is, his tremors were caused by psychological and not neurological damage.  Dr. Chen's analysis involved the identification and statistical analysis of the electrical signals in Byers' brain, comparing their timing and size with the electrical signals in his tremorous muscles.

To counter Dr. Chen's analysis, plaintiffs designated Dr. Donald Tintner.  Like Dr. Chen, Dr. Tintner is a neurologist and neurophysiologist specializing in movement disorders; unlike Dr. Chen, however, Dr. Tintner does not specialize in electrophysiology or pursue research in that field (although he does have expertise in statistics).  Dr. Tintner proposed to opine regarding Dr. Chen's electrophysiological analysis, and specifically the flaws in Dr. Chen's identification of and statistical analysis of the electrical measurements of Byers' tremors and jerks.

Defendants objected to this testimony, arguing that Dr. Tintner was not qualified to offer his opinions.  Following a mid-trial *Daubert* hearing,[207] the Court rejected defendants' argument and concluded Dr. Tintner was qualified to offer his opinions criticizing Dr. Chen's techniques and conclusions.  The Court further ruled that Dr. Tintner would be allowed to testify only on rebuttal, after Dr. Chen's testimony in defendants' case in chief.  Plaintiffs ultimately chose not to call Dr. Tintner as a witness on rebuttal, but this choice was not because the Court limited the admissibility of his opinions.

---

[207]  *See Byers* trial tr. at 2025-50 (Nov. 14, 2008).

128

27.    **Dr. Stebbins – Opinions Regarding Neuropsychology.**[208]

In the MDL bellwether trial of *Cooley*, the plaintiff underwent two different neuropsychological examinations.  Defense expert Dr. Glenn Stebbins reviewed the test results and the assessments of the doctors who gave those examinations, and then submitted an expert report offering the following opinions: (1) Cooley's "most recent neuropsychological examination is within normal limits, and does not provide any specific evidence of cognitive impairments;" further, his testing revealed no "deficit cognitive behaviors that are associated with damage to the basal ganglia, such as impairments in executive function and/or working memory;" (2) Cooley's test performance "[did] not support of [sic] a finding of any cognitive impairment due to his reported manganese fume exposure;" and (3) more broadly, a review of the scientific literature shows "there is not a consistent pattern of neuropsychological impairments resulting from exposure to welding fumes containing manganese."[209]

Because defendants filed Dr. Stebbins' expert report after the deadline, plaintiffs moved to exclude all of his opinions.  The Special Master ruled there was a valid excuse for the lateness of Stebbins' opinions' related to assessment of the neuropsychological tests – that is, there was an unavoidable delay in third-party production of the underlying test data.  There was no excuse, however, for the lateness of Dr. Stebbins' broader opinions that manganese exposure does not yield a certain pattern of mental impairment, or that the medical literature does not support a claim that neuropsychiatric injury is caused by manganese fume exposure.  Accordingly, the Special Master ruled that the second and third opinions listed above were not admissible at trial.[210]  The parties did not subsequently seek clarification from the

---

[208]  *See Cooley* pretrial tr. at 370-74 (Sept. 4, 2009); *Cooley* dkt. no. 274 at 5-9.

[209]  Stebbins' report at 3-4.

Court or otherwise challenge any aspect of the Special Master's ruling, and adhered to the ruling at trial.

In a later *Daubert* motion, the plaintiffs also challenged the admissibility of one of the aspects of Dr. Stebbins' opinions interpreting Cooley's neuropsychological test results.  In deposition, Dr. Stebbins suggested it was possible to determine Cooley's "premorbid" neuropsychological performance – that is, what Cooley's test performance would have been before he was ever exposed to welding fumes.  This technique of "backward prediction" first required a generalized assessment of the level of success a person has enjoyed in life – in particular, at school and in his job.  Then, based on an understanding of the skills and types of intelligence a person would normally need to obtain this level of success, the neuropsychologist can hypothesize what kind of cognitive ability the patient had, and thus what the patient's neuropsychological test results would have been before he suffered any alleged neurological injury.  Dr. Stebbins stated he had performed this analysis and concluded there was no real difference between Cooley's actual neuropsychological performance and what his hypothesized premorbid performance would have been.

Plaintiffs asserted Dr. Stebbins should not be allowed to offer opinions suggesting what Cooley's

---

[210] Specifically, after consulting with the undersigned, the Special Master ruled as follows, via email to the parties:

> Because Dr. Stebbins was waiting on neuropsych data, there was an excuse for his not providing opinions regarding Cooley's test results and performance.  But there was no excuse for his failure to timely provide opinions regarding whether the medical literature supports a claim of neuropsychiatric injury from manganese, or that manganese exposure does or does not yield a certain pattern of impairment, or that injury to the basal ganglia does or does not yield a certain pattern of impairment (more accurately, there was no valid excuse for [defense] counsel's failure to respond in any way to [plaintiff's counsel's] request for a timely report on these issues, and there was real prejudice flowing from this failure).
>
> [Thus,] Stebbins may opine ONLY on what the test results show regarding Cooley's neuropsychological performance and whether and how he is impaired, and not whether that pattern of performance or impairment may be associated with manganese exposure, or correlated with any patterns discussed in the literature.

pre-morbidity intelligence was, because Dr. Stebbins: (1) did not include any premorbidity opinions in his expert report; and (2) stated in deposition he had not undertaken a premorbidity intelligence estimate. Further, plaintiffs argued that, although Dr. Stebbins later stated in deposition that he had, after all, done a premorbidity analysis "in his head," the methodology he used to do so was flawed (e.g., he did not take into account Cooley's supervisory experience, which would suggest a higher expected premorbid IQ).

The Court found all of plaintiff's arguments well-taken. Even the most lenient and open interpretation of the opinions Dr. Stebbins included in his report did not allow a conclusion that he opined about Cooley's premorbid intelligence. Indeed, the term "premorbid" appeared nowhere in the written report. Having failed to offer these opinions in his written report, Dr. Stebbins was not allowed to offer them at trial.

More important, however, was that the Court found the methodology Dr. Stebbins used to support his ultimate opinion was flawed. Dr. Stebbins sought to testify that: (1) Cooley's post-morbid neuropsychology intelligence test scores were in the range of "average";[211] (2) having assessed Cooley's performance in school and on the job, he would expect Cooley's premorbid test scores also to be in the "average" range; and (3) accordingly, Cooley suffered no decrease in neuropsychological functioning, nor any other impairment to his intelligence, following his exposure to welding fumes. In other words, Cooley's expected premorbid scores were the same as his actual post-morbid scores, so his welding fume exposure did not cause any neuro-psychological harm.

This analysis suffered in two principal ways. First, the essence of Dr. Stebbins' premorbidity intelligence estimate appears to be: "Cooley was a welder, not a doctor, so I expect his premorbid scores

---

[211]  Dr. Stebbins opines: "the fact that [Cooley's] test results ranged from low-average to high-average is within the expected variability associated with normal performance, evidencing individual strengths and weaknesses in cognitive abilities." Report at 3.

131

to be average."  Neither Dr. Stebbins nor defendants offered any other, more sophisticated reasoning or analysis to support this estimate.  Given the huge range of human intelligence, and the multitude of obvious factors that confound a smoothly correlative relationship between intelligence, education level, and career choice, this is simply not a rigorous methodology worthy of admission under the *Daubert* standard.

Second, Dr. Stebbins was forced to concede that, even assuming Cooley's scores were "average" before he was exposed to welding fumes, this did not necessarily mean Cooley suffered no impairment.  As defendants explained, "Dr. Stebbins has not purported to testify whether Mr. Cooley's cognitive abilities have moved *within the broad range of 'average'* – only that he estimates that Mr. Cooley was in the 'average' range prior to his alleged injury and that neuropsychological testing today shows he is still in the average range."[212]  In other words, Cooley's test results could have dropped 20 points following welding fume exposure, from high-average to low-average, and Dr. Stebbins would still have the same opinion.

Ultimately, Dr. Stebbins' premorbidity opinions offered no aid to a jury.  He could say only that Cooley's post-morbid scores fell within the average range, when compared to the general population, and he could offer weak support for the conjecture that Cooley's premorbid scores would also have been average.  But Dr. Stebbins certainly offered no reliable methodology to support the assertion that Cooley's post-morbid scores were the same – not lower – than they would have been had Cooley not suffered manganese exposure.  Accordingly, the Court granted plaintiffs' motion to exclude Dr. Stebbins' premorbidity opinions at trial in their entirety.

---

[212]  Reply brief at 10 (emphasis added).  Although defendants offered this explanation in their briefing, Dr. Stebbins refused to concede this same point in deposition.

132

28.     **Dr. Brent – Opinions Regarding Epidemiology.**[213]

In the MDL bellwether trial of *Cooley*, defense expert toxicologist Dr. Jeffrey Brent offered the opinion, among others, that about 30 epidemiological studies had all failed to find any association between exposure to welding fumes and manganese neurotoxicity.  Essentially, Dr. Brent opined that, despite the existence of numerous studies designed to uncover a link between exposures to various toxins (including welding fumes) and brain damage, there is an "absence of evidence" that welders suffer parkinsonism at rates greater than the rest of the population.  Although the plaintiffs disagreed with Dr. Brent's interpretation of the results of some of these studies (and also asserted there were methodological weaknesses in most of the studies' analyses), the plaintiffs did not object to the admissibility of this aspect of Dr. Brent's proposed testimony.

Dr. Brent also sought to go further and opine, however, that, because these epidemiological studies (especially when viewed cumulatively and in combination) failed to show a statistically significant association between neuro-injury and welding fume exposure, the studies provide evidence that the *actual* risk is "infinitesimally small" and surely below 0.4%.  Plaintiffs objected strongly to this opinion, arguing that Dr. Brent could offer this opinion only if he undertook a thorough "power analysis" of all of the studies, which he did not do.  Plaintiffs argued that, unless Dr. Brent could show the studies were powerful enough to actually *unearth* a link between welding fume exposure and brain damage (if it exists), he had no basis to opine that the studies actually show there is *no* risk – as this Court has observed, "'[w]hen a study fails to find a statistically significant association, an important question is whether the result tends to exonerate the agent's toxicity or is essentially inconclusive with regard to toxicity,' due to lack of

---

[213]  *See Cooley* dkt. no. 274 at 2-4.

sufficient statistical power."[214]  Put more simply, although plaintiffs conceded Dr. Brent could opine that there is an *absence of evidence* that welders suffer parkinsonism at greater rates than the rest of the population, plaintiffs insisted there was no reliable basis for Dr. Brent to testify there is *evidence of an absence* of such an association.

In addition to receipt of substantial pretrial briefing regarding precisely what opinions Dr. Brent proposed to offer and the allowable scope of his testimony, the Court heard extensive argument from the parties on this subject at the final pretrial conference.[215]  This discussion was complex, but the result may be simplified to this extent: the Court concluded that: (1) it appeared Dr. Brent was seeking to "testify in a way that is different and more extreme than any other epidemiologist" who has appeared before the Court in any *Welding Fume* case;[216] (2) absent some sort of mathematical examination of the power of the 30 studies upon which he relied,[217] Dr. Brent had no basis to opine that the studies showed a certain level of actual risk of suffering brain damage due to welding fume exposure; and (3) at least some of Dr. Brent's

---

[214]  *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *33 n.76 (N.D. Ohio Aug. 8, 2005) (quoting *Reference Manual on Scientific Evidence* at 336).

[215]  *See Cooley* pretrial hrg. at 113-31 (Sept. 1, 2009).

[216]  *Id.* at 121.

[217]  It is unclear whether this sort of examination would require a statistical meta-analysis of the studies' confidence intervals, or a post-hoc power calculation for each study, or some other technique. But it certainly required more than what Dr. Brent performed, which was ultimately more a formation of a subjective impression of the entirety of the studies' results than it was a quantitative assessment: "given that all of these studies, using different methodologies and done in different places, yield results showing no association between fume exposure and neuro-injury, and given the confidence intervals in all of those studies, I conclude that there is, in fact, an extremely low risk of suffering neuro-injury from fume exposure."

To be admissible, this opinion must have much more of a mathematical underpinning than bare reference to "confidence intervals."  At least some of the studies' confidence intervals were very wide – for example, the "Danish Study" confidence interval was 0.1 - 3.5, which is consistent with the existence of high, actual risk of neuro-injury from welding fume exposure.  Thus, the objective basis for Dr. Brent's conclusion is, at best, not clear.

134

opinions which were purportedly explaining the "absence of evidence" sounded a lot like opinions that, in fact, there was "evidence of absence."  This last conclusion led the Court to declare it would have to draw careful evidentiary lines regarding admissibility before Dr. Brent took the stand.  Accordingly, the Court stated it would voir dire Dr. Brent outside the presence of the jury before he presented his testimony in open court.[218]

Ultimately, defendants chose not to call Dr. Brent as a witness, so the voir dire did not take place.  Thus, the Court cannot set out here its ultimate conclusions regarding those precise opinions Dr. Brent sought to offer that did and did not satisfy the *Daubert* standards.  The Court's rulings and observations at the final pretrial conference, however, continue to stand for the proposition that it will not allow any witness to opine that epidemiological studies (whether examined singly or in combination) are evidence of an absence of an association between welding fume exposure and neurological injury, unless the witness has performed a methodologically reliable analysis supporting such a conclusion.

---

[218]  The Court's approach on *Daubert*-related issues has been consistent throughout this MDL, which is to say the Court has always been exceedingly careful to ensure that every aspect of every expert opinion is undergirded by a reliable methodology.  While the Court is not charged with assessing the relative strength of the parties' proposed scientific evidence, the Court has attempted to assure that the parties' experts proffer only admissible opinions.  Whenever any party challenges the admissibility of an expert opinion, the Court's normal course is to read the expert's deposition testimony in its entirety, read at least the principal studies and articles upon which the expert relies, and often hear from the expert outside the presence of the jury.  Over the course of presiding over weeks of MDL-wide *Daubert* hearings on "core" experts, ruling on many dozens of overlapping *Daubert* motions filed in seven bellwether trials, and hearing these experts testify before juries, the Court has achieved an unusually thorough understanding of the parties' experts' subject matters and methodologies.  *See Cooley* pretrial tr. at 257-60 (Sept. 2, 2009) (describing this history).

### 29.    Dr. Watts – Opinions Regarding Charles Ruth.[219]

Defense expert Dr. Ray Watts is a neurologist specializing in movement disorders; he diagnosed the plaintiff in the MDL bellwether trial of *Cooley* as suffering from (a) essential tremor, combined with (b) a psychogenic gait disorder.  Plaintiffs sought to limit Dr. Watts from offering any opinion that Charles Ruth – who is another MDL welder-plaintiff, whose case settled – did not suffer from Manganese-Induced Parkinsonism ("MIP").[220]

The Court has ruled that Ruth's circumstances are generally relevant in every *Welding Fume* case because: (1) he was the subject of a peer-reviewed medical article ("the Sadek article") that concluded Ruth had MIP; (2) certain of defendants' neurology experts subsequently agreed Ruth had MIP; and (3) one of defendants' experts in *Ruth* concluded that Ruth's exposures to welding fumes were generally low. Thus, Ruth's circumstances tend to show that career welders exposed to relatively low levels of fumes can get MIP, and their symptoms and disease progression may differ from patients with "classic manganism." While defendants disagree with the conclusion that Ruth's circumstances are relevant, the Court has allowed *limited* reference to Ruth in each of the bellwether trials.

In his expert report in *Cooley*, Dr. Watts offered no opinions regarding Ruth.  Nonetheless, plaintiffs asked Dr. Watts in deposition about Ruth, the Sadek article, and whether Dr. Watts believed Ruth had MIP.  Plaintiffs did so because Dr. Watts had earlier opined, essentially, that he believes *no* welder can get – or has *ever* gotten – MIP simply from welding fume exposure; accordingly, plaintiffs wanted Dr. Watts to explain the circumstances of Ruth.  In response to plaintiffs' questioning, Dr. Watts responded

---

[219]  *See Cooley* pretrial tr. at 283-85 (Sept. 2, 2009); *Cooley* dkt. no. 274 at 9-16.

[220]  Plaintiffs also sought to preclude Dr. Watts from offering criticisms of certain diagnoses of plaintiffs' expert neurologist, Dr. Nausieda.  This aspect of Dr. Watt's testimony is discussed in Section IX.C.32 of this document.

he had viewed two videotapes of Ruth – one of Ruth's medical examination, and one of him testifying in Court – and he believed Ruth does not have MIP nor, indeed, any form of organic parkinsonism.  Rather, the videos suggested to Dr. Watts that Ruth may have psychogenic tremor.  Dr. Watts conceded he would need to examine Ruth to know for sure, but he opined (in response to plaintiffs' questioning) that the best diagnosis he could give would be that, just like plaintiff Cooley, Ruth does *not* have MIP – and that this was consistent with his opinion that no welder has ever gotten MIP from welding fume exposure.

Plaintiffs asked the Court to exclude this testimony, pointing out that every doctor who actually examined Ruth (including defendants' own expert, Dr. Olanow) had, at the very least, diagnosed Ruth as having an *organic* parkinsonism (as opposed to a psychogenic disorder); further, defense expert Dr. Lang, a world leader in the field of psychogenic movement disorders, has testified that Ruth is a credible case of MIP.  Moreover, defendants' own experts (Drs. Lang and Hurtig) have testified that a neurologist cannot and should not diagnose a patient simply by viewing a videotape, especially in the context of reaching a differential diagnostic choice between organic and pscyhogenic tremor.  Thus, plaintiffs concluded, Dr. Watts should be precluded from offering a "videotape diagnosis," opining that Ruth had a psychogenic disorder and not MIP.

In response, defendants argued that the entire subject matter of Ruth's diagnosis should not be admitted but that, if plaintiffs were allowed to ask Dr. Watts about Ruth, the Sadek article, and what Dr. Lang had to say about Ruth, then Dr. Watts should be allowed to answer that he disagrees with Dr. Lang and explain why.  Essentially, defendants asserted that, having asked the questions, plaintiffs could not object to Dr. Watts's answers on *Daubert* grounds.

The Court concluded, however, that plaintiffs' motion to exclude this aspect of Dr. Watts's opinions was well-taken.  An expert witness's testimony must satisfy *Daubert*, regardless of whether it

is offered on direct or cross-examination.  Even if Dr. Watts would opine only on cross-examination that "the videotapes show Ruth does not have MIP," this opinion was not premised upon any accepted scientific or medical methodology.  Because Dr. Watts's diagnostic opinions regarding the nature of Ruth's movement disorder did not satisfy the legal standard, the Court ruled they must be excluded from trial.

Finally, in addition to the issue discussed above, plaintiffs sought to preclude Dr. Watts from offering at trial a variety of statements he had made in deposition.  Plaintiffs argued these statements were all outside the scope of Dr. Watts's knowledge, or otherwise inadmissible.  The Court ruled on these statements as follows:[221]

a.  Statement: "Dr. Jankovic wrote his 2005 review article on 'Manganese and Parkinson's Disease' for the *Journal of Neurology* at the invitation of the editor in chief."  Plaintiffs argued Dr. Watts could not know about any "invitation" except through hearsay.  Defendants responded that Dr. Watts has served on the editorial review board of two medical journals and knows what an "invited review" article is and how it is conceived.  The Court denied the motion to exclude, and allowed cross-examination by plaintiffs.

b.  Statement: "My examinations of Cooley and other plaintiff-welders were 'independent' medical exams."  Plaintiffs did not like the adjective; defendants noted it is commonly used in case-law and in Fed. R. Civ. P. 35 itself.  The Court denied the motion to exclude, and allowed cross-examination by plaintiffs.

c.  Statement: Various negative characterizations of Dr. Nausieda.  Plaintiffs sought to exclude Dr. Watts's "derogatory comments" about Dr. Nausieda.  Defendants responded that Dr. Watts should be allowed to "provide his strongly-worded, unequivocal disagreement with Dr. Nausieda's professional reputation and diagnostic abilities."  The Court made clear that any such "disagreement" expressed by Dr. Watts must be limited to contrary medical opinions or assessment of fact; any *ad hominem* attacks pointed at Dr. Nausieda or any other witness would lead to immediate termination of Dr. Watts's testimony.  Similarly, Dr. Watts may not testify that another doctor is not qualified to reach a diagnosis if the Court has already overruled a motion addressing the admissibility of that doctor's diagnosis.[222]

---

[221]  *See Cooley* pretrial tr. at 327-31 (Sept. 2, 2009).

[222]  *See Cooley* trial tr. at 2441-48 (Sept. 29, 2009).

138

d.  Statement: "Cooley is not disabled."  The defendants did not oppose this aspect of plaintiffs' motion, agreeing Dr. Watts would not opine about whether Cooley was disabled and could not work.

e.  Statement: "Some welders-patients of mine have asked about legal advertisements asserting that welding fume exposure can cause brain damage."  Plaintiffs noted the Court has repeatedly limited all witnesses and attorneys from referring to legal advertising.  Defendants nonetheless opposed this motion, stating plaintiffs had asked Dr. Watts whether he would inform his own welder-patients that welding fumes contain manganese and can cause brain damage, and Dr. Watts's answer is that he has seen welder-patients who bring in legal advertising flyers about manganese exposure and parkinsonism.  The Court granted the motion to exclude, concluding Dr. Watts's answer referring to the advertisement was non-responsive and was clearly aimed at referring to matters the Court has addressed and excluded repeatedly in other trials.

f.  Statement: "Cooley asked for a manganese blood test only because of his 'recently-acquired information regarding the welding fume litigation.'"  Plaintiffs asserted this was just another back-door attempt by defendants to refer to advertising.  The Court agreed and further found it was not an accurate statement of fact, either; accordingly, the motion was granted.

### 30.     Certain Treating Doctors – Diagnoses of Manganese Neurotoxicity.[223]

In the MDL bellwether trial of *Cooley*, defendants sought to exclude the testimony of four of the plaintiff's treating physicians: his family doctor, two neurologists, and an occupational medicine specialist.[224]  In particular, defendants sought to exclude the testimony of all four treating doctors regarding their diagnoses of manganese neurotoxicity.  It is likely that defendants will file similar motions in other *Welding Fume* cases where the plaintiff's treating doctors ascribe his movement disorder to manganese exposure.

In *Cooley*, defendants asserted two primary grounds for exclusion of the treating doctors' diagnoses.  First, defendants argued the doctors' diagnoses did not meet *Daubert* standards because: (1) Cooley's doctors notably did *not* diagnose him as suffering from parkinsonism, because they did not

---

[223]  *See Cooley* pretrial tr. at 257-74 (Sept. 2, 2009); *Cooley* dkt. no. 274 at 9-16.

[224]  *See Cooley* pretrial tr. at 40-113 (Sept. 1, 2009).

observe at least two of the four classical parkinsonian symptoms;[225] and (2) there is no such thing as manganese neurotoxicity in the absence of parkinsonian symptoms.  Essentially, defendants argued that neurological damage caused by manganese exposure always appears as a parkinsonian syndrome, and a diagnosis of manganese neurotoxicity in a patient who is not parkinsonian is inadmissible "junk science."

The Court concluded this argument was not well-taken.[226]  As an initial matter, the Court noted that it was questionable whether *Daubert* standards applied to the medical diagnostic testimony of Cooley's treating doctors' at all, since Cooley offered the doctors as fact witnesses, not experts.  Given that Cooley "did not retain [the treaters] for the purposes of providing expert testimony," and that the doctors "formed their opinions as to causation at the time [of treatment]," before any litigation had begun, case law suggests *Daubert* does not apply.[227]  Out of caution, however, the Court did examine the four doctors' diagnosis testimony for admissibility under *Daubert.*  This examination revealed that, in fact, some of *defendants'*

---

[225]  The classical symptoms are: (1) "rest tremor," meaning an involuntary quiver of a body part while it is at rest; (2) "bradykinesia," meaning general slowness of movement, including paralysis; (3) "rigidity," meaning stiffness or inflexibility; and (4) "postural instability," meaning loss of normal postural reflexes, and/or a hunched, flexed posture.

[226]  *See Cooley* pretrial tr. at 257-74 (delivering rulings on all of these motions).

[227]  *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869-70 (6th Cir. 2007) (holding that Fed. R. Civ. P. 26(a)(2)(B) "does not require an expert report from a treating physician" even though the doctor "testif[ied] regarding causation," especially when "opinions about the cause of an injury are a necessary part of the patient's treatment").  *See also Perkins v. Origin Medsystems, Inc.*, 299 F.Supp.2d 45, 55 n.18 (D. Conn. 2004) ("[a] treating physician can testify as a fact witness about the care and diagnosis rendered as part of a plaintiff's treatment").

In *Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419, 426 (6th Cir. 2009), the Sixth Circuit stated that, "[g]enerally, a treating physician may provide expert testimony regarding a patient's illness, the appropriate diagnosis for that illness, and the cause of the illness," and this expert testimony must meet *Daubert* standards.  But a physician's testimony about his treatment and diagnosis of a patient is certainly not *automatically* expert testimony, which is why the *Gass* court affirmed the trial court's decision to admit testimony of diagnosis and treatment for pesticide exposure, but exclude specific causation opinions regarding precisely *which* pesticide caused the plaintiff's illness, or where and when the exposure occurred.  *Id.* at 426-27 n.4 & 428.

140

own neurologist experts have stated that manganese exposure can lead to neurotoxicity with either parkinsonian *or* non-parkinsonian manifestations.  For example, defense expert neurologist Dr. Anthony Lang testified in the MDL bellwether case of *Tamraz* that "[y]ou can have manganism in the earliest stages – for example, a miner who presents with manganese madness – who may not have Parkinsonism, but still has manganism and will develop manganese-induced Parkinsonism."[228]  Similarly, defense expert Dr. Warren Olanow has written that manganese neurotoxicity can appear in phases, and the initial phase is marked by non-specific symptoms of the very sort that Cooley complained of, which are not the classic markers of a parkinsonian syndrome.[229]

Further, various publications issued by independent organizations support the proposition that the clinical signs of manganese neurotoxicity may or may not include parkinsonian symptoms.  For example, the American Conference of Governmental Industrial Hygienists ("ACGIH") recently published a draft "notice of intended change (NIC)" to lower the existing Threshold Limit Value ("TLV") for respirable manganese by 90%.  The NIC notes there is "a severe form of chronic manganese poisoning" that "clinically resembles Parkinson's Disease," but suggests the TLV should be lowered because chronic manganese exposure can also lead to a range of more subtle neurobehavioral and neuropsychological deficits that do not amount to parkinsonism.  Similarly, an article discussing toxic manganese exposures states that "[a] variety of neurobehavioral manifestations may precede the development of extrapyramidal

---

[228] *Tamraz* Lang depo. at 155 (Oct. 3, 2007)  (*Cooley* dkt. no. 153 exh. D).

[229] N. Chu, F. Hochberg, D. Calne, & C. Olanow, *Neurotoxicology of Manganese* at 94-95, found in L. Chang & R. Dyer, *Handbook of Neurotoxicology* (*Cooley* dkt. no. 153 exh. E) ("The initial symptoms are usually subjective and nonspecific, and may include fatigue, anorexia, headache, poor memory, reduced concentration, apathy, lumbago, insomnia, diminished libido, somnolence, muscle aches and cramps, and generalized slowing of movements.  These symptoms vary a great deal from patient to patient and may appear in any combination and in any order.").

signs and symptoms."[230]  The Court found this medical literature "surely would support a reasonable conclusion by a qualified treating physician that there is a form of diagnosis of manganese toxicity that does not necessarily require a conclusion that a Parkinson's syndrome must accompany it."[231]

Defendants' second ground for exclusion of the doctors' diagnoses of manganese neurotoxicity was that none of the four doctors engaged in a proper "differential diagnosis,"[232] and/or were unqualified to render a neurological diagnosis.  Plaintiffs responded that each doctor did, in fact, undertake a differential diagnosis using an acceptable methodology, and each doctor was qualified to do so.  To resolve this issue, the Court read both the discovery and trial deposition transcripts of all four doctors.  It suffices to state that the testimony of three of the doctors revealed fairly careful, critical, thorough – and independent – analyses of what were Cooley's symptoms, what were the possible causes, and what was the most likely explanation.  As these three doctors recognized themselves, their analyses were certainly not iron-clad, and were susceptible to cross-examination, but the methodology they used satisfied Fed. R. Civ. P. 703 and *Daubert*.  Accordingly, the Court overruled defendants' motions to exclude testimony related to the diagnoses of those three doctors.

The Court could not say the same, however, for the fourth doctor.  Unlike the three others, the

---

[230]  N. Kumar, "Industrial and Environmental Toxins," in *Continuum: Lifelong Learning in Neurology* 102, 119 (Oct. 2008) (*Cooley* dkt. no. 153 exh. H).

[231]  *Cooley* pretrial tr. at 266 (Oct. 2, 2009).

[232]  "'Differential diagnosis' refers to the process by which a physician 'rules in' all scientifically plausible causes of the plaintiff's injury.  The physician then 'rules out' the least plausible causes of injury until the most likely cause remains.  The remaining cause is the expert's conclusion." *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1209 (10th Cir. 2002).
Defendants argued both that: (1) any differential diagnosis of manganese neurotoxicity absent parkinsonian symptoms is unreliable; and (2) even if this diagnosis is reliable, each doctor simply did not engage in a full and reliable methodology.  The former argument is coterminous with defendants' first ground for exclusion, discussed above.

fourth doctor practiced generalized family medicine – he had no specialized expertise in diagnosing neurological illness, or in recognizing syndromes caused by workplace toxins.  Also, the fourth doctor testified, essentially, that his diagnosis of manganese toxicity was premised entirely on the opinions of the other three doctors; he did not undertake any additional physical examination or medical testing or even questioning of Cooley on his own.  Although the fourth doctor oversaw Cooley's continuing care and even prescribed some of the drugs Cooley took to alleviate his neurological problems, this medical care was still premised on diagnoses reached by the other doctors.  While providing medical care to a patient in reliance on other specialists' diagnoses is proper, offering testimony to a jury solely to endorse the opinions of those specialists is not.[233]

Accordingly, the Court sustained in part defendants' motion and limited the fourth doctor's testimony to the facts surrounding his provision of medical treatment; he was not permitted to offer opinions regarding the cause of Cooley's neurological condition.  The Court denied the defendants' motions to limit the testimony of the other three doctors.

Finally, the Court adds the observation that, as a general matter, it will not exclude the opinions of a treating neurologist simply because: (1) he is not a "movement disorder specialist," or (2) he characterizes the plaintiff's malady using terms that the parties and their experts do not.  Regarding the first topic, there is no question but that neurologists engaged in general practice are normally qualified to recognize movement disorders, such as parkinsonism, and are also normally qualified to engage in differential diagnosis to determine what specie of parkinsonism a patient suffers (such as idiopathic Parkinson's Disease, Wilson's Disease, Huntington's Disease, essential tremor, progressive supranuclear palsy, and so on).  While a neurologist in general practice may refer certain patients to other neurologists

---

[233] *Ash Grove Cement Co. v. Employers Ins. of Wausau*, 246 F.R.D. 656, 661 (D. Kan. 2007) (a witness "may not simply parrot or recite the opinions and knowledge of other expert and fact witnesses").

who specialize in treating movement disorders, even defendants' movement disorder experts concede that the former is generally qualified to recognize, diagnose, and treat parkinsonism.

Second, over the course of several trials, the Court has now heard treating neurologists and the parties' experts use a variety of terms to describe a similar condition.  These terms include: manganism, manganese-induced parkinsonism, Parkinson's Disease caused by manganese exposure, manganese encephalopathy, manganese-induced neurotoxicity, manganese toxicity syndrome, manganese poisoning, manganese intoxication, and others.  Defense experts generally prefer to use the term manganism, which focuses on the *cause* of the disease and is often used in the literature to describe the most severe form of the malady.  Plaintiffs' treating doctors, as clinicians, tend to use phrases that include the word "parkinsonism" or "Parkinson's," which focuses on the *symptoms* of the disease (such as tremor, stiffness, slowness, and instability, which are the hallmarks of Parkinson's Disease).  Both plaintiffs and defendants have asserted that the other side's terminology is inaccurate, incorrect, and even scientifically unreliable. The Court has concluded, however, that this is a matter for argument and not a basis for exclusion of testimony – especially because the parties have shown themselves highly capable of pointing out for the

144

jury the supposed flaws of the other's opinions.[234]  Put simply, both expert and treating neurologists use different terms to describe similar neurological conditions, and none are "wrong."  Ultimately the question in every case is whether the neuro-injury suffered by the plaintiff (regardless of what it is called) is, more probably than not, caused by exposure to manganese in welding fumes.  So long as a treating doctor or expert uses a reliable methodology, such as differential diagnosis, to reach an opinion on this question, the Court will not exclude the opinion based on the terminology the doctor uses, nor on a minor weak leak in methodology or reasoning – and the Court has held carefully to this approach for both plaintiff's and

---

[234]  See, e.g., *Tamraz* pretrial tr. at 5-7 (Nov. 1, 2007), where the court ruled on a motion to exclude certain opinions of treating physician Dr. Walter Carlini:

* * * The briefing on this was certainly extremely well written from both sides, and the parties raise a number of issues, both factual and legal in them.  I have read all of the briefs.  I have read all the depositions, or the two depositions that were taken of Dr. Carlini.

I have gone back and reread the Court's *Daubert* opinion, which was on the main MDL docket at 1353, and I have decided that I am going to deny the defendants' motion.

To a large extent, the defendants' motion asks the Court to draw bright lines regarding diagnoses of movement disorders that I have already declined to draw, and I have already decided that the current state of the science does not require to be drawn.

I find that Dr. Carlini is a well-qualified physician, extremely well-educated, with an established practice.  I see nothing lacking in his qualifications to render opinions regarding movement disorders, and I see nothing about his methodology which is either flawed or inconsistent with the very diagnostic methods that other experts in this case, both the plaintiffs and the defendants' experts alike, have used and have described as appropriate diagnostic methods.

I think it is telling that the defendants have not proffered an affidavit from any expert indicating that there is anything wrong with Dr. Carlini's methodology, or that there is anything faulty with respect to his qualifications.

The fact that the defendants may disagree with Dr. Carlini's opinions or his word choice ["manganese-triggered Parkinson's Disease"] or the fact that his word choice may not be as cautious as one might expect from a practiced litigation expert to me is insufficient grounds to exclude his testimony.

It is clear that the defendants have fair grounds to attack the somewhat unusual diagnosis that Dr. Carlini renders in this case, and that they have done so in their cross-examination of Dr. Carlini, but that to me goes to the weight and not to the admissibility of his testimony.

So I am not going to exclude either portions of Dr. Carlini's testimony or, as was hinted in the plaintiffs' response, the entirety of Dr. Carlini's testimony.  I'm going to allow his testimony and deny the defendants' motion.

145

defendants' witnesses.

C.    **Motions in Limine.**

Historically, before every bellwether trial, the parties filed many dozens of motions in limine, seeking to exclude or limit the admission of certain types of evidence.  Many of these became repetitive, meaning the parties filed the same motions in limine in each bellwether case, even though the parties already knew how the Court would rule.[235]  While the parties filed these motions in each case to protect their ability to appeal the Court's evidentiary rulings, the Court concluded there was a better way to provide the parties with the protection they required, without repetitious filing of formulaic motions.

Accordingly, the Court issued an *Evidentiary Order* memorializing, in summary form, its prior rulings on a number of the parties' prior evidentiary motions, and stated that "**these rulings will apply to all future cases in this MDL** that are tried by this Court."[236]  That way, any party wishing to appeal one of these evidentiary rulings in a future case could – and should – simply point to this *Evidentiary Order*

---

[235]  Except as noted below, the motions in limine to which the Court refers here were not case-specific – that is, the contours and grounds for the motions did not change from case to case.

[236]  *Evidentiary Order* at 1-2 (Aug. 31, 2009) (master docket no. 2217) (emphasis in original).  As noted above in Section II of this document, the Court suggests that, under the doctrine of "the law of the case," these evidentiary rulings should also apply to all cases in this MDL that are tried by *other* courts, such as transferor courts on remand.

147

on appeal.[237]

_____

[237] Of course, on appeal, the parties *must* also point to the transcripts of the Court's oral rulings entered during prior MDL bellwether trials, when the Court addressed the parties' motions in limine at greater length.  These oral rulings were issued at final pretrial conferences, at sidebar conferences during trial, and from the bench during trial when ruling on objections raised by counsel.  And, the parties *must* also point to the other *written* Orders addressing these evidentiary issues, as well.  To be clear: the *Evidentiary Order* only *summarizes* some of the Court's repetitive evidentiary rulings, and reiterates that these evidentiary rulings are continuing in nature; but the summaries cannot be fully understood absent review of the full rulings, themselves.

From the beginning of this MDL, the Court made clear and the parties agreed that the evidentiary rulings entered in each bellwether case would apply to all future MDL cases, unless different factual circumstances warranted modification.  Thus, the precise ruling on a given evidentiary issue may have been best explained by the Court during a prior bellwether trial.

