UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: WELDING FUME PRODUCTS LIABILITY LITIGATION | Case No. 1:03-CV-17000 (MDL Docket No. 1535) <br><br> JUDGE O'MALLEY <br><br> **MEMORANDUM AND ORDER** |

Currently pending in this Multi-District Litigation ("MDL") are several hundred cases. In all of these lawsuits, the plaintiffs allege: (1) they inhaled fumes given off by welding rods; (2) these fumes contained manganese; (3) this manganese caused them permanent neurological injury and other harm; and (4) the defendants knew or should have known that the use of welding rods would cause these damages. Although the complaints in these cases and the theories of liability they recite are not identical, the plaintiffs generally bring claims sounding in strict product liability, negligence, fraud, and conspiracy. The gravamen of the complaints is that the defendants failed to warn the plaintiffs of the health hazards posed by inhaling welding fumes containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged in the welding process.

One of the defendants named in these complaints is Illinois Tool Works, Inc. ("ITW"). In addition to bringing claims directly against ITW, plaintiffs also allege that ITW is vicariously liable as a successor-in-interest to two companies that became ITW's subsidiaries: Miller Electric Manufacturing Company ("Miller Electric") and Hobart Brothers Company ("Hobart").

ITW now seeks summary judgment in its favor on all claims, in every case pending in this MDL where it is a named defendant (master docket no. 2134). For the reasons stated below, the motion is **GRANTED** and ITW is **DISMISSED** as a party in this litigation.[1]

## I. Facts.[2]

Knowledge of the dangers of manganese in welding fumes has developed from the 1930s to today. One of the first suggestions that manganese in welding fumes could be hazardous appeared in a 1932 report.[3] Various publications reiterated these warnings, noting that manganese poisoning can destroy the neuro-muscular system and lead to permanent disabilities.[4] Over the next 30 years, entities in the welding industry debated whether to provide warning labels on welding rods.[5] Eventually, in 1967, the American Welding Society (AWS), which included as members a number of defendants, adopted a mandatory warning label for welding rods stating that welding fumes may be hazardous.[6] Plaintiffs allege that certain defendants, through their AWS membership, conspired with other defendants to hide the hazards of welding fumes over the years.[7]

---

[1] There is a minor exception to this ruling in the event that discovery provides a plaintiff with a factual basis to reinstate claims against ITW. *See* Section IV.A. of this opinion, below.

[2] This Court has previously stated in detail the historical and factual background relevant to this MDL. *See, e.g.*, *In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605, at *3–9 (N.D. Ohio April 9, 2007) (granting summary judgment to Metropolitan Life Insurance Company) ("*MetLife*"); *In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d 775, at 778–95 (N.D. Ohio 2007) (granting summary judgment to Caterpillar, Inc.) ("*Caterpillar*"). These two opinions are incorporated here in their entirety, especially the reasoning employed. The facts relevant to ITW's pending motion for summary judgment are only summarized here.

[3] *Caterpillar*, 526 F. Supp. 2d at 779.

[4] *Id.*

[5] *Id.* at 780.

[6] *Id.* at 782.

[7] *Id.* at 784.

For most of this time, ITW—which was founded in 1912 as a manufacturer of metal cutting tools—had no involvement in the welding industry.[8] It was not until the 1990s that ITW acquired companies involved in the industry. Three such acquisitions are relevant here.

First, in 1993, Miller Electric, which manufactures and sells welding machines, became a wholly owned subsidiary of ITW.[9] This occurred through a stock-acquisition agreement: ITW purchased the issued and outstanding capital stock of The Miller Group, Ltd., a Wisconsin holding company that owned all of Miller Electric's capital stock.[10] Under the agreement, the Miller companies were to operate "as separate business units and maintain their identity."[11] Moreover, ITW did not assume any of Miller Electric's liabilities.[12]

Second, in 1996, Hobart, which manufactures welding consumables, also became a wholly owned subsidiary of ITW.[13] This occurred through a "reverse triangular merger": ITW created a wholly owned subsidiary that merged with Hobart, and Hobart then survived as a wholly owned subsidiary of ITW.[14] This had the same effect as the stock purchase of Miller Electric: ITW obtained the issued and outstanding capital stock of Hobart, but Hobart retained its own assets and was to continue to conduct business as it had before the acquisition.[15] Additionally, ITW did not assume any of Hobart's liabilities.[16]

---

[8] Affidavit of E. Scott Santi ("Santi Aff.") ¶¶ 3, 4.