*See Jowers* pretrial tr. at 5-6 (Jan. 23, 2008) ("I want to reiterate the fact that we have understood from the very beginning that all of the Court's rulings in earlier cases, except to the extent that the parties argue for and the Court decides to alter them, continue to apply.  And I do not think that, despite the fact that . . . you all can press the restart buttons on your motions and re-file virtually identical briefs with respect to those motions, that means that the Court needs to go through a detailed analysis of every ruling that it has done in the past and to repeat all the rationale for all of the rulings that it has made in the past.  So I want to make it clear that to the extent that any issues go up in this case from either side to the Court of Appeals, that that record won't be complete absent the Court's rulings in its earlier pretrial proceedings.  So the *Ruth* rulings, the *Solis* rulings, the *Tamraz* rulings, all need to be incorporated into the rulings in this case in order for some of the things that I'm going to say to make full sense and in order for the record to be complete with respect to those things.  So I'm incorporating all of those prior rulings, both the written rulings and the on-the-record oral rulings with respect to the motions in limine in those cases to the extent that those motions are repeated in whole or in part in this case."); *id.* at 178-80 (addressing preservation of appellate rights regarding pretrial evidentiary rulings).

*See also Tamraz* pretrial tr. at 6 (Nov. 1, 2007) (ruling as follows on defendants' motion to exclude certain expert witnesses: "I will stand by all of the earlier rulings that I have made with respect to those expert witnesses.  As I said, they are Cunitz, Longo, Parent and Rosen, all the defendants' earlier objections to their testimony are preserved, and all the restrictions that the Court placed on the testimony of those experts will remain intact for purposes of this proceeding, and you can refer to the Court's earlier rulings, some written and some oral, relating to those experts, but I think we all know what the limitations are."); *id.* at 195-97 (Nov. 2, 2007) ("Any ruling as to any document that was made during any of the prior proceedings stands unless there is a good reason to readdress that document because of a change of circumstances, either case-specific or otherwise, and all objections to those rulings stand, so that you don't need to raise them again.  Any objection that any party made to a ruling with regard to document admissibility is preserved for the record in this case, so for example, for purposes of appeal, you don't have to re-lodge those objections.  You already have them.  That's on the record.  It's been stated many times.").

*See also Byers* pretrial tr. at 5 (Oct. 30, 2008) (addressing the same issue); *Solis* pretrial tr. at 60-61 (June 1, 2006); *Goforth* pretrial tr. at 2, 20, 23-24 (Oct. 27, 2006); *Solis* pretrial tr. at 455-58 (June 1, 2006).

To the extent that the Court's rulings, as stated during successive MDL bellwether final pretrial

The Court explained in the *Evidentiary Order* that, in the future, the parties need not (indeed, generally should not) file in an individual case a motion (including a motion for reconsideration) addressing an evidentiary issued discussed therein.  Rather, the Court ordered that, "going forward, a party may file a motion in limine directed at modifying the contours of the rulings documented in this Order *if* (and *only if*) the party sincerely believes the particular circumstances of an individual case warrant a modification."[238]  For the most part, the Court memorialized in the *Evidentiary Order* only those rulings it believed are least likely to be affected by the idiosyncracies of a specific case.[239]

For the convenience of transferor courts, the MDL Court repeats verbatim, below, the language

---

hearings, were revised or refined as the MDL progressed, the Court's most recent rulings prevail.

[238]  *Evidentiary Order* at 4 (Aug. 31, 2009) (master docket no. 2217) (emphasis in original).  The Court concluded the Evidentiary Order with the following paragraph: "The evidentiary rulings documented in this Order are summaries of rulings the Court has entered in the MDL bellwether cases over which it has so far presided.  These rulings will apply to all future MDL cases tried by this Court.  The parties' objections to those rulings are preserved for all future trials and any appeals thereof.  Accordingly, a party should file a pretrial motion addressing these same evidentiary issues in future trials only if that party sincerely believes the particular circumstances of an individual case warrant a modification.  Further, although this Order documents the Court's rulings, the parties still have an obligation to object at trial if they believe the opposing party is not complying with the Court's conclusions regarding admissibility."  *Id.* at 73.

[239]  Some of the evidentiary issues addressed in the *Evidentiary Order* apply only to certain classes of cases.  For example, the Court's ruling that the defendants may show the jury only actual warning labels used, and not exemplar or "mock-up" labels, applies broadly to all cases; in contrast, the Court' ruling that the defendants may adduce evidence of many (but not all) stressors in a plaintiff's life, which might have caused him depression or emotional distress, carries aspects that are more case-specific.  The Court acknowledged that the parties may still need to file case-specific motions in limine addressing and flagging a few of the evidentiary issues that are discussed in the *Evidentiary Order*, even though the rulings set out therein will have given the parties much direction.

contained in its *Evidentiary Order* addressing these motions in limine.[240]  Following the bold headings

below, the Court lists (in footnotes) citations to some (but certainly not all) of the pretrial transcripts where

the Court issued oral rulings on the issues raised.  The Court does not provide many citations showing oral

rulings issued *during* bellwether trials, but those mid-trial rulings should continue to educate the parties

regarding the contours of admissible evidence, and likely will be cited to transferor courts by the parties.

> **1.** ▸ **Defendants' Motion to Exclude Evidence of Other Welding Fume Lawsuits – GRANTED IN PART.**
> ▸ **Defendants' Motion to Exclude Reference to Settlements of Other Welders' Claims – GRANTED IN PART.**
> ▸ **Plaintiff's Motion to Exclude Evidence of Lawyer Advertising  – GRANTED IN PART.**
> ▸ **Motion to Exclude Evidence of Efficacy of Lawyer Advertising – GRANTED.**[241]

The topics of "other *Welding Fume* claims and lawsuits" and "plaintiffs' lawyers' advertising" are

grouped together because they invariably arise together in the parties' pretrial evidentiary motions.

Defendants in each trial seek to exclude evidence of other *Welding Fume* lawsuits filed by other

plaintiffs, arguing this evidence has very limited relevance to the merits of the claims of the plaintiff at

trial.  Defendants assert that, to the limited extent evidence of other *Welding Fume* lawsuits may be

relevant to their notice and knowledge of the health hazards of welding, this evidence is excessively

---

[240]  There are some minor differences in the language below compared to the language in the *Evidentiary Order*.  The most substantial difference is the addition of some explanation regarding "phantom expert testimony," which the Court originally provided in *Cooley* after the parties sought clarification on this issue.  *See Cooley* docket no. 215 (Sept. 14, 2009) (discussing the difference between "core experts" and "case-specific experts" and how that difference affects the admissibility of "phantom expert testimony").

[241]  *See Byers* pretrial tr. at 97-116, 157, 256-57 (Oct. 22, 2008); *Jowers* pretrial tr. at 21-35, 64-65, 88 (Jan. 23, 2008); *Tamraz* pretrial tr. at 24-36, 119-23 (Nov. 1, 2007); *Goforth* pretrial tr. at 26-36, 74, 100-06 (Oct. 25, 2006); *Solis* pretrial tr. at 201-04, 206-07, 223-24 (May 16, 2006); *Solis* pretrial tr. at 408-15, 440-42 (June 1, 2006); *Ruth* pretrial tr. at 163-78 (Aug. 30, 2005); *Ruth* pretrial tr. at 67, 139 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *3-4 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

prejudicial under Fed. R. Civ. P. 403 – especially because the existence of these lawsuits shows only that the claims were brought, not that they are valid.

Defendants also assert that, if evidence of other *Welding Fume* lawsuits is allowed, then defendants should be permitted to introduce: (1) evidence that, beginning in 2002, the plaintiffs' bar engaged in heavy advertising to obtain clients for *Welding Fume* lawsuits; and (2) expert evidence on the efficacy of this type of advertising.  Defendants assert this evidence would tend to show an alternative reason for the many thousands of *Welding Fume* lawsuits filed by other welders.  Plaintiffs respond that evidence of lawyer advertising is itself excessively prejudicial compared to its limited relevance under Fed. R. Civ. P. 403.

The Court has ruled as follows on these motions.  Except as noted below, evidence of lawsuits brought by other welders, and also evidence of lawyer advertising, must be excluded pursuant to both Fed. R. Evid. 403 and 611(a)(2).  While plaintiffs are correct that a multiplicity of injury claims by welders is inconsistent with the notion that no harm can flow from exposure to welding fumes, defendants are also correct that the spark leading to the great number of recent *Welding Fume* lawsuits is the combination of the advertising and screening processes used by plaintiffs' counsel to identify potential claimants.  As defendants point out, moreover, the validity of the claims asserted in those cases remains mostly untested.[242]

Given the complicated issues in these cases, a jury's time would not be well-spent sifting through expert opinions regarding the efficacy of lawyer advertising and debating the viability of thousands of

---

[242]  Indeed, after their MDL cases were set for trial, three bellwether plaintiffs – Landry, Morgan, and Peabody – dismissed all of their claims, the latter two shortly before trial, and plaintiffs often file their own motion seeking to exclude evidence regarding the circumstances of the dismissal of these and any other *Welding Fume* cases.  The Court has always granted these motions for the same reasons it grants defendants' motions to exclude evidence of other *Welding Fume* lawsuits: except as discussed immediately below, the number and validity of other, similar cases is minimally relevant to the claims of a given *Welding Fume* plaintiff.

lawsuits that are not before it.  The Court, accordingly, finds it is necessary and appropriate to exclude both types of evidence to the extent possible, because of its limited relevance, possibly prejudicial effect, and also as a matter of prudent trial management.

The Court adds the following caveats, however, so that the scope of this ruling is not misunderstood.  First, the Court generally excludes reference to *lawsuits*, and evidence analyzing the arguable driving force behind those lawsuits having been filed.  This ruling does not pertain to claims for disability filed by a welder directly with one of the defendants, or filed with any employee benefit plan sponsored by or in any way affiliated with a defendant or a governmental entity (e.g., disability claims, Social Security claims, and so on).  Those types of claims, and their allowance *vel non*, are generally not the product of lawyer advertising and may, indeed, be relevant to the credibility of a defendants' current disavowal of having reason to know of any connection between welding and neurological injury.

Second, although Rules 403 and 611 counsel against admission of evidence regarding the *recent* spate of *Welding Fume* lawsuits that led to creation of this MDL, a different balance adheres to certain similar lawsuits filed many years earlier.  These lawsuits were definitely not the product of the recent mass advertising to which defendants object; further, the facts and circumstances of these lawsuits clearly go to whether defendants had notice of the hazards of welding fumes – especially cases where defendants settled for relatively large sums.  Indeed, in the last three MDL bellwether trials tried before the undersigned, counsel for the parties reached agreement regarding admission of evidence of the following "historical" lawsuits, which were brought by welders who suffered neurological injuries: *Nobles*, *Cox*,

*Treece*, *Kocher*, *Whisenhunt*, and "the Miami case."[243]   Evidence regarding the circumstances and

---

[243]   For example, in the MDL bellwether trial of *Jowers*, the parties reached the following agreement: "Plaintiffs will agree not to reference or attempt to introduce the mass of claims/lawsuits, and defendants will agree not to call advertising experts, Schimmel and Thomas, or attempt to introduce lawyer advertising.  Defendants also will agree not to suggest plaintiffs' lawsuit is 'lawyer-made;' however, [defendants] do reserve the right to simply establish that Racette's subjects were referred to him by lawyers.  Although defendants want their objections preserved, we understand that the Court will allow evidence of the fact that the following other claims were made: AC Nobles, Miami, Cox, Treece, Kocher and Whisenhunt."  Email between counsel (Jan. 15, 2008).  *See also Goforth* pretrial tr. at 27-31 (Oct. 25, 2006) (counsel first describing this agreement regarding introduction at trial of historical *Welding Fume* lawsuits); *Tamraz* pretrial tr. at 21-27, 130-31 (Nov. 1, 2007) (reiterating this agreement).

The parties also understand that reference will be made to a welder named Ruth, whose MDL case settled and who has been the subject of published medical studies.  Despite allowing these references to other *Welding Fume* lawsuits, the Court has limited these references to a minimum.

Finally, the Court has excluded evidence of MDL plaintiffs' verdicts in the cases of *Tamraz* and *Jowers*.

existence of these lawsuits is admissible.[244]

Third, it has become clear that it is simply not possible to avoid completely any reference to the existence of other *Welding Fume* cases during the course of a *Welding Fume* trial.  For example, the parties will often seek to impeach or challenge a witness with testimony elicited in other *Welding Fume* trials, so

---

[244]  In the second MDL bellwether trial of *Solis*, the Court explained from the bench its ruling on admissibility of certain earlier *Welding Fume* lawsuits, as follows:

> In this case, the defendants have argued both that there is no possible injury that could occur from welding fumes, because it can't get into the brain with sufficient quantity to cause injury, and more importantly, the defendants have argued that they were under no duty to conduct any additional investigation or to provide any additional warnings because they had no notice of any reason to do so.  In other words, they were not even alerted to any need to conduct additional investigation.
>
> This is not a classic products case, where the only question is whether or not a particular product is defectively designed or manufactured, and where therefore an injury suffered by someone else is irrelevant to the question of whether the design defect or manufacturing defect exists.
>
> This evidence of pre-1999 claims is relevant to the question of knowledge, the duty to investigate, the duty to make inquiry, and what would be required of one who is expected to be essentially an expert in the field as relates to the potential injury that their particular product could cause.
>
> I note that in the [first MDL bellwether] case [of *Ruth*], the *defendants* sought to introduce evidence regarding the absence of prior claims.  The plaintiffs resisted that, and the defendants won on that motion because the defendants said it went directly to the question of whether they were put on notice of any need to investigate further.
>
> So for the defendants now to say that this evidence is irrelevant is completely inconsistent with the position that they have taken in the past, and, as I said, is inconsistent with the fact that they have continued to argue that they had no duty to conduct additional investigation, and no notice of any need to provide additional warning.
> * * *
> I emphasize again, however, that I stand by my earlier ruling with respect to post-1999 evidence of claims.  It is arguable, as plaintiffs have pointed out, that the later claims are relevant to . . . the question of whether or not harm could ever flow from welding fumes, but I find that, both given the fact that many of those claims arose out of lawyer advertising or came in the form of lawsuits that post-dated the initiation of this MDL, and because of the undue prejudice and complications that would flow from having to allow the defendants then to reasonably respond to explain where those multitude of claims came from, that for all those reasons, the prejudice and unworkability of that later evidence greatly outweighs its minimal probative value.  So I stand by that earlier ruling that defendants won on the *Ruth* case with respect to post-1999 claims.

*Solis* pretrial hearing tr. at 202-03 (May 16, 2006).

the jury may come to understand that the trial they are watching is not the only one of its kind.  Indeed, these references to other *Welding Fume* cases are made at least as often by defendants as by plaintiffs. Thus, while the Court rules that references to other *Welding Fume* cases must be kept to a minimum, the Court also notes that such references cannot be avoided entirely.[245]

Fourth, although the defendants may not, as a general matter, refer to lawyer advertising, and may not show to the jury any *Welding Fume* advertisements, there are three limited exceptions to this rule. One: if the evidence shows the plaintiff saw an advertisement or letter from a plaintiff's attorney that *lists the symptoms* a welder with neurological injury might have, *and* if the plaintiff saw this communication *before* he ever visited a doctor complaining of his symptoms, then the defendants may ask the plaintiff about having seen the advertisement, and may read aloud the relevant portions to establish that the plaintiff was aware of the symptoms of parkinsonism before he ever went to a doctor; but defendants may not show the advertisement to the jury, and the advertisement is not itself admissible.[246]  Two: when questioning plaintiff's neurology experts Dr. Paul Nausieda or Dr. Juan Sanchez-Ramos, who conducted medical screenings for plaintiffs' counsel, defendants may bring out the fact that the welders whom these doctors screened had viewed advertisements that listed certain neurological symptoms.  Similarly, when discussing medical articles written by Dr. Brad Racette, who examined welders at screenings for the purpose of studying a possible link between welding and neurological injury, defendants may bring out the fact that the welders whom Dr. Racette studied saw advertisements that listed certain neurological symptoms.

---

[245]  The Court has also directed the parties to refer to "a witness's prior testimony" and not  to "prior trials."  *Byers* trial tr. at 428 (Nov. 4, 2008).

[246]  As discussed below, however, defendants may not characterize the plaintiff's claim as "lawyer-generated."

155

Again, however, the defendants may not show these advertisements to the jury.[247]  Further, the defendants must limit their use of the terms "advertising" or "advertisement" to an absolute minimum.[248]

And three: defendants will sometimes seek to elicit testimony (from administrators of workers' compensation or disability or health plans) that the employer historically received very few claims from welders for neurological injury.  Plaintiffs may then seek to elicit responsive testimony that welders could not know to make such claims, if they had no idea their neurological injury could be work-related.  If plaintiffs do elicit such responsive testimony, they must ensure their questioning is limited to the period before 2002.  Otherwise, the door may be opened for defendants to bring out the fact that, after 2002, the mass advertising by the plaintiffs' bar would have given welders more knowledge that their neurological injury was, in fact, possibly work-related.[249]

Finally, the Court adds that these caveats are narrow: testimony that is admissible under these exceptions must be kept to the minimum necessary to make the point.  The bottom line is: as much as possible, evidence of other *Welding Fume* lawsuits and of lawyer advertising will be excluded.

---

[247]  *See Goforth* trial tr. at 1882-85 (June 1, 2006).  The Court further held that defense counsel may adduce testimony regarding payments made by plaintiffs to screening doctors (such as Dr. Nausieda), but may not attack the screening process itself.  *Tamraz* trial tr. at 1149-50 (Nov. 8, 2007).

[248]  *See Cooley* trial tr. at 1362-65 (Sept. 21, 2009) (directing defendants not to use these terms).

[249]   *See Byers v. Lincoln Elec. Co*., 2008 WL 4849339 at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313) (concluding the door had not been opened in deposition); *Jowers* trial tr. at 1673-78 (discussing the allowable scope of Ingalls employee Steve Pierce on this topic).

2. **Plaintiff's Motion to Exclude Exemplar Warnings, Warnings for Other Products, Warnings of Other Manufacturers, and Post-Use Warnings – GRANTED IN PART.**[250]

In 1967, the American Welding Society ("AWS") adopted a mandatory warning label to accompany welding rods. With minor variations, all of the manufacturer defendants in the MDL used this mandatory warning. In 1979, the AWS revised the language for this mandatory warning label, and again, with minor variations, all of the manufacturer defendants adopted the mandatory language. Eventually, the manufacturers stopped acting in lockstep and began to use individualized warning label language; further, the manufacturers used different wording to describe health hazards in their MSDSs (which were first required in 1985), and also used different language on certain specialty products, such as high-manganese-content welding rods.

Plaintiffs have moved for an order prohibiting defendants from introducing: (1) any warning labels or MSDSs for welding rod products that the plaintiff did not actually use;[251] (2) any "exemplars" or mock-up labels that were not actual warning labels used by the defendants; and (3) any warning labels on other types of products, such as insecticides or cigarettes.

The Court has granted this motion in large part, but not completely. Addressing these categories

---

[250] *See Byers* pretrial tr. at 116-124, 248-49 (Oct. 22, 2008); *Jowers* pretrial tr. at 11-21, 65-66, 71-81, 90-91 (Jan. 23, 2008); *Jowers* trial tr. at 1333-34 (Feb. 14, 2008); *Tamraz* pretrial tr. at 131, 142-43 (Nov. 1, 2007); *Goforth* pretrial tr. at 74 (Oct. 25, 2006); *Goforth* pretrial tr. at 31-40, 62-68 (Oct. 27, 2006); *Solis* pretrial tr. at 194-95 (May 16, 2006); *Ruth* pretrial tr. at 69-72 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *4-5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[251] This includes warning labels on: (a) welding rod products manufactured by entities who are not defendants at trial (even if the entity was originally named as a defendant in the complaint); (b) welding rod products manufactured by a defendant but never used by the plaintiff; and (c) warning labels issued by a defendant after the plaintiff stopped welding. *See, e.g., Jowers* trial tr. at 1934-35 (Feb. 21, 2008) (ruling that, although witness Lyttle had shown a Union Carbide label to the AWS as an example of what the entire industry should adopt as a standard in 1979, the label could not be shown to the jury because Union Carbide was not a defendant at trial).

157

in reverse order: plaintiffs argue that warning labels on unrelated, non-welding-rod products (like insecticides) are simply not relevant to any issue in a *Welding Fume* lawsuit, because the circumstances of use of those other products are different than the circumstances of use of welding rods. Defendants respond that warning labels on other products that employ the same language – such as "use adequate ventilation" and "can be hazardous to your health" – are relevant to show the adequacy of this warning language generally, especially in response to a plaintiff's expert's opinion that this language is always insufficient. The Court concludes that similar warning language on other products has some minor relevance, so defendants may adduce evidence that the warning language defendants use is common and appears on other products. Defendants may not adduce evidence, however, as to the specific, other products on which the similar warning language appears (such as insecticides or cigarettes), because the circumstances of use of those products and the hazards they may carry are different from welding fumes; rather, defendants may simply solicit testimony that similar warning language is used elsewhere. Further, given the addictive quality of tobacco and the high stakes and strong emotions surrounding tobacco litigation, the Court concludes that reference to tobacco warnings (by any party) carries the risk of excessive prejudice and must be excluded.[252]

As for exemplar warning labels, defendants have sought to show mock-up labels to the jury that are more readable, or laid out differently, than the labels the defendants actually used. Given that the placement and size and physical design of a warning label goes to its adequacy, defendants may not use these exemplar labels; defendants may show the jury only those labels they actually used on the products

---

[252] See also the discussion regarding cigarette warnings at Sections IX.C.47 and IX.B.23 of this document.

at issue in a particular case.[253]

As for warning labels that are on products the plaintiff did not actually use, and warning labels issued by a defendant after the plaintiff stopped welding, the plaintiff would not have seen these labels during any relevant period, so the labels are generally not admissible.  There are two exceptions to this rule. The first exception is tied to the learned intermediary defense.  If the applicable State law in the case recognizes the learned intermediary defense, then a product manufacturer can discharge its duty to warn by providing information about the dangers of the product to a third person (such as an employer) upon whom it can reasonably rely to communicate the information to the product's end-users.  Thus, even if the plaintiff did not actually use a given product with a certain warning label, that label may be relevant if there is evidence that the plaintiff's employer saw it.  Accordingly, warning labels on products the plaintiff never used may be admitted, to the extent, and *only* to the extent, that defendants can first establish through testimony of the plaintiff's employers' representatives that: (1) the learned intermediary defense is viable in the particular case; (2) the particular warnings were actually received; and (3) the warnings educated and informed the employer in a particular, meaningful way that was in addition to any education and information provided by the warnings on the defendants' other products.

The second exception involves allowing the limited use of certain labels only on cross-examination.  Defendants' witnesses sometimes will assert at trial that: (1) welding fume exposure cannot

---

[253]  Thus, for example, defendants may not show the jury a warning label used by another manufacturer (e.g., Air Liquide) that is not a defendant at trial.  This ruling includes a prohibition against showing the jury any AWS memorandum that describes the mandatory label language, and suggesting that a defendant used "this label," since the language layout, font size, and so on in the memorandum is not identical to the defendants' actual warning labels.  AWS memoranda discussing mandatory warning language must be used *only* in connection with witnesses describing what AWS did.

Although some of the Court's prior rulings have sometimes suggested otherwise, **defendants may not present their warning label language using a document created for litigation**; all warning label language must be shown using actual warning labels.

cause neurological injury, especially exposure to fumes emitted from mild-steel welding rods; or (2) it was not feasible to include on a warning label the hazard of neurological injury.  If defendants' witnesses do make these assertions, or defendants' counsel does make these arguments, then plaintiffs may introduce *on cross-examination* other manufacturers' labels, and labels issued after the plaintiff stopped welding, for the purpose of showing: (1) that welding rod manufacturers have acknowledged the risk of neurological injury from welding fume exposure; and (2) the feasability of having included on a warning label the hazard of neurological injury.[254]

### 3.    Plaintiff's Motion to Exclude the "Navy Video" – DENIED.[255]

In the 1940s, the United States Navy produced a short movie of welders working in smoky conditions, along with a voice-over explaining basic safety precautions.  In the first MDL bellwether trial of *Solis*, plaintiffs played an excerpt of this film with no objection from defendants.  In the second MDL bellwether trial of *Goforth*, defendants played an excerpt with no objection from plaintiffs.  In subsequent bellwether trials, however, defendants have sought to play an excerpt, but plaintiffs have objected.  The Court initially sustained the objection (in the bellwether trial of *Tamraz*), concluding the defendants had not sufficiently authenticated the video and could not lay an adequate foundation showing the plaintiff or

---

[254] One of the labels that plaintiffs often seek to introduce on cross-examination to make these showings is a label that defendant manufacturer ESAB began using in 2006, which states: "Overexposure to manganese and manganese compounds above safe exposure limits can cause irreversible damage to the central nervous system, including the brain." *See Jowers* trial tr. at 1959-61 (Feb. 21, 2008) (Court ruling that defendants had opened door to use of ESAB label by plaintiffs on cross-examination).  The Court has separately held that, if it allows plaintiffs to show this label to the jury on cross-examination, ESAB may adduce evidence of its contentions that it included this language solely for litigation purposes. *See Jowers* pretrial tr. at 68 (Jan. 23, 2008); *Tamraz* pretrial tr. at 140 (Nov. 1, 2007).

[255] *See Byers* pretrial tr. at 127-29 (Oct. 22, 2008); *Jowers* trial tr. at 1344-50, 1456-57 (Feb. 14 & 19, 2008).

any coworkers had ever seen it.  Subsequently, however, defendants offered alternative arguments for its admissibility.  Specifically, foundational concerns were allayed by the ancient documents rule at Fed. R. Evid. 901(b)(8), and the film was relevant to the same extent and for the same reasons as other, historical documents created by non-defendants, which plaintiffs have consistently used at trial.  The Court has concluded that the defendants' alternative arguments are well-taken.  Accordingly, the Court's position on the admissibility of the Navy video has evolved and the video will be admissible in all future MDL cases.

### 4.     Plaintiff's Motion to Prohibit Conflating Warning Labels With MSDSs – DENIED.[256]

Plaintiffs have moved for an order requiring defense counsel and witnesses to refer to Material Safety Data Sheets ("MSDSs") as precisely that, and not as "warnings."  In particular, when plaintiffs ask a defense witness when certain information was first placed "on a *warning label*," plaintiffs do not want the witness to be allowed to answer by stating when the information first appeared on their *MSDSs*.  The Court denied this motion.  If necessary, plaintiffs can ask follow-up questions for clarification.

Plaintiffs have also moved for an order precluding defendants from referring to certain language on the first page of MSDSs as a "warning," rather than as directions for emergency response teams.  The Court denied this motion also, and plaintiffs can again ask follow-up questions or present argument to clarify.

---

[256]  *See Byers* pretrial tr. at 123-24 (Oct. 22, 2008).

161

**5.      Plaintiff's Motion to Exclude Evidence of the Disqualification of Experts in Other Cases – GRANTED.[257]**

Plaintiffs often call at trial expert witness Dr. Robert Cunitz to testify about warnings.  In at least four other product liability cases that did not involve welding rods, courts have ruled that Dr. Cunitz was not qualified to offer his proposed expert opinions.  Plaintiffs have asked that evidence of these other disqualifications be excluded as irrelevant.  This motion is well-taken.  The only relevant question is whether Dr. Cunitz is qualified to opine in *Welding Fume* cases.  Following extensive briefing on this issue, the Court concluded that Dr. Cunitz is, in fact, so qualified (though with limitations).[258]

Especially given the particular bases for the disqualification rulings in those four other cases, any attempt by defendants to delve into Dr. Cunitz's disqualifications in other proceedings would confuse the jury, cause the plaintiff undue prejudice, and have the effect of undermining the admissibility rulings of this Court.

---

[257]   *See Byers* pretrial tr. at 73-75 (Oct. 22, 2008); *Jowers* pretrial tr. at 68-69 (Jan. 23, 2008); *Tamraz* pretrial tr. at 132 (Nov. 1, 2007); *Goforth* pretrial tr. at 78 (Oct. 25, 2006); *Solis* pretrial tr. at 197 (May 16, 2006); *Ruth* pretrial tr. at 72 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).  *But see Tamraz* tr. at 1588-92 (ruling the door had been opened to limited questioning on Cunitz's disqualifications in other cases).

[258]   *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *6-8 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353) (addressing the admissibility of Dr. Cunitz's opinions under the *Daubert* standard and granting in part defendants' motion to exclude his testimony).

6. **Plaintiff's Motion to Bar Evidence of Previously-Named Defendants, Previously-Filed Claims, and Previously-Dismissed Cases – GRANTED.[259]**

Defendants have argued that a plaintiff's originally having named in his complaint welding rod manufacturer-defendants other than the ones appearing at trial, and then dismissing them, is relevant and admissible to show the plaintiff's awareness of warnings issued by these other manufacturers. Defendants go so far as to state that the plaintiff's allegations, in his original complaint, are tantamount to admissions against interest that he read these other manufacturers' warnings. The Court disagrees; the fact that the plaintiff merely named certain defendants and then dismissed them is not an admission and is not relevant to any issue in a *Welding Fume* case. Unless there is evidence that the plaintiff actually used a manufacturer's products, it is irrelevant that the manufacturer was a previously-named, dismissed defendant.[260]

Similarly, the fact that many – or any – other plaintiffs filed other *Welding Fume* cases and then moved for voluntary dismissal is irrelevant to any issue that is pending in a specific *Welding Fume* case. And the fact that a given plaintiff earlier filed a different lawsuit seeking reimbursement for other physical

---

[259] *See, e.g., Byers* pretrial tr. at 73-75 (Oct. 22, 2008); *Jowers* pretrial tr. at 69-70 (Jan. 23, 2008); *Goforth* pretrial tr. at 76 (Oct. 25, 2006); *Solis* pretrial tr. at 197 (May 16, 2006); *Ruth* pretrial tr. at 78 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[260] The same analysis also applies to a defendant who obtains summary judgment on the basis that the plaintiff could not show he ever used that defendant's welding rod products.

Further: (1) while plaintiffs may adduce evidence that a previously-dismissed defendant signed an agreement with remaining defendants to cooperate and testify, (2) plaintiffs may not pursue the point further, to the extent it is revealed that the witness worked for a company that was once a defendant; and (3) defendants may adduce responsive testimony that the agreement was signed because of a business relationship (such as distributor/manufacturer). *See Jowers* trial tr. at 1592-96 (Feb. 19, 2008) (outlining this process in connection with WESCO, which was a dismissed defendant that had earlier obtained indemnification from defendant ESAB).

injuries is also generally not relevant.[261]  Such evidence will be excluded.

**7.    Plaintiff's Motion to Exclude Evidence of Flying on Private Airplanes  –  GRANTED.[262]**

Various fact and expert witnesses sometimes use counsel's private airplanes to attend depositions, hearings, medical appointments, and so on.  Plaintiffs have sought to preclude defendants from bringing out this information at trial.  Defendants originally argued this evidence goes to bias, in the same way as does evidence of an expert's hourly rates; later, defendants did not oppose this motion.  The Court has concluded the "private airplane" evidence is too attenuated to show bias.  Counsel may sufficiently undertake impeachment on the basis of bias due to financial interests by adducing evidence of how much a witness was paid, how often they have worked for a particular party (or type of party), and the extent to which their expenses were covered or reimbursed.  Federal Rules of Evidence 403 and 611 counsel against delving into greater detail regarding which hotels experts use,  in what restaurants they ate, whether they fly first class, and so on.  This limitation will be applied equally to all parties.  As the Court explained, moreover, this rule applies to all aspects of the parties' and their witnesses' travel, such as the class of an individual's flight or the hotel room in which they stayed.

---

[261]  Although the fact that a plaintiff earlier filed a lawsuit seeking compensation for other physical injuries is generally not admissible (nor is the fact of any compensation received), the plaintiff's underlying medical history may well be relevant and admissible.  For example, if a plaintiff earlier asserted he suffered an injury or disability due to an automobile accident, this history is relevant to the extent he now claims similar injuries or disability due to MIP.  While the medical evidence is certainly admissible, *the fact of the prior lawsuit* is not, barring special circumstances (such as a pattern of filing work-related injuries bearing substantial similarity to the claims asserted).

[262]  *See Byers* pretrial tr. at 83 (Oct. 22, 2008); *Jowers* pretrial tr. at 69 (Jan. 23, 2008); *Tamraz* pretrial tr. at 132 (Nov. 1, 2007); *Goforth* pretrial tr. at 75-76, 92-93 (Oct. 25, 2006); *Solis* pretrial tr. at 196-97 (May 16, 2006); *Ruth* pretrial tr. at 78 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *6 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

**8.      Plaintiff's Motion to Exclude Evidence of Collateral Sources – GRANTED IN PART.**[263]

*Welding Fume* plaintiffs will sometimes have received workers' compensation or other disability plan benefits.  Often, these benefits qualify as "collateral sources" under State law and are inadmissible as evidence.[264]

In these circumstances, defendants generally agree they cannot use collateral source evidence to show damage mitigation.  But defendants argue that, for two other reasons, they should be permitted to make reference to federal or state "health benefit programs" or "collateral sources," so long as those references are not connected with the payment of benefits to the plaintiff.

First, defendants may seek to adduce evidence regarding how infrequently welders as a group have made claims for collateral source benefits due to neurological impairment as a result of welding.  For example, the person in charge of plaintiff's employer's health and disability benefits program may seek to testify that he never received a claim from a welder for benefits due to neurological injury.  Defendants want to adduce this evidence to show that, despite the exposure of many welders to welding fumes, none has suffered an injury similar to the plaintiff's.  The Court agrees this is relevant, and rules as follows. No witness or document may refer to a plaintiff's application to a workers' compensation or any similar benefits program, nor to the plaintiff's having received these benefits.  However, the defendants may adduce testimony from administrators of these benefit plans regarding the frequency of claims made by

---

[263]  *See Byers* pretrial tr. at 76-80, 86-98 (Oct. 22, 2008); *Jowers* pretrial tr. at 64-65, 185-86 (Jan. 23, 2008); *Tamraz* pretrial tr. at 130, 140-42 (Nov. 1, 2007); *Tamraz* trial tr. at 896 (Nov. 7, 2007);*Goforth* pretrial tr. at 73-74 (Oct. 25, 2006); *Solis* pretrial tr. at 194 (May 16, 2006); *Ruth* pretrial tr. at 78-80, 140 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *6 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[264]  In Mississippi, for example, "[c]ompensation or indemnity for the loss received by the plaintiff from a collateral source, wholly independent of the wrongdoer, as from insurance, can not be set up by the [defendant] in mitigation or reduction of damages."  *Busick v. St. John*, 856 So.2d 304, 309 (Miss. 2003).

165

welders generally for neurological impairment.  The parties will usually work out a stipulation that addresses these concerns.[265]

Second, the defendants may seek to show that, in the context of seeking disability benefits, the plaintiff asserted his disability was caused by an injury or disease other than welding fume exposure, or he claimed physical symptoms that are relevant to his *Welding Fume* claims.  Again, the Court agrees that this evidence is relevant and admissible, but it must be introduced in a way that keeps from the jury, as much as possible, the fact of any collateral source benefit compensation, or that the claim of disability was made for the purpose of seeking compensation, or any rulings issued in connection with the claim.

### 9. Plaintiff's Motion to Bar Certain Testimony Regarding PET Scans and L-dopa Trials – GRANTED IN PART.[266]

The Court earlier denied a *Daubert* motion filed by plaintiffs seeking to strike or limit testimony relating to PET scans.  The essence of plaintiffs' motion was that PET scans are not sufficiently reliable diagnostic tools for the purpose of differentiating Parkinson's Disease from Manganese-Induced Parkinsonism.  The Court concluded that the alleged weaknesses of PET scans for diagnostic purposes were grist for cross-examination, not the basis for wholesale exclusion under *Daubert*.

Plaintiffs' later raised a separate issue of whether defendants would be permitted to ask a plaintiff,

---

[265]  The admissibility of evidence related to this issue is also discussed in the context of admissibility of evidence of other lawsuits and other claims, see Section IX.C.1 of this document. Notably, it is only the person(s) who would normally receive reports of neurological injury to welders – such as the administrator of plaintiff's employer's health and disability benefits – who may testify on this subject.  Neither a co-worker of the plaintiff nor a defendant employee who works with welders may testify regarding whether he has ever seen other welders with neurological injury.  *See, e.g., Goforth* trial tr. at 3083-84 (Nov. 16, 2006) (prohibiting this testimony from defendant representative Ms. Quintana).