[9] *Id.* ¶ 6.

[10] *Id.*

[11] Miller Stock Acquisition Agreement at 23, ¶ 4.10.

[12] Santi Aff. ¶ 7.

[13] *Id.* ¶ 9.

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶ 11.

Third, in June 1998, ITW purchased the capital stock of Arcsmith, Inc., which owned a business known as National Torch Tip Co.[17] National Torch Tip, in turn, included two divisions (Natweld and Hi-Alloy) that purchased welding consumables from manufacturers, rebranded them, and sold them to distributors.[18] For the first six months after the purchase, Arcsmith (like Miller Electric and Hobart) was a wholly owned subsidiary of ITW.[19] On December 31, 1998, however, Arcsmith sold its assets (including Natweld and Hi-Alloy) to ITW.[20] As of this date, then, sales of products from Natweld and Hi-Alloy were attributable to ITW. ITW acknowledges that "sales of welding consumables may have occurred" at that time, though it states it has no records of such sales.[21] In any event, this arrangement was short lived: ITW sold the assets of Natweld and Hi-Alloy to another entity three months later, in March 1999.[22]

## II. Procedural History.

Plaintiffs across the country brought various suits against companies in the welding industry alleging liability for manganese-related injuries, and the cases were consolidated in this MDL. On October 31, 2004, this Court entered an order requiring all plaintiffs to complete a Fact Sheet to provide basic information about their claims, including the welding products that each plaintiff used.[23] None of the Fact Sheets stated that plaintiffs used or were exposed to welding consumables manufactured, supplied, or distributed by ITW (or by Natweld or Hi-Alloy when they were part of ITW). ITW has moved for summary judgment on all claims in all cases.

---

[17] *Id.* ¶ 15.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] ITW's Mem. in Support of Summ. J. at 12.

[22] Santi Aff. ¶ 15.

[23] Master Docket no. 405.

4

### III. Legal Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.[24] A fact is "material" only if its resolution will affect the outcome of the lawsuit.[25] Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."[26]

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.[27] Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."[28] The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that would create a genuine issue of material fact.[29] The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not

---

[24] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[26] *Id.* at 252.

[27] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[28] *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).

[29] *Fulson v. City of Columbus*, 801 F. Supp. 1, 6 (S.D. Ohio 1992).

enough for the non-moving party to show that there is some metaphysical doubt as to material facts.[30]

### IV. Analysis.

In response to ITW's motion for summary judgment, plaintiffs begin with two threshold challenges to the entirety of the motion and then provide further opposition with respect to the individual claims. These points are addressed in turn.

#### A. Plaintiffs' Challenges to the Entirety of ITW's Motion.

First, plaintiffs contend that ITW's motion should be denied because ITW did not include a choice-of-law analysis for the various claims. Plaintiffs rely on this Court's statement that "choice-of-law constraints are constitutionally mandated because a party has a right to have her claims governed by the state law applicable to her particular case."[31] Of course, if a party would be entitled to summary judgment under every potentially applicable state's law, the choice-of-law analysis is unnecessary. For example, if there is no evidence that plaintiffs were injured by a product that was manufactured or sold by ITW, there can be no product liability under any state's law.[32] As explained in more detail in the next section, none of the state laws that might apply here allow for ITW's liability in this MDL. Accordingly, the court will not deny summary judgment for want of a choice-of-law analysis.

Second, plaintiffs contend that the motion should be denied because they have not yet had an adequate opportunity for discovery. In ITW's motion for leave to obtain a briefing

---

[30] *Id.*

[31] *In re Welding Fume Prod. Liab. Litig.*, 245 F.R.D. 279, 291 (N.D. Ohio 2007).

[32] *Caterpillar*, 526 F. Supp. 2d at 796 n.98 ("Regardless of the theory which liability is predicated upon . . . it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold or was in some way responsible for the product, and this rule is supported in all of the cases examined in this annotation [of product-liability cases].") (citation omitted).