[266]  *See Jowers* pretrial tr. at 105-16 (Jan. 23, 2008); *Tamraz* pretrial tr. at 87-92 (Nov. 1, 2007); *Ruth* pretrial tr. at 80-81 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *7 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

166

himself, about his reasons for choosing not to undergo a PET scan.  The Court concluded that this line of questioning, when directed at a person who is not a learned professional or sufficiently educated regarding the science behind (or risks and benefits of) a complicated, invasive, radioactive medical procedure like a PET scan, would be confusing and unfair.  Accordingly, the Court ruled this evidence was not admissible, pursuant to Rule 403.  While defendants may establish that a plaintiff has not undergone a PET scan, they may not address his own willingness *vel non* to have one.  Defendants may ask the plaintiff's doctor, if appropriate, why he did not recommend a PET scan, or whether he did, in fact, make such a recommendation; but defendants may not ask the plaintiff, himself, why he did not undertake one.

These same rulings also apply, for the most part, to a plaintiff's ingestion of the drug levodopa ("L-dopa"), which doctors sometimes prescribe to ameliorate parkinsonian symptoms.  That is, defendants: (1) may adduce evidence that some doctors believe it is possible to use L-dopa trials to distinguish between Parkinson's Disease and Manganese-Induced Parkinsonism; and (2) may ask plaintiff's treating doctor, if appropriate, why he did not recommend L-dopa; but (3) may *not* question the plaintiff regarding his own willingness to undergo an L-dopa trial.  The only exception is that, if the plaintiff's own treating physician prescribed or recommended L-dopa, and the plaintiff then decided not to follow this recommendation, defendants may ask the plaintiff why.

Finally, the Court also ruled that defendants may not bring out the fact that they offered to pay for the cost of the plaintiff's PET scan (which is about $10,000), unless the plaintiff suggests that the reason he did not undergo a PET scan was the cost.[267]

---

[267] *Tamraz* trial tr. at 1129, 1185 (Nov. 8, 2007).

167

**10.    Plaintiff's Motion to Bar Evidence of Other Possible Causes of His Neurological Injury – GRANTED IN PART.**[268]

In every *Welding Fume* case, the plaintiff asserts he suffers neurological injury caused by exposure to manganese in welding fumes.  Plaintiffs have sometimes filed motions in limine stating they anticipate defendants might seek to submit evidence of possible *other* causes of the neurological injury, such as ingesting poisoned well water, Gulf War syndrome, head injury, or carbon monoxide exposure.  Plaintiffs have also stated they anticipate defendants might point to other sources of manganese exposure, such as welding on steel painted with primer, ingesting high-manganese drinking water, grinding of steel in the workplace, dietary supplements, and so on.  Plaintiffs have argued none of this evidence should be admitted unless there is: (1) a good faith, factual basis for these other causes or toxic exposures; and (2) expert opinion that these other agents can cause the plaintiff's particular set of symptoms or disease.[269]

Generally, the Court has agreed with plaintiffs' position.  Defendants may not suggest at trial, for example, that a plaintiffs' neurological condition might have been caused by some other, *hypothetical* toxic exposure, like carbon monoxide, if there is no evidentiary, factual basis for that suggestion.  Nor may defendants suggest the plaintiff's neurological condition was caused by some other, actual, *known* toxic exposure, unless there exists an admissible expert opinion that this known toxic exposure can cause the

---

[268]  *See Byers* pretrial tr. at 52-53 (Oct. 22, 2008); *Jowers* pretrial tr. at 103-04 (Jan. 23, 2008); *Tamraz* pretrial tr. at 69-79 (Nov. 1, 2007); *Solis* pretrial tr. at 146-51, 196 (May 15 & 16, 2006); *Ruth* pretrial tr. at 38-48 (Aug. 30, 2005); *Ruth* pretrial tr. at 82-86, 140 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *8 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[269]  *See Solis* trial tr. at 2516-17, 2741 (June 15, 2006) (excluding as rank speculation expert testimony regarding possible manganese overexposure due to dietary supplements).

plaintiff's condition.[270]

Further, defendants' expert industrial hygienists may testify regarding various common activities that occur in the plaintiff's workplace that yield exposure to manganese, such as metal-grinding, -cutting, and -blasting, but only if defendants first lay a foundation that, in fact, the plaintiff was probably exposed to that particular activity or source of manganese. Defendants' expert industrial hygienists may, if appropriate, also testify that there exist governmental or other regulations regarding manganese exposure limits with respect to these other activities. Unless defendants' expert industrial hygienists are also neurologists, however, they may *not* testify or opine that any of these other activities did or can cause neurological injury, as they are not qualified to do so; their testimony must be limited to the simple possibility of manganese exposure from these other sources.

---

[270] Defendants do not necessarily need expert opinion tying other, possible causes of plaintiff's condition to plaintiff's *symptoms*, if those connections are within common knowledge. For example, if plaintiff's doctors assert the plaintiff's loss of libido is tied to his manganese exposure and manganese-induced parkinsonism ("MIP"), defendants may question the doctors whether the loss of libido might instead be caused by other circumstances, such as natural aging; defendants need not adduce expert testimony regarding this link. On the other hand, if plaintiff's doctors assert the plaintiff's resting tremor is tied to his manganese exposure and MIP, defendants may question the doctors whether the tremor might instead be caused by exposure to (for example) insecticides *only* if defendants: (1) have a good faith, factual basis for suggesting the plaintiff was actually exposed to insecticides; and (2) adduce expert testimony that insecticide exposure can cause resting tremor.

**11.     Plaintiff's Motion to Exclude Evidence of Negative Economic Impact – DENIED.[271]**

Although State law on punitive damages varies, the Court has adhered to the following rulings in every MDL bellwether case.  The Court intends to continue to follow these rulings connected to punitive damages in every MDL case where a claim for punitive damages is asserted and is still viable at the time of trial, absent a showing by a party that State law requires otherwise.

Plaintiffs have moved to exclude evidence that a punitive damages award would cause defendants to suffer certain negative economic impacts, such as having to lay off workers.  Beyond the fact that any such effect (or at least the degree) is uncertain and unpredictable, plaintiffs assert such evidence is unduly prejudicial and immaterial to an award of punitive damages.  Defendants respond that a jury is charged with considering the "economic effects" of an award of punitive damages when determining the proper amount, and that the possibility of lay-offs and other reductions is a probative economic effect.

One factor a jury may consider when determining whether and to what extent a punitive damages award is appropriate in a given case is the defendant's ability to fund any such award.  Accordingly, the Court concludes the law allows defendants to present witnesses to provide testimony that, if a particular punitive damages award is given, there would be a negative economic effect on the defendants, including the effects to which plaintiffs object.  The Court adds, however, that such testimony will be limited to ensure there are no unnecessary or unsupported appeals to sympathy.

---

[271]  *See Jowers* pretrial tr. at 70-72 (Jan. 23, 2008); *Tamraz* pretrial tr. at 133 (Nov. 1, 2007); *Goforth* pretrial tr. at 79 (Oct. 25, 2006); *Solis* pretrial tr. at 195 (May 16, 2006); *Ruth* pretrial tr. at 98-99 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *9 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

On a related note, however, the Court has granted as unopposed motions by plaintiffs to exclude evidence that a plaintiff's verdict would lead to an increase in defendants' insurance premiums.  *See Jowers* pretrial tr. at 66 (Jan. 23, 2008); *Tamraz* pretrial tr. at 131 (Nov. 1, 2007); *Goforth* pretrial tr. at 74 (Oct. 25, 2006); *Solis* pretrial tr. at 195 (May 16, 2006).

12.    **Defendants' Motion to Exclude Evidence of Corporate Wealth – GRANTED IN PART.**

In at least one MDL bellwether trial, defendants moved to exclude evidence of their own corporate wealth, arguing this evidence was not relevant to a jury's determination of punitive damages.[272]  In support of this argument, defendants pointed to *Clark v. Chrysler Corp.*, 436 F.3d 594, 604 (6th Cir. 2006), where the appellate court held that "[the defendant's] wealth is an inappropriate basis for the $3 million punitive damage award."  The Court denied defendants' motion, however, noting that the *Clark* opinion: (1) cannot overrule earlier Sixth Circuit opinions holding that the defendant's financial condition *is* relevant;[273] and (2) was itself contrary to several Supreme Court opinions.[274]

The Court further held, however, that: (1) the financial condition of the defendant companies' parents was not relevant (e.g., the net worth of defendant Lincoln Electric Company is relevant, but the

---

[272]   *See Goforth* pretrial tr. at 79-86 (Oct. 25, 2006) (discussing a motion to exclude testimony of plaintiff's economics expert, originally filed by defendants in *Beheler* at docket no. 21).  The *Goforth* defendants had also moved for judgment as a matter of law on plaintiff's punitive damages claim, arguing the facts did not allow a reasonable jury to conclude, by clear and convincing evidence, that exemplary damages were appropriate.  After the Court denied this motion, the defendants moved to exclude from the jury's consideration any evidence of corporate wealth when assessing punitive damages.

[273]   As do most appellate courts, the Sixth Circuit holds that "[a] panel of this Court cannot overrule the decision of another panel."  *United States v. Hardin*, 539 F.3d 404, 4 (6th Cir. 2008).  Cases decided earlier than *Clark* by the Sixth Circuit routinely held that a jury may consider a defendant's financial condition when determining punitive damages.  *See Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 647 (6th Cir. 2005) ("The defendant's financial position is equally relevant to the State's interest in deterrence, which is also a valid purpose of punitive damages."); *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (discussing circumstances where "the defendant's aggregate net worth of $1.6 billion becomes relevant").

[274]   *See, e.g., BMW of North America, Inc. v. Gore*, 517 U.S. 559, 591 (1996) (Breyer, J., concurring) ("a fixed dollar award will punish a poor person more than a wealthy one, [so] one can understand the relevance of [the defendant's financial position] to the State's interest in retribution"); *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 n.28 (1993) (rejecting defendant's contention that "evidence of its impressive net worth" should not have been admitted, since, "[u]nder well-settled law . . . factors such as these are typically considered in assessing punitive damages").

171

net worth of parent Lincoln Electric Holding Company is not); and (2) while the plaintiff's expert may opine regarding the financial status of a defendant, he may not opine that a defendant could or should pay an amount in punitive damages within a certain range, or within a multiple of shareholder dividends.  The parties will often simply stipulate to the net worth of each defendant, and leave it at that.[275]

### 13. Plaintiff's Motion to Exclude Characterizations of an Author as a "Plaintiff's Expert" or "Defense Expert" – GRANTED.[276]

During trial, both plaintiffs and defendants ask questions of their own and the other side's experts regarding many dozens of learned treatises and medical and scientific articles.  Often, but not always, the authors of these articles and treatises have received payment from, and/or consulted with, the parties regarding issues central to the *Welding Fume* MDL.  The extent to which a party may adduce evidence that an author of one of these articles or treatises has received such payments is discussed at Section IX.C.45 of this document, below.

Separately, plaintiffs have moved to prohibit certain questioning and testimony involving non-testifying authors who have *not* received payment from, nor consulted with, any party regarding *Welding Fume* issues.  As an example, the parties have referred at trial to "The Warnings Handbook," written by Michael Wogalter.  Although Mr. Wogalter has apparently testified in other product liability cases on behalf of plaintiffs, he has never testified in a *Welding Fume* trial and has not consulted with any party about the specific issues raised in *Welding Fume* cases.  Thus, when defendants' warnings expert Dr. Jane Welch referred to Mr. Wogalter in an MDL bellwether trial as "a prominent plaintiff's expert," the Court

---

[275]  *See, e.g., Jowers* trial tr. at 1416-17 (Feb. 15, 2008).

[276]  *See Byers* pretrial tr. at 66-70, 126-27 (Oct. 22, 2008); *Jowers* pretrial tr. at 135-38, 145-46 (Jan. 23, 2008); *Jowers* trial tr. at 2720-22 (Feb. 26, 2008).

sustained an objection.  Further, in a subsequent case, the Court granted plaintiff's motion to exclude any questioning or testimony similarly characterizing any non-testifying author or witness as associated with plaintiffs or defendants, unless that author or witness has actually received payments from (or consulted with) *Welding Fume* parties about *Welding Fume* issues.  The Court has also ruled inadmissible evidence regarding amounts of payments by the parties or their attorneys to experts appearing in *Welding Fume* trials, if those payments were for unrelated litigation.[277]  This ruling applies equally to all other MDL cases and applies equally to both plaintiffs and defendants.

Finally, plaintiffs have also moved for an Order requiring defendants' experts to be fully prepared to answer how much compensation they have received from defendants, asserting that some experts avoid answering fully at trial.  The Court has granted this Order, and applied the ruling equally to plaintiffs' experts.

### 14.     Plaintiff's Motion to Exclude Certain Comments in Opening Statement – DENIED.[278]

Plaintiffs have moved to prohibit defense counsel from making certain comments during opening statement, including: (1) without welding rod products, the United States would have lost World War II; (2) defendant Lincoln has an annual bonus program that sometimes pays its employees amounts larger than their annual salary; (3) Lincoln has a "no lay-off" policy; and (4) Lincoln and other defendants "take care of their employees" and "really care about welders."  Plaintiffs complain these comments are irrelevant,

---

[277]  Thus, for example, evidence of payments by plaintiffs' counsel to plaintiffs' expert Dr. Burns for his work on *Welding Fume* cases is admissible, but payments by plaintiffs' counsel to Dr. Burns for his work on tobacco cases is not admissible.  Similarly, defendants may question plaintiff's expert Dr. Cunitz regarding whether he was hired by plaintiffs or defendants in other product liability cases, but not about the amount of payments he received.

[278]  *See Byers* pretrial tr. at 125-26 (Oct. 22, 2008); *Tamraz* pretrial tr. at 96-98, 131 (Nov. 1, 2007); *Goforth* pretrial tr. at 75-76 (Oct. 25, 2006); *Solis* pretrial tr. at 195 (May 16, 2006).

or are not tied to any testimony later offered by a witness.

The Court has denied these motions, observing that, even if the relevance of these comments is low, the risk of unfair prejudice is even lower; further, defendants, like plaintiffs, have a right to "personalize" their clients for the jury. The Court has cautioned defendants, however, that they: (1) may not engage in hyperbole; and (2) must offer proofs at trial to support any comments in opening statement regarding company policies.[279]

Plaintiffs have also moved to exclude defense counsel's assertion in opening statement that "Dr. Beintker probably got it wrong" when he reported, in 1932, that he found neurological injury in two welders. The Court has overruled this motion and allowed defendants to preview their evidence, so long as defendants subsequently adduce testimony to support their assertion.[280]

Finally, after defense counsel stated, in a *Welding Fume* trial, that defendants have "warned for over 40 years, before the law required it," plaintiffs filed a motion asking the Court to disallow this statement, because defendants have always had a duty to warn under common law. The Court directed defendants to modify their statement to "before OSHA required it," as opposed to "before the law required it," which is more accurate.[281]

---

[279] Similarly, when a plaintiff testifies to his lifestyle and general background, he is allowed to state he attends church and engages in religious activities; however, he is not allowed to suggest his religious adherence makes his testimony more credible, or to overemphasize this part of his background. *Byers* pretrial tr. at 250-51 (Oct. 22, 2008); *Cooley* pretrial tr. at 377 (Sept. 4, 2009).

[280] *See Byers* pretrial tr. at 164-66 (Oct. 22, 2008) (defendants noting that subsequent articles challenged Dr. Beintker's conclusions).

[281] *Byers* pretrial tr. at 72-73, 158 (Oct. 22, 2008).

174

**15.    Plaintiff's Motion to Exclude Videotaped Objections Made During Deposition Testimony – GRANTED.[282]**

During the course of the videotaped trial preservation depositions of witnesses who do not testify live at trial, questioning counsel is sometimes interrupted when opposing counsel makes objections. Plaintiffs have moved the Court to direct defendants to excise counsel's lodging of objections from any videotape shown to the jury, where the objections were either withdrawn (i.e., not presented to the Court for ruling) or denied by the Court.  The Court has granted this motion and ordered that this direction applies equally to both sides.

**16.    Plaintiff's Motion to Exclude Evidence that Plaintiff's Close Relatives are also Welders – DENIED.[283]**

Some of the *Welding Fume* plaintiffs have close relatives, such as a son or brother, who are also welders.  Plaintiffs have moved to exclude this evidence, arguing it is not relevant, while defendants respond that information the plaintiff told his relative about welding safety, such as whether to wear a respirator and so on, and the fact that these family members continue to weld despite knowledge of the plaintiff's alleged injuries, may have some relevance.  The Court agrees with defendants.

**17.    Plaintiff's Motion to Exclude Evidence that President Bush Welded at Lincoln Electric – GRANTED.[284]**

In 2008, President George W. Bush attended a fundraiser at defendant Lincoln Electric.  At this event, the President was shown how to use a computer to perform about 20 seconds of automated welding.

---

[282]  *See Byers* pretrial tr. at 128-30 (Oct. 22, 2008).

[283]  *See Byers* pretrial tr. at 132 (Oct. 22, 2008).

[284]  *See Byers* pretrial tr. at 153-54 (Oct. 22, 2008).

175

Plaintiffs ask that this evidence be excluded as irrelevant, and the Court has always granted this motion as unopposed.

### 18.    Defendants' Motion to Modify the Court's Earlier *Daubert* rulings – DENIED.[285]

Early in the history of this MDL proceeding, the Court held hearings on the admissibility of the opinions of a number of experts, applying the evidentiary standards set out in *Daubert*[286] and Federal Rule of Evidence 702.  The Court then issued a "*Daubert* opinion," which granted in part and denied in part the motions of the parties to exclude the testimony of each other's experts, including plaintiffs' experts Robert Cunitz, William Longo, Richard Parent, David Burns, and others.[287]

In each subsequent, individual *Welding Fume* bellwether trial, defendants have filed a motion asking the Court, essentially, to reconsider its *Daubert* rulings and to exclude entirely the testimony of these plaintiffs' experts.  It is apparent that defendants file this motion in each case simply to protect their appellate rights.  This Order makes clear that the Court will adhere to its *Daubert* rulings in every MDL bellwether case, and the defendants should not file a similar motion in each individual case for form's sake.

In addition, defendants have filed motions arguing that some of plaintiff's experts – especially Dr. Burns and Mr. Cunitz – have testified outside the boundaries allowed in the *Daubert* opinion, and asking the Court to preclude them from doing so at trial.  As the Court has explained, the boundaries continue to

---

[285]  *See Jowers* pretrial tr. at 9-10 (Jan. 23, 2008); *Tamraz* pretrial tr. at 6 (Nov. 1, 2007); *Goforth* pretrial tr. at 54-55, 67, 113 (Oct. 25, 2006).

[286]  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[287]  *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *6-8 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

apply in every MDL case, and defendants have an obligation to object contemporaneously at trial if they believe the expert is offering disallowed testimony.  Pretrial motions asking the Court to police live expert testimony beforehand on a question-by-question basis are not workable and should not be filed.[288]

**19.    Plaintiffs' Motion to Exclude Evidence Regarding Employers' "HazCom" Duties – DENIED.[289]**

Plaintiffs have sought to prevent defendants from eliciting certain testimony from their Industrial Hygiene experts regarding the Hazard Communication Standard ("HazCom"), 29 C.F.R. §1910.1200, which was promulgated by the Occupational Safety and Health Administration ("OSHA").  Plaintiffs assert the defendants' experts first discuss the duties, under HazCom, of employers to convey warnings to employees, and then "opine or insinuate" that the employers complied with the provisions of OSHA or HazCom.  Specifically, plaintiffs have argued that defendants intend to have their experts read portions of OSHA and HazCom to the jury and then testify to the jury: (1) what *they* think these regulations mean; (2) what *they* think the employers' obligations under the regulations are; and (3) whether *they* think the employers complied with those regulations.  Plaintiffs argue this is inappropriate because: (1) testimony explaining how a statute or regulation works and what it means invades the province of the Court; (2) testimony opining that an employer complied with its legal duties under HazCom invades the province of the jury; and (3) such testimony is wholly irrelevant anyway, because the manufacturer's duties to the plaintiff are separate from the employers' duties to its welder-employees.

---

[288]  *See Jowers* pretrial tr. at 42-47 (Jan. 23, 2008) (explaining this ruling).

[289]  *See Byers* pretrial tr. at 72 (Oct. 22, 2008);  *Byers* pretrial tr. at 278-79 (Oct. 23, 2008); *Tamraz* pretrial tr. at 64-66 (Nov. 1, 2007); *Goforth* pretrial tr. at 86-91 (Oct. 25, 2006); *Solis* pretrial tr. at 189-91, 193, (May 16, 2006); *Solis* pretrial tr. at 418-19 (June 4, 2006);  *Ruth* pretrial tr. at 49-60 (Aug. 30, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *10 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

In response, defendants argue that what the employers' duties are under HazCom, and whether the plaintiffs' employers met those duties, is highly relevant. Defendants assert that the question of what warnings were required depends on all the circumstances of the product-user and his environment, and those circumstances necessarily include what the manufacturer could reasonably expect an employer to tell its employees, as required under HazCom. For example, defendants note their warnings instruct employers of welders, as well as welding rod users, to refer to OSHA regulations and the MSDSs required under HazCom, "incorporating them by reference." Defendants also note that the "adequate ventilation" referred to in their warnings is necessarily provided by the employer, not the manufacturer, and the OSHA regulations make this clear.

The Court has concluded that the plaintiffs' motions to exclude evidence of employers' duties under HazCom must be denied, but the Court has added certain caveats. Testimony regarding HazCom requirements, and plaintiffs' employers' efforts to comply therewith, is relevant to many issues in a *Welding Fume* case, including: (1) the learned intermediary doctrine; (2) comparative fault (at least in some States); and (3) most important, what "all the circumstances" were surrounding the welding rod products' purchase and use. A central question in a *Welding Fume* case is whether defendants acted reasonably, under all the circumstances, in determining what warnings they needed to supply to the ultimate users of their welding rod products. These circumstances include the defendants' knowledge that the HazCom regulation existed, that employers had certain HazCom-related duties, and that some employers created "HazCom programs" to warn and educate their employees. Accordingly, the Court has ruled that defendants' witnesses may testify about *the defendants' understanding* of what HazCom required and how the defendants endeavored to meet those requirements. The court will be careful, however, to exclude any "ultimate conclusion testimony" opining whether a defendant did actually meet

any given legal requirement.  Further, the court will strictly limit any expert's attempt to explain the *meaning* of any terms or provisions in any statute or regulation, as opposed to simply what the statute or regulation says.

These limitations apply to both plaintiffs' and defendants' experts: an expert may not opine, for example, that a given warning or MSDS *did* meet regulatory or other legal standards, nor may he opine that it did *not*.  In sum, evidence regarding the existence of HazCom and an employer's efforts to comply with it are admissible, but a legal conclusion about what HazCom requires and whether an employer met those requirements is not.[290]  As with all the Court's *Daubert* and related evidentiary rulings limiting the areas about which experts may opine, it is the responsibility of counsel to object timely at trial if counsel believes a witness is not maintaining compliance.

### 20.    Plaintiff's Motion to Prohibit In-Court Requests for: Stipulations, Documents from Plaintiff's Files, and Demonstrations to the Jury – GRANTED.[291]

Plaintiffs have sought an Order directing that defendants be precluded from asking the plaintiffs for certain things in open court, including: (1) stipulations or agreements; (2) documents in plaintiffs' trial files; and (3) physical demonstrations before the jury.  Plaintiffs' concern is that a refusal of defendants' request in front of the jury might "look bad," even spiteful, especially if the refusal has a legitimate reason that plaintiffs are prohibited from revealing to the jury.  Defendants have not opposed this request, so long

---

[290]  The Court has also ruled that OSHA regulations, ANSI standards, and similar codes may be referred to at trial and shown to the jury; whether they are admissible as evidence and viewed by the jury during deliberations will depend on the particularized circumstances of the trial.  *See  Goforth* pretrial tr. at 20-22 (Oct. 27, 2006); *Solis* pretrial tr. at 417-18 (June 4, 2006).

[291]  *See Byers* pretrial tr. at 81, 247 (Oct. 22, 2008); *Jowers* pretrial tr. at 66, 85-89 (Jan. 23, 2008); *Tamraz* pretrial tr. at 130-31 (Nov. 1, 2007); *Goforth* pretrial tr. at 74-76 (Oct. 25, 2006); *Solis* pretrial tr. at 194-95 (May 16, 2006).

179

as it is made mutual, including plaintiff not engaging in physical demonstrations at his own counsel's request.  The Court has ruled accordingly.  This ruling does not preclude an attorney from asking counsel opposite for a copy of demonstrative evidence or an exhibit.[292]

### 21.  Motions to Exclude Evidence of the Parties' Litigation Documents – GRANTED.[293]

Both plaintiffs and defendants have filed motions to exclude from evidence documents they or the Court filed in this or related *Welding Fume* litigation, including: (1) motions and responsive briefing related to several matters (such as for sanctions, or for a court-ordered epidemiological study); (2) Court Orders resolving these motions or other matters; (3) a party's objections to discovery requests, or denials of requests for admission; and (4) orders issued by State courts in *Welding Fume* cases.

The Court has granted all of these motions, concluding this evidence does not help to establish any issue at trial.[294]  This ruling does not, however, apply to the following evidence contained in litigation documents, which is relevant and admissible: (1) positive discovery assertions, such as admissions and responses to interrogatories; (2) Fact Sheets; (3) Notices of Diagnosis; and (4) any amendments or

---

[292]  *See Goforth* trial tr. at 1751-52 (Nov. 8, 2006) (clarifying this point).

[293]  *See Byers* pretrial tr. at 144-45 (Oct. 22, 2008); *Jowers* pretrial tr. at 11, 14, 36, 56-65 (Jan. 23, 2008)*; Tamraz* pretrial tr. at 23-25, 130-32 (Nov. 1, 2007); *Goforth* pretrial tr. at 74, 107-08 (Oct. 25, 2006); *Solis* pretrial tr. at 198, 201, 205 (May 16, 2006).

[294]  "[T]he jury should not be informed about the judge's preliminary decisions concerning the admissibility of evidence."  1 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* '104.60[1] (2nd ed. 2005).  A Judge "should refrain from advising the jury of [her] findings" because it "is likely to influence strongly the opinion of individual jurors when they come to consider their verdict and judge the credibility of witnesses."  *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979).  "A party cannot read into evidence a party's denial of or refusal to admit a fact.  A denial or refusal to answer is no evidence of any fact."  Michael C. Smith, *O'Connor's Federal Rules: Civil Trials* 405 (2006).

180

supplements to these documents (e.g., an amended Fact Sheet with changed answers).[295]

**22.    Plaintiff's Motion to Exclude References that Impugn Motives of Counsel, Denigrate the Basis for Fees, and to Richard Scruggs – GRANTED.[296]**

Plaintiffs have asked the Court to prohibit defendants from seeking to elicit information that impugns the motives of plaintiffs' counsel.  Specifically, plaintiffs seek to exclude from trial the following matters: (1) any reference to the criminal guilty pleas or criminal actions of Richard Scruggs, who was formerly Plaintiffs' co-lead counsel, or his associates; (2) any suggestion that the *Welding Fume* MDL is a "lawyer-made epidemic," or that the plaintiff's claim was "lawyer-generated" or came through "marketing" by attorneys; (3) any observation that plaintiffs' counsel get paid on a contingent basis; (4) any suggestion that plaintiffs sued defendants only because they have "deep pockets;" and (5) any suggestion that plaintiffs are pursuing *Welding Fume* litigation because asbestos or silica litigation has "dried up."  The Court has granted this motion, most aspects of which defendants have not opposed, concluding that none of these matters are relevant to any issue at trial.

---

[295]  Fact Sheets may need to be redacted before publication to the jury or submission during deliberations.  *See Byers* trial tr. at 3404-05 (Nov. 21, 2008).

[296]  *See Byers* pretrial tr. at 80-83 (Oct. 22, 2008); *Jowers* pretrial tr. at 65, 67-68, 133-41 (Jan. 23, 2008); *Tamraz* pretrial tr. at 69, 130-32 (Nov. 1, 2007);*Goforth* pretrial tr. at 76-7 (Oct. 25, 2006); *Goforth* trial tr. at 2162-66 (Nov. 13, 2006); *Solis* pretrial tr. at 144, 194-95 (May 15 & 16, 2006).

**23.    Plaintiff's Motion to Exclude References that the Plaintiff Violated Workplace Safety Rules – DENIED.**[297]

If there exists evidence that a *Welding Fume* plaintiff violated any of his employers' workplace safety rules, defendants generally want to introduce it at trial, while plaintiffs seek to exclude it as irrelevant.  Unless the evidence is excessively prejudicial, the Court has ruled that this evidence is admissible as relevant to the question of proximate cause.  That is, evidence of whether the plaintiff ignored *other* safety warnings given him by his employer is relevant to show whether he would have paid attention to and heeded a better welding fume warning – which, in turn, is relevant to the question of causation.

**24.    Plaintiff's Motion to Exclude Evidence of Stressors – DENIED IN PART.**[298]

In every *Welding Fume* trial, the plaintiff has sought to exclude evidence of various private aspects of his personal and family life.   This evidence includes, for example, allegations of plaintiff's violent behavior (both domestic and otherwise), suicidal thoughts and depression suffered by himself or other family members, illegal drug use by himself or other family members, criminal history, alcoholism, and so on.

As a general matter, much of this evidence is admissible.  Plaintiffs normally seek damages for emotional distress; accordingly, defendants are entitled to show that the plaintiff's emotional distress was caused by stressors in his life other than the symptoms of his parkinsonism.  Similarly, the plaintiff usually

---

[297] *See Byers* pretrial tr. at 124-25, 134-44, 233-43 (Oct. 22, 2008); *Jowers* pretrial tr. at 89 (Jan. 23, 2008); *Tamraz* pretrial tr. at 143-44 (Nov. 1, 2007);

[298] *See Byers* pretrial tr. at 132-33 (Oct. 22, 2008); *Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313); *Jowers* pretrial tr. at 104 (Jan. 23, 2008); *Solis* pretrial tr. at 201 (May 16, 2006); *Ruth* pretrial tr. at 72-78, 140 (Aug. 8, 2005); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *5 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

asserts that depression is one of the symptoms of his manganese-induced parkinsonism ("MIP"); accordingly, defendants are entitled to adduce evidence of alternative causation of depression by other stressors, and that the plaintiff's depression predated his neurological diagnosis.  Defendants are also entitled to adduce limited evidence of: (1) depression or suicide in plaintiff's immediate family, because depression can be familial; and (2) a plaintiff's own alcoholism, which can be tied to depression and also to relevant physical symptoms, such as tremor.

On the other hand, the Court will ensure that any such references to stressors in plaintiff's life, or other aspects of plaintiff's personal history, are strictly limited, to ensure the plaintiff is not subjected to unnecessary embarrassment or prejudice or invasion of privacy.  Further, the Court will normally exclude evidence related to the behavior of the plaintiff's *friends and family* (such as the drug use or criminal history of plaintiff's adult child) as too tenuously linked to plaintiff's *own* behavior and mental state, unless defendants can establish a strong, direct, relevant, and non-prejudicial evidentiary link.  Also, while the Court may allow evidence of financial difficulties as contributing to the plaintiff's depression, it will not allow any suggestion that financial difficulties motivated the plaintiff to file his lawsuit.

### 25.    Plaintiff's Motion to Exclude Duplicative or Cumulative Expert Testimony – DENIED.[299]

Plaintiffs sometimes file a motion asserting that defendants have named a surfeit of expert witnesses, who will give overlapping testimony.  Plaintiffs ask the Court to order that defendants present only one expert on any given subject, and suggest defendants have actually designated too many experts as a ploy, to exhaust plaintiffs' counsel and funds.

---

[299] *See Byers* pretrial tr. at 75-76 (Oct. 22, 2008); *Tamraz* pretrial tr. at 93-94 (Nov. 1, 2007); *Solis* pretrial tr. at 187-88 (May 16, 2006).

The Court has denied these motions.  Generally, there is nothing wrong with adducing testimony from multiple experts on related (or even the same) topics, especially in an MDL, where there are core-experts and also case-specific experts.  Thus, rather than enter a pretrial Order limiting defendants' use of expert witnesses, the Court has dealt with this issue by citing to Fed. R. Evid. 611(a) as authority for limiting at trial any duplicative expert testimony via sustaining objections, giving *sua sponte* cautions to counsel, or even terminating counsel's questioning.  Further, because the Court has imposed limits on each side's total trial time, counsel already has an incentive (beyond keeping the jury's attention) to curtail duplicative testimony.

### 26. Plaintiff's Motion to Exclude Evidence Regarding Expert David Kahane's Wife – GRANTED.[300]

*Welding Fume* plaintiffs frequently call David Kahane as an expert witness on industrial hygiene. Mr. Kahane founded a company called Forensic Analytical, and Mr. Kahane's wife, Michelle, was an employee.  Several years ago, Mrs. Kahane was slated to offer forensic testimony in connection with a California state court criminal case, known as *Singh*, but she removed herself as a witness after questions arose regarding her qualifications.  Plaintiffs have sought to exclude as irrelevant any evidence regarding Mrs. Kahane's removal from *Singh* or the reasons therefor.  The Court has granted this motion, which defendants normally have not opposed.[301]

---

[300] *See Byers* pretrial tr. at 154-56 (Oct. 22, 2008).

[301] On a related note, the Court granted a motion by defendants to preclude Kahane from testifying that his parents are holocaust survivors.  *Cooley* pretrial tr. at 336 (Sept., 2, 2009).  On the other hand, Kahane is permitted to testify that the defendants approached him and considered hiring him as a consultant in this *Welding Fume* litigation.  *Id.* at 337-38.

27. **Plaintiff's Motion to Bar Testimony that Manganese in Welding Fume Cannot Reach the Brain, and Testimony that Manganese in Welding Fume Cannot Cause Injury to the Brain – GRANTED IN PART.**

The defendants' position regarding general causation has evolved during the course of this MDL. Initially, defendants took the position that exposure to welding fumes simply could not cause neurological injury. In particular, in their initial "Scientific & Technical Presentation" to the Court, defendants asserted that: (1) manganese particles in welding fumes have extremely low solubility and so are not bio-available to cells in the human body; (2) the body's normal defense mechanisms quickly isolate and excrete virtually all of the manganese particles in welding fumes that a welder might ingest; and (3) any manganese particles in welding fumes that do enter the blood stream never cross the "blood-brain barrier," and so cannot cause neurological injury.[302]

Later, in response to plaintiffs' request for admission that "overexposure to manganese in welding fumes can affect the central nervous system and can cause symptoms similar to Parkinson's Disease," defendants stated:

It is possible that sustained exposure to manganese in welding fume in quantities far in excess of OSHA's PEL and the ACGIH's TLV could affect the central nervous system and thereby could cause a movement disorder known as manganism, a form of parkinsonism that can be distinguished clinically, radiologically, pharmacologically and pathologically from Parkinson's disease and other movement disorders. * * * Whether this occurs, and at what exposure level, has not been established by reliable scientific evidence.[303]

While admitting that neurological injury from welding fume exposure was "possible," defendants still

---

[302] These assertions were made by defense expert toxicologist Dr. Ken Reuhl in a video "science tutorial" presentation created by defendants for the Court submitted on December 22, 2003.

[303] *See Solis* pretrial tr. at 134-44, 192 (May 15 & 16, 2006) (discussing this admission).

185

disagreed with plaintiffs whether, and the extent to which, it ever actually did so.[304]

During the course of subsequent litigation, moreover, defendants' own expert neurologists explicitly conceded that manganese particles in welding fumes *are* bio-available, *do* enter the blood stream, and *can* cross the blood-brain barrier.  Further, these experts conceded that welders *can* get Manganese-Induced Parkinsonism from welding fume exposure.[305]

Defendants currently take the position that, although welding fume exposure can cause a welder to suffer neurological injury in the most egregious of circumstances (e.g., if a welder suffers extremely high exposure to high-manganese fumes in enclosed areas for a prolonged period of time), those circumstances are so rare that it virtually never happens.  This position is not strictly at odds with

---

[304]  *Id.*; *see also Goforth* pretrial tr. at 24 (Oct. 25, 2006):

| The Court: | But we all agree [that manganese in welding fumes] gets in the blood, it can cross the blood-brain barrier, and your primary debate from the defendants' side is – |
| [Plaintiff's Counsel]: | How much. |
| The Court: | – under what circumstances that can happen, and to what extent that can happen? |
| [Defense Counsel]: | Yeah. |

[305]  These concessions were made by defense expert neurologists Dr. Warren Olanow and Dr. Anthony Lang during *Daubert* hearings and bellwether trials.  *See, e.g., Tamraz* trial tr. at 498 (Nov. 5, 2007) (video clip of testimony by Dr. Lang):

| "Question: | You believe that welders can get Manganese Induced Parkinsonism from welding fumes? |
| "Answer: | Yes. |
| "Question: | That has been proven to your satisfaction in the literature? |
| "Answer: | Yes.  I think there are enough patients with features that are sufficiently convincing that I believe that, yes." |

*See also Solis* trial tr. at 3021-22 (same); core expert decl. of Karl Kieburtz at 6 ("it is biologically plausible that exposure to certain welding fumes, and hence manganese could possibly lead to [a parkinsonian neurological] syndrome") (master docket no. 1601, exh. A); Gordon Sze depo. at 283 (agreeing that "it is reasonable to conclude that manganese accumulates in the brain from exposure to welding fume") (Mar. 4, 2005); *Jowers* trial tr. at 619-20 (Feb. 11, 2008) (defense expert neurologist Dr. Howard Hurtig agreeing that "manganese from welding fume accumulates, can accumulate in the part of the brain that controls movement" and "can cause Manganese-Induced Parkinsonism").

defendants' experts' concessions that manganese in welding fume can reach the brain and can cause brain injury.