6

schedule, ITW asserted that "[n]o additional discovery is needed to enable this Court to rule on ITW's proposed motion for summary judgment."[33] When other defendants had previously filed similar motions, plaintiffs opposed the motions when they believed additional discovery was needed.[34] Here, however, plaintiffs did not object; to the contrary, they filed a proposed stipulated briefing schedule.[35] Accordingly, plaintiffs have waived this argument, and summary judgment will not be denied or postponed on this basis.[36]

In any event, to the extent that further discovery reveals newly disclosed facts supporting the dismissed claims, plaintiffs retain the ability to reinstate them under the same terms as this Court has stated before:

> The Court understands that, in this MDL, the parties' practice has been to undertake final discovery regarding the specific welding products used by a particular plaintiff only when a given case is set for trial, and further that this additional discovery may uncover evidence that a particular plaintiff did, in fact, use or suffer injury attributable to [an ITW]-branded welding rod. If this situation occurs, that individual plaintiff may then move to amend his complaint to more specifically name [ITW] as a defendant to a product liability claim. *Cf.* Peripheral Defendant Order (master docket no. 1824), exh. A at 6 (discussing "re-institution of claims against previously dismissed peripheral defendants"). The same is true with respect to other product-based claims (e.g., a negligence claim based on the sale of a product, discussed below, or a claim for breach of product warranty). To this limited extent, and only because of the discovery practices peculiar to this MDL, the Court's dismissal of the product liability claims against [ITW] is

---

[33] Master docket no. 2123 at 4.

[34] *See, e.g.*, master docket no. 1485 (opposition to MetLife's motion); master docket no. 1381 (opposition to Caterpillar's motion).

[35] Master docket no. 2126.

[36] *See Players, Inc. v. City of New York*, 371 F. Supp. 2d 522, 533 (S.D.N.Y. 2005) (denying continuance of summary judgment motion where plaintiff stipulated to briefing schedule); *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 550 (S.D.N.Y. 2007) (rejecting request for further discovery before summary judgment ruling because plaintiff had "opportunity to seek relief from the Court but failed to do so").

> without prejudice to the possible, albeit unlikely, request for reinstatement of those claims.[37]

Indeed, ITW acknowledges this point: "In the unlikely event that any of the plaintiffs discover that they used or were exposed to Natweld or Hi-Alloy welding consumables sold by ITW during the relevant time period, then, consistent with the protocol of this litigation and with the relief permitted under Rule 56(f), that plaintiff can reinstate his product liability claims against ITW."[38]

With these threshold issues resolved, the Court turns to the merits of ITW's motion with respect to its argument that it is entitled to summary judgment on the individual claims alleged against it.

### B. The Individual Claims.

Plaintiffs raise various tort claims directly against ITW (which included Natweld and Hi Alloy during the relevant time in 1999). Plaintiffs also allege ITW is vicariously liable as the successor to Hobart and Miller Electric, as well as pursuant to a veil-piercing theory.

#### 1. Direct Liability.

Plaintiffs raise six types of claims against ITW directly: (a) product liability; (b) conspiracy; (c) negligent undertaking; (d) negligent misrepresentation; (e) fraudulent concealment; and (f) concert of action, and aiding and abetting. Summary judgment is appropriate for ITW on all of these claims.

##### a. Product liability.

Plaintiffs bring four product-liability claims: negligence, negligent sale of product, strict liability, and breach of warranty. The essence of these claims is that ITW failed to adequately

---

[37] *Caterpillar*, 526 F. Supp. 2d at 796 n.99.

[38] Master docket no. 2146 (ITW's reply brief at 12).

warn plaintiffs of the hazards of manganese in welding fumes emitted from ITW welding consumables.[39] But not one of the plaintiff's Fact Sheets identify an ITW product as one the plaintiff used (nor does any Fact Sheet identify a Natweld or Hi-Alloy product for the period that ITW controlled them in 1999).

"It is elementary that in any action claiming injury from a product, the plaintiff must show causal connection between the defendant manufacturer and that product."[40] "There can be no product liability claim against a defendant where there was no use of the defendant's product."[41] Accordingly, aside from the exception noted earlier regarding possible reinstatement of claims, ITW is entitled to summary judgment on all the product-liability claims against it.