In any event, given the admissions quoted above and the concessions that defendants' experts have made at trial, this motion in limine must be granted in large part.  While defendants may continue to argue that welding fume exposure can cause a welder to suffer neurological injury only in rare and severe circumstances, they may not argue that welding fume exposure cannot cause neurological injury under any circumstances.  This ruling does not, however, preclude a defense expert from opining he still believes it has not been proved to his own satisfaction that welding fumes can cause neurological injury – that is, he may disagree with multiple other defense experts on this point.[306]

### 28.    Plaintiff's Motion to Exclude Certain Testimony Regarding the "Taiwanese Cohort" – GRANTED IN PART.[307]

A number of the many medical articles relied upon by the parties' experts at trial address what is known as the "Taiwanese Cohort," a group of Taiwanese workers who were exposed to high levels of manganese in a smelting plant.  Several of these workers suffered severe cases of manganism, and several articles have been published that follow the progression of their disease.

Some of defendants' witnesses have sought to express opinions that: (a) there have been no

---

[306] In other words, despite the admissions of defendants' experts that manganese in welding fume can cause neurological injury, a particular expert may maintain an opinion otherwise.  As the Court explained regarding defense toxicology expert Dr. Furbee: "regarding Dr. Furbee's opinion that it has not been proved that welding fumes can cause neurological injury: Dr. Furbee may testify he does not believe this is proved based on his review of the literature; however, he may not testify that he has personally concluded there is no connection between welding fume exposure and neurological injury, as he has not done any independent toxico-neurological studies."  *Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

[307]  *See  Byers  v. Lincoln Elec. Co.*, 2008 WL 4849339 at *4 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

187

additional manganism cases arising from the Taiwan smelting plant since the time the original "Taiwanese Cohort" was discovered in 1980; and (b) the asymptomatic workers discussed in Dr. Kim's 1999 article about the Taiwanese smelting plant remain asymptomatic today.  The Court has ruled, however, that a defense expert is permitted to opine only that: (1) no additional cases of manganism arising from the Taiwan smelting plant were ever *reported*, and (2) if additional cases had occurred, he believes they probably would have been reported.

### 29.  Plaintiff's Motion to Prohibit Use of His Video Deposition to Show His Movement Disorder – GRANTED IN PART.[308]

In every *Welding Fume* bellwether case so far, the plaintiff has agreed to undergo a physical examination by a medical expert hired by defendants – defendants have never had reason to file a motion for Order permitting a physical examination pursuant to Fed. R. Civ. P. 35.  The Court has not seen the agreements between the parties regarding these medical examinations, but the parties have explained that one of the provisions in their recent agreements is that the medical examination will not be videotaped.[309]

---

[308]  *See Byers* pretrial tr. at 49-51 (Oct. 22, 2008); *Jowers* pretrial tr. at 91-103 (Jan. 23, 2008); *Tamraz* pretrial tr. at 133-35 (Nov. 1, 2007).

[309]  This agreement is based in part on the Court's informal statement to the parties that, if asked, the Court was not inclined to allow videotaping of an independent medical examination ("IME") unless it was normal procedure for the examining doctor to do so.  In different cases, the parties have reached different agreements as to whether the IME may be audio-taped.  Where the parties cannot agree, the Court will not order audio-taping of the IME, absent unusual circumstances.  *See Lerer v. Ferno-Washington, Inc.*, 2007 WL 3513189 at *2 (S.D. Fla. Nov. 14 2007) (plaintiffs must establish "good cause" for recording of an IME beyond "the potential bias of a physician selected by any defendant conducting an examination of a plaintiff"); *Calderon v. Reederei Claus-Peter Offen GmbH & Co.*, 258 F.R.D. 523 (S.D. Fla. 2009) (recording is not "typically necessary or proper" and, although recording might "avoid discrepancies that may arise over statements made by Plaintiff during the examination in response to the examining physician's inquiries," these issues will arise in every IME; thus, recording is appropriate only in unusual circumstances); *Hertenstein v. Kimberly Home Health Care, Inc.*, 189 F.R.D. 620 (D. Kan. 1999).

In contrast, the plaintiff's discovery deposition often is videotaped.

Each plaintiff has moved to preclude the defendants from using his deposition videotape during trial as demonstrative evidence to show the jury details of his movement disorder, such as presence or absence or type of hand tremor.  Plaintiffs assert that such use of the deposition videotape would be antithetical to the parties' Rule 35 agreement.  Defendants respond that, when relevant, video depositions are normally allowed to show explanatory gestures, body language, and so on, and they should be allowed to use the videotape in this way; however, defendants do not answer directly the contention that this use of the deposition videotape is contrary to the parties' agreement.

The Court has ruled that defendants may show the jury excerpts of the plaintiff's videotaped deposition only under limited circumstances.  For example, defendants may show video-clips on cross-examination to rebut or impeach the plaintiff and his medical witnesses regarding descriptions of the plaintiff's symptoms.  Defendants may also use such video-clips on direct examination of their own expert medical witnesses, but must: (1) designate those portions before trial, so that the Court and plaintiffs' experts can be aware of the intended scope of such use (which defendants have stated would be limited); and (2) request permission at side-bar to use a video-clip before actually doing so.  The Court reserves the right to rule on defendants' use of these video-clips on an instance-by-instance basis.[310]

Separately, plaintiffs have moved to preclude defendants' witnesses from testifying that refusing to be videotaped can be a clue that the patient is feigning his illness, or suggesting that the plaintiff "refused" to allow videotaping of his examination.  Given that the parties have *agreed* that the plaintiff's medical examinations will not be videotaped, this motion is granted.

---

[310]  These requirements apply specifically to video-clips of the plaintiff.  As a general matter, the parties may use earlier statements by a witness for purposes of impeachment without having designated them in advance.  *See Cooley* pretrial tr. at 357-58 (Sept. 4, 2009).

30.　　▸ **Plaintiff's Motion to Exclude any Reference to the Danish and Swedish Studies –
DENIED.**
▸ **Plaintiff's Motion to Exclude Hearsay Connected to the Danish and Swedish Studies
– GRANTED.**[311]

Since the beginning of this MDL, the Court has repeatedly addressed a number of issues related

to two epidemiological studies known as the Danish and Swedish Studies.[312]  Defendants provided funding

for both studies, and both studies concluded there was no link between welding and parkinsonism.

Recitation of the full and complicated background of the issues related to the Danish and Swedish Studies

is beyond the scope of this Order; it suffices to say there were discovery issues related to the two Studies

serious enough to give the Court reason to exclude any reference to them at any MDL trial.  Rather than

exclude them (as it could have), however, the Court concluded the Studies would be admissible and

reference to them by defendants allowed, but that plaintiffs would have "free rein on cross examination,"

including leeway to ask about a long series of issues that went to the credibility of those studies.[313]  Since

the time the Court issued this admissibility ruling, the ruling has applied (and will continue to apply) to

---

[311]  *See Byers* pretrial tr. at 198-208 (Oct. 22, 2008); *Byers v. Lincoln Elec. Co.*, 2008 WL 4849339
at *5 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313); *Jowers* pretrial tr. at 105 (Jan. 23, 2008); *Tamraz*
pretrial tr. at 147-60 (Nov. 1, 2007); *Goforth* pretrial tr. at 158-60 (Oct. 25, 2006); *Goforth* pretrial tr. at
182-218 (Oct. 30, 2006); *Goforth* trial tr. at 222-230 (Oct. 31, 2006).

[312]  The Court and the parties have referred to these studies by various names, including the "Fryzek
Studies," the "Scandinavian Studies," the "Swedish Study," and the "Danish Study."  The two studies are:
(1) Jon Fryzek, *et al., A Cohort Study of Parkinson's Disease and other Neurodegenerative Disorders*,
47(5) J. of Occupational & Environmental Medicine 466 (2005) (the "Danish Study"); and (2) C. Fored,
*et al., Parkinson's Disease and Other Basal Ganglia or Movement Disorders in a Large Nationwide
Cohort of Swedish Welders*, 63 J. of Occupational & Environmental Medicine (2006) (the "Swedish
Study").
　　Evidentiary and discovery issues related to the Scandinavian studies have received extensive
attention from the Court, during multiple proceedings over the course of several years.  Perhaps more than
with any other issue addressed in this Order, the summary here regarding admissibility of evidence related
to the Scandinavian studies cannot be fully understood absent review of the many actual, full rulings,
themselves.

[313]  *See Goforth* trial tr. at 223-25 (Oct. 31, 2006).

every MDL case.

Later, defendants supplied some of their experts with various materials that, essentially, were meant to rehabilitate the studies.  For example, one of the issues about which plaintiffs were allowed to inquire on cross-examination was possible incomplete data and coding errors.  After the Court's ruling allowing this cross-examination, counsel for defendants obtained declarations and emails from the studies' authors attesting that any coding errors had been corrected; counsel then supplied this information to their experts in preparation for a subsequent trial.  Plaintiffs moved to exclude any reference to these "rehabilitation materials" (which filled three binders), arguing all of it was hearsay and was not the sort of information upon which an expert would normally rely.  The Court ultimately agreed with plaintiffs – an expert neurologist relying upon a published epidemiological study would not normally also rely upon, for example, an email from the study's author to an attorney, sent well after the publication date, explaining that coding errors in the study had been corrected.  The Court noted, moreover, that plaintiffs had sought this information repeatedly, but defendants never produced it until their belated effort at rehabilitation.  Accordingly, the Court excluded all of this evidence.

### 31.     Defendants' Motion to Exclude Evidence Related to Dr. Bowler's Studies or Opinions – GRANTED IN PART.

During the early discovery phase of the MDL, the Court ruled that any expert called to testify by a party was required to produce data that the expert had obtained in connection with any welding-fume-related medical or scientific study the expert was conducting.  Plaintiffs had retained Dr. Rosemary Bowler as an expert in neuropsychology, and Dr. Bowler was in the process of conducting a study of welders.  Dr. Bowler refused to produce the study data in discovery, however, so plaintiffs agreed not to use her as an

expert or refer to the studies she performed during her retention.[314]  The Court has enforced this agreement.

Notably, however, this agreement pertained only to studies Dr. Bowler pursued during her retention by plaintiffs.  Nothing precludes reference by the parties to any studies Dr. Bowler conducted after her association with the plaintiffs ended.  Thus, despite their own motion seeking to exclude reference to Dr. Bowler's earlier studies, defendants have referred at trial to subsequent studies published by Dr. Bowler.  Of course, this opens the door to plaintiffs' reference to those same studies, and defendants are also allowed to note that Dr. Bowler had earlier been retained as an expert by plaintiffs.[315]

### 32.    Plaintiff's Motion to Exclude Evidence of "Incorrect" Diagnoses of MIP by Dr. Nausieda – GRANTED IN PART.[316]

Dr. Paul Nausieda is one of plaintiffs' expert neurologists, who is also a treating physician.  Plaintiffs hired Dr. Nausieda early during the course of this MDL to screen welders for manganese-induced parkinsonism ("MIP"), so he has examined thousands of welders, and he has formally diagnosed a large number of them with MIP.  One way that defendants have sought to attack Dr. Nausieda's credibility is to identify instances where he diagnosed a welder with MIP but was subsequently proved wrong.  Specifically, in the MDL bellwether trial of *Byers*, defendants proffered testimony from Dr. Daniel Perl, who is a neuropathologist, regarding the autopsy results of four patients whom Dr. Nausieda diagnosed with MIP; Dr. Perl asserted the pathological examination of the brain tissue from these patients

---

[314]  *See Ruth* pretrial tr. at 10, 95 (Aug. 30, 2005); *Goforth* trial tr. at 817, 832-35, 934-40 (Nov. 2, 2006).

[315]  *See Jowers* trial tr. at 1724-26, 1740, 1748 (Feb. 20, 2008); *Byers* trial tr. at 918-19, 928-30, 944, 1052 (Nov. 6, 2008).

[316]  *See Byers* pretrial tr. at 290-312 (Oct. 23, 2008); *Tamraz* pretrial tr. at 145-46 (Nov. 1, 2007); *Cooley* pretrial tr. at 276-83 (Sept. 2, 2009); *Cooley* dkt. no. 274 at 16-21.

confirm they suffered from other forms of parkinsonism and *not* MIP.  As have many of the neurologists who have testified before the Court, Dr. Nausieda agrees that pathological examination is generally the "gold standard" for diagnosing which form of parkinsonism a patient suffered; clinical examination is normally considered less accurate.[317]

The four Nausieda patients at issue are known as Bollato, Edwin, Patricia, and Bassham (a/k/a the "Prion Case").  Plaintiffs have argued Dr. Perl's testimony regarding these patients should not be admitted because it is based on inadmissible hearsay, is not accurate, and is not relevant.  For example, plaintiffs note that Dr. Perl did not, himself, perform a neuropathological examination of Edwin, Bassham, or Patricia, nor did he, himself, view their brain tissue slides.  Rather, Dr. Perl: (1) merely read the report of another neuropathologist regarding Edwin, which concluded the patient suffered a neurogenic disease known as MSA; (2) read a worker's compensation order connected to Bassham, which supposedly suggested Dr. Nausieda admitted his patient suffered from Prion's Disease and not MIP; and (3) read the report of another neuropathologist regarding Patricia, which *agreed* with Dr. Nausieda's diagnosis of MIP, but Dr. Perl believes the other doctor's examination was incomplete and incorrect.  Even as to Bollato, upon whom Dr. Perl did perform a neuropathological exam, plaintiffs have argued Dr. Perl's opinion is ultimately not relevant to whether the *Welding Fume* plaintiff at issue has MIP.

The Court ultimately found that neuropathological evidence regarding the type of disease suffered by patients diagnosed by Dr. Nausieda as having MIP is relevant and admissible, but that Dr. Perl could not offer pure litigation-related opinions based on hearsay pathology reports.  Specifically, the Court

---

[317] *See Daubert* hearing tr. at 43, 50 (Apr. 19, 2005); *Byers* pretrial tr. at 296 (Oct. 23, 2008). While it is generally true that pathological examination at autopsy of a patient's brain tissue is considered the "gold standard" for diagnosing the form of parkinsonism from which the patient suffered, this assertion is not unassailable.  *See* Ryan Uitti, *et al., Is the Neuropathological 'Gold Standard' Diagnosis Dead? Implications of Clinicopathological Findings in an Autosomal Dominant Neurodegenerative Disorder*, in 10 PARKINSONISM & RELATED DISORDERS 461, 462 (2004).

concluded that: (1) Dr. Perl could testify regarding his own neuropathology findings on Bollato; (2) defendants could question Dr. Nausieda about whether he believed he had mis-diagnosed the Prion case, and could introduce documents connected with the worker's compensation case through Dr. Perl to support a mis-diagnosis argument, if Dr. Nausieda denied it; and (3) Dr. Perl could not testify about the hearsay neuropathology reports of Edwin or Patricia.  The Court also concluded that defendants could ask Dr. Nausieda about a supposed admission that he had mis-diagnosed Edwin.[318]

Following these rulings in the MDL bellwether trial of *Byers*, defendants sought reconsideration in the MDL bellwether trial of *Cooley*, relying on new grounds.  Specifically, defendants asserted a new argument: the "hearsay" autopsies of Bollato and Edwin are actually business records upon which their new expert neurologist, Dr. Watts, was allowed to rely.  Defendants cited a number of cases where autopsy reports were, in fact, admitted as business records pursuant to Fed. R. Evid. 803(6).

The Court denied defendants' motion, however, noting that all of these cases involved autopsies performed by independent coroners or medical examiners.[319]  It is one thing to admit, as a business record, evidence of an autopsy done in the normal course of government activity (such as by a coroner), and entirely another to admit autopsy results or interpretations performed by a well-paid defense expert for litigation purposes.  It is "[a]n employer's *independent motivation* for creating and maintaining reliable business records [that] obviates the need for sworn testimony and cross-examination," which otherwise

---

[318] *See also Byers* trial tr. at 2969-72 (Nov. 19, 2008) (the Court suggesting stipulations regarding Dr. Perl's testimony on this issue).

[319] *See, e.g., United States v. Feliz*, 467 F.3d 227, 237 (2nd Cir. 2006) (government used autopsies performed by New York Medical Examiner to prove defendant conspired to commit homicide); *Wood v. Valley Forge Life Ins. Co.*, 478 F.3d 941, 945-46 (8th Cir. 2007) (official coroner's autopsy report admitted as evidence in trial over insurance proceeds).

194

normally must support admission of a document.[320]  Allowing defense expert Dr. Watts to discuss defense expert Dr. Perl's autopsy results of Bollato would be to ignore the requirement that the author of the autopsy have a motivation for reliability independent of the litigation.  The same was true regarding Dr. Watts's proposed discussion of some other unknown pathologist's non-official autopsy results of Edwin. Accordingly, the Court granted plaintiffs' motion in *Cooley* to limit Dr. Watts's testimony regarding autopsies of Dr. Nausieda's patients, adhering to the prior rulings in *Byers*.

As the parties obtain new evidence of additional autopsies performed upon Dr. Nausieda's patients, the Court will apply the same general rules regarding admissibility.

### 33.    Defendants' Motion to Exclude Reference to Dr. Lang's Diagnoses of Other MDL Plaintiffs – GRANTED.[321]

Defendants have employed Dr. Anthony Lang as an expert neurologist in four *Welding Fume* bellwether cases so far: *Morgan*, *Solis*, *Tamraz*, and *Byers*.[322]  In all but *Tamraz*, Dr. Lang diagnosed the plaintiff with psychogenic tremor, which Dr. Lang, himself, describes as a rare condition.[323]  Defendants have moved to exclude the fact that Dr. Lang has diagnosed other *Welding Fume* plaintiffs with psychogenic tremor for the purpose of suggesting that he "over-diagnoses" this condition.  Defendants assert that, if this evidence is allowed, it would make for several trials-within-a-trial, as defendants would

---

[320]   *Cobbins v. Tennessee Dept. of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009).

[321]   *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).

[322]   Defendants also employed Dr. Lang in the *Mann* trial, which was tried before Judge Dowd.

[323]   *See Solis* trial tr. at 3007, 3070 (June 19, 2006); *Byers* trial tr. at 2601 (Nov. 8, 2008).  Other experts also characterize psychogenic tremor as rare.  *See Goforth* trial tr. at 2058 (Nov. 9, 2006) (Dr. Swash testifying that psychogenic parkinsonism is "a very rare condition"; *Solis* trial tr. at 1320 (June 8, 2006) (Dr. Louis testifying that one in a thousand patients might have psychogenic parkinsonism).

be entitled to introduce rebuttal evidence showing the bases for all of Dr. Lang's diagnoses of psychogenicity.

The Court has granted this motion.  This ruling, of course, is in contrast to the ruling described immediately above, which allows defendants to attack plaintiff's expert Dr. Nausieda's diagnoses of MIP. The critical difference is that the information used by defendants to attack Dr. Nausieda's diagnoses include his own admissions and also the relatively objective information obtained through neuropathological examination; in contrast, plaintiffs' attacks on Dr. Lang's diagnoses rely solely on the rarity of psychogenicity and his apparent post-retention penchant for diagnosing it.  The Court has noted, however, that its ruling regarding the admissibility of Dr. Lang's other diagnoses was made "at this precise juncture" – the Court explained that, while "the number of [Dr. Lang's] other diagnoses of psychogenic parkinsonism does not provide a sufficient basis to show bias" at this time, this factor "may change in the future."[324]

**34.**      ▸ **Plaintiffs' Motion to Exclude Evidence Tendered by Defense Expert Mr. Chute – GRANTED IN PART.**
      ▸ **Plaintiffs' Motion to Exclude Testimony from Plaintiffs' Expert Mr. Ewing – DENIED.**[325]

The first MDL bellwether case involved plaintiff Charles Ruth.  Defendants and plaintiffs each retained an expert industrial hygienist in *Ruth*, and each expert issued a report offering an opinion

---

[324]   *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).  In other words, the fact that Dr. Lang diagnosed three out of four welders with psychogenic parkinsonism is not sufficiently probative; if he later reaches the same diagnosis for, say, 9 out of 10 welders, the probative value may change.

      Separately, the Court ruled that plaintiffs may not cross-examine Dr. Lang with a statement he made to plaintiff Tamraz suggesting Tamraz should consult with a movement disorder specialist unaffiliated with the *Welding Fume* litigation.  *Byers* trial tr. at 2698-700 (Nov. 18, 2008).

[325]   *See Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *4 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313).; *Tamraz* trial tr. at1344-49 (Nov. 9, 2007).

regarding whether Ruth had ever suffered welding fume exposures above the ACGIH's TLV of 0.2 mg/m[3]. Defendants' expert, Daniel Chute, opined that Ruth's exposures, on average, did not exceed the TLV.[326] In contrast, plaintiffs' core expert, Charles Ewing, wrote that a welding fume survey performed at Ruth's place of employment revealed that Ruth likely suffered exposures in excess of both the TLV and OSHA's PEL.[327]

Ruth's case was settled before trial, but evidence regarding his diagnosis and exposures often continues to come up in other *Welding Fume* trials.  Even before his case settled, Ruth was made the subject of a medical article: Ahmed Sadek, *et al., "Parkinsonism Due to Manganism in a Welder,"* 22 Int. J. Toxicol., 393, 393 (2003).  During the subsequent MDL welding fume trial of *Tamraz*, defendants' expert neurologist, Dr. Anthony Lang, was asked in deposition by plaintiff's counsel: "Do you believe the Sadek report to be a credible and reliable case report of a welder who developed Manganese-Induced Parkinsonism?"  Dr. Lang responded: "Yes.  I believe that this is a credible example of the case of Manganese-Induced Parkinsonism."[328]  Because this statement is an admission of one of defendants' experts that a welder can contract MIP, even after suffering relatively low manganese fume exposures, plaintiffs use Dr. Lang's statement to cross-examine other defense witnesses who assert this circumstance cannot happen.

Defendants have sought to counter plaintiffs' use of Dr. Lang's statement by introducing: (1) statements from plaintiff-expert Ewing's report that Ruth's exposures were high; (2) statements from

---

[326]  *See Jowers* trial tr. at 1783-84 (Feb. 20, 2008) (Chute wrote that Ruth's "maximum average exposure would not have exceeded 0.1 mg/m³").

[327]  *See Byers* trial tr. at 1322-29 (Nov. 10, 2008) (Ewing wrote that "the range of exposures to manganese in these welders was from 0.22 - 5.3 mg/m³, calculated as an eight hour time-weighted average").

[328]  *See Jowers* trial tr. at 625-26 (Feb. 11, 2008).

197

defense-expert Chute's report explaining the assumptions underlying the conclusion that Ruth's exposures did not exceed the TLV; (3) statements from defense-expert Chute's deposition explaining these same assumptions; and (4) statements made by Ruth in deposition regarding his exposures. Plaintiffs have objected to the use of this evidence to explain and allegedly weaken the conclusion that defendants' own expert, Chute, reached in *Ruth*.

The Court ruled that those portions of Chute's expert report that outline the assumptions he made in reaching his conclusions about Ruth's exposures are admissible under the rule of completeness. The proposed portions of Chute's deposition transcript are not admissible, however, as the rule of completeness does not apply to statements offered to contradict or expand upon those appearing in the report, and the deposition statements are otherwise hearsay. The same is even more true regarding statements contained in Ruth's own deposition transcript, as they cannot possibly "complete" Chute's opinions. Finally, the statements contained in Ewing's report on Ruth is admissible against plaintiffs as an admission, as he is one of plaintiffs' core experts.

### 35. Plaintiff's Motion to Exclude Irrelevant Evidence Related to the Government Contractor Defense – GRANTED.

In cases where none of the plaintiff's employers were government contractors, the plaintiff always moves for exclusion of any evidence related solely to the government contractor defense. These motions are always granted as unopposed.

### 36. Motions to Exclude Case-Specific Testimony from Core Experts – GRANTED.

Both plaintiffs and defendants designated a number of "core experts" whom they might call as witnesses in any MDL trial "to offer testimony that is generally applicable in support of [the party's]

position in more than one of the [MDL cases]."[329]  The Court has ruled that, unless a core expert timely provides a supplemental, *case-specific* expert report, his admissible opinions are limited to those stated in his *core* expert report – he may not offer plaintiff-specific opinions.  This rule extends to preclude a core expert from offering an opinion about a "hypothetical patient" who has the same symptoms or test results as the plaintiff.[330]  This rule does not, however, foreclose defendants from cross-examining a plaintiff's core expert with case-specific questions (that is, challenging whether the plaintiff's core expert's general opinion applies to the particular circumstances of plaintiff's case).

37.  ▸ **Motions to Exclude Cross-Examination of Experts with Statements Made by Other Experts – DENIED in part.**
▸ **Motions to Exclude Hearsay Statements of Experts – GRANTED.**

Plaintiffs and defendants have both moved to exclude the other side's use of statements made by one expert to cross-examine another expert.  For example, plaintiffs have moved for an order prohibiting defendants from cross-examining a plaintiff's expert witness with contradictory statements made by other plaintiff's expert witnesses.  The parties sometimes refer to this as "phantom expert testimony."

The Court's rulings on these motions are informed by whether the statements at issue qualify as an admission against interest by a party or his agent.  Thus, the Court has ruled that, as a general matter, a defendant may cross-examine a plaintiff's expert witness with contradictory statements made by: (1) that plaintiff's own, *case-specific* experts; and (2) any of the plaintiffs' *core* experts, even if the core expert is not a trial witness.  A defendant may *not*, however, cross-examine a particular plaintiff's expert witness

---

[329]  Case Management Order at 29, 30 (Dec. 9, 2003) (master docket no. 63).

[330]  *See Jowers* trial tr. at 469-72 (Feb. 8, 2008); *id.* at 2155-58 (Feb. 22, 2008); *id.* at 2380-82 (Feb. 25, 2008).

with statements made by some *other Welding Fume* plaintiff's *case-specific* witness.[331]

Similarly, the Court has ruled that, as a general matter, a plaintiff may cross-examine a defense expert witness with contradictory statements made by: (1) the defendants' own, *case-specific* experts; (2) any of the defendants' *core* experts, even if the core expert is not a trial witness; and (3) defendants' *case-specific* experts from any other *Welding Fume* case.[332]

To apply these rules, the parties must know whether each of the many *Welding Fume* plaintiffs' experts qualify as a "core expert" or a "case-specific expert." The following guidelines apply.

First, it is clear that any of the experts whom plaintiffs specifically designated as core experts, in

---

[331]  Stated differently: defendants may cross-examine plaintiff A's experts with contradictory statements made by plaintiff A's other case-specific experts and also any of plaintiffs' core experts, but not with statements made by plaintiff B's case-specific experts. The latter statements do not qualify as admissions by plaintiff A or his agents, while the other statements do.

[332]  Stated differently: a plaintiff may cross-examine any defense expert with contradictory statements made by any other defense expert in any *Welding Fume* case, as all such statements qualify as admissions by defendants or their agents. (Note, however, that a statement made by a case-specific defense expert *in deposition*, but not at trial, is not available as an admission for use by the plaintiff on cross-examination. *See Cooley* trial tr. at 2750-52( Sept. 29, 2009) (disallowing plaintiff from introducing the statement of a defense case-specific expert as an admission, because defendants chose not to call the expert at trial)).

Defendants are treated differently from plaintiffs with respect to use of contradictory statements from case-specific experts for two related reasons. First, while the plaintiff is always different from one case to the next, at least some of the defendants remain the same. For example, Lincoln has been a defendant in all of the first six MDL bellwether trials, and ESAB and Hobart have been defendants in five of the six. Second, the defendants have entered into a Joint Defense Agreement which contains judgment sharing provisions. *See Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 at *24-25 (N.D. Ohio July 18, 2008) (*Tamraz* docket no. 192) (appeal pending) (discussing these provisions). Thus, a case-specific expert of defendants, acting as defendants' collectively-retained agent in one trial, remains the defendants' agent in subsequent trials. In contrast, the fact that a plaintiff in one case retains a case-specific expert provides no basis, without more, for deeming that expert as an agent for any other plaintiff. Finally, there is no question but that all of the cases in this MDL are "related," and that defendants have always had an opportunity and similar motive to develop the testimony of their experts in every bellwether trial. *Cf. Kirk v. Raymark Indus., Inc.*, 61 F.3d 147 (3rd Cir. 1995) (reversing a trial court after it admitted an expert's testimony from another unrelated case).

200

documents filed on the master docket, are and remain core experts.[333]

Second, an expert is a core expert if he: (1) submitted two or more reports; (2) referred to one of those reports as a "general report" or "core report;" and (3) referred to another report as a "case-specific report." Thus, Industrial Hygienist Steven Paskal qualifies as a plaintiff's core expert.

Third, an expert is a core expert if: (1) he replied affirmatively, when asked explicitly in deposition, whether he was a core expert; (2) that affirmation was seconded by plaintiff's counsel; and (3) there is no basis to believe that seconding counsel was acting outside of his authority. Thus, Dr. Edward Baker qualifies as a plaintiff's core expert.

And fourth, the fact that a given individual has been hired as an expert by multiple *Welding Fume* plaintiffs does not, without more, qualify him as a core expert. This is true even if that individual offers general opinions, in addition to his or her case-specific opinions. Thus, neither Dr. Richard Lemen nor Dr. Michael Swash qualify as core experts.

A related issue is that plaintiffs have moved to preclude defendants from introducing statements made by the defendants' own experts in other trials, if the expert is not being called in the plaintiff's specific case – arguing such statements are hearsay. For example, defendants did not call their expert neurologist Dr. Lang to testify in the bellwether trial of *Jowers*, but sought to introduce videotaped testimony he had given earlier in another *Welding Fume* trial. Defendants sought to introduce this statement to explain an admission Dr. Lang made, which plaintiff Jowers had introduced pursuant to the rules set out in the paragraph above. The Court sustained plaintiff's objection, as Dr. Lang's statement

---

[333] The parties filed documents designating their core experts at the following master docket numbers: plaintiffs – 419, 741, 742, 863, 1177, & 1229; defendants – 622, 623, 628, 633, 800, 843, 1230, & 1236. The Court created a chart listing these core experts as exhibit A to *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

from the earlier trial was hearsay.[334]  The only exception to this rule is when the defense expert's statement must be admitted under the doctrine of completeness.[335]

### 38.     Defendants' Motion to Exclude Evidence Regarding Preparation of Expert Reports – GRANTED.

Early in the history of this MDL, the parties agreed that "neither side will be obligated to produce communications between attorneys and any expert with regard to the drafting of the expert['s] reports including but not limited to any drafts of the report."  In practice, both sides have avoided seeking discovery of draft reports, or asking experts during deposition about how they prepared their reports. Plaintiffs strayed from the parties' agreement during the *Jowers* trial, but agree the motion is well-taken.

### 39.     Defendants' Motion to Exclude Documents Relating to Welding Rod Companies Who are Not Named Defendants, and to "Historical Documents" – DENIED.[336]

In the MDL bellwether trial of *Ruth*, the Court issued a written opinion ("*Ruth Document Order*") addressing the admissibility of a number of documents authored or produced in discovery by

---

[334]  *See Jowers* trial tr. at 1818-20 (Feb. 20, 2008).  The general contours of this ruling excluding hearsay statements of experts applies equally, of course, to both plaintiffs and defendants.

[335]  Federal Rule of Evidence 106 states that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  The Court construes this rule narrowly, however: statements made by Dr. Lang *immediately surrounding his admission* may be admissible to give it context; but statements made by Dr. Lang at entirely other times are not admissible under the rule of completeness.  *See Byers* pretrial tr. at 59-65 (Oct. 22, 2008).

[336]  *See Byers* pretrial tr. at 246-47 (Oct. 22, 2008); *Jowers* pretrial tr. at 35-36 (Jan. 23, 2008); *Tamraz* pretrial tr. at 22-23 (Nov. 1, 2007); *Goforth* pretrial tr. at 106 (Oct. 25, 2006).

202

entities that were associated with the welding rod industry but were not defendants at trial.[337]

These entities included, for example: (1) trade organizations, such as the American Welding

Society ("AWS") and the National Electrical Manufacturers Association "(NEMA"); and (2)

manufacturers of welding rods whose products the plaintiff had never used.

In its *Ruth Document Order*, the Court outlined its reasoning for different categories of documents,

listing the various factors it considered when determining relevance and admissibility.[338]  The

Court also included a chart listing about 50 specific documents and an admissibility ruling for

each.  Subsequently, the Court and the Special Master applied the reasoning in the *Ruth Document*

*Order* to rule on the admissibility of dozens, if not hundreds, of additional, individual documents

that fell into the same categories.

One category addressed in the *Ruth Document Order* was documents authored by non-party

manufacturers, including certain documents that were purely internal materials (such as an intra-company

memorandum).  The Court concluded that some of these documents were admissible, stating as follows:

> [W]hen reviewing the documents [at issue] for relevance and admissibility –
> especially documents authored by industry participants who are not now (or never were)
> defendants in this case – the Court was guided by several other cases, including: *Gonzalez
> v. Digital Equipment Corp.*, 8 F.Supp.2d 194 (E.D.N.Y. 1998); *Dartez v. Fibreboard Corp*,
> 765 F.2d 456 (5th Cir. 1985); and *Borel v. Fiberboard Paper Prods. Corp.*, 493 F.2d 1076
> (6th Cir. 1973).  Generally, these cases explain that documents produced by non-party
> manufacturers may be relevant in a case against a defendant manufacturer in the same
> industry, even if the documents are purely internal materials.  The reason is that these
> documents may support an inference that, given the state of the art, defendant-members of
> the industry had, or should have had (given their duty to have the knowledge and skill of
> an expert), the same "state of mind" with respect to possible damage to users of their

---

[337] *Ruth v. A.O. Smith Corp.*, 2005 WL 6293396 (N.D. Ohio Aug. 13, 2005) (*Ruth* docket no. 172).

[338] *See* discussion at footnote 104.

product, and/or the adequacy of warnings in connection with such dangers.[339]

In other words, evidence regarding a *non-party* manufacturer's knowledge of: (a) risks posed by its product, (b) the efficacy of its warnings, and (c) the level of knowledge of learned intermediaries, may be relevant to the *defendant* manufacturer's knowledge on those issues, as well.  On the other hand, an internal document of a non-party that does not add anything of evidentiary value regarding the state of industry knowledge, and is relevant only to internal thought processes or individual "bad intentions," generally will not be admissible.[340]

In every subsequent MDL bellwether trial, the defendants have filed at least one motion in limine asking the Court to reassess this particular aspect of the rulings memorialized in the *Ruth Document Order*.  The Court has overruled each such motion, and has only become more certain with each trial that the documents at issue are, in fact, highly relevant and admissible.  This Order makes clear that the reasoning and result of the entire *Ruth Document Order* are hereby incorporated into this Order by reference, and apply to all MDL cases.[341]

---

[339] *Ruth v. A.O. Smith Corp.*, 2005 WL 6293396 at *2 (N.D. Ohio Aug. 13, 2005) (*Ruth* docket no. 172).

[340] The Court added that, even though the *Ruth* plaintiffs had brought a claim of conspiracy against some of the entities that had authored the documents at issue, the Court was *not* basing its admissibility rulings in any way on Fed. R. Evid. 801(d)(2)(E).  *Id.* at *2 n.3; *see also Jowers* pretrial tr. at 35-36 (Jan. 23, 2008) (same); *Tamraz* pretrial tr. at 22-23 (Nov. 1, 2007) (same); *Ruth* pretrial tr. at 56-61 (Aug. 8, 2005) (granting summary judgment to defendants on plaintiff's conspiracy claim and then addressing admissibility of documents).

[341] Thus, the defendants should not file motions in limine, for the purpose of protecting their appellate rights, directed either at *categories* of documents (e.g., documents authored by manufacturers who are not defendants at trial) or *specific* documents (e.g., the "Richard LaFave email," see *Jowers* pretrial tr. at 38-39 (Jan. 23, 2008)), upon which the Court already ruled in the *Ruth Document Order* or during subsequent hearings and trials.

**40. Defendants' Motion to Exclude Documents Pre-Dating Plaintiff's First Use of Welding Rods – DENIED.**[342]

Defendants have moved for exclusion of all documents created before the plaintiff's first use of welding rods, arguing that, since the manufacturers were all providing warnings and/or MSDSs by the time the plaintiff started welding, any evidence going to circumstances before that has no bearing on the plaintiff's claims.[343]  Defendants consistently assert these "old documents" are too remote in time to be relevant; and, even if relevant, they are more prejudicial than probative, so should be excluded under Rule 403.  The Court has repeatedly denied these motions, and repeatedly explained its reasoning.[344]  More recently, the Court entered an "*Evidentiary Ruling*" memorializing, in summary form, its prior rulings on this "historical document" issue (as well as many other issues).[345]  The following discussion explains in greater detail the Court's reasoning.