### b.   Conspiracy.

Plaintiffs also allege that, beginning in the late 1930s and continuing to the present, many "Defendants created committees within trade organizations and then used the committees to fraudulently and negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures."[42] Plaintiffs further allege that "Defendants combined with each other, and non-defendants[,] to engage in unlawful conduct."[43] This is a civil conspiracy claim.[44] All states generally agree that a civil

---

[39] *See, e.g.*, Luiting Compl. ¶¶ 97–98, 107–108, 114, 119 (Case Nos. 1:05-cv-18008, 1:03-cv-17000); Peruchetti Compl. ¶¶ 134, 153–54, 170, 181 (Case No. 1:03-cv-17000).

[40] *Caterpillar*, 526 F. Supp. 2d at 796.

[41] *Id.*

[42] Luiting Compl. ¶¶ 28, 31.

[43] *Id.* ¶ 75.

[44] These portions of the complaint also raise a fraudulent concealment claim, discussed below.

conspiracy requires (1) an object to be accomplished, (2) a meeting of the minds on the object or course of action, (3) one or more overt acts, and (4) damages as the proximate result.[45]

Plaintiffs have not adduced sufficient evidence to create a genuine issue of material fact suggesting that ITW—which had no involvement in the welding industry until 1993—agreed to join a conspiracy that plaintiffs contend began in the 1930s. The second element of a conspiracy claim—a "meeting of the minds"—occurs "when the parties reach a unity of purpose of common design and understanding . . . . There must be a preconceived plan."[46] Plaintiffs fail to identify any evidence tending to show that ITW or any ITW employee entered into any such agreement. Indeed, this Court already rejected similar claims against Caterpillar, which—unlike ITW—was a member of the trade organizations and could have been present when other defendants decided to engage in tortious acts.[47] There is no evidence that allows a reasonable jury to conclude ITW joined any such alleged conspiracy. Accordingly, summary judgment on this claim is appropriate.

### c. Negligent undertaking.

Plaintiffs allege generally that "defendants" in this MDL, as members and participants in the welding trade associations, voluntarily undertook the duty "to inform and apprise plaintiff[s], [plaintiffs'] employers, OSHA and other governmental agencies . . . , the welding industry, and the public health community of all issues relating to the health and safety of welders and welding fumes."[48]

---

[45] *MetLife,* 2007 WL 1087605, at *9.

[46] *Caterpillar*, 526 F. Supp. 2d at 802 (quoting 15A C.J.S. *Conspiracy* § 12 (Feb. 2007)).

[47] *Id.*

[48] *See, e.g.*, Luiting Compl. ¶ 176.

Claims for negligent performance of an undertaking can be based on two provisions of the Restatement (Second) of Torts (1965).  First, § 323, entitled "Negligent Performance Of Undertaking To Render Services," provides for liability where the plaintiff is the direct beneficiary of the defendant's voluntary undertaking:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Second, § 324A, entitled "Liability To Third Person For Negligent Performance Of Undertaking," provides for liability where the plaintiff is a third party who is injured by the defendant's voluntary undertaking to another:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform][49] his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

ITW is entitled to summary judgment under either provision.  Under both sections, the plaintiffs must establish that ITW undertook a duty to render services for their protection.[50]  Plaintiffs have identified no statement by ITW suggesting that it undertook such a duty, nor have

---

[49] The Restatement uses the word "protect" instead of "perform," but this is a typographical error. *Hill v. United States Fidelity and Guaranty Co.*, 428 F.2d 112, 115 n.5 (5th Cir. 1970).

[50] *See Caterpillar*, 526 F. Supp. 2d at 798; *see also Paz v. California*, 994 P.2d 975, 980 (Cal. 2000) ("Section 324A's negligent undertaking theory of liability subsumes the well-known elements of any negligence action," including a duty to plaintiff).

11

they shown a relationship with ITW that would create such a duty.[51]  Moreover, ITW's alleged participation in the welding trade associations does not create a duty to the end users of the welding products.[52]  Indeed, ITW (which has relationships to the trade association through some employees, but is itself not a member), is even further removed from liability under these theories than the trade association members themselves.  Accordingly, ITW is entitled to summary judgment on the plaintiffs' claims of negligent performance of a voluntary undertaking.