The gravamen of every *Welding Fume* plaintiff's complaint is that the manufacturing defendants failed to warn him that inhaling welding fumes could cause brain damage.  Each plaintiff further asserts that the defendants knew, or should have known, that this hazard existed.  Thus, there is no more central or relevant issue in these *Welding Fume* cases than the defendants' level and timing of knowledge regarding the existence of this hazard, and the defendants' decisions on whether and how to warn about

---

[342] *See Byers* pretrial tr. at 250 (Oct. 22, 2008); *Jowers* pretrial tr. at 47-53 (Jan. 23, 2008); *Tamraz* pretrial tr. at 16-18 (Nov. 1, 2007).

[343] Defendants provided their first warning in 1967 and their first MSDS in 1985.  Defendants filed their first such motion in a case where the plaintiff began welding in 1978.

[344] *See, e.g., Ruth v. A.O. Smith Corp.*, 2005 WL 6293396 (N.D. Ohio Aug. 13, 2005) (*Ruth* docket no. 172); *Byers* pretrial tr. at 250 (Oct. 22, 2008); *Tamraz* pretrial tr. at 16-18 (Nov. 1, 2007).
The Court's most thorough oral explanation of its reasoning is found at *Jowers* pretrial tr. at 47-53 (Jan. 23, 2008).

[345] *See Evidentiary Order* at 56-59 (master docket no. 2217).

205

it.

As such, a document that tends to show, for example, that a defendant knew in 1940 that exposure to welding fumes can cause brain damage is highly relevant; the fact that the document was created before the plaintiff was ever exposed to welding fumes does not reduce the document's relevance.  To the contrary, the document is arguably *more* probative given its age, because it shows the defendant knew of the hazard in time to craft a meaningful warning for the plaintiff, *before* the plaintiff suffered his first welding fume exposure.  Indeed, the longer a defendant has knowledge of a hazard but fails to warn new product users, the more culpable the defendant arguably may be.[346]

This Court has concluded that the "historical documents" to which defendants object are all relevant to show one of more of the following matters, which are clearly relevant in every *Welding Fume* case:

---

[346] Thus, the three cases cited by defendants, where the court excluded evidence as too distant in time, are inapposite.  The key issue in this *warning* case is defendants' knowledge of the hazard; the fact that the defendant may have gained this knowledge long ago does not make the evidence irrelevant or prejudicial.  None of the three cases cited by defendants involved warnings, and none of the excluded evidence in those cases was clearly and directly relevant to defendants' knowledge.  *See Chertkova v. Conn. Gen. Life Ins. Co.*, 2000 WL 349277, at *4 (2nd Cir. Apr. 4, 2000) (upholding exclusion of evidence of "inappropriate sexual behavior" by plaintiff's boss that occurred 11 years earlier, where plaintiff did not complain of boss's sexual behavior toward her); *Hicks v. Six Flags Over Mid-America*, 821 F.2d 1311, 1315-16 (8th Cir. 1987) (upholding exclusion of evidence of purportedly similar accident involving a tamper tool that occurred six years earlier (but allowing evidence of two other, more-recent, similar accidents)); *In re Air Crash Disaster at Sioux City, Iowa*, 1991 WL 279005 at *6 (N.D. Ill. Dec. 26, 1991) (excluding evidence of four purportedly similar incidents because they were dissimilar or remote in time, but admitting one similar incident that was not dissimilar or remote in time).

It also bears noting that the historical documents are not made irrelevant by the fact that defendants did begin to issue warnings about welding fumes in 1967.  Plaintiffs have consistently argued that: (1) all of defendants' warnings, from 1967 on, are insufficient because they do not convey critical hazard information about which defendants had earlier known for years; and (2) defendants knew how to give sufficient warnings, but purposefully chose not to.  The historical documents are relevant to these arguments, as well.  Whether the issue is complete absence of warning or insufficiency of warning, documents showing the manufacturer's knowledge of the extent of a hazard and the effect a given warning might have on ameliorating that hazard are relevant.

(1)     The extent of defendants' changing knowledge over time that exposure to manganese in welding fumes could lead to neurological injury.  The Court has also concluded that these documents are relevant regardless of which welding product the document is addressing – that is, even if the plaintiff never used "welding rod X," a document that shows a defendant knew that brain damage could be caused by manganese in welding fumes emitted by "welding rod X" is relevant, because defendants knew that *every* welding rod emitted *some* amount of manganese in the fume.  That a document addresses certain welding rods and not others goes to its weight, not its admissibility.[347]

(2)     Defendants' knowledge over time regarding the effects that giving or failing to give warnings would have on their own business, their competition, their welder-product-users, employers of those welders (who might be learned intermediaries), and other industry participants.  (In other words, all of the defendants' perceived costs and benefits of giving a warning).  The Court has also sometimes concluded that these documents are relevant even if the warning being discussed in the document is not specifically related to *manganese* in welding fumes.  For example, plaintiffs have

---

[347] *See* Airco/BOC memorandum from F. Saacke to members of Safe Practices Committee (Dec. 7, 1950) (trial exh. 407).  Among other things, this memorandum: (1) recognizes "the allowable safe limit for manganese" set by OSHA in 1948 as being "6 milligrams per cubic meter of air," which is 30 times the current OSHA limit; (2) recommends that, in light of this limit, a warning be placed on certain high-manganese welding rods; and (3) states the recommendation for warning is made "despite the possible loss of electrode sales, since it is believed that . . . the degree of hazard involved in arc-welding high manganese steels might subject the company to possible claims for damages that could far exceed any loss of sales that a frank Warning Label might create."  Defendant BOC ignored the recommendation and added no warning.

There is no question but that this evidence is highly relevant to the defendants' knowledge of the existence of the hazard of manganese in welding fume, the costs and benefits of using warnings generally, and to their subsequent decisions of whether and how to warn about manganese in welding fumes.  Further, the Court has concluded that the document's high probative value outweighs any possible prejudice (and that any prejudice may also be mitigated by defendants through explanation at trial of the context of the document), so that the document is admissible under Fed. R. Civ. P. 403.  Indeed, whenever this document is introduced at trial, the Court always provides an instruction to the jury noting that it is discussing a product that the plaintiff did not use.  *See Cooley* trial tr. at 520, 541-42 (Sept. 16, 2009).

207

introduced a document for the purpose of showing: (a) a defendant believed *fluoride* in welding

fumes was hazardous, so that a warning might be appropriate, (b) the defendant decided not to

warn welders of the *fluoride* hazard because it would lose business, and (c) the defendant made this

decision during a period in time that the defendant was also learning or had learned that *manganese*

in welding fumes was hazardous.[348]  This document is centrally relevant to defendants' knowledge

of the efficacy and necessity of giving a warning about welding fumes, the possible and probable

results of giving (and not giving) such a warning, and the defendants' state of mind when deciding

whether to warn; further, the document helps explain subsequent actions taken by the defendants

when they returned to the subject of whether to warn about manganese, in particular, and also gives

context to documents discussing the relative hazardousness of manganese and fluoride in welding

---

[348]  *See* Airco/BOC memorandum from I. Yates to F. Saacke at 1 (Oct. 25, 1949) (trial exh. 220). Among other things, this memorandum notes that: (1) "the arc welding industry at one time desired to take every precaution to guard against injury, and the NEMA [National Electrical Manufacturers Association] section decided to incorporate a warning [regarding fluoride in fumes] on all electrode box labels," but (2) all welding rod manufacturers eventually dropped the NEMA warning because (a) they felt a competitive disadvantage over those manufacturers who refused to use a warning, and/or (b) they believed the warning amounted to "an admission . . . that the [welding rod] coating under certain conditions might possibly cause injury," thus giving support to lawsuits by welders seeking "to recover damages."

There is no question but that these statements are highly relevant to the defendants' knowledge of fume toxicity, the costs and benefits of using warnings generally, and to their subsequent decisions of whether and how to warn about manganese in welding fumes.  The document also gives context to other documents discussing the various hazards of welding fume exposure, including both fluoride and manganese, and also touches on the state-of-the-art of warnings (a topic consistently discussed by the parties' experts).

Further, the Court has concluded that this document's high probative value outweighs any possible prejudice (and that any prejudice may also be mitigated by defendants thorough explanation at trial of the context of the document), so that the document is admissible under Fed. R. Civ. P. 403.  Indeed, both plaintiffs and defendants are always careful at trial to note that the document is discussing warnings regarding fluoride and not manganese.  *See, e.g., Cooley* trial tr. at 2344, 2370 (Sept. 25, 2009).  Also, defendants have argued the document is prejudicial because it improperly suggests a "tendency" not to warn.  Even accepting this speculative assertion as true, the Court remains convinced that any such prejudice is outweighed by the document's high probative value.

208

fumes.  Again, that a document written by a defendant, which discusses whether to warn about welding fumes, does not address manganese in welding fumes specifically goes to its weight, not its admissibility.

(3)     Defendants' involvement with setting or manipulating industry standards relating to manganese in welding fumes.  Defendants have interposed the government contractor defense, the essence of which is that the government was "both knowledgeable and concerned about the contents of the . . . warnings" used by the defendants and exercised its discretion to approve the warnings.[349]  Documents showing the interplay and relationship between the defendants and the government when the U.S. Navy and OSHA adopted the defendants' already-existing warnings are thus relevant, regardless of the documents' age, since the documents evidence the government's level of knowledge and degree of discretion.

(4)     The extent to which, over time, defendants supplied to welders and their employers all of defendants' knowledge regarding welding fume hazards.  Defendants have interposed the sophisticated user and learned intermediary defenses, the essence of which is that the end-user-welders and their employers already knew (or should have known) about the hazard of manganese in welding fumes.  Thus, documents tending to show that defendants withheld knowledge of (or misrepresented the nature of) this hazard to welders and their employers are relevant, regardless of the documents' age.

(5)     Whether defendants' decisions to warn *vel non* were made with the requisite *mens rea* to justify an award of punitive damages; and

(6)     The historical context within which the defendants made their decisions to warn or not – that is,

---

[349] *Tate v. Boeing Helicopters*, 140 F.3d 654, 658 (6th Cir. 1998).

whether the industry had historically represented to both welders and their employers that exposure to welding fumes was *not* hazardous, and whether this changed the extent of their duty to warn. Finally, for the reasons explained in the immediately preceding subsection, to the extent these historical documents are relevant and admissible in connection with any *individual* defendant, they are usually also relevant with regard to all defendants. Accordingly, for these reasons and the reasons stated in the Court's other relevant written Orders and oral rulings, the Court has overruled the defendants' blanket and document-specific objections to "historical documents."

**41.    Plaintiff's Motion to Exclude Testimony Related to the Origin of Document MDL-LI-00345576-608, and Defendants' Cross-Motion to Exclude the Document – BOTH DENIED.**[350]

The document in question is a PowerPoint presentation titled "Welding Fume Extraction – July 2004," and is also referred to by the alternative title, "What is Welding Fume?" The document contains language that is clearly relevant to the issues in a *Welding Fume* case. The logo of defendant Lincoln appears on every page, and two Lincoln employees are listed on the last page as references for more information. Lincoln produced the document during discovery.

Defendant Lincoln has asserted this document was actually created by an employee of a different company – Brad Pritzl of Euromate, which supplies fume removal equipment – without Lincoln's knowledge or permission. Defendants argue, accordingly, that the document is irrelevant and should be excluded. Plaintiffs argue it is clearly relevant and further move to preclude Lincoln from disclaiming authorship, asserting any such contention would be hearsay. Neither of these positions is well-taken. Whether Lincoln authored or ratified the document is an issue of disputed fact; a jury could certainly

---

[350] *See Byers* pretrial tr. at 65-71 (Oct. 30, 2008); *Tamraz* pretrial tr. at 92-93 (Nov. 1, 2007).

210

conclude it is a Lincoln document and contains Lincoln admissions.  Further, Lincoln witnesses may present an explanation or disavowal without referring to hearsay statements by others.  Accordingly, both parties' motions are denied.

**42.   Defendants' Motion to Exclude References to "Hardface Welding" in Cases Where Plaintiff Did not Engage in It – DENIED.[351]**

In the MDL bellwether trial of *Tamraz*, the plaintiff stated he had never engaged in "hardface welding," also known as "hardfacing" or "hardsurfacing."  Hardfacing involves addition of wear-resistant welding metal to the surface of a part that has worn down, such as the steel teeth on a steam shovel's bucket, to build the worn surface back up.  Often, hardfacing involves the use of high-manganese welding rods.  Defendants have argued that, since the plaintiff did not engage in hardfacing, documents referring to it should be excluded from trial.

The Court has denied this motion, stating that a pretrial, blanket ruling excluding such documents was not appropriate.  Some of the documents that discuss hardfacing address the hazards of manganese and welding fume generally, and thus remain relevant regarding defendants' knowledge.  For example, these documents may contain admissions that manganese in welding fumes can cause neurological injury; the fact that this admission is made in the context of hardfacing goes to weight, not admissibility.  Where appropriate, however, the Court will give (and, in fact, has given) a limiting instruction to the jury, if requested by the defendants.[352]

---

[351] *See Byers* pretrial tr. at 249 (Oct. 22, 2008); *Jowers* pretrial tr. at 37 (Jan. 23, 2008); *Tamraz* pretrial tr. at 18-20 (Nov. 1, 2007); *Solis* pretrial tr. at 61-73 (June 1, 2006).

[352] *See, e.g., Cooley* trial tr. at 541-42 (Sept. 16, 2009).

**43.     Defendants' Motion to Exclude Evidence of Company Knowledge and Warnings Issued After Plaintiff's Last Exposure to Welding Fumes – DENIED.**[353]

Virtually every *Welding Fume* plaintiff will have stopped working as a welder by the time of trial. Defendants have moved to exclude evidence that shows their own knowledge of the health effects of welding fumes after the time the welder-plaintiff stopped welding, including any warnings defendants issued after that time.  Defendants argue that any information they obtained regarding the health effects of welding fumes after the plaintiff stopped welding is irrelevant, as it can have no bearing on what the defendants could have known to warn plaintiff about when he was welding.  Defendants also argue that later-issued warning labels must be excluded as subsequent remedial measures, pursuant to Fed. R. Evid. 407.

The Court denied this motion, stating again that a pretrial, blanket ruling excluding such documents was not appropriate.  Although many such documents may, in fact, not be admissible, some may be admissible for various reasons.  For example, in some MDL bellwether trials, certain defense witnesses have "opened the door" to admission of later-issued warning labels by suggesting it was not feasible to include a manganese-specific warning on a welding rod label; this made admissible in rebuttal the fact of a later-issued label that did include a manganese-specific warning.[354]  Similarly, assertions by defendants that exposure to welding fumes simply cannot cause a welder to suffer MIP may open the door to admission in rebuttal of statements in later-issued documents acknowledging that there is such a risk. Thus, as with "hardfacing" documents, the admissibility of evidence showing defendants' knowledge of

---

[353] *See Jowers* pretrial tr. at 11-14, 68-69 (Jan. 23, 2008); *Tamraz* pretrial tr. at 134-140 (Nov. 1, 2007).

[354] *See also Jowers* pretrial tr. at 11-14, 68-69 (Jan. 23, 2008) (noting that, if the Court did later admit certain warnings used by defendants after the plaintiff last welded, defendants were then allowed to assert that some of the language was included in the warnings only for litigation purposes); *Tamraz* pretrial tr. at 134-140 (Nov. 1, 2007) (same).

welding fume hazards after the time the plaintiff stopped welding will have to be on a document-by-document basis, depending on all of the evidence at trial.  Again, where appropriate, the Court will give a limiting instruction to the jury, if requested by the defendants.

### 44.    Defendants' Motion to Exclude Evidence of Lobbying Activities – DENIED.[355]

At various times, defendants have urged the ACGIH, OSHA, and other entities not to lower the TLV exposure limit for manganese.  Defendants have moved to exclude documents reflecting such lobbying activities, arguing it is constitutionally-protected speech and cannot be considered by a jury, even in part, as a basis for liability.  Plaintiffs responded with case law standing for the proposition that, although "the *Noerr-Pennington* doctrine [holds] that lobbying alone cannot form the basis for liability, . . . such activity may [still] have some evidentiary value."[356]

The Court agreed with defendants' general contention that documents are not admissible only to show their lobbying efforts, which are constitutionally-protected activities.  But the Court denied defendants' motion, ruling again that a pretrial, blanket ruling was not appropriate.  To the contrary, the Court has since admitted several such documents over defendants' objection because, even though the document was arguably created for lobbying purposes, it also contains statements directly relevant to issues central to every *Welding Fume* case.  For example, a document which unsuccessfully urged the ACGIH not to lower its manganese TLVs, and also asserted that many welders would be "overexposed"

---

[355] *See Byers* pretrial tr. at 249-50 (Oct. 22, 2008); *Jowers* pretrial tr. at 37-38 (Jan. 23, 2008); *Tamraz* pretrial tr. at 20-22 (Nov. 1, 2007); *Solis* pretrial tr. at 33-60 (June 1, 2006); *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *13 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[356] *Hamilton v. Accu-Tek*, 935 F. Supp 1307, 1327 (E.D.N.Y. 1996).  *See also MCI v. AT&T*, 708 F.2d 1081, 1160 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983) ("[e]vidence of an activity that is protected by the *Noerr* doctrine may be admitted to show the purpose and character of other activities if doing so if not overtly prejudicial").

if the TLV was lowered, contains an admission against interest; the fact that the document involved First Amendment lobbying activity does not immunize the communication from coming into evidence, and defendants cannot use the First Amendment as a shield to keep relevant evidence from a jury.  Other, similar documents may be relevant to show defendants' knowledge that manganese exposure has neurological health effects, or that defendants considered funding various studies to examine neurotoxicity of welding fumes.[357]  The Court has cautioned the plaintiffs, however, that they may not suggest to the jury that defendants were engaged in any improper activity by lobbying.

**45.**    ▸ **Defendants' Motion to Limit Evidence of Payments to Authors – GRANTED IN PART.[358]**
▸ **Plaintiffs' Motion to Require Preparedness in Answering Payment Questions – GRANTED.**

Both the plaintiffs and the defendants have given sizable amounts of money to various persons and organizations as reimbursement for scientific research addressing the question of whether, and the extent to which, manganese in welding fumes causes parkinsonism.  Many of the funding recipients have published medico-scientific studies, articles, and treatises setting out their conclusions.  The Court has issued a detailed Order addressing the discovery obligations of the parties concerning their payments to the authors of these studies, articles, and treatises, upon which expert witnesses often rely during trial; the Order explains that the fundamental basis for discovery of this information is that the payments are

---

[357]  *See Solis* pretrial hearing tr. at 33-60 (June 1, 2006).

[358]  *See Byers v. Lincoln Elec. Co*., 2008 WL 4849339 at *5-6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313); *Byers* pretrial tr. at 209-220 (Oct. 22, 2008); *Jowers* trial tr. at 1155-61 (Feb. 14, 2008); *id.* at 1813-14 (Feb. 20, 2008);

214

relevant to show the possible bias of the authors.[359]

As an example, one of defendants' experts, Dr. Warren Olanow – who is a highly respected neurologist and researcher – received from defendants over $1.6 million between October of 1999 and March of 2006.  During this same time period, Dr. Olanow published at least a dozen articles upon which various experts testifying in MDL bellwether trials have relied to form their opinions.  Thus, when plaintiffs cross-examine such an expert, plaintiffs often point out that the author of the articles upon which the expert relies to form his opinion received substantial compensation from the defendants.

Defendants have come generally to accept the proposition that evidence of funding received by an author of a medical article goes to show the author's possible bias, so that it is fair to ask an expert who relies upon the article about his knowledge of the author's compensation; however, defendants have moved to restrict the plaintiff's depth of inquiry on this subject.  Specifically, defendants point out that the amount of compensation they have paid to a given author or expert is directly tied to the existence of the entire *Welding Fume* MDL – they likely would have paid most of these authors and experts only a fraction of the compensation if there were only a handful of *Welding Fume* cases, as opposed to the many thousands of cases filed by plaintiffs in the last several years.  Thus, the only reason that plaintiffs can assert the authors of the medical articles appearing on a given expert's reliance list – that is, the list of all of the medical articles upon which the expert relied to form his opinion – received a total of $7 million from defendants, is that the authors have served as testifying and consulting experts for *Welding Fume* defendants for many years.  Defendants note they are stuck in a bind – they cannot explain to the jury that one reason they have paid large aggregate amounts to their experts and to authors is because there are so

---

[359] *In re Welding Fume Prods. Liab. Litig.*, 534 F.Supp.2d 761 (N.D. Ohio 2008) (master docket no. 2114).

many *Welding Fume* cases, because the fact of many cases is prejudicial, but so is the fact of the large aggregate payments.

The Court has concluded that the information related to payments by defendants to experts who wrote articles and conducted studies is highly probative, but that safeguards need to be put into place to ensure the introduction of this evidence is not repetitive or overstated, to the unfair prejudice of defendants.[360] Accordingly, in light of Fed. Rules of Evid. 403 & 611, the Court has ruled as follows: (1) if a defense expert specifically relies upon an article/study in his deposition or trial testimony, or in the body (not merely reliance list) of his report, or if defense counsel refers specifically to an article/study with any witness, then plaintiffs may adduce evidence of all payments made by defendants to the author(s) of that particular article/study; (2) if the basis of a defense expert's opinions is largely a literature review (such as with toxicologist Dr. Furbee), plaintiffs may adduce evidence of all payments made by defendants to the author(s) of any *individual* article/study on that witness's reliance list; (3) in no case may plaintiffs refer to any exact total of payments made by defendants to groups of authors (e.g., the entire total of payments made by defendants to all authors, or the total for a given reliance list), except a generic reference such as "tens of thousands" or "millions."

Finally, plaintiffs have asserted that defense experts sometimes arrive at trial unprepared to answer accurately how much compensation they have received. Accordingly, the Court has ordered experts from both sides to be prepared to testify regarding their hourly rate, the amounts they have received, and the amounts they expect to be paid by the time their testimony is completed.

---

[360] The Court has also concluded that defendants' suggestion – which is that evidence of lawyer advertising should be admitted to explain why there are so many *Welding Fume* lawsuits, which explains in turn why defendants spent the amounts they have on experts and articles – is not a good one, because evidence of lawyer advertising has a much lower probative value and carries a much higher risk of prejudice. *Byers* pretrial tr. at 217-18 (Oct. 22, 2008).

216

46.     **Motions to Exclude Evidence Regarding Business Ethics – GRANTED.**[361]

Before the first MDL bellwether trial, the Court held a *Daubert* hearing to determine the admissibility of various experts' proposed testimony.  One of those experts was "Dr. W. Michael Hoffman, who is a Professor of Philosophy and Ethics, [whom plaintiffs listed] to offer testimony about business ethics generally and also whether the defendants acted ethically in this case."[362]  The Court ultimately concluded that testimony from *any* expert on the subject of business ethics was generally not admissible, because ethical standards are different from the legal standards that a jury must apply.[363]

In subsequent cases, both plaintiffs and defendants have filed motions in limine asking the Court to preclude the other side's experts from offering testimony going to business or corporate ethics, even if some of the expert's testimony on other topics was admissible.  The Court has granted all such motions,

---

[361] *See Byers* pretrial tr. at 126 (Oct. 22, 2008);  *Byers* pretrial tr. at 278 (Oct. 23, 2008); *Tamraz* pretrial tr. at 94-98 (Nov. 1, 2007); *Goforth* pretrial tr. at 42-59, 73-74 (Oct. 25, 2006).

[362] *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *18 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353).

[363] The Court explained its rulings as follows, and also added the caveat that there was a small possibility that ethics testimony by plaintiff's experts would be allowed on rebuttal:

> It is th[e legal] standard, and not what an ethical corporation 'should have done,' that matters.  Dr. Hoffman's opinions on a corporation's purported ethical requirements, and whether a particular defendant met those requirements, will not help a juror navigate this [legal] instruction; indeed, because his opinions are all premised on a moral compass, not a legal one, confusion is almost assured.

> In sum, the Court concludes that Dr. Hoffman may not testify in plaintiff's case in chief.  The Court holds open the remote possibility, however, that it may allow Dr. Hoffman to testify in rebuttal.  Specifically, plaintiffs have suggested that certain defendants may testify that their actions always comported with the highest ethical standards.  It is conceivable that the Court might then allow plaintiffs to call Dr. Hoffman on rebuttal to explain: (1) the ethical principles that apply to a business; and (2) whether certain conduct meets these universal ethical standards.

*Id*. at *21.  The Court also ruled that the same exclusion applied to defendants' expert witness on ethics, as well.  *Id.*

*See also* Goforth trial tr. at 1518-20 (Nov. 7, 2006) (allowing very limited ethics testimony from Dr. Burns on rebuttal, because defendants had opened the door on cross).

217

and makes clear here (again) that testimony from any expert witness on this subject matter will not be admitted.  A plaintiffs' expert witness may review defendants' documents and discuss what defendants *actually* said about their own knowledge of welding fume hazards, and what defendants *actually* did; but that witness may not opine regarding what defendants *should* have known or *should* have done.[364]


**47.    Defendants' Motion to Exclude References to Tobacco and Asbestos – GRANTED.[365]**

Defendants ask the Court to preclude plaintiffs' witnesses from comparing the *Welding Fume* industry, warnings, and lawsuits to those of tobacco or asbestos.  This motion is granted, with some small

---

[364] There is, of course, a gray area regarding this type of expert testimony.  As the Court explained in a similar context:

> It is difficult for the Court to provide in advance complete guidance to the parties as to "where the lines will be drawn" at trial.  This is especially true because some of counsel's questions to [plaintiff's expert] may be phrased in hypothetical form, some may refer to other testimony and evidence, and the Court will have to examine the overall methodological foundation for many of [the expert's] answers on a question-by-question basis.  The parties will have to use the familiar trial technique of raising objections to particular questions.

*In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046 at *8 (N.D. Ohio Aug. 8, 2005) (master docket no. 1353) (*Daubert* Order discussing the admissibility of opinions of plaintiff's expert on warning and human factors psychology, Dr. Cunitz); *see id.* at 22 ("The Court has tried to explain, for each expert, where it will set limits and why, but the precise extent that a party will have to rely on cross-examination instead of a sustained objection must be left for trial.").

Essentially, a qualified plaintiff's witness may: (1) review and read aloud from historical documents, such as internal company documents and medical publications; (2) recite his conclusions regarding: (a) the consequences of Mn exposure; (b) what *the documents* show that defendants knew, and when they knew it; and (c) what defendants actually did and when they did it, as compared with what they knew; BUT, the witness may *not*: (a) offer legal conclusions or ethics testimony; (b) characterize defendants' state of mind; or (c) speculate about what might have occurred if defendants had warned earlier or "better."

[365] *See Cooley* pretrial tr. at 383-85 (Sept. 4, 2009) (noting that, if an expert had some involvement with testifying about tobacco warnings, it could be explored very briefly by way of background – referring to experts Cunitz and Wood); *Byers* pretrial tr. at 247-48 (Oct. 22, 2008); *Jowers* pretrial tr. at 14-21 (Jan. 23, 2008) (also discussing another caveat, connected with admissibility of evidence of the plaintiff's alleged failure to heed tobacco warnings); *Tamraz* pretrial tr. at 42 (Nov. 1, 2007); *Goforth* pretrial tr. at 48-54, 94-98, 114 (Oct. 25, 2006); *Solis* pretrial tr. at 433-34 (June 1, 2006).

caveats.  References to tobacco and asbestos may be necessary but will be kept to a minimum.  For example, a plaintiff's actual exposure to asbestos may be admissible to the extent he earlier claimed this exposure caused him to suffer disability or physical symptoms that overlap with his *Welding Fume* claims.  Also, the parties may elicit simple background information, such as an expert witness's involvement with public health efforts and smoking (e.g., Dr. Burns).  Beyond these references, however, all parties will not introduce evidence related to asbestos or tobacco.

### 48.      Defendants' Motion to Exclude Plaintiff's Animation – GRANTED IN PART.[366]

In every *Welding Fume* bellwether trial, the plaintiff has sought to play a video animation showing welding fumes entering a welder's lungs, and the manganese in the fume eventually entering the welder's brain.  Defendants have consistently asked the Court to exclude the animation, and the Court has consistently granted this motion in part.

In particular, the Court has ordered that the plaintiff may present this animation to the jury, but must excise that portion of it that shows manganese entering the welder's brain through the "olfactory pathway."  This portion shows the welder breathing fumes in through his nose, and then shows the manganese in those fumes entering the brain directly, through the olfactory epithelium  – as opposed to showing the fumes passing into the welder's lungs, and the manganese then carried to the brain by blood in the circulatory system, in the same way that oxygen moves from lungs to brain.  The Court excluded the "olfactory pathway" portion of the animation after concluding the science supporting this theory of manganese exposure to the brain was insufficiently reliable at that time.  The Court concluded that the rest

---

[366] *See Cooley* pretrial tr. at 383 (Sept 4, 2009); *Byers* pretrial tr. at 248 (Oct. 22, 2008); *Jowers* pretrial tr. at 36-37 (Jan. 23, 2008); *Tamraz* pretrial tr. at 8-10 (Nov. 1, 2007); *Goforth* pretrial tr. at 117-18 (Oct. 25, 2006);  *Goforth* pretrial tr. at 4-5 (Oct. 27, 2006); *Solis* pretrial tr. at 452-55 (June 4, 2006); *Ruth* pretrial tr. at 46 (Aug. 8, 2005).

of the animation, however, was a fair depiction and admissible.  Absent a change in scientific knowledge, this ruling will apply to all MDL cases.[367]

### 49.     Defendants' Motion to Exclude other *Welding Fume* Plaintiffs from Testifying at Trial – GRANTED IN PART.[368]

Some *Welding Fume* plaintiffs list as potential trial witnesses three welders who were, themselves, also *Welding Fume* plaintiffs, and who suffer obvious signs of neurological disease: Charles Ruth, Lonnie Whisenhunt, and Kenneth Riley.  Plaintiffs list these witnesses for the following possible purposes, among others: (1) to the extent that Ruth and Whisenhunt worked for the same employer or at the same work sites as did the plaintiff, to offer testimony regarding working conditions and the employer's welding safety practices; and (2) Riley worked at defendant ESAB as a test welder, and would offer testimony regarding the welding safety information that this welding rod manufacturer gave to is own employees.

Defendants object that the testimony these witnesses would offer is at best minimally relevant, and that a plaintiff's real purpose for calling them would be to suggest impermissibly that neurological injury

---

[367]  While the Court concluded that experts could, under *Daubert*, opine that manganese from welding fume enters the brain through the olfactory pathway, the Court concluded the question was a close one and that defendants' videotape animation was not a reliable depiction of the scientific conclusions. *Cf. Daubert* hearing tr. at 46 (Aug 8. 2005) (the Court: "On the first issue, the olfactory pathway, I have gone back and forth on this question.  I think it is a very close question as to whether there is a sufficient scientifically reliable basis to allow this testimony, because it is based on rat studies, and there are lots of criticisms as to extrapolating from animal studies and particularly rat studies and particularly rat studies as it relates to the olfactory pathway.  But after analyzing the question and examining the extent to which defendants' own experts, including Dr. Fechter and Dr. Olanow and others, do rely on animal studies, I have concluded that I am going to allow the testimony and simply give the defendants wide latitude on cross-examination with respect to the – whether or not the testimony is sufficient to establish the things that plaintiffs purport that it establishes.").

[368]  *See Tamraz* pretrial tr. at 38-39 (Nov. 1, 2007); *Jowers* pretrial tr. at 6-9 (Jan. 23, 2008); *Solis* pretrial tr. at 215-17 (May 16, 2006).

220

from welding fume exposure is common among welders.  Defendants cite the Advisory Committee Notes to Federal Rule of Evidence 403, which defines "unfair prejudice" as evidence having "an undue tendency to suggest decision on an improper basis, commonly an . . . emotional one," and argue that the risk of unfair prejudice clearly outweighs the probative value of any testimony from these three witnesses.

For the most part, the Court agrees with defendants.  Given the serious risk of sympathy and unfair prejudice, the Court has ruled that these witnesses may not testify in a plaintiff's case in chief.  The Court held open the possibility, however, that these witnesses might be allowed to offer rebuttal evidence, depending on the evidence adduced by defendants in their case in chief.[369]

### 50.  Motions to Preclude Witnesses from Testifying About Their Belief that Other Welders Suffer (or Don't) From Welding-Related Illnesses – GRANTED.[370]

In some *Welding Fume* cases, the welder-plaintiff or his co-workers have stated at deposition they believe they know of other welders who also suffer from movement disorders caused by exposure to welding fumes.  Defendants seek to exclude this testimony, arguing that the plaintiff and his co-workers are lay witnesses not qualified to opine regarding whether another welder has a disease, or what may have caused that disease.  The Court has agreed with defendants and ruled accordingly.  Thus, for example, while a co-worker witness may testify regarding his observation of the *plaintiff's* symptoms (e.g., tremor),

---

[369] *See Solis* pretrial tr. at 165-71 (May 15, 2006) and 215-17 (May 16, 2006).  To date, while welders Ruth and Whisenhunt may have worked at the same worksites as other welder-plaintiffs, they have not worked *with* those plaintiffs.  The Court's analysis may be different if the *Welding Fume* plaintiff at trial actually worked alongside Ruth or Whisenhunt.  The same rules will apply if a plaintiff lists as a witness any other welder-plaintiff who has suffered neurological injury (e.g., MDL plaintiffs Jeff Tamraz and Robert Jowers).

[370] *See Byers* pretrial tr. at 133-34, 253 (Oct. 22, 2008); *Byers* pretrial tr. at 274 (Oct. 23, 2008); *Jowers* pretrial tr. at 185-92 (Jan. 23, 2008); *Tamraz* pretrial tr. at 39-43 (Nov. 1, 2007); *Cooley* pretrial tr. at 308-09 (Sept. 2, 2009).

he may not testify regarding the symptoms of *other* welders, nor offer his opinion on why the plaintiff or other welders suffer these symptoms.

Further, the Court also prohibited any lay witnesses called by defendants from offering similar symptom-related testimony. Lay employees of defendants may not testify, for example, that they have worked with many welders during many years and have never seen any of them exhibit tremor or suffer from neurological injury. The only caveat is that a defense witness whose job duties included receipt of health claims or complaints from welders may testify he did not receive any claims or complaints of neurological injury.

### 51. Defendants' Motion to Exclude Reference to Individual Susceptibility – DENIED.[371]

Defendants have moved to exclude any reference during trial to the concept of individual susceptibility, arguing there is no evidence: (1) regarding individual susceptibility to manganese *generally*, or (2) that a given plaintiff is himself "more" susceptible to manganese exposure than the average person. Defendants assert that plaintiffs are using false logic – that is, "welders who are susceptible to manganese will develop tremors, and the plaintiff has tremors, so he must be susceptible to manganese" – in order to convince a jury that the bare fact of a plaintiff's injury shows he has manganism. Ultimately, defendants insist, allowing the plaintiff to make the suggestion that some individuals may be more susceptible to manganese than others, without actual evidence that this is true, eliminates the plaintiff's burden of proof on causation.

---

[371] *See Byers* pretrial tr. at 220-26 (Oct. 22, 2008); *Byers v. Lincoln Elec. Co.*, 2008 WL 4849339 at *6 (N.D. Ohio Nov. 6, 2008) (*Byers* docket no. 313) ("Defendants' Motion in Limine to Exclude Reference to Individual Susceptibility is denied. Plaintiffs are not arguing (and may not) that Byers, himself, is individually susceptible; and the concept generally is relevant and admissible, as discussed by defendants' own documents and experts. To the extent the defendants are concerned the jury will infer Byers is individually susceptible, defendants can clarify this on cross.").

The Court has denied this motion because at least three of defendants' own experts – movement disorder specialist Dr. Howard Hurtig, toxicologist Dr. Brent Furbee, and neuro-pharmacologist Dr. James Bennett – have each testified that the concept of individual susceptibility exists generally as to *all* known drugs and toxins *and specifically as to manganese*.  Further, there are similar statements in various medico-scientific articles, including a Canadian consensus document co-authored by defense expert Dr. Warren Olanow ("There is a concern that these workers are at increased risk of developing manganism where progression depends on the exposure level, the exposure duration, *and individual susceptibility*") and a 1955 article produced by defendants from their industrial hygiene files ("In no other occupational disease is individual sensitivity more important than manganism").

Further, it is beyond question that the concept of individual susceptibility is relevant.  First, defendants' knowledge thereof goes to whether their warning is sufficient.  Second, the concept rebuts defendants' argument that, if manganese in welding fumes is toxic, there should be an epidemic of welders with Manganese-induced Parkinsonism – individual susceptibility may explain why there is no epidemic.