### d. Negligent misrepresentation.

To establish negligent misrepresentation, a plaintiff must generally show: (1) the defendant had a duty to exercise reasonable care in the giving of information; (2) the defendant supplied false information; (3) with reasonable reliance by the plaintiff upon the information given; and (4) the plaintiff suffered damages proximately caused by the defendant's negligence.[53]  To show that ITW had a duty to plaintiffs, the plaintiffs must establish a fiduciary or other special relationship between ITW and themselves.[54]  In this case, however, there is no evidence of any relationship (fiduciary or otherwise) between plaintiffs and ITW.  Nor is there

---

[51] *Cf. Caterpillar*, 526 F. Supp. 2d at 798 ("[P]laintiffs identify no statement made by Caterpillar directly to any plaintiff suggesting that Caterpillar explicitly undertook a duty to that plaintiff.  Nor does any plaintiff suggest he and Caterpillar had a fiduciary or other special relationship . . . that might impose a duty."); *Solis v. Lincoln Electric Co.*, 2006 WL 1305068, at *7 (N.D. Ohio May 10, 2006) (rejecting same claims).

[52] *See Caterpillar*, 526 F. Supp. 2d at 798–99 (concluding that the trade association's mission statements do not represent legally binding undertakings, that each organization belonging to the association is even further removed from these statements, and that the trade associations themselves have no duty to users of products in the trade).

[53] *MetLife,* 2007 WL 1087605, at *7 (citing 37 Am. Jur. 2d *Fraud and Deceit* § 128 (Jan. 2007)).

[54] *Chiarella v. United* States, 445 U.S. 222, 228 (1980) ("[T]he duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.").

12

any evidence that any plaintiff relied upon any information supplied by ITW (as opposed to Hobart or Miller Electric). As noted, there is not even any evidence that plaintiffs used any ITW products. In short, there is no evidence of a negligent misrepresentation made by ITW to plaintiffs, so ITW is entitled to summary judgment on this claim as well.

### e. Fraudulent concealment.

The same is true for the fraudulent-concealment claims. "There is general agreement in all states that, to maintain an action for damages for fraud by reason of concealment, the following elements must generally be present: [1] an actual concealment [2] of a material fact [3] with knowledge of the fact concealed [4] with intent to mislead another into relying upon such conduct [5] followed by actual reliance thereon by such other person having the right to so rely [6] with injury resulting to such person because of such reliance."[55] Moreover, the plaintiff must establish that the defendant had a duty to communicate the concealed information.[56] As noted earlier, there is no evidence of any relationship (fiduciary or otherwise) between plaintiffs and ITW and, thus, no evidence of any duty flowing from ITW to plaintiffs. Accordingly, summary judgment is appropriate on the MDL plaintiffs' fraudulent concealment claim.

### f. Concert of action, and aiding and abetting.

The theoretical foundation for these claims is set out in § 876 of the Restatement (Second) of Torts. Subsection (a) describes concert of action; subsection (b) describes aiding and abetting:

> § 876. Person Acting in Concert.

---

[55] *MetLife*, 2007 WL 1087605, at *7 (internal quotation marks and alterations deleted) (citing 37 Am. Jur. 2d *Fraud and Deceit* § 200 (May 2006)).

[56] *Chiarella*, 445 U.S. at 228; *see also MetLife,* 2007 WL 1087605, at *9 (rejecting fraudulent-concealment claim and noting that defendant had no duty to provide information to plaintiffs).

13

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other . . . .[57]

To act in concert, there must be an agreement: "Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result."[58] As noted earlier, the Court concludes that no reasonable jury could find ITW acted in accordance with an agreement to cooperate with any other defendant in this case (including its own subsidiaries, Hobart and Miller Electric) to commit a tortious act.[59] Accordingly, ITW is entitled to summary judgment on claims that it acted in concert.[60]

To be liable as an aider and abettor, a defendant must "act with the intention of advancing the tortious activity."[61] Moreover, the defendant must knowingly give "substantial assistance"

---

[57] 4 Restatement (Second) of Torts § 876 (1977).

[58] *Caterpillar*, 526 F. Supp. 2d at 806 (quoting 4 Restatement (Second) of Torts § 876, cmt. a (1977)).