Accordingly, defendants' motion to exclude any reference to the concept of individual susceptibility must be denied.  The Court will sustain an objection, however, to any suggestion that the plaintiff is, himself, individually susceptible, unless the plaintiff adduces a personalized, medico-scientific foundation for such evidence.

223

## X.    Motions for Judgment as a Matter of Law.

In the several cases chosen for MDL bellwether trials, the defendants filed motions for summary judgment directed at various claims.  In addition, in the three bellwether cases that ended with a plaintiff's verdict, the defendants filed post-judgment motions for judgment as a matter of law.  The Court summarizes below its rulings on these motions, on a claim-by-claim basis.

### A.    Defendants' Motion to Dismiss All Post-1985 Claims, Based on Federal Preemption – DENIED.

Early in the MDL process, a few defendants filed a motion arguing the plaintiffs' claims for failure to warn were all pre-empted by federal law, to the extent the alleged failure occurred after November 25, 1985.  It was on that date that a federal regulation known as the Hazard Communication Standard (commonly referred to as the "HazCom Standard"), promulgated by the Occupational Safety and Health Administration ("OSHA"), took effect.  The HazCom Standard was designed "to ensure that the hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to employers and employees."[372]  Among other things, the HazCom Standard required manufacturers to: (1) distribute to all "downstream employers" a material safety data sheet ("MSDS") listing the health hazards posed by the chemicals in their products, and (2) label each product container with "appropriate hazard warnings."[373]

The moving defendants argued that, because OSHA's HazCom Standard was a comprehensive piece of legislation regulating the entire field of chemical-product warnings, the HazCom Standard explicitly or impliedly preempted the plaintiffs' failure-to-warn claims.  After analyzing the Supreme

---

[372]  29 C.F.R. §1910.1200(a)(2).

[373]  *See generally* 29 C.F.R. §1910.1200(a-g).

224

Court's cases discussing federal preemption, the language of the congressional act authorizing the creation of OSHA, and the language of the HazCom Standard, this Court found the motion to dismiss was not well-taken.[374]  The Supreme Court has since issued a number of cases discussing the doctrine of federal preemption, and those cases have only strengthened this Court's earlier conclusion.[375]

**In sum,** none of the claims asserted by a plaintiff in a case remanded to a transferor court will fail based on federal preemption.

### B. Defendants' Motion for Summary Judgment on All Claims, Based on the Government Contractor Defense – DENIED.

In the MDL bellwether case of *Ruth*, the defendants moved for summary judgment on all of Ruth's claims based on the government contractor defense (also known as the "military contractor defense"). Although the defendants filed this motion in the context of the *Ruth* case, the parties and the Court understood that the Court's ruling on this issue would apply in every *Welding Fume* case where the welder-plaintiff had used welding rods while working on a federal government project (e.g., constructing U.S. Navy ships).[376]

---

[374]  *See In re Welding Fume Prods. Liab. Litig.*, 364 F.Supp.2d 669 (N.D. Ohio 2005) (master docket no. 1002).  Among other things, the Court concluded: "The HazCom Standard directs the defendants to give their employees appropriate warnings.  State common law duties requiring manufacturers and suppliers to warn the general public of known hazards does not pose an obstacle to compliance with this federal directive."  *Id.* at 698.

[375]  *See, e.g., Wyeth v. Levine*, 129 S.Ct. 1187, 1196-1204 (2009) (holding that federal regulations requiring the defendant to supply an "adequate" warning did not prevent the defendant from strengthening an agency-approved warning, and denying preemption).  Defendants have not appealed this Court's HazCom Standard preemption ruling in any bellwether case.

[376]  Thus, for example, the defendants appropriately did not file another motion for summary judgment based on the government contractor defense in the subsequent MDL bellwether case of *Jowers*. Instead, the Court instructed the *Jowers* jury on the law of this defense, and the jury specifically concluded the defendants did not carry their burden of proof on this matter.

Plaintiff Ruth, at the end of his career, spent three years at the Ingalls Shipyard in Pascagoula, Mississippi welding on ships built for the U.S. Navy.[377]  The welding rods Ruth used on these ships were manufactured to meet written military specifications, known as "MIL-specs," issued by the Navy's Naval Sea Systems Command ("NAVSEA").  These MIL-specs governed the welding rods' chemical composition and mechanical properties, as well as the warning language that accompanied the rods.  The defendants argued that, in light of their compliance with these MIL-specs, they were immune from liability pursuant to the government contractor defense.  The essence of this defense is that the manufacturing defendants were acting in their role as federal military contractors when they provided the allegedly defective welding rods to Ruth, and acting under federal direction during manufacture; accordingly, they were clothed with the same immunity the government enjoys.

This Court first examined the government contractor defense in the context of determining whether federal jurisdiction attached to cases where the plaintiff welder had used MIL-spec welding rods.  In particular, many *Welding Fume* cases were filed in state court and diversity between the parties was clearly lacking.  Defendants sometimes removed these cases to federal court, however, under the doctrine of "federal officer removal."  That is, the manufacturing defendants argued these cases were removable to federal court because the defendants were: (1) acting in their role as federal military contractors when they provided the allegedly defective welding rods to the plaintiffs, and (2) acting under federal direction during manufacture.  In this jurisdictional context, the Court's task was to determine "only whether the defendants invoke[d] a colorable federal defense, and not whether this defense will ultimately prevail."[378]  The Court concluded the defendants met this threshold burden: "it is fair, for jurisdictional purposes only, to conclude

---

[377]  Ingalls Shipyard is now known as Northrop Grumman Ship Systems.

[378]  *In re Welding Fume Prods. Liab. Litig.*, 2004 WL 1179454 at *10 (N.D. Ohio May 21, 2004) (master docket no. 224).

226

that the defendants were acting under federal office."[379]

When the defendants invoked the government contractor defense again as a basis for summary judgment in *Ruth*, the Court had to undertake a different analysis – not whether the defense was merely colorable, but whether it entitled defendants to judgment as a matter of law and undisputed fact.  The key question in this analysis – a question of fact – was whether the government: (1) "participated in discretionary design decisions" when it issued the MIL-specs; or, instead, (2) "exercise[d] no discretion [and] simply approve[d] a design with a rubber stamp, that is, approve[d] a design without scrutiny."[380] After examining the evidence, the Court concluded that "reasonable jurors could find in favor of either the plaintiffs or the defendants with respect to the level of discretion exercised by the Navy in the formulation and approval of the relevant warnings, and also on the question of whether the defendants warned the Navy of information in their possession about which the Navy was unaware."[381]  The Court reached this conclusion even though the law of the Sixth Circuit is relatively lenient regarding when the government contractor defense will prevail.[382]

**In sum,** in any *Welding Fume* case where the plaintiff used welding rods while working on a

---

[379]  *Id.* at *11.

[380]  *Ruth v. A.O. Smith Corp.*, 2005 WL 2978694 at *6 (N.D. Ohio Oct. 11, 2005) (*Ruth* docket no. 180) (quoting *Landgraf v. McDonnell Douglas Helicopter Co.*, 993 F.2d 558, 560 (6th Cir. 1993); *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989), *cert. denied*, 494 U.S. 1030 (1990); and *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1153 (6th Cir. 1995)).

[381]  *Id.*

[382]  *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995) ("some of the cases decided in other circuits applying the government contractor defense to failure to warn claims may require a higher level of government involvement than we think is required"); *cf. Beaver Valley Power Co. v. National Engineering & Contracting Co.*, 883 F.2d 1210, 1216 (3rd Cir. 1989) (requiring that "the government knew as much or more than the defendant contractor about the hazards of the project or product" before the government contractor defense will prevail).

227

project for the federal government, the manufacturing defendants will likely interpose the government

contractor defense.  The case law applicable to this defense is set out at length in two separate opinions.[383]

Whether the defendants prevail on this defense is normally a matter for the jury, and should not be raised

in a pretrial motion for judgment as a matter of law.  To date, the defendants have interposed the

government contractor defense in one MDL bellwether case that went to trial (*Jowers*); the jury rejected

the defense and found for the plaintiff.


### C.     Defendants' Motion for Summary Judgment on Plaintiff's Claim for Failure to Warn Based on Adequacy of Warning Language – DENIED.

The primary claim in every *Welding Fume* case is that the defendants failed to provide to the

plaintiff adequate warnings regarding the true hazards associated with the use of welding rods.  Plaintiffs

make this claim even though, beginning in 1967, the defendants did provide *some* warning.  Specifically,

the American Welding Society ("AWS") adopted a mandatory warning label in 1967 that stated:

> Caution.  Welding may produce fumes and gases hazardous to health.  Avoid breathing these fumes and gases.  Use adequate ventilation.  See USAS Z49.1, 'Safety in Welding & Cutting' published by the American Welding Society.

All of the welding rod manufacturer defendants used this same warning for 12 years.[384]  Then, in 1979,

the AWS adopted a new, mandatory, industry-wide warning label, which stated, in pertinent part:

> **FUMES AND GASES** can be dangerous to your health.
> •     Keep your head out of fumes.

---

[383] *In re Welding Fume Prods. Liab. Litig.*, 2004 WL 1179454 at *10 (N.D. Ohio May 21, 2004) (master docket no. 224); *Ruth v. A.O. Smith Corp.*, 2005 WL 2978694 at *6 (N.D. Ohio Oct. 11, 2005) (*Ruth* docket no. 180)

[384] Certain manufacturers added minor modifications to the standard warning.  For example, while the AWS used the phrase "avoid breathing these fumes and gases," defendant Airco/BOC's labels stated "avoid *excessive* breathing of these fumes and gases," while defendant Lincoln's labels stated "avoid breathing *concentrations* of these fumes and gases."

228

- • Use enough ventilation or exhaust at the arc or both.
- • Keep fumes and gases from your breathing zone and general area.

\* \* \*

See American National Standard Z49.1, "Safety in Welding and Cutting," published by the American Welding Society.

Again, all of the manufacturer defendants used this same warning for about six years.

As discussed above in Section VI.B.1 of this document, in 1985, OSHA promulgated the HazCom Standard, which directed manufacturers to: (1) distribute to all "downstream employers" a material safety data sheet ("MSDS") listing the health hazards posed by the chemicals in their products, and (2) label each product container with "appropriate hazard warnings."[385]  Each defendant manufacturer responded by creating its own MSDSs (with non-standardized language) for its different welding rod products, and each manufacturer also began to use different warnings – that is, the warnings also became less standardized from one defendant to another.  Today, some defendants warn explicitly that breathing welding fumes can cause brain damage, and some do not.  Defendant ESAB's warning labels now state: "Overexposure to manganese and manganese compounds above safe exposure limits can cause irreversible damage to the central nervous system, including the brain."[386]

Given this history of having provided *some* warnings with their welding rods, the defendants in the MDL bellwether trial of *Ruth* moved for summary judgment on Ruth's failure-to-warn claim, arguing the warnings they did supply were adequate as a matter of Mississippi law.  The Court denied this motion, concluding a reasonable jury could find the defendants' warnings were inadequate.[387]  In particular, the Court observed that the evidence allowed a jury to find well-taken some or all of the following arguments

---

[385] *See generally* 29 C.F.R. §1910.1200(a-g).

[386] Trial exh. 1152, exh. O (emphasis added).

[387] *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

229

made by plaintiffs:

- the warning to "use enough ventilation . . . to keep fumes and gases from your breathing zone" does not "communicate sufficient information" to inform a welder how to use the welding rod safely, because "enough ventilation" is not defined.

- the warnings' use of a reference to a separate document – the MSDSs and American National Standard Z49.1 – did not serve as a sufficient mechanism to adequately and actually give notice to the intended warning recipient.

- the size and placement of the warnings worked to make them inadequate as methods of actual notice to welders.

- the defendants undertook efforts to mitigate the force of their own warnings, such as by publishing articles in welding trade journals downplaying and even contradicting their warnings, thereby making the warnings inadequate.

- the warnings did not sufficiently communicate the level and extent of the danger of inhaling welding fumes – that is, that: (a) inhaling welding fumes can cause permanent brain damage, and the damage may progress; (b) this brain damage can lead to total disablement, even after exposures as short as a few months to high-fume concentrations; and (c) symptoms of this disablement are similar to Parkinson's syndrome and may be commonly mis-diagnosed.

The Court's denial of the defendants' motion for summary judgment on Ruth's failure-to-warn claim was made pursuant to Mississippi law.  The law on failure-to-warn claims is fairly standardized from State to State, however, so that the factual and legal analysis applicable to every other plaintiff's failure-to-warn claim would be virtually the same in any other State.  Recognizing this, defendants appropriately have not filed a similar summary judgment motion in any of the subsequent bellwether trials applying other States' laws.

The Court's ruling denying summary judgment in the very first bellwether case of *Ruth* was made before trial and was based "on the evidence so far adduced."[388]  Since then, the undersigned has presided over the trial of six bellwether cases, three of which – *Tamraz*, *Jowers*, and *Cooley* – ended with jury verdicts in favor of the plaintiff on his failure-to-warn claim.  In all three cases, the defendants filed post-

---

[388] *Id.* at *2.

judgment motions for judgment as a matter of law.  In *Tamraz* and *Jowers*, the Court denied the motions, finding there was sufficient evidence to support the jury's conclusion that the defendants' failure to warn had proximately harmed the plaintiff.[389]  The Court's post-judgment opinions in these two cases include a summary of the relevant evidence, which a transferor court may find useful as a preview of what to expect at trial.  On appeal, the defendants did *not* argue that their warnings were adequate as a matter of law.[390]

**In sum**, in a particular case, a particular defendant may be entitled to judgment as a matter of law on a plaintiff's claim for failure to warn for various reasons, such as that the plaintiff failed to show: (1) he ever used that particular defendant's products; or (2) a different or better warning would have made any difference in his behavior (discussed immediately below).  But a plaintiff's failure-to-warn claim will not founder based on the argument that the defendants' warning language was adequate as a matter of law; the question of warning language adequacy clearly presents an issue for resolution by a jury.

---

[389] *See Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending); *Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724 (S.D. Miss. 2009) (*Jowers* docket no. 459) (appeal pending).  In *Cooley*, the defendants also filed post-judgment motions (which the Court has not yet ruled upon), but those motions did not argue there was insufficient evidence to support the jury's verdict on the failure-to-warn claim.

[390] In their appeal of the *Tamraz* verdict, for example, the defendants argued that: (1) plaintiffs' medical causation expert testimony was unreliable; (2) the trial court erred in admitting certain "ultimate opinion" testimony from the plaintiff's warnings expert, Dr. Cunitz; (3) the trial court erred in failing to give a "sophisticated user" jury instruction; (4) the plaintiff failed to identify with sufficient particularity which warnings he saw, and when; and (5) as to defendant TDY, there was insufficient proof that the plaintiff used that particular defendant's products.  Defendants did not argue that, as a matter of law, their warning language communicated sufficient information about the hazards of using welding rods.

**D.** **Defendants' Motion for Judgment as a Matter of Law on Plaintiff's Claim for Failure to Warn Based on Lack of Showing that a "Better" Warning Would Have Made a Difference – DEPENDS.**

A part of the chain of proof that a *Welding Fume* plaintiff must normally establish to prevail on his claim for failure to warn is that he would have heeded a better warning – in other words, he must show not only that the defendants' warnings were inadequate, but also that an *adequate* warning would have made a difference by changing his behavior.[391]  As this Court instructed the jury in the MDL bellwether trial of *Tamraz*, where California law applied, the plaintiff "must show that, if he had received different or additional warnings from the defendants, it is more likely than not that he would have altered his conduct in the use of welding consumables, and this alteration would have prevented him from suffering the same amount of harm."[392]

Defendants may assert two related evidentiary defenses pointed at this link in plaintiff's chain of proof; both defenses may be raised in a Rule 50 motion during or after trial, or a Rule 56 motion before trial.[393]  First, if the evidence suggests the plaintiff did not read the warnings he was given, the defendants may assert he cannot prevail because it did not matter *what* their warnings said – if the plaintiff did not read any warnings, then the best warning on earth would have made no difference.  In the MDL bellwether trial of *Byers*, for example, defendants filed a Rule 50 motion seeking judgment as a matter of law,

---

[391]  For example, a welder could testify that, had he been given a better warning, he would have ceased welding, or arranged for better ventilation, or worn a respirator.

[392]  *Tamraz* Jury Instructions at 28 (docket no. 160).

[393]  In two MDL trials, defendants have raised these defenses pursuant only to Rule 50; however, the Court is aware that defendants have raised these defenses pursuant to Rule 56 in at least one state court *Welding Fume* case.  *See Boyd v. Lincoln Elec. Co.*, 902 N.E.2d 1023, 1032 (Ohio Ct. App. 2008) (reversing summary judgment for defendant, who had relied in the trial court "on cases that hold that when a plaintiff admits he or she did not read a warning label, proximate cause cannot be established, and the claim fails;" citing this Court's opinion in *Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending)).

232

asserting the plaintiff had testified he knew warnings were provided with defendants' products but he did not read them, thinking he had sufficient knowledge and did not need to.  Because the jury found in favor of the *Byers* defendants, the Court never ruled on the merits of this motion.

Second, even if the plaintiff read the warnings, the defendants may assert the plaintiff adduced insufficient evidence that he would have, in fact, altered his behavior if the defendants had supplied a better warning.  In the MDL bellwether trial of *Tamraz*, for example, defendants filed a Rule 50 motion asserting the plaintiff had not shown at trial he would have done anything differently if he had been given a better or different or more adequate warning: "given the testimony in the record indicating that Mr. Tamraz continued to weld despite his subjective belief that exposure to welding fumes posed significant health risks, including injury to his eyes and lungs, plaintiffs could not prove that Mr. Tamraz's welding behavior would have been affected by different or additional warnings."[394]  On the evidence adduced, the Court denied this motion, concluding a jury could reasonably find Mr. Tamraz would have acted differently if presented with a different warning.[395]

Transferor courts should note that the viability of these "warning language causation" defenses calls for examination of whether the applicable State law adopts the "heeding presumption."  The heeding

---

[394] *Tamraz* defendants' post-judgment motion for judgment as a matter of law on causation at 3 (*Tamraz* docket no. 174).

[395] *See Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 at *4 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending) ("To make a sufficient evidentiary showing on this issue, there need not be uttered by plaintiff (or any other witness) certain 'magic words;' counsel is not required to ask the plaintiff explicitly whether he would have behaved differently if he had received a different warning, and the plaintiff need not testify precisely to this effect. Indeed, a jury could reasonably perceive such a formulaic exchange as weightless. * * * The [circumstantial] evidence summarized above provides a sufficient basis upon which a reasonable jury could infer, find, and conclude that: (a) Mr. Tamraz was generally a careful welder; (b) Mr. Tamraz did his best to follow the warnings he was given, including directions on when and whether to use respirators; and (c) if warned that welding carried a risk of permanent brain damage, and that this risk could be mitigated by taking certain additional precautions (e.g., wearing a respirator), then Mr. Tamraz would have changed his behavior and welded differently.").

233

presumption is "a rebuttable presumption . . . that the [welder] would have read any warning provided by the manufacturer, and acted so as to minimize the risks;" this presumption "is a burden-shifting device assisting a plaintiff in establishing causation."[396]  If State law recognizes the "heeding presumption," then the jury will be instructed to presume, absent evidence otherwise, that the welder-plaintiff would have behaved differently if he had been given a better warning.  In *Tamraz*, the Court assumed the heeding presumption did not apply but nonetheless denied defendants' motion for judgment as a matter of law invoking the warning language causation defense.

**In sum**, to prevail on a claim for failure to warn, a plaintiff must prove not only that the warning language provided by defendants was inadequate, but also that a better warning would have made a difference.  State law may assist the plaintiff in shouldering this burden by recognizing the rebuttable "heeding presumption" – an evidentiary premise that the plaintiff would have read and followed a better warning.  A defense motion for judgment as a matter of law on the question of whether a plaintiff would have heeded a better warning will be highly fact-specific, but may be amenable to judgment as a matter of law in certain circumstances.

### E.   Defendants' and Plaintiffs' Motions for Summary Judgment on the Sophisticated User and Learned Intermediary Defenses – DENIED.

In every *Welding Fume* case, the defendants have asserted two related defenses: (1) the

---

[396] *Id.* at 3 (quoting *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1281 (5th Cir. 1974), *cert. denied*, 419 U.S. 1096 (1974)).  The *Reyes* court further explained: "Such a presumption works in favor of the manufacturer when an adequate warning is present.  Where there is no warning, as in this case, however, the presumption that the user would have read an adequate warning works in favor of the plaintiff user.  In other words, the presumption is that [the product user] would have read an adequate warning.  The presumption, may, however, be rebutted if the manufacturer comes forward with contrary evidence that the presumed fact did not exist." *Reyes*, 498 F.2d at 1281 (quoting *Technical Chemical Co. v. Jacobs*, 480 S.W.2d 602, 606 (Tex. 1972)).

Sophisticated User Defense, and (2) the Learned Intermediary Defense.  The precise contours of these two defenses are different under each State's laws – indeed, some courts use the two terms interchangeably, while other courts use them to refer to two distinct theories of law.  Further, certain States may apply the Learned Intermediary doctrine only in cases involving physicians, and some States shift the burden of proof when considering the viability of one or both of those defenses.  Thus, transferor courts must take care when assessing motions for judgment as a matter of law in connection with these two defenses, and also when crafting instructions that explain to a jury how these defenses work.

An example description of the Sophisticated User Defense is provided by the California Supreme Court: "just as a manufacturer need not warn ordinary consumers about generally known dangers, a manufacturer need not warn members of a trade or profession (sophisticated users) about dangers generally known to that trade or profession."[397]  The Sophisticated User Defense holds that, "[f]or those individuals or members of professions who do know or should know about the product's potential dangers, that is, sophisticated users, the dangers should be obvious, and the defense should apply."[398]  The defense "exempts manufacturers from their typical obligation to provide product users with warnings about the products' potential hazards.  The defense is considered an exception to the manufacturer's general duty to warn consumers, and therefore, in most jurisdictions, if successfully argued, acts as an affirmative defense to negate the manufacturer's duty to warn."[399]

In the context of *Welding Fume* cases, both defendants and plaintiffs have filed motions for summary judgment aimed at the Sophisticated User Defense.  Defendants consistently assert that the

---

[397] *Johnson v. American Standard, Inc.*, 179 P.3d 905, 912 (Cal. 2008).

[398] *Id.*; *see id.* at 910 (also stating the rule as: "sophisticated users need not be warned about dangers of which they are already aware or should be aware").

[399] *Id.* at 910.

235

welder-plaintiff is a sophisticated user of welding rods who received training from his employers, union, and/or welding school, and thus knew (or at least should have known) that welding fume exposure could cause neurological injury. Accordingly, defendants assert they are entitled to summary judgment on all of the plaintiff's claims based on the Sophisticated User Defense. Plaintiffs consistently respond that, while the manufacturer-defendants may have warned generally that welding fumes can be hazardous, the defendants never explained adequately to *anybody* that welding fumes could cause permanent, progressive brain damage; to the contrary, plaintiffs assert, defendants minimized and hid this particular danger of welding fumes. Accordingly, plaintiffs have moved for summary judgment on the Sophisticated User Defense, arguing the Court should not instruct the jury that it is available.

While the Sophisticated User Defense focuses upon the knowledge of the ultimate product-user (here, the welder-plaintiff), the Learned Intermediary Defense focuses upon the knowledge of the entity that provides the product to the end-user (here, the welder's employer). An example description of the Learned Intermediary Defense is provided by the United States Court of Appeals for the Fifth Circuit: although the law normally "requires a manufacturer to provide adequate warnings of the dangers of its product" to the ultimate product-user, the Learned Intermediary Defense "allows the manufacturer to discharge its duty to warn by providing necessary information about the dangers of the product to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product."[400] The Learned Intermediary Defense is most often interposed by drug companies, which may discharge their duty to warn users of a prescription drug by giving notice of the drug's hazards to the

---

[400] *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 676 (5th Cir. 1999) (applying Mississippi law).

prescribing physician.[401]

In *Welding Fume* cases, defendants consistently assert they discharged their duty to warn when they told the plaintiff's employers and welding instructors about the hazards of welding fumes, because those employers and instructors had their own duties to provide safety instruction to welders and, thus, should have passed on the relevant warning information to the plaintiff.  Accordingly, defendants assert they are entitled to summary judgment on all of the plaintiff's claims based on the Learned Intermediary Defense.  Plaintiffs consistently respond, again, that, while the manufacturer-defendants may have warned the employers and instructors generally that welding fumes can be hazardous, the defendants never explained adequately to *anybody* that welding fumes could cause permanent, progressive brain damage; thus, the intermediaries could not pass on the necessary information.  Accordingly, plaintiffs have also moved for summary judgment on the Learned Intermediary Defense, again arguing the Court should not instruct the jury that it is available to defendants.[402]

The Court has denied every motion for summary judgment directed at the Sophisticated User Defense and the Learned Intermediary Defense, whether filed by plaintiffs or defendants.  For example,

---

[401] *See Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1231 (4th Cir. 1984) ("It is settled in a substantial majority of jurisdictions that the duty a manufacturer of ethical drugs 'owes to the consumer is to warn only physicians (or other medical personnel permitted by state law to prescribe drugs) of any risks or contraindications associated with that drug.'  If the prescribing physician has received adequate notice of possible complications, the manufacturer has no duty to warn the consumer.  In that instance, the physician is called on to act as a 'learned intermediary' between the manufacturer and the consumer because he is in the best position to understand the patient's needs and assess the risks and benefits of a particular course of treatment.") (citations omitted).

[402] As noted above, the law and terminology used by courts in different States when discussing the Sophisticated User and Learned Intermediary Defenses varies.  In South Carolina, for example, the "sophisticated user defense is permitted in cases involving an employer who was aware of the inherent dangers of a product which the . . . employer purchased for use in his business.  Such an employer has a duty to warn his employees of the dangers of the product." *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 331 (S.C. Ct. App. 1995).  This actually describes a Learned Intermediary Defense.  Many states lump the two defenses together, usually under the name Sophisticated User Defense.

in the MDL bellwether case of *Ruth*, the defendants moved for summary judgment on the basis of the Learned Intermediary Defense.  The Court denied the motion, because if "defendants had certain knowledge regarding the extent of welding fume hazards and how to avoid those hazards, but defendants did not fully disclose this information to [Ruth's employer] Ingalls Shipyard[, then] Ingalls may not have been completely 'learned' regarding the known hazards of welding, and so could not adequately warn [its welder-employees]."[403]  Conversely, in the MDL bellwether case of *Jowers*, the plaintiff moved for summary judgment on the Sophisticated User and Learned Intermediary Defenses.  The Court denied the motion because, "[b]ased on the record evidence so far adduced, just as a reasonable jury could conclude that [Jowers' employer] Ingalls Shipyard was not a learned intermediary, a reasonable jury could also conclude it was.  Similarly, a reasonable jury could conclude that Jowers, himself, was a sophisticated user.  Because there remain material issues of fact in dispute, Jowers' motion for summary judgment on this defense must be denied."[404]  In the *Jowers* bellwether trial, the jury specifically rejected the defendants' sophisticated user defense; in the *Goforth* bellwether trial, the jury specifically accepted the defendants' sophisticated user defense.[405]

**In sum**, the Sophisticated User Defense holds that a product manufacturer need not warn members

---

[403] *Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *2 (N.D. Ohio Feb. 27, 2006) (*Ruth* docket no. 183).

[404] *Jowers v. BOC Group, Inc.*, 2009 WL 995613 at *11 (S.D. Miss. Apr. 14, 2009) (*Jowers* docket no. 460) (appeal pending) (citing *Ruth*, 2006 WL 530388 at *2).

[405] *See Jowers* Verdict Form, docket no. 438 (jury answering "no" to the interrogatory "Do you find that the defendants proved, by a preponderance of the evidence, all three elements of their sophisticated user defense, based on all the instructions I have given to you relating to that defense?"); *Goforth* Verdict Form, docket no. 135 (jury answering "yes" to the interrogatory "Do you find that the defendants established, by a preponderance of the evidence, that the Duke Power Company was a sophisticated user of the defendants' welding products, such that the defendants had no duty to warn Mr. Goforth or Mr. Quinn directly regarding any dangers inherent in the use of those welding products?").

238

of a trade or profession about dangers generally known to that trade or profession. Similarly, the Learned Intermediary Defense holds that a product manufacturer can discharge its duty to warn by providing information about the dangers of the product to a third person, upon whom it can reasonably rely to communicate the information to the product's end-users. Defendants in *Welding Fume* cases will assert the undisputed facts show they are entitled to summary judgment under both defenses, while plaintiffs will object and even assert the undisputed facts show the defenses both fail as a matter of law. While the law applicable to the Sophisticated User and Learned Intermediary Defenses varies from State to State, this Court has denied all summary judgment motions directed at these two defenses, whether filed by plaintiffs or defendants.[406]

### F. Plaintiffs' Motion for Summary Judgment on the Joint Tortfeasor Defense under Mississippi Law – GRANTED.

Mississippi law holds that, "in actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault without regard to whether the joint tort-feasor is immune from damages."[407] In two MDL bellwether cases where Mississippi law applied – *Ruth* and *Jowers* – defendants asked the Court to follow this rule and allow a jury to apportion fault to Ingalls Shipyard, which was the employer of the welder-plaintiff in each case. In particular, the defendants asserted that, to the extent the plaintiff's injuries were caused by the negligent conduct of Ingalls Shipyard

---

[406] On a related note, the Court has directed that counsel and witnesses may not refer during trial to a plaintiffs' employer as "sophisticated" because, if a word has two separate vernacular and legal meanings, then the word should be excluded during trial. *Cooley* pretrial tr. at 305-06 (Sept. 2, 2009); *see Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) (discussing use of word "discrimination"). If the Court concludes there is sufficient evidence in a given case to submit the Sophisticated User and/or Learned Intermediary Defenses to the jury, only then will the Court allow counsel to use the term during closing argument, in conjunction with a properly-worded jury instruction.

[407] Miss. Code Ann. §85-5-7(5).

239

for failing to provide a safe work environment, a jury should apportion fault accordingly.

In both *Ruth* and *Jowers*, however, the plaintiff was covered by the federal workers' compensation statute known as the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§901 *et seq*.  This statute provides that a person who receives LHWCA benefits cannot sue his employer for damages related to his on-the-job injury.  Further, LHWCA provides that, when a plaintiff covered by LHWCA (such as welder Ruth) sues a third party (such as a welding rod manufacturer) for work-related injuries: (1) if the third party is a "vessel," then a trial court should *not* assess the fault of the employer, nor reduce a verdict against the third-party defendant by the amount of the employer's fault; and (2) if the third party is not a "vessel," then the question of whether a trial court should assess the fault of the employer and reduce a verdict against the third-party defendant by the amount of the employer's fault is a question of State law.

In *Welding Fume* cases, the manufacturer defendants are not "vessels." Thus, this Court had to examine the interplay of LHWCA and Mississippi law to determine whether a *Welding Fume* jury should apportion fault to Ingalls Shipyard.  Although the Mississippi Supreme Court used somewhat confusing logic when examining the reach of LHWCA, this Court ultimately concluded that "the current state of Mississippi law holds that, when an employee covered by LHWCA sues a [non-vessel] third party for damages, the trial court does not apportion fault to the employer."[408]  Accordingly, the Court granted summary judgment on this issue to plaintiffs in both *Ruth* and *Jowers* and did not allow the jury to apportion fault to the employer, Ingalls Shipyard.  While the parties settled in *Ruth* before trial, a jury found in favor of the plaintiff in *Jowers*.  Thus, the question of whether this MDL Court was correct when

---

[408] *Ruth v. A.O. Smith Corp.*, 416 F. Supp. 2d 584, 592 (N.D. Ohio 2006) (*Ruth* docket no. 184); *see also Jowers v. BOC Group, Inc*., 2009 WL 995613 at *12-13 (S.D. Miss. Apr. 14, 2009) (*Jowers* docket no. 460) (appeal pending) (noting this remains true even if the plaintiff did not actually apply for or receive benefits under LHWCA).

it did not allow the *Jowers* jury to apportion fault to the employer will be assessed on appeal.

**In sum**, unless the Fifth Circuit Court of Appeals reverses the decision of this Court in *Jowers*, a transferor court should grant a Mississippi plaintiff's motion for summary judgment on apportionment of fault to an employer, if the plaintiff was covered by LHWCA during his employment.[409]

### G.     Plaintiffs' Motion for Summary Judgment on the Defense of Contributory Negligence under Mississippi Law – DENIED.

In every *Welding Fume* case where the applicable law provides for contributory negligence, the defendants will assert this defense.  For example, Mississippi law provides that, in all personal injury actions, "damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured."[410]  Accordingly, in the MDL bellwether trial of *Jowers*, defendants invoked this defense and asked the Court to instruct the jury to reduce the amount of damages, if any, in accord with the plaintiff's own degree of fault.

As did the plaintiff in *Jowers*, Mississippi plaintiffs may move for summary judgment on this defense, arguing the undisputed facts do not allow a jury to reasonably conclude the plaintiff was, himself, in any way negligent.  The Court denied this motion in *Jowers*, and the jury ultimately found the plaintiff's own negligence was 40% of the cause of his injuries.  Because the question of whether the plaintiff was, himself, negligent is usually very fact-specific, it is most likely a question that must be resolved by a jury.

---

[409]  As noted above, under LHWCA, if the third party is not a "vessel," then the question of whether a trial court should assess the fault of the employer and reduce a verdict against the third party defendant is a question of State law. When examining State law, this Court found the Mississippi Supreme Court had used a "somewhat circular analysis" and "arguably faulty" reasoning when explaining how State law interacted with LHWCA. *Ruth*, 416 F. Supp. 2d  at 590, 592.  It could also occur that the Mississippi courts clarify their analysis, in which case this Court's conclusion regarding apportionment might no longer apply.

[410]  Miss. Code Ann. §11-7-15.

241

Thus, a transferor court will normally deny a plaintiff's motion for summary judgment on contributory negligence.

**In sum**, whether a welder-plaintiff's own negligence contributed to his injuries normally is a fact question that must be determined by a jury, and is not susceptible to ruling on summary judgment.

### H.    Defendants' Motion for Summary Judgment on Plaintiff's Claim for Conspiracy and Fraud under Mississippi Law – GRANTED.

In the first MDL bellwether case of *Ruth*, in which Mississippi law applied, the plaintiff brought a claim for "conspiracy and fraudulent concealment."  The principal allegation underlying this claim was that the defendants conspired to: (a) conceal and misrepresent information regarding the toxic effects of manganese in welding fumes; and (b) issue product warnings that did not fully disclose the welding rods' hazards.  The defendants moved for summary judgment, based on three grounds: (1) there was insufficient evidence that the defendants had ever entered into any agreement to accomplish an unlawful purpose; (2) even if the defendants had entered into such an agreement, there was no evidence this agreement was the proximate cause of Ruth's injury; and (3) under Mississippi law, a conspiracy claim cannot succeed when it is premised on a failure to warn.

The Court examined only the third argument, and found it well-taken because "Mississippi courts . . . have consistently held that a claim of fraud may not be based upon an omission or silence, unless there exists a special relationship between the parties."[411]  In *Ruth*, the allegations of fraudulent conduct were predicated not on what the manufacturing defendants affirmatively misrepresented, but on what they allegedly failed to disclose.  Under Mississippi law, "silence, in the absence of a duty to speak, is not

---

[411] *Ruth v. A.O. Smith Corp.*, 2005 WL 2978694 at *3 (N.D. Ohio Oct. 11, 2005) (*Ruth* docket no. 180).

actionable."[412] Ruth tried to overcome this rule by arguing he was in a special, fiduciary relationship with the defendants, but the Court rejected this argument, finding "[t]he relationship between Ruth and the defendants . . . was simply one of product-user / product-manufacturer."[413] Ruth also argued the allegedly deficient product warnings provided by the defendants were "affirmative misrepresentations," upon which a fraud claim could be based.  The Court rejected this argument also, because "to hold otherwise would convert all product manufacturer's duty to warn claims into fraud claims."[414]  The Court concluded that, under Mississippi law, "the affirmative misrepresentations upon which a claim for fraud must be premised cannot include only the very warnings that support a product liability claim for failure to warn."[415]

**In sum,** because Ruth identified no *affirmative* misrepresentations made by any alleged conspirator upon which he relied (as opposed to alleged misrepresentations by omission or silence), defendants were entitled to summary judgment on Ruth's conspiracy claim as a matter of Mississippi law.  This does not mean that a Mississippi plaintiff cannot proceed "against defendants for their alleged silence and omissions; it is just that he must do so using a failure to warn theory, not a conspiracy or fraud theory."[416]  Further, as discussed below in Section X.J of this document, a Mississippi plaintiff may still pursue a fraud claim based on *affirmative* misrepresentations.  And finally, it is notable that summary judgment on the

---

[412] *Id.* at *4 (quoting *Smith v. Tower Loan of Mississippi, Inc.*, 216 F.R.D. 338, 358 (S.D. Miss. 2003).