[59] It is questionable whether a parent corporation can conspire, act in concert with, or aid and abet its own wholly-owned subsidiary. *See American Needle, Inc. v. National Football League*, 2010 WL 2025207 at *7 (May 24, 2010) ("a parent corporation and its wholly owned subsidiary 'are incapable of conspiring with each other for purposes of § 1 of the Sherman Act'") (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984)); *Williamson v. Ocwen Loan Servicing, LLC*, 2009 WL 5205405 at *4-5 (M.D. Tenn. Dec. 23 2009) (noting that, "[a]s a general matter of conspiracy law, a company cannot conspire with its corporate affiliates or employees," but acknowledging contrary authority). Even if the Court were to adopt the minority view that the law recognizes such conspiracies, it remains true that, on the undisputed facts presented, no reasonable jury could conclude ITW conspired, aided and abetted, or acted in concert with its own subsidiaries to engage in a tortious act.

[60] *Cf. Caterpillar*, 526 F. Supp. 2d at 807 (same conclusion regarding Caterpillar).

[61] *Id.* (quoting *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1496 (8th Cir. 1997) (alterations deleted)).

that proximately results in the harm.[62] Mere knowledge that a tort is being committed and the failure to prevent it do not constitute aiding and abetting.[63] Here, plaintiffs have not pointed to any acts of substantial assistance or encouragement by ITW to commit a tortious act. Given that there is no genuine dispute of material fact, ITW is entitled to summary judgment for these claims as well.

*　　　　*　　　　*

In sum, ITW is entitled to summary judgment on each claim asserted against it on a direct theory of liability. ITW is therefore also entitled to summary judgment on any derivative claims, such as loss of consortium, medical monitoring, and punitive damages. The remaining question is whether ITW can be held vicariously liable for alleged torts committed by Hobart and Miller Electric.

### 2. Vicarious Liability.

In addition to asserting claims against ITW directly based on plaintiffs' alleged use of welding rods manufactured or sold by ITW, plaintiffs also seek to hold ITW vicariously liable for the alleged torts of Hobart and Miller Electric. Plaintiffs allege ITW is liable as "a successor in interest to Hobart and Miller."[64] The purpose of successor liability is to ensure that claimants are not left without recourse against an entity simply because the entity sells all of its assets or changes its corporate form.[65] Successor liability enables claimants to seek recourse from the

---

[62] *Id.*

[63] *Id.* (quoting *Fiol v. Doellstedt*, 58 Cal. Rptr. 2d 308, 313 (Cal. Ct. App. 1996)).

[64] *See, e.g.*, Peruchetti Compl. ¶ 21 ("ITW is liable as a successor in interest to Hobart and Miller, and is responsible for the conduct of said predecessor entities . . . .").

[65] *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478, 487 (8th Cir. 1992) ("The purpose of corporate successor liability is to prevent corporations from evading their liabilities

15

successor that has replaced or entirely taken over the original entity. Of course, if the original entity still exists, there is no successor—and no successor liability.[66]

There can be no successor liability in these MDL cases because Hobart and Miller Electric still exist and continue to operate separately as subsidiaries of ITW. ITW simply purchased their issued and outstanding capital stock, while each retained its liabilities. Moreover, courts have recognized that the "reverse triangular merger," by which ITW obtained Hobart, does not result in the parent company (ITW) assuming the liabilities of the acquired company (Hobart).[67] Even if plaintiffs are correct that Hobart, Miller Electric, and ITW have

---

(continued…)

through changes of ownership."); *see also* Restatement (Third) of Torts: Product Liability, § 12 cmt. b (1988) (discussing this rationale for successor liability).

[66] *See, e.g., White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 772 (E.D. Texas 2002) ("[I]t is axiomatic that to establish corporate successor liability there must in fact be a corporate successor."); *Roy v. Bolens Corp.*, 629 F. Supp. 1070, 1073 (D. Mass. 1986) (holding that successor liability doctrine does not apply where acquired company remains in existence). Even to the extent the law on successor liability differs from state to state, it remains a bedrock principle that, if the original entity still exists, there is no successor—and no successor liability. This remains true even in states that have adopted more lenient doctrines of successor liability. *See Guerrero v. Allison Engine Co.*, 725 N.E.2d 479, 487 (Ind. Ct. App. 2000) (holding that "a successor corporation is liable only when the predecessor corporation no longer exists," and noting that a "similar requirement is found [even] among that minority of states applying the [more-lenient] product-line exception"); *White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 774 (E.D. Tex 2002) (noting the California Supreme Court adopted a more lenient approach to successor liability because "sale and dissolution of the old company destroyed the plaintiff's remedies against the original manufacturer, thus leaving the plaintiff with . . . no remedy"—a justification that does not apply when the original manufacturer "remain[s] in existence"); *Conway v. White Trucks, Div. of White Motor Corp.*, 885 F.2d 90, 95 (3rd Cir. 1989) ("If a remedy against the original manufacturer was available, however, the consumer has not been obliged to bear the risk[,] and the justification for imposing successor liability evaporates").