[413] *Id.*

[414] *See id.* at *5 ("The affirmative misrepresentations upon which a claim for fraud must be premised cannot include only the very warnings that support a product liability claim for failure to warn."). The Court also held that Ruth could not base his fraud claim on historical statements made by defendants to trade journals, because there was no evidence he ever personally relied on these alleged misrepresentations.

[415] *Id.*

[416] *Id.* at 10.

243

same claims may not be appropriate when the law of other States is applied, as explained immediately below.

## I.      Defendants' Motion for Summary Judgment on Plaintiff's Claim for Fraud under California Law – DENIED.

As noted immediately above, the Court granted summary judgment to defendants in *Ruth* on plaintiff's claim for fraud.  Under Mississippi law, a claim of fraud cannot be based upon an omission or silence unless there exists a special relationship between the parties.  Because Ruth pointed only to defendants' omissions (and not affirmative representations), and because the relationship between Ruth and the defendants was simply one of product-user / product-manufacturer, the defendants were entitled to summary judgment.

When this Court examined a claim for fraudulent concealment under California law in *Tamraz*, however, the Court denied summary judgment.[417]  The simplest explanation for this ruling is that, in a California state court *Welding Fume* case, the judge denied an identical motion.  Specifically, California has a state-court analog to this federal MDL, known as California Judicial Council Coordination Proceeding ("C.J.C.C.P.") No. 4368, where California has aggregated all of its *Welding Fume* cases.  In one of those cases, Presiding Judge Bonnie Sabraw[418] noted that, under California law, there are "four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from

---

[417] *Tamraz v. Lincoln Elec. Co.*, 2007 WL 3399721 at *9-10 (N.D. Ohio Nov. 13, 2007) (*Tamraz* docket no. 147) (appeal pending).

[418]  Judge Sabraw has since retired and the Honorable Robert Freedman is now presiding over C.J.C.C.P. No. 4368.

244

the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."[419]  After examining the conspiracy evidence – which will be virtually the same in all *Welding Fume* cases – Judge Sabraw concluded there were triable issues of fact suggesting the plaintiff could prevail under the categories of fraudulent concealment, and she denied summary judgment.[420]  Because this Court was applying California law in *Tamraz*, it also denied summary judgment on the claim for fraudulent concealment.  The jury found for the defendants on this claim.

**In sum**, when applying California law, issues of material fact will normally preclude entry of summary judgment on a claim for fraudulent concealment.

### J.  Defendants' Motion for Summary Judgment on Plaintiff's Claims for Negligent & Conscious Misrepresentation under Mississippi Law – GRANTED in part and DENIED in part.

In the MDL bellwether trial of *Jowers*, where Mississippi law applied, the plaintiff brought claims against defendants for both negligent and conscious misrepresentation of the degree to which welding fumes are hazardous.  "Conscious misrepresentation" is another name for fraud.  As discussed above in Section X.H of this document, the Court granted summary judgment on a fraud claim in the MDL

---

[419]  *Limandri v. Judkins*, 52 Cal. App. 4th 326, 336 (Cal. Ct. App 1997) (discussed by Judge Sabraw in *King v. BOC Financial Corp.*, case no. RG-07344706, slip op. at 7-8 (Sup. Ct. Cal. Nov. 1 2007)).  The *King* case may be found at *Tamraz* docket no. 185, exh. B.

[420]  Judge Sabraw also cited *Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 680-681 (2004) to support her conclusion.  This Court examined *Whitely's* reasoning in *Tamraz*, 2007 WL 3399721 at *9-10 (*Tamraz* docket no. 147) (appeal pending).  Among other observations, *Whiteley* holds that: "One who makes a misrepresentation or false promise or conceals a material fact is subject to liability if he or she intends that the misrepresentation or false promise or concealment of a material fact will be passed on to another person and influence such person's conduct in the transaction involved. * * *  One who makes a misrepresentation or false promise or conceals a material fact with the intent to defraud the public or a particular class of persons is deemed to have intended to defraud every individual in that category who is actually misled thereby."  *Id.* at 680-81.

bellwether case of *Ruth*, where Mississippi law also applied.  In *Jowers*, however, the Court granted the same motion only in part, because the evidence and allegations in *Jowers* were slightly different than in *Ruth*.

In particular, whereas plaintiff Ruth premised his fraud claim only on the defendants' alleged *silence and omissions* regarding the hazards of welding fumes, plaintiff Jowers premised his fraud claim additionally upon *affirmative statements* made by defendants in various marketing and scientific publications, and also in MSDSs that accompanied the welding rods Jowers used.  Further, Jowers asserted that, even though he did not rely on these affirmative statements directly (because he did not read them himself), the defendants made these affirmative misrepresentations to his employer, Ingalls Shipyard, with the expectation that Ingalls would essentially repeat those misrepresentations to him; and, Ingalls supervisors and managers did, in fact, pass on those misrepresentations and Jowers did, in fact, reasonably rely upon them, as defendants had always intended.[421]

In *Jowers*, then, the Court had to assess whether defendants were entitled to summary judgment under Mississippi law on a claim for fraud that was premised not upon defendants' alleged omissions, but on plaintiff's alleged indirect reliance on defendants' affirmative statements.  The Court concluded this

---

[421] *Jowers v. BOC Group, Inc.*, 2009 WL 995613 at *7 (S.D. Miss. Apr. 14, 2009) (*Jowers* docket no. 460).  As an example, Jowers noted that "defendant Lincoln provided to Ingalls a 1972 welding handbook stating that welding fumes are 'innocuous.'  Jowers assert[ed] the evidence [would] show that: this statement is false; Lincoln knew it was false when it made it; Lincoln expected Ingalls to pass this false information on to its welder-employees; Ingalls actually did pass this information on to Jowers; and Jowers reasonably relied upon it, to his detriment.  Thus, Jowers argue[d] summary judgment on his fraud claim is inappropriate because he can establish *indirect* reliance upon affirmative misrepresentations made by the defendants."  *Id.* at *7-9.

In essence, Jowers' argument presents the other side of the Learned Intermediary Doctrine discussed in Section X.E of this document – that is, just as defendants assert they discharged their duty to warn by providing all known hazard information to Jowers' employers, Jowers asserts defendants engaged in fraud by affirmatively misrepresenting to his employers the full nature of those welding fume hazards.

distinction did make a difference and denied defendants' motion for summary judgment, but the ruling was very narrow.  The Court held that Jowers could "prevail on this claim only if he shows at trial that: (a) a defendant made an affirmative misrepresentation to Jowers' employer; (b) the defendant reasonably expected that the employer would convey substantially the same affirmative misrepresentation to Jowers; (c) the employer actually did so; and (d) Jowers actually and reasonably relied upon the affirmative misrepresentation."[422]  Ultimately, Jowers could not navigate this narrow ruling: at trial, after the close of plaintiffs' case, the Court granted a Rule 50(a) motion for judgment as a matter of law on the claim for conscious misrepresentation, because there was insufficient evidence of actual, if indirect, reliance.

In addition to his claim for conscious misrepresentation, Jowers also asserted a claim for negligent misrepresentation.  It suffices to say that the Court's rulings on defendants' motions directed at this claim were the same as the rulings on the claim for conscious misrepresentation – summary judgment was narrowly denied, but the Court later granted a Rule 50(a) motion in defendants' favor at trial.

**In sum**, the evidence may allow a Mississippi *Welding Fume* plaintiff to avoid summary judgment on a misrepresentation claim, but the proofs at trial are exacting.  To prevail, the plaintiff must show he actually relied upon an affirmative misrepresentation (not simply an omission) made by the defendants.  While a plaintiff may show *indirect* reliance by pointing to alleged misrepresentations made by defendants *to others*, such as the plaintiff's employer, the plaintiff must then show the defendant reasonably expected the employer would convey to the plaintiff substantially the same affirmative misrepresentation, the employer actually did so, and the plaintiff actually and reasonably relied upon the affirmative misrepresentation.  No MDL plaintiff has succeeded in making this showing at trial.

---

[422]  *Id.* at *8 (footnote omitted).  The Court added: "Also, the type of showing to support this alleged indirect reliance is exacting, and a fraud claim will only lie against the individual defendant who made the relied-upon affirmative misrepresentation."  *Id.* (footnote omitted).

247

**K.  Defendants' Motion for Summary Judgment on Plaintiff's Claims for Fraud under Iowa Law – GRANTED.**

In the MDL bellwether trial of *Cooley*, where Iowa law applied, the plaintiff brought a claim for fraud, as had the plaintiffs in the bellwether cases of *Ruth*, *Tamraz*, and *Jowers*.  And, like the defendants in those other three cases, the *Cooley* defendants filed a motion for summary judgment.  The Court examined Cooley's fraud claim in light of its earlier summary judgment analyses and concluded that, in contrast to *Jowers*, the motion for summary judgment was well-taken.[423]  Specifically, the Court held that "Iowa law would probably allow Cooley to bring the type of 'indirect reliance' fraud claim that was permitted (though ultimately not proven) in *Jowers*."[424]  Further, "Iowa law would probably allow Cooley to pursue a fraudulent concealment claim if he had evidence of reliance upon direct communications from the manufacturers other than their product labels."[425]  But, under Iowa law, Cooley could not "rely on alleged omissions in the defendants' product labels, alone, to support his fraud claim," and this was the only allegation that Cooley made.[426]  Cooley did not allege he had ever relied upon direct communications from the defendants contained in their advertising or welding handbooks, nor on any communications received indirectly through an employer or union.  Rather, Cooley made clear that his only factual basis for his claim of fraudulent concealment was the alleged omissions from the defendants' warnings labels.[427]  Even though Cooley referred to the alleged omissions as tantamount to "half-truths," Cooley did not point

---

[423]  Order at 2 (Aug. 31, 2009) (*Cooley* docket no. 199).

[424]  *Id.* at 15-16.

[425]  *Id.*

[426]  *Id.*

[427]  Cooley wrote: his "fraudulent misrepresentation claim depends on his reliance on the product labels themselves.  The half-truths in those labels misled Mr. Cooley, causing him to use the products, and to use them in a way that injured him."  *Id.* at 12 (quoting Cooley's opposition brief at 3).

248

to any *affirmative* "half-true" statements; thus, Cooley's position was, ultimately, the same as the plaintiff in *Ruth*, and he obtained the same result – summary judgment for defendants on his fraud claim.

**In sum**, an Iowa *Welding Fume* plaintiff cannot succeed on a claim for fraudulent misrepresentation that is premised solely upon alleged omissions in the defendants' warnings labels.[428]

**L.      Defendants' Motion for Summary Judgment on Plaintiff's Claims for Negligence under Mississippi Law – GRANTED.**

In the MDL bellwether trial of *Jowers*, the plaintiff brought claims under theories of: (1) common law negligence; and (2) strict liability, pursuant to the Mississippi Products Liability Act ("MPLA").  The defendants moved for summary judgment on the negligence claim, asserting the MPLA had abrogated common-law product-based claims, so a plaintiff seeking recovery for harm caused by a product could pursue only the statutory claim.

The Court observed that the "case law addressing defendants' argument has been mixed," with some cases finding that a negligence claim was "redundant" of a claim of inadequate warnings under the MPLA, while other cases "directly rejected" the conclusion that the MPLA abrogated common law claims.[429]  This Court then concluded "that the greater weight of the somewhat-mixed authority holds that negligence-based claims *of product defect* are abrogated by the MPLA."[430]  More important, it is clear that there is no error where a trial court instructs a jury only on an MPLA claim and not a negligence claim: under Mississippi law, "a claim of inadequate warnings under the MPLA requires the jury to perform

_____

[428]  Judge Dowd Court also granted summary judgment on plaintiff's fraud claims in *Mann*, where South Dakota law applied.

[429]  *Id.* at *2 (discussing several cases applying Mississippi law).

[430]  *Id.* at *4 (emphasis in original).

249

negligence analysis in assessing liability. * * * [When] the jury is instructed pursuant to the MPLA, the court need not present the jury with a separate negligence instruction on inadequate warnings."[431] Accordingly, the Court granted defendants' motion for summary judgment on plaintiff's claim of negligence, finding that it added nothing to the case in light of plaintiff's claim of strict liability under the MPLA.

**In sum**, where a *Welding Fume* plaintiff asserts claims for negligence pursuant to Mississippi common law and also strict liability pursuant to the MPLA, the Court may properly grant summary judgment to defendants on the common law claim because it is repetitive of the statutory claim.

### M.  Defendants' Motion for Summary Judgment on Plaintiff's Claims for "Aiding & Abetting" and "Acting in Concert" under California Law – GRANTED.

In addition to bringing product liability claims against the manufacturers of welding rods he actually used, a *Welding Fume* plaintiff may use legal theories, similar to the law of conspiracy, to assert claims against welding rod manufacturers whose products he did *not* use.  Two such legal theories are set out in *Restatement (Second) of Torts* §876.  Section 876**(a)** is the source of claims for "acting in concert," while §876**(b)** is the source of claims for "aiding and abetting":

> *§876.  Persons Acting In Concert.*
> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a)      does a tortious act in concert with the other or pursuant to a common design with him, or
> (b)      knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself
> * * * [432]

---

[431] *Id.* (quoting *Palmer v. Volkswagen of Am., Inc.*, 905 So. 2d 564, 600 (Miss. Ct. App. 2003)).

[432] 4 *Restatement (Second) of Torts* §876 (1977).

250

Essentially, a person is liable for aiding and abetting if he assists or encourages another person to breach a duty to a third person.  Similarly, a person is liable for acting in concert if he agrees to cooperate with another person to accomplish a particular result that is harmful to a third person.

Some *Welding Fume* plaintiffs assert that each defendant aided and abetted all of the other ones, because each defendant: (1) breached a duty to fully warn the plaintiff of the dangers of welding fumes, and to investigate the hazards associated with using welding rods; and (2) assisted or encouraged other defendants to (a) use "industry standard" warnings they knew were inadequate, and (b) fail to undertake scientific and medical investigations of the extent to which welding fumes could cause neurological injury. Ultimately, these plaintiffs assert each manufacturing defendant aided and abetted all of the others to *fail to warn* and *fail to investigate*.  Similarly, these plaintiffs assert each manufacturing defendant acted in concert with all of the others, and pursued a common design, to *fail to warn* and *fail to investigate*.  Using these legal theories, a plaintiff may name a manufacturing defendant even though he never used that defendant's welding rods – that is, he may (for example) name manufacturer BOC even though he never used BOC welding rods, asserting that BOC aided and abetted and acted in concert with defendant Lincoln, whose welding rods he did use.

In the MDL bellwether trial of *Tamraz*, defendants moved for summary judgment on the plaintiff's claims for aiding and abetting and acting in concert.  Applying California law, the Court granted the motion, noting that the California Supreme Court "has explicitly frowned upon use of any of the legal theories set out in §876 in the product liability context, where the plaintiff premises his claims on a failure to warn and failure to investigate."[433]  In particular, the California Supreme Court has observed that "it seems dubious whether liability on the concert of action theory can be predicated upon substantial

---

[433]  *Tamraz v. Lincoln Elec. Co.*, 2007 WL 3399721 at *6 (N.D. Ohio Nov. 13, 2007) (*Tamraz* docket no. 147) (citing *Sindell v. Abbot Labs.*, 607 P.2d 924 (Cal. 1980)).

assistance and encouragement given by one alleged tortfeasor to another pursuant to a tacit understanding to fail to perform an act."[434]  Although at least one California court has affirmed a plaintiff's verdict in a product liability case under a §876 theory of liability, the scope of the positive misrepresentations and false assurances by the defendants in that case (and plaintiffs' reliance thereon) made the case distinguishable.[435]

**In sum**, this Court has concluded that, absent additional evidence not adduced in *Tamraz*, a *Welding Fume* plaintiff's §876 claims will fail under California law.  It appears probable that the same result will adhere in *Welding Fume* cases governed by the law of other States, as well.  For example, following the Court's ruling in *Tamraz*, the plaintiff in the next MDL bellwether trial of *Jowers* (governed by Mississippi law) did not oppose a motion for summary judgment on his §876 claims.

### N.    Defendants' Motion for Summary Judgment on Plaintiff's Claim for "Negligent Performance of a Voluntary Undertaking" under Texas & California Law – GRANTED.

One of the legal theories upon which *Welding Fume* plaintiffs may premise a claim is set out in *Restatement (Second) of Torts* §323 (1965), entitled "Negligent Performance of Undertaking to Render Services."[436]  This *Restatement* section states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the

---

[434]  *Id.* at *7 (quoting *Sindell*, 607 P.2d at 606).

[435]  *See id.* at *7 n.16 (discussing *Henley v. Philip Morris Inc.*, 9 Cal.Rptr.3d 29 (Cal. Ct. App. 2004)).

[436]  Some *Welding Fume* plaintiffs also premise claims on *Restatement (Second) of Torts* §324A, entitled "Liability To Third Person For Negligent Performance Of Undertaking," but no party has yet presented the MDL Court with a summary judgment motion on such a claim.

252

undertaking.

Plaintiff Solis, whose MDL bellwether case was governed by Texas law and was the first to end with a jury verdict, relied on this theory and claimed the defendants "voluntarily assumed the duty and responsibility to report honestly and completely on all research regarding the hazards of manganese-containing welding consumables" and "pledged to do research, to understand the science, to protect all welders, and to garner welding expertise in their quest to be the world leaders in the welding industry."[437] Solis alleged the defendants then "breached this duty by failing to adequately test their products, [failing] to accurately report on research that was conducted, publishing and publicizing fraudulent science, and failing, in general, to prudently complete the responsibility which it publicly assumed."[438]

The Court found there was no evidence to support the allegation that any defendant had, in fact, undertaken "to report honestly and completely on all research regarding the hazards of" manganese-containing welding consumables.  Solis pointed to defendants' corporate mission statements and advertising, where defendants resolved "to do everything possible to protect" users of welding rods. Defendant Hobart's president, for example, announced his company "has an obligation to do everything it can to communicate to its customers how to safely use its products . . . it's our responsibility to make sure that our customers understand that absolutely, to the extent we can, how to safely use our products."[439] But this Court concluded these "statements merely acknowledge[d] [the defendants'] existing legal duties [to learn of and warn about their products' hazards]; they do not represent a voluntary obligation to

---

[437] *Solis v. Lincoln Elec. Co*., 2006 WL 1305068 at *4 (N.D. Ohio May 10, 2006) (*Solis* docket no. 98) (quoting Complaint at ¶57).

[438] *Id.* (quoting Complaint at ¶58).

[439] *Id.* at *5.

253

shoulder additional legal duties."[440]  Converting a company's aspirational mission or marketing statements into a special undertaking to inform the public about known product risks would subject every manufacturer to liability for a 'special duty' created by normal business practices.

**In sum,** a plaintiff cannot prevail on a claim under Texas law for negligent performance of a voluntary undertaking, pursuant to *Restatement (Second) of Torts* §323, if the only evidence of the alleged undertaking is a defendant's aspirational mission or marketing statements.  This is especially true where the plaintiff cannot show actual reliance on those statements.[441]  The same result will probably adhere when the law of other states is applicable, as well.[442]

### O.  Defendant's Motion for Summary Judgment on all of Plaintiff's Claims Based on Lack of Product Identification – DEPENDS.

As this MDL Court has recognized, "[i]t is elementary that in any action claiming injury from a product, the plaintiff must show causal connection between the defendant manufacturer and that product."[443]  Thus, for example, California case law decrees that, "to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced,

---

[440]  *Id.* at *6.

[441]  *Id.* at *6 n.4 ("there can be no voluntary undertaking claim based on the defendant company's procedure manual or company newsletter discussing the company's responsibilities, because the plaintiff 'did not have, and was not aware of, the contents of the manual or newsletter'") (quoting *Williford Energy Co. v. Submersible Cable Services, Inc.*, 895 S.W.2d 379, 386 (Tex. Ct. App. 1994)).

[442]  *Id.* at *6 (noting Pennsylvania case law standing for this same proposition).  The Court also granted a motion for summary judgment on plaintiff's claim for negligent performance of a voluntary undertaking in *Tamraz v. Lincoln Elec. Co.*, 2007 WL 3399721 (N.D. Ohio Nov. 13, 2007) (*Tamraz* docket no. 147) (applying California law).  Subsequently, in *Jowers*, the plaintiff did not oppose a motion for summary judgment on the same claim, and in *Byers* the plaintiff voluntarily dismissed the same claim.

[443]  *In re Welding Fume Prods. Liab. Litig.*, 526 F.Supp.2d 775, 796 (N.D. Ohio 2007) (master docket no. 2091) (quoting *Baughman v. General Motors Corp.*, 627 F.Supp. 871, 874 (D. S.C.1985)).

254

manufactured, sold, or was in some way responsible for the product."[444]  Similarly, Texas case law holds that "[a] fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury."[445]

In every MDL bellwether case so far, one or more manufacturer-defendants have moved for judgment as a matter of law based on the argument that the plaintiff adduced insufficient evidence of exposure to welding rods manufactured by that particular defendant.  In *Ruth*, for example, defendants BOC and TDY argued they were entitled to summary judgment "because there is absolutely no evidence in the record that Ruth used, or was otherwise exposed to, fumes from welding consumables manufactured and/or sold by [BOC or TDY]."  This is obviously a question of fact in every case.  Because welding rods are somewhat fungible, the parties often need to engage in discovery to determine which manufacturers' welding rods a plaintiff used during his career.  This discovery will include: (1) asking the plaintiff and his co-workers which welding rods he used while working on particular jobs and for particular employers; and (2) asking the employers and the employers' suppliers for business records reflecting welding rod purchases.

A plaintiff may respond to a manufacturer's summary judgment motion based on lack of product identification in one of two principal ways.  First, as occurred in the MDL bellwether case of *Ruth*, the plaintiff may simply move to voluntarily dismiss his claims against that defendant, implicitly acknowledging he has insufficient proof of substantial exposure to that defendant's welding rod products.  When moving for dismissal, the plaintiff will usually seek agreement from all remaining defendants that

---

[444] *Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending) (quoting *Garcia v. Joseph Vince Co.*, 148 Cal.Rptr. 843, 846 (Cal. Ct. App. 1978)).

[445] *Solis v. Lincoln Elec. Co.*, 2006 WL 1305068 at *3 (N.D. Ohio May 10, 2006) (*Solis* docket no. 98) (quoting *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989)).

255

they will not use the "empty chair" defense – that is, point to a dismissed defendant and argue some or all of the liability belongs to an absent party.  If, as occurred in *Ruth*, the defendants agree not to use the "empty-chair" defense, the Court will grant the motion to dismiss as unopposed (or stipulated) and deny the summary judgment motion as moot.  As occurred in the bellwether case of *Byers*, however, the defendants may not agree to eschew the "empty chair" defense, even though the defendants essentially agree there is a dearth of evidence showing the plaintiff used certain defendants' products.  In this circumstance, the motion for summary judgment requires a more formal ruling.[446]

Second, the plaintiff may oppose the motion by attempting to show the existence of a material issue of fact.  In the MDL bellwether case of *Solis*, for example, the plaintiff argued the facts allowed a jury to conclude his employer had purchased BOC/Airco welding rods from a certain supplier during the time he worked there, permitting an inference that he used BOC/Airco rods.  The Court concluded this argument was speculative on the evidence presented and granted summary judgment to BOC.

It is notable that a defendant may choose not to raise the issue of product identification in a summary judgment motion, yet later raise the issue at trial.  In the bellwether case of *Tamraz*, no defendant filed a motion for summary judgment based on product identification.  During trial, however, after the close of plaintiff's case, four of the five defendants moved for judgment as a matter of law, pursuant to

---

[446] In *Byers*, the Court granted motions for summary judgment to several manufacturer-defendants, either because: (1) the evidence that the plaintiff used that manufacturer's products was speculative; or (2) the evidence showed the plaintiff's use of that manufacturer's products during his career was so *de minimis* that no reasonable jury could find a causal link between the manufacturer and the plaintiffs' alleged injuries.  *Byers v. Lincoln Elec. Co.*, 607 F.Supp.2d 840, 860-66 (N.D. Ohio 2009) (*Byers* docket no. 379) (applying Texas law).

The Court also ruled that statements made by the dismissed defendants in their summary judgment briefs regarding the speculative or *de minimis* use of their products would be admitted at trial as admissions, if appropriate (given the defendants' unity of interest and joint defense posture).  The *Byers* defendants did not use the "empty-chair" defense at trial, so the plaintiff's use (or non-use) of the dismissed defendants' products never became an issue.

256

Fed. R. Civ. P. 50(a), arguing the trial proofs were insufficient to allow a jury to conclude the plaintiff had ever used their products. This Court reserved judgment on the trial motions and the jury found against all five defendants. The four defendants then renewed their "product-ID motions" and sought judgment notwithstanding the verdict, pursuant to Fed. R. Civ. P. 50(b). Ultimately, this Court granted BOC's motion for judgment as a matter of law based on insufficient proof at trial of product identification, but denied the motion filed by the other three defendants.[447]

**In sum**, to prevail on his product liability claims against a particular manufacturing defendant, a *Welding Fume* plaintiff must adduce sufficient evidence that he actually used that manufacturer's products. This evidence may be direct (e.g., testimony by the plaintiff and/or his co-workers that he used certain welding rod products) or circumstantial (e.g., documents showing the plaintiff's employer bought certain welding rod products during the time of the plaintiff's employ). Because many plaintiffs worked as welders for a variety of employers in different locations over many years, and because welding rods are somewhat fungible and are often provided to end users by employers without apparent product markings, the discovery of product identification evidence can be toilsome, and the results less than clear. Whether a given defendant is entitled to judgment as a matter of law based on lack of product identification is a highly fact-specific question, and the answer as to certain defendants in certain cases may not even become clear until after trial.

---

[447] *Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending). In a more-recent *Welding Fume* trial tried by the Honorable David D. Dowd, *Mann v. Lincoln Elec. Co.*, case no. 06-CV-17288, the court: (1) denied a motion for summary judgment where defendant Hobart argued there was insufficient evidence to allow a jury to conclude the plaintiff had suffered substantial exposure to welding fumes emitted by Hobart's products; but (2) granted a similar motion for directed verdict at the close of plaintiff's case, *see Mann* trial tr. at 1797-98 (May 17, 2010).

**P.** **Defendants' Motion for Summary Judgment on Plaintiff's Claim for Breach of Warranty under California Law – GRANTED.**

Some *Welding Fume* plaintiffs bring claims for breach of express warranty, alleging the defendants expressly warranted that welding rods were generally safe.  The plaintiff in the MDL bellwether trial of *Tamraz* asserted this claim and pointed to two sources of communication from the defendants that supposedly contained this warranty:  (1) the warning labels that came with the welding rods he used; and (2) various industry publications, such as welding literature written and disseminated by defendants.  The defendants moved for summary judgment under California law, arguing that: (1) these communications did not qualify as express warranties; and (2) the plaintiff could not show reliance on the warranties.

The Court first disagreed with the defendants' argument that statements on warning labels could never constitute express warranties.  Like many states, California law holds that a claim for breach of express warranty by a seller may be based on an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain," and there is no reason to assume such statements could never appear on warning labels.[448]  The Court agreed, however, that the defendants' *warning labels* contained no affirmation of fact or promise that could qualify as a warranty.  For example, the cautionary language "use adequate ventilation" is not an affirmation of fact, nor a promise that welders using a certain level of ventilation will *not* suffer injury; it is only an instruction that "adequate ventilation" is necessary to avoid injury.

The Court concluded, however, that some of the defendants' other publications *could* qualify as warranties – for example, the unequivocal statement in Lincoln Electric's Welding Handbook that "the fumes and smoke obtained when welding steel and ferrous alloys are not harmful."  Despite this

---

[448]  Cal. Com. Code § 2313(1)(a).  "California Uniform Commercial Code section 2313, regarding express warranties, was enacted in 1963 and consists of the official text of Uniform Commercial Code section 2-313 without change."  *Keith v. Buchanan*, 173 Cal. App.3d 13, 20 (1985).

258

conclusion, the Court granted summary judgment against the plaintiff in *Tamraz* because the Court found the defendants' second argument well-taken.  To succeed on a claim of breach of express warranty under California law, a plaintiff must show that the affirmations or promises became "part of the basis of the bargain."[449]  Plaintiff Tamraz pointed to no evidence suggesting he ever saw the industry publications at issue, much less that the affirmations they contained became a part of the basis of any bargain between himself and the manufacturing defendants.  Without this evidence, Tamraz's warranty claim failed as a matter of law and undisputed fact.

**In sum**, if a *Welding Fume* plaintiff asserts a claim for breach of warranty predicated on a State law that parallels Uniform Commercial Code §2-313, then the plaintiff cannot prevail unless he shows: (1) the defendant made affirmative statements to the plaintiff about the welding rods (2) which became "part of the basis of the bargain."  While some of the defendants' publications and marketing materials arguably qualify as the necessary affirmative statements, this Court has not seen a welder testify that these representations induced him to begin his career in welding, or to continue down that path, or to use or not use any specific product, or to take any particular level of care when welding.  Absent this evidentiary link that defendants' statements became the basis of a bargain with the welder-plaintiff, the defendants are entitled to summary judgment on a claim of breach of warranty.

### Q. Defendants' Motions for Summary Judgment on Plaintiffs' Claims for Design Defect under South Carolina and California Law – GRANTED.

Every *Welding Fume* plaintiff includes in his complaint a product liability claim for defective *warnings*, using theories of either "strict product liability for defective marketing" or "negligent failure to warn," or both.  Some plaintiffs also assert product liability claims for defective *design*, and these claims

---

[449]  Cal. Com. Code §2313(1)(a).

259

come in two species: (1) assertions that defendants' welding rods themselves are defectively designed, because they should have been formulated to emit less manganese in the welding fume; and (2) assertions that defendants' welding wire machines are defectively designed, because the machines should have incorporated a fume extraction device to mitigate a welder's fume exposure.[450]  Both species of defective design claim rest on the assertion that safer and technologically feasible alternative designs existed, but defendants did not use them.

In the third MDL bellwether trial of *Tamraz*, in which California law applied, the defendants moved for summary judgment on the plaintiff's design defect claim.  In California, there are two different tests for proving design defect – the "consumer expectation test" and the "risk-benefit test."  A court should instruct a jury on the consumer expectation test only in "cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design*."[451]  Generally, expert testimony is neither required nor allowed in cases where the consumer expectation test is invoked, because use of an expert "to demonstrate what an ordinary consumer would or should expect . . . would invade the jury's function."[452]

In contrast, in cases "where plaintiff's theory of defect seeks to examine the behavior of 'obscure

---

[450]  Welding consumables come in two main categories: (1) stick electrodes, which are relatively short; and (2) wire, which comes on spools in longer lengths.  When using stick electrodes, the welder has to pause periodically to attach a new stick to his welding apparatus; when using wire, the welder pauses to "reload" much less frequently.  Both stick and wire consumables give off fumes that contain manganese, with wire consumables generally producing more copious fumes.  The second specie of plaintiffs' design defect claim is directed at the machine which feeds wire to a welder's welding gun – plaintiffs assert the machine should have incorporated an integrated suction device to vacuum away fumes as they were produced at the gun.

[451]  *Soule v. General Motors Corp.*, 882 P.2d 298, 308 (Cal. 1994) (emphasis in original).

[452]  *Id.*

components under complex circumstances' outside the ordinary experience of the consumer, the consumer expectation test is inapplicable; and defect may only be proved by resort to the risk-benefit analysis."[453] When evaluating the adequacy of a product's design under the risk-benefit test, the jury may consider, "among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design."[454] Because these factors are "outside the ordinary experience of the consumer," expert testimony is necessary.[455]

In *Tamraz*, the MDL Court concluded – and, indeed, the parties agreed – that the appropriate test for the plaintiff's design defect claim was the risk-benefits test, and not the consumer expectation test. This meant that, to prevail, Tamraz had to offer expert testimony "regarding, for example, the degree of danger posed by a flux-cored arc-welding gun that does not have an integrated fume extractor, the mechanical feasibility and financial cost of adding a fume extractor to a welding gun, and the consequences to the gun and the welder and his employer that would result from adding a fume extractor."[456] Tamraz, however, did not offer any expert opinion going to these issues. Accordingly, the Court granted defendants' motion for summary judgment on his design defect claims.

The Court's analysis of the design defect claims in the MDL bellwether case of *Goforth*, where

---

[453] *McCabe v. American Honda Motor Co.*, 123 Cal. Rptr. 2d 303, 311 (Cal. Ct. App. 2002).

[454] *Barker v. Lull Engineering Co.* 573 P.2d 443, 454 (Cal. 1978)).

[455] *See Lester v. Barbosa Cabinets, Inc.*, 2006 WL 3365644 at *9 (Cal. Ct. App. Nov. 21, 2006) ("In a design defect case involving the risk-benefit analysis . . . , the jury necessarily relies heavily on the testimony of experts.").

[456] *Tamraz v. Lincoln Elec. Co.*, 2007 WL 3399721 at *5 (N.D. Ohio Nov. 13, 2007) (*Tamraz* docket no. 147) (appeal pending).

261

South Carolina law applied, was essentially the same.  Because the plaintiff offered "no evidence that has been presented by way of expert testimony that would support [a design defect] theory," the Court ruled that defendants were entitled to judgment on the design defect claim as a matter of law.[457]  In all of the other MDL bellwether cases where the plaintiff originally stated a design defect claim, the plaintiff dismissed the claim before trial.  More recently, however, plaintiffs have pursued additional discovery going to their design defect claims, and indicated an intention to retain an appropriate expert in future trials.[458]

**In sum**, unless and until a plaintiff tenders an expert who will offer admissible opinions addressing the existence of an alternative, feasible design, and the factors relevant under the applicable risk-benefits test, it is unlikely the design defect claims in any case remanded to a transferor court will remain viable for trial.

### R.    Defendants' Motions for Judgment as a Matter of Law on all of Plaintiff's Claims Based on Lack of Evidence of Overexposure – DENIED.

As noted earlier, *Welding Fume* defendants will always assert the defense at trial that the plaintiff has not proved specific causation.  For example, the defendants may assert the plaintiff did not sufficiently quantify: (a) how much welding fume exposure a person must suffer before he has an increased risk of contracting Manganese-Induced Parkinsonism; and/or (b) how much total welding fume exposure the plaintiff actually suffered, himself, during his career; and/or (c) how much of plaintiff's welding fume

---

[457]  *Goforth* pretrial tr. at 120 (Oct. 25, 2006).

[458]  In the MDL bellwether case of *Arroyo*, plaintiffs originally indicated an intent to pursue a design defect claim and designated a materials design expert.  The designation was untimely, however, and the Court granted a motion to strike the expert witness; accordingly, no design defect claim was presented to the jury in *Arroyo*, either.

262

exposure is attributable to each specific defendant.  To date, the Court has always denied defendants' motions for summary judgment and for directed verdict on this ground and allowed the jury to assess the evidence.[459]

If the jury finds for the plaintiff, it is likely the defendants will move for judgment as a matter of law on the ground that insufficient evidence of specific causation was presented at trial.  This circumstance occurred in all three of the MDL bellwether trials that ended in a verdict for plaintiffs: *Tamraz*, *Jowers*, and *Cooley*.  Defendants' post-judgment motions required the Court to undertake an extensive review of all of the evidence of specific causation adduced at trial, which generally included: (1) testimony from the plaintiff and his co-workers regarding the conditions of plaintiff's employment, including how often he welded, the welding products he used, the physical configuration of the areas where he worked, the amounts of ventilation available, the number of other welders nearby, and so on; (2) evidence from plaintiff's employers regarding these same matters, sometimes including documented exposure levels of welders; (3) testimony from expert industrial hygienists regarding the range of exposure levels to which welders are generally exposed, the range to which the plaintiff was exposed, and the threshold exposure levels at which the risk of neurological injury increases; and (4) documents authored by plaintiffs' employers, defendants, welding trade organizations, and occupational health organizations discussing all

---

[459] *See, e.g., Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724, 731-43 (S.D. Miss. 2009) (*Jowers* docket no. 459) (appeal pending) (denying a motion for judgment notwithstanding the verdict where defendants argued plaintiff had adduced insufficient evidence of causation); *Byers v. Lincoln Elec. Co.*, 607 F.Supp.2d 840, 853 (N.D. Ohio 2009) (*Byers* docket no. 379) (denying a motion for summary judgment where defendants argued plaintiff "has insufficient evidence regarding: '(1) what level of exposure to welding fumes – if any – causes neurological injury; and (2) whether [he] was exposed to fumes from each individual defendant's products at that level.'").

Notably, despite having denied summary judgment on causation grounds in *Byers* (applying Texas law), the Court explained its view that a post-judgment Rule 50 motion on the same grounds might be well-taken.  The *Byers* jury found for defendants, however, so the Court did not return to the issue. Further,

263

of these matters.