[67] *See, e.g.*, *In re McKesson HBOC, Inc., Secs. Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) ("[A] 'reverse triangular merger' of the sort performed here (merger of target with a specially formed subsidiary of the acquirer, which then becomes the sole shareholder of the newly merged subsidiary), does not effect a 'de facto' merger unless the transaction has been structured to disadvantage creditors or shareholders.") (citing *Orzeck v. Englehart*, 195 A.2d 375, 378 (Del. Ch. 1962)); *see also Binder v. Bristol-Myers Squibb Co.*, 184 F. Supp. 2d 762, 769–72 (N.D. Ill. 2001).

overlapping operations (e.g., employee participation in a single pension plan, use of the same vendor for payroll services, and sharing of executive personnel), this does not mean that Hobart and Miller Electric ceased to exist. Indeed, plaintiffs have not created a genuine issue of fact suggesting that Hobart or Miller Electric are unable to pay their claimants—the driving concern behind successor liability. Other courts have rejected similar claims of successor liability based on ITW's acquisitions of Hobart and Miller Electric.[68] This Court does so as well. In short, if plaintiffs have viable claims against Hobart and Miller Electric, plaintiffs can pursue those claims against Hobart and Miller Electric—not against ITW.

Instead of pressing the successor liability theory stated in their complaints, plaintiffs now contend that ITW can be vicariously liable for alleged acts of Hobart and Miller Electric based on a veil-piercing theory. That is, in their response brief, plaintiffs change the focus of their argument from successor liability to veil piercing, arguing that Hobart and Miller Electric, though still in existence, have corporate structures that are "largely ignored by ITW" such that plaintiffs should be entitled to pierce these corporate veils and reach ITW's assets for compensation. This is a new theory of liability: "Successor liability . . . and corporate veil-piercing, while based on many overlapping factors, are separate legal doctrines with distinct legal consequences."[69] "Unlike its veil-piercing cousin, successor liability does not speak to an existing relationship between the corporation and its current owner, but to the relationship between the corporation and its predecessor . . . ."[70]

---

[68] *See, e.g.*, *Grant v. Illinois Tool Works*, No. 04-21112 (Cook Cty., Ill., Aug. 3, 2005) (master docket no. 2135-11) (rejecting this argument in welding fume case).

[69] *Carter Enters. v. Ashland Specialty Co.*, 257 B.R. 797, 801 (S.D. W. Va. 2001); *see also id.* ("This case is *not* about corporate veil-piercing . . . .") (emphasis in original).

[70] *Id.*

None of the plaintiffs' complaints, however, allege facts that can support a veil-piercing theory under any state's law. For example, plaintiffs did not allege facts suggesting that ITW and these two subsidiaries are, as plaintiffs now argue, a "single business enterprise," or that ITW is simply their "alter ego."[71] Accordingly, the complaint is deficient regarding a veil-piercing theory.[72]

Moreover, the failure to allege these facts in the complaint cannot be cured by raising them for the first time in opposition to a motion for summary judgment, as plaintiffs do here. "District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour," such as those raised in opposition to a summary judgment motion.[73] This is a sound approach, because the earlier failure to allege the theory or claim leaves the defendant without notice. Indeed, other courts have rejected similar attempts to invoke the veil-piercing theory at the summary judgment stage when it was not alleged in the complaint.[74] This result is

---

[71] *Cf.* response brief (master docket no. 2138) at 36–38 (listing factors of corporate control not alleged in any complaint but that courts generally consider under a veil-piercing theory, including the following: common stock ownership; common directors or officers; common business departments; consolidation of financial statements; financing of the subsidiary; whether the parent incorporated the subsidiary; whether the subsidiary operates with grossly inadequate capital; and whether the parent pays salaries and other expenses of the subsidiary).