A recounting of the Court's detailed analyses of whether the evidence was sufficient in *Tamraz* and *Jowers* to support the jury's verdict in favor of each plaintiff – including, specifically, a determination that the plaintiff proved, more probably than not, specific causation – is beyond the scope of this Trial Template; a transferor court may wish to examine these evidentiary reviews by reading this Court's post-judgment opinions.[460]  It suffices to repeat here only certain statements the Court made in conclusion:

- "Mr. Tamraz was not required to quantify the amount of manganese fume he was exposed to; he was required only to prove he was exposed to amounts that exceeded safe levels.  * * *  Mr. Tamraz offered proof at trial that the products he used emitted fumes with high manganese levels; the frequency and regularity of his exposure to manganese fumes were both high; he was occasionally in situations with little ventilation; and his symptoms are entirely consistent with excessive manganese exposure.  Even though none of the parties' experts could define the threshold exposure amount for injury to occur, the only expert industrial hygienist who offered an opinion at trial opined that Mr. Tamraz was regularly and certainly exposed to amounts that exceeded safe levels, as defined by the current TLV.  And Mr. Tamraz's expert neurologist agreed with his treating neurologist, opining that these excessive exposures caused his symptoms.  These opinions enjoyed substantial evidence to support them, and that is all this Court must find to sustain the verdict."[461]

- "While defendants argue it is theoretically conceivable that 'the one and only cause of Mr. Jowers injury is his exposure to non-defendants' products,' defendants had every opportunity to make this argument to the jury and had the benefit of instructions requiring the jury to find each defendant, individually, was a proximate cause of harm to Mr. Jowers.  More important, the jury had the benefit of both direct and circumstantial evidence – including expert opinions and sufficient facts upon which those opinions could be reasonably and reliably based – from which it could conclude

---

[460]  *See Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 at *2-10 (N.D. Ohio, July 18, 2008) (*Tamraz* docket no. 192) (appeal pending); *Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724, 731-43 (S.D. Miss. 2009) (*Jowers* docket no. 459) (appeal pending).  The Court has not yet ruled on the post-judgment motions in *Cooley*.

[461]  *Tamraz*, 2008 WL 2796726 at *9 (footnotes omitted).  *See also id.* at *10 ("Indeed, given that defendants' own documents discuss the substantial likelihood that welders in 'most workplace atmospheres' will experience manganese exposure in excess of the threshold safety level of 0.2 mg/m$^3$ TLV, and given that about one third of the welders in the OSHA database were, at the time of measurement, experiencing manganese exposure in excess of the same TLV, any inferences and assumptions made by Mr. Tamraz's experts (and by the jury), based on the evidence at trial of Mr. Tamraz's actual workplace conditions and exposure, also had substantial evidentiary support.").

that the possibility defendants posit did not actually occur.  To the contrary, the evidence sufficed to allow a reasonable jury to infer and conclude that Mr. Jowers was regularly overexposed to manganese contained in fumes given off by welding consumables manufactured, in substantial part, by each defendant, and that the sum of those overexposures was a proximate cause of his injuries."[462]

### S.     Defendants' Motion for Judgment on Plaintiff's Claim for Punitive Damages as a Matter of Various States' Laws – DENIED.

In every MDL bellwether case, defendants have moved for judgment as a matter of law on plaintiffs' claims for punitive damages.  Defendants have so moved at the summary judgment stage pursuant to Fed. R. Civ. P. 56; after presentation of plaintiffs' case pursuant to Fed. R. Civ. P. 50(a); and after presentation of their own case, again pursuant to Fed. R. Civ. P. 50(a).  The essence of defendants' argument has always been that punitive damages are allowed in only the most egregious of circumstances and those circumstances are not present in any *Welding Fume* case.

This Court has denied every such motion, ruling it could not conclude as a matter of applicable

---

[462] *Jowers*, 608 F.Supp.2d at 740-41 (footnotes omitted).  *See also id.* at 739-40 ("The sum of this evidence, along with fair inferences, allowed a reasonable jury to reach two relevant conclusions.  First, Mr. Jowers' exposure to manganese did not exceed safe levels only at a single point in time, when he was using a particular welding consumable; rather, the jury could (and apparently did) conclude there were innumerable instances during his career when the manganese he inhaled from welding fumes exceeded the TLV of 0.2 mg/m$^3$.  * * *  Thus, there was substantial evidence to support a jury determination that, during the course of his 30-year career at Ingalls, Mr. Jowers suffered overexposure to manganese due to inhaling fumes from products manufactured by every substantial supplier of welding consumables to Ingalls – both defendants and non-defendants.

"Second, the effects of exposure to manganese are cumulative.  The jury could conclude that each and every overexposure that Mr. Jowers suffered added to the damage of that portion of Mr. Jowers' brain which governs voluntary movement.  There was substantial evidence to support a jury determination that the many overexposures Mr. Jowers suffered combined to cause a single, indivisible injury, a type of brain damage diagnosed by his treating neurologist as Manganese-Induced Parkinsonism.  No single exposure and no single welding consumable was, alone, the cause of Mr. Jowers' injury.").

State law that no reasonable jury could find the plaintiff was entitled to punitive damages.[463]  This remained true regardless of which State's law applied.  In four of the MDL bellwether cases over which the undersigned presided, these rulings were ultimately made moot when the juries entered verdicts in defendants' favor on plaintiffs' punitive damages claims.

In the MDL Court's bellwether trial of *Jowers*, however, the jury awarded punitive damages to the plaintiff under Mississippi law and defendants moved for judgment as a matter of law notwithstanding the verdict, pursuant to Fed. R. Civ. P. 50(b).[464]  Accordingly, this Court had to undertake a more detailed analysis of whether a reasonable jury had a legally sufficient evidentiary basis to find against a defendant on a claim for punitive damages under Mississippi law.  Specifically, the Court examined whether a reasonable jury could conclude, by clear and convincing evidence, that defendants acted with "gross negligence which evidences a willful, wanton or reckless disregard for the safety of others."  Ultimately, the Court denied the defendants' post-verdict motion for judgment as a matter of law, ruling that a reasonable jury could conclude there was sufficient evidence to support an award of exemplary damages.[465]

The Court's assessment included four essential conclusions.  First, defendants had argued that, even if the jury concluded their warnings were inadequate, defendants could not be liable for punitive damages as a matter of law because the defendants had provided *some* warning.  The Court rejected this

---

[463]  *See, e.g., Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *3 (N.D. Ohio Feb 27, 2006) (*Ruth* docket no. 183) (Mississippi law); *Solis* pretrial tr. at 179 (May 16, 2006) (Texas law); *Goforth* pretrial tr. at 121-23 (Oct. 25, 2006) (South Carolina law); *Tamraz v. Lincoln Elec. Co*., 2007 WL 3399721 at * 3-4 (N.D. Ohio Nov. 13, 2007) (*Tamraz* docket no. 147) (appeal pending) (California law); *Jowers v. BOC Group, Inc.*, 2009 WL 995613 at *10 (S.D. Miss. Apr. 14, 2009) (*Jowers* docket no. 460) (appeal pending) (Mississippi law); *Byers* pretrial tr. at 43-44 (Oct. 22, 2008) (Texas law).

[464]  The *Cooley* jury also awarded punitive damages, and defendants filed a post-judgment motion for judgment as a matter of law.  The Court has not yet ruled on this motion, which implicates Iowa law.

[465]  *See Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724, 743-68 (S.D. Miss. 2009) (*Jowers* docket no. 459) (appeal pending).

argument, holding that, even if the defendants' provision of *some* warning might otherwise suggest a lack of reckless disregard for others, a jury could still reasonably award punitive damages when that warning "fails completely to mention a *known* hazard."[466]

Second, defendants had argued that, because they (and the scientific community) had a good faith basis for disagreement regarding whether exposure to manganese in welding fumes is, in fact, hazardous, no jury could reasonably conclude they had a reckless disregard for the safety of others.  The Court rejected this argument as well, holding that, "the existence of this type of dispute – that is, how often a known hazard occurs and its severity – is *one factor* that should inform a jury's finding of whether a defendant acted with reckless disregard for the safety of others.  The Court disagrees with defendants' argument, however, that, under Mississippi law, the very existence of this type of dispute immunizes them from punitive damages altogether."[467]

Third, defendants had argued that, because their warnings conformed with established industry standards – such as OSHA's legal requirements, ANSI's industry standards, and the United States Navy's military specifications – they could not be found liable for punitive damages.  The Court agreed that, under Mississippi law, compliance with industry standards is relevant to whether a product is reasonably safe,

---

[466] *Id.* at 758 (different emphasis in original); *see id.* at 762 (discussing another case where, "[e]ven though the . . . defendant had given *some* warning regarding *some* hazards of using its product, it had given *no* warning about other, *known* hazards, and the jury reasonably concluded this failure showed a reckless disregard for the plaintiff's safety") (emphasis in original).

[467] *Id.* at *26; *see id.* ("Defendants were entitled to, and did, present evidence to the jury that there is a serious scientific dispute regarding the frequency with which welders suffer MIP [manganese-induced parkinsonism].  The jury weighed this evidence, along with other evidence regarding the severity of the harm posed by the hazard, the defendants' level of knowledge of the hazard, the defendants' public and private conduct, the extent to which the scientific research was funded by the parties, and the defendants' *mens rea* connected with their decision on whether and to what extent to warn.  The Court's review of all of this evidence leaves it with the conclusion that a reasonable jury could find the plaintiffs carried their heightened burden of showing that defendants engaged in 'misconduct coupled with a bad state of mind.'") (footnotes omitted).

267

and thus whether defendants' actions showed a reckless disregard for the safety of others.  But the Court also concluded that: (1) evidence existed to support plaintiff's argument that defendants' warnings did not, in fact, comply fully with industry standards; and (2) under Mississippi law, "[c]onformity with established industry standards, while evidence of whether a product is reasonably safe, may never be conclusive on the point."[468]

And fourth, the Court's review of the entire record revealed "substantial evidence from which a jury could reasonably conclude that, while the defendants (and the welding consumable industry generally) were acknowledging privately . . . that welding fumes could cause permanent neurological injury, the defendants were not being candid about this hazard with the general public for fear of how candor might affect sales."[469]  Ultimately, while "[a] jury could reasonably find that defendants did *not* act egregiously or with the requisite *mens rea*, and so were not grossly negligent to support an award of punitive damages," a jury "could also reasonably find, as it did, by clear and convincing evidence, that the defendants' actions manifested a willful, wanton or reckless disregard for the safety of others."[470]

The Court's analysis in *Jowers* was pursuant to Mississippi law, and the standards for imposition of punitive damages under the laws of other States may be more strict.[471]  But the Court's assessment in *Jowers* stands for the proposition that a ruling on a motion by defendants for judgment as a matter of law

---

[468]  *Id.* at *29 (quoting *Hall v. Mississippi Chem. Express, Inc.*, 528 So.2d. 796, 799 (Miss. 1988) (emphasis added)).

[469]  *Id.* at *13.

[470]  *Id.* at *29.

[471]  In the MDL bellwether trial of *Cooley*, the jury also entered an award of punitive damages. Defendants filed a post-trial motion for judgment notwithstanding the verdict, arguing, among other things, that the applicable law of Iowa on punitive damages is more strict than the applicable law in *Jowers*.  The MDL Court has not yet ruled on this motion.

268

on a *Welding Fume* plaintiff's claim for exemplary damages should normally be entered only after all of the evidence has been presented at trial.  This is especially true because the Court has determined that much of the evidence that would support a claim for punitive damages is also relevant and admissible for other purposes.

**In sum,** the Court has denied every motion made by defendants for judgment as a matter of law on claims for punitive damages in a *Welding Fume* case.  This is true regardless of the applicable State law, and regardless of whether the motion was made at the summary judgment stage or following a jury verdict in plaintiff's favor on a punitive damages claim.  Absent unusual circumstances, and given the extent and complexity of the evidence relevant to the issue in these cases, a transferor court should rule on a motion by defendants for judgment as a matter of law on a plaintiff's claim for exemplary damages only after all of the evidence has been presented at trial.

### T.	Plaintiffs' Motion for Attorney's Fees Following a Verdict of Punitive Damages under Mississippi Law – GRANTED.

In the MDL bellwether trial of *Jowers*, the jury found for plaintiffs on their claim for punitive damages.  Plaintiffs then filed a post-judgment motion for costs and attorney's fees, arguing Mississippi law provides that a fee award is appropriate following a jury verdict of punitive damages.  The Court ultimately agreed, dismissing four responsive arguments interposed by defendants.[472]

First, the Court easily concluded that  Mississippi state law, and not federal law, governed the

---

[472] *Jowers v. Lincoln Elec. Co.*, 608 F.Supp.2d 724, 774-84 (S.D. Miss. 2009) (*Jowers* docket no. 459) (appeal pending).

269

question of whether attorney fee awards were appropriate.[473]  Second, the Court turned aside defendants'

assertion that the question of attorney's fees should have been presented to the jury, and not left for post-

verdict determination by the Court.[474]  Third, the Court undertook an exhaustive review of Mississippi case

law to assess defendants' argument that plaintiffs had to advance a "special justification" for an award of

attorney's fees.  Contrary to defendants' contention, however, the Court observed that, "[o]ver and over,

the Mississippi Supreme Court, the lower state appellate courts, and federal courts applying Mississippi

law have all stated, quite simply and without more, that an award of attorneys' fees is appropriate when

punitive damages were warranted."[475]  Put differently, "as a general, almost universal, rule, '[w]here

punitive damages are awarded by the jury, attorney's fees are justified' under Mississippi law."[476]

Defendants' final argument was that plaintiffs' request for a total award of almost $2.2 million was

unreasonable.  Noting that defendants had arguably waived their right to challenge the reasonableness of

the fee request, the Court gave the defendants two choices: (1) stipulate that plaintiffs' request was

reasonable in amount, and waive the right to challenge on appeal the reasonableness of the amount, but

---

[473]  *See id.* at 775-76 ("Our cases have made it clear that in an ordinary diversity case, state rather than federal law governs the issue of the awarding of attorney's fees.") (citing *Shelak v. White Motor Co.*, 636 F.2d 1069, 1072 (5th Cir. 1981) and *Ashland Chemical Inc. v. Barco Inc.*, 123 F.3d 261 (5th Cir. 1997)).

[474]  *See id.* at 777-78 ("What Rule 54(d)(2)(A) requires is that a party seeking legal fees among the items of damages – for example, fees that were incurred by the plaintiff before the litigation begins, as often happens in insurance, defamation, and malicious prosecution cases – must raise its claim in time for submission to the trier of fact, which means before the trial rather than after.  Fees for work done during the case should be sought after decision, when the prevailing party has been identified and it is possible to quantify the award." (quoting *Rissman v. Rissman*, 229 F.3d 586, 588 (7th Cir. 2000), *cert. dismissed*, 531 U.S. 987 (2000)).

[475]  *Id.* at 780.

[476]  *Id.* at 783 (quoting *Mississippi Power & Light Co. v. Cook*, 832 So.2d 474, 486 (Miss. 2002)).

retain the right to challenge on appeal the Court's decision to grant the motion for a fee award in the first place; or (2) challenge the amount as unreasonable with a detailed written submission justifying that challenge, and also provide to the Court and opposing counsel all of their own counsel's hourly rates (and/or any other compensation mechanisms), and also figures disclosing the amount of time that each attorney and paralegal spent litigating the case.[477]  The defendants chose the first option.  Accordingly, the Court granted plaintiff's motion for the requested attorney fee award.

**In sum,** a plaintiff who obtains a verdict of punitive damages under Mississippi law will normally also be entitled to a post-trial award of attorney fees by the Court.  The amount of any such award, of course, must be reasonable under the appropriate standards.[478]  The Court is not aware of any other State where similar rules regarding the award of attorney's fees apply.

### U.    Plaintiffs' Motion for Judgment as a Matter of Law on Plaintiff's Claim for Loss of Consortium under Mississippi Law – DENIED.

In the MDL bellwether case of *Jowers*, the jury found for welder Robert Jowers on his claim for failure to warn and awarded him $1.2 million in compensatory damages.  The jury also found, however, against Mrs. Jowers on her claim for loss of consortium.  Plaintiffs filed a post-trial motion for judgment notwithstanding the verdict, noting that defendants had not even cross-examined Mrs. Jowers.  Plaintiffs asserted that, when there is uncontradicted evidence to support the wife's claim for loss of consortium, a jury verdict against the wife is a manifest error of law.

Plaintiffs' motion required the Court to reconcile two competing tenets of Mississippi law.  First,

---

[477]  *Id.* at 783-84.

[478]  The factors a Court applying Mississippi law must consider when determining the reasonableness of a fee are set forth in Rule 1.5 of the Mississippi Rules of Professional Conduct, and are discussed in *Mississippi Power & Light Co. v. Cook*, 832 So.2d 474 (Miss. 2002).

"evidence which is not contradicted by positive testimony or circumstances, and is not inherently improbable, incredible or unreasonable cannot be arbitrarily or capriciously discredited, disregarded, or rejected even though the witness is a party interested; and unless shown to be untrustworthy, is to be taken as conclusive, and binding on the triers of fact."[479]  Second, "even when [t]here is no evidence on the issue of consortium damages except the testimony of [the spouse] herself, . . .  the jury was free to disbelieve her."[480]  Ultimately, the Court was "loathe to set aside the jury's decision except in the most clear and egregious of circumstances," and concluded the case did not present that situation.[481]  Accordingly, even though the question presented was a close one, the Court denied the motion for judgment notwithstanding the verdict.

---

[479]  *Id.* at 771 (quoting *American Nat'l Ins. Co. v. Hogue*, 749 So.2d 1254, 1263 (Miss. Ct. App. 2000) and *Lucedale Veneer Co. v. Rogers*, 211 Miss. 613, 53 So.2d 69, 75 (1951)).

[480]  *Id.* at 771-72 (internal quotation marks omitted).

[481]  *Id.* at 774.

272

## XI.     TRIAL MATTERS.

It is for the transferor court to decide how to conduct the trial of its own *Welding Fume* case following remand of the case from this Court.  So that transferor courts might obtain some benefit from this Court's MDL bellwether trial experiences, however, the Court sets out several procedures it has used to good effect.

### A.     The Jury Venire; Jury Questionnaires; Voir Dire.

A transferor court presiding over a *Welding Fume* case may, of course, follow any voir dire and jury selection process with which it feels comfortable.  The MDL Court describes below the process it has followed in every MDL bellwether trial over which it has presided, simply to illustrate the routine with which the parties have become familiar.

The MDL Court normally seats a jury of nine for a *Welding Fume* trial, which usually lasts about three weeks.  This allows room to excuse three jurors during the course of trial due to emergency and still maintain a jury of six members – an unusual circumstance, but one that actually arose in the MDL bellwether trial of *Cooley*.  To obtain the jury, the Court calls a venire of about 55 potential jurors.

At the parties' joint request, the Court has directed the venire to fill out a juror questionnaire before trial.  Although the parties agree on most of the written questions, the parties sometimes require assistance from the Special Master to settle disputes over questionnaire content.  An example, editable copy of a questionnaire may be obtained from the Special Master or Liaison Counsel.

The Court normally asks venire members to report to the courthouse several days before trial to fill in the questionnaire, which takes about an hour.  The Court then provides copies of all filled-in questionnaires to counsel.  Specifically, the Court's clerks supply to each side one copy of a CD containing

273

PDF files of all the completed questionnaires.  The parties receive this CD the same day the venire finishes

filling in the forms. After some time to review the forms, the parties meet and determine whether there are

any venire members whom they agree should be struck for cause and not called back for voir dire, in light

of obvious hardships, disqualifications, or biases.  This process, which the Special Master oversees,

usually culls between five and ten venire members.[482]  The parties also flag for the Special Master any

sensitive issues about which they wish the Court to inquire at side-bar during voir dire.

Later, on the first day of trial, all remaining venire members are called to Court for voir dire.  The

Court spends a short amount of time making introductions and asking general questions, and then allows

each side about an hour for voir dire questioning, which may include follow-up examination on issues

revealed in the questionnaire and also any other relevant questions.[483]  Counsel may not use voir dire to

present argument in any way.  The Court then confers at side bar with individual venire members who

answered questions (either on the questionnaire or during voir dire) with information requiring further

inquiry in private.  Private inquiry at side bar may be appropriate because the information is sensitive and

personal in nature, or because of the risk that an answer stated in open court might taint the entire jury

(e.g., familiarity with news reports about the litigation, familiarity with Ohio-based defendants, strong

opinions regarding tort actions, and so on).

Following voir dire, the Court hears argument at side bar regarding for-cause strikes.  Only after

---

[482]  The Court also allows the parties to engage in limited "horse-trading" – that is, if plaintiffs believe venire member 17 should be struck for cause but defendants disagree, and defendants believe venire member 31 should be struck for cause but plaintiffs disagree, the parties may agree to make a trade and strike both.

[483]  This process is unusual for this Court.  In its non-MDL matters, the Court usually conducts the bulk of the voir dire, providing counsel for the parties only 20 minutes or so to follow up on the Court's extensive questioning.  In this MDL, the parties have asked for more time to interact with the jury during the voir dire process.

hearing argument from both parties regarding all venire members does the Court rule and strike any member for cause.   Typically, between five and ten venire members are stricken for cause.  The Court then allows each side five peremptory strikes (two more per side than the rules normally prescribe), which they make in alternating order.  The Court does not prohibit back-strikes.[484]  Assuming there is no successful *Batson* challenge,[485] the first nine remaining venire members are seated as jurors.

To summarize the numbers: the Court calls an initial venire of 55 members; between 5 and 10 are excused in light of their questionnaire answers; another 5 to 10 are excused for cause in light of their responses at voir dire; 10 more are excused through the use of peremptory challenges; and 9 jurors are seated.  There are also sometimes a few "no-shows" at different stages of the process.  This means that the venire includes about 15 more potential jurors than absolutely necessary, but the Court believes this cushion is required to accommodate the possibility of unusual circumstances.

Typically, this voir dire process takes up the morning of the first day of trial.  After a lunch break, the parties present opening arguments and the trial proceeds.

### B.  Time Limits.

To ensure efficient use of the Court's and the jury's time, the Court has imposed time limits on the parties.   Originally, the Court allowed 44 trial hours for each side, not including voir dire, opening statements, or closing arguments.  The Court has whittled that number down and is now allowing each side

---

[484] In other words, plaintiffs may use a peremptory strike on venire member 7, defendants may then use a peremptory strike on venire member 13, and plaintiffs may then "go back" and use a peremptory strike on venire member 2.

[485] *Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that striking of veniremen in criminal trials must be for race-neutral reasons); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) (extending the *Batson* rule to civil trials); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (extended *Batson* to gender-based peremptory challenges).

275

30 trial hours.  The Special Master tracks the running totals of the time used and reports these figures to the parties at the end of each trial day.[486]  A *Welding Fume* trial will normally last about three weeks, depending on holidays, how long the jury deliberates, length of trial days, and so on.

### C.  Introduction of Witnesses; Note-Taking by Jurors; Witness Order Disclosure; Exchange of Demonstrative Exhibits.

The Court has adopted a number of procedures to make the trial easier for the jurors, the attorneys, and the Court.

Because of the length and complexity of a *Welding Fume* trial, the Court has suggested to the parties that, during trial, they give a brief introduction of each witness, explaining how their testimony fits within the entire presentation of proofs.  This introduction and explanation is meant only to provide context to the jurors – it is not an opportunity for interim argument.  As an example, rather than simply introduce a witness by name, an attorney may say something along these lines:

- Our next witness is John Doe.  Mr. Doe is a welder and he worked with the plaintiff at Blackacre Industries during the 1990s.  Mr. Doe is going to testify about what the workplace conditions were like at Blackacre when the plaintiff worked there, and also about the safety training that he and the plaintiff received.

- You will now hear from Dr. Jane Roe.  Dr. Roe is an expert neuro-radiologist who specializes in reading images of the brain, like PET scans and CAT scans.  Dr. Roe is going to explain what the scans of the plaintiff's brain show.  Dr. Roe works at the Blackville Clinic with Dr. Loe, the neurologist who testified yesterday about the plaintiff's blood tests.

These factual introductions have been helpful to both the Court and the jury.  Counsel is also permitted to remind the jurors regarding other witnesses who testified earlier on similar issues, sometimes with

---

[486]  To track trial time, the Special Master has used a "chess clock" and has also used the time-signatures that are automatically inserted in the Court Reporter's real-time transcript.  The latter method has proved more accurate and reliable, especially in connection with allocation of time used on direct and cross-examination in video depositions played at trial.  Time spent during Court discussions with counsel outside the presence of the jury is not allocated.

testimony contrary to that about to be proffered, so the jury can connect the testimony of a particular witness with the relevant testimony of others.  In some bellwether trials, the parties have provided to the deliberating jury a picture-book containing the names and photographs of all the witnesses, in order of appearance.

Further, the Court allows jurors to take notes during the presentation of proofs.  Given the length of the trial and the extreme complexity of the medical testimony, it would be very difficult for jurors to deliberate intelligently without notes.  The Court does not allow note-taking during opening statement and closing argument, however, as these presentations are not evidence.  Also, jurors must leave their notebooks in the jury room when they leave the courthouse during the trial.

Another facet of trial procedure meant to make things easier for counsel involves ongoing witness disclosure.  Specifically, the Court has ordered the parties to disclose, at the end of each day, which witnesses they will call to testify the next day and the order in which they will be called.[487]  This reduces the element of surprise and trial by ambush, allowing both sides to prepare intelligently during evening hours for the next trial day.

Similarly, the Court has urged the parties to come to agreement regarding exchange of demonstrative exhibits.  For example, the parties usually agree to supply to opposing counsel copies of demonstrative exhibits they intend to use on direct examination by 10:00 p.m. on the day before they will be used for the first time.[488]  The parties may or may not agree to also supply opposing counsel with demonstrative exhibits they intend to use on cross-examination.  The Court requires the parties to disclose

---

[487]  Of course, the parties must identify all potential witnesses well before trial and may not add new witnesses to their witness list during trial.  The in-trial exercise described above is an additional courtesy the Court requires the parties to extend to one another.

[488]  This late hour is one proposed by the parties.

277

to opposing counsel any demonstratives that will be used during opening statement.  Again, these agreements are meant to reduce the element of surprise, to improve the quality of trial preparation, and to avoid gamesmanship.

### D.      Bifurcation.

No party has moved for bifurcation in a *Welding Fume* case, and the Court has never found any reason for bifurcation.  To the contrary, in the bellwether trial of *Jowers*, which was tried under Mississippi law, the parties agreed that bifurcation was neither necessary nor appropriate, even though bifurcation would probably have been required if the case was tried in Mississippi state court.[489]  This Court has concluded that bifurcation would not serve any useful purpose in any of the *Welding Fume* trials so far conducted.[490]

### E.      Videotaped Trial Deposition Transcripts.

Typically, the parties present testimony at trial from a number of fact and expert witnesses using videotaped trial deposition transcripts.  The Court explains here the protocol it follows regarding the parties' use of videotaped trial transcripts of fact witnesses, simply to illustrate the routine with which the

---

[489] As stated by the *Jowers* plaintiffs: "The Parties agree that a bifurcated trial would neither serve convenience nor avoid prejudice . . . . * * * Nonetheless, the Court should know that for proceedings in Mississippi *state* courts, punitive damages 'must' be bifurcated from the compensatory phase of trial. Miss. Code. §11-1-65; *Bradfield v. Schwartz*, 936 So.2d 931, 938 (Miss. 2006) (Miss. Code '§11-1-65 insulates a jury from hearing and considering both the issue and the evidence regarding punitive damages until after it has decided the case-determinative issue regarding the culpability of the defendant.)'." Plaintiffs' trial brief at 2 (*Jowers* docket no. 404) (emphasis in original).

[490] *See, e.g., Jowers* trial tr. at 456-59 (Feb. 8, 2008) ("There is no reasoned basis, I believe, to bifurcate here to the extent that there are issues of liability, damages, and perhaps at the end punitive damages.").

278

parties have become familiar.  Transferor courts may choose to follow a different protocol.

Before a videotaped deposition is played in Court, both parties: (1) designate those portions of the transcript they want presented to the jury; and (2) assert objections to the other side's designations, if any. The Court then rules on the objections, and the parties edit the videotape accordingly – to include all those designated portions where there was no objection or an objection was overruled.  The parties typically give the Court a printout of the deposition transcript, with plaintiff's designations highlighted in one color and defendants' designations highlighted in another color.  The parties then mark the portions to which they object, and write a very short basis for their objection in the margin.  The Court writes "overruled" or "sustained" next to the objections, and the parties then file this marked-up transcript on the docket, to preserve their objections for the record.

The Court has concluded it would be confusing to the jury for each party to present in its case-in-chief only the portions of a deposition that *it* designated, and not those portions designated by the opposing party.  Accordingly, a party wishing to present a videotaped deposition of a fact witness in its case-in-chief must show to the jury, all at once, *all* of the designated portions of the videotaped deposition, including those designated by the opposing party.  The only two exceptions to this rule are: (1) if one party's designations are very short and the other party's designations are extensive, the Court may allow the first party to present only the short designations, alone; and (2) when the plaintiff wants to play in its case-in-chief portions of a videotaped deposition of *a party opponent on cross-examination,* the defendant may not force the plaintiff to present concurrently defendant's own designations.  Rather, the defendant must

present testimony from that witness (whether by videotape or live) in its own case-in-chief.[491]

**F.      Admission of Evidence.**

This Court follows the practice of addressing final admissibility of exhibits only after all of the

evidence has been tendered – that is, after the defendants have rested.  After the presentation of proofs is

complete, the Court requires the parties to meet and confer and, to the extent possible, agree on which of

their exhibits will be admitted and presented to the jury during deliberations (subject to preservation of

any of the parties' earlier objections and motions in limine).  The Court then rules on those remaining

exhibits that one side wants admitted but the other does not agree.  This process is facilitated by the

Court's having directed the parties at the start of trial that it is their responsibility to keep a running chart

of all exhibits used during the course of trial.  This chart is eventually filed on the docket, along with the

Court's rulings on admissibility.  Using this process allows for a quicker and more efficient presentation

of proofs during the course of the trial and usually results in fewer admissibility disputes, because the

parties can consider each piece of evidence in the context of the totality of the proofs offered.[492]

---

[491] The Court usually explains this last issue to the jury when it occurs.  *See, e.g., Cooley* trial tr. at 542 (Sept. 16, 2009) ("When a party calls the opposing party's representative, the client representative in their case-in-chief, they have the right to do so as on cross-examination.  So Mr. Shelton was essentially calling Airco on cross-examination.  So when that happens, the defendants have no right at that point in time to question the witness.  You will see this happen more than once, and the defendants may choose at later points in time to recall those same witnesses and have their own discussion and present that testimony on direct.  But in those limited situations in which a plaintiff calls the opposing party in their case-in-chief, they have the right to do that on cross, and the questioning stops at the end of that cross. It's a bit of a complicated procedural thing that occurs in cases, but I wanted to make sure that you know it's not that the defendants are being gagged or that they wouldn't have had some questions that they might have asked in the normal course.").

[492] On certain occasions a motion in limine to exclude evidence has been denied with the caveat that a proper foundation be laid at trial.  On those occasions, the Court has addressed the admissibility of the document at side bar before the document is shown or described to the jury, but after the offering party has proffered a foundation for its use.

Following these rulings, the Court directs the parties that it is their responsibility to: (1) collect all, and only, those exhibits that have been admitted; and (2) double-check to ensure this exhibit collection does not include any exhibit that has been excluded.  This collection is then given to the jury once it retires to deliberate.

The parties' agreements regarding admissibility of exhibits has been informed by the Court's rulings, during the course of the MDL bellwether trials, on the following categories of documents:

- Curriculum Vitae – in order to save trial time by shortening the foundational testimony of expert witnesses, the Court allows experts' C.V.s to go back to the jury.[493]

- Learned Treatises – although the parties may refer to medical articles and learned treatises in trial while examining expert witnesses, these documents are admitted into evidence only if an expert explicitly states it is something he relies upon, or if the proofs at trial showed a specific article goes to notice to a defendant.  The parties will often come to agreement on the admissibility of medical articles and learned treatises, including articles from NIOSH.  Textbooks are normally sent to the jury in their entirety, as opposed to just excerpts.[494]

- Medical Records – the Court does not admit the entirety of a plaintiff's voluminous medical files.  Rather, the Court is inclined to admit only those pages that are referred to specifically at trial.  The parties will often come to agreement on the admissibility of a limited number of additional medical records.[495]

- Discovery Responses – the Court does admit a party's interrogatory responses and its admissions to requests for admission.  The Court does not allow a parties' denial of a request for admission to be referenced at trial or to go to the jury.[496]

- Regulations – the Court does not admit regulations promulgated by OSHA, such as the HazCom Standard (29 C.F.R. §1910.1200), although it does quote certain provisions of those regulations in the Jury Instructions.  The Court does admit copies of American National Standard Z49.1, which are mentioned in the defendants' warnings and referred to often at trial.

---

[493]  *See Solis* trial tr. at 3175 (June 20, 2006).

[494]  *See Solis* trial tr. at 3182-94 (June 20, 2006); *Goforth* trial tr. at 4283-87 (Nov. 27, 2006); *Jowers* trial tr. at 3003-10, 3020 (Mar. 2, 2008); *Byers* trial tr. at 3392-95 (Nov. 21, 2008).

[495]  *See Solis* trial tr. at 3194-200 (June 10, 2006); *Tamraz* trial tr. at 2683-95 (Nov. 20, 2007).

[496]  *See Goforth* trial tr. at 4274-75 (Nov. 27, 2006); *see* footnote 294.

281

- <u>Demonstrative Exhibits</u> – the Court does not allow demonstrative exhibits to go back to the jury unless the parties agree otherwise.[497]

- <u>Expert Reports</u> – the Court does not admit experts' reports into evidence or allow the jury to view them.

A list of non-case-specific exhibits that have been admitted in MDL bellwether trials is attached as Appendix Five.

### G.    Jury Instructions and Verdict Forms.

The MDL Court has so far presided over bellwether trials involving application of the law of five different states: Mississippi, Texas, South Carolina, California, and Iowa.  Thus, the Court has drafted Jury Instructions setting out the applicable law of these jurisdictions, along with accompanying Verdict Forms.

While the parties usually agree with many of the Court's Jury Instructions, they do not necessarily agree with all aspects of them.  For example, the defendants in the *Tamraz* trial have appealed the plaintiff's verdict and asserted the Court did not instruct the jury properly regarding the sophisticated user defense under California law; similarly, the defendants in the *Jowers* trial have appealed the plaintiff's verdict and asserted the Court did not instruct the jury properly regarding apportionment of fault under Mississippi law.

Nonetheless, transferor courts may find some of the format and language contained in this Court's various bellwether trial Jury Instructions and Verdict Forms useful.  Courts may obtain editable copies of these Instructions and Verdict Forms from the Special Master or Liaison Counsel.

Two aspects of these Instructions and Verdict Forms are notable.  First, the Court always engages in a lengthy "charge conference," allowing the parties to offer comments upon, proposed amendments to,

---

[497] *See Goforth* trial tr. at 4275-77  (Nov. 27, 2006); *Jowers* trial tr. at 3011-17 (Mar. 2, 2008).

282

and objections to the Court's draft instructions.  During these charge conferences, the Court often provides lengthy explanations for particular charging decisions, which depend upon the evidence presented and the State law at issue.  These explanations are documented in the transcript and preserved for reference by transferor courts, as well as for appellate purposes.

Second, the bellwether trial Verdict Forms have directed the jury, where applicable, to enter only a single award of compensatory damages, payable jointly from all defendants – as opposed to separate awards, payable by each defendant.  In each case, this result was requested and agreed to by the defendants before the Court charged the jury.[498]  In contrast, the Verdict Forms direct the jury, where applicable, to enter separate awards of punitive damages against each individual defendant.

---

[498] *See Tamraz v. BOC Group, Inc.*, 2008 WL 2796726 at *24 (appeal pending) ("the actual, final Verdict Form in *Solis* directed the jury simply to: (1) determine whether each defendant, individually, was liable for failure to warn; and (2) if there was any liability, determine a total amount of compensatory damages.  This Verdict Form allowed for entry of no individualized, defendant-specific damage amounts in the Court's final judgment.  Although the defendants never explained explicitly why they preferred this approach, the Court assumed it was because, well before the inception of the Welding Fumes MDL, the defendants (and other welding consumable manufacturers) had entered into a judgment-sharing agreement.") (footnote omitted).

**XII.   CONCLUSION.**

Over the last several years, the undersigned has presided over six MDL bellwether trials and numerous evidentiary, procedural, and substantive hearings; further, the Court has issued dozens of written opinions, and hundreds of oral rulings, addressing and resolving innumerable disputes related to the trial of a *Welding Fume* case.

This "Trial Template" document attempts to synthesize, organize, and summarize most of those issues and rulings, to assist other trial judges in transferor courts and state courts who may preside over the trial of a *Welding Fume* case.

Beyond doubt, variations on these issues, and also entirely new issues, are sure to arise during future trials of other *Welding Fume* cases.  To the extent this Trial Template does not provide sufficient assistance, the MDL Judge and the Special Master remain available and committed to providing any help other judges may require.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: June 4, 2010

284