[72] *United States ex rel. Pilecki-Simko v. Chubb Inst.*, No. 06-3562, 2010 U.S. Dist. LEXIS 27187, at *38–52 (D.N.J. March 22, 2010) (rejecting veil-piercing theory despite allegations that parent companies "exclusively controlled" subsidiary, where complaint failed to allege other essential facts, such as whether the subsidiary was "grossly undercapitalized"); *see also Scarbrough v. Perez*, 870 F.2d 1079, 1084 (6th Cir. 1989) ("Neither the original complaint nor the amended complaint . . . alleged that [the acquired company] was the mere instrumentality or alter ego of [the acquirer], or that [the acquired company's] separate existence ought to be disregarded.") (rejecting veil-piercing theory).

[73] *Carr v. Gillis Assoc. Indus., Inc.*, 227 F. App'x 172, 176 (3rd Cir. 2007) (citing cases that disallow the plaintiff from raising claims for the first time in opposition to a summary judgment motion).

[74] *See, e.g.*, *United States v. Atlas Minerals & Chems.*, No. 91-5118, 1993 U.S. Dist. LEXIS 18411, at *17–18 (E.D. Pa. Dec. 7, 1993) ("Plaintiff's pursuit of the alter ego theory in this regard is commendable; however, as the defendant[s] point out in their [summary judgment]

even more appropriate in this MDL context, where litigation and discovery has been ongoing for over six years.

Here, because plaintiffs alleged only a successor liability theory and made no factual allegations to support veil piercing, they cannot proceed on the veil-piercing theory.  And because there can be no successor liability on the undisputed facts, ITW is entitled to summary judgment on plaintiffs' claims that it is vicariously liable for the alleged torts of Hobart and Miller Electric.[75]

## V.    Conclusion.

Plaintiffs' claims against ITW under theories of direct liability cannot succeed because there is no evidence that plaintiffs were harmed by an ITW product or that ITW had a duty to plaintiffs.  Moreover, ITW cannot be vicariously liable as a successor to Hobart and Miller Electric, because those companies still exist.  Finally, plaintiffs did not allege in their complaints

---

(continued…)

memorandum, the use of this theory in order to pierce the corporate veil is inappropriate where the complaint offers no allegations to put the defendant on notice."); *Klein v. Colorado 126 P'ship*, No. 90-A-560, 1991 Bankr. LEXIS 1649 (Bankr. N.D. Ill. May 6, 1991) ("The primary basis of plaintiffs['] . . . opposition to the motion for summary judgment is that [the defendant] should be held liable under the piercing the corporate veil theory.  This theory, however, was never pled in the compl[ai]nt and is simply not an issue in this proceeding."); *cf. United States ex rel. Beattie v. Comsat Corp.*, No. 96-966, 2001 U.S. Dist. LEXIS 26185, at *13 (M.D. Fl. April 18, 2001) ("While . . . the aforementioned allegation does not properly allege a claim for abuse of the corporate form/veil piercing, the . . . allegation does appear to set forth a claim for successor liability . . . .").

[75] Even if plaintiffs had alleged facts supporting a veil-piercing claim, summary judgment would likely still be warranted, as there is scant evidence that ITW's control over Hobart and Miller Electric has been exercised in such a way as to commit "fraud, an illegal act, or a similarly unlawful act."  *See Dombroski v. Wellpoint, Inc.*, 895 N.E.2d 538, 545 (Ohio 2008) (stating veil-piercing requirements in Ohio, where Hobart is incorporated); *Consumer's Co-op. of Walworth Cty. v. Olsen*, 419 N.W. 2d 211, 217–18 (Wisc. 1988) (stating similar veil-piercing requirements in Wisconsin, where Miller Electric is incorporated).  While plaintiffs adduce substantial evidence that ITW, Hobart, and Miller Electric have ignored aspects of their corporate forms and act as a single business enterprise, there is no evidence tending to show that ITW has done so in pursuit of fraud.

19

any facts that would support a veil-piercing theory, nor do plaintiffs suggest that ITW has exercised control over Hobart or Miller Electric in pursuit of fraud.  Accordingly, ITW's motion for summary judgment is **GRANTED** and all claims against it are **DISMISSED**.

    **IT IS SO ORDERED.**

    /s/ Kathleen M. O'Malley
    **KATHLEEN McDONALD O'MALLEY**
    **UNITED STATES DISTRICT JUDGE**

**DATED**: June 11, 2010